# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| O.O., by his parent and next friend CLAUDIA PABO, et al., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :  Civ. Action No. 07-1863(JDB) |
| | : |
| DISTRICT OF COLUMBIA, et al., | : |
| | : |
| Defendants. | : |

## ADMINISTRATIVE RECORD

Attached is an index and the record of the administrative proceedings at issue in this action.

Respectfully submitted,

PETER NICKLES
Interim Attorney General for the District
 of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ *Edward P. Taptich*
EDWARD P. TAPTICH (012914)
Chief, Equity Section 2

/s/ *Veronica A. Porter*
VERONICA A. PORTER (412273)
Assistant Attorney General
441 4th St., N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-6651
(202) 727-3625 (facsimile)
veronica2.porter@dc.gov

January 11, 2008

## O.O. v. District of Columbia, Civ. Action No. 07-1863

### Index of Record

|  | Page |
|---|---|
| 1. Certification of Record | 1 |
| 2. Hearing Officer's Decision, 11/5/07 | 2-15 |
| 3. Reply to DCPS Closing Argument, 8/9/07 | 16-20 |
| 4. DCPS Closing Statement, 8/6/07 | 21-25 |
| 5. Letter from Eig requesting confirmation of Closing Arguments, 8/3/07 | 26-28 |
| 6. Closing Argument on Behalf of Child and Parent, 8/2/07 | 29-35 |
| 7. Letter from Eig to H.O. Banks, 6/8/07 | 36 |
| 8. Letter from Eig to Newsome requesting confirmation that hearing scheduled for 4/18/07 was taken off of the calendar, 4/4/07. | 37-38 |
| 9. Letter Motion for Continuance, 3/13/07 | 39-40 |
| 10. DCPS Supplemental Disclosure Statement, 3/7/07 | 41-42 |
| 11. DCPS-16 Review of Independent Evaluation, 7/11/06 | 43-45 |
| 12. DCPS-17 Solomon letter to C. Brown, 8/18/06 | 46-47 |
| 13. DCPS-18 Letter from C. Brown to C. Pabo, 8/10/06 | 48 |
| 14. DCPS-19 Fax cover sheet, 7/13/06 | 49-50 |
| 15. DCPS-20 IEP, 8/10/06 | 51-66 |
| 16. DCPS-21 MDT Meeting Notes, 8/10/06 | 74-94 |
| 17. Plaintiff's Disclosure letter, 3/7/07 | 95-96 |
| 18. Letter from Eig to H.O. Banks re: missing transcript |  |

testimony, 3/2/07                                                              97

19. Due Process Hearing Notice 2/9/07                                          98

20. Transcript of Hearing, 3/14/07                                             99-256

21. Hearing Officer's Third Interim Order, 2/8/07                              257-259

22. Letter from Eig to Newsome re: continuance, 2/8/07                         260-261

23. Letter from Eig supplementing disclosure, 2/5/07                           262

24. OO-19, IEP, Speech & Language Recommendation, and MDT

    Meeting Notes dated 11/14/06                           263-292

25. Letter Motion for Continuance from Eig, 1/31/07                            293-295

26. Parent's Response to DCPS' Memorandum on Placement

    Authority, 1/24/07                                      296-298

27. DCPS Memorandum on LEA Placement Authority, 1/19/07                        299-317

28. Due Process Hearing Notice, 1/16/07                                        318

29. Hearing Officer's Corrected Second Interim Order, 1/19/07                  319-322

30. Letter from Eig to DCPS regarding previous disclosures, 1/9/07             323-324

31. Due Process Hearing Notice, 12/4/06                                        325

32. Transcript of Hearing, 1/16/07                                            326-561

33. Hearing Officer's Interim Order, 11/17/06                                  562-565

34. Letter from Eig to Newsome re: December 5, 2006 date, 11/17/06             566-567

35. Letter from Eig to Newsome, objecting to DCPS disclosure

    documents delivered on 11/8/06 after business hours, 11/10/06   568-569

36. Parent's Opposition to DCPS Motion for Summary Decision,

    11/10/06                                                 570-575

37. DCPS' Opposition to Parent's Motion for Summary Decision
and DCPS Cross-Motion for Summary Decision, 11/9/06     576-581

38. Declaration of Dr. Eve Byford-Peterson, 11/9/06     582-584

39. Kingsmore v. DC, CA 05-7156 (DC Cir. September 29, 2006)     585-590

40. Parent's Motion for Pre-Hearing Summary Decision and
Opposition to DCPS Motion to Dismiss, 11/8/06     591-603

41. Resolution Meeting Notes, 9/26/06     604

42. Declaration of Claudia Pabo, 11/7/06     605-607

43. Due Process Complaint Notice, 9/14/06     608-612

44. Due Process Complaint Disposition, 9/26/06     613-614

45. Declaration of Marlene Gustafson, 11/2/06     615-616

46. Declaration and Resume of Laura Solomon, 11/6/06     617-621

47. DCPS Disclosure Statement, 11/8/06     622-624

48. DCPS-01 Notarized Statement of Dr. Ruffin, 11/7/06     625

49. DCPS-02 Prior Notice and MDT Notes, 11/8/06     626-631

50. DCPS-03 IEP and MDT Notes, 11/8/06     632-658

51. DCPS-04 Prior Notice and MDT Notes, 8/30/06     659-668

52. DCPS-05 IEP and MDT Notes, 8/30/06     669-694

53. DCPS-06 Occupational Therapy Evaluation Report, 10/23/06     695-703

54. DCPS-07 Social Work Evaluation Report, 8/31/06     704-711

55. DCPS-08 Educational Evaluation, 5/30/06     712-717

56. DCPS-09 Classroom Observation, 7/10/06     718-721

57. DCPS-10 Speech and Language Evaluation Report, 5/18/06     722-728

58. DCPS-11 Report of Neuropsychological Evaluation, 5/3/06     729-755

59. DCPS-12 Prior Notice and MDT Notes, 9/21/06     756-760

60. DCPS-13 Contact Log, 6/06-8/06     761-762

61. DCPS-14 Confirmation of Meeting Correspondence, 11/2/06     763-766

62. DCPS-15 MDT Meeting Invitation, 9/8/06     767-769

63. DCPS Motion to Dismiss, 11/7/06     770-779

64. Petitioner's 5-day Disclosure Letter, 11/7/06     780-781

65. OO-1 Request for Due Process Hearing, 9/14/06     782-786

66. OO-2 Letter from Eig to Brown, Shaw JHS, 9/21/06     787-788

67. OO-3 Letter from Eig to Brown, Shaw JHS, 9/18/06     789

68. OO-4 Letter from Eig to Brown, Shaw JHS, 9/8/06     790

69. OO-5 Letter from Eig to Brown, Shaw JHS, 8/15/06     791

70. OO-6 Occupational Therapy Evaluation Report, 10/23/06     792-798

71. OO-7 Supplementary Evaluation, 8/16/06     799-808

72. OO-8 Supplementary Evaluation, 8/9/06     809-819

73. OO-9 Classroom Observation, 7/10/06     820-823

74. OO-10 Letter from Renner to Pabo, 7/2/06     824-826

75. OO-11 Social Work Evaluation Report, 8/31/06     827-835

76. OO-12 Educational Evaluation, 5/30/06     836-841

77. OO-13 Speech and Language Evaluation Report, 5/18/06     842-848

78. OO-14 Report of Neuropsychological Evaluation, 5/3/06     849-875

79. OO-15 Child Neuropsychological History, 5/3/06     876-910

80. OO-16 Application for admission to Kingsbury, 7/06     911-922

81. OO-17 Due Process Complaint Disposition, 9/26/06          923-925

82. OO-18 Prior Notice and MDT Meeting Notes, 9/21/06         926-930

83. Due Process Hearing Notice, 10/12/06                      931

84. Scheduling Memorandum, 9/14/06                            932-935

85. Due Process Complaint Notice, 9/14/06                     936-942

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
#### SPECIAL EDUCATION

In the Matter RE:    O██████, O██ vs. Kingsbury Day School

Case Information:    Hearing Dates: **01/16/2007 & 03/14/2007**
Held at: **District of Columbia Public Schools Headquarters**
**825 N. Capitol Street, N.E.**
**Washington, D.C. 20002**
Student Identification Number:  **9051483**
Student's Date of Birth: ██████**/1993**
Attending School: **Kingsbury Day School**
Managing School:
Hearing Request Date(s): **09/14/2006**

## CERTIFICATION OF RECORD

I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting  of all letters, pleadings, orders,

exhibits and depositions.

I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Wednesday, November 21, 2007.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

1

# District of Columbia Office of the State Superintendent
## Office of Compliance and Review
### State Enforcement & Investigation Division
**Terry Michael Banks, Due Process Hearing Officer**
1150 - 5ᵗʰ Street, S.E.; Room 3
Washington, D.C. 20003
(571) 437-7381
Facsimile: (202) 689-3825

## Confidential

| | |
|---|---|
| O███ O███████, STUDENT ) | Hearing Dates: November 16, 2006 |
| ) | January 16, 2007 |
| Date of Birth: █████████, 1993 ) | February 12, 2007 |
| ) | March 14, 2007 |
| Petitioner, ) | |
| ) | |
| v. ) | Complaint Filed: September 14, 2006 |
| ) | |
| THE DISTRICT OF COLUMBIA ) | |
| PUBLIC SCHOOLS ) | |
| ) | Held at: 825 North Capitol Street, N.E. |
| Respondent. ) | 8ᵗʰ Floor |
| ) | Washington, D.C. 20002 |
| Student Attending: ) | |
| Kingsbury Day School ) | Interim Orders: November 17, 2006 |
| ) | January 19, 2007 |
| ) | February 8, 2007 |

## HEARING OFFICER'S DECISION

| | |
|---|---|
| **Parents:** | Ms. Claudia Pabo, Mother |
| | 3512 Rodman Street, N.W. |
| | Washington, D.C. 20008 |
| | |
| **Counsel for Petitioner:** | Michael J. Eig, Esquire |
| | 5454 Wisconsin Avenue; Suite 760 |
| | Chevy Chase, Maryland 20815-6938 |
| | (301) 657-1740; Fax: (301) 657-3843 |
| | |
| **Counsel for DCPS:** | Saurabh Gupta, Esquire |
| | Office of the General Counsel, DCPS |
| | 825 North Capitol Street, N.E.; 9ᵗʰ Floor |
| | Washington, D.C. 20002 |

An index of names is attached hereto for the benefit of the parties. The index will permit the parties to identify specific witnesses and other relevant persons. The index is designed to be detached before release of this Decision as a public record.

## INDEX OF NAMES

| Child | O█ O█ |
|---|---|
| Child's Parent(s) (specific relationship) | Claudio Pabo, Mother |
| Child/Parent's Representative | Michael J. Eig, Esquire |
| School System's Representative | Saurabh Gupta, Esquire |
| Educational Consultant | Dr. Laura Solomon |
| Principal or Designee | Dr. Eve Peterson, Principal, Prospect Learning Center<br>Marlene Gustafson, Director, Kingsbury Day School |
| Psychologist | Dr. Denise White-Jennings, DCPS<br>Jermaine Perkins, School Psychologist, DCPS C.A.R.E. Center |
| Social Worker | Cindy Brown, Clinical Social Worker, DCPS |

3

**Jurisdiction**

This proceeding was invoked in accordance with the rights established under the Individuals With Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. Sections 1400 et seq., Title 34 of the Code of Federal Regulations, Part 300; Title V of the District of Columbia ("District" or "D.C.") Municipal Regulations ("DCMR"), re-promulgated on February 19, 2003; and Title 38 of the D.C. Code, Subtitle VII, Chapter 25.

**Introduction**

Petitioner is a fourteen year-old student attending Kingsbury Day School ("Kingsbury"). On September 14, 2006, Petitioner filed a Due Process Complaint Notice ("*Complaint*") alleging that the District of Columbia Public Schools ("DCPS") had failed to provide an appropriate placement. On November 7, 2006, DCPS filed *DCPS Motion to Dismiss*, arguing that it had been unable to secure Petitioner's educational records from Kingsbury and, therefore, was unable to prepare adequately for trial. On November 8, 2006, Petitioner filed *Parent's Motion for Pre-Hearing Summary Decision and Opposition to DCPS Motion to Dismiss*. Petitioner's counsel indicated that his Five-Day Disclosure Notice mooted DCPS' concern about Petitioner's records. In his motion for summary decision, Petitioner's counsel argued that DCPS' failure to convene an appropriate team at the Resolution Session meeting entitled Petitioner to a judgment against DCPS. On November 13, 2006, DCPS filed *DCPS' Opposition to Parent's Motion for Summary Decision & DCPS Cross-Motion for Summary Decision*. DCPS argued that Petitioner had "failed to show any facts, remote or direct, which prove Prospect LC is inappropriate. Furthermore, DCPS disputed Parent's assertion the resolution meeting was invalid because the Local Education Agency (LEA) representative lacked the authority to make a decision." Later on November 13th, Petitioner filed *Parent's Opposition to DCPS Motion to Summary Decision*, in which Petitioner's counsel reiterated his position that DCPS' failure to convene an appropriate team at the Resolution Session meeting should be dispositive.

The hearing was continued from November 16, 2006 to January 16, 2007 for the reasons set forth in the Interim Order. On January 16, 2007, the hearing could not be completed due to the length of Petitioner's direct case. On January 19, 2007, this hearing officer issued a Second Interim Order continuing the proceeding to February 2, 2007. On January 31, 2007, Petitioner's counsel filed a *Letter Motion for Continuance* due to conflicting proceedings. On February 8, 2007, this Hearing Officer issued a Third Interim Order granting the motion for a continuance until March 14, 2007.

The due process hearing was reconvened and completed on March 14, 2007. DCPS' Supplemental Disclosure Statement, dated March 7, 2007, was admitted into evidence at the inception of the hearing. At the conclusion of the hearing, the parties agreed to submit written closing arguments upon the completion of a transcript. After an extended delay in the preparation of a transcript, Petitioner filed a *Closing Argument on*

*Behalf of Child and Parent* on August 2, 2007. DCPS filed *DCPS' Closing Statement* on August 7, 2007. On August 9, 2007, Petitioner filed a *Reply of Child and Parent to DCPS' Closing Statement.*

**Witnesses for Petitioner**

>    Dr. Laura Solomon, Educational Consultant
>    Marlene Gustafson, Director, Kingsbury Day School
>    Petitioner's Mother

**Witnesses for DCPS**

>    Dr. Denise White-Jennings, Psychologist, DCPS
>    Cindy Brown, Clinical Social Worker, DCPS
>    Jermaine Perkins, School Psychologist, DCPS C.A.R.E. Center
>    Dr. Eve Peterson, Principal, Prospect Learning Center

**Findings of Fact**

1. Petitioner is a fourteen year-old student attending Kingsbury.[1]

2. On May 3, 2006, Dr. Ronald S. Federici completed a Neuropsychological Evaluation of Petitioner. Dr. Federici diagnosed Petitioner with Cognitive Disorder Not Otherwise Specified, Mixed Receptive-Expressive Language Disorder, Learning Disorder Not Otherwise Specified, Mathematics Disorder, Disorder of Written Expression, Developmental Reading Disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), Adjustment Disorder of Childhood with Mixed Emotional Features (Anxiety, Depression, and Periodic Disturbance or Conduct), and Post-Traumatic Stress Disorder (Early Childhood Institutionalization).[2] Dr. Federici's findings and recommendations, *inter alia*, include the following:

>    [Petitioner's] intellectual abilities fall within the low average-borderline range although there are clear indications of "general suppression" due to his Attentional and concentrational problems in addition to global neuropsychologically based processing deficits in both auditory and visual spheres.

>    Specifically, [Petitioner] definitely displays language comprehension and auditory processing impairments in addition to weaknesses in clarity in oral expression. While [Petitioner] can certainly "communicate," he can sometime chatter incessantly and be rambling, fragmented, and somewhat

---

[1] *Complaint* at 1.
[2] Petitioner's Exhibit ("P.Exh.") No. 14 at 19.

disjointed. Additionally, [Petitioner] has major weaknesses related to a nonverbal learning disorder as he struggles with visual attention, visual discrimination, visual-spatial relations, visual figure ground, in addition to visual memory as well as visual scanning, tracking and sequencing.

It is very common for children who have multisensory neuropsychologically based processing and Attentional deficits related to fetal alcohol syndromes to develop a classic "dyslexic disorder." The principal definition of neuropsychologically based dyslexia is a multiple learning disability syndrome characterized by problems in receptive and expressive language, oral and written language, with overall problems emerging in the areas of reading, spelling, writing, speaking, listening, and mathematics. Dyslexic children typically have differences in the structure and function of the brain due to auditory and visual processing problems.

Discussion with [Petitioner's] principal indicates that he is "falling behind" and has major academic struggles which confirms the diagnosis of multiple learning difficulties.

Recommendations:

[B]ased on the neuropsychological evaluation, [Petitioner] definitely requires Special Education support in the following areas:

A. Speech and, primarily, language therapy a minimum of 2-3 hours per week. Emphasis needs to be improving [Petitioner's] overall auditory comprehension and processing and expressive skills, particularly organizing semantic-pragmatic language.

B. Occupational therapy to address nonverbal learning deficits and organizational problems related to ADHD. Occupational therapy should be a minimum of 2 hours per week.

C. Intensive learning disability remediation is highly recommended a minimum of 5 hours per week. [Petitioner] has the ability to improve but definitely requires a great deal of individualized instruction…

It would be very important to develop a strong "behavioral plan." The family definitely requires Applied Behavioral Analysis and verbal behavior therapy to work on a concrete and specific behavioral plan for [Petitioner] as well as his overall family…[3]

    3. On May 18, 2006, DCPS completed a Speech and Language Evaluation of Petitioner. The pathologist concluded Petitioner's "speech and language skills to be

---

[3] *Id.* at 20-21.

within normal limits. Scores received do no qualify him for services under IDEA and Chapter 30. [Petitioner's] weaknesses in the area of semantic relationships can be addressed in the classroom curriculum.[4]

4. On May 30, 2006, Dr. Laurie C. Dietzel completed an Educational Evaluation of Petitioner. Dr. Deitzel made no recommendations as to an appropriate educational program or setting for Petitioner. Dr. Dietzel's findings, *inter alia*, include the following:

> [Petitioner's] academic skills – reading and spelling words in isolation and solving paper-pencil math computations – were in the average range, both when comparing him to his grade and age peers. By comparison, his fluency (accuracy and speed) on simple reading and writing tasks was significantly weaker, placing in the low average range for reading and in the low range for math fluency, using age and grade based norms. While [Petitioner's] basic skills were adequate, he had more difficulty applying them to reading comprehension, math problem solving, and written expression at both the single sentence and paragraph level; his scores fell in the low average range when compared to age peers on the WJ-III tests. His reading comprehension on an untimed paragraph test was in the very poor range while his paragraph writing performance was below average...[5]

5. On August 16, 2006, Dr. Laura Solomon completed a Woodcock-Johnson Psychoeducational Battery - Third Edition - Test of Cognitive Ability. Dr. Solomon's findings and recommendations, inter alia, include the following:

> On this examiner's testing, [Petitioner's] strengths clearly fell in the auditory-verbal realm (which, by the way, does <u>not</u> mean that he doesn't have deficits in this area; according to Dr. Federici's findings, he does). In contrast, his visual processing, especially on timed measures, fell significantly below that range. By far the most concerning finding is the effect that [Petitioner's] deficits in Cognitive Efficiency have on his academic performance. He simply cannot muster what is necessary to bring his considerable strengths to school-based learning. Included in this is quite severe ADHD.

> In light of all the data available on [Petitioner], this examiner believes that it is imperative that he receive an intensive, full-time special education program for the 2006-2007 school year. To the parents' credit, they have attempted to keep [Petitioner] in two different mainstream environments with substantial financial and time expenditures on their part. For the entirety of [Petitioner's] elementary school career, [Petitioner's mother] has been tutoring her son several hours each night. In addition, the family has hired tutors and speech/language pathologists to provide extra support. This part-time special education model, with services being provided *a la carte*, did not meet [Petitioner's] needs and it is time to try something else.

---

[4] P.Exh. No. 13 at 7.
[5] P.Exh. No. 12 at 4.

[Petitioner] needs a full-time special education placement that has the following components:

- Built-in, consistent academic and behavioral structure and supports;
- Non-traditional, creative curriculum, strategies, techniques, and programming designed to further [Petitioner's] academic and cognitive growth;
- On-site speech/language therapy to provide support for [Petitioner's] auditory processing difficulties;
- On-site occupational therapy for support of severe visual perceptual problems;
- On-site psychological services to support growth in self-concept, social skills and problem solving;
- Small class size;
- Low student:teacher ratio...

There is no reason to return to a part-time public-school special education model, or even the one full-time placement that DCPS has to offer, because what [Petitioner] needs is much more intensive and creative than that. It would not be appropriate to bind [Petitioner] to a standard curriculum when he has shown repeatedly that he does not respond well to that. He needs a placement in which teachers and therapists are free, indeed, encouraged, to use any type of program necessary to enable [Petitioner] to meet the goals and objectives on his IEP, not one that has predetermined curricula and materials.[6]

6. DCPS convened a Multidisciplinary Team ("MDT") meeting on August 30, 2006. The MDT classified Petitioner with multiple disabilities: other health impaired ("OHI") and learning disability ("LD"). The MDT prescribed twenty-six hours per week of specialized instruction, ninety minutes per week of psychological services, and 30 minutes per week of psychological consultation.[7] The parent disagreed with limiting Petitioner areas requiring attention to reading comprehension; Petitioner's mother argued that math calculations and reasoning as well as written language should have been included as areas of concern.[8] The MDT referred Petitioner for an occupational therapy ("OT") evaluation.[9]

7. The MDT determined that Petitioner "requires full-time program, including non-academic classes with small group, low teacher-student ratio with high level of

---

[6] P.Exh. No. 8 at 8-9.
[7] DCPS Exh. No. 5, IEP at 1; DCPS Exh. No. 4, MDT Notes.
[8] DCPS Exh. No. 4, MDT Notes at 3.
[9] DCPS Exh. No. 4, Student Evaluation Plan.

structure."[10] The MDT engaged in an extended and thorough discussion of the goals and objectives in Petitioner's IEP.[11]

8. DCPS proposed placing Petitioner at Prospect Learning Center ("PLC") at the August 30, 2006 MDT meeting. DCPS provided a detailed description of the program and facilities at PLC. The parent requested that Petitioner be placed at Kingsbury prevent Petitioner having to be moved again at the end of the eighth grade; PLC has no 9th grade. The parent agreed to visit PLC before making a decision as to whether to accept DCPS' placement proposal.[12]

9. DCPS issued a Prior Notice on August 30, 2006 that changed his classification, related services, and educational setting. The Prior Notice did not specify that PLC would be the placement for Petitioner.[13]

10. Petitioner's mother and Dr. Solomon visited PLC on September 7, 2006.[14]

11. On September 8, 2006, DCPS invited Petitioner's mother to a follow-up placement meeting "to discuss the parent's impressions of the Prospect Learning Center and to allow her to either accept or reject that placement."[15]

12. Petitioner's mother unilaterally placed Petitioner at Kingsbury Day School for the 2006-2007 school year.[16]

13. Petitioner's counsel filed the *Complaint* on September 14, 2006.[17]

14. On September 18, 2006, Petitioner's counsel notified DCPS that "my client has filed a due process complaint notice appealing the decision of the IEP team to place [Petitioner] at Prospect Learning Center. Accordingly, my client rejects this placement and will be proceeding to a due process hearing. Therefore, the meeting on September 21, 2006 is unnecessary and should not go forward."[18]

**Conclusions of Law**

1. Although DCPS proposed placing Petitioner at PLC at the MDT meeting on August 30, 2006, it deferred to the parent's desire to visit PLC before making a decision whether to accept the proposed placement. Dr. Solomon and Petitioner's mother visited PLC on September 7, 2006. On September 8, 2006, DCPS invited Petitioner's mother to

---

[10] DCPS Exh. No. 5, MDT Notes at 2.
[11] *Id.* at 2-4.
[12] *Id.* at 4.
[13] DCPS Exh. No. 4 at 1.
[14] Testimony of Dr. Solomon, Petitioner's mother, and Dr. Peterson.
[15] P.Exh. No. 2.
[16] Testimony of Petitioner's mother.
[17] P.Exh. No. 1.
[18] P.Exh. No. 3.

a follow-up meeting "to discuss the parent's impressions of the Prospect Learning Center and to allow her to either accept or reject that placement."[19] Petitioner's counsel filed the *Complaint* on September 14, 2006, and formally rejected the offer for a follow-up placement meeting on September 18, 2006.

During the MDT meeting on August 30th, DCPS described PLC as having a full-time special education program with fully certified special education teachers. The class size was described as averaging 7-10 students with a maximum of 12. The available related services were described as including speech therapy, occupational therapy, psychological services, social work services, physical therapy, and adaptive physical education. Neither the parent nor Dr. Solomon suggested that PLC could not provide the services prescribed in Petitioner's IEP. Rather, Petitioner's mother was concerned that Petitioner would be required to change schools at the end of the 2006-2007 school year, because PLC did not have a ninth grade class.

The testimony presented at the hearing to prove the inappropriateness of PLC as a placement was based on information learned during the visit to PLC by Petitioner's mother and Dr. Solomon on September 7, 2006.[20] However, Petitioner's representatives refused to share their findings with DCPS even though the MDT deferred the determination of the placement until after the parent's visit to PLC. After DCPS invited the parent to a follow-up placement meeting on September 8, 2006, Petitioner's counsel filed the Complaint on September 14th and specifically rejected a placement meeting on September 18th. At no time prior to filing the *Complaint* did Petitioner's representatives provide DCPS with an explanation for their rejection of PLC as a proposed placement.

The PLC program as described to the parent at the August 30, 2006 MDT meeting was capable of meeting Petitioner's needs as defined in the IEP. While Petitioner's representatives challenged the validity of some of the goals and objectives of the IEP, there was considerable discussion at the meeting about the goals and objectives. Petitioner's counsel argued in his closing statement that the IEP was inappropriate because it failed to prescribe speech and language services. However, Petitioner failed to adduce conclusive evidence of the need for speech services. Dr. Federici recommended speech services, while DCPS' speech pathologist concluded that Petitioner did not require such services. Neither examiner provided testimony at the hearing.[21] Other than the speech services, there was no disagreement as to the overall program that Petitioner required: full-time specialized instruction and psychological services. The MDT also agreed to refer Petitioner for an occupational therapy evaluation to confirm Dr. Federici's recommendation to add those services.

Petitioner's strongest evidence offered by Petitioner that PLC could not offer an appropriate program was testimony from Dr. Solomon that the class sizes she saw on September 7, 2006 were larger than the 7-10 that were described at the August 30th

---

[19] P.Exh. No. 2.
[20] Testimony of Dr. Solomon and Petitioner's mother.
[21] Dr. Solomon, who claims no expertise in speech pathology, also recommended speech services, adopting Dr. Federici's recommendation.

meeting. Dr. Peterson, PLC's prinicipal, a witness for DCPS, testified that there was no vacancy for Petitioner on September 7, 2006. However, the August 30th MDT was aware that space was limited at PLC. Ms. Brown advised Petitioner's representatives at the that meeting that Petitioner's "Slot will only be held for a couple of days."[22] When Dr. Solomon and Petitioner's mother visited PLC a week later, Dr. Peterson advised them that PLC was at capacity, but that she had the authority to hire a new, certified special education teacher and a new teacher's aide if Petitioner enrolled at PLC.

Petitioner's representatives elected not to attend a follow-up placement meeting to discuss what they learned during their visit to PLC. Perhaps DCPS would have facilitated the immediate staffing increase at PLC. Perhaps DCPS would have concluded that PLC was no longer an appropriate placement option. Perhaps DCPS would have acceded to the Parent's request to place Petitioner at Kingsbury. By refusing to participate in the follow-up placement meeting proposed by DCPS the day after the parent's visit to PLC, and only nine days after the August 30th meeting, Petitioner's representatives intentionally obstructed DCPS' ability to complete the placement determination. The Hearing Officer concludes that Petitioner has failed to meet his burden of proving that DCPS failed to provide an appropriate placement. In fact, Petitioner's counsel strategically prevented DCPS from finalizing a specific placement proposal.

2. Even if Petitioner had proved that DCPS had failed to propose an appropriate placement, Petitioner's counsel's intentional frustration of DCPS' attempt to convene a follow-up placement meeting deprived Petitioner of the right to reimbursement for the unilateral private placement at Kingsbury Day School. The regulations authorize denial or limitation of reimbursement under the circumstances evident in this case:

> The cost of reimbursement described in paragraph (c) of this section may be reduced or denied if
>
> (1)(i) At the most recent IEP Team meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide FAPE to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
>
> (ii) At least ten (10) business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in paragraph (d)(1)(i) of this section...
>
> (2) If, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in §300.503(a)(1), of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for the evaluation; or

---

[22] DCPS Exh. No. 5 at 4.

(3) Upon a judicial finding of unreasonableness with respect to actions taken by the parents.[23]

In this case, Petitioner's representatives jeopardized Petitioner's entitlement to reimbursement in the following ways:

- Petitioner's parent did not inform the MDT Team on August 30, 2006 that she rejected the placement proposed by the DCPS. Rather, she stated that she would visit PLC before making a final decision. In deference to her wishes, DCPS issued a Prior Notice changing Petitioner's services and educational setting, but did not specify a placement.
- Prior to filing the *Complaint*, Petitioner's parent did not inform DCPS that she had any concerns about PLC's capability to meet the Petitioner's educational needs. She complained only that placement at PLC would require Petitioner to change schools for the 2007-2008 school year. However, IDEIA requires annual placement determinations,[24] not perennial placements.
- Prior to filing the *Complaint*, Petitioner's parent did not inform DCPS of her intent to enroll Petitioner in a private school at DCPS' expense.[25]
- The first notice of Petitioner's rejection of the proposed placement at PLC, of the unilateral placement at Kingsbury, and the intent to hold DCPS financially responsible for the placement was the *Complaint*.

Finally, DCPS invited Petitioner's mother to a follow-up placement meeting the day after Petitioner's mother and consultant visited PLC and less than ten days from the August 30th meeting. Petitioner's representatives they refused to attend the follow-up meeting with DCPS that was contemplated when the placement determination was deferred at the August 30th meeting, thereby refusing to share and discuss their findings about PLC with DCPS. Petitioner's counsel then filed the *Complaint* without giving DCPS prior notice of the alleged inadequacy of the proposed placement or of Petitioner's intent to hold DCPS financially liable for the placement. The Hearing Officer concludes, pursuant to 34 C.F.R. Section 300.148(d)(3), that Petitioner's parent and counsel acted unreasonably in refusing to attend the follow-up placement meeting.

3. The Hearing Officer recognizes that this Decision is being issued long after the 45-day deadline.[26] However, although the *Complaint* was filed on September 14, 2006, the final hearing was not completed until March 14, 2007. The parties agreed to file

---

[23] 34 C.F.R. §300.148(d).
[24] 34 C.F.R. §300.116(b) and §300.324(b).
[25] P.Exh. No. 4.
[26] 34 C.F.R. §300.515(a).

written closing arguments after the completion of the transcript. The transcript was not completed until June 5, 2007.

The history of this proceeding is as follows. The Hearing Officer notified the parties in mid-November 2006 that he would deny their cross-motions for summary decision. Petitioner's counsel then requested a continuance until January 2007 due to the unavailability of his expert witness until after the holiday break. The Hearing Officer ordered the parties to arrive at a mutually convenient hearing date:

> **IT IS FURTHER ORDERED,** that on or before November 22, 2006, Petitioner's counsel shall provide counsel for DCPS three dates in January that are convenient for his witnesses. On or before November 29, 2006, counsel for DCPS shall notify the SHO if one or more of those dates are convenient for his witnesses. If so, the SHO will set a hearing date. If none of Mr. Eig's proposed dates is convenient for DCPS' witnesses, Mr. Gupta should notify Mr. Eig, and the parties should submit lists of convenient dates in January to the hearing officer by facsimile transmission.[27]

The hearing was reconvened on January 16, 2007, but could not be completed due to the length of Petitioner's direct case. The proceeding was continued to the first mutually convenient available date, February 12, 2007. On January 31, 2007, Petitioner's counsel requested a continuance due to a scheduling conflict until February 16th or 28th. The hearing was continued to March 14th, the first available mutually convenient date. On the eve of the hearing, March 13th, Petitioner's counsel requested another continuance until mid-April, which the Hearing Officer denied. The hearing was completed on March 14th, but the parties agreed to file written closing arguments upon the completion of the transcript.

The transcript was not completed until June 5, 2007. Petitioner filed a *Closing Argument on Behalf of Child and Parent* on August 2, 2007. DCPS filed *DCPS' Closing Statement* on August 7, 2007. On August 9, 2007, Petitioner filed a *Reply of Child and Parent to DCPS' Closing Statement*.

The Hearing Officer cannot justify the delay in completing the Decision within a reasonable period of time after receiving the closing arguments. However, from Petitioner's counsel's requests for extended continuances in November 2006, on January 31, 2007, and March 13, 2007, it was apparent that tuition reimbursement was the only goal in this proceeding, not a DCPS placement. This was confirmed in Petitioner's closing argument, in which counsel prayed only for reimbursement for the 2006-2007 school year. Nevertheless, the Hearing Officer's ultimate conclusion that Petitioner is not entitled to reimbursement was made only upon the completion of his belated, but thorough review of the record. Most important, Petitioner has not suffered educational harm as a result of the delay. Petitioner's representatives concede that Petitioner is receiving an appropriate education. Petitioner's representatives made a unilateral

---

[27] *Interim Order* at 4.

placement at Kingsbury before the *Complaint* was filed, placing Petitioner at the school they believed would maximize his academic potential. While Petitioner is not receiving a *free* education, strategic decisions made by his attorney deprived Petitioner of any entitlement to reimbursement.

## ORDER

Upon consideration of Petitioner's request for a due process hearing, the parties' Five-Day Disclosure Notices, the testimony presented at the hearings, Petitioner's *Closing Argument on Behalf of Child and Parent*, DCPS' *Closing Statement*, Petitioner's *Reply of Child and Parent to DCPS' Closing Statement*, and the representations of the parties' counsel at the hearings, this 5th day of November 2007, it is hereby

**ORDERED**, that the *Complaint* is **DISMISSED WITH PREJUDICE**.

_____
Terry Michael Banks
Hearing Officer

Date:   November 5, 2007


Issued:   _____


Copies to:

Michael J. Eig, Esquire
Haylie Iseman, Esquire
5454 Wisconsin Avenue; Suite 760
Chevy Chase, Maryland 20815-6938
(301) 657-1740; Fax: (301) 657-3843

Saurabh Gupta, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.
9th Floor
Washington, D.C. 20002

**ATTENDANCE SHEET**

STUDENT'S NAME: O███ O█████

SCHOOL OF ATTENDANCE: Kingsbury Day School

D.O.B: ████████, 1993

| HEARING DATE: 3/14/07 | ROOM: 8115 | TIME: 9:29 A.M./P.M. |
| | | says 8:29 |

| PARTICIPANT NAME: | ON BEHALF OF DCPS OR STUDENT: | End 2:00 TITLE: |
| --- | --- | --- |
| Michael J. Eig | Student | Counsel for Student |
| Claudia Pabo | student | mother |
| Denise White Jennings | DCPS | Clinical Psychologist |
| Saurabh Gupta | DCPS | Atty Advisor |
| Cindy F. Brown, LICSW | DCPS | Clinical Social Worker/Case Manager |
| Jermaine Perkins | DCPS | School Psychologist |
| Dr. Eze Peterson | DCPS | Principal PLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Impartial Hearing Officer

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig          MD, DC
Haylie M. Iseman        MD, DC, NY
————
Of Counsel:
Matthew B. Bogin        MD, DC

Paula A. Rosenstock     VA, DC
Patricia Cyr            CA, DC

August 9, 2007

Terry Michael Banks
Impartial Hearing Officer
c/o Sharon Newsome
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington D.C. 20002

Re:  O███ O█████
*via facsimile and first-class mail*

Dear Mr. Banks:

Enclosed please find the Reply of Child and Parent to DCPS' Closing Statement for the above-referenced matter.  If you have any questions, please feel free to contact my office.  Thank you.

Sincerely,

Michael J Eig/mlg
Michael J. Eig

*Enclosure*

cc:   Saurabh Gupta, Esq.
      Ms. Claudia Pabo

16

| | |
|---|---|
| IN THE MATTER OF | * |
| | * BEFORE AN IMPARTIAL HEARING |
| | * OFFICER OF THE |
| O▮▮▮ O▮▮▮▮▮ | * DISTRICT OF COLUMBIA OFFICE OF |
| | * STUDENT HEARINGS |
| | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REPLY OF CHILD AND PARENT TO DCPS' CLOSING STATEMENT

In response to the DCPS Closing Statement submitted to the Hearing Officer on or about August 6, 2007, we respectfully ask that the Hearing Officer consider the following points:

1. In its introduction, DCPS misconstrues our position as stated in Footnote 6 of our earlier Memorandum. We do not assign or suggest any blame to DCPS counsel for the delays in this matter (although it is true that we were unable to reach counsel by phone to agree to a final briefing schedule). Rather, we complain of the delays resulting from incomplete and incompetent hearing transcripts, delayed receipt of hearing transcripts, and the absence of any briefing schedule for both counsel to follow in closing the record. These delays have been significant, and have adversely affected the Due Process rights of O▮▮ and his mother.

2. Turning to substance, there is much with which we disagree in the DCPS Closing Statement, but it is either difficult or superfluous for us to add to that which we set forth previously. The problem is that DCPS makes arguments of fact without transcript or exhibit citation; there is no record justification for what is written and it should therefore be ignored. We would ask the Hearing Officer to refer back to our earlier Memorandum in which citations in support of our version of these same facts are provided.

1

AUG.09.2007 09:22 30165735843    MICHAEL J BIG & ASSOCIATES    #6549 P.003/005

3. It is simply untrue to argue that Prospect could have provided O███with an appropriate education. First, the only special education expert with first-hand knowledge of O███ who testified, Dr. Laura Solomon, categorically stated that an appropriate education could not be provided to him at Prospect. Dr. Solomon provided her reasons and they were not attacked, questioned or challenged by DCPS. Notably, DCPS does not even suggest that Dr. Solomon's expert opinion was questionable in its Closing. Second, all that Dr. Peterson or Prospect stated was that she had reviewed O███ IEP and that she believed Prospect could implement it, if she had space for him. Even if space were available, this does not qualify as an opinion that Prospect itself would have been appropriate for O███ and Dr. Peterson very candidly acknowledged that she did not know this child at all. And then there is the space issue. What Dr. Peterson freely admitted was that she had no idea when or how a new class could be set up for students like O███ that she had never done it before, and that she would have to await decisions and staffing by the "downtown" people. In other words, all that the Hearing Officer is unquestionably sure of on this record is that Dr. Peterson had been told by unnamed people that another class could be set up. In the context of knowing that such a class never was undertaken and without any other information, that mere, unattributable promise cannot equal the provision of FAPE.

4. Finally, it is impossible to respond to allegations that O███ mother somehow engaged in "delay tactics" when going through the IEP process when specific transcript citations are once more not provided. However, it is important to emphasize that Ms. Pabo specifically explained her perception and recollection of the IEP meetings, the need to adjourn and come back in order for her to visit Prospect, the problems with scheduling around her expert's calendar. There were some delays, as there always are in these matters, but they were not great,

2

#6549 P.004/005        MICHAEL J BIG & ASSOCIATES        3016573843 22:60 L00Z·60·DNV

they were explained, and they never impacted the inadequacy of the DCPS proposal or program availability in the end.

As requested in our earlier Memorandum, we respectfully submit that the Hearing Officer should order DCPS to place and fund O█ O████ at the Kingsbury Day School for the 2006-2007 school year, reimbursing O████ mother for any costs already incurred.

Respectfully Submitted,

Michael J. Eig)
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for O█ O████ and his parent

**************************************************************************

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage prepaid, to Saurabh Gupta, Esq., counsel for DCPS, on August 9, 2007.

Michael J. Eig

3

19

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig        MD, DC
Haylie M. Iseman    MD, DC, NY

Of Counsel:
Matthew B. Bogin    MD, DC

Paula A. Rosenstock    VA, DC
Patricia Cyr              CA, DC

# FAX

**To:**                 Hearing Officer Terry Michael Banks
                        **c/o Sharon Newsome**
**Fax Number:**    (202) 698-3825
**From:**              Michael J. Eig, Esq.
**Date:**              August 9, 2007
**Time:**              9:11 am

**Total Pages:**    5
**(including cover)**

**Re:**                 O━━ O━━━━

**cc:**                 Saurabh Gupta, Esq.
                        (202) 442-5097/98

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

**District of Columbia Public Schools Student Hearing Office**
1150 5th Street, SE
Washington, DC 20003

## CLOSING STATEMENT

| | |
|---|---|
| O▆▆ O▆▆▆, STUDENT | ) |
| | ) |
| Date of Birth: ▆▆▆1993 | ) |
| | ) |
| Petitioner, | ) Hearing Officer: ~~▆▆▆▆▆~~, Esq. |
| | ) *Terry Banks* |
| v. | ) |
| **THE DISTRICT OF COLUMBIA** | ) |
| **PUBLIC SCHOOLS** | ) |
| | ) |
| | ) |
| Respondent. | ) |

### DCPS' CLOSING STATEMENT:

**I. Introduction**

DCPS states for the record it was not notified of any order affirmatively setting a date for the submission of written closing arguments. DCPS was awaiting the transmission of the transcripts to Parents as agreed upon the last day of the hearing. Contrary to Counsel's assertion on footnote 6, page 6, I have never been personally contacted to discuss "an expedited briefing schedule." The last contact by Parent's Counsel was on June 8, 2007 proposing to the Hearing Officer that closing arguments be submitted by June 18, 2007. DCPS did not receive a decision on this proposition and thus did not submit a closing statement. Obviously, Mr. Eig had the same understanding since he waited until August 2, 2007 to submit his closing brief. It is curious how Mr. Eig can now claim a DCPS counsel delayed the submission of briefs.

**II. Statement:**

Under 34 CFR 300.l48 the LEA does not have to fund a private school if the LEA made a FAPE available and the parent elected to place the child in a private school. This is exactly what happened in O.O's case. There was not a denial of a FAPE here and an appropriate placement was made at Prospect Learning Center. Prospect LC was appropriate because it could have implemented the IEP as developed by the CARE Center and the parent on August 30, 2006. *see DCPS-05.* This IEP was developed by the entire team, which included the Parent, and was agreed at the meeting it was appropriate.

1

21

Parent claims it was inappropriate at the hearing but failed to assert at the August 2006 meeting what specifically is wrong with it. Examination of the MDT notes from this meeting show there were long discussions over specific areas in the IEP which the Parent and the DCPS team disagreed. *Id.* However, after a discussion the entire team did eventually resolve the disagreements and this resolution were actually addressed in the contents of the IEP. *Id.* It is disingenuous for the Parent then to now attack an IEP when at the meeting where it was developed all parties were willing to address and actually did resolve some of the other concerns she harbored.

Parent attacks the placement stating that it is inappropriate because it allegedly could not have implemented the IEP developed on 8/30/2007. However, Dr. Peterson credibly testified to the appropriateness of Prospect for O.O. Her testimony revealed Prospect has an appropriate therapeutic environment with effective behavior modification systems in place which would be a benefit for O.O. Furthermore, O.O would have received individual attention due to the low student to teacher ration, psychological services from licensed service providers, and all supplemental and additional support that O.O. required. The fact is Parents did not prove Prospect could not have provided a Free and Appropriate Public Education for O.O. because that notion is untrue.

Finally, Parents here obstructed the implementation of the program developed for O.O by delaying or canceling at least three meeting leading up to the August 30, 2006 meeting. *See Cindy Brown testimony and DCPS-13, 18, 19, 21.* Due to the well orchestrated delay tactics employed by the Parents it ensured that DCPS would have to offer any placement after the school year has already began and thus there would be a chance certain classrooms would be at capacity. DCPS assured the Parents that Prospect could add another classroom if the program was at capacity. This point became moot after the parent unilaterally placed the student at Kingsbury.

////

////

////

////

////

////

2

**III. Conclusion**

Federal law requires DCPS to provide a Free and Appropriate Public Education to all children within its jurisdiction. Federal law does require DCPS to provide a Free and *BEST* Public Educations. Here, DCPS clearly did make an appropriate education available to the O.O. and thus had fulfilled its federally mandated obligations to O.O. Therefore, the Hearing Officer should deny Petitioners claim for tuition reimbursement for the 2006-07 school year.

Date: August 6, 2007

Respectfully Submitted,

Saurabh Gupta
Attorney Advisor, DCPS
Saurabh.Gupta@k12.dc.us

cc:    Michael Eig, Esq.

3



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| To: | Mr. Terry Banks | From: | Saurabh Gupta, Esq. |
|---|---|---|---|
| **Fax:** | 698-3825 | **Date:** | Monday, August 06, 2007 |
| **Phone:** | | **Pages:** | ___ (Including cover page) |
| **Re:** | O███O█████ | **CC:** | M. Eig |

☐ Urgent  ☐ For Review ☐ Please Comment  ☐ Please Reply ☐ Please Recycle

•**Comments:**

DCPS closing arguments.

# hp LaserJet 9050mfp series



---

| Fax Call Report | 1 |
|---|---|

DCPS Office of General Counsel
2024425098
06-Aug-2007 06:11 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|---|---|---|---|---|---|---|
| 10851 | 06-Aug-2007 06:10 PM | Send | 93016573843 | 0:55 | 4 | Success |



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| To: | Mr. Terry Banks | From: | Saurabh Gupta, Esq. |
|---|---|---|---|
| Fax: | 698-3825 | Date: | Monday, August 06, 2007 |
| Phone: | | Pages: | (including cover page) |
| Re: | Ol   Ol | CC: | M. Eig |

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

•Comments:

DCPS closing arguments.

25

# MICHAEL J. EIG AND ASSOCIATES, P.C.

**ATTORNEYS AT LAW**
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

Of Counsel:
Matthew B. Bogin   MD, DC

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome |
| | **DCPS Student Hearing Coordinator** |
| **Fax Number:** | (202) 698-3825 |
| **From:** | Michael Eig, Esq. |
| **Date:** | August 3, 2007 |
| **Time:** | 10:23 am |
| **Total Pages:** (including cover) | 2 |
| **Re:** | O███ O████ |
| cc: | Saurabh Gupta, Esq. (202) 442-5097/98 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

*BANKS*

# MICHAEL J. EIG AND ASSOCIATES, P.C.
### ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |
| | | | |
| Of Counsel: | | | |
| Matthew B. Bogin | MD, DC | | |

August 3, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
1150 5th Street, SE, 1st Floor
Washington, D.C. 20003

Re:    O█ O█
*via facsimile and first-class mail*

Dear Ms. Newsome:

Please confirm in writing today that the closing arguments filed in the above-referenced matter yesterday, August 2, 2007, have been given to Hearing Officer Terry Michael Banks for his consideration. Thank you.

Sincerely,

Michael J. Eig

cc:    Saurabh Gupta, Esq.
Claudia Pabo

27



# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig          MD, DC
Haylie M. Iseman      MD, DC, NY

Of Counsel:
Matthew B. Bogin      MD, DC

Paula A. Rosenstock   VA, DC
Patricia Cyr          CA, DC

August 3, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
1150 5th Street, SE, 1st Floor
Washington, D.C. 20003

Re:    O▮▮ O▮▮▮▮
*via facsimile and first-class mail*

Dear Ms. Newsome:

Please confirm in writing today that the closing arguments filed in the above-referenced matter yesterday, August 2, 2007, have been given to Hearing Officer Terry Michael Banks for his consideration. Thank you.

Sincerely,

Michael J. Eig

cc:    Saurabh Gupta, Esq.
       Claudia Pabo

DC PUBLIC SCHOOL SYSTEM
2007 AUG -7 AM 10: 20

28



**MICHAEL J. EIG AND ASSOCIATES, P.C.**

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |
| | | | |
| Of Counsel: | | | |
| Matthew B. Bogin | MD, DC | | |

August 2, 2007

Terry Michael Banks
Impartial Hearing Officer
c/o Sharon Newsome
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington D.C. 20002

Re:    O███ O██████
*via facsimile and first-class mail*

Dear Mr. Banks:

Enclosed please find the closing arguments for the above-referenced matter. If you have any questions, please feel free to contact my office. Thank you.

Sincerely,

Michael J Eig /mlg
Michael J. Eig

*Enclosure*

cc:    Saurabh Gupta, Esq.
Ms. Claudia Pabo

DC PUBLIC
SCHOOL SYSTEM

2007 AUG -7  AM 11: 52

29



IN THE MATTER OF

O▮▮▮ O▮▮▮▮

\*
\*
\*
\*
\*
\*
\*
\*

BEFORE AN IMPARTIAL HEARING
OFFICER OF THE
DISTRICT OF COLUMBIA OFFICE OF
STUDENT HEARINGS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CLOSING ARGUMENT ON BEHALF
## OF CHILD AND PARENT

## I. INTRODUCTION.

Whether one looks at this appeal from a substantive or procedural perspective – whether one views the evidence in a light more favorable to the school system or the child and parent – it all comes out the same way. The evidence before the Hearing Officer points but in one direction: DCPS has provided O▮▮▮ O▮▮▮ with no education, special or otherwise, literally no Due Process under the IDEA, and little more than countless delay and unmet promises. The entire process has been a special education travesty. But for O▮▮▮ mother's actions to secure him an unquestionably appropriate education at the Kingsbury Day School ("Kingsbury") for the 2006-2007 school year, this significantly disabled student would not have had his clearly-identified needs met in any classroom.

Many exhibits were placed in evidence before the Hearing Officer, and significant testimony was provided, but at base this is a simple case. DCPS has failed to provide O▮▮▮ a free, appropriate education for the 2006-2007 school year. Therefore, the school system should be ordered to place and fund O▮▮▮ at Kingsbury, effective as of the commencement of the 2006-2007 school year.

1

## II. FAILURE OF DUE PROCESS.

The hearing process itself has denied O███and his mother the Due Process to which they are entitled under the IDEA.  In fact, we must first emphasize that this closing memorandum has been significantly delayed because DCPS failed to produce adequate *verbatim* transcripts of the hearing.

The first transcript (of Day One) was so rife with errors that both parties agreed to have it replaced.  It was literally unusable.  The second transcript (of both Days One and Two), while better, still contains a multitude of errors, including misidentifying some of the parties and witnesses, as well as failing to contain the most basic of elements: a certification by a court reporter.  Given that some of the errors could have been avoided or corrected simply by reviewing the hearing application to obtain the correct spelling of O███mother's name, it is evident that little to no care was taken to ensure the accuracy of the transcript.  And since the transcripts took months to arrive, it also appears that during the additional delays, nothing was being done to prepare them or to check for accuracy.

Should this case proceed beyond the Due Process Hearing level, it is our position that DCPS has failed to comply with 34 C.F.R. §300.512(a)(4) and 34 C.F.R. §300.512(c)(3).  The failure to provide an accurate or timely transcript has prevented O███and his mother from receiving a timely decision.  The inadequate transcript is far from a mere technical error; it is one that impacts upon O███and his mother's statutory rights.

2

## III. REVIEW OF THE EVIDENCE.

All agree that O█ is a significantly learning disabled student who is eligible for a comprehensive special education program and placement.  As the Hearing Officer heard, during the 2005-2006 school year, he was a student at Our Lady of Victory, where he was unable to succeed despite numerous supportive services in and out of school.  Tr. at 45.[1]  O█ has severe attentional issues, even when medicated, as well as equally significant executive dysfunction, Tr. at 50, and those attentional issues interfere with his school performance in all activities.  Tr. at 51.  While all parties apparently agree O█ needs a full-time special educational placement, Tr. at 60 and 97, the school system's IEP calls for O█ to be in regular education 23 percent of the time.  DCPS exhibit 20, pg. 1.[2]  By contrast, the Kingsbury IEP mandates no regular education classes.  OO Exhibit 19, p.1.[3]

To implement its IEP last year, DCPS proposed to place O█ at the Prospect Learning Center, a separate special education facility, where mainstreaming is not possible.  Therefore, by its own actions (which were never explained or even rationalized), DCPS has proposed a placement not based on its own IEP, 34 C.F.R. §300.116(b)(2), and where its own IEP could not be implemented.

---

[1]The transcript of the January 16, 2007 proceedings is referred to as "Tr. at [page number]."  The transcript for the March 14, 2007 proceedings appear as "Tr. II at [page number]."

[2]It is actually unclear as to what DCPS ended up recommending for O█ educational program.  The notes from the final IEP meeting indicate that DCPS staff eventually accepted the mother's long standing position that O█ requires full-time special education is a separate setting.  However, at least one "final" version of the DCPS IEP clearly does not call for a full-time setting.

[3]Actually, the deficient hearing transcript refers to O█ need for a "full-time special education assessment."  Tr. at 60.  That is nonsensical.

3

There are additional, serious problems with the DCPS proposal. Prospect uses curricular material that is inappropriate for O█. Tr. at 81. The actual class size at Prospect was too large and different from that represented to O█ mother. Tr. at 81-82. And, of course, these significant problems became academic when it also was plainly established by testimony from the parent and DCPS alike that there was no space for O█ at Prospect -- and that there never would be. DCPS Exhibit 12, p.4.[4]

A school district fails to provide a FAPE when it does not identify a specific school at which a disabled child will, in fact, be educated. *A.K. ex rel. J.K. v. Alexandria City School Board,* 484 F.3d 672,679 (4th Cir. 2007). In this case, Prospect can neither implement the school system's IEP, nor is it available, due to a lack of space. All that O█ and his mother were provided were vague promises that his needs would be met – somehow and at some unidentified time in the future. DCPS did not even attempt to introduce evidence that available and/or qualified teachers and aides would be at Prospect by some date. Tr. II, at 138. Indeed, there was no evidence to show that DCPS even had the resources to carry out its promises. There simply was no showing that O█ IEP could have been implemented at Prospect, that the IEP was appropriate or that O█ would have received a FAPE under the DCPS proposal. On the other hand, there was strong and unrebutted evidence from the mother and her experts on each of these

---

[4]Dr. Eve Peterson, who runs Prospect, was very candid on this point. Tr. II, at 137. She testified that "Downtown" assured her that she could start another class at Prospect should she need it, but as of March 14, 2007, eight months into the school year, there was still no space for O█ at Prospect, nor did Dr. Peterson know when, how, and by whom any new class could be set up and run.

points.[5]  It is also critical to underscore that DCPS has utterly failed to provide for O███Speech

and Language needs.  This is a child who has been diagnosed in his Comprehensive

Psychoeducational Report as "Speech/Language Impaired," OO Exhibit 14, p.20, and for whom

Kingsbury has drafted an IEP calling for Speech/Language Therapy, 105 minutes per week.

Somehow DCPS has completed its IEP without any Speech/Language Therapy.

In the end, whatever DCPS meant to do, wished it could do, or planned to do for O███

the real life result of its proposal would have left O██ with no educational program to attend as

of the commencement of the 2006-2007 school year, and for many months thereafter.  If, at some

point in the future, a program became available at Prospect, neither the Hearing Officer nor the

mother have any idea who would have taught O███ class, who would have attended, whether

appropriate related services would have been provided, or how an IEP calling for less than full-

time special education could have been implemented in a school that has only special education

(not to mention an inappropriate curriculum).  Nothing here even approaches what the IDEA

guarantees O███ and his mother.


## IV. CONCLUSION.

The overwhelming weight of the evidence demonstrates that Kingsbury is an appropriate,

least restrictive placement for O███ while Prospect cannot provide him with a FAPE.  There is

no space, appropriate curriculum, assurance of necessary related services, or implementable IEP

at Prospect.  In contrast, O██ has benefitted greatly from Kingsbury and there has been no

---

[5]DCPS also did not attempt to demonstrate that O███ related sevices could be met at Prospect.
The Prospect Occupational Therapist may or may not have been able to meet his needs.  Once
more, we are left only to speculate.  Tr. II, at 132.

suggestion, let alone significant school system evidence, questioning anything about O███████

placement there.

Therefore, the Hearing Officer should order DCPS to place and fund O███O█████ at the

Kingsbury Day School for the 2006-2007 school year, reimbursing O████mother for any costs

already incurred.[6]

Respectfully Submitted,

*Michael J. Eig / Kmj*

Michael J. Eig
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for O███O█████ and his parent

*******************************************************************************
**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage
prepaid, to Saurabh Gupta, Esq., counsel for DCPS, on August 2, 2007.

*Michael J. Eig / Kmj*

Michael J. Eig

---

[6]During the long delays awaiting a usable transcript, and then after receipt of the transcript, we
have attempted to agree to an expedited briefing schedule with DCPS counsel. We have received
no response. Should DCPS decide to respond to this closing, it should do so by the date set by
the Hearing Officer, with a reply period reserved for us.



# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
———
(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |
| Of Counsel: | | | |
| Matthew B. Bogin | MD, DC | | |

June 8, 2007

Hearing Officer Banks
c/o Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
1150 5th Street, SE
Washington, D.C. 20003

Re:    O____/O____/DCPS
*via facsimile and first-class mail*

Dear Mr. Banks:

We have finally received the hearing transcripts for the above-referenced student. We were informed by the Student Hearing Office that they were ready for pick up on June 5, 2007, and my office picked them up yesterday, June 7, 2007. As we discussed on the last day of the hearing, Mr. Gupta and I will now be submitting simultaneous written closing arguments. I would propose that they be submitted to you on or before June 18, 2007. If Mr. Gupta has a practical problem with this date, by copy of this letter, I am asking that he contact my office to discuss another mutually agreeable date. Thank you.

Sincerely,

Michael J. Eig

cc:    Saurabh Gupta, Esq.
Claudia Pabo

36

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig          MD, DC
Haylie M. Iseman        MD, DC, NY

Of Counsel:
Matthew B. Bogin        MD, DC

Paula A. Rosenstock     VA, DC
Patricia Cyr            CA, DC

April 4, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: O███O████
*via facsimile and regular mail*

Dear Ms. Newsome:

We have received a hearing notice for April 18, 2007, for the above-referenced student. However, the hearing has been completed except for written closing arguments. The parties agreed at the last hearing that once everyone received copies of the corrected and complete transcripts for both days of the hearing (which we have yet to receive), that we would agree on a submission date. Please confirm in writing that the hearing scheduled for April 18, 2007, has been taken off of the calendar, and advise us when we can expect the transcripts. Thank you.

Sincerely,

Michael J. Eig



cc:     Ms. Claudia Pabo
        Hearing Officer Banks
        Saurabh Gupta, Esq.

37

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig          MD, DC
Haylie M. Iseman        MD, DC, NY

Of Counsel:
Matthew B. Bogin        MD, DC

Paula A. Rosenstock   VA, DC
Patricia Cyr          CA, DC

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome |
| | **DCPS Student Hearing Coordinator** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael J. Eig, Esq. |
| **Date:** | April 4, 2007 |
| **Time:** | 9:32 am |
| **Total Pages:** (including cover) | **2** |
| **Re:** | O██ O████ |
| cc: | Hearing Officer Banks |
| | (202) 442-5556 |
| | Saurabh Gupta, Esq. |
| | (202) 442- 5097-98 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

*Mr. Barr*

## LETTER MOTION FOR CONTINUANCE

District of Columbia Public Schools
State Enforcement & Investigative Division
Special Education Student Hearing Office
825 North Capitol Street, N.E. 8th Floor
Washington, DC 20002

*DC PUBLIC SCHOOL SYSTEM 2007 MAR 13 AM 11: 31*

Dear Student Hearing Officer:

This letter is to request a continuance of my Due Process Hearing currently scheduled to take place

on __March 14, 2007__ for __O▮ O▮▮▮__ DOB ▮▮▮.93 . I am unable

to appear for the hearing on this date for the following reasons:
1. My only rebuttal witness, Marlene Gustafson, has to fly out of town tonight for a medical emergency involving her daughter.
2. The transcript of the previous Due Process Htg upon which I have been trying to prepare, is missing hours of testimony, including Ms. Gustafson's direct, and is now being re-prepared.

I am available to appear for the hearing on the following dates:

1. __April 13, 2007__   2. __April 17, 2007__   3. __April 18, 2007__

I attempted to contact opposing counsel to discuss scheduling before proposing these dates: I spoke to

__Saurabh Gupta__ (opposing counsel) at __11:15__ A.M. / P.M. on __3/13/07__ (date).

Opposing Counsel ☐ agreed to the continuance ☒ did not agree to the continuance.

   I UNDERSTAND THAT THESE DATES MAY NOT BE AVAILABLE AND THAT THE
STUDENT HEARING OFFICE MAY NEED TO RESCHEDULE MY HEARING FOR
ANOTHER DATE.

   I ALSO UNDERSTAND THAT BY REQUESTING A CONTINUANCE I HEREBY WAIVE
RIGHTS TO A FINAL DECISION WITHIN 75 DAYS OF FILING THE DUE PROCESS
COMPLAINT.

   FURTHERMORE, I REALIZE THAT THE HEARING MAY GO FORWARD AS
SCHEDULED UNLESS I RECEIVE A WRITTEN DECISION FROM THE HEARING
OFFICER GRANTING A CONTINUANCE. IF I DO NOT RECEIVE A WRITTEN DECISION
GRANTING A CONTINUANCE AND I FAIL TO APPEAR FOR A SCHEDULED HEARING, I
UNDERSTAND THAT THE HEARING OFFICER MAY DISMISS MY REQUEST.

   BY MY SIGNATURE BELOW I CERTIFY THAT I HAVE PROVIDED THE OPPOSING
PARTY WITH A COPY OF THIS MOTION AND HAVE ATTACHED PROOF OF SERVICE
(FAX CONFIRMATION, COURIER RECEIPT, ETC.)

Parent/Advocate or Attorney Advisor: _____   Date: __3-13-07__

Telephone: __301-657-1740__   Fax: __(301) 657-3843__

Revised 05/23/06

39

## MICHAEL J. EIG AND ASSOCIATES, P.C.
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig      MD, DC
Haylie M. Iseman    MD, DC, NY

Paula A. Rosenstock    VA, DC
Patricia Cyr           CA, DC

# FAX

**To:**              Hearing Officer Terry Michael Banks
                     c/o Sharon Newsome
                     **Student Hearing Coordinator**
**Fax Number:**      (202) 442- 5556
**From:**            Michael J. Eig, Esq.
**Date:**            March 13, 2007
**Time:**            11:20 am

**Total Pages:**     2
(including cover)

**Re:**              O█, O████

cc:                  Sharon Newsome
                     (202) 442- 5556

                     Saurabh Gupta, Esq.
                     (202) 442- 5097/98

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

*SMO*

**Office of the Superintendent**
Office of the General Counsel
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000        Fax: 202-442-5098
www.k12.dc.us

March 7, 2007

Michael J. Eig, Esquire
5454 Wisconsin Avenue
Suite 760
Chevy Chase, MD 20815

## SUPPLAMENTAL DISCLOSURE STATEMENT

## VIA FACSIMILE 301-657-3843

**Subject: Due Process Hearing for O▇ O▇▇▇▇**
**DOB:      ▇▇▇93**

Dear Mr. Eig:

At the upcoming due process hearing in the above-referenced matter, scheduled for Thursday, March 14, 2007 at 9:00 a.m., and pursuant to 34 C.F.R. 300.509(a)(3), in addition to any documents and witnesses disclosed by the parent, DCPS may rely upon any of the following witnesses/documents[1]:

### Witnesses:

1. Marla Oakes, Executive Director, Office of Special Education, DCPS and/or designee(s) – 825 North Capitol Street, N.E., Washington, D.C. 20002; (202) 442-4800 – same for all Central Office staff;
2. Carol Helton, Assistant Director, Technical Support, School Support, DCPS, and/or her designee(s);
3. Erika Grey, DCPS Non-Public Placement Specialist, and/or designee;
4. Dr. Tiece Ruffin, DCPS Non-Public Placement Specialist, and/or designee;
5. Dr. Eve Peterson, Principal, Prospect LC, and/or designee(s) – 920 F Street, NE, Washington D.C. 20002; (202) 698-3800;
6. Cindy F. Brown L.I.C.S.W., Case Manager, C.A.R.E Center at Shaw Junior High, and/or designee – 925 Rhode Island Ave, NW, Washington D.C. 20001, (202) 671-0882 – Same for all CARE Center Staff;
7. Leslie Charles, Speech & Language Therapists, CARE Center, and/or designee;
8. Dr. Denise White-Jennings, Clinical Psychologist, CARE Center, and/or designee;
9. Jermaine Perkins, Psychologist, CARE Center, and/or designee;

Pursuant to 34 C.F.R. 300.509(a)(2) and 5DCMR 3031.1(b), DCPS hereby compels the attendance of the below named individual as a necessary and material witness(es):

1. **Claudia Pabo, mother**

---

[1] Witnesses may testify by telephone.

41



Page 2 of 2

**Documents:**

DCPS-01    Notarized Statement of Dr. Tiece Ruffin
DCPS-02    Prior Notice & MDT Notes (11/8/06)
DCPS-03    IEP and MDT Notes (11/8/06)
DCPS-04    Prior Notice & MDT Notes (8/30/06)
DCPS-05    IEP and MDT Notes (8/30/06)
DCPS-06    Occupational Therapy Evaluation (10/19/2006)
DCPS-07    Social Work Evaluation Report (6/28/06)
DCPS-08    Educational Evaluation (5/30/2006)
DCPS-09    Classroom Observations (7/10/20060
DCPS-10    Speech & Language Evaluation (5/18/2006)
DCPS-11    Neuropsychological Evaluation (5/3/2006)
DCPS-12    Prior Notice & MDT Notes (9/21/2006)
DCPS-13    Contact Log
DCPS-14    November 2006 Meeting Confirmation correspondences
DCPS-15    MDT Meeting invitation (9/8/2006)
*DCPS-16*    Classroom observation: Jermaine Perkins (7/11/2006)
*DCPS-17*    L. Solomon letter to Cindy Brown (8/18/2006)
*DCPS-18*    C. Brown letter to Ms. Pabo (8/10/2006)
*DCPS-19*    MDT Meeting Confirmation Notice (7/13/2006)
*DCPS-20*    IEP Meeting (8/10/2006)
*DCPS-21*    MDT Meeting (8/10/2006)

DCPS reserves the right to examine any witness called or identified as a potential witness by the representative of Dayvonne Elvis, as if such witness was called by DCPS. Also, DCPS reserves the right to rely upon and/or use any documents/witnesses presented and/or disclosed by the parent that DCPS deems relevant in this case. Lastly, DCPS reserves the right to call rebuttal witnesses in this matter.

If you wish to discuss any aspect of this case further, or have questions, please contact me at (202) 442-5178.

Sincerely,

Saurabh Gupta
Attorney Advisor


cc:    Student Hearing Office

42



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

Central Assessment Referral and Evaluations
(C.A.R.E.) CENTER @ Shaw JHS
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001
202-671-0882, fax: 202-673-6557
www.k12.dc.us

## REVIEW OF INDEPENDENT EVAUATION
## AND CLASSROOM OBSERVATION
### (Confidential for professional use only)

NAME: O█████O██████                    REPORT DATE: 7/11/06
AGE: 13 years, 3 months               OBSERVER: Jermaine Perkins
DATE OF BIRTH:█████/1993              PARENTS: Claudia Pabo/ Charles Oliver
GENDER: Male                          TEACHER: Ms. Beck
ID: 9051483
GRADE: 5th
SCHOOL: Our Lady of Victory

**Assessment Techniques Utilized:**

Classroom Observation (6/05/06)
Teacher Interview (6/05/06)
Record Review (7/03/06)
- Report of Neuropsychological Evaluation (5/3/06)

**Background Information/Record Review**

     Based on a reviewed Neuropsychological Evaluation, O███ was found to have respectively met the DSM-IV criteria for a Cognitive Disorder Not Otherwise Specified (NOS); Mixed Receptive-Expressive Language Disorder; Learning Disorder NOS; Mathematics Disorder; Disorder of Written Expression; Developmental Reading Disorder; Attention Deficit Hyperactivity Disorder NOS; Adjustment Disorder of Childhood with Mixed Emotional Features; and Post-Traumatic Stress Disorder. There were noted cognitive processing weaknesses that encompassed visual perception and organization, memory (particularly with visual stimuli), and attention. Results from projective measures and rating scales correlated with deficits in social emotional functioning. O███ generally displayed below average academic skills across all noted domains (i.e. reading, math, and written language). Notably, he exhibited better reading and spelling skills on the Wide Range Achievement Test-Third Edition (WRAT-III)

**DCPS - 16**

43

when compared to his corresponding performances on Wechsler Individual Achievement Test-Second Edition (WIAT-II).

## Classroom Observation

In order to provide an informal assessment of O___ functioning in his current educational setting, a classroom observation was conducted. On this day, the class consisted of approximately 15 students and 1 teacher. The class activity for the day consisted of a group writing exercise.

Upon this observer's arrival into the classroom, the class was stratified into groups of approximately 3 to 4 students. Each group had a laptop and appeared to be either completing or editing their respective paper. At this time, O___ was seated away from his group with no interaction with his peers. His teacher did later prompt him to "get with his group." She then came by and assisted him in moving closer. Thereafter, he appeared to be still disengaged from the group based on his lack of attention and absence of input toward the task. Another student later approached the group, and appeared to ask O___ a question, of which he gave some type of response. No further interaction was observed. A subsequent question or comment was directed to O___. Shortly after this occurrence, he was observed leaving his group's area and moving his seat back to his desk. A female group-member later came by and engaged him, at which case he returned back to the group. Although he was positioned closer and was looking at the laptop screen, he displayed negligible interaction with other students. O___ did begin to assist with the typing of the paper. He exhibited limited typing skills, as noted by a slow index finger pecking motion. It was observed that his group-mate assisted him by instructing to push the shift and space bar on different occasions. Another instance saw others telling O___ to add a comma and particular words. As the class transitioned and prepared for the next exercise, he went back to his desk. Subsequently, O___ was observed kicking and hitting his bag in what appeared to be a demonstration attempt to another student. Thereafter, he was observed hitting his head with a book, which prompted one of his group-members to respond, "stop."

## Teacher Interview

To further gain insight into O___ functioning in his present educational setting, a brief teacher interview was conducted with his homeroom teacher, Ms. Beck. She described O___ as a young man who is well spoken, can read well, and has good ideas as pertaining to writing. She reported significant difficulties with attention and organization (e.g. turning in homework). O___ lack of focus is stated to impact his reading comprehension, written expression, and general task completion (takes twice as much time). In regard to written language, Ms. Beck explained that she has to assist him by going through the steps of brainstorming and paragraph development. It was added that he works better in a small group or one-on-one. Ms. Beck indicated that O___ can have problems with transitions, which has since been addressed by having more of a self-

Oliver, O.
3.

contained (less class changes) classroom for this academic year. By report, O▇▇ was
suspended a month prior to this observation because of problem behaviors. Ms. Beck
noted that a medication miss-match (reportedly high dosage), as a primary determinant to
his functioning (e.g. more irritable) during this period. Accordingly, his behavior is
described as being qualitatively better when compared to the beginning of the year.

### Summary and Impressions

Based on the reviewed evaluation, observation, teacher interview, and record
review, it appears that O▇▇ would meet the DCPS criteria for a child with a "Learning
Disability." A final determination regarding eligibility for Special Education services
and/or related services will be made at the Multi-Disciplinary Team (MDT) meeting.

**This report is valid only if signed by a qualified professional:**

Jermaine Perkins
School Psychologist

LAURA SOLOMON, ED.D.

SPECIAL EDUCATION SERVICES, INC.

5512 30TH STREET, NW
WASHINGTON, DC 20015
202-244-5336
FAX 202-244-5045
EMAIL: placeyourkids@aol.com

August 18, 2006

Cindy Brown, LICSW
District of Columbia Public Schools
Central Assessment Referral and Evaluation
925 Rhode Island Avenue, NW
Washington, DC 20001

RE: O████O█████

Dear Ms. Brown,

  Enclosed please find my Supplementary Evaluation on O████O█████. Please let me know if you need any additional information from me or if any member of the IEP Team would like to discuss my findings and/or recommendations prior to the IEP meeting that is scheduled for 8/30/06.  Thank you.

Sincerely,

*Laura Solomon, Ed.D.*

Laura Solomon, Ed.D.
Special Education Consultant

cc: parents
  Michael Eig, Esq., and Associates







U.S. POSTAGE PAID
CHEVY CHASE, MD
20815
AUG 24 '06
AMOUNT
**$5.12**
0009285-10

20001

0000

7004 2890 0000 7421 5229

LAURA SOLOMON, ED.D.

SPECIAL EDUCATION SERVICES, INC.

5512 30TH STREET, NW
WASHINGTON, DC 20015

Cindy Brown, LICSW
DCPS    CARE Center
925 Rhode Island Ave, NW
Wash. DC 20001

47



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

Central Assessment Referral and Evaluations
(C.A.R.E.) CENTER @ Shaw JHS
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001
202-671-0882, fax: 202-673-6557

August 10, 2006

Ms. Claudia Pabo
3512 Rodman Street, N.W.
Washington, D.C. 20008

*Via regular mail*

Re:     O█, O█ (DOB: █/'93)

Dear Ms. Pabo,

Due to your absence at the Multi-disciplinary Team (MDT)/Individualized Educational Program (IEP) Meeting, scheduled for today, DCPS proceeded with the special education process in your absence. This was the third attempt to convene the MDT/IEP meeting and as of yesterday, you confirmed that you would be present. Furthermore, DCPS must comply with the 120-day timeline and consequently, proceeded in determining your child's eligibility for special education services and developing an IEP. Enclosed is a copy of the IEP for your review. Placement will be discussed in the near future. If you have any questions or concerns, please contact me at 202/671-0882. If you wish to provide a written response, it can be forwarded to my attention via facsimile at 202/673-6557.

Sincerely,

Cindy F. Brown, LICSW
Case Manager

Cc:     Patricia Young, Director– C.A.R.E. Center

**DCPS - 18**

48



**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

Central Assessment Referral and Evaluations
(C.A.R.E.) CENTER @ Shaw JHS
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001
202-671-0882, fax: 202-673-6557

# facsimile transmittal

| | | | | |
|---|---|---|---|---|
| To: | Laura Solomon | Fax: | 202/244-5045 | |
| From: | Cindy F. Brown, LICSW – | Date: | 7/13/2006 | |
| | Case Manager | | | |
| Re: | Q███ O█████ | Pages: | 6 | |
| CC: | | | | |

☐ Urgent    ☐ For Review    ☐ Please comment    ☐ Please Reply    ☐ Please Recycle

Copy of Classroom Observation
Confirmation of Meeting Notice

Thank you

```
          ***********************
          ***   TX REPORT   ***
          ***********************


  TRANSMISSION OK

  TX/RX NO              4880
  RECIPIENT ADDRESS     92445045
  DESTINATION ID
  ST. TIME              07/13 08:48
  TIME USE              03'40
  PAGES SENT            6
  RESULT                OK
```



**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

Central Assessment Referral and Evaluations
(C.A.R.E.) CENTER @ Shaw JHS
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001
202-671-0882, fax: 202-673-6557

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Laura Solomon | Fax: | 202/244-5045 |
| From: | Cindy F. Brown, LICSW – | Date: | 7/13/2006 |
| | Case Manager | | |
| Re: | | Pages: | 6 |
| CC: | | | |

☐ Urgent    ☐ For Review    ☐ Please comment    ☐ Please Reply    ☐ Please Recycle

Copy of Classroom Observation
Confirmation of Meeting Notice

50

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.
INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP  Page 1 of 4
Additional Comments: ☐

## I. IDENTIFICATION INFORMATION

**II. CURRENT INFORMATION**

Date of IEP Meeting: 8/10/06
Date of Last
IEP Meeting: N/A
Date of Most Recent
Eligibility Decision: 8/10/06

Student Name: Last O███     First O███     MI

Student ID 9051483     Soc. Sec. No.     Age: 13     Grade 7

Gender ☒ M ☐ F     Date of Birth ███/93     Ethnic Group Asian-American

Address     3512 Rodman Street, N.W.
House No.     Street Name     Quadrant     Apartment #
Washington, D.C. 20007
City     State     Zip Code

☐ Non-attending

Attending School Our Lady of Victory     Home School Eaton ES

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Parent     Claudia Pabo/Charles Oliver

Address of (if different from student):     ☐ Parent ☐ Guardian ☐ Surrogate

House No.     Street Name     Quad.     Apt. No.     City     State     Zip Code

Telephone: Home 202/966-4368     Work 202/418-1595

Purpose of IEP Conference:
☒ Initial IEP     ☐ Review of IEP
☐ Requested Eval.     ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:
IV

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| ☒ BEHAVIOR | ☒ TRANSPORTATION |
| ☐ ESY | ☐ TRANSITION |

## III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements |
|---|---|---|---|---|
| Student | English | English | N/A | English |
| Parent | English | English | English | Native Lang |
| Home | English | N/A | N/A | English |

To be completed by Office of Bilingual Education
English and Math Proficiency Assessment

Oral _____
Rdg./ Written _____
Instrument: _____
Date: _____

## IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hr / Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # | wks./mos |
|---|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | .0 | 24.0 | 24.0 | Hour | Week | Gen Ed and/or Spec Ed Tchr | 8/28/06 | 10 | mos |
| Psychological Services | .0 | 1.0 | 1.0 | Hour | Week | Social Worker/Psychologist | 8/28/06 | 10 | mos |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| TOTAL | | 24.0 | 25.0 | Hours Per Week | | | | | |

## V. Disability(ies)

Other Health Impairment (OHI)

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☐ 0-20%     ☐ 21-60%     ☒ 61-100%

Percent of time NOT in a Regular Education Setting 77%

## VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Claudia Pabo - Mother     not present

Cindy F. Brown, LICSW - Case Manager/SW     Cindy F. Brown (LCSW)

Jermaine Perkins - School Psychologist     Jermaine Perkins

D. White-Jennings, Ph.D. - Clinical Psychologist     not present

Leslie Charles - Speech Therapist     Leslie J. Charles

Harry Brackenberry - LEA / Harry Brackenberry LEA
Special Ed Tchr.

Michael Ellis - Spec Ed Tchr/IEP Developer

_I AGREE_ with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.
Parent/Guardian Signature     Date

District of Columbia Public Schools     07-02-2001

**DCPS - 20**

Appendix - A     IEP Page 1 of 4

51

| Student Name    O█  O██████ | | Managing School  C.A.R.E. Center | DCPS - IEP |
|---|---|---|---|
| Student ID Number 9051483 | DOB  ███/93 | Attending School  Our Lady of Victory | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)** J. Bulter (Indep Eval); J. Perkins, Reviewer

**Score(s) When Available**

Math Cal.    96    6.7
Math Rea.    87    4.9

Math Strengths:

Low average problem-solving skills and aveage math calculation skills

See goal page:

Date:  5/30/06 (Indep Eva

Impact of disability on educational performance in general education curriculum:

Weaknesses in reading comprehension, as well as deficts in attention, organization, and impulse control negatively impact academic performance.

Rdg. Com    84    3.6

Reading Strengths:

Overall low average to average basic reading and writing skills

Rdg. Basic    97    6.3
Written Ex.    85    4.8

Impact of disability on educational performance in general education curriculum:

Weaknesses in reading comprehension, as well as deficts in attention, organization, and impulse control negatively impact academic performance.

See goal page:

Date:  5/30/06 (Indep Eval)

**Communication (Speech & Language) (Evaluator)**

**Score(s) When Available**

Strengths:

Exp. Lang.
Rec. Lang.
Artic
Voice
Fluency

Impact of disability on educational performance in general education curriculum:

Exp. Voc.
Rec. Voc.
See goal page:
Date:

**Motor/Health (Evaluator)**

**Score(s) /Results When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:

Date:

**Social Emotional Behavioral Areas: (Evaluator)** D. White-Jennings, Ph.D. (Reviewer)

**Score(s) When Available**

N/A

Strengths:

Able to express needs; responds well to praise, rewards; wants to acheive

Impact of disability on educational performance in general education curriculum:

Deficits in social-emotional functioning, as well as deficts in attention, organization, and impulse control negatively impact academic performance.

See goal page:

Date:  7/10/06

**Cognitive/Adaptive Behavior: (Evaluator)** Federici (Indep Eval); J. Perkins, Reviewer

**Score(s) When Available**

| FSIQ - 74 | VCI - 83 |
|---|---|
| PRI - 71 | WMI - 83 |
| PSI - 83 | TONI-3 - 80 |

Strengths:

Impact of disability on educational performance in general education curriculum:

Weaknesses in reading comprehension, as well as deficts in attention, organization

See goal page:

Date:  5/3/06; 7/11/06

**Prevocational Skills: (Evaluator)**

**Score(s) When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:

Date:

| Student Name     O___O_____ | Managing School     C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number   9051483     DOB   __93 | Attending School   Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**     Additional Comments:

Area addressed by goal:     Academics: Reading

Goal Number: [ I ]

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate growth in reading skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s):     General Education and/or Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate adequate reading fluency, as evidenced by his ability to self-correct errors while reading passage material, respond appropriately to punctuation marks, and determining familiar/unfamiliar words w/speed, 80% of the time over a consistent period of time. | | Weekly |
| The student will use various strategies (i.e., sound segmentation, phonics skills, linguistic patterns, structural analysis, context clues) to correctly determine the pronunciation and meaning of familiar and unfamiliar words in isolation and in text, 80% of the time over a consistent period of time. | | Monthly |
| The student will use various strategies (i.e., rereading, paraphrasing, self-questioning, highlighting, outlining, mapping, illustrating) without teacher prompting to enhance comprehension of material 80% of the time. over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will orally and in writing answer who, what, when, where, and why questions with 80% mastery over a consistent period of time. | | Weekly |
| After reading passage material at the instructional level, the student will answer questions (orally and in writing) regarding the sequence of events and specific details/facts with 80% mastery over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will identify, give the meaning, and discuss literary devices/forms (i.e., metaphors, analogy, exaggeration, personification, etc…) that are used in text in order to enhance comprehension, 80% mastery over a consistent period of time. | | Weekly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name    O⬛O⬛ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483_     DOB ⬛⬛93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**     Additional Comments:     Goal Number: [ 2 ]

Area addressed by goal: _____Academics: Reading_____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in reading skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): ____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| After reading passage material at the instructional level, the student will accurately summarize (orally and in writing) events from the passage material 80% of the time over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will, orally and in writing, accurately answer questions in a complete sentence that require him to identify the main idea, compare characters, predict events, and draw conclusions with 80% mastery over a consistent period of time. | | Weekly |
| After reading passage material at the instructional level, the student will, orally and in writing, accurately answer questions in a complete sentence that require him to infer information based on information referenced in the text with 80% mastery over a consistent period of time. | | Weekly |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools     07-02-2001     Division of Special Education  Appendix – A     IEP Page 3 of 4

54

| Student Name          O___ O_____ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
|---|---|---|
| Student ID Number  9051483 _____ DOB ____93 | Attending School  Our Lady of Victory ___ | Page 3 of 4 |

| VII. SPECIALIZED SERVICES | Additional Comments: | Goal Number: [  ] |
|---|---|---|

Area addressed by goal: _____ Academics: Written Expression _____

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in written expression skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will write letters, words, and numbers with correct formation, sizing, and spacing, 8 out of 10 attempts over a consistent period of time. | | Weekly |
| Given various word lists, including sight word lists, at his instructional level, the student will utilize strategies to correctly spell familiar one- and multi-syllable words from dictation with 80% mastery over a consistent period of time. | | Weekly |
| Given spelling words mastered in isolation, the student will correctly use these words in writing sentences of increasing length and complexity with 80% mastery over a consistent period of time. | | Weekly |
| Given at least five sentences, the student will correctly sequence sentences for writing, 8 out of 10 attempts over a consistent period of time. | | Weekly |
| Given a teacher- or student-identified writing prompt, the student will write sentences of increasing length and complexity using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given sets of simple sentences, the student will combine simple sentences to make compound sentences, 8 out of 10 attempts over a consistent period of time. | | Weekly |

| EVALUATION PROCEDURE(S) |
|---|
| X Portfolio ☐ Log ☐ Chart  X Test  X Documented Observation ☐ Report ☐ Other _____ |

| Student Name _____ O___ O___ | Managing School ___ C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483_____ DOB ___93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: [ ]

Area addressed by goal: _____ Academics: Written Expression _____

ANNUAL GOAL: (including mastery criteria.)

> The student will demonstrate growth in written expression skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a teacher- or student-identified writing prompt, the student will elaborate on sentences by adding adverbs, adjectives, and phrases, as well as using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given various types of sentences, the student will distinguish between and write sentences (i.e., declarative, interrogative, etc...) using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given a teacher- or student-identified writing prompt, the student will use various strategies (i.e., mapping, webbing, outlining, etc...) to organize information and ideas before writing – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| After identifying a topic, the student will write a simple paragraph using correct format, sequencing, as well as capitalization, punctuation, spelling, grammar, and syntax and grammar 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given a teacher- or student-identified writing prompt, the student use organizational strategies and write a paragraph using the correct format (i.e., topic sentence, supporting details, and concluding sentence), as well as correct capitalization, punctuation, spelling, syntax, and grammar, 80% mastery over a consistent period of time. | | Monthly |
| Using a list of writing goals/guidelines, the student will proofread written drafts to correct for punctuation, capitalization, spelling, syntax, and grammar – 8 out of 10 opportunities over a consistent period of time. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
|---|
| X Portfolio ☐ Log ☐ Chart  X Test  X Documented Observation ☐ Report ☐ Other _____ |

| Student Name    O███O████ | Managing School    C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number   9051483         DOB    ██93 | Attending School  Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:                                    Goal Number: ☐

Area addressed by goal:        Academics: Written Expression

ANNUAL GOAL: (including mastery criteria.)

| The student will demonstrate growth in writing skills, as evidenced by mastery of the following short-term objectives by 80%. |
|---|

Provider(s):        General Education and/or Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Using a list of writing goals/guidelines, the student will edit written assignments to improve the quality of drafts by identifying needed changes in word choices, sentence structures, as well as identifying errors in punctuation, capitalization, spelling, syntax, and grammar errors – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| Using a list of writing goals/guidelines, the student will revise written assignments to improve the quality of drafts by changing and/or word choices, modifying/correcting sentence structures, as well as correcting for punctuation, capitalization, spelling, syntax, and grammar errors – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| | | |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

X Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools      07-02-2001      Division of Special Education  Appendix – A      IEP Page 3 of 4

57

| Student Name ___O___O___ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483_____ DOB __93_ | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: [ ] |
|---|---|---|
| | Area addressed by goal: ___Academics: Mathematics___ | |

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in mathematical skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** _____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| At his instructional level, the student will compare and order very large numbers in standard, expanded, and exponential forms with 80% mastery over a consistent period of time. | | Monthly |
| Using manipulative materials and/or symbols, the student will demonstrate understanding of place value up to hundred thousandths by interpreting the model of a number, modeling a number, matching the model of a number with the written symbol, and illustrating a number with the model -- all with 80% mastery over a consistent period of time. | | Monthly |
| The student will recall and math facts (i.e., addition, multiplication, etc...), as well as effective strategies for determining these math facts with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will correctly complete computation problems involving multi-digit calculations (i.e., additional, subtraction, multiplication and division) with 80% mastery over a consistent period of time. | | Monthly |
| Given at least ten real world math problems involving multiple steps at his instructional level, the student will demonstrate understanding of comparative and quantitative terms, by identifying number relations and then, identifying the correct sequence of operations to correctly solve these problems - 80% mastery over a consistent period of time. | | Monthly |
| Given math calculation and word problems involving multiple steps at his instructional level, the student will identify the correct sequence of operations and then apply appropriate strategies to correctly solve these problems - 80% mastery over a consistent period of time. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
|---|
| X Portfolio ☐ Log ☐ Chart X Test X Documented Observation ☐ Report ☐ Other _____ |

| Student Name ___ O█ O█████ | Managing School ___ C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483_____ DOB ___██93 | Attending School _Our Lady of Victory_____ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ☐ |
|---|---|---|

Area addressed by goal: _____Academics: Mathematics_____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in mathematical skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s):_____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| At his instructional level and using manipulative materials and/or symbols, the student will demonstrate understanding of the following fraction concepts: name fractional parts, sequencing fractions, finding equivalent fractions, renaming improper fractions and mixed numbers, reducing fractions – all with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will complete computation problems involving addition and subtraction of mixed numbers with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will complete computation problems involving multiplication and division of mixed numbers with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will apply appropriate strategies to correctly solve problems involving time with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will apply appropriate strategies to correctly solve problems involving the conversion, addition, and subtraction of units of measurement (within the same measurement system) for length, volume, capacity, and weight with 80% mastery over a consistent period of time. | | Monthly |
| Using manipulative materials and/or symbols, the student will count dollar/coin combination amounts and correctly make change for any dollar/coin combination amount with 80% mastery over a consistent period of time. | | Monthly |

**EVALUATION PROCEDURE(S)**

X Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name ___O___O___ | | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
| Student ID Number __9051483__ | DOB ___93___ | Attending School __Our Lady of Victory__ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:

Area addressed by goal: _____Cognitive_____

Goal Number: [ 8 ]

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in the area of cognition, especially as it relates to attention and organization, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given previously presented strategies for improving attentional skills, the student will use these strategies for improving attention skills with minimal prompting or cueing 80% of the time. | | Weekly |
| Given previously presented strategies for improving organizational skills (i.e., checklists, planner, outlines, etc...), the student will use these strategies for improving organization skills needed to successfully complete academic activities with minimal prompting or cueing 80% of the time. | | Weekly |
| The student will start and complete tasks as assigned by teacher/adult with minimal redirection and/or prompting from teacher/adult, 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will sustain attention during a variety of activities (i.e., presentation, lesson, discussion, classwork, group activity, etc...) with minimal redirection and/or prompting from teacher/adult, 8 out of 10 situations over a consistent period of time. | | Weekly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio   X Log   ☐ Chart   ☐ Test   X Documented Observation   ☐ Report   ☐ Other _____

| Student Name _____ C_____O_____ | Managing School ____ C.A.R.E. Center ___ | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483___ DOB __ ___93 | Attending School Our Lady of Victory _____ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: 9 |
|---|---|---|

Area addressed by goal: _____ Social - Emotional _____

**ANNUAL GOAL: (including mastery criteria.)**

> The student will demonstrate growth in social-emotional functioning in the area of coping skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ Social Worker/Psychologist/Therapist and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will appropriately verbalize and discuss his emotions, both positive and negative, with minimal prompting from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will **identify** various adaptive coping strategies (i.e., self time-out, counting, participating in calming activity, deep breathing, etc…) to effectively manage negative emotions (i.e., anger, frustration, anxiety, etc…) with minimal assistance from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will **identify and utilize** various adaptive coping strategies (i.e., self time-out, counting, participating in calming activity, deep breathing, etc…) to effectively manage negative emotions (i.e., anger, frustration, anxiety, etc…) with minimal assistance from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will identify and demonstrate appropriate behavioral responses to a variety of situations, both positive and negative, with minimal assistance or prompting from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| Given a variety of problem situations, the student will identify the problems, select adaptive coping strategies by which to solve it, and implement the appropriate strategy for resolution with minimal assistance from adult/therapist/teacher, 8 out of 10 situations over a consistent period of time. | | Monthly |
| The student will accept redirection and/or consequences for inappropriate behavior with decreasing need for emotional and/or behavioral support therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio  X Log  X Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____ |

| Student Name    O████ O███████ | | Managing School    C.A.R.E. Center | DCPS – IEP |
|---|---|---|---|
| Student ID Number  9051483    DOB  ███93 | | Attending School  Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:                Goal Number: 10

Area addressed by goal:    Social - Emotional

ANNUAL GOAL: (including mastery criteria.)

The student will demonstrate growth in social-emotional functioning, especially as it relates to interpersonal skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s):    Social Worker/Psychologist/Therapist and/or Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will develop a therapeutic relationship with his therapist, as evidenced by his willingness to disclose personal thoughts to therapist with minimal prompting and/or emotional support in 8 out of 10 sessions over a consistent period of time. | | Weekly |
| The student will appropriately verbalize thoughts, emotions, and/or needs to peers and adults (i.e., /teachers, school staff, therapist) with minimal behavior and/or emotional support from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| Given a variety of structured and unstructured social situations, the student will engage in positive, non-provocative, and non-aggressive interactions with peers and adults with minimal prompting and/or redirection from teachers/adults – 8 out of 10 opportunities over a consistent period of time. | | Weekly |
| Given a variety of social situations, the student will demonstrate the ability to take another's perspectives by identifying/stating the other's perspective in such situations - 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will comply with requests or directives from adults/teachers/therapist with minimal prompting, cueing and/or redirection from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will appropriately ask for assistance, when necessary or as appropriate, with regard to academic activities or social situations with minimal need for intervention from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  X Log  X Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name    O__ O_____ | | Managing School    C.A.R.E. Center | DCPS – IEP |
|---|---|---|---|
| Student ID Number  9051483          DOB    __/93 | | Attending School  Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**

Additional Comments:

Goal Number: ⬜ _II_

Area addressed by goal: _____Social-Emotional_____

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate growth in social-emotional functioning, especially as it relates to interpersonal skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** _____Social Worker/Psychologist/ Therapist and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate improved self-advocacy skills, as evidenced by his ability to act in a manner that allows him to seek assistance or solve problems on his own during interactions with peers and adults - 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will demonstrate socially appropriate conversational skills, including appropriate responses to nonverbal cues, with minimal prompting and/or redirection from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will accept redirection from teacher/adult/therapist with minimal need for behavioral support from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will accept consequences for negative or inappropriate behavior with minimal need for emotional and/or behavioral support or intervention from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

⬜Portfolio  X Log  ⬜Chart  ⬜Test  X Documented Observation  ⬜Report  ⬜Other _____

| Student Name _____ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
|---|---|---|
| Student ID Number __9051483_____ DOB ____93___ | Attending School _Our Lady of Victory__ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ⌐1 2⌐ |

Area addressed by goal: _____Social-Emotional_____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate increased self-regulation, impulse-control, and frustration tolerance, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____Social Worker/Psychologist/ Therapist and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will complete classroom activities/assignments with no more than two prompts from therapist/teacher/adult during the activity/assignment in 8 out of 10 events. | | Weekly |
| The student will utilize organizational skills necessary for successfully completing work assignments within specified period of time with minimal reminders and/or prompting from therapist/teacher/adult during the activity/assignment in 8 out of 10 events. | | Weekly |
| Given a novel or challenging task that the student perceives as challenging, the student will approach the task with a positive attitude and persist through the task with minimal behavioral support (i.e., redirection, cueing, prompting) from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will self-initiate the completion of assignments with no more than two prompts by therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will demonstrate improved self-regulation of behavior and emotional responses, as evidenced by her ability to use adaptive strategies to remain on task, remain calm or calm herself, demonstrate appropriate boundaries, and make appropriate comments to others with minimal need for emotional and/or behavior support from therapist/teacher/adult, 80% of the time over a consistent period of time. | | Weekly |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  X Log  ☐ Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name _____ O___ O___ | Managing School ___ C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number __9051483____ DOB __███/93__ | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ⌐13 |
|---|---|---|

Area addressed by goal: _____ Social-Emotional _____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in area of self-concept, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ Social Worker/Psychologist/ Therapist and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate improved self-concept, as evidenced by his ability to appropriately verbalize personal and academic strengths in discussions with peers and adults, 8 out of 10 situations over a consistent period of time. | | Monthly |
| The student will demonstrate increase self-confidence, as evidenced by his ability to take risks in academic and social situations with a decreasing need for behavioral and/or emotional support from therapist/teacher/adult, 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| With the assistance from therapist/teacher/adult, the student will identify negative/problematic behavior and with assistance, develop a plan for changing behavior with rewards, consequences, and monitoring. | | Weekly |
| With the assistance from therapist/teacher/adult, the student will monitor his progress toward identified goal(s) for academic and/or personal achievement. | | Monthly |
| | | |
| | | |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio  X Log  ☐ Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____ |

| Student Name | O█ O█ | Managing School | C.A.R.E. Center | DCPS - IEP |
| Student ID Number 9051483 | | DOB ███93 | Attending School Our Lady of Victory | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
## SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education? ☐ Yes ☑ No

Explanation for removal out of regular education classroom.

The student requires a therapeutic setting with small teacher/student ratio. Student also requires accomodaions/modifcations that cannot be implemented in the general education setting.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| Word processor | | 10.0 | 10.0 | Hour | Week | Gen Ed and/or Spec Ed Tchr | 8/28/06 |
| Highlighters | | 27.5 | 27.5 | Hour | Week | Gen Ed and/or Spec Ed Tchr | 8/28/06 |
| templates to reduce visual field | | 27.5 | 27.5 | Hour | Week | Gen Ed and/or Spec Ed Tchr | 8/28/06 |
| calculator | | 10.0 | 10.0 | Hour | Week | Gen Ed and/or Spec Ed Tchr | 8/28/06 |
| | | | | | | | |

Check and list modifications and/or accommodations for testing: ☐ None needed

Timing/Scheduling: extra response time; breaks, as needed; flexible scheduling; test sessions over several days

Setting: small group or one-to-one, as needed; behavioral support

Presentation: repeated and simplified directions; checks for understanding; Test read to student

Response: Written responses transcribed in test booklet by test administrator

Equipment: calculator

## XI. STATE AND DISTRICT ASSESSMENTS

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III  (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V  Portfolio: _____

☐ Level II  (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☒ Level IV  (Describe the alternative assessment) Test read to student

## XII. Areas Requiring Specialized Instruction and Related Services:

☑ Reading        ☐ Physical/Sensory      ☐ Transition
☑ Mathematics    ☑ Social Emotional      ☐ Vocational
☑ Written Expression  ☐ Physical Development  ☐ Independent Living
☑ Other: Cognitive   ☐ Speech/Language
☐ None    Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

**Modifications:**
☐ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| General Education Setting | Reject | |
| Combination General Ed/Resource Setting | Reject | School failure; impact on self-esteem |
| Out of General Education | Accept | Naegative impact on self-esteen |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

psychological services; small group or one-to-one instruction, as needed; behavioral support; extra response time; breaks, as needed; repeated and simplified directions; checks for understanding; calculator; templates to reduce visual field; highlighters; odified assignments and/or reduced workload; flexible scheduling; test sessions over several days

Location for Services _____

**District of Columbia Public Schools**
Washington, D.C.

I.E.P. Attachment A
Intervention Behavior Plan

**INTERVENTION BEHAVIOR PLAN**     Date Developed: ___8|10|06___

Student Name ___O██  O███___     ID# __9051483__     DOB: ███93   Grade __th__

Address _3512_   _Rodman Street_     _N.W._     _____   _Washington_     _D.C._   _20007_
        Street #    Street Name       Quadrant   Apartment #    City          State    Zip Code

Telephone (H) __202/966-4368__ (W) __202/418-1595__   Counselor _____

Attending School _Our Lady of Victory_     Teacher _____   Room _____ Section _____

**TARGETED BEHAVIOR(S):**                                       Additional Comments: ☐

> Refusal to complete schoolwork; Non-compliance with rules/routines or adult requests; withdrawal from situations when challenged; verbal aggression or inappropriate commenting toward peers and/or adults.

**POSITITVE INTERVENTION STRATEGIES: Student Objective –**

> Student will (1) appropriately verbalize needs, feelings, thoughts; (2) follow class rules/routine with minimal prompting; (3) appropriately ask for assistance from teacher when needed; (4) complete schoolwork with minimal prompting; (5) appropriately participate in class activities; and (6) interact with peers and adults in a friendly, non-provocative, non-aggressive manner.

Implementation description –

> Participation in behavior modification plan targeting specific behaviors and specified goals, rewards, and/or consequences. Development of behavioral contract with student identifying rewards for expected behavior

**POSITIVE INTERVENTION STRATEGIES: Teacher Strategies**

> Proximity; verbal prompting/cueing; redirection; immediate recognition when desired behavior is demonstrated; immediate redirection for inappropriate behavior; praise, rewards, and incentives; modeling; special privileges, responsibilities

**MONITORING SYSTEM: Responsible Teacher -** _General and/or Special Education Teacher_

Describe System –

> Charting of behavior; observation, treatment notes, anecdotal notes; Daily and/or weekly communication with parent regarding student's behavior and progress

Data Collection timeline –

> Daily

**FOLLOW-UP MEETING:** Date - _____

DISTRICT OF COLUMBIA PUBLIC SCHOOLS   07-02-2001  DIVISION OF SPECIAL EDUCATION   IEP ATTACHMENT A    INTERVENTION BEHAVIOR PLAN

67

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

| | IEP Attachment B<br>Transportation |
|---|---|

**TRANSPORTATION DIVISION**

**STUDENT TRANSPORTATION DATA FORM**

_____2006-07_____
School Year

_____905/483_____
STUDENT IDENTIFICATION NUMBER

(MDT must first determine if student meets the requirements for transportation services and has it included in the IEP.)

Person Making Request:  Cindy F. Brown, LICSW

Date of Request:  _____8/10/06_____

Status of Request:  _____

Date Request Received:  _____

Person Receiving Request:  _____

---

Ms. Claudia Pabo
_____
Parent / Guardian (Print legibly or type)

202/966-4368
_____
Telephone (H)

202/418-1595
_____
Telephone (W)

_____
Emergency Contact

_____
Relationship

_____
Telephone No.

_____
Pager / Cell No.

Students will be taken to a central location until 6:00 p.m. if the bus attendants are unable to deliver them to the designated location. After 6:00 p.m. the police will be contacted. This year's central location is _____

---

| O⬛ | O⬛ | |
|---|---|---|
| Student:    Last Name | First Name | MI |

3512    Rodman Street, N.W.
House No.    Street Name              Quad.    Apt.

Washington, D.C. 20007
City                          State    Zip Code

⬛13    M    English    C.A.R.E. Center - 202/671-0882
DOB    Gender    Primary Language    Submitting School and Telephone Number

OHI                              None
Disability Classification        Medical Issues

**MODE OF TRANSPORTATION**    ☒ *Bus   ☐ Tokens   ☐ Farecards
* SPECIAL ACCOMMODATIONS FOR BUS

Height _____    Weight _____

Oxygen        Tracheotomy tube        Seizures        Helmet

Harness        1:1 Aide        Behavioral issues _____

Medication _____    Specific allergies _Latex_

Dosage required during transportation :
☐ Yes  ☐ No    Dosage _____    ☐ PM ☐ AM

☐ Mobility  ☐ Ambulatory ( ☐ Cane, ☐ Crutch, ☐ Walker)
☐ Ambulatory w/ assistance ( ☐ Cane, ☐ Crutch, ☐ Walker)
☐ Non Ambulatory ( ☐ Standard, ☐ Motorized, ☐ Oversized
w/ lap tray  ☐ Yes  ☐ No)

☐ Car Seat        ☐ Positioning Device
☐ Special Restraint        ☐ Other, Describe: _____

---

Click one of the following:

☒ AM Pick-up & PM Drop-off is the same as the student address.

☐ _____    _____
AM Pick-up Address                        Telephone No.

☐ _____    _____
PM Drop-off Address                        Telephone No.

**Transportation will  NOT be provided without confirmed placement through the proper procedures. Justification for other than neighborhood settings must be explained on the back by the school official requesting the transportation services.**

Cindy F. Brown, LICSW        202/671-0882        8/10/06
School Official requesting transportation service:    Telephone No.        Date

School to Attend: _____    Address of School _____    Telephone No. _____

**Questions may be directed to the Special Education Transportation Liaison.**

District of Columbia Public Schools    07-02-2001    Division of Special Education    IEP Attachment B    Transportation

## EVALUATION TO JUSTIFY TRANSPORTATION

Student  O▮▮O▮▮▮▮_____  ID# 9051483_____  DOB ▮▮▮▮/93_____

Attending School   Our Lady of Victory_____  Neighborhood School   Eaton ES_____

Attach a copy to the Transportation Data Form and maintain as a part of the IEP

Justification for Transportation as a related service as stipulated in 300.24 (15). (Check all that apply):

1. ☐  Medical reports document a severe health condition that prevents the student from walking to school. Specify _____

2. ☐  Medical reports document a physical disability that prevents the students from walking to or getting to school independently. Specify _____

3. ☐  A documented severe cognitive disability prevents the students from walking or getting to school independently. Specify _____

4. ☐  A visual and/or hearing disability interferes with the student's ability to arrive at school independently. Documentation source _____

5. ☐  A severe communication disability prevents the student from communicating for his/her own safety Documentation source _____

6. ☐  A behavior /emotional disability is so severe or erratic that there is concern for the safety of the student and/or others. Documentation source _____

7. ☐  The student is eligible for the preschool special education program and could not participate without special transportation.

8. ☒  The student is/will attend a distant school because the IEP cannot be implemented at the zoned school.

9. ☐  The student is medically fragile. Documentation source _____

10. ☐  The student requires assistance to get on and off the bus. Documentation source _____

11. ☐  The student is unable to function independently due to the severity of the disability. Documentation source _____

12. ☐  The student requires a non-routine transportation schedule (i.e. contract services, abbreviated school day). Explain _____

13. ☐  Medical reports document that the student has a physical disability and/or severe health condition that prevents him or her from walking to school. Documentation source _____

14. ☐  A documented severe cognitive disability prevents the student from walking to school. Documentation source _____

15. ☐  Other (Specify)

     _____
     |                                                                    |
     |_____|

DISTRICT OF COLUMBIA PUBLIC SCHOOLS        07-02-2001        DIVISION OF SPECIAL EDUCATION        APPENDIX-A

69

I

**DOCUMENTED LEVEL OF SERVICE (PERM)**
Complete and attach to MDT/IEP meeting notes

| | | |
|---|---|---|
| School: Our Lady of Victory/C.A.R.E. | Principal S. Martinez (OLV) | Special Education Coordinator |
| Date 8/10/06    Case Manager Cindy F. Brown, LICSW | | Technical Support Supervisor |
| Student C■ O■ | DOB: ■93 Age 13 Grade | ID# 9051483    SSN# |
| Parent Claudia Pabo/Charles Oliver | Telephone (H) 202/966-4368 - Mom | (W) 202/418-1595 - Mom |

Address: 3512 Rodman Street, N.W.    Washington, D.C. 20007
Street #    Street    City    State    Zip Code

REFERRAL SOURCE: (Check)    [X] 120 Day    [ ] Reeval.    [ ] HOD    Quad   Apt. No.    [ ] SA    [ ] MA

[ ] Nonpublic    [ ] Residential    [ ] Citywide    [ ] Courts    [ ] Local School    [X] Other: C.A.RE. Center

Previous least restrictive environment (LRE Setting):    not previously in special education

---

**JUSTIFICATION FOR SETTING CONSIDERATION**
(Submit TAT/MDT Documentation)
SUPPORTIVE DATA/DOCUMENTATION

| 2. ACCOMMODATIONS/ MODIFICATIONS | 3. DATA REQUIREMENTS | | | | |
|---|---|---|---|---|---|
| Homework tracking system | Current IEP | Yes | [X] | No | [ ] |
| odifyingm ethods, amterials, presentations | Signatures of required participants (MDT notes) | Yes | [X] | | |
| change in grouping | Intervention Behavior Plan | Yes | [ ] | | |
| change n texts/materials | Copies of current class work and homework assignments: | Yes | [X] | | |
| positive reinforcement | Medical Reports: | Yes | [ ] | No | [ ] |
| one-to-one assistance | Clinical Reports: | Yes | [X] | No | [ ] |
| indivdual time to work on assisgnments | Psychiatric Reports | Yes | [ ] | No | [ ] |
| | Medications: | Yes | [ ] | No | [ ] |
| | Attendance Record | Yes | [ ] | | |
| | Copies of most recent evaluation(s) | Yes | [X] | | |

| 4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.) | 5. Resources needed for program implementation |
|---|---|
| SEP/Referral meeting - 4/26/06<br>MDT/IEP Meeting - 8/10/06<br>SEP     - 8/10/06 | Highlighters<br>Calculator<br>Work Processor<br>Templates to reduce visual field |

---

**6. CURRENT SETTING CONSIDERATIONS**

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | [ ] in general education classroom setting | [ ] general educators with consultation from special education staff | [ ] between 0% and 20% of service time |
| 2 | [ ] combination general education and resource classroom | [ ] combination general educators, special educators and related service providers | [ ] between 21 % and 60% of service time |
| 3 | [X] *out of general education classroom | [X] special educators and related service providers | [X] between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children m those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings)

Check the level of need as indicated:

DIRECTIONS:

| | |
|---|---|
| If two or three boxes are checked in the Row 1, check LOW.<br>If two or three boxes are checked in the Row 2, check MODERATE.<br>If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row,<br>check either MODERATE or HIGH,<br>depending on the need of the student. |

| 7. LEVEL OF NEED | | |
|---|---|---|
| [ ] LOW | [ ] MODERATE | [X] HIGH |

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM (MDT)

PRIOR NOTICE

Check Purpose:
- [X] Initial Evaluation
- [X] Initial Placement
- [ ] Reevaluation
  - [ ] Change in Category Exit
  - [ ] Related Service Add
  - [ ] Related Service
  - [ ] Change in Placement
  - [ ] Other _____

Date _August 10, 2006_

Student O__ O_____     DOB __93

School  Our Lady of Victory/C.A.R.E. Center

Current Disability Category  Other Health Impairment (OHI)

Setting  Out of General Education Setting

Dear  Ms. Pabo

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
~~Therefore, you are being notified of the following proposed changes:~~
- [X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)
- [ ] Your child is not eligible for special education service(s).
- [X] Your child is eligible or continues to be eligible to receive special education services as a student with  Other Health Impairment (OHI)
- [X] Your child will begin receiving  Psychological services  as a related service(s).
- [ ] Your child will no longer receive _____ as a related service(s).
- [ ] Your child's category of disability is being changed from _____ to _____
- [X] Your child's alternative placement on continuum (next setting) is being changed,
      from  Not in special education  to  Out of General Education Setting
- [ ] Your child is no longer eligible and will be exited from the special education program.
- [ ] Other: _____

**Description and Explanation of agency action proposed or refused.**

The MDT has reviewed evaluations/reports and determined that the student is eligible fo rspecial education services as a student w/ a disability classification of _OHI_ . He requires Out of General Education Setting, as accomodations/modifications cannot be implemented in the general education setting.

**Description of Other Options Considered and reasons for rejection of each option**

The MDT has reviewed evaluations/reports and determined that General Education Setting and Combination General Education/Resource Setting will not provide the appropriate level of services to address the student's special education needs. Accomodations/modifications cannot be implemented in the general education setting.

Other relevant factors to the decision- _____

MDT Members: [X] Principal or Designee     [X] General Education Teacher     [X] Psychologist
             [X] Parent                    [X] Special Education Teacher     [X] Other: Ed. Consultant
             [ ] Student                    [X] Speech and Language           _____
             [X] Social Worker             [X] *LEA & Interpreter (*may be one)  _____

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the **Procedural Safeguards** for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact  Cindy F. brown, LICSW - Case Manager  at  202/671-0882  (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION
MULTIDISCIPLINARY TEAM
(MDT)

Student O____O____ _____ DOB ___93 Age 13 Grade 7 ID 9051483

You have the right to challenge the recommendations by requesting Mediation or a Due Process Hearing before an impartial hearing officer. To initiate a mediation or hearing, you will need to complete a REQUEST FOR MEDIATION or DUE PROCESS HEARING form and mail it to the address listed below:

Student Hearing Office
D.C. Public Schools 825 North
Capitol Street, N.E. 8ᵗʰ floor
202-442-5432

You have the right to be represented at the hearing by legal counsel.
A copy of Parents Procedural Safeguards handbook is provided.
A list of free or low cost legal service, for which you may qualify depending on your income, is included.
If you would like an additional copy, please contact the principal.

**EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

[X] Wechsler Intelligence Scale for Children-III (WISC-III) – commonly employed individually administered test designed to measure the intelligence of individuals aged 6 ½ to 16 ½ years. Date of Report __5/3/06__

[ ] Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R) - measures specific mental abilities and processes in ages 4 ½ to 6 ½ years. Date of Report _____

[ ] Wechsler Adult Intelligence Scale-III (WIAS III) an individually administered test designed to measure the intelligence of individuals ages 16 and over. Date of Report _____

[ ] Bayley Scales of Infant Development-11 - an individually administered instrument that measures motor, mental and social development in infants and children from 1 month to 42 months of age. Date of Report _____

[X] Wechsler Individual Achievement Test (WIAT)- a commonly used individually administered instrument designed to assess the educational achievement of children and adolescents in areas of basic reading, mathematics reasoning, spelling, reading comprehension, numerical operations, listening comprehension, oral expression, and written expression. Date of Report __5/3/06__

[ ] Peabody Individual Achievement Test-Revised (PIAT-R) - an individually administered test measuring achievement in areas of general information, reading recognition, reading comprehension, spelling, written expression, and mathematics. Date of Report _____

[ ] Kaufman Test of Educational Achievement (KTEA) -an individually administered instrument measuring achievement skills in reading decoding, mathematics applications, spelling, reading comprehension, and mathematics computation. Date of Report _____

[X] Woodcock-Johnson Psycho-Educational Battery - a diagnostic and evaluation instrument composed of twenty-seven tests divided into three major parts: tests of cognitive ability, tests of achievement, and tests of interests. Date of Report __5/30/06 (Indep Eval)__

[ ] Bender Visual Motor Gestalt Test - measures perceptual motor skills to determine visual-motor gestalt functioning and neurological soft-signs in ages 4 to 12 years using the Koppitz Scoring System. Date of Report _____

[X] Developmental Test of Visual Motor Integration (VMI) -assesses visual perception and motor coordination in ages 3 years and up using a more structured booklet format. Date of Report __5/3/06__

[ ] Children's Apperception Test - a projective story-telling technique for personality evaluation in ages 5 to 10 years. Date of Report _____

[ ] Thematic Apperception Test - a projective story-telling technique for personality evaluation in older children and adolescents. Date of Report _____

[ ] House-Tree-Person - a projective drawing technique providing insight into personality structure, physical concerns, and social-emotional adjustment in children and adolescents. Date of Report _____

Neuropsychological Evaluation (Federici, 5/3/06)
Comprehensive Receptive and Expressive Vocabulary Test (CREVT-2) -5/15/06
Social Work Evaluation Report (7/5/06)

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION
MULTIDISCIPLINARY TEAM
(MDT)

Student O█████ _____ DOB ███93 Age 13 Grade 7 ID 9051483 _____

[X] **Kinetic Family Drawing** - a projective drawing technique measuring one's perception of her family and her role within the family. Date of Report 5|3|06

[✓] **Rorschach Psychodiagnostic Test** - a projective measure y which one's responses to inkblots reveal personality structure, ego strengths and reality testing in ages 3 and older. Date of Report 5|3|06

[ ] **Goodenough-Harris Drawing Test** - a projective drawing procedure measuring intellectual perceptual-motor maturity and personality through the use of drawings of self and a member of the opposite sex in ages 3 to 15.11 years. Date of Report _____

[X] **Conner's Parent and Teacher Rating Scales** - a paper-and-pencil instrument measuring problem behaviors of children and adolescents as reported by the child's teacher, parents, or alternate care-giver. Date of Report 5|3|06

[ ] **The Vineland Adaptive Behavior Scales** - assesses adaptive and social competency skills. Date of Report _____

[ ] **Test of Language Development Primary - Revised (TOLD-P)** - measures primary language proficiency and specific strengths and weaknesses in language skills. Date of Report _____

[ ] **Kaufman Assessment Battery for Children** - assesses the ability to solve problems using simultaneous and sequential metal processes in four global areas: Sequential Processing, Simultaneous Processing, Mental Processing, and Achievement. Date of Report _____

[ ] **Preschool Language Scale** - measures auditory comprehension and verbal ability skills. Date of Report _____

[ ] **Oral Peripheral Speech Examination** - a procedure to determine whether the examinee can appropriately use the lips, tongue, mouth, etc. Date of Report _____

[X] **Clinical Evaluation of Language Fundamentals - III** - assesses the child's language functioning including processing and production. Date of Report 5|15|06

[ ] **Expressive One Word Picture Vocabulary Test** - assesses the child's single word expressive vocabulary. Date of Report _____

[ ] **Receptive One Word Picture Vocabulary Test** assesses the child's single word receptive vocabulary. Date of Report _____

[ ] **Goldman-Fristoe Test of Articulation** - assesses the production of consonants in simple and complex contexts. Date of Report _____

[ ] **Peabody Picture Vocabulary Test-Revised** - individually administered, multiple choice test measuring nonverbal, receptive vocabulary. Date of Report _____

[ ] **Fisher-Logemann Test of Articulation Competence** - assesses articulation proficiency with single sounds, consonant blends, and vowel production. Date of Report _____

[X] **Classroom Observation** - assesses present functioning of the student within the classroom environment.

**Free or Low Cost Legal Services**

Neighborhood Legal Services
701 4' Street, N.E.
Washington, D.C. 20001
202-682-2700 (NW)
202-682-2732 (NE)
Fax 202-682-0588

The Children's Law Center Inc. 1050
Connecticut Avenue, N.W. Suite 1200
Washington Square
Washington, D.C. 20036-5317
202-467-4900
Fax 202-467-4949

Neighborhood Legal
Services 1213 Good Hope
Road, S.E. Washington, D.C.
20020 202-678-2000
Fax 202-889-3374

University Legal Services
300 1 Street, N.E.
Washington, D.C. 20002
202-547-0198
Fax 202-547-2662

National Coalition for Students
with Disabilities
10560 Main Street, Suite 417
Fairfax, VA 22030
703-267-6588        (fax) 703-267-6992

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
**(MDT)**
MEETING NOTES

MDT REFERRAL DATE: 4/26/06

| MDT |
| --- |

STUDENT: O███ O███ (DOB:███/93)    SCHOOL: Our Lady of Victory    DATE: 8/10/06

PARTICIPANTS: (Print Name)    PARTICIPANTS: (Sign Name)    POSITION

| | | |
| --- | --- | --- |
| Claudia Pabo | | Mother |
| Cindy F. Brown, LICSW | Cindy F. Brown, LICSW | Case Manager/Social Worker |
| Jermaine Perkins | Jermaine Perkins | School Psychologist |
| Denise White-Jennings, Ph.D. | | Clinical Psychologist |
| Michael Ellis | | IEP Developer/Spec Ed Teacher |
| Laura Solomon, Ed.D. | | Educational Consultant |
| Leslie Charles | Leslie J Charles | Speech Therapist |
| Mary Ann Ewers | via telephone | Gen. Ed. Tchr. |
| Harry Brockenberry | Harry Brockenberry | Special Ed Specialist/LEA |

The purpose of this meeting is to review evaluations/reports and determine the student's eligibility for special education and related services.

DCPS waited for parent (C. Pabo) and Dr. Solomon to arrive. Neither showed for meeting scheduled for 9:30 am. DCPS waited 25 minutes and did not receive any notice from parent via telephone regarding her intent to participate. This is the third attempt by DCPS to convene the MDT meeting.

Teacher report

Student sometimes was very cooperative and at other time uncooperative. He appeared to understand concepts and proud when he was successful. Student had various teachers for different subjects and his main teacher did indicate that he required frequent redirection to stay on task. During group work, he usually refused to participate. He did have difficulty interacting with peers. If he was directly involved (ie. answering questions), he would be off-task. Student had a lot of difficulty in science class, but it is noted that teacher was very stern. He often refused to complete work in this class. Student also tried to avoid certain classes and would make somatic complaints. Parent has been very involved.

Socially, student had difficulty understanding social cues, which caused problems with peers. Students' initially were very receptive, but he often misinterpreted social situations and then would hold a grudge. He had difficulty developing friendships and his closest friend was a 2nd grader.

With regard to language development, student enjoyed having conversations and did not present w/ any language concerns. Student was able to carry on conversations, but sometimes would change topics because he wanted to talk about something different.

With regard to written language, student's handwriting was not good. He appeared to have fine motor issues and did not like writing activities.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION    ON    MDT MEETING NOTES    APPENDIX - A

DCPS - 81

74

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

| MDT |

MDT REFERRAL DATE: 4/26/06

STUDENT: O█ O████ (DOB: █████/93)    SCHOOL: Our Lady of Victory    DATE: 8|10|06

PARTICIPANTS: (Print Name)        PARTICIPANTS: (Sign Name)        POSITION

_____        _____        _____
_____        _____        _____
_____        _____        _____
_____        _____        _____
_____        _____        _____
_____        _____        _____

Page 2

Teacher could not speak to retention issues, but noted that other teachers reported that he had problems retaining information.

Review of Educational Evaluation

Student tested previously w/o medication (Neuropsychological eval - Federici). Most recent educational testing w/ medication.

Woodcock-Johnson III, Form B.

Broad Reading - ss (Age) -87 (4.8)
  Letter-Word ID        -99 (7.2)
Passage Comprehension  -84 (3.6)
  Reading Fluency       -81 (3.9)
Basic Reading Skills    -97 (6.3)
  Word Attack           -95 (5.1)
Letter-Word ID          -99 (7.2)

Broad Math ss (Age) -89 (5.6)
  Calculation           -96 (6.7)
  Applied Problems      -87 (4.9)
  Math Fluency          -86 (5.7)
Broad Written Lang      -85 (4.8)
  Spelling              -95 (5.8)
  Writing Samples       -89 (5.0)
  Writing Fluency       -75 (3.9)

Academic Skills        -96 (6.6)
Academic Applications  -84 (4.5)
Academic Fluency       -78 (4.2)

TOWL-3 (Form B) - Spontaneous Composite - 85
GSRT (Form B) - Silent Reading Comprehension -55

Brief Review of Neuropsychological Eval.

Teacher noted that she had chance to briefly review this report. Teacher indicated that she was surprised that cognitive scores were so low, but agreed with descriptions re: his social functioning. Teacher also indicated that student is manipulative and could have done poorly because of his own mood or feeling regarding the testing.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: 4/26/06

MDT

STUDENT: O█████ (DOB: ████93)    SCHOOL: Our Lady of Victory    DATE: 8/10/06

PARTICIPANTS: (Print Name)        PARTICIPANTS: (Sign Name)        POSITION

Page 3
Cognitive scores from Federici's report are: VCI - 83; PRI - 71; WMI - 83;     WISC-IV
   PSI - 83; FSIQ - 74 (Score low average to borderline)     TONI-3 - 80
VMI - 109  (Visual - 106 and Motor - 104)
Test of Visual-Perceptual Skills (Non-Motor) - 65 (Deficient)
Academic scores reflected below average performance in all areas.
Testing of social-emotional functioning indicates clinically significant problems w/
regard to attention, organization, socialization, hyperactivity, anxiety and
conduct.
Review of Speech/Language Evaluation
Background info. as indicated in report. Speech testing also administered
during neuropsychological evaluation. See report for scores. Noted that
student was tested off meds during neuropsychological and on medication
by DCPS speech therapist.
CELF-4 - Core Lang - 97; Receptive Lang - 92; Expressive Lang - 99;
Lang. Memory - 90.
   Weakness noted in semantic relationship subtest. Student had difficulty
   answering questions w/ spatial, temporal, sequential and passive relationships.
Overall, student has average expressive and receptive language skills.
Evaluator did indicated that student performed poorly on tests administered when
he was not medicated, although student performed in mostly average to
high average range on TAPS-UL.
Further discussion of Neuropsychological Evaluation
DCPS noted that report was reviewed by DCPS clinical psychologist. Concerns
noted that student was tested off medication. Clinical psychologist
observed student in class and noted problems with attention, following
directions, frustration tolerance, interpreting social cues, completing tasks,

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

| MDT |
| --- |

MDT REFERRAL DATE: 4/26/06

STUDENT: O██ O█████ (DOB: ███/93)     SCHOOL: Our Lady of Victory     DATE: 8/10/06

PARTICIPANTS: (Print Name)          PARTICIPANTS: (Sign Name)          POSITION

Page 4

following rules, and socializing w/ peers. Behaviors observed were reflective of teacher's report. Student also observed by school psychologist and similar behavior problems noted.

Social Hx briefly reviewed by MDT as all participants read the report. Behaviors reported by parent have been confirmed through observation, teacher reports. Students school hx sig. for learning and behavioral concerns. Noted that many behavioral concerns are result of student misinterpreting social cues and acting impulsively. Recommendation for services to address social emotional concerns.

Review of Vision Report

Indicated that student has 20/20 vision w/ corrective lenses. Noted dx of estropia (cross-eyes). MDT agrees w/ recommendations for accommodations/modifications in educational setting.

Eligibility Determination

DCPS psychologist reviewed eligibility criteria for Learning Disability (LD); Other Health Impairment (OHI); and Emotional Disturbance (ED). Based on this review, student is eligible for special education services as Other Health Impairment (OHI). The student does not meet the criteria as ED. The school had not implemented any interventions to address emotional or behavioral concerns. Student has not had behavior plan or counseling at school. The student does not meet criteria for LD, as there is no sig. discrepancy based on current cognitive and academic testing. Parent was to provide DCPS w/ updated cognitive assessment. DCPS will reconsider LD disability when and if parent-provided info.

# Other Health Impairment (OHI)
## Eligibility Determination Form
### (Attach MDT Meeting Notes)

| Student's Full Name: O███ O███ | Student ID: | 9051483 |
|---|---|---|
| Date of Birth: ███/93 | Date of MDT: | 8/10/06 |
| Attending School: **OUR LADY OF VICTORY** | Neighborhood School: | **EATON ES** |

In order to determine if a student to have a disability of Other Health Impairment and is eligible for specialized instruction and/or related services, the MDT must compare evaluation data and document that:

| | | |
|---|---|---|
| ⊘Y  o N<br>oInsufficient<br>(There is NOT enough documentation available to make a determination) | 1a. | A health impairment caused by chronic or acute health problems such as heart condition, tuberculosis, sickle sell anemia, hemophilia, epilepsy, rheumatic fever, nephritis, asthma, lead poisoning, leukemia, diabetes, acquired immune deficiency syndrome, attention deficit disorder, or attention deficit hyperactive disorder.<br>The diagnosis of Other Health Impairment is (specify):<br>**Attention Deficit Hyperactivity Disorder (ADHD)** |
| ⊘Y  o N<br>oInsufficient | 1b. | The impairment effects the following (check all that apply): |

| | |
|---|---|
| | Strength, or |
| | Vitality, or |
| X | Alertness (including heightened alertness to environmental stimuli) that results in limited alertness with respect to the educational decision. |

| | | |
|---|---|---|
| ⊘Y  o N<br>oInsufficient | 2. | Evaluation information confirms there is an adverse effect on educational performance. |
| ⊘Y  o N<br>oInsufficient | 3. | Diagnosed by a physician as having an other health impairment. |

Supporting evidence [Type(s) of documentation used to make the determination, i.e., psycho-educational evaluation, speech language evaluation, classroom work, teacher observation, etc.]:
**Neuropsychological Evaluation; Speech-Language Evaluation; Observations; Social Work Evaluation**

| | |
|---|---|
| ⊘Y  o N | Evaluation information confirms that lack of instruction in reading and/or math was not a determinant factor in the eligibility decision. |
| ⊘Y  o N | Evaluation information confirms that limited English proficiency was not a determinant factor in the eligibility decision. |

The MDT used the above interpretation o d the evaluation data to determine:

☑ The student has Other Health Impairment and is eligible for specially designed instruction and/or related services (Criteria 1, 2, and 3 must be checked to be eligible), **or**

☐ The student does not have Other Health Impairment, **or**

☐ Evaluation data is insufficient to determine eligibility. Additional assessments and/or data will be obtained in the area(s) as indicated on the **STUDENT EVALUATION PLAN (SEP)**. The MDT will reconvene by _____ to review and determine eligibility.

All medical documentation must be reviewed by a DCPS medical doctor.

September 20, 2002

## Specific Learning Disability
### Eligibility Determination Form
#### (Attach MDT Meeting Notes)

| Student's Full Name: O███ O█████ | Student ID: | 9051483 |
|---|---|---|
| Date of Birth: ███/93 | Date of MDT: | 8/10/06 |
| Attending School: **OUR LADY OF VICTORY** | Neighborhood School: | **EATON ES** |

In order to determine if a student to have a disability of Specific Learning Disability and is eligible for specialized instruction and/or related services, the MDT must compare evaluation data and document that:

| | | |
|---|---|---|
| o Y  ● N<br>o Insufficient<br>(There is NOT enough documentation available to make a determination) | 1a. | The student has a severe aptitude/achievement discrepancy as identified by a validated regression method and does not achieve commensurate with his or her age and ability levels in one or more of the following areas:<br>o   Oral Expression<br>o   Listening Comprehension<br>o   Written Expression<br>o   Basic Reading Skills<br>o   Reading Comprehension<br>o   ~~Mathematics Calculation~~<br>o   Mathematics Reasoning<br>o   Developmental Skills (e.g., motor skills, language development, memory skills), and<br><br>*Note: Based on available cognitive & academic testing.<br>Parent was to provide updated cognitive testing. Not yet provided to DCPS.* |
| o Y  o N<br>o Insufficient<br>N/A | 1b. | The severe discrepancy between ability and achievement is not primarily the result of a visual, hearing, or motor impairment; mental retardation; emotional disturbance; or environmental, cultural, or economic disadvantage. |
| o Y  o N<br>● Insufficient | 2. | Evaluation information confirms there is an adverse effect on educational performance. |
| o Y  o N<br>o Insufficient | 3a. | The following relevant behavior was noted during the observation of the child:<br>**Inattentiveness, difficulty following directions, difficulty understanding information** |
| ● Y  o N<br>o Insufficient | 3b. | Relationship between the observed behavior in 3a. to the child's academic functioning is:<br>**Behaviors negatively impact his academic performance** |
| Supporting evidence [Type(s) of documentation used to make the determination, i.e., psycho-educational evaluation, speech language evaluation, classroom work, teacher observation, etc.]:<br>**Psychological, Educational, & Speech-Language Evaluations; Observations; Social Work Evaluation** | | |
| ● Y  o N | | Evaluation information confirms that lack of instruction in reading and/or math was not a determinant factor in the eligibility decision. |
| ● Y  o N | | Evaluation information confirms that limited English proficiency was not a determinant factor in the eligibility decision. |

The MDT used the above interpretation o d the evaluation data to determine:

☐   The student has Specific Learning Disability and is eligible for specially designed instruction and/or related services (Criteria 1, 2, and 3 must be checked to be eligible), **or**

☐   The student does not have Specific Learning Disability, **or**

☑   Evaluation data is insufficient to determine eligibility. Additional assessments and/or data will be obtained in the area(s) as indicated on the **STUDENT EVALUATION PLAN (SEP)**. The MDT will reconvene by _____ _____ to review and determine eligibility.

All medical documentation must be reviewed by a DCPS medical doctor.

September 20, 2002

Specific Learning Disabilities Written Report – Continued

Student's Full Name: O████ O████████,      Student ID:          9051483
Date of Birth: ██████/93                     Date of MDT:       8/10/06
Attending School:    OUR LADY OF VICTORY      Neighborhood School:  EATON ES

Multidisciplinary Team Members: The MDT has reviewed evaluations/reports and determined that the student is / is not eligible for services as a student with a disability classification of Learning Disability (LD)

| Titles | Signatures | Agree | Disagree |
|---|---|---|---|
| LEA Representative | Mary Brockenberg | ✓ | |
| Parent/Guardian | not present | | |
| Regular Education Teacher | via telephone | ✓ | |
| Special Education Teacher | Mary Brockenberg  LEA | ✓ | |
| Psychologist/Evaluator | Psh | ✓ | |
| Speech/Language Therapist | Jessica Charles | ✓ | |
| Social Worker or Counselor | Evelyn F. Breny LCSW | ✓ | |
| Student | | | |
| Other | | | |
| Other | | | |
| Other | | | |

Each MDT member shall certify in writing whether the report reflects his/her conclusion. If it does not reflect his/her conclusion, the team member must submit a separate statement presenting his or her conclusion. By completing the appropriate boxes the MDT will document decisions.

80

**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

Office of Special Education
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

# Evaluation Report for Emotional Disturbance

*This supplement must be completed for a student suspected of having an
educational disability of Emotional Disturbance, and must be attached
to the Multidisciplinary Team (MDT) Meeting Notes.*

NAME OF STUDENT: _____

DOB: _____      SCHOOL: _Our Lady of Victory_

ID # __9051483__      DATE OF MEETING: _8/10/06_

## I. Criteria/Characteristics:

A student with an educational disability of Emotional Disturbance who requires special education intervention must meet **ALL** of the following criteria listed in sections I and II.

The school psychologist shall determine the following criteria and present documentation to the MDT team:

   A.  Documentation that a condition is present is provided in a report prepared by a certified DCPS school psychologist, licensed psychologist, or licensed psychiatrist. If reports are presented that have been completed by personnel outside of DCPS, they shall be reviewed by the DCPS school psychologist to determine whether any additional assessment data are needed to consider evidence of the condition.

       _X_ Yes ____ No

   B.  Before a student is determined to have an Emotional Disturbance under IDEA, the school psychologist must find evidence that an emotional condition exists that exhibits *one or more* of the following characteristics over a long period of time and to a marked degree.

       ____ An inability to learn that can not be explained by intellectual, sensory, or health factors
       _X_ An inability to build or maintain satisfactory interpersonal relationships with peers and teachers
       _X_ Inappropriate types of behavior or feelings under normal circumstances
       ____ A general mood of unhappiness or depression
       _X_ A tendency to develop physical symptoms or fears associated with personal or school problems
       ____ The term includes schizophrenia

   C.  The term Emotional Disturbance does not apply to a student who is socially maladjusted, unless it is determined that the student is also emotionally disturbed. The school

psychologist has ruled out social maladjustment as the only cause of the characteristics listed above.

X Yes ____ No

D.   The above criteria have been met and a condition is present.

X Yes ____ No

***Certification of the School Psychologist:*** I certify that _____ ▆▆▆ exhibits/does not exhibit an Emotional Disturbance based on the characteristics I have checked above AND that all characteristics marked YES reflect an emotional condition that is not only the result of social maladjustment.

Jermaine Perkins _____     _____  8-10-06
*Name of Certifying School Psychologist*          *Signature*          *Date*

*(At this point, if a condition of Emotional Disturbance has been determined to be present by the school psychologist, the MDT then proceeds to determine whether the student meets the rest of the criteria.)*

## II.   Determination by MDT of Adverse Educational Impact:

A.   There is documentation from qualified personnel which indicates that the student's condition adversely affects his educational performance in one or more instructional areas.   X Yes _____ No

Adverse educational impact is indicated in at least one of the following:

____X__ Standardized test scores          ___X__ Appropriate social functioning
_____ Current grades                    ___X__ Serious incident reports
___X___ Classroom participation           ___X__ Availability for instruction
___X___ Engagement in learning
_____ Other factors in educational performance that are significantly below the level of peers.

Specify: _____
_____
_____

B.   Adverse educational impact is evident after appropriate accommodations and interventions were implemented and is a result of one or more of the characteristics listed above.   ____ Yes  X No

There is evidence that, despite receiving regular educational assistance, the student exhibits behaviors that are directly related to his/her emotional condition that are documented by the school psychologist.   ____ Yes  X No

Documentation: ____ FBA/BIP _____ staff/student contracts _____ instructional modifications
____ Other (list): _____

There is evidence that the emotional condition is *not* the result of physical, sensory, or intellectual deficits, lack of appropriate instruction, lack of management of behavior, culture, or social maladjustment.   X Yes ____ No

The behavior of concern occurs in more than one setting.   X Yes ____ No

Documentation:   X teacher reports ____ office referrals ____ incident reports

82

<u>X</u> observations _____ report cards <u>X</u> parent reports
other (describe): <u>Social Work Evaluation</u> _____

_____

_____

C.  Due to the condition of Emotional Disturbance and its impact on educational performance as described above, the student needs specialized instruction that cannot be provided through general education alone.

_____ Yes    <u>X</u> No

_____

## III. <u>Findings of MDT:</u>

_____ Based on assessment reports and all of the above documentation, the student *meets the criteria* for an educational disability of Emotional Disturbance as found in IDEA and Chapter 30 of the DCPS Board of Education Rules *and* requires special education services. Lack of instruction in reading or mathematics and limited English proficiency have been ruled out as the primary cause of the disability.

*or*

<u>X</u> The student *does not meet the criteria* for Emotional Disturbance as found in IDEA and Chapter 30 of the DCPS Board of Education Rules. He/she is to be referred back to the Teacher Assistance Team (TAT) for additional interventions or to the MDT for consideration of a disability other than Emotional Disturbance.

_____

*Signature of MDT Members* *(If a team member disagrees, he/she must attach a statement explaining his/her conclusions. When there is a dissenting opinion, the Local Education Agency (LEA) representative must make the final determination.)*

| Printed Name/Signature | Title | Agree | Disagree |
|---|---|---|---|
| Cindy F. Brown, LICSW / *(signature)* | Case Manager / Social Worker | ✓ | |
| Germaine Perkins / *(signature)* | Psychologist | ✓ | |
| Harry Brockenberry / Harry Brockenberry | Special Ed Spec | LEA ✓ | |
| Leslie Charles | Speech Therapist | ✓ | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Revised 10-30-04

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**

**STUDENT EVALUATION PLAN**
**(SEP)**

| | |
|---|---|
| **MDT SEP** | |

MDT REFERRAL DATE: 8/10/06    MEETING DATE: 8/10/06

STUDENT: O__ O__    DOB: __/93    AGE: 13    GRADE: ___    SCHOOL: Our Lady of Victory

STUDENT IDENTIFICATION NUMBER: 9051483    TEACHER / HOMEROOM: _____

ADDRESS: 3512 Rodman Street, N.W., Washington, D.C. 20007

Street #    Street Name;    Quadrant    Apartment #    City,    State,    Zip Code

PARENT(S)/GUARDIAN: Claudia Pabo    TELEPHONE (H): 202/966-4368    (W): 202/418-1595

**Summarize Area(s) of Concern:**

Student presents with deficits in fine motor skills and visual perceptual skills. Also noted are problems in sensory integration and self-regulation.

**Team Recommendations:**

MDT recommends an Occupational Therapy Evaluation

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☐ Psychological | | | | |
| ☐ Speech/Language | | | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☐ Educational | | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other    Other: TBD | | Other: TBD | 7/14/06 | |
| Occupational Therapy | | | | |

| TEAM MEMBERS: NAME | POSITION | TEAM MEMBERS: NAME | POSITION |
|---|---|---|---|
| Claudia Pabo (not present) | Mother | Leslie Charles, OT / Kathie Thompson | Speech Therapist |
| Cindy F. Brown, LICSW (CSPO) | Case Manager/SW | Harry Brockenberry - LEA | Special Ed. /LEA |
| Jermaine Perkins | School Psychologist | | |
| Denise White-Jennings, Ph.D. (not present) | Clinical Psychologist | | |

The MDT meeting to discuss the evaluation results is scheduled on _____ at _____ in room _____

Place completed form in MDT folder.

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

MDT

### CONSENT FOR EVALUATION - INITIAL OR REEVALUATION
**(*CHECK ONE ONLY - INITIAL OR REEVALUATION)**

**I.    INITIAL EVALUATION CONSENT   ☒**

As a result of the review of the screening information at the MDT meeting on _____

it was determined in a MDT meeting that your child, O███O███_____

is in need of a full and individual evaluation to assist us in developing the most appropriate educational program. You have been provided a copy of the "Procedural Safeguards - Parental Rights" booklet. We would like to remind you at this time that:

- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all necessary action to provide an appropriate program and may be required to initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) in Section 111.

**II.    REEVALUATION    ☐**

The MDT received the following request for a reevaluation for _____

by /for a:    ☐  parent request        ☐  teacher request        ☐  3 year reevaluation

The MDT will collect supportive documentation in the area of the disability to determine the need for continued special education and related services. The school is required to only evaluate in those areas of documented need or consensus of the MDT (parent is a member of team). Parents have the right to request assessments to determine if the child continues to be a child with a disability. DCPS may reevaluate your child, without your consent, if the school district can demonstrate that it has taken reasonable steps to get parental consent and the parent has not responded.

- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all necessary action to provide a Free Appropriate Public Education program and may be required to initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) on the student evaluation plan (SEP)   .

**III.**    I give permission for District of Columbia Public Schools to proceed with the evaluation(s) based on the Student Evaluation Plan (attached ) for my child, O███O███_____

Within a reasonable period of time days after completion of the evaluation, we will hold another MDT meeting (to which you will be invited) to determine if your child is eligible for special education and related services. The written reports of all procedures administered will be provided to you at that meeting, along with explanations and interpretations. We will use this information to determine an appropriate program for your child. If records are to be obtained/released as part of this evaluation, the "Consent for Release of Records" form is completed and attached.

If you have questions or concerns at any time during the evaluation process, feel free to contact me at  202/671-0882 _____(telephone number).

*☒ INITIAL EVALUATION                    *☐ REEVALUATION

Parent Response Section:

☐ I agree to the proposed evaluation(s)                    ☐ I do NOT agree to the proposed evaluation(s)

_____                    _____
Parent/Guardian Signature                                                     Date

DCPS        DIVISION OF SPECIAL EDUCATION        07-02-2001        MDT - CONSENT FOR EVALUATION        APPENDIX - A

85

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

## NOTICE TO PARENT OF INTENT TO EVALUATE/REEVALUATE

Date: 8/10/06

To  Ms. Claudia Pabo

3512 Rodman Street, N.W.

Washington, D.C. 20007

Telephone: (H)  202/966-4368

Dear  Ms. Claudia Pabo

Ref  O___O____

DOB  ___/93

ID #  9051483

(W)  202/418-1595

The District of Columbia Public Schools is requesting that _____ Oleg Oliver _____ be available for testing for the following tests, on the indicated date, at the school.

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TEST DATE ASSIGNED | ADMINISTERED |
|---|---|---|---|---|
| ☐ Psychological | | | | |
| ☐ Speech/Language | | | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☐ Educational | | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other | Other: | Other: | Other: | |
| OT | TBD | TBD | 7/14/06 | |

### LIST OF TESTS WITH DESCRIPTIONS

☐ **Bayley Scales of Infant Development-II** - an individually administered instrument that measures motor, mental and social development in infants and children from 1 month to 42 months of age.

☐ **Bender Visual Motor Gestalt Test** - measures perceptual motor skills to determine visual-motor gestalt functioning and neurological soft-signs in ages 4 to 12 years using the Koppitz Scoring System.

☐ **Children's Apperception Test** - a projective story-telling technique for personality evaluation in ages 5 to 10 years.

☐ **Clinical Evaluation of Language Functions - III** - assesses the child's language functioning including processing and production.

☐ **Conner's Parent and Teacher Rating Scales** - a paper-and-pencil instrument measuring problem behaviors of children and adolescents as reported by the child's teacher, parents, or alternate caregiver.

☐ **Developmental Test of Visual Motor Integration (VMI)** - assesses visual perception and motor coordination in ages 3 years and up using a more structured booklet format.

☐ **Expressive One Word Picture Vocabulary Test** - assesses the child's single word expressive vocabulary.

☐ **Fisher-Logemann Test of Articulation Competence** - assesses articulation proficiency with single sounds, consonant blends, and vowel production.

☐ **Goldman-Fristoe Test of Articulation** - assesses the production of consonants in simple and complex contexts.

## NOTICE TO PARENT OF INTENT TO EVALUATE/REEVALUATE

| INTENT Page 2 |

Student O███O████_____   DOB ███/93   Age 13   Grade ____   ID 9051483_____

☐ **Goodenough-Harris Drawing Test** - a projective drawing procedure measuring intellectual perceptual-motor maturity and personality through the use of drawings of self and a member of the opposite sex in ages 3 to 15. 11 years.

☐ **House-Tree-Person** - a projective drawing technique providing insight into personality structure, physical concerns, and social-emotional adjustment in children and adolescents.

☐ **Kaufman Assessment Battery for Children** - assesses the ability to solve problems using simultaneous and sequential metal processes in four global areas: Sequential Processing, Simultaneous Processing, Mental Processing, and Achievement.

☐ **Kaufman Test of Educational Achievement (KTEA) -** an individually administered instrument measuring achievement skills in reading decoding, mathematics applications, spelling, reading comprehension, and mathematics computation.

☐ **Kinetic Family Drawing** - a projective drawing technique measuring one's perception of her family and her role within the family.

☐ **Oral Peripheral Speech Examination** - a procedure to determine whether the examinee can appropriately use the lips, tongue, mouth, etc.

☐ **Peabody Individual Achievement Test-Revised (PIAT-R) -** an individually administered test measuring achievement in areas of general information, reading recognition, reading comprehension, spelling, written expression, and mathematics.

☐ **Peabody Picture Vocabulary Test-Revised** - individually administered, multiple choice test measuring nonverbal, receptive vocabulary.

☐ **Preschool Language Scale** - measures auditory comprehension and verbal ability skills.

☐ **Receptive One Word Picture Vocabulary Test** - assesses the child's single word receptive vocabulary.

☐ **Rorschach Psychodiagnostic Test** - a projective measure y which one's responses to inkblots reveal personality structure, ego strengths and reality testing in ages 3 and older.

☐ **Test of Language Development Primary - Revised (TOLD-P) -** measures primary language proficiency and specific strengths and weaknesses in language skills.

☐ **The Vineland Adaptive Behavior Scales** - assesses adaptive and social competency skills.

☐ **Thematic Apperception Test** - a projective story-telling technique for personality evaluation in older children and adolescents.

☐ **Wechsler Adult Intelligence Scale-III (WIAS III) -** an individually administered test designed to measure the intelligence of individuals ages 16 and over.

☐ **Wechsler Individual Achievement Test (WIAT) -** a commonly used individually administered instrument designed to assess the educational achievement of children and adolescents in areas of basic reading, mathematics reasoning, spelling, reading comprehension, numerical operations, listening comprehension, oral expression, and written expression.

☐ **Wechsler Intelligence Scale for Children-III (WISC III)** - commonly employed individually administered test designed to measure the intelligence of individuals ages 6 1/2 to 16 1/2 years.

☐ **Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R)** - measures specific mental abilities and processes in ages 4 1/2 to 6 1/2 years.

☐ **Woodcock-Johnson Psycho-Educational Battery** - a diagnostic and evaluation instrument composed of twenty-seven tests divided into three major parts: tests of cognitive ability, tests of achievement, and tests of interests.

☐ **Classroom Observation** - assesses present functioning of the student within the classroom environment.

☐ **List other tests with descriptions:**

|  |
|  |
|  |

**Other factors that are relevant to be included:**

|  |
|  |
|  |

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT O▮ O▮▮▮ (DOB: ▮▮▮93)          SCHOOL Our Lady of Victory          DATE: 2/1/06

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Claudia Pabo | not present | Mother |
| Cindy F. Brown, LICSW | Cindy F. Brown, LICSW | Case Manager/Social Worker |
| Jermaine Perkins | Jermaine Perkins | School Psychologist |
| Leslie Charles | Leslie J. Charles | Speech Therapist |
| Denise White-Jennings, Ph.D. | not present | Clinical Psychologist |
| ~~Michael Ellis~~ Harry Brockenborry | Harry Brockenbe | Special Ed Tchr/IEP Developer |
| Laura Solomon, Ed.D. | not present | Educational Consultant |
| | | |
| | | |
| | | |
| | | |

The purpose of this meeting is to develop an appropriate Inidividualized Education Program (IEP) for the student.

The MDT has determined that:

- the student has a disability classification of _Other Health Impairment(OHI)_.

- the drafted goals/objectives are _appropriate_.

- the student requires:

| | | | |
|---|---|---|---|
| X | specialized instruction | - 24.0 | hours/week |
| | speech therapy | - | hours/week |
| X | psychological services | - 1.0 | hours/week |
| | occupational therapy | - | hours/week |
| | physcial therapy | - | hours/week |
| | other | - | hours/week |
| | other | - | hours/week |

- a behavior plan is _required to address behaviors noted: refusal to complete assignments, non-compliance, withdrawal, inappropriate commenting and verbal aggression._

- the student requires level _IV_ testing w/ accomodations/modifications, as indicated on page 4 of 4 of the IEP.

- the student requires supplementary aides/services, as indicated on page 4 of 4 of the IEP.

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.

### INDIVIDUALIZED EDUCATION PROGRAM
### (IEP)

STUDENT ___O▓▓▓O▓▓▓ (DOB: ▓▓/93)___   SCHOOL ___Our Lady of Victory___   PAGE _2_ OF _3_

---

**Discussion of Placement :**

General Education Setting ( Accept / (Reject) ):

Accommodations/modifications have not been successful in general education setting in addressing academic weaknesses.

Combination General Education/Resource Setting ( Accept / (Reject) ):

Same reason as above

Out of General Education Setting ( (Accept) / Reject ):

MDT agrees that this setting is appropriate, as student will benefit from low teacher-student ratio in academic classes to address learning and behavior concerns. Student, per last report card, has been able to perform well in non-academic classes such as art, music, physical education. Although Out of General Ed-Setting recommended, student should be able to attend non-academic classes w/ nondisabled peers.

89

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)

STUDENT   O██ O████ (DOB: ████/93)   SCHOOL   __Our Lady of Victory__   PAGE 3 OF 3

Discussion of Placement (continued):

DCPS defers discussion of placement in order to identify a program that has availability and can appropriately address student's needs. MDT discussed student's present grade placement as 6th grader but recommends placement in 7th grade due to his age - 13 yrs. He would turn 14 yrs. before the end of the upcoming school year.

90

# SUPPLEMENTAL AIDES, SERVICES, ACCOMODATIONS, AND MODIFICATIONS CHECKLIST

Use for explanation as to removal of student from general education setting.

| STUDENT: O███ O█████ (DOB:███93) | SCHOOL: OUR LADY OF VICTORY/C.A.R.E. CENTER |
|---|---|
| III.    Check each accommodation applied<br><br>II.    Indicate Setting<br><br>☐  General Education Classroom<br>☐  Combination General Education and Resource Classroom<br>☐  Out of General Education Classroom | III. Student needed accommodations in these classes: (check)<br><br>☑ Language Arts (reading, writing, spelling)<br>☑ Social Studies<br>☑ Science<br>☑ Health<br>☑ Math<br>☑ Physical Education<br>☑ Music<br>☑ Art<br>☑ Other |

| | | | |
|---|---|---|---|
| 1. | Directions read aloud | 19. | Carrels |
| 2. | Questions read aloud | 20. | Special seating/proximity to monitor |
| 3. | Simplified and repeated directions | 21. | Adaptive furniture |
| 4. | Signed | 22. | Noise buffers |
| 5. | Taped | 23. | Special lighting/acoustics |
| 6. | Assistance with interpretations of directions | 24. | Extended time |
| 7. | Braille | 25. | Extra breaks during test |
| 8. | Large print | 26. | Multiple test sessions or test sessions spread over several days |
| 9. | Fewer lines/items per page | 27. | Student specific schedule |
| 10. | Extra spacing between lines | 28. | Behavioral support |
| 11. | Important words highlighted | 29. | Word lists/dictionaries |
| 12. | Magnifying equipment | 30. | Number table or math fact sheets |
| 13. | Amplification equipment | 31. | Spell checker |
| 14. | Templates to reduce visual print field | 32. | Specific contracts |
| 15. | Tape recorder | 33. | Behavior modification reinforcement charts |
| 16. | Computer/word processor | 34. | Allowance of cooling off period, time out area in class |
| 17. | Large pen or specifically designed writing tool | 35. | Specific limits, clear consequences defined in advanced – consequences in effect immediately and consistently |
| 18. | Altered worksheets/materials and/or reduced workload | 36. | Calculator |
| | | 37. | Prompting and cueing to remain on task |
| | | 38. | One-to-one assistance, as needed |

| Comments |
|---|
| |
| |
| |
| |



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| | | | |
|---|---|---|---|
| **To:** | M. Eig, Esq. | **From:** | Saurabh Gupta, Esq. |
| **Fax:** | 301-657-3843 | **Date:** | March 7, 2007 |
| **Phone:** | | **Pages:** | ___ (Including cover page) |
| **Re:** | O█ O█████ | **CC:** | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

**•Comments:**

DCPS SUPPLAMENTAL  5 day disclosure

☒ DCPS-16 to DCPS21 ONLY

92

# hp LaserJet 9050mfp series



## Fax Call Report                                                                    1

DCPS Office of General Counsel
2024425098
07-Mar-2007 05:48 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 3733 | 07-Mar-2007 05:40 PM | Send | 93016573843 | 7:55 | 53 | Success |



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| To: | M. Eig, Esq. | From: | Saurabh Gupta, Esq. |
|-----|--------------|-------|---------------------|
| Fax: | 301-657-3843 | Date: | March 7, 2007 |
| Phone: | | Pages: | _____ (including cover page) |
| Re: | O▮▮▮▮ | CC: | |

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

·Comments:

DCPS SUPPLAMENTAL 5 day disclosure

☒ DCPS-16 to DCPS-21 ONLY

93



# hp LaserJet 9050mfp series

| Fax Call Report | 1 |

DCPS Office of General Counsel
2024425098
07-Mar-2007 05:39 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 3731 | 07-Mar-2007 05:30 PM | Send | 93016573843 | 7:58 | 53 | Success |



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| **To:** M. Eig, Esq. | **From:** Saurabh Gupta, Esq. |
|---|---|
| **Fax:** 301-657-3843 | **Date:** March 7, 2007 |
| **Phone:** | **Pages:** _____ (including cover page) |
| **Re:** O█, O█████ | **CC:** |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

·**Comments:**

DCPS SUPPLAMENTAL 5 day disclosure

✗ DCPS-16 to DCPS21 ONLY

94

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

March 7, 2007

Saurabh Gupta, Esq.
DCPS Office of the General Counsel
825 North Capitol Street, NE
Washington DC 20002

Re: O████ O██████
*via facsimile and first-class mail*

Dear Mr. Gupta:

For the upcoming Due Process Hearing regarding the above-referenced student we will be relying on the witness and documents (copies of which are already in the school system's possession) previously disclosed on November 7, 2006, and February 5, 2007. We will also be relying on the transcripts from the first day of O█████ Hearing, January 16, 2007.

Please be advised that we may also relay on any documents and witnesses disclosed by DCPS, as well as any documents and witnesses to which DCPS does not object. We will object to any documents or testimony from witnesses not disclosed in a timely manner in accordance with the IDEA and federal regulations.

Sincerely,

*Michael J Eig hnly*

Michael J. Eig

cc:     Claudia Pabo
        Student Hearing Office

2007 MAR -7 AM 10: 31
DC PUBLIC
SCHOOL SYSTEM

95

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig        MD, DC
Haylie M. Iseman      MD, DC, NY

Paula A. Rosenstock   VA, DC
Patricia Cyr          CA, DC

# FAX

| | |
|---|---|
| **To:** | Saurabh Gupta, Esq. |
| **Fax Number:** | (202) 442- 5097/98 |
| **From:** | Michael J. Eig, Esq. |
| **Date:** | March 7, 2007 |
| **Time:** | 10:20 am |
| **Total Pages:** (including cover) | 2 |
| **Re:** | O█ O█  |
| **cc:** | Student Hearing Office (202) 442-5556 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

96

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

March 2, 2007

Hearing Officer Terry Michael Banks
c/o Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: O███ O██████
*via facsimile and first-class mail*

Dear Mr. Banks:

I have just completed a review of the transcript for the hearing of January 16, 2007, regarding the above-referenced student. It is far from *verbatim*, contains no page or line numbers, has multiple misspellings, some of which are truly comic, and clearly does not comply with the IDEA. Of greatest concern, is that midway through the transcript the reporter notes, "end of audio tape 3", which is followed by, "beginning of audio tape 6". What is missing in its entirety, is a large part of our only expert witness's testimony, Dr. Laura Solomon, both direct and cross examination. In fact, the transcript picks back up after the direct examination of Marlene Gustafson, somewhere in the middle of her cross examination.

By copy of this letter, I am requesting that Sharon Newosme advise us whether the missing portion was in fact recorded and if so how soon an expedited transcript can be prepared. If there is no recording found, I would ask that you immediately convene a status conference with counsel to discuss this situation. Thank you.

Sincerely,

*Michael J Eig hly*

Michael J. Eig

cc:    Ms. Claudia Pabo
       Ms. Sharon Newsome
       Saurabh Gupta, Esq.

97

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 02/12/2007 10:02
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROE6J471573
```

```
DATE,TIME              02/12  10:02
FAX NO./NAME           93016573843
DURATION               00:00:18
PAGE(S)                01
RESULT                 OK
MODE                   STANDARD
                       ECM
```

# District of Columbia Public Schools
## State Enforcement & Investigation Division
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



2007 FEB 12  AM 11: 02
OFFICE OF THE
GENERAL COUNSEL

### HEARING NOTICE

MEMORANDUM VIA: [ ✓ ] FACSIMILE  [ ] MAIL  [ ] HAND DELIVERY

TO:   Parent (or Representative): _M. EIG_     Fax No.: _(301) 657-3843_

LEA Legal Counsel: _S. GUPTA_

RE:   O██████  O███     and (LEA) DOB: _____
      Student's Name

FROM:   **SHARON NEWSOME**
        Special Education Student Hearing Office Coordinator

DATE SENT: _2/9/07_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_____. Please be advised that the hearing has been scheduled for:

DATE: _3/14/07_                            _Con'f_     98
TIME: _9:00, 11:00, 1:00 or 3:00_          _1/12/07_

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## STUDENT HEARING OFFICE

### IN THE MATTER OF
O▆▆▆ O▆▆▆▆▆▆

**HEARING DATE:  MARCH 14, 2007**

**TRANSCRIBED BY**

**LEGAL PERSONNEL, INC.    (301) 277-5711**

### APPEARANCES

**HEARING OFFICER:**    Mr. Terry Banks

**ATTORNEY ADVISOR FOR D.C. PUBLIC SCHOOLS:**    Serum Gupta

**PARENT:**    Mrs. Claudia Pavo

**ATTORNEY FOR PARENT:**    Mr. Michael Eig

**WITNESSES:**
    Dr. Denise White-Jennings, Psychologist
    Cindy Brown, Clinical Social Worker
      And Case Manager, D.C. Public Schools
    Mr. Jermaine Perkins, Psychologist
    Dr. Peterson, Principal, Prospect Learning Center

1

2                                **PROCEEDINGS**

3

4        **HEARING OFFICER:**   Today is March 14, 2007.   This is

5   an Administrative Hearing for O▮▮ O▮▮▮▮ who ▮▮▮▮▮▮▮,

6   1993.   This case is here on entering orderly _____ two or

7   three   previous   proceedings   so   I'll   dispense   with   the

8   preamble.   Prior to this hearing, Mr. Eig filed a Motion

9   for Continuance due to the unexpected absence of Marline

10  Gusthinson who he had proposed to have as a rebuttal

11  witness and also he wanted to get a Transcript which was

12  unavailable due to inability of the staff to put together

13  an accurate Transcript.   After talking to both counsel

14  yesterday,   I've   decided   to   deny   the   Motion   for   A

15  Continuance primarily because, number one, the witness was

16  a   rebuttal   witness   rather   than   a   direct   witness   and

17  because,   as   I   mentioned   to   Mr.   Eig,   the   lack   of   a

18  Transcript is somewhat of a luxury and in most cases don't

19  go beyond on day in which case the Transcript isn't

20  available, and the third reason is because this case has

21  dragged on for so long.   So for those reasons, I've denied

22  the Motion for A Continuance, would you like to add

23  something Mr. Eig?

101

1    **MR. EIG:**  Yes, no. Just to note that I did mention Mr.

2    Banks, since Mr. Cook  --that I didn't talk at the same

3    time, I wanted him to know that sort of at the end of the

4    conversation, let's hope that she will be prepared of

5    course for today what about that if it ends tomorrow, that

6    means I don't get rebuttal is what I said and what Mr.

7    Banks says, which I understand if we get to it, we might

8    deal with it, that's all; and the second point is on the

9    transcript issue - what I argued to you before, but I do

10   advise Mr. Cook and the hearing officer right now, that the

11   transcript that has been prepared and now they found the

12   missing disk, that's what happened, of course it's in the

13   middle of our case but that's why I'm caring a lot, I , as

14   to quality and to accessibility, it's pathetic.    It's

15   highly inaccurate, it's nothing close to verbatim, there no

16   page numbers on it so you can't site to it and speakers are

17   confused, names are mangled and important areas of answers

18   for the stuff I do have here right now, sometimes come out

19   as pure mish-mosh, so this could be an issue as this case

20   goes on, I just want to put that on the record right now.

21       HEARING   OFFICER:  Ok,  Mr.  Gupta  has  submitted  a

22   supplemental disclosure;

23    do you have any objection to it, Mr. Eig?

24       MR EIG:  Which one is March the 7, what notice?

2

1          **HEARING OFFICER:**    16TH thru 21, it's dated March the

2    7th.

3          **MR. EIG:**  I don't believe so.

4          **HEARING OFFICER:**    Who do you propose to call today,

5    Mr. Gupta?

6          **MR. GUPTA:**    I will be calling Cindy Brown, I will

7    be calling Dr. Denise White-Jennings, I will be calling

8    Jermaine Perkins and I might be calling Lesley Charles.

9          **HEARING OFFICER:**    Ok, who's first?

10          **MR. GUPTA:**    Well, DCPS will open with a Motion For

11    Directive Verdict as a matter of law, out motion is based

12    on the fact that petitioners had to prove, in order to meet

13    their burden of proof, they had to prove that at the time

14    they filed this complaint, DCPS was not able to provide –

15    DCPS does not offer faith, well at the time this complaint

16    was filed, the parents had unilaterally placed the student

17    a Kingsbury Day School and a former prior notice of

18    placement had not yet been issued and pursuant to IDIA

19    section 615B3 as I'm sure the hearing officer and everybody

20    in this room  is well aware, the agency is required and it

21    strictly mandates the agency issue a prior notice of

22    placement, a written prior notice of placement regarding

23    any fundamental change in the program.   At the time this

24    complaint was filed, there was not written prior notice of

3

1   placement.   Now,   say   if   we   had   gone   in   a   different

2   direction and then if they — the issue was we didn't issue

3   a prior notice of placement, then certainly the discussions

4   that happened in the MDT meeting and the August 30th MDT

5   notes would not be found sufficient as to put the parents

6   on notice so under that same argument, DCPS is saying there

7   was   no   placement   issue   at   the   time   they   filed   this

8   complaint, if prior notice was not filed until a week after

9   — if prior notice was not issued until a week after the

10   complaint was filed.

11      **HEARING OFFICER:**   But   that   is   not   the   truth,   one

12   thing I know is trial by answers, now when was the last —

13   whenever it was, you had ample opportunity to file a motion

14   if you're going to trial.

15      **MR. GUPTA:**   This   is   a   motion   for   directive   verdict

16   and I can't file that until the parents rested their side

17   of the case.

18      **HEARING OFFICER:**   Oh well, they've rested since last

19   year, they rested since the last —

20      **MR. EIG:**  Excuse me, yea and we ran out of time but I

21   didn't have a chance to issue this motion because we ran

22   out of time, they rested and we indeed —

23      **HEARING OFFICER:**   You had the time to file it, or

24   when you filed --- which would have been consistent with

4

104

1   the SOP which requires the hearing motions to be filed – at

2   which point, Mr. Eig would have had an opportunity to

3   respond to you.

4       **MR. EIG:**  Well, I accept your argument, I just want to

5   say for the record thou at the last hearing, if you're

6   arguing a trial by ambush, I was certainly ambushed before

7   in the pre-hearing matters as well, we had already settled

8   all of the pre-hearing motions and again, I was about two

9   separate motions to dismiss or issue asserted against DCPS

10  in that hearing as well.

11      **MR. EIG:**  Issues were asserted against DCPS at that

12  hearing as well.

13      **MR. GUPTA:**    Did I grant it?

14      **MR. EIG:**  You did not grant it.

15      **MR. GUPTA:**    I submitted them in writing giving you

16  an opportunity to respond is exactly what the point is

17  here; can I just make one point before we go on?  This is

18  for the record, this is important – traditionally, you

19  can't file a petition for a directive verdict in

20  You put into evidence during before you put on your case,

21  during the indecisive case --

22      So we'd like an appeal.  That's all.  On the

23  transcript issue, _____what I argued to you before.  But I

24  do advise Mr. Cook to end the hearing officer right now,

5

1  that the transcript that has been prepared, and now they've

2  found the missing disc.   That's what happened.   ---But the

3  transcript itself, as to its quality and accessibility is

4  pathetic.   It's highly-inaccurate, it's nothing close to

5  verbatim.   There are no case numbers, so you can't cite to

6  it,  speakers  are  confused,  names  were  mangled,  and

7  important areas of answers, of course the stuff I do have

8  here right now, sometimes pronounced pure "mish-mosh".  So

9  this could be an issue if this case goes on.   I just want

10 to put that on the record right now.

11    **HEARING OFFICER:**   Ok,  Mr.  Gupta  has  submitted  a

12 supplemental disclosure.  Do you have any objection to this

13 Mr. Ike?

14    **MR EIG:**   What are the numbers?

15    **HEARING OFFICER:**   16-21 is dated March the 7th.

16    **MR EIG:**   Ok.

17    **HEARING  OFFICER:**  I  don't  believe  so.   All  the

18 documents are pre-complaint.

19    **MR EIG:**   Right. They are and um, no.

20    **NOISE…supplemental**

21    **HEARING OFFICER:**   Who do you propose to call today,

22 Mr. Gupta?

6

106

1      **MR. GUPTA:**      I will be calling Cindy Brown, who will

2      be calling Dr. Denise White-Jennings, Janine Perkins, and I

3      might be calling Lesley Charles.

4          **HEARING OFFICER:**    Ok, who's first?

5      **MR. GUPTA:**      Well, DCPS will open with a motion for

6      directive verdict as a matter of law.    Um, our motion is

7      based on the fact that petitioners' had to prove, in order

8      to meet their burden of proof, they had to prove that at

9      the time they filed this complaint, DCPS was not able to

10     provide an offer of faith.    At the time, the complaint was

11     filed, the parents had unilaterally placed the student at

12     Kingsbury Day School and a formal prior notice of placement

13     had not yet been issued, and pursuant to IDIA section

14     615(b)3 as I'm sure the hearing officer and everyone in

15     this room is well aware, the agency is required and it

16     strictly mandates the agency to issue a written prior

17     notice of placement regarding any fundamental change in the

18     program.    At the time this complaint was filed, there was

19     no written prior notice of placement.    Now, say if we had

20     gone in a different direction and the issue was that we

21     hadn't issued a prior notice of placement, then certainly

22     the discussions that happened in the MDT meeting and the

23     August 30th MDT notes, would not be found sufficient as to

24     put the parents on notice, so under that same argument,

7

1    DCPS is saying there was no placement issue at the time

2    they filed this complaint.  If prior notice was not filed

3    until a week after the complaint was filed.

4        **HEARING OFFICER:**    I'm going to stop right there.

5    One thing I don't like, is trial by ambush.  Now, whenever

6    it was, you had ample time to file a motion if

7        **HEARING OFFICER:**    You   had   ample   enough   time

8    opportunity to file a motion if you wanted to file one.

9        **MR. GUPTA:**    This is a motion for Directive Verdict

10   and I cannot file that until the parents have rested side

11   of the case.

12       **HEARING OFFICER:**    Yeah well they rested at the last

13   year.

14       **MR. GUPTA:**    Excuse me.

15       **HEARING OFFICER:**    They rested at the last year.

16       **MR. GUPTA:**    Yeah, and we ran out of time, but I

17   didn't have a chance to issue this motion because we ran

18   out of time, they rested and we convened.

19       **HEARING OFFICER:**    You had a time to file it, along

20   with your five-day disclosure.  If you could have been

21   consistent with the SOP, which requires three motions to be

22   filed at the time of the five-day disclosure, at which

23   point Mr. Eig would have had an opportunity to respond to

24   it.

8

108

1    **MR. GUPTA:**  Well I accept your argument, but I just

2    want to say for the record, thou, at the last hearing, if

3    your argument is "Trial by Ambush", I was certainly

4    ambushed before in the pre-hearing matters as well. We had

5    already settled all the pre-hearing motions, and again

6    separate motions to dismiss were issued or were asserted

7    against DCPS in that hearing.

8    **HEARING OFFICER:**   Did I grant it?

9    **MR. GUPTA:**    You did not grant them sir.

10   **MR. EIG:**  I submitted them in writing and he had an

11   opportunity to respond.  So exactly what the point is here?

12   Can I just make one point before we go on?

13   **HEARING OFFICER:**   Really, please.  I would like to

14   continue.

15   **MR. EIG:** Just for the record, this is important.

16   Institutionally, you can't file a motion for a direct

17   verdict if you put in evidence during -- before you put on

18   your case, during the other side's case.  He has put, in

19   all his documents already, which I have referred to

20   significantly.   So you can't make that motion anyway.

21   That's what I just wanted to say.

22   **HEARING OFFICER:**   This has gone on long enough that

23   I'm not granted any dispositive motions at this point until

1   everybody has put their whole case on the record.  So let's

2   proceed with your first witness.  Who's that going to be?

3       **MR. GPUTA:**    DCPS call's Dr. Denise White-Jennings.

4       **HEARING OFFICER:**    Dr. White-Jennings will you raise

5   your right hand please?  Do you swear or affirm the

6   testimony you are about to give will be the truth and

7   nothing but the truth?

8       **DR. DENNISE WHITE-JENNINGS:**    I do.

9       **HEARING OFFICER:**    Thank you, go ahead Mr. Gupta.

10      **MR. GUPTA:**    Dr. Jennings, state your name and

11  position for the record, please.

12      **DR. JENNINGS:**    Denise White-Jennings.  I am employed

13  by D.C. Public Schools as a Psychologist.  How long have

14  you been in that position?

15      **DR. JENNINGS:**    Twenty-one years.

16      **MR. GUPTA:**    All 21 years as a DCPS Psychologist?

17      **DR. JENNINGS:**    I've been in that position for 21

18  years.  Prior to that, I work for Clinics, as well as a

19  private school as a Psychologist.

20      **MR. GUPTA:**    How long have you been a Psychologist

21  in aggregate?

22      **MR. EIG:**  Excuse me, if I can offer some assistance?

23  I am very familiar with Dr. White-Jennings and if we are

1  trying to stipulate that she is an expert Psychologist, we

2  recognize that.

3      **HEARING OFFICER:**    Ok, thank you.

4      **MR. EIG:**  Would that help?

5      **MR. GUPTA:**    Yes.  Dr. Jennings, do you know – have

6  you come to know a Student name Oleg Oliver?

7      **DR. JENNINGS:**    Yes.

8      **MR. GUPTA:**    How have you come to know that student?

9      **DR. JENNINGS:**    From the reviewing record as well as

10  observing him when he was at Our Lady of Victory.

11      **MR. GUPTA:**    Ok.    When did you first come across

12  this student's records or his name?

13      **DR. JENNINGS:**    I don't remember the date when that

14  student was referred to us.

15      **HEARING OFFICER:**    Ms.    White-Jennings,    you    speak

16  somewhat softly so can --

17      **DR. JENNINGS:**    I don't remember the date that –

18      **HEARING OFFICER:**    Just move the mic closer, we'll

19  compensate that way – it's picking up, but it will pick up

20  a little better.    That's fine.

21          **DR. JENNINGS:**    Ok, I don't remember the date he

22  was actually referred to the Care Center.

23      **MR. GUPTA:**    Could you recall the school year?

24      **DR. JENNINGS:**    2006.

1       **MR. GUPTA:**      So, when he was referred to the Care

2   Center what action did you take?

3       **DR. JENNINGS:**      I   reviewed   the   records   on   the

4   previous  testing  and  the  referral  forms  that  the  mother

5   submitted and then I made an appointment to go and observe

6   him at Our Lady of Victory.

7            **MR. GUPTA:**      When   you   say   you   reviewed   the

8   records,  could  you  expand  on  that  -  could  you  enumerate

9   which records you reviewed?

10            **DR. JENNINGS:**      Well  there  is  previous  testing

11   in  Neuropsychological  evaluation  and  -  and  so  I  reviewed

12   that  as  well  as  the  referral  information  that  the  mother

13   had  submitted  as  to  why  we  were  -  the  case  was  being

14   referred for evaluation.

15       **MR. GUPTA:**      And why was the case being referred for

16   evaluation?

17       **DR. JENNINGS:**      There was concern about how Oleg was

18   functioning, both academically as well as socially.

19       **MR. GUPTA:**      At  the  time  the  case  was  referred  to

20   you, what school was he attending?

21       **DR. JENNINGS:**      Our Lady of Victory.

22       **MR. GUPTA:**      Is that a DCPS School?

23       **DR. JENNINGS:**      No, that's a Catholic School.

1      **MR. GUPTA:**    Ok,  now  you  stated  that  after  you

2   reviewed  the  records,  you  went  –  you  scheduled  an

3   observation.   What  is  an  observation?

4      **DR. JENNINGS:**    It's  where  you  go  to  the  Classroom

5   and  you  observe  the  student  in  preferably  one  or  more

6   classes  to  see  how  the  student  is  functioning.

7      **MR. GUPTA:**    Ok,  so  after  you  said  you  scheduled

8   one,  did  you  actually  go  through  with  the  observation?

9      **DR. JENNINGS:**    Yes.   I  observed  him  in  May.

10     **MR. GUPTA:**    In  May  of  what  year?

11     **DR. JENNINGS:**    2006.

12     **MR. GUPTA:**    How  many  classes  did  you  observe  him

13   in?

14     **DR. JENNINGS:**    Two.

15     **MR. GUPTA:**    How  long  do  you  think  in  aggregate,  you

16   were  there  for  observation?

17     **DR. JENNINGS:**    Probably  about  one  hour  and  a  half.

18      **MR. GUPTA:**    What  did  you  –  can  you  describe  to  us

19   or  detail  for  us  what  you  found  in  your  observation?

20     **DR. JENNINGS:**    Ok,  the  first  class  I  observed,  Oleg

21   was,  I  guess  it  was  his  homeroom  class  where  he  has  most  of

22   his  academic  instruction  and  he  was  working  independently

23   on  a  project  about  the  Executive  Branch  of  the  Government.

24   They  were  making  mobiles  with  information,  then  written

13

113

1    about the Executive Branches and he was completing that

2    project and I – some of the things I had noticed is that he

3    had done a very good job in terms of drawing some buildings

4    which copied what the teacher had presented.    And he did

5    have very large messy writing when he wrote down the

6    information about the Executive Branches.    I noticed that

7    while he worked independently, and he was very focused on

8    during his project, when he completed the project, he was

9    noted to run across the room to put it away, he kind of

10   tripped over things – bumped into things as he moved around

11   the room.    He – I think it was after that, that then the –

12   some of the students who were also finished, the teacher

13   told them that they could study with each other in groups –

14   in pairs to study for their upcoming Science Test and so

15   the students paired-off and O██ did not pair-off with

16   anyone and the teacher offered to study with him for the

17   Science Test and O██ said that he didn't need to because

18   he had already studied a lot with his mom.    So he felt

19   pretty prepared for the Science Test.

20       MR. GUPTA:    ·  Let me stop you there for a second.

21       DR. JENNINGS:    Um, um.

22       MR. GUPTA:    I want to ask you the significance of

23   some of the things you have told us.    You said, he

24   tripped over things and bumped over things, kind of sound

14

114

1    like you are saying he was clumsy.    So what is the

2    significance of that in terms of your purpose for being

3    that?

4        DR. JENNINGS:    Well I think because he had been

5    diagnosed with Attention Deficient Hyperactive Disorder and

6    he was showing some of those signs.    That even though he

7    was able to be focus when he was working on the project,

8    when he was not working on the project, then kind of at

9    loose ends, he showed a high activity level.

10        MR. GUPTA:    And then while you were in that

11   Homeroom Class did other factors of his attention deficit

12   sort of play out - did he need a lot of redirection in your

13   opinion?  Did he need to be constantly monitored?

14        DR. JENNINGS:    He did need - later on when I

15   observed him after - when he returned to the class after

16   the Science Class, he did need some redirection.    The

17   teacher had to tell him to calm down - to settle down,

18   because he just kind of got more exuberant and a little

19   getty; which he blamed on a pixy stick that he had been

20   given; it was a treat after the Science Test and the

21   teacher had to tell him to calm down - settle down.

22        HEARING OFFICER:    Is that similar to the twinky

23   defense?

24        Chuckles.

15

115

1       **DR. JENNINGS:**    I guess so.  (chuckling).

2       **MR. GUPTA:**    In the hour and a half you were there

3    would you be able to enumerate how many times he needed

4    redirection?

5       **DR. JENNINGS:**    I did not keep that numerical count

6    of how many times.

7       **MR. GUPTA:**    But was it — would you be able to say,

8    in a range, was it over 50%, less than 50% of the time he

9    was being redirected?

10      **DR. JENNINGS:**    I would say maybe 50% of time.

11   Because for a large part of the time he was focused on his

12   project that he was doing and it was during the less

13   structured time that he had more difficulty.

14      **MR. GUPTA:**    Now you said you observed him in a

15   second class.  What class was that?

16      **DR. JENNINGS:**    I observed him in part of Science.  I

17   didn't go to the beginning of the Science Class because

18   they were taking a test and I didn't think there would be

19   much to observe.  I talked with his teacher some during

20   that time.  And um, so I did observe him briefly in

21   Science.  The teacher was reviewing — when I went in the

22   teacher was reviewing some of the responses to the Science

23   Test and O███ seemed fairly focused during that time.  The

24   teacher called on once to answer and he didn't know the

1    answer.   But then the teacher called him later and he did

2    know the correct answer.

3         MR. GUPTA:    Do you know if at the time of your

4    review, whether he was taking medication for his ADHD or

5    not?

6         DR. JENNINGS:    I can't be sure that he had it on

7    that particular day, but he had been prescribed medication

8    and had been on Conserta.

9         MR. GUPTA:    Now you also stated you reviewed a

10   neuropsychological - can you recall who conducted that

11   neuropsychological?

12        DR. JENNINGS:    It was Dr. Federici.

13        MR. GUPTA:    And   was   that   Dr.   Federici,

14   neuropsychological saying your psychological that was

15   referenced earlier in part of this case?

16        DR. JENNINGS:    I believe so.

17        MR. GUPTA:    Do you remember what your analysis of

18   that evaluation was?  What you believed after you read it?

19        DR. JENNINGS:    Well, I mean at the time that I read

20   it, I had no experience with the student and so I just kind

21   of took it at face value.

22        MR. GUPTA:    Um, um.

23        DR. JENNINGS:    After reading it, I did have a

24   conversation with mom, who expressed some concerns about it

17

1    because she felt that because O███ had taken the test -

2    done the testing without medication, she felt that it

3    seriously underestimated his - particularly his cognitive

4    potential. She had some concerns about that.

5        MR. GUPTA:    Are you aware a new evaluation was

6    given to Oleg.

7        DR. JENNINGS:    Yes.

8        MR. GUPTA:    With medication.

9        DR. JENNINGS:    Yes.

10       MR. GUPTA:    And did you have a chance to review

11   that evaluation?

12       DR. JENNINGS:    Yes, I did.

13       MR. GUPTA:    Can you highlight - Wow, let me back up

14   for a second.

15       HEARING OFFICER:    Help me out here.    The first one,

16   are there two Dr. Fedirici, neuropsychics in the record?

17       DR. JENNINGS:    No.

18       MR. GUPTA:    No there is one Dr. Fedirici,

19   neuropsychics in the record.

20       HEARING OFFICER:    That's the one you just asked

21   about.

22       MR. GUPTA:    Yes.

23       HEARING OFFICER:    And what exhibit is that?

24       MR. GUPTA:    That is - in DCPS that is 11.

1       **HEARING OFFICER:**    And now what are you asking about?

2       **MR. GUPTA:**    About his second evaluation.

3       **HEARING OFFICER:**    It's not a neuropsychic?

4       **MR. GUPTA:**    It is a -- well if I can clear that up

5    in testimony, I'll do that for you.    Now we were just

6    talking about a second evaluation.

7       **MR. GUPTA:**    Is    that    second    evaluation,    a

8    neuropsychological, as well.

9       **DR. JENNINGS:**    I don't believe so.    I don't – I

10    think that it was not.

11       **MR. GUPTA:**    Do you want an opportunity to refresh

12    recollection?

13       **DR. JENNINGS:**    Sure, that would be great.

14       **MR. GUPTA:**    Let    the    record    show    –    showing    the

15    witness, DCPS 08 in order to refresh her memory.

16       Have you had sufficient time?

17       **DR. JENNINGS:**    Um, um.

18       **MR. GUPTA:**    Now    that    second    evaluation,    can    you

19    tell us it was called?

20       **DR. JENNINGS:**    It was an Educational Evaluation.

21       **MR. GUPTA:**    And    in    general,    what    does    an

22    Educational Evaluation test?

23       **DR. JENNINGS:**    It    looks    at    the    child's    academic

24    skills, reading, arithmetic, writing skills, sometimes.

19

119

1    MR. GUPTA:    And what part of the educational is

2    related to the neuropsychological evaluation?

3    DR. JENNINGS:    Well the neuropsychological also

4    looks at his academic skills as well.

5    MR. GUPTA:    Ok, now in terms of the academic skills

6    that are contained in both tests, what similarities or

7    differences or anything that stood out, did you come across

8    after reviewing both of those side-by-side?

9    DR. JENNINGS:    Well I know in the subsequent

10   testing, O███ scored much better, I believe than he had

11   done on the previous testing when he was testing without

12   medication.

13   MR. GUPTA:    So in the second evaluation, was he on

14   medication?

15   DR. JENNINGS:    Yes.

16   MR. GUPTA:    Do you believe he scored better because

17   he was on medication in the second evaluation?

18   DR. JENNINGS:    Well, he was more able to focus and

19   slow down enough to not have an impulsive responding to

20   attend to the question.

21   MR. GUPTA:    And what's the significance of the

22   academic skills improving on the second evaluation, in

23   terms of his disability?

1    **DR. JENNINGS:**    Well, one of the other disabilities

2    was that he had been diagnosed with a learning disability

3    as well, and on the second testing it shows that he is

4    average academic functioning.

5    **MR. GUPTA:**    What's the standard for determining a

6    student to be learning disabled?

7    **DR. JENNINGS:**    We usually look at the child's

8    cognitive functioning and compare it with their ability to

9    learn.    Whether they are learning at a rate mentored with

10   their cognitive potential.

11   **MR. GUPTA:**    So you say that, that on the second

12   test his academic functioning was improved.    So does

13   academic functioning go towards cognitive functioning or

14   does that go more towards their achievement?

15   **DR. JENNINGS:**    More towards their achievement.

16   **MR. GUPTA:**    So how were his cognitive scores?

17   **DR. JENNINGS:**    What on the second test?

18   **MR. GUPTA:**    On the second evaluation.

19   **DR. JENNINGS:**    There was no cognitive testing done

20   on the second evaluation.

21   **MR. GUPTA:**    So, in order to determine a learning

22   disabled disability – how did you do that – did you compare

23   it to the cognitive testing on the first test?

24   **DR. JENNINGS:**    Yes, that would have been it.

1    **MR. GUPTA:**    Now a – regardless of whether a student

2    is on medication for their ADHD or not, would their scores

3    be effected by medication or not on cognitive testing?

4    **DR. JENNINGS:**    It could be, yes.

5    **MR. GUPTA:**    It could be.    Do you recall how his

6    cognitive scores were in the first evaluation?

7    **DR. JENNINGS:**    I don't remember the exact number.    I

8    know that – what I mainly remember is that I thought that

9    mom had expressed some concern about – feeling that it did

10    not fully access where she felt he was functioning.

11    **MR. GUPTA:**    What is his disability as far as you

12    know?

13    **DR. JENNINGS:**    He has a – from the Federici testing,

14    he had a number of diagnoses in terms of a cognitive

15    disorder, various learning disorders, speech and language

16    disorder, Attention Deficit Hyperactivity Disorder.

17    **HEARING OFFICER:**    Did you say speech disorder?

18    **DR. JENNINGS:**    Yes, speech and language disorder

19    from the Federici testing – I'm trying to remember what

20    else.    There may have been others, there were a number of

21    them.

22    **MR. GUPTA:**    Now in your role as a psychologist,

23    what in general, if you were at an IEP Meeting or if you

22

1  were to help develop an IEP, what part of the IEP would you

2  normally help develop?

3      DR. JENNINGS:    I    typically    develop    the    social

4  emotional goals.

5      MR. GUPTA:    Are you aware if O███ needed social

6  emotional goals in his IEP?

7      DR. JENNINGS:    Yes he did.

8      MR. GUPTA:    Did you help develop those goals?

9      DR. JENNINGS:    Typically, I worked with -- if Ms.

10  Brown is on a case, I work with Ms. Brown.

11      MR. GUPTA:    Ah, ah.

12      DR. JENNINGS:    But, I know that we were coming to

13  the table during the summer on this one, and I really can't

14  remember if I - if we worked together on these or not.  But

15  I know I was not present at the IEP.

16      MR. GUPTA:    Ok, you can't - do you recall if you

17  worked in the background at all?

18      DR. JENNINGS:    Then I probably -- usually we do,

19  that's the main thing that I can say, is usually we do.

20      MR. GUPTA:    Do you recall being at the 8:30, 2006

21  MDT/IEP Meeting?

22      DR. JENNINGS:    Yes, I was at that one.

23      MR. GUPTA:    Ok, can you describe to us, your role

24  in that meeting?

23

123

1      **DR. JENNINGS:**    Well to be a part of the Team.    To

2  listen  to  -  to  review  the  reports,  listen  to  the

3  information and to come to a conclusion as to the child's

4  disabilities,   and   eligibility   for   special   education

5  services.

6      **MR. GUPTA:**    Ok, and, were you in attendance at the

7  8:10, 2006 Meeting?

8      **DR. JENNINGS:**    I don't know.    I was not there for

9  that one.

10      **MR. GUPTA:**    Ok, do you remember at the - then let's

11  just stick with the 8:30 meeting since you weren't at the

12  prior one.    Do you remember what the Team concluded at the

13  8:30 meeting about O███████ disability and his IEP?

14      **DR. JENNINGS:**    Well  we  did  find  him  eligible  for

15  special  education  services.    He  was  found  to  be  multiply

16  handicapped.    I  think  within  other  health  impairment  based

17  on  the  Attention  Deficit  Hyperactivity  Disorder  and

18  possibly learning disabled, I believe.

19      **MR. GUPTA:**    Was O█████ mother at that meeting?

20      **DR. JENNINGS:**    I believe so.

21      **MR. GUPTA:**    And  the  entire  Team  in  agreement  with

22  the IEP that was developed that day?

23      **DR. JENNINGS:**    I believe so.

1      **MR. GUPTA:**    Do you know if placement was discussed

2    at that meeting?

3      **DR. JENNINGS:**    No.   I don't think we discussed at

4    that time.

5      **MR. GUPTA:**    Now, I just want to ask you a couple

6    more questions about your experiences.   So have you worked

7    with multiply disabled children before?

8      **DR. JENNINGS:**    You mean to attend evaluations for

9    them?

10      **MR. GUPTA:**    Sure.

11      **DR. JENNINGS:**    Yes.

12      **MR. GUPTA:**    Do you in terms of the kind of

13    classroom structure or curriculum do you have any knowledge

14    on that question, just generally?

15      **DR. JENNINGS:**    Yes, some general knowledge.

16      **MR. GUPTA:**    In your experience generally, what do

17    similarly disabled children need in terms of classroom

18    structure or curriculum?

19      **MR. EIG:**  Objection, it's irrelevant.   What does O█████

20    need might be highly relevant, but what are similar

21    children need.

22      **HEARING OFFICER:**    Yeah, I'm not sure I understand

23    the question.

25

125

1      **MR. GUPTA:**    She can't recall – well I'll back up –

2  I was going to get to O███ after I establish that generally

3  she has worked with similarly disabled children before.

4      **MR. EIG:**  I did object to that one.

5      **HEARING OFFICER:**    Similar with what?    With OHI and

6  LD –

7      **MR. GUPTA:**    And the multiply disabled.

8      **HEARING OFFICER:**    Well there can be – when you say

9  multiply that can be any number of multiple disorders.    Do

10  you want to talk about OHI and LD –

11

12      **MR. GUPTA:**    Ok, I'll just ask specifically about

13  O███.

14      **HEARING OFFICER:**    Now why don't we talk about a

15  child with learning disability and ADHD.    Since that seems

16  to be what the Team concluded he had.

17      **MR. GUPTA:**    So in your experience can you describe

18  to us the type of classroom structure and classroom

19  curriculum a child with LD and ADHD disability needs?

20      **DR. JENNINGS:**    I can speak more to the type of

21  structure than to the type of curriculum.

22      **MR. GUPTA:**    Ok, can you describe to us the type of

23  structure you would recommend?

1    **DR. JENNINGS:**    Typically    the    child    needs    a    highly

2    structured    environment    with    very – smaller    classroom,    the

3    opportunities for a lot of redirection, regrouping.

4    **MR. GUPTA:**    What does regrouping mean?

5    **DR. JENNINGS:**    Well    the    opportunity    to    group    them

6    according to what they need at that time so that they are

7    not always walked into, you know, everyday they are doing

8    things    exactly    this    way    but    to    have – I    guess    to    some

9    flexibility to meet their needs.

10    **MR. GUPTA:**    Are    you    able    to    quantify    what    smaller

11    classroom means?  Are you able to give us a range in terms

12    of    what    that    means,    like    number    of – maybe    a    range    in

13    student to teacher ratio?

14    **DR. JENNINGS:**    No.

15    **MR. GUPTA:**    No.    What    would    you    consider    a    large

16    classroom?

17    **DR. JENNINGS:**    I guess anywhere from twenty and up.

18    **MR. GUPTA:**    If you could speak up a little louder.

19    **DR. JENNINGS:**    Twenty and up.

20    **MR. GUPTA:**    Ok, do you – would    you    have    a    basis –

21    would you have any knowledge of answer any type of behavior

22    plans    that    should    be    set    up    for    such    a    student    in    LD/ADHD

23    student?

24    **DR. JENNINGS:**    Well the behavior plans –

27

127

1     **MR. EIG:** I object again. We are here about O▇▇▇

2     **HEARING OFFICER:**    Sustain.

3     **MR. GUPTA:**    Ok,    so    after    reviewing    O▇▇▇

4     evaluation and developing his IEP, what type of environment

5     do you feel would be appropriate for O▇▇ in terms of

6     classroom structure?

7     **DR. JENNINGS:**    I    think    you    would    need    a    small

8     classroom; he needs structure; ability to have redirection

9     to kind of anticipate some of his needs.

10     **MR. GUPTA:**    And do you feel O▇▇▇ needs a behavior

11     plan?

12     **DR. JENNINGS:**    Yes.

13     **MR. GUPTA:**    What do you think that plan should

14     consist of?

15     **DR. JENNINGS:**    Well, it probably would focus on

16     redirecting him, slowing him down, helping him with some of

17     the social issues, in terms of peer relationships.

18     **MR. GUPTA:**    In terms of those social issues you

19     just described, you said peer relationships, could you

20     expand upon that; what do you mean by that?

21     **DR. JENNINGS:**    Well, I think O▇▇▇ has a difficult

22     time relating to properly to other students. I know on the

23     day that I observed him, there were times when he attempted

24     to relate to other students, but he did so in a way that he

128

1   failed to get the other student's attention before he tried

2   to relate to them, so they ignored him.   There were a

3   couple of instances where students - he had made a comment

4   and the students attempted to relate to him, but he wasn't

5   aware that they were trying to piggyback on his comment and

6   relate to him.   So it's kind of a hit or miss kind of going

7   on.   I know his teacher had commented that he tended to

8   play alone a lot; that it was hard to get him to work in a

9   group, though he was showing some improvement in terms of

10  being more willing to work with other students.

11       **MR. GUPTA:**    So    in    your    experiences    are    there

12  interventions or strategies that could help O███ improve

13  his peer relationship skills?

14       **DR. JENNINGS:**    Yes.

15       **MR. GUPTA:**    And  could  you  briefly  describe  some

16  strategies you think would work on that?

17       **DR. JENNINGS:**    Well, I think that you would give him

18  a lot of support; give him queues, like when, you know if

19  you are observant to like some of the situations that I

20  noticed when he had tempted to get the student's attention.

21  You know the teacher would intervene and say, "O███, you

22  know you did a good thing in terms of trying to get that

23  student's attention - trying to relate to the student's,

24  but first you might need to call that person's name to make

1    sure they are paying attention to you before you continue

2    with your comment; in helping him to recognize that so and

3    so tried to interact with you, but you didn't notice.

4    Putting him in some situations with a lot support where he

5    would have to interact.

6        MR. GUPTA:    So to improve social issues skills with

7    O███ as you described, do you feel that it should be - such

8    interaction should be increased, decreased, or left at the

9    same level as when you observed them.

10       DR. JENNINGS:    I would think that you would work to

11   increase his social interaction.

12       MR. GUPTA:    And how does one increase social

13   interaction?  How do you do that?

14       DR. JENNINGS:    I think, kind of like what I was just

15   saying, that you would put him in situations where he would

16   - you know like a small group, if he's primarily working

17   alone, you would set it up so that maybe he has to work

18   with two or three students; but making sure that he is

19   given support to be successful with it.  Helping him to get

20   a better understanding of social queues by pointing them

21   out to him when they are happening, which ones he's

22   missing, which ones he's picking up, by reinforcing his

23   skills.

1      **MR. GUPTA:**    Thank you Dr. Jennings, I don't have

2  any further questions.

3      **HEARING OFFICER:**    Mr. Eig.

4      **MR. EIG:** Indulge us for one moment please.    Thank

5  you.

6      Your observation is at DCPS 9, isn't that right.

7      **DR. JENNINGS:**    Yes.

8      **MR. EIG:** And you did the report in July - early July,

9  but the observation obviously wasn't then, because school

10  is not in - it was late May.

11      **DR. JENNINGS:**    Um, um.

12      **MR. EIG:** Just a couple of weeks, probably before the

13  end of school, right?

14      **DR. JENNINGS:**    Right.

15      **MR. EIG:** Ok.

16      And on page 3 of your report, you mentioned the

17  following behaviors; I just want to highlight them, so I'll

18  just list them and then ask you a question.    This was from

19  the Science Class walking back to - I guess - what do you

20  go back to his Homeroom Class?

21      **DR. JENNINGS:**    Yes.

22      **MR. EIG:** Ok, and in his Homeroom Class, you observed

23  him screaming, tripping over several things, balancing a

24  book on his head; observed him to twirl and bang into the

1    walls, you went back to the class; when he got back into

2    homeroom he was hitting himself over the head with a book

3    and with a hanger; he talked to himself; he jumped around

4    talking to himself; he was engaged in making admiring

5    comments to himself about his project; ran from spot to

6    spot in the class.

7        **MR. GUPTA:**    Objection.  Mr. Eig is reading into the

8    record.  Is he testifying himself?  He can direct those

9    questions out.

10       **HEARING OFFICER:**    Overruled.

11       **MR. EIG:**  Twirling on his knees -- almost finished -

12   making noises until redirected by teacher, continuing to

13   fidget, crawl on the floor, putting his head on the desk,

14   when she intervened…

15       **DR. JENNINGS:**    Yes.

16       **MR. EIG:**  And then laid on the floor next to his book

17   bag.  You saw all those behaviors in that pre-brief _____

18   is that correct?

19       **DR. JENNINGS:**    Yes.

20       **MR. EIG:**  This is a very, very, ADD kid, right?

21       **DR. JENNINGS:**    Yes.

22       **MR. EIG:**  When Mr. Gupta asked you about general

23   questions about experience with children with ADD and LD,

1   you can throw the LD aside for this question right now

2   because …

3        **HEARING OFFICER:**    Just a second, you described him

4   as ADD and you confirmed now – is ADD the same as ADHD?

5        **DR. JENNINGS:**    No.

6        **MR. EIG:**   ADHD is his diagnosis, correct?

7        **DR. JENNINGS:**    Right.

8        **MR. EIG:**   And the H – in this case, the hyperactivity

9   is ____ ____.

10       **HEARING OFFICER:**    So you are agreeing to ADHD.

11       **DR. JENNINGS:**    ADHD.

12       **MR. EIG:**   Thank you for interrupting me.

13       **DR. JENNINGS:**    I didn't catch it.

14       **MR. EIG:**   Ok, and the ADHD child that you saw is – in

15   the setting that he was in – at OLV, was very

16   inappropriate.

17       **DR. JENNINGS:**    Yes.

18       **MR. EIG:**   Ok, now, you didn't, I think say in here how

19   large the classrooms – do you remember about how large they

20   were?

21       **DR. JENNINGS:**    I would have to guess, if I didn't –

22       **MR. EIG:**   No, I don't want you to guess.   Ok, the

23   interventions that the teacher was able to do – it was in

24   the small range, right?  Do you remember that?

33

133

1      **DR. JENNINGS:**    What the class?

2      **MR. EIG:**  Yeah, the class size.

3      **DR. JENNINGS:**    I don't – you know – I really don't

4      remember how many kids – I didn't write it down.

5      **MR. EIG:**  So if I told you that the tape was going to

6      say that there were 12 kids in that class – that would have

7      jogged your memory?

8      **DR. JENNINGS:**    No.

9      **MR. EIG:**  Ok, if it was a class of that size, and you

10     said that he needed a small class, in a class, or whatever

11     class it was, he was seen with significant problems,

12     correct?

13     **DR. JENNINGS:**    Yes.

14     **MR. EIG:**  Ok, I have no further questions for her.

15     **HEARING OFFICER:**    Any redirect?

16     **MR. GUPTA:**    Yes.    At that same classroom that you

17     observed, what type of environment was it – was it General

18     Ed, or Special Ed environment?

19     **DR. JENNINGS:**    General ed.

20     **MR. GUPTA:**    So as far as you know, where there

21     other Special Education students in the class?

22     **DR. JENNINGS:**    I would have no way of knowing.

23     **MR. GUPTA:**    Thank you.

24     **MR. EIG:**  Nothing.

1   **HEARING OFFICER:** Thank you very much.

2  **MR. GUPTA:** Can I take a three minute recess?

3  **HEARING OFFICER:** As long as it is no more than three

4 minutes.

5  **MR. EIG:** Can I suggest we do five so that I can call

6 my office, please?

7  **MR. GUPTA:** I'd go along with that.

8  **HEARING OFFICER:** By popular demand. (chuckling)

9 We will recess for five minutes.

10  **HEARING OFFICER:** Ok, we are back on the record.

11  **MR. GUPTA:** DCPS would like to call its second

12 witness, Cindy Brown.

13  **HEARING OFFICER:** Ms. Brown, would you raise your

14 right hand?  Do you swear or affirm the testimony you are

15 about to give will the truth, the whole truth and nothing

16 but the truth?

17  **MS. BROWN:** Yes.

18  **HEARING OFFICER:** Thank you.  Go a head Mr. Gupta.

19  **MR. GUPTA:** Ms. Brown, can you state your name and

20 position for the record please?

21  **MS. BROWN:** Cindy Brown, Clinical Social Worker

22 and Case Manager with D.C. Public Schools.

23  **MR. GUPTA:** You are a Licensed Clinical Social

24 Worker?

1        **MS. BROWN:**       Yes.

2        **MR. GUPTA:**       How   long   have   you   been   a   Licensed

3   Social Worker?

4        **MS. BROWN:**       Since about 1999.

5        **MR. GUPTA:**       And how long have you been with DCPS?

6        **MS. BROWN:**       As a Social Worker since 1999.

7        **MR. GUPTA:**       Ok.

8        **MS. BROWN:**        But,   I've   worked   for   D.C.   Public

9   Schools previously.

10       **MR. GUPTA:**       What school for DCPS are you working –

11   or what school for DCPS do you work for?

12       **MS. BROWN:**       I   don't   work   specifically   with   the

13   school, but I work with the Care Center that's located at

14   Shaw Jr. High School.

15       **MR. GUPTA:**       Can you briefly describe to us what the

16   Care Center is?

17       **MS. BROWN:**       The   Care   Center   is   the   Center   for

18   Assessment   and   Referral   and   Evaluation.   So   we   take

19   referrals and do Assessments and Evaluations for children

20   who are attending Private and Religious Schools that are

21   funded by their Parents.

22       **MR. GUPTA:**       Now   since   you've   been   working   at   the

23   Care Center have you come across a named O██ O███████?

24       **MS. BROWN:**       Yes.

1      MR. GUPTA:    When did you first come across that

2  name?

3      MS. BROWN:    I believe O███ was referred toward the

4  latter part of April of 06.

5      MR. GUPTA:    Who referred him?

6      MS. BROWN:    The - I believe the Parent referred

7  O██ to the Care Center with some assistance from the

8  school, Our Lady of Victory.

9      MR. GUPTA:    So when a student is referred can you

10  describe the process, what happens?

11      MS. BROWN:    There is a registration and somewhat a

12  intake procedure where the Parent will come in and provide

13  all the information for proof of residency, fill out the

14  enrollment forms, there is an SEP meeting held usually on

15  that  same  day  because  it  is  usually  a  scheduled

16  appointment, and they meet usually with Ms. Hall who is the

17  Liaison  for  Private  and  Religious  Schools  at  the  Care

18  Center and Nathialia Houston, they meet with either both or

19  one  of  those  individuals  and  they  review  whatever

20  information that the Parent has provided, whether it's just

21  the referral from the school, Report Cards, evaluations.

22  They determine what evaluations will need to be done and

23  they get the Parent's consent for us to proceed with the

24  evaluation process.

37

137

1      **MR. GUPTA:**    So when O██████ mother came into the

2    Care Center what documentation or what was in referral

3    packet.

4      **MS. BROWN:**    I don't know specifically what she may

5    have come in at the time that they did the SEP meeting, the

6    referral meeting, when the case was given to me, I believe

7    there was the Neuropsychological Report along with the Care

8    Center referral.    There also may have been some school

9    records.

10      **MR. GUPTA:**    And so, I guess, describe to us what

11    you did next.    Actually, let me back up before you answer

12    that - so then what is your role in terms of O██ at the

13    Care Center.

14      **MS. BROWN:**    I had a duel role in this case.    There

15    was a request for a social work evaluation, a social

16    history, which I would get completed - I would do myself.

17    I would also coordinate the Assessment Evaluations with the

18    rest of my team, with regard to other evaluations that

19    might be requested or need to be done.    Whether it be

20    observation, speech and language report, any other types of

21    evaluations.

22      **MR. GUPTA:**    So were you the Liaison between O██,

23    between the Mother and the Care Center?

24      **MS. BROWN:**    Yes.

1    **MR. GUPTA:**    Now   let   me   move   on   to   that   prior

2    question.   So, after you received the Referral Packet from

3    the Mother and you said you had an SEP Meeting, describe to

4    us what took place next?   What process did you prepare?

5    **MS. BROWN:**    When   I   got   the   case,   I   provided   a

6    contact sheet, which includes the child's information, the

7    parent's information, school, what reports were available,

8    and I provided that information to Mr. Perkins, Dr. White-

9    Jennings   and   I   believe   Leslie   Charles   also   had   that

10   information; and she is a Speech Therapist.

11   **MR. GUPTA:**    And so when did you conduct your Social

12   History Evaluation?

13   **MS. BROWN:**    I believe it was in May of 06.   I'm not

14   quite sure of the date.   May or June 06.

15   **MR. GUPTA:**    And, I'm showing Witness DCPS 07; is

16   this your Social History Evaluation Report?

17   **MS. BROWN:**    Yes it is.

18   **MR. GUPTA:**    Ok, do you recall - can you briefly

19   describe to us what you found out when you conducted your

20   Social History Evaluation?

21   **MS. BROWN:**    I met with mom in June and I explained

22   to her the purpose of the social history, and gave her an

23   idea of what kind of information I would be eliciting from

24   her.   We discussed his school history; we discussed the

1  family history, make-up, how he interacts with family

2  members in the home; how he interacts in the community;

3  school history, including where he had attended school; how

4  he did at each one of those schools academically as well as

5  socially.    Asked about behavioral characteristics; his

6  personal functioning in terms of hygiene; self-care; what

7  his interests were; if he had experienced any tram, any

8  services that he may have received in the community, or

9  privately; and then summarized that information and made

10  recommendations.

11    **MR. GUPTA:**    Ok, so lets move specifically to the

12  school history session, what did you find in terms of

13  O███ school history?

14    **MS. BROWN:**    I believe he had attended three

15  different schools, Our Lady of Victory being the last

16  school that he was attending.    And, there were periods

17  where he had done a little better than others, or had

18  demonstrated much more progress at other times, but overall

19  he had consistently demonstrated some level of academic

20  problems, specially in the areas of reading and I believe

21  writing may have been another of those issues.    Social

22  issues seemed to be pretty much consistent throughout his

23  school history; having difficulty understanding social

140

1    queues, maintaining peer relationships, avoiding classes or

2    academic tasks that were challenging for him.

3        MR. GUPTA:    Let me back-up for one second.    At the

4    time that he was referred to you, what grade was he in?

5        MS. BROWN:    I believe 5th, I may be mistaken, but I

6    believe he may have been in the 5th Grade.

7        MR. GUPTA:    And you mentioned he had been to three

8    different schools, prior to coming to you, including Our

9    Lady of Victory.

10       MS. BROWN:    Um, um.

11       MR. GUPTA:    Do    you    recall    if    he    was    Special

12   Education Student in any other those three schools?

13       MS. BROWN:    No.

14       MR. GUPTA:    So the SEP Meeting you had for him was

15   the time he is being considered for Special Education?

16       MS. BROWN:    Yes.

17       MR. GUPTA:    Do you recall if you asked the mother

18   whether she had requested him to be evaluated in the past,

19   for Special Education?

20       MS. BROWN:    I    don't    recall    whether    or    not    we

21   discussed that; I do recall discussing him receiving ESL

22   Services and that being the reason why one of the previous

23   schools may have been eaten - didn't pursue an evaluation

24   because he was an ESL Student.

41

141

1    **MR. GUPTA:**    Can you tell us what ESL means?

2    **MS. BROWN:**    English as a Second Language.

3    **MR. GUPTA:**    Ok, so what is the significance of that

4    which of your statement?

5    **MS. BROWN:**    If you haven't grasped the language and

6    you are not proficient enough, there is concerned that the

7    language issues is the reason for some of the difficulties

8    you may be experiencing, and so, often times, schools are

9    apprehensive about referring children for Special Ed when

10   they are still trying to learn the language or become

11   proficient with what is considered proficient in language.

12   **MR. GUPTA:**    And at the time you - at the time the

13   referral packet came to you, was he proficient in English?

14   **MS. BROWN:**    He was no longer an ESL student and in

15   discussion with mom, he had grasped the language; speech

16   she was not - her concerned that he was very verbal and

17   like to talk and communicate.

18   **MR. GUPTA:**    Ok, now, in terms of family history,

19   did you find anything significant there that sticks out in

20   your mind?

21   **MS. BROWN:**    He was adopted.  He also has two other

22   older siblings who are also adopted.  All of them are of

23   Russian background.  That when he was adopted he - well

24   during his time in the Orphanage, he experienced some

42

142

1    health issues, I believe it may have been malnutrition.

2    According to Federici's report and Mom's report there

3    appear to be some level of trauma that he experienced in

4    the orphanage. It wasn't documented, but he didn't get a

5    lot of stimulation; and so that significantly impacted his

6    development, overall.

7        MR. GUPTA:    And so in your experience, when such

8    early childhood trauma is experienced by a young child,

9    what is the significance of that trauma in relation to

10   their, I guess, academic achievement, or how they end up

11   matriculating into society and in school in general?

12       MS. BROWN:    Well in his case, you couldn't identify

13   — there was nothing written in terms of what specific

14   trauma he experienced, but moving from orphanage to

15   orphanage, not being able to make attachments, would effect

16   a child's social development and emotional development, how

17   they relate to other people, issues of trust.

18       MR. GUPTA:    Do you recall how old he was when Ms.

19   Pavo adopted him.

20       MS. BROWN:    I don't recall.

21       MR. GUPTA:    Do you recall if there had been — in

22   your report if there had been findings of adversarial

23   medical history or health history of the student?

24       HEARING OFFICER:    What kind of history?

43

143

1       **MR. GUPTA:**      Adversarial or bad background.

2       **MS. BROWN:**      Federici indicated a diagnosis that was

3    related to fetal alcohol syndrome, I don't know where he

4    got the diagnosis, I didn't see any medical records, there

5    were not provided in the information with regard to fetal

6    alcohol syndrome.    He did seem to indicate that, that

7    diagnosis may have been based on some of the physical

8    characteristics, his placement of his ears and his eyes;

9    but like I said, I don't know, where he got that

10   information, whether it was the diagnosis that provided

11   himself, or he got from medical records.

12      **MR. GUPTA:**      Ok, and so overall, what were your

13   impressions or your analysis when you concluded your report

14   or in having done the various background legwork, what did

15   you conclude in this?

16      **MS. BROWN:**      That his, I believe I did reference his

17   early history; his longstanding academic issues, and social

18   issues, and that he would need some sort of support with

19   regard to his social and emotional functions.

20      **MR. GUPTA:**      Did you identify any specific supports

21   he may need in that are?

22      **MS. BROWN:**      I don't recall what they were.    I

23   believe I did make more specific recommendations; I don't

24   recall what they are.

1      **MR. GUPTA:**     Would you like to refresh your memory?

2      **MS. BROWN:**     Sure.

3      **MR. GUPTA:**     I'm showing the Witness, DCPS 07, which

4   is the Witness' own social work evaluation report.

5      **MS. BROWN:**     Ok.

6      **MR. GUPTA:**     You can't read from there?

7      **MS. BROWN:**     Yes.  Ok.

8      **MR. GUPTA:**     You can refresh your memory.  Ok, let

9   me ask the question again.  Do you recall any strategies or

10   interventions   you   may   have   proposed   to   support   his

11   deficiencies in the social emotional area?

12      **MS. BROWN:**     Yes, I did indicate that it appeared

13   counseling  was  warranted  and,  if  it  was  going  to  be

14   provided  it  should  address  developing  adaptive  prompting

15   skills,  social  skills,  self-regulation  and  self-concept.

16   Also there was a suggestion for a behavior plan.

17      **MR. GUPTA:**     In general, can you describe to us what

18   a – explain to us what a behavior plan means?

19      **MS. BROWN:**     Behavior  Plan  is  developed  a  team  of

20   people who have familiarity with a student and it addresses

21   usually three areas sometimes it can be up to five, but

22   addressing specific behaviors that have the most impact on

23   his functioning in that particular setting.  A Behavior

24   Plan will include specifically what the goal is; what you

1    would like him to do, as well as strategies that are going

2    to be implemented in the setting, by his teacher or whoever

3    is implementing the plan.    It could be one teacher, it

4    could be a team of teachers, and so those different

5    strategies might include mop ling, positive feedback,

6    special seating, immediate consequences for behavior,

7    redirecting prompting; those kinds of things.

8        **MR. GUPTA:**    Ok, and do you know if such a plan was

9    ever developed?

10       **MS. BROWN:**    I believe we did develop a Behavior

11   Plan.

12       **MR. GUPTA:**    Was that plan - when it was developed,

13   was it included with the IEP?

14       **MS. BROWN:**    I believe it was.

15       **MR. GUPTA:**    Now, I want to backup again to your

16   strategies you described for the social and emotional help

17   that O████ needs.    Did you ever implement those strategies

18   in some form, in his educational program?

19       **MS. BROWN:**    We addressed the areas of deficit

20   through social emotional goals and the Behavior Plan was

21   developed.

22       **MR. GUPTA:**    Where are the social ---

23       **MS. BROWN:**    In terms of the actual implementation,

24   we wouldn't do the actual implementation; the school in

1  which he would be placed is where the plan and the IEP

2  would be implemented.

3      MR. GUPTA:    Ok, and where are the social and

4  emotional goals generally located, then?

5      MS. BROWN:    Within the IEP.

6      MR. GUPTA:    Within the IEP.

7      MS. BROWN:    Um, um.

8      MR. GUPTA:    And you actually helped develop those

9  goals?

10     MS. BROWN:    Yes.

11     MR. GUPTA:    Ok, I will come back to the IEP in a

12  little bit.  I want to move on thou; so you stated that you

13  did the social work evaluation, or at least you talked to

14  the mother sometime around June and the report would have

15  come out subsequently to that, correct?

16     MS. BROWN:    Yes.

17     MR. GUPTA:    So then, after the report was

18  developed, what did you do next, in terms of trying to get

19  this - get an educational program created for this student?

20     MS. BROWN:    Once my report was written; that was -

21  I informed the evaluators that the report was available so

22  that they could have the background information and have

23  more information on the student and kind of eliminate

24  having so many people calling mom asking her the same

1   questions that I would have already asked.    Observations

2   had already been scheduled and so that information was kind

3   of incorporated with everyone else's in terms of you know

4   there observations and what they knew about his social

5   history.    And so when the social and emotional goals were

6   developed, I initially drafted goals and then shared them

7   with the team and then modifications were made to those

8   goals, the drafted goals.

9        MR. GUPTA:    Um, um.

10        MS. BROWN:    And then the final draft was presented

11   to the parent, at a later date.

12        MR. GUPTA:    So, after you delivered the plan to the

13   parent, did you ever try to convene an IEP interim team

14   meeting to discuss all the outstanding evaluations and the

15   observations and your evaluation?

16        MS. BROWN:    Actually just to clarify the draft of

17   the IEP with the social and emotional goals as well as the

18   other goals, was provided for the IEP Meetings, but wasn't

19   provided to the parent, prior to.

20        HEARING OFFICER:    The goals were not?

21        MS. BROWN:    The draft was not.

22        MR. GUPTA: So when was the first IEP Meeting that you

23   scheduled?

1      **MS. BROWN:**     The first IEP Meeting was scheduled in

2    July.   I had spoken with mom and we had identified a date

3    for the IEP meeting.   We had talked about several dates and

4    were able to identify a date and a time.   I was not present

5    at that meeting, but I had designated a colleague to chair

6    that meeting for me in my absence.   From the notes that I

7    read and the feedback that I got from my Team when I

8    returned was that the mother and Ms. Laura Solomon did come

9    to that meeting, but there was an unwillingness to proceed

10   because Laura Solomon did not - had done some testing and

11   didn't have a copy of her report; and so there was an

12   agreement to reconvene the meeting on another day, with the

13   assumption that that report would have been available for

14   the next meeting.

15      **MR. GUPTA:**     So, substantively that meeting did not

16   go forward due to Ms. Solomon's report?

17      **MS. BROWN:**     The   meeting   was   scheduled,   it   was

18   assumed that the meeting would go forward and on that date;

19   the parent, nor Ms. Solomon showed for the meeting.

20      **MR. GUPTA:**     I just want to clarify; I'm talking

21   about the first meeting where you weren't in attendance for

22   because you said that meeting went forward, but didn't go

23   forth substantively.

24      **MS. BROWN:**     No.

1       **HEARING OFFICER:**    It didn't go forward because Dr.

2   Solomon's report wasn't ready.

3       **MS. BROWN:**    Yes.

4       **HEARING OFFICER:**    And they agreed to adjourn a week

5   when the report was ready.

6       **MR. GUPTA:**    Ok.

7       **MS. BROWN:**    Um, um.

8       **HEARING OFFICER:**    Next meeting.

9       **MR. GUPTA:**    When was the next meeting after that?

10      **MS. BROWN:**    Ah,

11      **MR. GUPTA:**    Or your attempt to hold a meeting?

12      **MS. BROWN:**    I can't recall off the top of my head.

13      **MR. GUPTA:**    Do you recall if there was - can you

14  recall if it was in July or August?

15      **MS. BROWN:**    I believe it may have been - I really

16  can't recall.

17      **MR. GUPTA:**    Would you like your memory to be

18  refreshed?

19      **MS. BROWN:**    Yes, please.

20      **MR. GUPTA:**    I am showing the Witness DCPS 19, which

21  is the Meeting Confirmation Notice.

22      **MS. BROWN:**    Um, um. Yes.

23      **MR. GUPTA:**    Now can you tell us when that next

24  meeting was?

1        MS. BROWN:      The next meeting was the 24th.

2        HEARING OFFICER:      Of?

3        MS. BROWN:      Of July.

4        MR. GUPTA:      And did this meeting go forward?

5        MS. BROWN:      No.

6        HEARING OFFICER:      Mr. Gupta.   I really don't care

7    about   meetings   that   didn't   happen,   in   which   nothing

8    occurred.   I want to find out when decisions were made or

9    not made.

10       MR. GUPTA:      Ok, I'm just trying to set up a pattern

11   of parents failing to show up to meetings.

12       HEARING OFFICER:      You know -- I don't care.   I'm

13   here to determine whether or not this is an appropriate

14   placement.

15       MR. GUPTA:      Ok, so when was the very next – when

16   was the meeting after that?

17       MS. BROWN:      The meeting after that was August 10th,

18   I believe, I had spoken to the parent a day or two prior to

19   that and she had confirmed that she would be present at

20   that meeting, that we would go forward and we did meet on

21   that day.   Unfortunately, the parent did not show.

22       MR. GUPTA:      Ok, did the meeting go forward even

23   though the parent did not show?

51                                                                  151

1     **MS. BROWN:**   Yes.   Because we had made multiple

2    attempts to proceed with the meeting and we didn't seem to

3    be able to convince the parent to come to the meeting.  We

4    had identified and confirmed and it was still a no show.

5     **MR. GUPTA:**   Ok, do you recall what occurred at this

6    meeting?

7     **MS. BROWN:**   We reviewed the available reports,

8    which was Federici's report.  I believe there was a report

9    that mom had sent to me by Deitsel.  It was an Educational

10   Evaluation.   Leslie Charles had completed a Speech and

11   Language Evaluation and had also reviewed the reports

12   because some of the reports; I believe Federici's report

13   did incorporate some testing that Speech Therapist usually

14   do.  So she had reviewed his report also.  And we had the

15   General Ed teacher from Our Lady of Victory, although she

16   was on vacation, she agreed to participate by phone, and so

17   we had her participate so she could provide us information

18   about how he was functioning in the classroom setting on a

19   daily basis.

20    **MR. GUPTA:**   Ok, and what did you – do you recall

21   what you found with the review of the reports?

22    **MS. BROWN:**   There was some concern about his

23   performance especially in the area of speech.  When

24   Federici provided the testing, he scored fairly low; I

1    believe on those test that related to speech and language,

2    as well as his overall functioning on that test - on his

3    evaluation, was somewhat low; but however -

4        **MR. GUPTA:**    Before you go forward, let me just

5    clarify something.

6        **MS. BROWN:**    Um, um.

7        **MR. GUPTA:**    Because there has been some

8    discrepancy.  Do you recall which report it was that the

9    child was not on medication?

10       **MS. BROWN:**    Federici.

11       **MR. GUPTA:**    Ok, all right go on.

12       **MS. BROWN:**    And then when Ms. Charles tested him,

13   the results of her evaluation demonstrated that he had

14   average language skills and that that was not an area of

15   deficit.

16       **MR. GUPTA:**    Did you find any areas of deficit that

17   day, in regards to the other reports?

18       **MS. BROWN:**    Deisal report show a much better

19   performance; pretty much average performance; academically

20   for the achievement test, I believe he did the Woodcock

21   Johnson, compared to Federic's report.  And the difference

22   being that when he was tested, when Deisal and Associates,

23   I believed - Deisal tested, he was on medication, when

1   Federici tested, he was not on medication; so there was a

2   mark improvement on that second evaluation.

3       MR. GUPTA:   So the Deisal Report contained an

4   aptitude section to it too, or no; or was it just

5   achievement-based.

6       MS. BROWN:   It was achievement-based.

7       MR. GUPTA:   And then, what else did you review that

8   day?

9       MS. BROWN:   I believe those were the reports that

10  were reviewed on that day.

11      MR. GUPTA:   Ok.

12      MS. BROWN:   And we had school records in terms of

13  his grades.

14      MR. GUPTA:   So what did you end up concluding that

15  day?

16      MS. BROWN:   We concluded that he was eligible for

17  services as a student with a disability classification of

18  other health impairment.

19      MR. GUPTA:   And what was the basis for that?

20      MS. BROWN:   He had a diagnosis of Attention Deficit

21  Hyperactivity Disorder and he was consistently

22  demonstrating that he was having problems regulating his

23  behavior, impulsivity attention organization.

1    **MR. GUPTA:**    At this particular meeting, were any

2    other diagnosis considered?

3    **MS. BROWN:**    We reviewed the criteria for the

4    learning disability.    He wasn't eligible based on our

5    criteria.    We were aware that Laura Solomon had done

6    testing.    We weren't sure as to the scope of her testing,

7    but we were going to reconsider the disability

8    classification once we had the additional information.

9    **MR. GUPTA:**    So, as of the date of this meeting, did

10    you, or did you not have, Laura Solomon's report?

11    **MS. BROWN:**    We did not.

12    **MR. GUPTA:**    So, due to not having her report, you

13    did not consider LD or you found the student not eligible

14    for --

15    **MS. BROWN:**    We considered LD, but we could not find

16    him eligible, based on the criteria.

17    **MR. GUPTA:**    What is the criteria?

18    **MS. BROWN:**    It's a list, it relates to having a

19    significant discrepancy between the student's cognitive and

20    achievement as well - in addition to not performing

21    commensurate with the peers and so both that has to be met.

22    It list the different areas - the academic areas that you

23    would identify, reading, comprehension, mathematics,

24    developmental language, motor, probably missing something,

1    I think oral expression, writing, so it's a long list of

2    areas.

3         MR. GUPTA:     Ok.

4         MS. BROWN:     Having   a   negative   impact   on   the

5    educational   performance.    Noting the different documents

6    that   were   reviewed   in   determining   or   making   that

7    eligibility decision and also considering whether, or not,

8    language, or lack of instruction, have anything to do with

9    it.

10        MR. GUPTA:     Were any - now you have discussed OHI

11   and LD, were there any other diagnosis considered for O█████

12   that day?

13        MS. BROWN:     No.

14        MR. GUPTA:     Was placement discussed that day?

15        MS. BROWN:     Let me go back to your question.    I

16   think we did discuss the issue of emotional disturbance and

17   that was based on Federici's Report.    Because he had listed

18   diagnosis   such   as   post-traumatic   stress,   I   believe

19   adjustment   disorder,   along   with   reading,   math,   disorder

20   written language, but it was a long list of disorders that

21   he had provided and so we wanted to go through that to rule

22   out whether or not there were any significant emotional -

23   social emotional issues.    And getting the feedback from the

24   teacher,   as   well   as   from   the   observations   and   the

56

156

1    interaction that the evaluators had had with O███; it was

2    determined that it wasn't the social emotional issues that

3    he was experiencing did not rise to the point of an

4    emotional distress.

5       **MR. GUPTA:**    I want to go back to the LD discussion.

6       **MS. BROWN:**    Um, um.

7       **MR. GUPTA:**    Now you stated earlier that you

8    couldn't have a full discussion on it because you were

9    waiting on Dr. Solomon's report.

10      **HEARING OFFICER:**    No, that is not what she said.

11   She said the student was not eligible for LD, but they were

12   willing to reconsider upon receipt of Dr. Solomon's

13   evaluation.

14      **MR. GUPTA:**    Ok.

15      **HEARING OFFICER:**    She didn't say that they didn't

16   discuss it, they said he wasn't eligible.

17      **MR. GUPTA:**    Ok, I'll rephrase it.   You stated he

18   wasn't eligible, but is that based on the Federici report,

19   the Deisal report or is there another reason that we don't

20   know of - or that we haven't discussed right here today.

21   What was the - how did you base your decision on not giving

22   him the LD status that day?

23      **MS. BROWN:**    It was based on -- we had to look at

24   the cognitive scores that were provided in the Federici

57

157

1    report and we looked at the academic scores, I believe from

2    Deisal's report as well as looking at the Speech and

3    Language Evaluation also - the speech and language testing.

4        MR. GUPTA:    And I know you gave us the criteria

5    already for LD, so you said there wasn't enough of a gap

6    between the two scores and the two reports to qualify?

7        MS. BROWN:    I can't remember if it wasn't enough of

8    -- there wasn't a discrepancy and I don't recall whether or

9    not that was the only issue.    It may have also been that

10   the academic scores were higher than the cognitive scores,

11   because there was a mark improvement from Federici's

12   Achievement Testing and Deisal's Achievement Testing.

13       MR. GUPTA:    And, up to this point, are you aware of

14   another set of cognitive scores outside of the Federici

15   report?

16       MS. BROWN:    Ms. Laura Solomon, I believe had done

17   the - I believe the cognitive portion of the Woodcock

18   Johnson.

19       MR. GUPTA:    Ok.

20       MS. BROWN:    And she may have done some other

21   testing, I don't recall.

22       MR. GUPTA:    Ok, before we move on, I just wanted to

23   make sure I finished off the 8:10 meeting.    Was placement

24   discussed at the 8:10, 06 meeting?

1      **MS. BROWN:**       I can't recall.

2      **MR. GUPTA:**       Would you like to refresh your memory?

3      **MS. BROWN:**       Yes.

4      **MR. GUPTA:**       I'm showing the Witness, DCPS 21, which

5   are the MDT Meeting Notes from August 10, 2006.

6      **MS. BROWN:**       They wouldn't be in the MDT notes; they

7   would have to be in the IEP Notes.

8      **MR. GUPTA:**       Clarify I'm showing the Witness, DCPS

9   20, which is the IEP from 8:10, 2006.

10     **MS. BROWN:**       They are actually not under 20, they

11  must be under 21.  We deferred the discussion of placement

12  at that time.

13     **MR. GUPTA:**       Ok, do you recall as to why?

14     **MS. BROWN:**       Well when we met on O███, we really

15  weren't sure whether or not he would require – what kind of

16  setting he would require.  We didn't know whether or not he

17  would require a combination setting which would likely be

18  able to be addressed in his neighborhood school or whether

19  or not he would need a full-time placement which would be

20  out of General Ed; and so we had deferred that discussion.

21     **MR. GUPTA:**       Ok, now, you said earlier, as of August

22  10, 2006, you did not have Dr. Solomon's report.  Do you

23  recall when you got Dr. Solomon's report?

1    **MS. BROWN:**    It was shortly after that meeting.    It

2    may have been a week later.    It may not have been as long,

3    but it was after that meeting.

4    **MR. GUPTA:**    Ok,    and    so    after    you    received    Dr.

5    Solomon's report, did you attempt to schedule another IEP –

6    MDT Meeting or any meeting to review that report?

7    **MS. BROWN:**    Yes.

8    **MR. GUPTA:**    Ok, when was that scheduled for?

9    **MS. BROWN:**    For the 30th of August.

10    **MR. GUPTA:**    Did that meeting go forward?

11    **MS. BROWN:**    Yes it did.

12    **MR. GUPTA:**    Did    the    parent    show    up    for    that

13    meeting?

14    **MS. BROWN:**    Yes she did, as well as Ms. Solomon –

15    Dr. Solomon

16    **MS. BROWN:**    Do    you    recall    any    other    –    the    other

17    people in attendance at that meeting?

18    **MS. BROWN:**    Jermaine Perkins was at that meting.    I

19    believe, Leslie Charles was at the meeting.

20    **MR. GUPTA:**    What is Leslie Charles' occupation?

21    **MS. BROWN:**    She is a Speech Therapist.

22    **MR. GUPTA:**    Ok.

23    **MS. BROWN:**    Dr. White-Jennings was at that meeting.

24    I believe Ms. – Dr. Solomon, an attorney from -- Mr. Eig

60                                                          160

1  ____, oh God, it may have been Paula Rosenstock, I got it,

2  as well as Besha Bannar who is his Special Ed Teacher and

3  IEP Developer.  I think I got everybody.

4      **MR. GUPTA:**    Ok, now what occurred at this – maybe,

5  I know, let me backup for a second, actually.  Give us a

6  Table of Contents of what occurred and then we will go down

7  and talk detailed about each Table of Contents.  _____

8  _____.

9      **MS. BROWN:**    Well we began with reviewing the evals

10  and we kind of went back over some the evaluation, as we

11  were reviewing the new information, it was always

12  referenced back to some of the information from the

13  previous report and so we went through that discussion

14  about how he was functioning and considered Dr. Solomon's

15  report and we had determined that he would be eligible as a

16  learning disabled student and so he would carry the

17  classification of a multiple disability to include the OHI

18  and the LD.

19      **MR. GUPTA:**    So just to be clear, you added LD due

20  to which evaluation?

21      **MS. BROWN:**    It was based on the new information

22  from Dr. Solomon.

1    **MR. GUPTA:**    Do you recall specifically, what was

2    new in that report that may have caused the change of

3    course?

4    **MS. BROWN:**    The cognitive scores and I don't recall

5    if she had done other testing, I just can't remember, it's

6    been a while.

7    **MR. GUPTA:**    Ok, and do you recall just in terms of

8    educational setting, the type of setting – academic setting

9    the student should be in or should not be in.    Do you

10   recall a discussion about that?

11   **MS. BROWN:**    Well, I believe that the Team Members

12   for DCPS were more inclined to believe he would need a

13   full-time setting.    However, we did have to discuss the

14   issue of a combination setting because some of his Report

15   Cards – well his Report Card from Our Lady of Victory did

16   indicate that he was during well in the non-academic

17   subjects, which I believe were music, art, and maybe one

18   other class and so based on that information, we have to

19   consider whether or not he could be in a combination

20   setting, meaning that he would be in General Ed or the non-

21   academic classes and in a resource room for the academic

22   classes.    We did get clarification about his functioning in

23   those subject areas and it did come up that based on the

24   amount of – I don't want to call them aphesis, the student

1   avoiding those classes because he didn't like the classes,

2   or behavior, he wasn't in those classes so there should

3   have been no way he could earn an A in music if he wasn't

4   in music class; and so based on that information, we had

5   determined that he wasn't functioning well in the non-

6   academic classes.  And that he would be more appropriately

7   placed in a full-time setting.

8       MR. GUPTA:    And just briefly describe to us —

9   explain?

10      MS. BROWN:    Meaning out of General Education, all

11  the classes, even the non-academic, lunch and recess, all

12  of them is in a Special Education setting with disabled

13  peers.

14      MR. GUPTA:    Bear with me for one second, just

15  catching up on my handwritten notes.

16      And, was a — I guess — was the population size of this

17  setting discussed in terms of the classroom?

18      MS. BROWN:    Yes, we all agreed that he needed a

19  small group setting.

20      MR. GUPTA:    Ok, can you define for us what a small

21  group setting means?  I guess can you quantify that number,

22  generally in your experience?

23      MS. BROWN:    It can range from four to five

24  students, depending on how specialized the setting is, it

63

163

1   might be even smaller than that.  But, usually it could be,

2   you know, four to five students in a class, ranging up to

3   twelve and 10 to 12 with a teacher and usually a teacher's

4   assistance.

5       MR. GUPTA:     And, what about the type of structure

6   within the classroom.

7       MS. BROWN:     Structured classroom setting; usually

8   specialized program such as that having a school-wide type

9   of plan, with regard to behavior and so, you know,

10  everything is scheduled;  their behavior plans that are

11  done class-wide as well as school-wide, to provide

12  additional structure.

13      MR. GUPTA:     Ok, and were social and emotional goals

14  discussed, or strategies to implement those goals,

15  discussed at this meeting?

16      MS. BROWN:     Yes.  I believe Dr. Solomon had some

17  issue with the amount of social and emotional goals; and we

18  did explain that because he was having the kind of

19  difficulties whereas with other children we may combine

20  certain behaviors and one particular goal, with O███, we

21  had separated the amount because he may master one part of

22  the objective and not to be able to master the other one –

23  the other part of it if it was written together.  And so we

24  really broke down the goals so that he would have some

                                64

                                                          164

1  success and we would, you know, be able to determine

2  whether or not he is reaching the main objective.  And so

3  they were broken down much more so than we would with other

4  students who may be functioning a little higher socially.

5       MR. GUPTA:     Do you recall specifically, an example

6  of that?  When you broke down that goal into two parts

7  instead of keeping it as one whole goal?

8       MS. BROWN:     I would have to look at the goals.

9       MR. GUPTA:     Ok, I am showing DCPS 05, the IEP

10  developed on 8:30, 06.

11      MS. BROWN:     Ok, this is on the IEP, under social,

12  emotional; I believe it is Goal No. 9.  One of the goals

13  broken down was with regard to adaptive coping strategies

14  often times will have the child identify and utilize

15  various adaptive strategies, with O███ we broke it down to

16  first just being able to identify it and then second goal

17  would be to identify and utilize because those were skills

18  that he likely wouldn't master at the same time so that,

19  you know, he would be able to identify what it was, but it

20  probably would take longer for him to be able to implement.

21      MR. GUPTA:     Ok, and then just generally, when you

22  state that he should master the short-term objective by 80%

23  in the IEP…

24      MS. BROWN:     Um, um.

1    MR. GUPTA:    What does that mean?

2    MS. BROWN:    It means that of the goals, it is 80%

3    of the goals that are listed that would demonstrate the

4    mastery.

5    MR. GUPTA:    So just so we understand correctly; the

6    goals that are listed are the several boxes that are below

7    the – right there…

8    MS. BROWN:    Um, um.

9    MR. GUPTA:    So here we see one, two, three, four,

10   five, six.

11   MS. BROWN:    Um, um.

12   MR. GUPTA:    So 80% means, I guess in this sense,

13   would be four of those six?

14   MS. BROWN:    Four or five of those six, yes.

15   MR. GUPTA:    Ok, now, was the Team in agreement to

16   break up these goals into two parts, as you had done?

17   MS. BROWN:    Yes, I had an opportunity to share the

18   goals with Ms. Banner, Mr. Perkins, Dr. White-Jennings, I

19   believe she had looked at the goals prior to the meeting

20   and we all reviewed those goals during the meeting.

21   MR. GUPTA:    Ok.

22   MS. BROWN:    Because they were drafts and so if

23   there was something that needed to be added in or we

166

1   strongly felt that something needed to be taken out then we

2   were ready to do that.

3       MR. GUPTA:    Ok, just bear with me one second.  Were

4   there any further discussions about other goals; maybe not

5   just the social emotional goals, but other goals that were

6   developed?

7       MS. BROWN:    I'm sure there were.   I believe Dr.

8   Solomon had many issues, she had a long list on a notepad

9   of things that she was in disagreement with or wanted

10  clarification for so, I'm certain there were other things

11  that she disagreed with that we discussed.

12      MR. GUPTA:    But, once the meeting was concluded,

13  did the Team walk away with an understanding that what you

14  had developed, everyone was in agreement with?

15      MS. BROWN:    I think DCPS didn't have - thought that

16  the IEP that was drafted was appropriate.   Dr. Solomon

17  disagreed with certain areas of the IEP and so she and the

18  parent and Paula Rosenstock were not in agreement; and I

19  believe that I noted what the disagreements were.

20      MR. GUPTA:    I know that in my prior question, you

21  highlighted upon that, but are you able to specifically

22  tell us what Dr. Solomon, Ms. Rosenstock, and Ms. Pavos'

23  concerns were?

24      MS. BROWN:    Off the top of my head no.

167

1    MR. GUPTA:    If I were to refresh your memory would

2  you be able to tell us then?

3    MS. BROWN:    Yes, probably.

4    MR. GUPTA:    I am showing the Witness, DCPS 05 which

5  is the 8:30, 06 MDT Meeting Notes.

6    MS. BROWN:    Ok.

7    MR. GUPTA:    Let me re-ask the question, just in

8  case you don't member.

9    MS. BROWN:    Ok.

10    MR. GUPTA:    Can you specifically mentioned --

11  highlight the objections Dr. Solomon had with the IEP that

12  was developed that day?

13    MS. BROWN:    Specifically, with regard to social

14  emotional goals, it was issue about a goal that - an

15  objective that indicated that he needed to develop a

16  therapeutic relationship and she objected and thought that

17  was inappropriate.  We disagreed because of the difficulty

18  he had with trusting and maintaining relationships that it

19  would be important for him to be able to develop a

20  therapeutic relationship so that he would be able to

21  discuss his feelings and issues with a therapist.

22    MR. GUPTA:    Did she explain why she objected to

23  that?

168

1      **MS. BROWN:**     She thought it was inappropriate, she

2    didn't believe that it needed to be there.

3      **MR. GUPTA:**     But no basis – did she give you a basis

4    for why she thought it was inappropriate?

5      **MS. BROWN:**     Naturally a basis, I know that's not

6    necessarily her area of expertise, but she did very

7    strongly state that she believed that it was inappropriate.

8      **MR. GUPTA:**     Ok, any other concerns?

9      **MS. BROWN:**     There were concerns about the writing

10   goals, in that she didn't want the writing goals that we

11   had drafted.  She believed that they were too difficult and

12   that wasn't something that he needed to be working on and

13   we disagreed because, even though writing may have been

14   challenging for him, it was a skill that he – that you know

15   – it was a deficit area that needed to be addressed.  He

16   has to learn to write, he has to learn the writing process

17   and that the goals that we had were appropriate and they

18   did – the goals started in a more simplified way and moved

19   up.  So, we were hopeful that over a years time, that he

20   would be able to master some of those goals, he may not

21   master all of them, but he should be able to master some of

22   the objectives with regard to writing.

169

1      MR. GUPTA:      So once again, did Dr. Solomon give you

2    a rationale or a basis as to why – I mean you said she

3    thought they were too difficult.  Did you she you a reason?

4      MS. BROWN:      She said based on his skill level, and

5    we did consider where he was functioning, so the goals were

6    based on where he was functioning and started at simple

7    forms of writing to develop – to move up to – you know

8    something that – you know was a bit more challenging for

9    him.  But – you know -- certainly skills that he would need

10   to learn with regard to writing.

11     MR. GUPTA:      So what was her proposition as to the

12   writing goals?

13     MS. BROWN:      I recall that she wanted us to take

14   them out, I don't recall her suggesting alternative goals;

15   I believe that she wanted them deleted from the plan.

16     MR. GUPTA:      Ok, where there any other disputes?

17     MS. BROWN:      There was some – I wouldn't necessarily

18   call them disputes, there were some issues that were raised

19   with regard to the accommodations and the modifications and

20   we added some things into those areas.   I think they

21   related to his visual perceptual issues.   There was issue

22   in – she wanted the setting somehow incorporated – excuse

23   me – she wanted the setting somehow incorporated into the

24   individual objectives, and we objected to that.   We

70

170

1  disagreed because setting was already discussed.  It was

2  indicated in the notes.  It will be indicated in the IEP.

3  So the setting didn't need to be stated in each individual

4  objective.

5      **MR. GUPTA:**    Could you further explain that, what do

6  you   mean   when   you   state   setting   incorporated   into

7  individual objective?

8      **MS. BROWN:**    I believe what she wanted was that for

9  each particular objective for it to somehow incorporate the

10  setting, a small group of x amount.  I think she wanted to

11  determine that and have that in each objective and we

12  disagreed.  We had indicated that the setting that is

13  identified will speak to the size of the group and often

14  times in classrooms even it it's a group of ten, children

15  aren't working in groups of ten, often times children are

16  working in groups of three, sometimes two, sometimes four,

17  but they work in smaller groups, it was no need to indicate

18  a specific number or setting in each individual goal.

19      **MR. GUPTA:**    Ok,  and  then  were  there  any  other

20  issues, or areas of  _____ between Dr. Solomon and DC

21  Team with regards to the IEP.  Just a recap, you mentioned

22  social emotional writing and accommodations.

23      **MS. BROWN:**    I believe that was mostly it.

1        MR. GUPTA:    And, did the Team discuss any issue

2   regarding further evaluation or anything of that nature,

3   more testing – maybe some more testing for the student?

4        MS. BROWN:    Yes.    We agreed to complete an

5   occupational therapy evaluation.

6        MR. GUPTA:    Why was that decided upon?

7        MS. BROWN:    There were concerns about his visual

8   perceptual issues, as they related to reading.   I think it

9   was also indicated in some of the reports, I think there

10  were some inconsistency about he scored in some areas and

11  how he was actually functioning, and we agreed that it

12  would be appropriate to go ahead and complete it.    We

13  weren't in disagreement about the OT evaluation.

14       MR. GUPTA:    And the Team was in agreement with,

15  right?

16       MS. BROWN:    Um, um.

17       MR. GUPTA:    Ok, now you frame the setting – the

18  Team agreed upon the setting which was the out of General

19  Education should be the setting, but did the Team ever

20  discuss location, where the program should be implemented?

21       MS. BROWN:    We had discussed Prospect as a possible

22  placement.    We are very familiar with the program.    We

23  understood that mom did not have a chance to see the

24  program, prior to the meeting.    And also, we did not have

172

1   Dr. Peterson available by phone, but we suggested Prospect.

2   We thought it would be a program that would meet his needs,

3   but we weren't ready at that time to actually place the

4   student at Prospect, we wanted to make sure that Dr.

5   Peterson did have an opportunity to at least look at his

6   packet and determine whether or not there was space

7   available for him; whether there was a classroom that could

8   accommodate him, or you know, just overall whether or not

9   they believe that they could meet his needs.    I do know

10  that Dr. Peterson has a team of professionals that look at

11  the entire packet.    There will be a Clinical Psychologist,

12  maybe another Psychologist, if the child has other issues,

13  that person may also be present.    So it is a team.    But

14  based on my experience with the school, as well as Dr.

15  Peterson, and in placing children at Prospect that have

16  similar needs, we did believe that they did have the

17  services. They have the program that could appropriately

18  address his needs.

19      **MR. GUPTA:**    So, at this meeting, I know you said

20  you weren't ready to propose it, but was information given

21  about Prospect to the Parent, Ms. Pavo?

22      **MS. BROWN:**    Yes, we did discuss the program.

23      **MR. GUPTA:**    Oh, you did discuss the program?

1      **MS. BROWN:**    We did discuss, you know, the program,

2    yes.

3      **MR. GUPTA:**    Ok, and did the parents, or Dr.

4    Solomon, or Ms. Rosenstock give an opinion, or did they

5    have a comment on the program, at time?

6      **MS. BROWN:**    I don't remember who led the

7    discussion, whether it was mom, or Ms. Rosenstock, but it

8    was discussed that they wanted placement at Kingsbury, and

9    they thought Kingsbury could meet his needs, and Kingsbury

10   is a full-time Special Education School.

11     **MR. GUPTA:**    And as far as you were aware as of the

12   date of this meeting, was the student already enrolled in

13   Kingsbury?

14     **MS. BROWN:**    The student was - I don't believe the

15   student was already enrolled at Kingsbury, I was aware that

16   the student had already been accepted to Kingsbury, and I

17   believe I had received a letter that indicated that if a

18   placement wasn't identified for him, prior to a specific

19   date, then the parent's intent was to enroll him at

20   Kingsbury.

21     **MR. GUPTA:**    Did you in receipt of that letter have

22   the date of this meeting or did you receive that letter

23   before or prior to before...?

1      MS. BROWN:      I believe I received that information

2   prior to the meeting, but close to the meeting date.  If it

3   wasn't prior, it was certainly very close to the meeting –

4   right before or right afterwards.

5      MR. GUPTA:      Ok, so then after placement discussion,

6   did   the   meeting   conclude,   or   were   there   further

7   discussions?

8      MS. BROWN:      The meeting concluded.  Mom had agreed

9   to go visit the school and we had indicated that we would

10  reconvene the placement meeting when we would have Dr.

11  Peterson available to answer any questions that she might

12  have that she wasn't able to ask at the time of the visit,

13  and Dr. Peterson could address any concerns or issues, or

14  questions that the Parent had, but we would convene a

15  placement meeting.

16     MR. GUPTA:      Ok, and did you convene that placement

17  meeting?

18     MS. BROWN:      I believe we did.

19     MR. GUPTA:      Did you invite the Parent to that

20  meeting?

21     MS. BROWN:      Yes, I did.

22     MR. GUPTA:      Do you recall the date you proposed for

23  the placement meeting?

1      **MS. BROWN:**      I believe it was September.   I believe

2  I proposed three sets of dates and times.

3      **MR. GUPTA:**      Ok, and then do you recall the Parents

4  answer back with one of those three sets that you have

5  proposed?

6      **MS. BROWN:**      I believe - I want to say that I did

7  get a response back from Mr. Eig that indicated that there

8  wasn't a reason for a placement meeting.

9      **MR. GUPTA:**      Ok, and so how did you interpret that

10  letter?

11      **MS. BROWN:**      That there was no intent to come to a

12  placement meeting.

13      **MR. GUPTA:**      Ok, did a placement meeting actually

14  occur then?

15      **MS. BROWN:**      Yes.

16      **MR. GUPTA:**      When did it occur?

17      **MS. BROWN:**      Sometime in the ladder part of

18  December.

19      **MR. GUPTA:**      Do you want to refresh your memory, to

20  see if you can give us an exact date?

21      **MS. BROWN:**      Sure.

22      **MR. GUPTA:**      I'm showing her DCPS 12, I believe.

23      **MS. BROWN:**      September 21st 06.

1      MR. GUPTA:     Ok, excuse me; I'm just catching up

2  with my handwritten notes.   So were you at the September

3  21st meeting?

4      MS. BROWN:     Yes.

5      MR. GUPTA:     Ok, do you recall who else was at the

6  meeting?

7      MS. BROWN:     Myself, Mr. Perkins, Ms. Banner - I

8  believe, Leslie Charles and Dr. Peterson, by telephone.

9      MR. GUPTA:     And, how about the Parent?

10     MS. BROWN:     No.

11     MR. GUTPA:  Dr. Solomon?

12     MS. BROWN:     No.

13     MR. GUPTA:     Any   representative   from   Mr.   Eig's

14  Office?

15     MS. BROWN:     No.

16     MR. GUPTA:     Ok, did the meeting go forward that

17  day?

18     MS. BROWN:     Yes, it did.

19     MR. GUPTA:     Ok, can you briefly describe to us what

20  happen at that meeting?

21     MS. BROWN:     We got Dr. Peterson on the phone and

22  pretty much asked her to describe her program in detail, in

23  terms of the classroom services that were provided the

1   staff.   Whether or not she thought her program would be

2   able to address his needs.

3        MR. GUTPA:   And what was her opinion regarding the

4   last statement you said — last question you stated that

5   whether or not the program can address his needs?

6        **MS. BROWN:**   That her program could address his

7   needs.

8        **MR. GUPTA:**   And so did the team come to a decision

9   that day?

10       **MS. BROWN:**   Yes, that Prospect was an appropriate

11  placement.

12       **MR. GUPTA:**   Based on — what was your rationale?

13       **MS. BROWN:**   Based on the information that we had

14  already had available per the evaluations, teachers'

15  reports, observations, along with Dr. Peterson's

16  information that she provided about her program.

17       **MR. GUPTA:**   Ok, and then finally, did you -- based

18  on the Team's decision, did you issue a prior notice to the

19  Parents?

20       **MS. BROWN:**   Yes, I did.

21       **MR. GUPTA:**   Ok, thank you, I don't have any further

22  questions.

23       **HEARING OFFICER:**   Mr. Ca

24       **MS. BROWN:**   Can, I take that back.

178

1      **HEARING OFFICER:**    Ok, we are back on the record.

2    Mr. Eig.

3      **MR. EIG:**  Thank you very much Mr. Banks.

4      Ms. Brown, I don't have a lot of questions for you.

5    Some just to clarify – on that last issue, one of the

6    confusions seems to have been whether placement was

7    proposed at the August 30th IEP Meeting or not, is that

8    right?

9      **MS. BROWN:**    We suggested what we thought would be a

10    possible placement.

11      **MR. EIG:**  Well, we have some documents, some letters

12    that you referred to, I think; 002 is the September 21st

13    letter that referred back to a September 8th letter which I

14    think is – this letter to you from me told you that we

15    thought that DCPS had proposed Prospect on August 30th,

16    right?  And that we had already rejected it on September

17    18th.

18      **MS. BROWN:**    Yes, I see what your letter says, yes.

19      **MR. EIG:**  I'm just saying that usually had been told

20    before you had other IEP Meeting in September that it was

21    my clients' and my offices' understanding that DCPS had

22    proposed Prospect and that we had rejected.

23      **MS. BROWN:**    That was not my understanding at the

24    August 13 meeting.

1    MR. EIG:  No, no, I didn't ask you that one.  I stated

2    you knew from our letters that that was our understanding –

3    so we are saying our understanding was that it had been

4    proposed and we had rejected.

5    MS. BROWN:    Yes, I know what you had written in

6    your letter, yes.

7    MR. EIG:  Ok, and actually if you look at 003, should

8    be the next one there, that just tell you that we _____ due

9    processing and we were rejecting Prospect.

10    MS. BROWN:    Yes, it clearly states that.

11    MR. EIG:  Ok, now if you can turn to the DC documents

12    now, lets see where that understanding might have come

13    from; can you please turn to the minutes of the notes of

14    the August meeting and if you turn to page four of four, on

15    the notes there, you're there, ok – you see the top of that

16    page, it says, MDT is in agreement with Out of General

17    Educational setting.  And there is no confusion about that,

18    right.   Everybody thought he should be in a full-time

19    placement, right.  Is that a yes – you agree.

20    MS. BROWN:    We   agree   to   the   Out   of   General

21    Education setting, yes.

22    MR. EIG:  I'm   reading,   DCPS   proposing   Prospect

23    Learning Center.

24    MS. BROWN:    Yes.

180

1      **MR. EIG:** Are you saying that DCPS wasn't proposing

2  Prospect Learning Center?

3      **MS. BROWN:** We were proposing Prospect as we

4  thought it was appropriate, however, we didn't have Dr.

5  Peterson available at the meeting. Mom had not visited the

6  program and we needed to take that into consideration and

7  so we wanted to also continue discussion about placement

8  once Mom had visited the program and Dr. Peterson had a

9  chance to review the information, respond to any questions

10  that mom might have regarding the program.

11      **MR. EIG:** Ms. Brown, from that note - I'm sorry, who

12  wrote this?

13      **MS. BROWN:** I did.

14      **MR. EIG:** Ok, so this is a DCPS saying that we are

15  proposing Prospect Learning Centering, right.

16      **MS. BROWN:** Ah, ah.

17      **MR. EIG:** To the end of the page, which is the end of

18  the notes, right, show us anywhere you just said it

19  capsulated that while we are not proposing it officially

20  because we want the Mom to have a chance to verify - and

21  then we are going to come back and - show us that?

22      **MS. BROWN:** It's a summary of the discussion, it is

23  not going to include every aspect of the session that we

24  had.

1      MR. EIG: Show us any suggestion -- I understand that

2   every aspect isn't covered.   I understand these are not

3   verbatim notes, just any suggestion right there that DCPS

4   says we are proposing Prospect, but only for you to look at

5   it - when the mother wants to visit DCPS, you recorded that

6   and where it says and then we are going to come back to

7   another meeting.

8      MS. BROWN:   I believe I did write that the Parent

9   wants to visit the program and has not yet made a decision.

10     MR. EIG: Well, yeah, but that's true with any

11  proposal.

12     MS. BROWN:    Not really.

13     MR. EIG:  Any proposal in which a Parent hasn't been

14  to the program - when a notice goes to a Parent…

15     HEARING OFFICER:   Argumentative.   Some arguing with

16  the lady, just ask the question.

17     MR. EIG:  I was trying to get around to it.

18     HEARING OFFICER:    Yeah, well ask the question.

19     MR. EIG:  When a proposal goes to a Parent with a

20  prior notice, is the Parent told how she can go observe it

21  the program?

22     MS. BROWN:    Yes.

23     MR. EIG: And, do many parents do go and observe the

24  program, if they are not familiar with it?

182

1    **MS. BROWN:**    Some parents do and some don't.

2    **MR. EIG:**  Ok, what was different here?

3    **MS. BROWN:**    As we had during the discussion, Mom

4    indicated that she would visit the program; she had not yet

5    made a decision; and we had very clearly discuss that we

6    would come back to the table to discuss the program after

7    she visited.

8    **MR. EIG:**  Ms. Brown, if you very clearly discussed it,

9    why didn't you put it in the minutes - the notes, any

10    suggestion that you were going to reconvene?

11    **MS. BROWN:**    It was a very long meeting.

12    **MR. EIG:**  You were tired.

13    **MS. BROWN:**    I'm sure at that point we were tired

14    and hungry; but like I said, the meeting is summarizing the

15    main points of the meeting and often times, it's not

16    something that I always write in the meeting notes, its if

17    I remember to write, I write them.

18    **MR. EIG:**  You knew a couple weeks later, in lieu of

19    September, that the Parents' position has we have said in

20    those letters was that Prospect as we - she understood

21    Prospect being proposed and we had rejected.    That's what

22    you wrote.

23    **MS. BROWN:**    That's what you indicated in your

24    letter, yes.

83

183

1        MR. EIG:  Did you or anybody else from DCPS respond to

2   that – that with a letter that says no that is not right,

3   we really haven't proposed a placement, and we want you to

4   come back -- _____ respond to our letters.

5        MS. BROWN:    I really don't recall what my letter

6   may have said.

7        MR. EIG:  Now, when you made the placement decision,

8   and lets talk about – whether it was made on September 30th

9   or September 21st, was it?

10        MS. BROWN:    I believe it was the 21st.

11        MR. EIG:  Whether it was at the IEP Meeting or the

12   30th, and/or, in other words, it could be one or both, or

13   whatever.  The September 21st, did you have a General

14   Educator in front of those committees?

15        MS. BROWN:    On which meeting?

16        MR. EIG:  Either one.

17        MS. BROWN:    Which dates again, please?

18        MR. EIG:  August 30th or September 21st and the

19   placement decision was certainly made on one of those,

20   obviously.

21        MS. BROWN:    Did we have a General Ed Teach?

22        MR. EIG:  At either meeting.

23        MS. BROWN:    No, not at either of those meetings.

184

1     MR. EIG: Now, would you turn please to DCPS _____

2 _____.

3     MS. BROWN:    Yes, we so advised.

4     MR. EIG: _____ _____ IEP. In good of that goal, I

5 would like to clarify something again.   The social

6 emotional goals?

7     MR. EIG: I think the one that 9 or 10, room number –

8 what was the number for that.

9     MR. GUPTA:    Was it goal nine?

10     MS. BROWN:    Nine.

11     MR. EIG: Ok, well nine is as good as any other.  This

12 is the proposed IEP for O███, right?

13     MS. BROWN:    Say it again.

14     MR. EIG: This is the proposed IEP for O███ for this

15 year, right?

16     MS. BROWN:    Yes.

17     MR. EIG: Ok, when Mr. Gupta was asking you questions,

18 you were referring to the six – structural objectives the

19 lowest goals.   They are really not goals, they are

20 breakdown of the annual goals.

21     MS. BROWN:    There are objectives, they are a

22 breakdown of the ---

185

1      **MR. EIG:** So that we are clear here, these are

2  objectives and it says that, although it's hard to read on

3  here; and above it is the Annual goal, right?

4      **MS. BROWN:**    Um, um.

5      **MR. EIG:** And the Annual goal, he asked you about how

6  you measure success achievement and you said 80% and that

7  and that's what sets the annual goal.

8      **MS. BROWN:**    Um, um.

9      **MR. EIG:** He also ask you would that mean that you are

10  80% of the objectives done and you said yes.   That's not

11  really the way it's written, right?   Each objective has an

12  80% criteria in it, isn't that right?   Ok.

13      **MS. BROWN:**    Yes, each objective has 80%.

14      **MR. EIG:** Ok, it comes to trial - so he'd understand.

15  And the way that we would measure, whether indeed he was

16  achieving certain goals, is that each goal and see if he

17  would do it eight out of 10 times, right?

18      **MS. BROWN:**    Yeah, or whatever the measurement is

19  for that particular objective.

20      **MR. EIG:** They happen to alternate eight out of ten.

21  And the way we would determine that annual goal was

22  achieve, would be if all short-term goals were achieve were

23  achieved, right?

1     **MS. BROWN:**    Eighty percent of the short term

2  objectives.

3     **MR. GUPTA:**    No, not 80 percent.  Oh, so you are

4  saying that if (there are six of these here) - you are

5  saying that if he had 80%, mastering five of the six, for

6  short-term objectives and zero on the last one, he would

7  still have achieved the annual goal, because five out of

8  six is over 80%.

9     **MS. BROWN:**    What I said was that the goal is

10  measured by mastery of 80% of those objectives.

11     **MR. EIG:**  We talked about early on, an IEP meeting

12  that what goal you would have had his teacher on the phone

13  for a while, where Ms. Pavo and Jack Solomon didn't attend.

14     **MS. BROWN:**    Yes.

15     **MR. EIG:**  There is some confusion about that, right?

16     **HEARING OFFICER:**   I'm sorry what was the question,

17  again?

18     **MR. EIG:**  There was some confusion about -isn't it

19  true that you subsequently found out, that Ms. Pavo

20  confirmed the meeting going forward, Dr. Solomon either

21  canceled or attempted to cancel and inform Ms. Pavo that it

22  had been canceled and that's why they didn't show up.

23     **HEARING OFFICER:**   Which meeting are we talking about

24  now?

1    **MR. EIG:** This is the one – the summer, when they –

2    **HEARING OFFICER:** Oh you mean the one back in July.

3    **MR. EIG:** Sure, that's exactly the one. I didn't

4    write the date down.

5    **MS. BROWN:** The tenth.

6    **HEARING OFFICER:** _____ _____ to discourage

7    discussion, thou.

8    **MR. EIG:** Yes, I just wanted to get one thing clear,

9    but right now my client is now showing up at a meeting, and

10    I just wanted to – I understand that you said that you

11    don't even want to talk about unless something happen –

12    **HEARING OFFICER:** I'm much more concerned about the

13    September 21st than the one in July which nothing happened.

14    Mr. EIG: Ok, I'll move on. So am I.

15    **MR. EIG:** So the prior notice that issued for O▉▉▉

16    placement is dated September 21st.

17    **MS. BROWN:** Yes, it is.

18    **MR. EIG:** We need to talk about that, can you show us

19    that? For the record, I'm retrieving DCPS 12. Is this the

20    prior notice that proposes to place Oleg at Prospect?

21    **MS. BROWN:** This is the prior notice that, yes,

22    places him at Prospect Learning Center.

23    **MR. EIG:** Ok, and what is a therapeutic placement?

24    When that phrase is used by DCPS, what does that mean?

1      **MS. BROWN:**    Therapeutic, it means it's a placement

2    that provides the kinds of support that will address

3    various needs; social/emotional, it often times refers to.

4      **MR. EIG:** It sought of sounds like that every

5    placement.

6      **HEARING OFFICER:**    Sounds like what?

7      **MR. EIG:** Like every placement; I mean every

8    placement is supposed to support its student social and

9    emotion need, right?

10     **MS. BROWN:**    It also could mean something different

11   given a different type of placement, if it was the

12   placement that focused specifically on speech and language

13   needs and the therapeutic would be relevant to that.

14     **HEARING OFFICER:**    Let me just interject for, when I

15   get therapeutic, for instance, if the child is just LD,

16   with no behavioral or social/emotional issues, I wouldn't

17   expect a therapeutic setting.

18     **MR. EIG:** Right and I want to clarify that.  Doesn't

19   it mean that:  translated with (maybe we'll call it typical

20   LD placement) just a more academic deficit, that

21   therapeutic would be integrated into his program (some form

22   of therapy).

23     **MS. BROWN:**    Yes.

1    **MR. EIG:** What would it there be, a psychologist, or a

2    clinical social worker, if some form of therapy would be

3    integrated into his program.

4    **MS. BROWN:**    Yes.

5    **MR. EIG:** Ok.

6    **HEARING OFFICER:**    Let me just make sure I understand

7    your answer.    You are agreeing with Mr. Eig, that

8    therapeutic setting means one in which therapy will be

9    integrated into the child's program.

10    **MS. BROWN:**    Yes.

11    **HEARING OFFICER:**    Thank you.

12    **MR. EIG:** So the notice of proposed placement was

13    generated by a team that did not include a regular

14    education teacher, O█████ current teacher, O█████ former

15    teacher, or will be - current teacher, I mean, at Kingsbury

16    by that time, Ms. Pavo or her educational consultant.    None

17    of them participated in the deliberations or that that

18    resulted during the meeting that resulted in the

19    prim__?___.

20    **MS. BROWN:**    His General Ed teacher had participated

21    in an earlier meeting and we had the sense that he would

22    not be receiving any General Education services, so it was

23    not necessary for his General Ed teach to be present,

24    again.

1    **MR. EIG:** You didn't answer my questions and we will

2    be finish soon.  If you are going to make a speech about,

3    we are going to take a long time.  I did ask you that, you

4    know that.  I asked you, who participated in the group that

5    came up with the placement.  You talk about Prospect.

6    **HEARING OFFICER:**    Well    actually,    if    that's    the

7    question, that's already been asked and answer.  Now you're

8    to reinforce, suggesting that I didn't hear the answer the

9    first time.

10    **MR. EIG:** No sir, I certainly, I just want to make

11    sure that the ---

12    **HEARING OFFICER:**    She said there was no teacher the

13    September 21st meeting.

14    **MR. EIG:**  There was no general education teacher.

15    **HEARING OFFICER:**    She said there was no teacher at

16    the September 21st or the August 30th meeting.

17    **MR. EIG:** I asked her earlier if there was a General

18    Education Teacher.

19    **HEARING OFFICER:**    Whether    it    was    a    general    or

20    special if there is no teacher, neither general nor special

21    is it?

22    **MR. EIG:**  Yes, I agree with that.

23    **HEARING OFFICER:**    And if there was no teacher, then

24    his teacher wasn't there either.

1      MR. EIG:  Yes, I agree with that.

2      HEARING OFFICER:    See, see how it kind of flows.

3      MR. EIG:  You are ahead of me, and I've caught up with

4   you.   You are right.   That wasn't my main focus.   The

5   teacher was involved, from OLV, earlier, you had already

6   discuss placement with Prospect with that teacher, did you?

7      MS. BROWN:    No.

8      MR. EIG:  You ever discussed any specific placement

9   with her, right?

10      MS. BROWN:    No.

11      MR. EIG:  Thank you.

12      That's all I have.

13      MS. BROWN:    Can I clarify something that Mr. Eig

14   had indicated.   He indicated that there was no teacher at

15   the meeting.

16      MR. EIG:  Mr. Banks was the one who said that.

17      MS. BROWN:    That's not what I responded to earlier.

18      MR. EIG:  There are no questions here.

19      HEARING OFFICER:    Look, I am the fact-finder, so let

20   me not play games.

21      MR. EIG:  And don't put me in the middle of this.

22      HEARING OFFICER:    I'm not putting you in the middle;

23   I'm just studying what I wrote down in my notes, when you

24   asked the previous question.

192

1    **MR. EIG:** Mr. Banks, I can ask her a question right
2    now, which I would be happy to do to make it clear; but I
3    think I know where she's going and I have no problem with
4    it.

5    **HEARING OFFICER:** Well, actually, I want to find it
6    in my notes.

7    **MR. EIG:** Ok.

8    **HEARING OFFICER:** Ok, when you made the placement
9    decision 8:30, or 9:21; was there a General Ed Teacher on
10   either team? The answer is no. That's what I wrote down.

11   **MR. EIG:** And just to make sure _____ there wasn't
12   right? But there was a Certified Special Educator, right?

13   **MS. BROWN:** Yes.

14   **MR. EIG:** That is what you wanted to say.

15   **MS. BROWN:** Yes.

16   **MR. EIG:** Ok, I have no problem with that, because the
17   person signed in that way. Ok, thank you. But not anybody
18   on September 21, know of Kingsbury.

19   **MS. BROWN:** No.

20   **HEARING OFFICER:** Ok, go ahead Mr. Gupta:

21   **MR. GUPTA:** I want to get back to the last question
22   Mr. Eig asked. At the 8/10 meeting, was there a General
23   Education Teacher?

93

193

1    MS. BROWN:    At the 8/10 meeting, yes it was.  That

2  was the _____ stated by phone.

3    MR. GUPTA:    And, was an IEP developed that day?

4    MS. BROWN:    Yes, it was.

5    MR. GUPTA:    Did the IEP recommend a educational

6  setting that day?

7    MS. BROWN:    Yes.

8    MR. GUPTA:    Was that setting primarily, Special

9  Education or General Education?

10    MS. BROWN:    It was out of General Ed.   Oleg ??

11  Special Ed.

12    MR. GUPTA:    So with your understanding of the

13  process, in subsequent meetings, would you need to have a

14  General Ed teacher?

15    MR. EIG:  Objection, leading to the point of

16  testifying.

17    HEARING OFFICER:    _____ draw any conclusion that I

18  have to find out.

19    MR. GUPTA:    Ok, fine, I'll withdraw it.

20    HEARING OFFICER:    Although, I mean I guess it

21  instructive, since she is the Case Manager.  I'll allow the

22  question – go ahead.

23    MR. GUPTA:    Did you hear the question, or do you

24  want me to re-ask it?

194

1    **MS. BROWN:**    Please, do so.

2    **MR. EIG:**  Could you ask it in a very much less leading

3    manner?  Because that it all I was objecting to at first.

4    **HEARING OFFICER:**    Ok.

5    **MR. GUPTA:**    What is your understanding of required

6    IEP attendees or an Out of General Education student?

7    **MS. BROWN:**    My  understanding  is  that  a  General

8    Education Teacher is not required to be present when the

9    student will not receive any services in the General

10   Education setting.

11   **MR. GUPTA:**    Ok, and so, just to make sure we are

12   clear.    At the 8/30 meeting what was the status of the

13   student in regards to educational setting the student would

14   be in?

15   **MS. BROWN:**    Out of General Education.

16   **MR. GUPTA:**    Ok.

17        Ok, I only have one more question.    Oh, as the

18   Case Manager for a student, what is your understanding of

19   what is required of you when proposing placement for the

20   student?  What steps must you go through?

21   **MS. BROWN:**    We    are    required    to    have    a

22   representative from the school in which the placement is

23   being proposed at the meeting.    Though often times, if that

24   person is not present during the initial discussion, the

1  meeting is reconvened so that person, that representative,

2  whether it is the principal or someone she's designated as

3  a representative, just speak about the program.

4     MR. GUPTA:    And, what is your understanding of, I

5  guess, the mode of communication you must use to convey

6  that placement decision to the parents or to the parents

7  advocate, basically anybody on the parental side.  What

8  mode of communication must you use to convey that decision?

9     MS. BROWN:    Through prior notice of placement.

10    MR. GUPTA:    And what form does that prior notice

11 have to take?

12    MS. BROWN:    It is a notice that's issued after

13 conclusion of the meeting and the placement has been

14 determined.  That notice is provided to the parent if the

15 parent has an attorney.  Notice is also provided to the

16 attorney as well as to the school that the student has been

17 place; and so those parties received a notice, indicating

18 that the placement has been made.

19    MR. GUPTA:    How is that notice, commutative?

20    HEARING OFFICER:    He wants you to say it's in

21 writing.

22    MS. BROWN:    It a written notice.

23    MR. EIG:  He wants you to say it's a prior notice.

1      MR. GUPTA:      However stipulated?    That is the way

2  _____.

3      MS. BROWN:      Its written notice.

4      MR. GUPTA:      And so, in conclusion of the 8/30

5  meeting, was there a written prior notice issued?

6      MS. BROWN:      Yes it was.

7      MR. GUPTA:      At the 8/30 meeting?

8      MS. BROWN:      Please repeat?    I'm probably getting

9  tired.

10      MR. GUPTA:      No, that fine.    This is my last

11  question.    At the conclusion of the 8/30 meeting, was a

12  written prior notice issued for Prospect Learning Center?

13      MS. BROWN:      A written prior notice for placement

14  at Prospect was not issued at the 8/30 meeting.    A written

15  notice was issued with regard to the disability change, the

16  setting and the related services that would be provided.

17      MR. GUPTA:      Thank you.

18      MR. EIG: Just one on the IEP part.    You stated, Ms.

19  Brown that you understood that if a child is in regular

20  education, you don't need a regulator education teacher, at

21  the IEP Meeting to discuss placement, right?

22      MS. BROWN:      Not that's not what I said.

23      MR. EIG:  What did you say?

197

1      **MS. BROWN:**    I said if the student is not going to

2   be in General Education setting, receive any services in

3   General Ed, then a General Education Teacher is not

4   required to be at that meeting.

5      **MR. EIG:**  Ok, we are in agreement.   I thought that was

6   what you said.

7      Ok, and so what you are saying, is that when you came

8   back to the IEP Meeting on August 30, General Education was

9   off the table, no matter what information was provided.

10      **MS. BROWN:**    We did not believe that the student was

11   going to be in any other setting other than out of General

12   Ed, based on the information that we had prior to.

13      **MR. EIG:** And   on   August   30,   you   reviewed   your

14   information, correct?

15      **MS. BROWN:**    Yes, we did.

16      **MR. EIG:**  Ok, so it was certainly possible that that

17   decision could have been "oh we can main steam in PE.    It

18   was possible.  I like possible.

19      **MS. BROWN:**    It was unlikely.

20      **MR. EIG:**  Ok, are you aware that the law says is that

21   you need a regulator education teacher, if the child there;

22   if the student is or may be place.  That's the regulations,

23   are you aware of that?

1 **MS. BROWN:** We didn't believe that the child might

2 be placed in General Ed.

3 **MR. EIG:** Once, again, mam, answer my questions, if I

4 ask them. Are you aware that that's what the regulation

5 say's. I'm citing 322, 323.

6 **HEARING OFFICER:** See this is what I didn't want.

7 **MR. EIG:** You let him do it, because it is one more

8 active; because it is one more after this one. I'm sorry

9 its not 232, it is 34C, Part 300.321 Westfelder IDP. Were

10 you aware what the requirement is, is that not less the one

11 regulation teacher if the child is or maybe participating

12 in the regulation education environment?

13 **MS. BROWN:** Yes I'm aware that it says that, yes.

14 **MR. EIG:** And are you also aware that whether or not

15 the child is going to be in the regulation education or may

16 be in the regular education setting; that you need a

17 Special Education Teacher of the child participating. That

18 is the very next thing. In order words, you need a current

19 teacher of the child General Ed or Regular, you are aware

20 of that, aren't you?

21 **MS. BROWN:** I'm aware of that, but the child not

22 receiving Special Ed services; did not have a Special

23 Education Teacher.

24 **MR. EIG:** August 30th right?

1       **MS. BROWN:**    No he did not.

2       **MR. EIG:** So  you  would  have  gone  back  to  old

3    _____.

4       **MS. BROWN:**    Just the initial.

5       **MR. EIG:** Ok and when you made the placement decision

6    on September 21st you knew from our letters and that are

7    Hearing  the  Request,  right?    They  did  have  a  Special

8    Education Teacher at Kingsbury.

9       **MS. BROWN:**    My  understanding  was  that  he  was  not

10   yet attending on September 21st when I issued the notice.

11   What are you asking?

12      **MR. EIG:** When you set the September 21st meeting and

13   we wrote you and said that we think there is no need for

14   the meeting; we understand the proposal; Ms. Tavis placed

15   him at Kingsbury, and we started hearing request; you knew

16   that he was in Kingsbury, at that point, didn't you?  By

17   September 21st.

18      **MS. BROWN:**    I believe he may have been.  I didn't

19   know where he was.

20      **MR. EIG:** Ok, so what efforts did you to have if you

21   didn't have General Education teacher anymore, because

22   there is Kingsbury, what efforts on September 21st did you

23   make to get _____ there.

24      **MS. BROWN:**    We made no effort.

100

200

1          **HEARING OFFICER:**    Ok, do you have another witness,

2     Mr. Gupta?

3          **MR. GUPTA:**    I do, Mr. Perkins.

4          **MR. EIG:**    Off the record.    I would like to ask for a

5     lunch break.

6          **HEARING OFFICER:**    Ok, we are back on the record.

7          Mr. Perkins, would you raise your right hand?    Do you

8     swear or affirm the testimony you are about to give, will

9     be the truth, the whole truth and nothing but the truth?

10         **MR. PERKINS:**    Yes, I swear.

11         **HEARING OFFICER:**    Thank you.    Go ahead Mr. Gupta.

12         **MR. GUPTA:**    Mr. Perkins, can you state your name

13    and position for the record, please?

14         **MR. PERKINS:**    Yes.    My name is Germane Perkins, I am

15    a Psychologist with DCPS.

16         **MR. GUPTA:**    And where do you primarily work out of.

17         **MR. PERKINS:**    The Care Center, a Central Assessment

18    Referral and Evaluation Center.

19         **MR. GUPTA:**    How long have you been there sir?

20         **MR. PERKINS:**    This is my third year.

21         **MR. GUPTA:**    Ok, what are your primary duties for

22    the Care Center?

23         **MR. PERKINS:**    My primary duties are to conduct

24    assessments, inclusive of seeing students within the

1    classroom    environment;    also    if    necessary,    complete

2    evaluations, also participate in eligibility meetings and

3    if necessary, I EP Development and the subsequent meetings.

4         MR. GUPTA:    Do you ever write goals in EIP's?

5         MR. PERKINS:   In some occasions, on other occasions,

6    we  do  have  a  Clinical  Psychologist  and  also  a  Social

7    Worker, which we often collaborate at sometimes in regard

8    to the goals.

9         MR. GUPTA:    Ok, now, have you heard of a student

10   name O██ O███?

11        MR. PERKINS:   Yes.

12        MR. GUPTA:    How did you come to know this student?

13        MR. PERKINS:   Well, he was a student who was referred

14   through the Care Center for evaluation.  And actually he

15   had evaluations during the initial referral period.  So

16   with that came a review and the classroom observation while

17   he was at Our Lady of Victory.

18        MR. GUPTA:    Do  you  remember  the  date  of  your

19   classroom observation?

20        MR. PERKINS:   I don't know the exact date.  I believe

21   it was early June, that I did see him.

22        MR. GUPTA:    If I showed you a document to refresh

23   your memory, would you be able to recall then?  If I showed

24   you your own Observation Report.

1     **MR. PERKINS:**   Yes.

2     **MR. GUPTA:**    I'm showing the Witness, DCPS 16, which

3  is a review of independent evaluations and classroom

4  observation conducted by the Witness.

5     **MR. PERKINS:**   Yes, the actual Observation Date was

6  June 5th, 06.

7     **MR. GUPTA:**    And when did you actually issue the

8  report?

9     **MR. PERKINS:**   The report was, I'm not sure of the

10  exact date, but it was within, I would say, a month of

11  that, earlier of that date of the observation report.

12    **MR. GUPTA:**    Ok, now, prior to doing the Classroom

13  Observation on June 5th, had you reviewed any other data on

14  the student?

15    **MR. PERKINS:**   Yes, there was a Neuropsychological

16  Evaluation that was conducted by Dr. Federici.   I believe

17  I'm saying his name correctly.   I did have a chance to

18  review that and also, relevant information regard to

19  records. MDT Notes in regard to some of the issues that the

20  student was presenting.

21    **MR. GUPTA:**    Now this neuropsychic by Dr. Federici,

22  was this the eval where the student was on medication, or

23  was not on medication?

24    **MR. PERKINS:**   Was not on medications.

1    MR. GUPTA:    And, so upon your review of Dr.

2  Federici's report, were you able to develop any type of

3  impressions, or did you make any type of analysis on what

4  you read in his report?

5    MR. PERKINS:  Well based on his findings, he

6  certainly had learning issues as pertaining to the

7  information that was obtained. One of the issues as we went

8  to actual meeting, Eligibility Meeting was that he was off

9  of medication.   In that respect, cognitive scores,

10  educational scores, presented as very low, over all.   And

11  with that in mind, when you're thinking about measuring

12  cognition, attention shouldn't be a part of that construct.

13  In addition, at the meeting, we talked about the sheer

14  amount of test that we are giving.   Especially for a child

15  with attention issues, for that amount of test, in my

16  experience of testing children, even without attention

17  issues, to have that amount of test within one setting is

18  probably a bit too much and probably, at best, makes the

19  results questionable, or should be interpreted with

20  caution.

21    MR. GUPTA:    I want to back up for one second.   You

22  said — I want to make sure I heard you correct.   Did you

23  say attention should not be part of the construct?

24    MR. PERKINS:  Right.

1        **MR. GUPTA:**    What does that mean?

2        **MR. PERKINS:**    Meaning    intelligence,    in    itself,    I

3    believe it is in the Weslin Social Skills or additional

4    also testing non-verbal intelligence, Third Edition.    So

5    what those test, generally reassure is reasoning ability.

6    Those are the two primary constructs that those particular

7    tests are founded on.    And so attention is another variable

8    that can be measured.    Intelligence is not a component that

9    you would want to be - if you are measuring intelligence,

10    you don't want the thing that you are actually measuring as

11    being influenced by attention issues.

12        **MR. GUPTA:**    So,    was    that    the    reasoning    why    he

13    wasn't on medication,    or are you saying he should be on

14    medication when you are testing cognitive.

15        **MR. PERKINS:**    Well,    in    regard    to    that    issue,

16    actually test developers, with _____ explicitly states in

17    the manual in regard to testing special populations.

18    Specifically,    in    that    regard,    if    they    are    not    on

19    medication,    it's    probably    a    Bass    Scenario    where    you

20    actually do it over for several days.    However, in regard

21    to, if you are talking about executive functioning aspect,

22    attention    organization,    if    those    are    areas    you    wanted

23    measured in,    off mediation may be the best bet,    but I

24    wouldn't ascertain,    unless    you    are    just    doing    it    for

1    diagnostic purposes, serves no purpose to assess a child

2    off medication as a measure of his intelligence.

3        MR. GUPTA:    Ok, so, let us move on to June 5th, now,

4    at this point, just to recap.  You had already reviewed Dr.

5    Federici's report.  Now on this day you went into actually,

6    personally observe the students?  _____ of O██, correct?

7    What school did you go to?

8        MR. PERKINS:    The school was Our Lady of Victory.

9        MR. GUPTA:    How long do you think you stayed there?

10       MR. PERKINS:    I stayed there a total, I would say,

11   around an hour.  It encompassed the whole writing block of

12   the school day.

13       MR. GUPTA:    Ok, so during the time you were there

14   was the student transitioned from class-to-class, or was he

15   in one class the entire time?

16       MR. PERKINS:    He was in one class during my

17   observation.

18       MR. GUPTA:    And I guess you already said that he

19   was in the writing class.

20       MR. PERKINS:    Right.

21       MR. GUPTA:    Can you give us some key highlights?  A

22   summary of what you observed in that hour?

23       MR. PERKINS:    I'm just generally speaking.  The

24   classes involved in group writing exercise were actually

106

206

1    small groups of, I don't have the specific number, but I

2    believe around three to four students.   They were actually

3    working on a writing assignment, so all students were

4    putting in input.   They were actually using a laptop.

5    During this time, O███ was actually, the most, I guess,

6    pertinent observation was his disengagement from the group.

7    In fact, at one point, he actually took his seat and moved

8    back to his desk.   The teacher did come by and moved him

9    closer to the group, assuming to get him to participate,

10   but again, it was almost even in that instance, he would

11   still moved the seat back, was kind of observing instead of

12   engaged in the group activity.   Also, just doing the

13   writing; the students did try to engage him and get him to

14   participate in which case he did, I believe type some

15   things, but other students were giving him a lot of

16   feedback in regard to words to put in the actual document.

17   Also typing seemed to be an issue, he was using a pecking

18   type of motion, I'm not sure if he has typing skills, but

19   that was noted.   And lastly, at the end of class, it was

20   observed, he had somewhat of inappropriate ways of trying

21   to gain attention.   At some point he was hitting his head

22   with the book.   And it seemed to sort to get attention.

23   Another student actually replied "stop it".   And actually

1    then it seem to be, anyway, I guess, entertained by that

2    act.

3        MR. GUPTA:    Was he hitting his head hard with the

4    book, or why did you come to the conclusion that it was an

5    attention getter?  That is purpose was to gain attention?

6        MR. PERKINS:  Well it was kind of in the tapping way,

7    it wasn't in anyway to hurt his self in that type of way.

8    And obviously, and just in regards to some students

9    reactions, it was more so more of an attention getter, as

10   how I saw it.

11       MR. GUPTA:    Do you think it was to try and get

12   attention from anyone, a specific student, or the teacher,

13   or just in general, he wanted to be eyes on him, or what do

14   you think was going on?

15       MR. PERKINS:  Well, it's hard to say.  I would say

16   being in that classroom, he wasn't necessarily close to any

17   particular student in general.  So, I would probably, best

18   bet, just from student and teacher.

19       MR. GUPTA:    Now, are you aware whether O████ is

20   supposed to be taking medicine, or not?

21       MR. PERKINS:  Just from records and my understanding,

22   he was prior to that on medication.  He had been taking it

23   and he was taking medication at the time of the

24   observation.

108                                                    208

1    **MR. GUPTA:**    He was taking medication at the time of

2    observation.

3    **MR. PERKINS:**  Right.

4    **MR. GUPTA:**    Ok, did you ever have a conversation

5    with his teacher about his mediation?

6    **MR. PERKINS:**  Yes, I did.

7    **HEARING OFFICER:**    Mr. Gupta.   I do get paid by

8    the hour, so it's in my pecuniary interest to allow

9    this to go on, but what exactly this observation is

10    going to help me decide the issues that are relevant

11    to this case?

12    **MR. GUPTA:**    I am trying to show that this –

13    what I was going to get to eventually is that this is

14    a regular education environment and so nobody has

15    really observed the student in a special education

16    environment based these facts.

17    **HEARING OFFICER:**    Is DC taking the position

18    that he should be in General Ed?

19    **MR. GUPTA:**    No.  But it's been compared to his

20    behavior, for reason they stated, it necessitates

21    Kingsbury because it was _____ at OLV (what is Our

22    Lady of Victory).

23    **HEARING OFFICER:**    Ok, go ahead.

1          **MR. EIG:** Mr. Perkins is basically, as he said,

2      summarizing a very specific and I assume accurate

3      report.    I'm just saying, everything he has already

4      been in his report.    He is not reading from it, as you

5      can see, but there hasn't been one single that is in

6      his report.    Why did he put these documents in, I mean

7      —

8          **HEARING OFFICER:**    Go ahead.    I just wanted to

9      know the reason for the testimony.    Go ahead.

10      **MR. GUPTA:**    In terms of your conversations with the

11      teacher, I think that was my last question when I left off,

12      was did you ever have conversation regarding medication

13      with the teacher?

14      **MR. PERKINS:**    Yes, she did note that there apparently

15      was a medication mismatch in regard to — I assume that the

16      medication may have been a little bit too strong of dosage,

17      so his behavior had been marketedly, I assume worst, prior

18      to that observation.    I think there as an occasion where he

19      was suspended, I believe.    So she did note that in regard

20      to previously as to now, his behavior has been qualifiedly

21      better.

22      **MR. GUPTA:**    Better.

23      **MR. PERKINS:**    Yes.

1    **MR. GUPTA:**    Alright I want to move forward to the

2  IEP MDT Meetings.   Have you attended any IEP MDT Meetings

3  for O███?

4    **MR. PERKINS:**    Yes, several.

5    **MR. GUPTA:**    Ok, can you remember off the top of

6  your head, which ones you have attended?

7    **MR. PERKINS:**    I've actually attended all of them.

8  There were two to three during the summer and then

9  September, so I can't think of the exact number, but I've

10  been at all the meeting.

11    **MR. GUPTA:**    Ok, I want to go straight to the August

12  30th meeting, were you at that meeting?

13    **MR. PERKINS:**    Yes.

14    **MR. GUPTA:**    Ok, do you remember - actually before I

15  go into that meeting, what in an IEP Meeting, traditionally

16  what is your role?

17    **MR. PERKINS:**    My role is to actually go over

18  assessments, in this regard, review an assessment; also,

19  helping with the aspect of determining eligibility for a

20  specific category, so, in regard to eligibility decisions.

21    **MR. GUPTA:**    So we have already gotten through, I

22  guess, prior what happen at this meeting, but in terms of

23  your observations, from this meeting, what did you observe

24  going on in terms of the development of the IEP and the

1    program that was being proposed for him.   The type of

2    setting and everything, what was done at this meeting?

3        MR. PERKINS:   Again, we - in regard to some of the

4    issues that were noted in the disability classification, we

5    actually, in development of the goals, a lot of them were

6    associated within the social emotional domain attention,

7    well cognitive area attention, and thus in regard to the

8    setting itself, we used that primarily, again with the

9    academic as well, but we used those as carriers that moved

10   setting-wide.  So again, I guess the severity of the issues

11   kind of moved as to looking at Out of General education.

12       MR. GUPTA:    Ok.

13       MR. PERKINS:   And, I not for sure if that the exact

14   meeting that we actually determined that.

15       MR. GUPTA:    Do you recall disputes about the social

16   emotional goals, when they were being discussed at this

17   meeting?

18       MR. PERKINS:   Not at that particular meeting. I would

19   have to refer back to the notes, but I don't remember any

20   specific issues, I don't know if it was that meeting or a

21   later meeting, but there may have been issues in regard to

22   how they were written, but nothing as far as -

23       MR. GUPTA:    Just so you are clear, do you want to

24   refresh your memory, so you can distinguish which meeting

212

1    it is – which meeting was the 8/30 meeting?    I'm showing

2    him DCPS 05 8/30/06 MDT Meeting notes.

3         **MR. PERKINS:**    Right.

4         **MR. GUPTA:**     So are you clear on which meeting I'm

5    referring to, the 8/30 one now.

6         **MR. PERKINS:**    Right.

7         **MR. GUPTA:**     So your last statement was that as

8    their might have been a dispute as to how it was written?

9    Is that right?

10        **MR. PERKINS:**    Right.

11        **MR. GUPTA:**     Can you elaborate on that a little bit?

12        **MR. PERKINS:**    Well, again, just from those notes,

13   obviously that wasn't the actual issue at that meeting.

14   There were some issues in regard to psychological services,

15   the amount of time needed per week and DCPS' position was

16   to – actually a lot of those goals are going to have to be

17   integrated within the classroom, thus a therapeutic-type

18   environment, in addition to the one hour a week

19   psychological services.

20        **MR. GUPTA:**     And lastly, I would like to have you

21   explain further what Mr. Simmons just said.  Can you define

22   – would you – in your professional experience, what

23   therapeutic environment means?

1    **MR. PERKINS:** Well, it can be like I said, a

2    multitude of things, but in regard to as it applies to

3    specific goals, the classroom environment actually

4    incorporates a lot of those social emotional type

5    strategies within a General Ed class, it may be just DCPS

6    noted behavior intervention plan, which was I supposed by,

7    I believe, as Dr. Solomon has noted from the notes, but

8    again, the classroom may implement something such as that,

9    maybe a classroom-wide program and again, the purpose is to

10    address some of the actual social emotional goals. It may

11    be in regard to appropriate interaction, engaging with

12    other students appropriately, which is similar. Social

13    skills training integrated within that classroom

14    environment.

15    **MR. GUPTA:** Now, at this 8/30 meeting, do you

16    remember if the educational setting was discussed? I'm

17    sorry, the location where the setting would be implemented?

18    **MR. PERKINS:** I believe we did propose Prospect as a

19    possibility; but typically when we do that we do have to

20    refer that to Dr. Peterson, who is actually over Prospect

21    and also encourage the Parent to actually visit.

22    **MR. GUPTA:** So at the date of this meeting, had the

23    Parent ever visited Prospect?

24    **MR. PERKINS:** No, not at that meeting.

114

214

1      MR. GUPTA:    Ok, and was Dr. Peterson available?

2  Was she at the meeting?

3      MR. PERKINS:   No, she wasn't at the meeting.

4      MR. GUPTA:    Do you know if that was the day that

5  Dr. Peterson was available - was on the phone for that

6  meeting?

7      MR. PERKINS:   Yes, I believe, if I can refer back to

8  -

9      MR. GUPTA:    Sure, refresh your memory.

10     MR. PERKINS:   I'm not for sure if this is denoting

11  Dr. Peterson.  This is in my experience.  Generally she

12  does participate by phone.  Sometimes, Ms. Brown, (Cindy)

13  actually is designated by her to actually discuss the

14  program; but, I not for sure.  I can't make out if this is

15  her actually stating these things.

16     MR. GUPTA:    I think maybe if you look at the

17  attendance sheet, then you'll know.  Sir just for the

18  record, this stipulate Dr. Peterson wasn't at this meeting.

19  At the conclusion of this meeting, do you know if there was

20  a firm decision whether Prospect was proposed or not?

21     MR. EIG:    Objection to leading.  What does he mean by

22  firm?

23     HEARING OFFICER:    Sustain.

1       **MR. GUPTA:**     At the conclusion of this meeting, was

2    there a decision as to placement?  As to what location, the

3    educational program would be implemented?

4       **MR. PERKINS:**  Well, it was proposed in regard to

5    Prospect.  However, in regards to a firm decision, I would

6    say that was not.

7       **MR. EIG:**  Objection -- objection to the answer, to the

8    question that was struck.  He doesn't understand – if the

9    witness doesn't understand, he was trying to answer both

10   questions.

11      **HEARING OFFICER:**    Just let it go.

12      **MR. EIG:**  Ok.

13      **HEARING OFFICER:**    Go ahead.

14      **MR. PERKINS:**  Again we were proposing again, we did

15   encourage the Parent to actually visit the program and you

16   know, I guess based on – that is factually what happened.

17      **MR. GUPTA:**    Ok, was there another meeting after

18   this meeting?

19      **MR. PERKINS:**  I believe so.  I would have to look at

20   the documents.

21      **MR. GUPTA:**    I'm going to refresh his memory with

22   using DCPS 12.

1        MR. PERKINS:    Right.    Yes, there was another meeting

2    and this is where actually placement was discussed and Dr.

3    Peterson was available by phone at this meeting.

4        MR. GUPTA:    What was the date of this other

5    meeting?

6        MR. PERKINS:    It was September 21st

7        MR. GUPTA:    In our position as a MDT Team Member,

8    do you know if Parents were at this meeting?

9        MR. PERKINS:    They were at this meeting.

10        MR. GUPTA:    At the 9/21 meeting.

11        MR. EIG:    Stipulate they were at the September 21st

12    meeting.    Let's not go back over the same stuff again.    The

13    witness does not remember.    Why?

14        MR. GUPTA:    Actually, I'm trying to establish what

15    he came across from the meeting with.

16        HEARING OFFICER:    He obviously has not look at his

17    own notes.    He hasn't looked at the IEP, and you are just

18    having him read over documents.    So, since we have

19    established that he didn't prepare for this Hearing, why

20    don't you ask him for why he agreed or disagreed with

21    things that were done?

22        MR. GUPTA:    Ok.

23        HEARING OFFICER:    Because, he obviously, didn't

24    prepare for this Hearing.

1      **MR. GUPTA:**    At the 9/21/06 meeting, you said a

2  placement was issued, was that placement for Prospect then?

3      **MR. PERKINS:**  Right.  Yes.

4      **MR. GUPTA:**    Did you agree with that placement?

5      **MR. EIG:**  Objection, lack of foundation.  I'm not

6  saying he doesn't have the basis –

7      **HEARING OFFICER:**    I'm sorry.

8      **MR. EIG:**  Lack of foundation.  As far as we know right

9  now, he knows absolutely nothing about Prospect.  How can

10  he state an opinion?

11      **HEARING OFFICER:**    He participated in the discussion,

12  whether he knew anything about it or not.  He is part of

13  the team.

14      **MR. EIG:**  He said he was an expert.

15      **HEARING OFFICER:**    I didn't say he was an expert.  He

16  was part of the team.

17      **MR. EIG:**  I'm sorry.  I withdraw the objection.

18      **HEARING OFFICER:**    Overruled.  Go ahead.

19      **MR. EIG:**  I withdraw the objection.

20      **HEARING OFFICER:**    Go ahead, Mr. Gupta.

21      **MR. GUPTA:**    So you say you agreed with the

22  placement at Prospect, why did you agree with that

23  placement?

1      MR. PERKINS:    Generally speaking, they are able to

2  implement the IEP.    These services that were denoted with

3  regard to specialized instruction, those services are

4  available there.    Also, psychological services – Prospect

5  does have Clinical Psychologist as denoted by Dr. Peterson;

6  also student psychologist, social workers.    They do have –

7  I believe that was all the services that were denoted on

8. the actual IEP.

9      MR. GUPTA:    Was information presented, whether or

10  not Prospect does a therapeutic setting?

11      MR. PERKINS:    They talk about – Dr. Peterson, I

12  believe talk about in regard to some of the behavior

13  management things they have integrated within the

14  classroom.

15      MR. GUPTA:    Did you agree that was sufficient to

16  service O████?

17      MR. PERKINS:    Yes.

18      MR. GUPTA:    Thank you.    No further questions.

19      HEARING OFFICER:    Mr. EIG.

20      MR. EIG:    Just a few.    The reason for Ms. Pavo to go

21  and observe at Prospect was to see if she would accept the

22  program, right?    That was the idea right.

23      MR. PERKINS:    Well, no.    I would say we still would

24  have a placement meeting thereafter.    So, in that regard,

119

219

1  the Parent was encouraged to go and look at the program and

2  was once the placement meeting, discuss any issues she may

3  have with it.

4      **MR. EIG:**  Do you have any idea why that isn't recorded

5      in the notes of that meeting?

6      **MR. PERKINS:**  I have no idea, if they aren't?

7      **MR. EIG:**  The class that you observed at OLV was on –

8  was it on June 5th, by the way you were saying, your report

9  was dated July 11, according to what we have here.  That

10  was a relatively small class, certainly for a regular

11  education class, right -- fifteen students.

12      **MR. PERKINS:**  It depends on the school, but --

13      **MR. EIG:**  It was 15 students, right?

14      **MR. PERKINS:**  Right.

15      **MR. EIG:**  You said you _____ _____.  Do you know how

16  long O███ had been at OLV?  Do you remember?

17      **MR. PERKINS:**  From understand, I don't know if it was

18  a year, I know he was retained.  I'm not for sure if it was

19  a year or two years.

20      **MR. EIG:**  Do you have any ideas as to his comfort

21  there?  Do you know the people that know the kids?  Do you

22  notice-

1    **MR. GUPTA:**    Objection, that is out of the scope of

2    my direct.    I didn't ask him any questions about his

3    comfort level, or his relationship to other students.

4    **HEARING OFFICER:**    He asked him how he behaved.

5    **MR. GUPTA:**    Behavior is still outside the scope of

6    behavior.

7    **HEARING OFFICER:**    Overruled.

8    **MR. EIG:**  Do you know what his comfort level at the

9    school was?

10    **MR. PERKINS:**    Well, just again, I can just go off my

11    observations and teacher interviews.

12    **MR. EIG:**  Less go with the teacher interview first,

13    ok.    Did you talk to the teacher about that, not about his

14    problem, but whether he was part of the community?

15    **MR. PERKINS:**    Well, specifically, when asked about

16    social emotional functioning, then one thing she did notice

17    was in regard to how his behavior changed.    She didn't

18    specifically talk about peer and action, in the sense of,

19    and actually she did say he actually had problems with the

20    group; engaging in group activities; so, pretty consistent

21    with observations.

22    **MR. EIG:**  Yeah, but what I'm asking, but then, maybe

23    you don't have the answer to this question.    What, I'm

1   trying to get from you is, do you have an appreciation of

2   whether he had been there enough to adjust to the school?

3         MR. PERKINS:   Well, I personally didn't make that

4   assumption.

5         MR. EIG:  So you personally can—

6         MR. PERKINS:   Can make that assumption.   He felt as

7   though he was part of the school community.

8         MR. EIG:  Ok, when was the last time you observed one

9   of the, I think there were two classes that were considered

10  age-wise, as possibilities where Oleg were attending, there

11  at Prospect, is that right?

12        MR. GUPTA:    Objection.   Again that is out of my

13  direct.   I never went into specifics of which classes he

14  was in at Prospect, and whether not, whether –

15        HEARING OFFICER:   Overruled.   You elicited testimony

16  about his agreement with the placement at Prospect.   The

17  door is open.   The door is wide opened with no hinges on

18  it; overruled.

19        MR. GUPTA:    Not about first –

20        HEARING OFFICER:   Please Mr. Gupta, where are you

21  dreaming this stuff up?

22        MR. EIG:  Ok, were there two different possibly aged-

23  appropriate classes that would be considered for O███ at

24  Prospect, do you know?

1    **MR. PERKINS:**    I do in regard to the class, because he

2   would have fit into the class range at the extremity of –

3   because the school actually – he would have fit into that

4   classroom in which it would be the last class for a student

5   – for age-wise for a student to be at, and I can't

6   specifically talk about classrooms itself.

7    **MR. EIG:**   Are you saying all this information is based

8   on Dr. Peterson talking to the team on September 21st over

9   the phone, right?

10    **MR. PERKINS:**    Right.

11    **MR. EIG:**   That is the sum total of the information

12   about O▮▮▮ and Prospect, isn't that right?

13    **MR. PERKINS:**    Right.

14    **HEARING OFFICER:**    I'm not sure I got an answer to

15   the question.    Have you ever done an observation at

16   Prospect Learning Center?

17    **MR. PERKINS:**   No   I   haven't   in   that   particular

18   classroom.

19    **HEARING OFFICER:**    But you have observed classes at

20   Prospect?

21    **MR. PERKINS:**    Yes, I have been –

22    **HEARING OFFICER:**    but not the ones that were

23   proposed for him.

24    **MR. PERKINS:**    No.

1      **MR. EIG:**  Thank you.  And are you aware that she – do

2  you recall, can you describe that – that she said that

3  there were two 13 year old classrooms at – two 13 year old

4  class – I'm just looking at the notes from DCPS 12.  Do you

5  remember that?

6      **MR. PERKINS:**  Right.

7      **MR. EIG:**  And those are the ones you certainly never

8  observed.

9      **MR. PERKINS:**  Right.

10      **MR. EIG:**  Ok, so do you know the names of the teachers

11  of those two classrooms?

12      **MR. PERKINS:**  I couldn't tell you the teachers

13  'names.

14      **MR. EIG:**  And you weren't asked – you didn't say in

15  talking about whether you agree or disagree with the

16  Prospect proposal, anything about the curriculum that they

17  use there; that isn't your specific area of focus, is that

18  correct?

19      **MR. PERKINS:**  No, not specifically.  However we do

20  look at educational testing as a – in the regard that – and

21  that's one of the things when we did compare the two

22  evaluations, because there were subsequent educational

23  testing, actually he was performing a lot, well moderately

24  better, and categorically better in a lot of academic areas

1    so when driving curriculum-based decisions, it indicates

2    that a child may be able to grasp - in regard to grade

3    level, integrate grade level aspects of curriculum better

4    when you look at the two evaluations, so certainly in that

5    respect, the curriculum was in some ways, the evaluation

6    did drive whether he could grasp the curriculum.

7        MR. EIG:  Ok, that is actually what I was going for,

8    but I did want you to have a chance to finish.  What I want

9    to know is you don't know what curriculums are being used

10   in those two 13 year old classrooms, do you?

11       MR. PERKINS:  From my understanding that DCPS does

12   integrate grade-level curriculum or standards within that.

13       MR. EIG:  You were hear when Dr. Solomon testified two

14   months ago were you?

15       MR. PERKINS:  Yes.

16       MR. EIG:  Oh you were here?  Do you remember she

17   testified that a major problem that she had with the

18   Prospect Proposal is that they were using Standard DCPS

19   curriculum, which she said would be inappropriate for Oleg

20   to try to access.  Do you remember that testimony?

21       MR. PERKINS:  Um, um.

22       MR. EIG:  Rights.

23       MR. PERKINS:  Ok.

1      MR. EIG:  She was right wasn't she?  I'm not asking

2  you to try to agree with her opinion that it would be

3  inappropriate.  Not that part.  But she was right that they

4  are using Standard DCPS curriculum that they modified.

5      MR. PERKINS:  Right, they do integrate the DCPS

6  curriculum, as I understand it, right.

7      MR. EIG:  To some extent, you have observed, but you

8  haven't talk to the teachers, right?

9      MR. PERKINS:  Right.

10      MR. EIG:  Ok, I have nothing further.

11      Thank you very much.

12      HEARING OFFICER:   Mr. Gupta.

13      MR. GUPTA:   No redirect.

14      HEARING OFFICER:   On direct, you were asked about

15  therapeutic setting.  Now I guess I have a misunderstanding

16  about therapeutic settings, so maybe you can help me out.

17  All along I thought that a therapeutic setting was one in

18  which a child had ready access to emotional support,

19  Clinical Social Workers, Psychologists, Psychiatrists,

20  because of behavioral issues that had been evidenced in the

21  past, rather than integrating social emotional goals in the

22  curriculum.  So are you saying, is your definition of a

23  therapeutic setting one in which social emotional goals are

24  integrated into the curriculum or one in which a child has

1    need for, you know, day long access, (ready access) to

2    social emotional support from professionals.

3        MR. PERKINS:    Right, and I think in that regard, you

4    are exactly right to have access to again Clinical

5    Psychologists which Prospect does have there. But, I guess

6    as you said, the therapeutic environment it ranges in

7    regard to its specifically designed necessarily at

8    emotionally disturbed kids, it is only therapeutic

9    environment you can have; again it is also the integration

10   of those type of goals within the curriculum as well has a

11   part of a therapeutic environment.

12       HEARING OFFICER:    Ok, I just never heard of it –

13   well, I'll take the testimony that you have given, but my

14   believe is heretofore has always been therapeutic means:

15   you have a child who has some a real issues and for his

16   emotional support there must be either a social worker in

17   the class or nearby so that there will be ready access for

18   support if his behavior deteriorates to the point that one

19   needs it.    That is my understanding.    BU that wasn't the

20   focus of your response, the focus of your response was

21   integration of social emotional goals in the classroom.    So

22   is that the priority or is the other the priority?

23       MR PERKINS:    Well, I would say both are, in regard to

24   just establishing what the aspects of the classroom are

1  there can be the so called therapeutic environments where

2  not necessary that the Clinical Psychologist is in the

3  classroom all day with the kids in that sense.  So, just

4  more so, I think just establishing some of the things that

5  would go on in a classroom outside of the actual service

6  providers who would actually work much in the same with the

7  teacher with developing these type of whether it is

8  behavior modification, token economy, all these type of

9  things that you would integrate with regards to a classroom

10 behavior type management system.

11     **HEARING OFFICER:**    Ok, thank you very much.

12     Who is the next witness?

13     **MR. GUPTA:**    Dr. Peterson, Prospect Learning Center.

14     This is Serum Gupta, I'm in the Hearing right now for

15 O██ O█████.    I'm going to put you on speaker phone and

16 just letting you know the Hearing Officer is going to ask

17 you to make sure you are in a room by yourself.  Ok, I'm

18 going to put you on speak phone.

19     DR. PETERSON is talking but you can not hear her.  She

20 is saying something to the fact that she is really pressed

21 for time.

22     **MR. GUPTA:**    Yeah, I understand you are pressed for

23 time and I will be as quick as possible.  I only have a few

1    questions for you.   No that's fine.   I'm going to put you

2    on speaker now and Mr. Banks is going to take over.

3        **HEARING OFFICER:**    Dr. Peterson.

4        **DR. PETERSON:**    Yes, good morning.   Good afternoon.

5        **HEARING OFFICER:**    Good  afternoon,  this  is  Terry

6    Banks, I'm the Hearing Officer.

7        **DR. PETERSON:**  Yes sir.

8        **HEARING OFFICER:**    I'm going to place you under oath.

9    You will be asked questions by Mr. Gupta and when he is

10   done you will be crossed examined by Mr. Michael Eig, who

11   is Counsel for the Student in this case.

12       Would you raise your right hand?

13       **DR. PETERSON:**  Yes sir.

14       **HEARING OFFICER:**    Do   you   swear   or   affirm   the

15   testimony you are about to give would be the truth, the

16   whole truth and nothing but the truth?

17       **DR. PETERSON:**  Yes sir.

18       **HEARING OFFICER:**    Now are you by yourself?

19       **DR. PETERSON:**    I am sir.

20       **HEARING OFFICER:**    Do you have any documents related

21   to this case?

22       **DR. PETERSON:**  I do.

23       **HEARING OFFICER:**    Ok, what are they?

1       DR. PETERSON:  The Referral Packet, it has an IEP and

2    accompanying evaluations

3       HEARING OFFICER:    Ok, go ahead Mr. Gupta.

4       MR. GUPTA:    Dr. Peterson, what is your position at

5    Prospect?

6       DR. PETERSON:  I am the Principal here.

7       MR. GUPTA:    How long have you been in that

8    position?

9       DR. PETERSON:  This is my ninth year.

10      MR. GUPTA:    Ninth year, ok.  Dr. Peterson when a

11   student gets referred to your school, what is the general

12   process?

13      DR. PETERSON:  We receive a referral packet from the

14   Central Office and I have staff members here who are

15   assigned to the Intake Team, review the package and respond

16   to the Staff Review Committee and let them know what our

17   finds were in regards to whether we are able to meet the

18   student's needs.

19      MR. GUPTA:    And did you receive such a package for

20   a student named O██ O█████?

21      DR. PETERSON:  I did.

22      MR. GUPTA:    And what did you committee decide?

1      DR. PETERSON:  Initially, it was not a full-time IEP

2  so we indicated that we were not able to meet his needs,

3  initially.

4      MR. GUPTA:    Ok, and then subsequent to that, did

5  you get a full-time IEP.

6      DR. PETERSON:  I don't believe I still have a full-

7  time IEP.

8      MR. GUPTA:    Ok.

9      DR. PETERSON:  Let me look and see.  Yes, I do have a

10  full-time IEP, I think.  I am 100% yes.

11      MR. EIG:  I have a real problem of not knowing what

12  she is looking at.

13      HEARING OFFICER:    I agree with you.

14      MR. GUPTA:    It is the disclosure documents that we

15  know.  Ok.

16      HEARING OFFICER:    Well, we can identify the

17  documents one-by-one if you like to do that.

18      MR. EIG:  I think we have to.

19      MR. GUPTA:    Can you identify the document that you

20  say is a full-time IEP?

21      DR. PETERSON:  It is the one that has the -

22      MR. GUPTA:    What is the date on it?

23      DR. PETERSON:  Let me see, hold on a second please.

24  I'm sorry - hold on a second, I'm looking through here

1    because I — it is dated 8/30/06.   It is checked of 61 to

2    100%.

3        MR. GUPTA:    Ok, and so have you reviewed this IEP?

4        DR. PETERSON:  I have.

5        MR. GUPTA:    Do you believe Prospect Learning Center

6    could implement this IEP.

7        DR. PETERSON:  I don't see any reason why we couldn't.

8    Yes, according to what I have been able to review, I didn't

9    see any problems with implementation.

10       MR. GUPTA:    Ok, there has been some question — well

11   actually before I get to that, let me back up.   Can you

12   tell us again for the record what related service providers

13   you have?

14       DR. PETERSON:  At the school?

15       MR. GUPTA:    Yes.

16       DR. PETERSON:  We have two Speech Pathologists, we

17   have three school Psychologists, two of whom has Clinical

18   Training and one who is a Licensed Clinical Psychologist,

19   and we have an Occupational Therapist, and our PE Teacher

20   is able to do _____, we have Physical Therapy as needed,

21   we don't have it on site, but all the persons that I

22   mentioned, besides the Physical Therapist are dedicated to

23   our program so that they serve only our population here at

24   the school.

1       MR. GUPTA:    So that means that they are full-time,

2    correct?

3       DR. PETERSON: Full-time.    Ok, now, do you know if

4    this kind of IEP that you are looking for calls for a 100%

5    percent of General Education?

6       DR. PETERSON: If the IEP that I'm looking at right

7    now calls for a 100%?

8       MR. GPUTA:    Well, yeah, calls for Out of General

9    Education Setting.

10       DR. PETERSON: 100% of time, not in regular education

11    setting, it indicates 85%, but the hours reflected here on

12    the IEP are the same hours that we consider full-time,

13    27.5.

14       MR. GUPTA:    Ok, would you consider your school to

15    be able to provide a therapeutic environment?

16       DR. PETERSON: Therapeutic,   giving   that   meaning,

17    please.

18       MR. GUPTA:    Excuse me, Mr. Eig.

19       MR. EIG: That's why I was laughing because we –

20       HEARING OFFICER:   Do not say a word.   Go ahead Mr.

21    Gupta.

22       MR. GUPTA:    Well, let me reverse that on you, I

23    should have asked the previous question first.   When you

233

1   hear the term Therapeutic Environment, what do you believe

2   that means?

3       DR. PETERSON:  I believe that that means a youngster

4   who requires an atmosphere or a learning environment that

5   will address social emotional needs to a degree that he or

6   she is now available for learning.

7       MR. GUPTA:    Ok, and is that environment in the

8   classroom or in the school as a whole or just both?

9       DR. PETERSON:  I would say both.

10      MR. GUPTA:     Ok, does Prospect have such an

11  environment?

12      DR. PETERSON:  We are not therapeutic in that sense.

13  Our youngsters for the most part do not require that

14  transition first before being available for learning.  They

15  have support emotionally, but it doesn't come as a primary

16  need.

17      MR. GUPTA:     So within the classroom, can social

18  emotional goals be incorporated.

19      DR. PETERSON:  Yes, and they are.

20      MR. GUPTA:     And are support services available to

21  students in general, in way of social workers or

22  psychologists in case there is a behavior problem?

234

1      DR. PETERSON: Yes there are services for that manner.

2  I forgot to mention, we do have a social worker also that

3  is there.

4      MR. GUPTA:    Ok, does Prospect have a system for

5  controlling behavior, or to modify behavior if a student

6  needs such a support system?

7      DR. PETERSON: Yes we have an in-house system. We

8  have adopted or are in the process of adopting for the past

9  two years, a program called PBIS, but there are number of

10  schools that have it as Positive Behavior Intervention

11  Support. And we have a coordinator who is one of our

12  psychologist who does the actual coordination of our

13  efforts throughout the building and as part of that she

14  also has a, what she calls a therapeutic recovery room. It

15  is sort of a place where youngsters who have some

16  difficulty are able for a period of time just to — a short

17  period of time to just de-escalate, regroup and be able to

18  resume their normal activities.

19      MR. GUPTA:    Now, primarily, what kind of students

20  attend Prospect? What are their main disabilities?

21      DR. PETERSON: Learning disabilities for the most

22  part; LD youngsters; we do have some speech language

23  impaired youngsters; and we do have a portion of our

1   students who have OHI on their IEP, primarily because of

2   their ADD or ADHD.

3       MR. GUPTA:      When you received his Referral Packet

4   was it classroom identified for him, at the time when you

5   first received it?

6       DR. PETERSON: When I first received the package, I

7   don't – age group wise and realizing – well no – in

8   actuality, an age group warrant in that point in time, the

9   age group that I had, had for that particular – I mean, I'm

10  sorry, the classes for that particular age group had

11  reached capacity.

12      MR. GUPTA:      Ok, what was the age group at the time?

13      DR. PETERSON:  Thirteen.

14      MR. GUPTA:      Ok.

15      DR. PETERSON:  Twelve, thirteen.

16      MR. GUPTA:      How many classes did you have with that

17  age group?

18      DR. PETERSON:  Of thirteen year olds?

19      MR. GUPTA:      Yes.

20      DR. PETERSON:  We have two classes with thirteen year

21  olds.  Actually two and a portion of another class, but two

22  classes predominately, not predominately, they are actually

23  all are thirteen years old in those classes.

1      **MR. GUPTA:**      Ok, and with both those classes being

2   in full capacity, did you make any inquires with DCPS

3   Officials as to how to accommodate?

4      **DR. PETERSON:** Yes, I did.  I spoke with the parties

5   in Central Office, out of the Division of Special

6   Education, indicating what the situation was, at that point

7   in time as far as class size was concerned, and I was told

8   that if the need arose and, excuse me, I reach the point

9   where I had a student, or a student that were of that age

10   group, I needed a classroom that was filled, they would

11   provide me with the service as quickly as possible, well

12   that's is what they indicate as quickly as possible, to

13   establish another classroom.  I indicated to them that I

14   had the where with all to do that, meaning, I had the

15   classroom space.  I would just need to have them and the

16   resources in the building as far as materials are

17   concerned, but I would need to have the staffing the

18   personnel.

19      **MR. GUPTA:**      And what would that extra personnel

20   entail?

21      **DR. PETERSON:** Well, excuse me, I'm sorry.   In each

22   class, currently we have a Certified Special Education

23   Teacher and an Aid, an Assistant.

1        MR. GUPTA:    Ok, so you would need another Certified

2   Teacher and an Aid.

3        DR. PETERSON:  Yes.

4        MR. GUPTA:    And what did Special Ed say in regards

5   to that?

6        DR. PETERSON:  Well their response to me was when I

7   indicated that, if the need arose, to notify them and let

8   them know and that they would provide that request, or meet

9   the request that I was making.

10       MR. GUPTA:    And what is capacity for each classroom

11   -- for each of the thirteen year old classrooms?

12       DR. PETERSON:  For the classes it is twelve.

13       MR. GUPTA:    Twelve.  And, did they inquire further

14   as to how long that process would take, to provide you with

15   the extra personnel if the need arose?

16       DR. PETERSON:  No, we didn't go into detail.

17       MR. GUPTA:    Ok.

18       DR. PETERSON:  But, they told me as quickly, their

19   implication was as quickly as possible.

20       MR. GUPTA:    And was that information relayed to

21   anybody that was involved in the placement decision for

22   O████?

23       DR. PETERSON:  You mean here at the school.  My staff

24   you mean.

138

238

1    MR. GUPTA:   No.   Ok, let me back up, I'm sorry.

2  Where you involved in a placement meeting for O███?

3    DR. PETERSON:  I think I was, I believe I was.

4    MR. GUPTA:   Ok, do you know if you - doing that

5  placement meeting for O███, if you ever informed that you

6  had such a conversation with Downtown Special Ed

7  Department, if the need arose, that class could be added?

8    DR. PETERSON: Yes.

9    MR. GUPTA:   Ok.

10   DR. PETERSON:  I know that certainly during the visits

11  that were made here, that was indicated.

12   MR. GUTPA:   Could you expand upon that - visits by

13  whom?

14   DR. PETERSON: There were visits made by both an

15  Educational Advocate for the family and for the students,

16  and the Parent.  I believe the Parent was here at least two

17  times and the Educational Advocate here at least once.

18   MR. GUPTA: And you are saying, you've relayed that

19  information to the Parent and the Advocate?

20   DR. PETERSON:  Yes.

21   MR. GUPTA:   Now, I want to talk about the

22  curriculum at your school. Can you describe, and let's

23  just, I guess to say time, specifically talk about the

24  curriculum that O███ would have gotten had he entered your

1  school in September in that 13 year old classroom. Just

2  briefly describe the curriculum you use in that 13 year old

3  classroom.

4      DR. PETERSON: The specialized instruction in the

5  class is pretty much from and throughout the building. We

6  utilize, well we emphasis the basis academics, most

7  youngsters who are here require the emphasis on reading, on

8  the mathematics and on the written language skills, those

9  are assess core, and the target area classes are taught in

10  the classroom and those are - they are taught as vehicles

11  towards development of those basic academic skills and

12  materials in the classroom, generally speaking are the

13  materials - they are modifications of the materials that

14  are used system-wide. We do have a check setup provided to

15  us by the system, in both, reading, math, and any of the

16  content areas, we utilize those materials and text in the

17  classroom.

18      MR. GUPTA: When you say they are modified

19  materials, system-wide, what do you mean by modified? How

20  are they modified?

21      DR. PETERSON: Well they are modified depending on

22  what the child's specific needs might be. They are not

23  modified system-wide. The materials and texts that we use

24  are system-wide materials and texts, but the modifications

1    would come into play with the individual instructors

2    working with specific students and based on what their

3    needs are, based on working with them and/or on the needs

4    of that are stated on the IEP.

5        MR. GUPTA:    Ok, so does modification mean, new

6    information can be added, some information is deleted,

7    like, I guess I'm just trying to get a clear understanding

8    of that, I mean, because you are saying modified to the

9    individual needs of the child.  So what is the expectation

10   then?

11       DR. PETERSON:  That the materials that we are using

12   are a benefit to the success in the specific area for the

13   youngster.  That materials are instructionally appropriate,

14   that they provide for an avenue towards success, but

15   because the needs of the youngsters vary, that we have,

16   based on how the observation might indicate the needs might

17   be as I said before the evaluations might have indicated,

18   or the IEP might have indicated, we have to make some

19   adjustments in how material is either presented, how its

20   measured, how its success is measured, or whether or not,

21   I'm trying to not use the word modification again, whether

22   or not there needs to be adjustments made in the approach

23   used to develop skills.

1       **MR. GUPTA:**     Can adjustments be made to generally

2    how the information is presented, whether its visual or

3    oral, or recording, in the mod of delivery, can that be

4    adjusted?

5       **DR. PETERSON:** It is all the time.   I mean we have

6    that capability within the classrooms.   We have a variety

7    of ways of imparting the knowledge to the youngster or the

8    information to the youngster.   And we do all of those,

9    depending on of course his best way of learning, and of

10   course, we have in fact used many modalities in an attempt

11   to impart knowledge to the youngster.

12      **MR. GUPTA:**     And generally, how do you determine

13   what mod of delivery for the curriculum.   How does it –

14      **DR. PETERSON:** Well,     as    I    indicated    earlier,

15   observation, it could be based on the assessments that have

16   already been provided to us, it could be based on informal

17   assessments that are given to the youngster once he

18   arrives.   It could be observation, it could be looking at

19   the IEP and determining what their specific indicators are

20   in there.   And so, it is a variety of ways of making a

21   determination how that particular child, or a particular

22   child would best benefit from instructions.

23      **MR. GUPTA:**     Is there a, I guess, like a constant

24   observation of the child so to know that the modifications

1    that the teacher is using is working or not, if further

2    modifications are needed, is there such a plan in place for

3    that?

4        DR. PETERSON:  The teacher has many ways of charting

5    information.  The teacher also has collaborative times with

6    other staff members that work with the child to get

7    feedback.  The teacher also does portfolio development.  In

8    other word the information is screened in portfolios so

9    that, gathered and kept in portfolios I should say, so that

10   the measure can be made from, this is how, the kid was

11   first explored or first worked with and we have made

12   progress to this point, because we have the documentation

13   here to demonstrate that.  Progress notes are sent home to

14   the Parent.  So it is a variety of ways that it is done.

15       MR. GUPTA:    And, in terms of tracking goals that

16   made the IEP, how is that done?

17       DR. PETERSON:  I'm sorry, can you repeat that again

18   please?

19       MR. GUPTA:    Sure, in terms of tracking the goals

20   that are on the IEP to, as you know most IEPs have that

21   mastery section, how is that done, or who does the

22   tracking?

23       DR. PETERSON:  The teachers in that regard; and that

24   maintains - they have copies of the IPEs in the classroom

243

1   and they maintain that record by indicating date of

2   mastery.   They are provided with charts to individual

3   indicate objectives so that they are able to determine

4   level of mastery for that particular objective and the date

5   of mastery and they are able, again, maintain that as part

6   of the portfolio for the student.  So that they are able to

7   track and keep information regarding successes, maybe even

8   lack of successes if it needs to be reviewed and reworked.

9        MR. GUPTA:    Ok, and finally, after having reviewed

10  his referral packet and obviously, you have knowledge of

11  your own school, do you feel Prospect could have

12  implemented the IEP at in the beginning of the school year?

13       DR. PETERSON:  Yes, I see no reason why not.

14       MR. GUPTA:    And if the need arose, and you had to

15  create another classroom, could ████ have received an

16  educational benefit at Prospect at the time the Referral

17  Packet was sent to you.

18       DR. PETERSON:  At that time, certainly.

19       MR. GUPTA:    Thank you.   I don't have further

20  questions, I think Mr. Eig will cross examine you now.

21       DR. PETERSON:  Can you hold for one second please?

22       MR. GUPTA:    Sure.

23       DR. PETERSON:  Thank you.

24       I'm sorry.

244

1      **HEARING OFFICER:**    That is all right, Mr. Eig is

2    going to start now.

3      **MR. EIG:**  Dr. Peterson, how are you?

4      **DR. PETERSON:**  Hi, how are you doing, long time no –

5      **MR. EIG:**  Yeah, I was going to say that first myself,

6    nice talking to you.

7      **DR. PETERSON:**  How are you?

8      **MR. EIG:**  Even under these circumstances.

9      **DR. PETERSON:**  Right, exactly.

10     **HEARING OFFICER:**    What do you mean by that?    These

11   are very good circumstances.

12     **MR. EIG:**   The telephone.

13     **DR. PETERSON:**  I would like to see how much grey hair

14   you have right now.

15     **MR. EIG:**  And you know what, I hardly have any.

16     **DR. PETERSON:**  You would like to see how much grey

17   hair I have.

18     **MR. EIG:**  Dr. Peterson, I don't have a lot of

19   questions for you, but let see, first of all, Prospect goes

20   up to what age, or grade?

21     **DR. PETERSON:**  It goes up – well we are ungraded, but

22   if you wanted to translate that into a grade level, it

23   would be eight grade.   And if you wanted to translate it

24   into age, we work with students up to the age of 14, but it

245

1  doesn't mean that we don't have 14 and above, because we do

2  have, but they age out at 14.

3     MR. EIG:  They age out at 14.   So O███ is - it just

4  happens that his birthday is March.

5     DR. PETERSON:  Last week, right.

6     MR. EIG:  So if he had been at Prospect this year, he

7  would be transitioning to where if he still required a

8  full-time placement, do you know?

9     DR. PETERSON:  I can tell you where most of our

10 students go.   There is not a Prospect at the High School

11 level, but we do have students that leave us and go to some

12 of the Public High Schools, where we have a transition

13 person who assist in that transition, but they are Wilson,

14 Woodson, Cardosa, Coolidge, and Anacostia.   Those are the

15 schools that we normally have sent youngsters to.

16    MR. EIG:  Ok, and those are big High Schools where

17 they will have Special Education Programs for them within a

18 comprehensive High school, right?

19    DR. PETERSON:  Yes.

20    MR. EIG:  Ok, all right.   Now, so the placement at

21 Prospect would have been - this year, would have been for

22 one year for O███?

23    DR. PETERSON:  More than likely.  Well let me just say

24 this.  We have had youngsters who have come in to us at age

246

1    13 and for whatever reason the Parent's request and I

2    looking at the youngsters needs, that's I say, we have had

3    youngster 14 plus, or normally they age out.  We do have

4    some youngsters who have stayed an additional year so that

5    aging out at the end of their 14th year as opposed to the

6    beginning.

7        MR. EIG:  Ok, now, the Parent you are remembering who

8    came and observed, are sitting right to my right, by the

9    way, is Claudia Pavo. Do you remember?  And Ms. Pavo came

10    both in the beginning of the year and I guess, early

11    September and then in December.  Does that sound about

12    right?

13        DR. PETERSON:  It does, I think it was like the last

14    day of November if I recall my notes --.

15        MR. EIG:  And both times, she has testified in this

16    Hearing, and her first day was a couple of months ago

17    actually.  She testified in the Hearing that both times you

18    told her, as I think you have testified, that you were at

19    capacity at that age, that you - as indication that you

20    have testified today that you have approval for another

21    class, but that is something that you didn't know how long

22    it would take, because you hadn't done it before.

23        DR. PETERSON:  Exactly, I told her that.

1    **MR. EIG:** Ok, I just want to make sure she had it

2  right.

3    **DR. PETERSON:** She did.

4    **MR. EIG:** And, she also said, that you said the same

5  thing in the last day of November or the 1st or early

6  December, in other words, nobody else had come to Prospect

7  during that period time that were referred for that 13 year

8  old class, right?

9    **DR. PETERSON:** Not that they – they may have been

10  referred, but they hadn't come, so there was no need to

11  implement or to put a plan into action.

12    **MR. EIG:** And, as of today, I assume you still don't

13  have – you haven't started the other class, right?

14    **DR. PETERSON:** No, I don't, in fact, I have a slot in

15  that 13 year old class, where a youngster had left – has

16  transitioned out.

17    **MR. EIG:** Ok, now, even though you haven't had to do

18  it before, I'm sorry, you know, Arlene Guthinson, don't

19  you, at Kingsbury?

20    **DR. PETERSON:** At Kingsbury?

21    **MR. EIG:** Ms. Guthinson, also the reason I asked is –

22  she testified in this hearing as well, and she was asked a

23  question as to whether, how hard it was during a school, or

24  the beginning of a school to start a new class, and she

1   said it takes a long time and its very difficult.   Does

2   that sound right to you, from your administrative

3   experience?

4       DR. PETERSON:   Like I said before, I really have not

5   had to do that, but I would think it would take some doing.

6   You know you don't just waive a magic wand and have it

7   happen, but I have the facilities, I have the materials,

8   but I just did not have the staff.   I would depend on how

9   long it would take them to get the Staff - the appropriate

10  and adequate staff to me.

11      MR. EIG:   Ok, thank you.   Now, do you have that August

12  30th IEP in front of you?

13      DR. PETERSON:   No, but I can find it.

14      MR. EIG:   Actually, that is the only other thing that

15  I'm going to ask you questions about.

16      DR. PETERSON:   I have it front - I have 8/30.

17      MR. EIG:   Ok, do you have the first page there?

18      DR. PETERSON:   The Cover page, yes.

19      MR. EIG:   You, mentioned this, this is the seventh

20  time, not in Regular Education setting, 85%.

21      DR. PETERSON:   That is what it says, yes.

22      MR. EIG:   Do you have any students that have that

23  written on their IEP.

1      DR. PETERSON:  You know, off the top of my head, I

2  couldn't say that, but let me say this, the check-off says

3  61 to 100% and the number of hours that are indicated on

4  here, are the same hours that we consider our kids to be

5  full-time; but I couldn't answer your question, because I

6  don't know what all the IEPs say, but the 85% may or may

7  not be on another IEP, it may, I don't know.  I can't

8  answer that.

9      MR. EIG:  If this kid is - this kid, I'm sorry, if

10 O████ is supposed to be in General Education for 15% of his

11 week, day, whatever, you can not do that, right?

12     DR. PETERSON:  No, we have no care abilities with

13 General Education at all, we are full-time Special.

14     MR. EIG:  Ok, and do you see any consistency between

15 those two things, the 85% and the 27.5 hours.

16     DR. PETERSON:  No, because on ours 25.5 is what we

17 consider full-time here, counting the full-time lunch;

18 because at one point in time, we use to write 32.

19     MR. EIG:  Right, I remember.

20     DR. PETERSON:  Do you remember that, 32.5, now it's

21 27.5 and it's taking out the lunch period.  The 27.5 and

22 all of our IEP's are consistent, because that's what we

23 consider full-time here.

1        MR. EIG:  Ok, just give me a moment, because the other

2   questions that I was going to ask you, I think Mr. Gupta

3   covered for me, so just give me a moment.

4        DR. PETERSON:  Sure.

5        MR. EIG:  I have no further questions for you.

6        HEARING OFFICER:   Can you redirect?

7        MR. GUPTA:    I just have one.   You can implement

8   27.5 hours, is that what you are saying?

9        DR. PETERSON:  I'm saying the 27.5 hours here at our

10  school is what we consider our full-time placement.   And

11  all of our students have that 27.5 hours on their IEPs.

12       MR. GUPTA:    Ok, thank you.

13       HEARING OFFICER:   Dr. Peterson, I have never dealt

14  with you before and your description of the Intake Process

15  struck me as different from anything I've ever heard in

16  DCPS.  Are you an ordinary DCPS Public School?

17       DR. PETERSON:  Yes, we are; we have happen to be a

18  Full-time Special Education Program, though.

19       HEARING OFFICER:   Ok, well you seem to have more

20  control over your school than most that I have heard.

21       DR. PETERSON:  Thank you.

22       HEARING OFFICER:   Thank you.

23       MR. GUPTA:    Thanks a lot, Dr. Peterson.

251

1    **MR. EIG:** Go back to your kids, thank you very much,

2  nice talking to you.

3    **DR. PETERSON:** Take care, now. Bye, bye.

4    **MR. GUPTA:**    I guess technically I'm done, I was

5  going to put on a rebuttal witness to Ms. Solomon's

6  testimony about capacity, but I think that issue — about

7  Prospect and their capacity and their direct.  Ms. Solomon

8  said that when she was at Prospect and its capacity and

9  there was no they could accept O████, but I think that —

10    **HEARING OFFICER:**    This is all closing stuff.    Ok

11  now, do you want a rebuttal and if so, what's your problem?

12    **MR. GUPTA:**    Here is my problem, there is one and

13  only one area that I would place rebuttal on, and I do not

14  have to place rebuttal on anything but having Ms. Guthinson

15  talked about the time, more specifically now that we have

16  heard from Dr. Peterson, I don't know that I need this

17  quite honestly, but I also don't want to — because of the

18  circumstances,   just   go   to   closing   without   it.    The

19  difficulty with say — you have permission to start a class,

20  how long will that generally take, what the difficulties

21  are, was there a number that she discussed with me in

22  prepping for this, that we aren't on the record now. And I

23  do believe — since we never know what's going through the

1    Hearing Officer's head, from where I'm setting right here,

2    I think it is highly irrelevant.  That's my problem.

3        **HEARING OFFICER:**   Well - you know - I don't care.

4    DC has had the chance to put on its case, if you want to

5    drag this out another month -

6        MR. GUTPA: Do I want to?

7        **HEARING OFFICER:**   It's up to you, it's your case.

8    If you want to drag this out another month to take five

9    minutes of testimony from Ms. Guthinson -

10       MR. EIG:  Fifteen minutes on redirect.

11       **HEARING OFFICER:**   I don't care.

12       **HEARING OFFICER:**   We are back on the record.  Mr.

13   Eig.

14       MR. EIG: Thank you Mr. Banks.   We decided that

15   although if we had Ms. Guthinson here, we would put on

16   rebuttal that its not absolutely necessary to go find

17   another date, probably we _____ the records.  Full enough

18   on the point that we are talking about, that we could close

19   on that, which means that we don't have a rebuttal case.   I

20   would ask however, although, quite honestly, I am prepared

21   to close orally, I would ask that you allow us to close in

22   writing, because of two factors:   (1) the fact that this

23   hearing taking - whenever hearings go over a couple months

24   period of time, you loose the flow and you use the evidence

253

1  because of the transcript problem if we indeed we could get

2  the transcript in the first day, I believe it would be very

3  helpful, I wouldn't propose a schedule that was contingent

4  on that, I propose a schedule on the hope that we get that

5  transcript, quite honestly because that –

6      **HEARING OFFICER:**    I  understand  that's  been  order

7  now.

8      **MR. EIG:**  It's been ordered and maybe they can give us

9  an idea, I don't know if they are expediting it or whatever

10  –

11      **HEARING OFFICER:**    I can find that out.

12      **MR. EIG:**  Ok, so in any event, the other reason is

13  because I do believe that with the IEP issues, the notice,

14  a lot of things that both sides have brought up here is

15  that I believe that some level of briefing would be quite

16  helpful to you in you _____ making a decision.  And I know

17  you welcome that.

18      **HEARING OFFICER:**    You certainly can do your closing

19  in writing if you like, what you prefer Mr. Gupta?

20      **MR. GUPTA:**    That's  fine.    I'm  not  against  in

21  writing, but I just would like clarity as to if they are

22  supposed to be submitted simultaneously, or one after the

23  other.

1       **HEARING OFFICER:**    So, what I will do is, I will find

2   out the status Mr. Eig has requested a complete Transcript,

3   so I will find out when that's going to be delivered and

4   then –

5       **MR. EIG:**  Well, I wouldn't _____ that you ask for it

6   today.    If we could get the Transcript in a couple of

7   weeks, the fixed-up Transcript from Day 1, I would have no

8   problem.  This is fine.  I knew to take better notes today,

9   than I took two months ago, by-the-way.  So if that's then

10  we set a schedule based on that and as far as whether we do

11  it simultaneously or the normal way which is the type of

12  Burden I go first, he go next, and then I get the brief

13  reply.  Simultaneous is fine with me.

14      **MR. GUPTA:**    No,    no,    I    would    be    against

15  simultaneous.

16      **MR. EIG:**  Fine.

17      **HEARING OFFICER:**    I'm    only    going    to    do    it

18  simultaneously.

19      **MR. EIG:**  Well we know all the issues.

20      **HEARING OFFICER:**    All you are doing is telling me

21  what you want me to take from the testimony that is being

22  presented.

23      **MR. GUPTA:**    I understand.

1    **HEARING OFFICER:**    So, it's going to be simultaneous.

2    This has gone on long enough, you want to get his and then

3    respond to it, is that what it is?

4    **MR. GUPTA:**    And then I get to respond to his, is

5    the point _____ _____.

6    **HEARING OFFICER:**    We will just do simultaneous.

7    **MR. GUPTA:**    Simultaneous is fine with me.

8    **HEARING OFFICER:**    Let me tell you, the likelihood

9    that the Closing Arguments will have a significant impact

10    on my decision is not high.  Ok, I'm going to read this

11    entire record.  I'm going to read all of my notes.  There

12    may be a morsel in what you file, or what you say orally,

13    that I'll take back and that will have some impact, but you

14    know, that is why I take rims and rims of notes, so that I

15    can come to my own conclusion.

16    **MR. EIG:** Could we take off record to check on this

17    then?

18    **HEARING OFFICER:**    Sure.

19    **END OF HEARING.**

20

# District of Columbia Public Schools
## State Enforcement and Investigation Division
**Terry Michael Banks, Due Process Hearing Officer**
825 North Capitol Street, N.E.; Room 8076
Washington, D.C. 20002
(571) 437-7381
Facsimile: (202) 442-5556

## Confidential

| | |
|---|---|
| O█████ O███████, STUDENT ) | Hearing Dates: November 16, 2006 |
| ) | January 16, 2007 |
| Date of Birth: ████████, 1993 ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | Complaint Filed: September 14, 2006 |
| THE DISTRICT OF COLUMBIA ) | |
| PUBLIC SCHOOLS ) | |
| ) | |
| and ) | |
| ) | Held at: 825 North Capitol Street, N.E. |
| Respondent. ) | 8th Floor |
| ) | Washington, D.C. 20002 |
| Student Attending: ) | |
| Kingsbury Day School ) | Interim Orders: November 17, 2006 |
| ) | January 19, 2007 |

2007 FEB -8 PM 2: 30
DC PUBLIC
SCHOOL SYSTEM

## THIRD INTERIM ORDER

**Parents:**       Ms. Claudia Pabo, Mother
3512 Rodman Street, N.W.
Washington, D.C. 20008

**Counsel for Petitioner:**       Michael J. Eig, Esquire
5454 Wisconsin Avenue; Suite 760
Chevy Chase, Maryland 20815-6938
(301) 657-1740; Fax: (301) 657-3843

**Counsel for DCPS:**       Saurabh Gupta, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.; 9th Floor
Washington, D.C. 20002

**Jurisdiction**

This proceeding was invoked in accordance with the rights established under the Individuals With Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. Sections 1400 et seq., Title 34 of the Code of Federal Regulations, Part 300; Title V of the District of Columbia ("District" or "D.C.") Municipal Regulations ("DCMR"), re-promulgated on February 19, 2003; and Title 38 of the D.C. Code, Subtitle VII, Chapter 25.

**Introduction**

Petitioner is a thirteen year-old student attending Kingsbury Day School ("Kingsbury"). On September 14, 2006, Petitioner filed a Due Process Complaint Notice ("*Complaint*") alleging that the District of Columbia Public Schools ("DCPS") had failed to provide an appropriate placement. On November 7, 2006, DCPS filed *DCPS Motion to Dismiss*, arguing that it had been unable to secure Petitioner's educational records from Kingsbury and, therefore, was unable to prepare adequately for trial. On November 8, 2006, Petitioner filed *Parent's Motion for Pre-Hearing Summary Decision and Opposition to DCPS Motion to Dismiss*. Petitioner's counsel indicated that his Five-Day Disclosure Notice mooted DCPS' concern about Petitioner's records. In his motion for summary decision, Petitioner's counsel argued that DCPS' failure to convene an appropriate team at the Resolution Session meeting entitled Petitioner to a judgment against DCPS. On November 13, 2006, DCPS filed *DCPS' Opposition to Parent's Motion for Summary Decision & DCPS Cross-Motion for Summary Decision*. DCPS argued that Petitioner had "failed to show any facts, remote or direct, which prove Prospect LC is inappropriate. Furthermore, DCPS disputes Parent's assertion the resolution meeting was invalid because the Local Education Agency (LEA) representative lacked the authority to make a decision." Later on November 13th, Petitioner filed *Parent's Opposition to DCPS Motion to Summary Decision*, in which Petitioner's counsel reiterated his position that DCPS' failure to convene an appropriate team at the Resolution Session meeting should be dispositive.

The hearing was continued from November 16, 2006 to January 16, 2007 for the reasons set forth in the Interim Order. On January 16, 2007, the hearing could not be completed due to the length of Petitioner's direct case. On January 19, 2007, this hearing officer issued a Second Interim Order continuing the proceeding to February 12, 2007. On January 31, 2007, Petitioner's counsel filed a *Letter Motion for Continuance* due to conflicting proceedings.

258

## ORDER

Upon consideration of Petitioner's *Letter Motion for Continuance*, the hearing officer finds that good cause exists for a continuance. Therefore, this 8th day of February 2007, it is hereby

**ORDERED,** that the proceeding is continued to March 14, 2007, 9:00 a.m. – 5:00 p.m.

_____
Terry Michael Banks
Hearing Officer

Date:   February 8, 2007

Issued: _____

Copies to:

Michael J. Eig, Esquire
Haylie Iseman, Esquire
5454 Wisconsin Avenue; Suite 760
Chevy Chase, Maryland 20815-6938
(301) 657-1740; Fax: (301) 657-3843

Saurabh Gupta, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.
9th Floor
Washington, D.C. 20002

259

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig          MD, DC                                      Paula A. Rosenstock   VA, DC
Haylie M. Iseman        MD, DC, NY                                  Patricia Cyr          CA, DC

February 8, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: O█O████

*via facsimile and first-class mail*

Dear Ms. Newsome:

On January 31, 2007, I filed a Letter Motion for Continuance regarding the above-referenced student, who has a hearing scheduled for February 12, 2007. Having received no response, today my assistant contacted the Student Hearing Office and was asked to re-fax the Letter Motion for Continuance. To date, I have not received a new hearing date. It appears that the SHO has negligently failed to respond to a time-sensitive matter. Please place this letter be in O████ file. Thank you.

Sincerely,

Michael J. Eig

cc: Claudia Pabo

260

# MICHAEL J. EIG AND ASSOCIATES, P.C.

### ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig      MD, DC
Haylie M. Iseman   MD, DC, NY

Paula A. Rosenstock   VA, DC
Patricia Cyr          CA, DC

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome **Student Hearing Coordinator** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael J. Eig, Esq. |
| **Date:** | February 8, 2007 |
| **Time:** | 2 :48 pm |
| **Total Pages:** (including cover) | 2 |
| **Re:** |  |

2007 FEB -8 PM 3: 16
DC PUBLIC
SCHOOL SYSTEM

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

261

# MICHAEL J. EIG AND ASSOCIATES, P.C.

### ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
### CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | |
|---|---|---|---|
| Michael J. Eig | MD, DC | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | Patricia Cyr | CA, DC |

February 5, 2007

Saurabh Gupta, Esq.
DCPS Office of the General Counsel
825 North Capitol Street, NE
Washington DC 20002

Re: O███ O██████
*via facsimile and first-class mail*

Dear Mr. Gupta:

Should the Due Process Hearing set for February 12, 2007, regarding the above-referenced studnet proceed, we will be relying on the previously disclosed documents (copies of which are already in the school system's possession) and witnesses of November 7, 2006, as well as:

OO- 19  Kingsbury Day School IEP, 11-14-06.

Please be advised that we may also rely on any documents and witnesses disclosed by DCPS, as well as any documents and witnesses to which DCPS does not object. We will object to any documents or testimony from witnesses not disclosed in a timely manner in accordance with the IDEA and federal regulations.

Sincerely,

Michael J. Eig

cc:    Claudia Pabo
Student Hearing Office

262

DCPS - IEP  Page 1 of 4

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**
**INDIVIDUALIZED EDUCATIONAL PROGRAM**

Additional Comments: ☐

### I. IDENTIFICATION INFORMATION

**II. CURRENT INFORMATION**

Date of IEP Meeting:  11/14/2006
Date of Last
IEP Meeting:

Student Name: Last O███    First O███    MI

Date of Most Recent
Eligibility Decision:

Student ID ____  Soc. Sec. No. ____  Age: 13  Grade ____

**Purpose of IEP Conference:**

Gender ☒ M ☐ F  Date of Birth ███ 993  Ethnic Group  Caucasian

☐ Initial IEP      ☐ Review of IEP
☐ Requested Eval.  ☐ 3yr ReEval.

Address  3512 Rodman St. NW
House No.     Street Name        Quadrant   Apartment #

Washington  D C         20008
City          State    Zip Code

Indicate Level of Standardized Assessment:

☐ Non-attending

Attending School  Kingsbury Day School    Home School ____

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

☐ Elem. ☒ Mid/JHS ☐ SHS ☐ CWS /

Parent  Claudia Pabo and Charles Oliver

| BEHAVIOR | TRANSPORTATION |
|---|---|
| ESY | TRANSITION |

Address of (if different from student):  ☒ Parent ☐ Guardian ☐ Surrogate

Telephone: Home 202-309-3027    Work  202-418-1595

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | | | | Oral |
| Parent | English | | | | Rdg./Written |
| Home | English | | | | Instrument: |
| | | | | | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd Total | | | FREQUENCY Hr./Min  D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks/mos |
|---|---|---|---|---|---|---|---|
| Speech Lang Svcs. | ✓ | 90 | min. | W | Speech Lang Pla. | 11/14/06 | 7 | mo |
| Psychological | ✓ | 90 | min. | W | Psychologists | 11/14/06 | 7 | mo |
| Occupational Therapy | ✓ | 60 | min. | W | Occupational Therapist | 11/14/06 | 7 | mo |
| Specialized Inst. | ✓ | 250 | HR | W | Sp Ed Team | 11/14/06 | 7 | mo |
| TOTAL | | 30 | Hours Per Week | | | | |

**V. Disability(ies)**    LD

Percent of time in Specialized Instruction and Related Services
☐ 0-20%  ☐ 21-60%  ☒ 61-100%

☐ (Check if setting is general Ed.)

Percent of time NOT in a Regular Education Setting  100 %

### VI. IEP TEAM (Participants in the development of the IEP)    Print and sign your name below.

Piper Phillips Caswell  Director, MS
Diane Wunn  MS CCC-SLP Speech Lang Pathologist
_____ Psychologist
Ann Powell, Ph.D. , Psychologist
Sara Stanger  Special Education Teacher

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in this IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.
Parent/Guardian Signature  Claire Claudea Pabo  7/14/06  Date 11/14/06

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 1 of 4

EXHIBIT

00-1███

| Student Name | O___ O___ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB ___/1993 | Attending School | Kingsbury Day School | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)** Special Ed. Team

**Math Strengths:**

Relative strength in math calculations

**Impact of disability on educational performance in general education curriculum:**

Overall deficits in math skills and short attention span negatively impact rate of learning on academic performance.

**Reading Strengths:**

Good background vocabulary, strong decoder

**Impact of disability on educational performance in general education curriculum:**

Difficulty with reading comprehension

**Score(s) When Available**

| | | |
|---|---|---|
| Math Cal. | 106 | SS |
| Math Rea. | 94 | SS |
| See goal page: | WJ III | |
| Date: | | |
| Rdg. Com | 90 | SS |
| Rdg. Basic | 108 | SS |
| Written Ex. | 96 | SS |
| See goal page: | | |
| Date: | WJ III | |

**Communication (Speech & Language) (Evaluator)**

**Strengths:**

**Impact of disability on educational performance in general education curriculum:**

**Score(s) When Available**

| | | |
|---|---|---|
| Exp.Lang. | | |
| Rec- Lang. | | |
| Artic | | |
| Voice | | |
| Fluency | | |
| Exp. Voc. | | |
| Rec. Voc. | | |
| See goal page: | | |
| Date: | | |

**Motor/Health (Evaluator)**

**Strengths:**

**Impact of disability on educational performance in general education curriculum:**

**Score(s) /Results When Available**

See goal page:

Date:

**Social Emotional Behavioral Areas: (Evaluator)**

**Strengths:**

**Impact of disability on educational performance in general education curriculum:**

**Score(s) When Available**

See goal page:

Date:

**Cognitive/Adaptive Behavior: (Evaluator)** Special Ed. Team

**Strengths:**

Responds successfully to structure

**Impact of disability on educational performance in general education curriculum:**

Attention, following directions, controlling impulses, staying on task, and organization

**Score(s) When Available**

See goal page:

Date:

**Prevocational Skills: (Evaluator)**

**Strengths:**

**Impact of disability on educational performance in general education curriculum:**

**Score(s) When Available**

See goal page:

Date:

264

| Student Name | O███ O2███ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB ███93 | Attending School | Kingsbury Day School | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)**

Score(s) When Available

Math Strengths:

Math Cal. ____ ____

Math Rea. ____ ____

Impact of disability on educational performance in general education curriculum:

See goal page: ____

Date: ____

Reading Strengths:

Rdg. Com ____ ____

Rdg. Basic ____ ____

Impact of disability on educational performance in general education curriculum:

Written Ex. ____ ____

See goal page: ____

Date: ____

---

**Communication (Speech & Language) (Evaluator)**

Score(s) When Available

Strengths:

Exp. Lang. ____ ____

Rec- Lang. ____ ____

Artic ____ ____

Voice ____ ____

Impact of disability on educational performance in general education curriculum:

Fluency ____ ____

Exp. Voc. ____ ____

Rec. Voc. ____ ____

See goal page: ____

Date: ____

---

**Motor/Health (Evaluator)**

Score(s) /Results When Available

Strengths:

____ ____

____ ____

Impact of disability on educational performance in general education curriculum:

____ ____

See goal page: ____

Date: ____

---

**Social Emotional Behavioral Areas: (Evaluator)** Damon A. Silas, Psy.D., Psychologist

Score(s) When Available

Strengths:

O███ is a personable adolescent with a desire to form interpersonal relationships, and he also possesses a capacity for insight.

____ ____

____ ____

Impact of disability on educational performance in general education curriculum:

O███ level of anxiety as well as his difficulty managing his impulses impacts his daily functioning and interpersonal relationships.

See goal page: ____

Date: ____

---

**Cognitive/Adaptive Behavior: (Evaluator)**

Score(s) When Available

Strengths:

____ ____

____ ____

Impact of disability on educational performance in general education curriculum:

____ ____

See goal page: ____

Date: ____

---

**Prevocational Skills: (Evaluator)**

Score(s) When Available

Strengths:

____ ____

____ ____

Impact of disability on educational performance in general education curriculum:

____ ____

See goal page: ____

Date: ____

---

| Student Name O██ O██████ | | Managing School | DCPS - IEP |
|---|---|---|---|
| Student ID Number | DOB ████/1993 | Attending School Kingsbury Day School | Page 3 of 4 |

| **VIII. SPECIALIZED SERVICES** | Additional Comments: ☐ | Goal Number: ☐☐ |
|---|---|---|

Area addressed by goal: Language Arts - Reading/ Listening Comprehension

**ANNUAL GOAL: (Including mastery criteria.)**

O████ will demonstrate comprehension of written material presented in the classroom instruction as measured by mastering the following objectives.

Provider(s): Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will read and follow multi-step directions, including identifying the command word, with 80% accuracy. | | Quarterly 06-07 |
| O██ will use strategies such as visualizing, scanning for cue words, and re-reading to recall important events from the reading with 80% accuracy. | | |
| O██ will monitor comprehension by recognizing when the text does not make sense and use strategies such asking a question at the end of each passage with 80% accuracy. | | |
| In writing, O██ will make connections from reading a text to other books or to his life in 3 out of 4 opportunities. | | |
| O██ will identify the setting and the influence of setting on characters and events in 4 out of 5 opportunities. | | |
| O██ will predict story events by using background knowledge, illustrations, bold print, italics, and foreshadowing clues in 4 out of 5 opportunities. | | |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☒ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☒ Report  ☐ Other _____

| Student Name  O██ O█████ | | | |
|---|---|---|---|
| Student ID Number | DOB █/██/1993 | Managing School _____ | DCPS - IEP Page 3 of 4 |
| | | Attending School  Kingsbury Day School | |

**VIII. SPECIALIZED SERVICES**  Additional Comments: ☐

Goal Number: ▢ Ia

Area addressed by goal:  Language Arts - Reading / Listening Comprehension 2

**ANNUAL GOAL:** (including mastery criteria.)

continued from previous page.

Provider(s): Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will differentiate between relevant and irrelevant information in a text given 4 out of 5 opportunities. | | Quarterly 06-07 |
| O██ will make inferences about stories read independently or listening to them presented orally in 4 out of 5 opportunities. | | |
| O██ will summarize a passage using relevant details from the passage in 4 out of 5 opportunities. | | |
| O██ will use word knowledge of word relationships to determine meanings of words and phrases including antonyms, synonyms, homophones and idioms in 4 out of 5 opportunities. | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☒ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☒ Report  ☐ Other _____

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

267

| Student Name | O█ O█ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB █/██/1993 | Attending School | Kingsbury Day School | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**   Additional Comments: ☐        Goal Number: 2

Area addressed by goal: Language Arts - Written Expression

**ANNUAL GOAL:** (including mastery criteria.)

O█ will improve written expression skills as measured by the following objectives.

**Provider(s):** Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O█ will use pre-writing skills by generating or selecting graphic organizers, lists, and outlines prior to writing 4 out of 5 times. | | Quarterly 06-07 |
| O█ will write a complete sentence that includes a noun, adjective, and verb with 90% accuracy | | |
| When answering questions, O█ will use part of the question in his response with 80% accuracy. | | |
| O█ will increase his typing accuracy and speed by 25% above the baseline. | | |
| O█ will write paragraphs with proper structure, including a topic sentence, relevant supporting details, and a concluding sentence 4 out of 5 times. | | |
| Using an editing checklist, O█ will proofread and edit writing to improve spelling, punctuation and capitalization 4 out of 5 times. | | |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☒ Documented Observation  ☒ Report  ☐ Other

| Student Name | O███ O█████ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB O████93 | Attending School | Kingsbury Day School | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐3 |
|---|---|---|

Area addressed by goal: Mathematics

**ANNUAL GOAL: (including mastery criteria.)**

O███ will improve his math skills as demonstrated through mastery of the following objectives.

Provider(s): Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will solve 3 by 2 multiplication problems with 80% accuracy | _____ _____ _____ _____ | 11/3/06 1/26/07 4/6/07 6/14/07 |
| O██ will solve division problems with 4 digit dividends and 2 digit divisors with 80% accuracy | _____ _____ _____ _____ | 11/3/06 1/26/07 4/6/07 6/14/07 |
| O██ will perform basic operations using whole, decimal and fraction numbers with 80% accuracy | _____ _____ _____ _____ | 11/3/06 1/26/07 4/6/07 6/14/07 |
| O██ will convert decimals to fractions to percents and vice versa with 80% accuracy | _____ _____ _____ _____ | 11/3/06 1/26/07 4/6/07 6/14/07 |
| O██ will use metric and customary units to measure length, weight, capacity and temperature with 75% accuracy | _____ _____ _____ _____ | 11/3/06 1/26/07 4/6/07 6/14/07 |
| O██ will compute, estimate and solve problems involving mean, median, mode, and range for a given set of data with 80% accuracy | _____ _____ _____ _____ | 11/3/06 1/26/07 4/6/07 6/14/07 |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☐ Documented Observation  ☒ Report  ☐ Other _____

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

| Student Name | O██ O███ | | | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB ████/93 | Managing School | | Page 3 of 4 |
| | | | Attending School Kingsbury Day School | | |

**VIII. SPECIALIZED SERVICES**     Additional Comments: ☐                Goal Number: 3a

Area addressed by goal: Mathematics

**ANNUAL GOAL:** (including mastery criteria.)

O██ will improve his math skills as demonstrated through mastery of the following objectives.

Provider(s): Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will calculate the perimeter and area of various polygons with 80% accuracy | ———— ———— ———— ———— | 11/3/06 1/26/07 4/6/07 6/14/07 |
| Given a series of multiple step word problems, O██ will correctly identify (1) key words (2) operations (3) sequential order of steps necessary to solve problems with 80% accuracy | ———— ———— ———— ———— | 11/3/06 1/26/07 4/6/07 6/14/07 |
| | | |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☒ Portfolio   ☐ Log   ☐ Chart   ☒ Test   ☐ Documented Observation   ☒ Report   ☐ Other _____

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 3 of 4

270

| Student Name O█, O█ | | | | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number ___ | DOB █/1993 | Managing School ___ | | Page 3 of 4 |
| | | Attending School Kingsbury Day School | | |

**VIII. SPECIALIZED SERVICES**     Additional Comments: ☐

Area addressed by goal: Organization          Goal Number: ☒ 4

**ANNUAL GOAL: (including mastery criteria.)**

O█ will improve his organizational skills and productivity as measured by mastery of the following objectives:

Provider(s): Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O█ will keep his papers organized in a designated system with 80% accuracy. | | Quarterly 06-07 |
| O█ will keep his desk and locker organized so that he can retrieve required materials by a second request in 4 out of 5 instances. | | |
| Given one teacher prompt, O█ will maintain only appropriate materials on his desk and put other items away in his desk 4 out of 5 times. | | |
| O█ will refrain from putting loose papers in his desk by either placing them in the appropriate folder/binder or discarding unnecessary papers by throwing them away with 80% accuracy. | | |
| O█ will bring required materials to class 80% of the time. | | |
| O█ will independently turn in daily assignments at the appropriate location in the classroom 80% of the time. | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio   ☐ Log   ☐ Chart   ☐ Test   ☒ Documented Observation   ☒ Report   ☐ Other ___

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 3 of 4

271

| Student Name | O___ O___ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB ___/1993 | Attending School | Kingsbury Day School | Page 3 of 4 |

## VIII. SPECIALIZED SERVICES    Additional Comments: ☐

Goal Number: 4a

Area addressed by goal: Organization Continued

**ANNUAL GOAL: (including mastery criteria.)**

continued from previous page.

Provider(s): Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O___ will utilize a daily assignment book to list homework 90% of the time after one prompt. | | Quarterly 06-07 |
| O___ will submit class assignments when due 80% of the time. | | |
| O___ will submit homework assignments when due 80% of the time. | | |
| O___ will take home and return assignments, school notes to parents, and personal belongings 80% of the time. | | |
| O___ will independently clean out and organized his binder and locker at least one time per week in 3 out of 4 weeks. | | |
| O___ will arrive on time or early to each class period in 4 out of 5 opportunities. | | |

## EVALUATION PROCEDURE(S)

☐ Portfolio   ☐ Log   ☐ Chart   ☐ Test   ☒ Documented Observation   ☒ Report   ☐ Other _____

| Student Name | O█ O█ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB █ 1993 | Attending School | Kingsbury Day School | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | | Goal Number: ☐5 |
|---|---|---|---|

Area addressed by goal: Classroom Adaptations, self-regulation

**ANNUAL GOAL: (including mastery criteria.)**

O█ will improve his ability to effectively function and self-regulate in the classroom with mastery of the following objectives.

Provider(s): Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O█ will complete less favorable tasks when assigned without avoidance or excuses in 4 out of 5 attempts. | | Quarterly 06-07 |
| O█ will face the teacher during lessons and acknowledge the teacher through verbal response in 4 out of 5 attempts. | | |
| O█ will respond to teachers, peers, and others by using and appropriate tone of voice and choice of words in 4 out of 5 attempts. | | |
| O█ will accept constructive feedback without frustration in 4 out of 5 attempts. | | |
| During group discussions, O█ will remain on topic by asking and answering questions about the topic at hand and avoiding off-topic comments 3 out of 5 instances with one teacher prompt. | | |
| O█ will self-regulate by employing strategies when he gets frustrated or agitated, e.g. ignoring the behavior of others, getting a drink, walking in the hall or taking a break in an identified "safe space," or talking with an adult in 4 out of 5 instances. | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☒ Report  ☐ Other _____

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 3 of 4

273

| Student Name | O████ O██████ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB ████ 1993 | Attending School | Kingsbury Day School | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐

Goal Number: [✓]

Area addressed by goal:  Social - Emotional

**ANNUAL GOAL:** (including mastery criteria.)

O██ will improve his social functioning in the school setting by mastery of the following objectives.

**Provider(s):** Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will maintain his own personal space when interacting with peers in 3 out of 5 opportunities. | | Quarterly 06-07 |
| O██ will respect the personal space of others when interacting with peers and staff in 3 out of 5 opportunities. | | |
| O██ will interact positively with peers in academic and social situations by not teasing or expressing negative comments in 3 out of 5 opportunities. | | |
| In anxiety-provoking situations, O██ will identify and utilize relaxation techniques such as breathing exercises and counting strategics to calm himself down in 3 out of 5 opportunities. | | |
| O██ will respond respectfully with adults who attempt to support him in challenging times in 3 out of 5 opportunities. | | |
| O██ will demonstrate flexibility when he interacts with his peers and adults by responding positively to the opinions and ideas of others in 3 out of 5 opportunities. | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio   ☒ Log   ☐ Chart   ☐ Test   ☒ Documented Observation   ☒ Report   ☐ Other _____

District of Columbia Public Schools      07-02-2001      Division of Special Education      Appendix - A      IEP Page 3 of 4

274

| Student Name | O█ O█ | | | |
|---|---|---|---|---|
| Student ID Number | | DOB █/93 | Managing School | DCPS - IEP Page 3 of 4 |
| | | | Attending School Kingsbury School | |

**VIII. SPECIALIZED SERVICES**  Additional Comments: ☐

Goal Number: 7

Area addressed by goal:  Social/Emotional

**ANNUAL GOAL:** (including mastery criteria.)

O█ self-concept will improve.

Provider(s): Psychologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O█ will demonstrate improved self-concept as evidenced by his ability to appropriately verbalize personal and academic strengths in discussions with others in 4 out of 5 opportunities. | | Quarterly 06-07 |
| O█ will demonstrate increased self-confidence as evidenced by his ability to take risks in academic and social situations with a decreasing need for behavioral and/or emotional support from an adult in 4 out of 5 opportunities. | | Quarterly 06-07 |
| O█ will identify negative/problematic behavior and with assistance develop a plan for changing behaviors with rewards, consequences, and monitoring. | | Quarterly 06-07 |
| O█ with assistance from an adult, will monitor his progress toward identified goal(s) for academic and/or personal achievement. | | Quarterly 06-07 |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

| Student Name | O████, O████ | Managing School | | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | | DOB ████/93 | Attending School Kingsbury School | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: 7a

Area addressed by goal: Social/Emotional

**ANNUAL GOAL:** (Including mastery criteria.)

O████ coping skills will improve.

**Provider(s):** Psychologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O████ will appropriately verbalize and discuss his emotions, both positive and negative with minimal prompting from the therapist in 4 out of 5 situations. | | Quarterly 06-07 |
| O████ will identify and utilize various adaptive coping strategies (i.e., self time-out, counting, participating in calming activity, deep breathing, etc.) to effectively manage negative emotions (i.e., anger, frustration, anxiety, etc.) with minimal assistance in 4 out of 5 situations. | | Quarterly 06-07 |
| O████ will identify and demonstrate appropriate behavioral responses to a variety of situations, both positive and negative, with minimal assistance or prompting in 4 out of 5 opportunities. | | Quarterly 06-07 |
| Given a variety of problem situations, O████ will identify the problems, select adaptive coping strategies by which to solve it, and implement the appropriate strategy for resolution with minimal assistance in 4 out of 5 situations. | | Quarterly 06-07 |
| O████ will accept redirection and/or consequences for inappropriate behavior with decreasing need for emotional and/or behavioral support from an adult in 4 out of 5 opportunities. | | Quarterly 06-07 |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

| Student Name O█████ O█████ | Managing School _____ | DCPS - IEP |
| Student ID Number _____ DOB ██/██/93 | Attending School Kingsbury School | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | | Goal Number: 7 b |

Area addressed by goal:  Social/Emotional

**ANNUAL GOAL: (including mastery criteria.)**

O████ self-regulation, impulse control, and frustration tolerance will improve.

Provider(s):  Psychologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O████ will demonstrate improved self-regulation of behavior and emotional responses as evidenced by his ability to use adaptive strategies to remain on task, remain calm or calm himself, demonstrate appropriate boundaries, and make appropriate comments to others with minimal need for support from an adult in 4 out of 5 opportunities. | | Quarterly 06-07 |
| O████ will be able to tolerate difficult emotions (i.e., anger, frustration, anxiety) for at least 10-15 minutes without engaging in a distracting activity, or talking over the therapist in 4 out of 5 situations. | | Quarterly 06-07 |
| | | |
| | | |
| | | |
| | | |

| **EVALUATION PROCEDURE(S)** |
| ☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____ |

277

| Student Name | O██ O████ | | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|---|
| Student ID Number | | DOB ██/██/93 | | Attending School | Kingsbury School | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: 7a |
|---|---|---|

Area addressed by goal: Social/Emotional

**ANNUAL GOAL:** (including mastery criteria.)

O██ social skills will improve.

Provider(s): Psychologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will will demonstrate improved self-advocacy skills as evidenced by his ability to act in a manner that allows him to seek assistance or solve problems on his own during interactions with peers and adults in 4 out of 5 situations. | | Quarterly 06-07 |
| O██ will demonstrate socially appropriate conversational skills, including appropriate responses to nonverbal cues with minimal prompting in 4 out of 5 situations. | | Quarterly 06-07 |
| O██ will accept redirection with minimal need for behavioral support from an adult in 4 out of 5 situations. | | Quarterly 06-07 |
| O██ will accept consequences for negative or inappropriate behavior with minimal need for emotional and/or behavioral support or intervention from an adult in 4 out of 5 situations. | | Quarterly 06-07 |
| | | |
| | | |

| EVALUATION PROCEDURE(S) |
|---|
| ☐ Portfolio ☐ Log ☐ Chart ☐ Test ☒ Documented Observation ☐ Report ☐ Other _____ |

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

278

| Student Name O███ O████ | | Managing School | DCPS - IEP |
|---|---|---|---|
| Student ID Number | DOB ████93 | Attending School  Kingsbury School | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ |
|---|---|---|

Area addressed by goal:  Social/Emotional (Individual and Group Therapy)

**ANNUAL GOAL: (including mastery criteria.)**

O████ social and interpersonal skills will improve.

Provider(s):  Psychologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O████ will develop a therapeutic relationship with the therapist as evidenced by his willingness to disclose personal thoughts to the therapist with minimal prompting and/or emotional support in 4 out of 5 opportunities. | | Quarterly 06-07 |
| O████ will appropriately verbalize thoughts, emotions, and/or needs to peers and adults with minimal behaviors and/or emotional support from adults in 4 out of 5 opportunities. | | Quarterly 06-07 |
| Given a variety of structured and unstructured social situations, O████ will engage in positive, non-provocative and non-aggressive interactions with peers and adults in 4 out of 5 opportunities. | | Quarterly 06-07 |
| Given a variety of social situations, O████ will demonstrate the ability to take another's perspective by identifying and/or stating the other's perspective in 4 out of 5 situations. | | Quarterly 06-07 |
| O████ will comply with requests or directives from adults with minimal prompting, cueing, and/or redirection in 4 out of 5 situations. | | Quarterly 06-07 |
| O████ will appropriately ask for assistance, when necessary or as appropriate, with regard to social situations with minimal need for intervention from an adult in 4 out of 5 opportunities. | | Quarterly 06-07 |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools        07-02-2001        Division of Special Education        Appendix - A        IEP Page 3 of 4

279

| Student Name | O█████ | | Managing School | | DCPS - IEP |
| Student ID Number | | DOB ███ 93 | Attending School | Kingsbury Day School | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: ✗ a

Area addressed by goal: Speech and Language: Reading Comprehension

**ANNUAL GOAL:** (including mastery criteria.)

O███ will improve reading comprehension skills for improved completion of academic tasks and improved classroom participation, as measured by mastery of the following objectives:

Provider(s): Speech Pathologist and Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O███ will use context clues to determine the meaning of unknown words in written and conversational contexts with 80% accuracy. | | 1/26/07 4/6/07 6/14/07 |
| With minimal assistance, given an age appropriate written and orally presented story, O███ will respond to questions about the following infromation with 80% accuracy<br>a) main idea   c) inference   e) causation<br>b) details   d) prediction | a)<br>b)<br>c)<br>d)<br>e) | 1/26/07 4/6/07 6/14/07 |
| Given one prompt or model, O███ will demonstrate the use of 2-3 reading/listening comprehension strategies (such as visualizing/verbalizing, highlighting, note-taking, etc.) in 3/5 opportunities during 1:1 sessions. | | 1/26/07 4/6/07 6/14/07 |
| When given an association between a text and something else (personal experience, another text, world knowledge, or academics), O███ will identify at least 2 similiarities or differences in 4/5 opportunities. | | 1/26/07 4/6/07 6/14/07 |
| O███ will use context clues to recall the meaning of a familiar example of figurative language with 80% accuracy. | | 1/26/07 4/6/07 6/14/07 |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio   ☒ Log   ☐ Chart   ☐ Test   ☒ Documented Observation   ☐ Report   ☐ Other

| Student Name    O██ O██ | | Managing School | DCPS - IEP |
|---|---|---|---|
| Student ID Number | DOB ██/93 | Attending School  Kingsbury Day School | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: 8 |
|---|---|---|

**Area addressed by goal:**  Speech and Language: Pragmatic Language

**ANNUAL GOAL: (including mastery criteria.)**

O██ will improve pragmatic language skills for improved classroom participation and completion of independent daily life skills, as measured by mastery of the following objectives:

**Provider(s):** Speech Pathologist and Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a verbally presented social problem, O██ will generate a list of 3 possible solutions and choose the best one in 4/5 opportunities. | | 1/26/07 4/6/07 6/14/07 |
| Given a verbally presented situation where another person has solved a social problem incorrectly, O██ will identify the problem, and offer a more appropriate solution in 4/5 opportunities. | | 1/26/07 4/6/07 6/14/07 |
| O██ will role-play common social situations where he must relay or request 3 pieces of information with 80% success (i.e. For example, when inviting a friend to a party, or calling a store for information). | | 1/26/07 4/6/07 6/14/07 |
| Given a common emergency situation (i.e. You are lost at the mall), O██ will role-play an appropriate solution/response, including who to contact, what information to give, and how to stay safe, with 90% success. | | 1/26/07 4/6/07 6/14/07 |
| O██ will engage in team-based classroom activities effectively, using appropriate language to encourage his peers, and using language to ask questions and solve problems effectively and efficiently in 4/5 opportunities. | | 1/26/07 4/6/07 6/14/07 |
| When frustrated or upset, O██ will request a break if necessary to calm down, then use his language skills to effectively communicate the problem and work through a solution with moderate adult support in 3/5 opportunities. | | 1/26/07 4/6/07 6/14/07 |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio  ☒ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____ |

| Student Name | O██ O████ | Managing School | | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | | DOB ███/93 | Attending School Kingsbury Day School | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: ☐ 8a

Area addressed by goal: Speech and Language: Phonemic Awareness

**ANNUAL GOAL:** (including mastery criteria.)

O██ will improve phonemic awareness skills for improved spelling, reading accuracy, and reading fluency, as measured by mastery of the following objectives:

Provider(s): Speech Pathologist and Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will auditorily blend segment, and manipulate sounds in words and nonsense words of up to 5 sounds with 90% accuracy. | | 1/26/07 4/6/07 6/14/07 |
| O██ will demonstrate independent use of blending, segmenting, and phoneme manipulation while encoding and decoding CVC, CCVC, and CVCC words in one:one sessions. | | 1/26/07 4/6/07 6/14/07 |
| O██ will demonstrate mastery of the short vowels (a, e, i, o, u) and their sounds with 80% accuracy in single syllable words. | | 1/26/07 4/6/07 6/14/07 |
| O██ will decode and encode long vowel sounds as shown by the vowel+e pattern with 80% accuracy. | | 1/26/07 4/6/07 6/14/07 |
| O██ will decode and encode 5 new advanced code vowel digraph Phono-Graphix sounds over baseline 11/06 data. | | 1/26/07 4/6/07 6/14/07 |
| O██ will chunk multi-syllable words up to 3 syllables in length with 80% accuracy. | | 1/26/07 4/6/07 6/14/07 |

**EVALUATION PROCEDURE(S)**

☐ Portfolio   ☒ Log   ☐ Chart   ☐ Test   ☒ Documented Observation   ☐ Report   ☐ Other _____

| Student Name | O██ O███ | | Managing School | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | | DOB ██93 | Attending School Kingsbury Day School | | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**     Additional Comments: ☐     Goal Number: 8d

Area addressed by goal: Speech and Language: Written Language

**ANNUAL GOAL:** (including mastery criteria.)

O██ will improve written language skills for improved completion of academic tasks and improved classroom participation, as measured by mastery of the following objectives:

**Provider(s):** Speech Pathologist and Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O██ will demonstrate mastery of 3 new punctuation rules over baseline 9/06 data by applying the rules with 90% accuracy in guided writing activities. | | 1/26/07 4/6/07 6/14/07 |
| O██ will independently reread his written work and self-correct 90% of missing or repeated words for 4/5 observed written assignments. | | 1/26/07 4/6/07 6/14/07 |
| Given two pieces of information, O██ will write a simple or compound sentence that contains the information with 80% accuracy. | | 1/26/07 4/6/07 6/14/07 |
| Given a graphic organizer or organizer software such as Inspiration, O██ will independently gather information necessary for a written assignment, put it in the correct place on the organizer, and use that organizer to generate an organized and complete paragraph in 4/5 opportunities. | | 1/26/07 4/6/07 6/14/07 |
| O██ will demonstrate attention to the directions and feedback given by the instructor during classroom writing assignments, and attempt to make the appropriate changes accordingly in 3/5 opportunities. | | 1/26/07 4/6/07 6/14/07 |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☒ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

Student Name _____
Student ID Number  9051483 ___ DOB ___93

Managing School ___ C.A.R.E. Center
Attending School  Our Lady of Victory

DCPS – IEP
Page 3 of 4

| VII. SPECIALIZED SERVICES |
|---|

Additional Comments:

Goal Number: 01

Area addressed by goal: ___ Motor/Health

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate growth in the area of motor skills, especially as it relates to visual perception, visual motor skills, and scanning, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): ___ Occupational Therapist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O__ will complete a 100 piece puzzle with picture within 2 sessions while seated on a therapy ball.  Criteria: 80% accuracy | | Weekly |
| O__ will complete a maze, word search, and connect the dot puzzle while seated on a therapy ball.  Criteria: 95% accuracy | | Weekly |
| Given instruction in correct directionality, alignment, and spacing of letters O__ will write uppercase and lower case letters with correct directionality, alignment, and good spacing while seated on a therapy ball  Criteria: 95% accuracy | | Weekly |
| O__ will attend to a table top activity for 20 minutes while sitting on a therapy ball.  Criteria: 3 out of 4 sessions | | Weekly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  X Log  ☐ Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools      07-02-2001      Division of Special Education  Appendix – A      IEP Page 3 of 4

284

| Student Name | O___ O___ | | Managing School | | DCPS - IEP |
| Student ID Number | | DOB ___1993 | Attending School | Kingsbury Day School | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
## SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in <u>regular education</u>? ☐ Yes ☑ No

Explanation for removal out of regular education classroom.

The student needs specific accommodations and modifications which address specific learning needs. Receives specialized instruction with a low teacher-student ratio. Related services and social skills need to be integrated into this program.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SETTING SpEd | Total | FREQUENCY Hr./ Min | FREQUENCY O/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| tracker | | ✓ | | as needed | | Sp Ed Team | 11/14/06 |
| audio tapes / CD | | ✓ | | as needed | | " | |
| Word processor | | ✓ | | " | | " | |
| calculator | | ✓ | | " | | " | |
| fidgets | | ✓ | | " | | " | |

Check and list modifications and/or accommodations for testing: ☐ None needed

*as provided to him*

*files in manageable*
*its*
*ting software*

Timing/Scheduling: extended time
Setting: small group
Presentation: directions clarified, text read to him
Response: write in test booklet
Equipment: word processor, calculator, tracker

## XI. STATE AND DISTRICT ASSESSMENTS

☐ Level I Tested with non-disabled peers under standard conditions without accommodations.

☐ Level II (Describe accommodations for level II) Tested under standard conditions with special accommodations

☒ Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level IV (Describe the alternative assessment)

☐ Level V Portfolio:

## XII. Areas Requiring Specialized Instruction and Related Services:

☑ Reading
☑ Mathematics
☑ Written Expression
☐ Other:
☐ None

☑ Physical/Sensory
☑ Social Emotional
☑ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☐ Speech/Language

**Modifications:**
☑ Language Arts/English
☑ Social Sciences
☑ Biological & Physical Sciences
☑ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| Full time general education | reject - cannot meet students needs | continued school failure |
| Part time general education | reject - cannot meet students needs | participate with non-disabled peers |
| Full time special education | accept - will meet students needs | will not participate with non-disabled peers |

Modification(s)/Accommodation(s) to address the harmful effects:

therapeutic setting, specific setting, specific scheduling to accommodate related services, low student/teacher ratio, and social skills training

Location for Services | Kingsbury Day School

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 4 of 4

285

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
OFFICE OF SPECIAL EDUCATION
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232


Caring for Our Students with Disabilities
A Procedural Manual for Parents

RECEIPT


I, _Claudia Pabo_____, received a copy of *A Procedural*
    (Parent/Guardian Name)

*Manual for Parents* from _Piper Phillips Caswell_ /Title _Director, MS_
                        (Person Issuing Document)

at _Kingsbury Day School_.
        (School)


                    _11_/_14_/_06_.
                        (Date)




                    _Claudia Pabo___
                Parent/Guardian Signature



(This receipt is to remain in a designated file in the school.)



## MICHELLE FILL & ASSOCIATES, INC.

*Speech and Language Specialists*

### O██ O█████ – Speech and Language Recommendation

There are four reports currently on file for O██, each reflecting different opinions of O████ speech and language functioning. The first, conducted by Dr. Federici of the Neuropsychological and Family Therapy Associates in May of 2006 diagnosed O██ with the speech and language related disabilities of Mixed Receptive-Expressive Language Disorder, Nonverbal Learning Disorder, Developmental Reading Disorder and Disorder of Written Expression. Specifically, deficits were noted in language comprehension, auditory processing, oral expression, reading comprehension, written formulation, phonemic awareness, and social/pragmatic language.

DCPS conducted a re-evaluation and review a week later. This evaluation notes that Dr. Federici's evaluation was conducted without medication for O████ ADHD. It is possible that O██ significant attention deficits impacted his performance on these tests. The DCPS evaluator administered a broad language test and a vocabulary test, and noted deficits only in receptive and expressive vocabulary. It is important to note that this evaluation did not address the other areas of deficit noted by Dr. Federici, including reading comprehension, written language, phonemic awareness, and social/pragmatic language.

At the end of May 2006, a third evaluation was conducted by Dietzel, Butler, and Associates. This evaluation was conducted with medication for O████ attentional deficits. Deficits were again noted in reading comprehension, written expression, vocabulary and phonemic awareness.

Finally, in July of 2006, DCPS conducted a classroom observation and evaluation. The observer noted significant difficulties with social language and interaction, with O██ rarely engaging his peers appropriately. A teacher interview revealed deficits in reading comprehension, written expression, and social language. This evaluator found O██ eligible to be declared as an LD student in DCPS.

Several things are important to note. First, there is no current and complete speech and language evaluation on file. DCPS's evaluation in May did not address several areas of speech and language functioning that have been noted to be areas of deficit in several other reports, and dismissed his significant below average scores from his evaluation by Dr. Federici. While it is unfortunate that a complete speech and language evaluation was not conducted, at this time I feel that O██ has been subjected to more than enough testing, and we can proceed with a recommendation and therapy for O██ based on the cumulative information contained in these available reports.

It is also important to note that O█████ is ESL. He was adopted at the age of 5 from a Russian orphanage. While his prenatal, birth, and early developmental histories are not available, several reports have noted that his deficits are consisted with fetal alcohol exposure. All of these factors put O████ at significant risk for speech and language disabilities, and are often associated with higher level language problems including difficulties with higher level reading comprehension, written language, vocabulary, and figurative language. It is also important to note that although O████ is 13 years old, he is currently functioning at between 3rd and 5th grade levels for these areas. This represents a 3-5 year delay in academic functioning. Because he is a student with significant diagnosed learning disabilities, this gap is likely to increase if he is not provided appropriate remedial services.

Based on the available information and conversations with O█████ language arts teacher, it seems clear that O████ has significant speech and language deficits in the following areas: social/pragmatic language, reading comprehension, written expression, phonemic awareness (in terms of oral reading fluency and spelling in context), and figurative language. While vocabulary is seen as a relative strength for O███ in the classroom, it is important to note that O███ is currently reading at a 5th grade level, even though he is 13.

O████ would benefit from a 45-minute social language group to address his social pragmatic deficits. In addition, due to his attentional deficits and the severity of his deficits, an hour of individual therapy per week is recommended to address the phonemic awareness, reading comprehension, and written language concerns. Shifting 30 minutes of individual time to a small group of 2-3 students may be appropriate later in the year as O████ skills progress in individual therapy. This would help O███ to integrate his social pragmatic skills with his academic skills. A total of 105 minutes of therapy is recommended at this time, based on the available evaluations.

Respectfully Submitted,

*Diane Winner, MS CCC-SLP*

Diane Winner, MS CCC-SLP
Speech-Language Pathologist

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
**(MDT)**
MEETING NOTES

MDT REFERRAL DATE:

STUDENT:

| MDT |
| --- |

MEETING DATE:

SCHOOL: Kingsbury Day School

PARTICIPANTS: (Print Name)

Diane Winner
Pleasant Suns PhD
Ann Rowe PhD
Charles Oliver
Sara C. Hudgins
Claudia Pabo
Piper Phillip Caswell

PARTICIPANTS: (Sign Name)

Diane MS CCC-SLP
Ann Rowe PhD
Chas Oliver
Sara C Hudson
Claudia Pabo
Director, Middle School  Piper Phillip Caswell

POSITION

Speech Language Pathologist
Psychologist
Psychologist - Group Therapist
father
Special Education Teacher
Parent

Parental guidelines provided. Team introduced.
Language Arts - Still adjusting to routines, has difficulty
engaging in class, doodles and uses some fidgets. Trying
to get him to use fidget that keeps him focused on
class and not the fidget. Will advocate for himself
and request breaks.
Motivated to write, once he's generated an idea, uses
assistive technology. Discussed use of audio tapes
to support comprehension (particularly at home - already
done at school)

THE PARENT · ☒ IS PRESENT ☐ IS NOT PRESENT  AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT

☒ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS TO BE EXITED FROM  SPECIAL EDUCATION

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE:

STUDENT: ▮▮▮▮▮

Page 2 of 4

SCHOOL: Kingbury Day School    DATE 11.14.06

Teacher expressed concern with organizational skills; can be inflexible in class, cited an example with a homework assignment. Mom said she works diligently at home at following through. Psychologist feels a lot of the rigidity is cognitive - executive functioning impacts him.

Transitions can be difficult - gets off task - and tries to resettle, will take a break but can be frustrated when re-entering an ongoing activity. Mom concurs that she experiences this as well.

Psychologist (individual) - Enjoys adult attention and working 1:1 in session. Can be very anxious so he needs structure and boundaries. He can also multitask. Can also tune out as an avoidance tactic. Has good insight, reflects on his behaviors and asked about how he can perform well in 1:1 but not in group.

Speech/language - work on models for social language, how do you get what you want without manipulating or take over or avoid - but doesn't socially engage.

Psychologist (group) - Agree with speech therapist

290

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES

MDT REFERRAL DATE: _____

MEETING TYPE: _____

STUDENT: _____

Page: 3 of 4

SCHOOL: Kingsbury Day School    DATE: 11·14·06

Will say things that others might want to hear (what he thinks) - he tries to be congenial in the group but he may not want to do what the others want. Talked about dealing with flexibility, anxiety and cognitive shifting and how he develops these skills.

Psych - one example of confusion - comes to group on own initiation - she approached him in the hall once and he didn't recognize her - very context bound. Recommend 1 session each of individual and group.

Speech - not currently being seen - what do all the reports say and look at his needs from the big picture perspective. Recommends 1 group and 2 individual.

Talked extensively about pragmatic language with peers vs. adults (who support and facilitate it) reading comprehension, figurative language, vocabulary is a relative strength, written language (organize, formulate and edit) generalize spelling skills goals will need to be developed.

OT - report done by DCPS - remarked on need for sitting on a ball or seat cushion - talked about using cushion first in afternoon classes.

291

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: _____

Page: 4 of 4

STUDENT: [redacted]

SCHOOL: Kingsbury Day School    DATE: 11.14.06

OT reported on anxiousness. And Talked about sensory input
to self regulate - put strip of velvet under lid of
desk. Team reviewed OT recommendations and concur with
Reviewed supplementary aids and accomodations.)
→ the recommendation of 60 minutes weekly.

292

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Paula A. Rosenstock    VA, DC
Patricia Cyr           CA, DC

Michael J. Eig        MD, DC
Haylie M. Iseman      MD, DC, NY

January 31, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: O███ O█████
*via facsimile and first-class mail*

Dear Ms. Newsome:

Enclosed please find a Letter Motion for Continuance for the above-referenced student. My office has tried to contact opposing counsel, Saurabh Gupta, but he has not responded. If you have any questions, please feel free to contact my office. Thank you.

Sincerely,

Michael J. Eig

cc:    Claudia Pabo
       Saurabh Gupta, Esq.

293

# LETTER MOTION FOR CONTINUANCE

District of Columbia Public Schools
State Enforcement & Investigative Division
Special Education Student Hearing Office
825 North Capitol Street, N.E. 8th Floor
Washington, DC 20002

Dear Student Hearing Officer:

This letter is to request a continuance of my Due Process Hearing currently scheduled to take place

on 2-12-07 for O█████O██████ DOB █████93 . I am unable to appear for the hearing on this

date for the following reasons:
Due Process Hearing in Montgomery County, Maryland

I am available to appear for the hearing on the following dates:

1. 2-14-07           2. _____     3. _____

I attempted to contact opposing counsel to discuss scheduling before proposing these dates: I spoke to

_____ (opposing counsel) at _____ A.M. / P.M. on _____ (date).

Opposing Counsel ☐ agreed to the continuance ☐ did not agree to the continuance.

   **I UNDERSTAND THAT THESE DATES MAY NOT BE AVAILABLE AND THAT THE STUDENT HEARING OFFICE MAY NEED TO RESCHEDULE MY HEARING FOR ANOTHER DATE.**

   **I ALSO UNDERSTAND THAT BY REQUESTING A CONTINUANCE I HEREBY WAIVE RIGHTS TO A FINAL DECISION WITHIN 75 DAYS OF FILING THE DUE PROCESS COMPLAINT.**

   **FURTHERMORE, I REALIZE THAT THE HEARING MAY GO FORWARD AS SCHEDULED UNLESS I RECEIVE A WRITTEN DECISION FROM THE HEARING OFFICER GRANTING A CONTINUANCE. IF I DO NOT RECEIVE A WRITTEN DECISION GRANTING A CONTINUANCE AND I FAIL TO APPEAR FOR A SCHEDULED HEARING, I UNDERSTAND THAT THE HEARING OFFICER MAY DISMISS MY REQUEST.**

   **BY MY SIGNATURE BELOW I CERTIFY THAT I HAVE PROVIDED THE OPPOSING PARTY WITH A COPY OF THIS MOTION AND HAVE ATTACHED PROOF OF SERVICE (FAX CONFIRMATION, COURIER RECEIPT, ETC.)**

Parent/Advocate or Attorney Advisor: _____     Date: 1-31-07

Telephone: (301) 657-1740          Fax: (301) 657-3813

Revised 05/23/06     294

# MICHAEL J. EIG AND ASSOCIATES, P.C.
## ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig     MD, DC
Haylie M. Iseman    MD, DC, NY

Paula A. Rosenstock    VA, DC
Patricia Cyr           CA, DC

# FAX

| | |
|---|---|
| **To:** | Sharon Newosme **Student Hearing Coordinator** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael J. Eig, Esq. |
| **Date:** | January 31, 2007 |
| **Time:** | 12:58 pm |
| **Total Pages:** (including cover) | **3** |
| **Re:** |  |
| **cc:** | Saurabh Gupta, Esq. (202) 442- 5097/98 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Paula A. Rosenstock    VA, DC
Patricia Cyr    CA, DC

Michael J. Eig        MD, DC
Haylie M. Iseman    MD, DC, NY

January 24, 2007

Sharon Newsome
Student Hearing Coordinator
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: O███ O█████
*via facsimile and first-class mail*

Dear Ms. Newsome:

Enclosed please find a copy of the Parent's Response to DCPS' Memorandum on Placement Authority for the above-named student. Please forward this to Mr. Banks for his consideration. Thank you.

If you have any further questions, please contact my office.

Sincerely,

Michael J. Eig

cc:    Saurabh Gupta, Esq.
    Ms. Claudia Pabo

296

|  | * |  |
|---|---|---|
| IN THE MATTER OF | * | BEFORE AN IMPARTIAL HEARING |
|  | * | OFFICER OF THE DISTRICT OF |
|  | * | COLUMBIA OFFICE OF |
| O███ O███████ | * | STUDENT HEARINGS |
|  | * |  |
|  | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PARENT'S RESPONSE TO DCPS' MEMORANDUM ON PLACEMENT AUTHORITY

On January 16, 2007, at the hearing in this matter, District of Columbia Public Schools ("DCPS") through counsel, argued that school systems have unilateral and absolute authority to determine placements under the IDEA. According to the representations of counsel at the hearing, the federal regulations under the IDEA are replete with language indicating that parents have no role in determining placement. Since neither the Hearing Officer nor the undersigned counsel agreed with that statement of the law, the Hearing Office provided DCPS counsel the opportunity to brief the matter. We respond to that DCPS briefing below.

There is not much to respond to, in truth. DCPS did not point to a single citation, in the federal regulations or elsewhere, in support of excluding the parents from placement determinations. In fact, all that DCPS provided was a comment to the regulations and a somewhat recent federal court case speaking to the fact that the school system has the authority to identify the proposed placement at the end of all IEP proceedings. We cannot argue with that fact of legal life; if the parents do not like the school system proposal, that is what Due Process Hearing are all about. But nothing in the law says that parents cannot contribute to placement discussions. They are integral parts of IEP meetings, all parts of those meetings.

297

This has been another waste of time.  We respectfully request that the Hearing Officer reject the view of law contained in it.

Respectfully Submitted,

Michael J. Eig
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for O█, O█ and his parent

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage prepaid, to Saurabh Gupta, Esq. on January 24, 2007.

Michael J. Eig

2

298



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| | | | |
|---|---|---|---|
| **To:** | Mr. Terry Banks | **From:** | Saurabh Gupta, Esq. |
| **Fax:** | 442-5556 | **Date:** | January 19, 2007 |
| **Phone:** | | **Pages:** | 19 (Including cover page) |
| **Re:** | O███O███ – Memo | **CC:** | Michael Eig, Esq 301-657-3843 |

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

•**Comments:**

DCPS memorandum on LEA's placement authority.

299



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

*Office of the Superintendent*
**Office of the General Counsel**
*825 North Capitol Street, N.E., 9th Floor*
Washington, DC 20001
202-442-5000   Fax # 202-442-5098
*www.k12.dc.us*

January 19, 2007

Mr. Terry Banks
Impartial Hearing Officer
Student Hearing Office
DCPS Office of Compliance
825 North Capitol, N.E.
8th Floor
Washington, D.C. 20002

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

### SPECIAL EDUCATION

### ADMINISTRATIVE DUE PROCESS HEARING OFFICE

| | |
|---|---|
| In the Matter of | ☆ |
| O███, O█████ | ☆ |
| | ☆ |
| | ☆ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DCPS' Memorandum on LEA Placement Authority

As requested at the January 16, 2007 hearing, the Respondents respectfully submits this memorandum regarding the Public Agency's inherent authority to issue public placements that are designed for the student to receive an educational benefit.

### I. LEA Placement Authority

The IDEA does not require placements according to a majority vote and nor does it require the LEA to abide by the Parent's wishes for the placement. In *Shoenbach vs District of Columbia* (2006), the court stated a majority vote of agreement is not required nor is it a rational basis to make a decision under IDEA. The court cited to the regulation which explicitly states:

300

*O████ O████ [DOB. ████03]*
*Memorandum on LEA Placement Authority*

"The IEP team should work toward a consensus, but the public agency has ultimate responsibility to ensure the IEP includes services that the child needs in order to receive FAPE. It is not appropriate to make IEP decision based upon a majority "vote." If the team cannot reach consensus, the public agency must provide the parents with prior written notice of the agency's proposals or refusals, or both, regarding the child's educational program, and the parents have the right seek a resolution of any disagreement by initiating an impartial due process hearing."

34 CFR Part 300, Appendix A – Notice of Interpretations, 64 Fed. Reg 12,473 (1999); *Schoenbach, 05-cv-01591 at 11 (2006)*. The public agency has the right to propose their placement because the parents have an avenue for relief through a due process hearing. Thus, if after the public agency issues a notice of placement the parents still have a channel to seek relief, if they disagree.

The *Schoenbach* court explained the school system has the right to first explore appropriate public placements as long as those placements can deliver an educational benefit. *Id at 12-13*. Thus the school system is not required to forego an appropriate public school placement for a private school placement. DCMR §5-3018.

Finally, *Schoenbach* states IDEA does not require an education designed to satisfy a parent's wishes. *Id at 13*. Thus, the school system only has to ensure FAPE will be provided at the placement offered in order to comply with the statute.

The school system does not need to abide to every wish of the parent as long as FAPE is provided. Furthermore, DCPS has the authority to decide on the location of the educational placement as long as it can provide an educational benefit. As the *Schoenbach* court confirmed IDEA "does not require that a school provide the very best educational experience" only one designed to where the student can derive an educational benefit. *Id at 12 citing Rowley, 458 U.S. at 201*.

Respectfully Submitted,

1/19/08
Dated

Saurabh Gupta
Attorney Advisor, DCPS

*C██ O███ [DOB:█████93]*
*Memorandum on LEA Placement Authority*

## CERTIFICATE OF SERVICE

I, Saurabh Gupta, Esq. hereby certify that a copy of the Defendant's response was served to Michael J. Eig, Esq. on January 19, 2007 via facsimile at 301-657-3843

Saurabh Gupta
Attorney Advisor
Office of the General Counsel
District of Columbia Public Schools
Telephone: (202) 442-5178
Fax: (202) 442-5097/8

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANNA SCHOENBACH, *et al.*,     ) | |
|        ) | |
|      Plaintiffs,     ) | |
|        ) | |
|     v.     ) | Civil Action No. 05-1591 (RMC) |
|        ) | |
| DISTRICT OF COLUMBIA, *et al.*,     ) | |
|        ) | |
|      Defendants.     ) | |

### MEMORANDUM OPINION

Andrew Schoenbach and Daryl Kade (collectively the "Schoenbachs") are the parents of Anna, a disabled child. Anna is eligible to receive special education services pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400-1487. The Schoenbachs filed this suit against the District of Columbia and Clifford Janey, in his official capacity as Superintendent of the District of Columbia Public Schools (collectively "DCPS"), asserting that DCPS failed to provide a free appropriate public education ("FAPE"), *see* 20 U.S.C. § 1412(a)(1)(A), to Anna and that DCPS was required to reimburse them for tuition at a private school. The parties have filed cross motions for summary judgment. Because DCPS offered placement in a public school program that provides the special education services recommended for Anna and the private school where the Schoenbachs placed Anna does not provide such services, DCPS is not obligated to reimburse the Schoenbachs for the private school tuition they have paid. The Court will deny the Schoenbachs' motion for summary judgment and will grant DCPS's motion for summary judgment.

## I. BACKGROUND

### A. IDEA

Under the IDEA, disabled students are entitled to a FAPE consisting of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89 (1982); *see* 20 U.S.C. § 1412(a)(1)(A). Congress' specific intent is evident on the face of the statute:

The purposes of this chapter are —

(1)(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;

(B) to ensure the rights of children with disabilities and parents of such children are protected;

. . . .

(4) to assess, and ensure the effectiveness of, efforts to educate children with disabilities.

20 U.S.C. § 1400(d)(1)(A) & (B), 1400(d)(4).

When a disabled student is identified, a multi-disciplinary team ("MDT") consisting of the parents and teachers of the disabled student, a representative of the local educational agency with knowledge about the school's resources and curriculum, and other educational specialists as needed, confers to develop an individualized education program ("IEP") for that student. *Reid v. Dist. of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005) (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)). The IEP is the "*modus operandi*" of the IDEA. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471

-2-

U.S. 359, 368 (1985). The IEP is a written statement that includes goals and instructional objectives for the student's education, services to be provided, projections regarding the dates on which such services are to be offered, and criteria for evaluating whether instructional objectives are met. 20 U.S.C. § 1414(d)(1)(A); *see also* 20 U.S.C. § 1401(14). "[T]he IEP must, at a minimum, provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction . . . . If no suitable public school is available, the [school system] must pay the costs of sending the child to an appropriate private school." *Reid*, 401 F.3d at 519. Additionally, the IEP team may determine that in order to benefit from special education, the student requires "related services," non-educational, supportive services such as physical and occupational therapy and psychological counseling. *See* 34 C.F.R. § 300.24(a).

      The statute contains a number of procedural safeguards. Parents of a disabled child must be notified in writing of any proposed change in "the identification, evaluation, or educational placement of the child" and are permitted to challenge any matter relating to such change. 20 U.S.C. § 1415(b)(3) & (b)(6). Parents can have their complaints considered in "an impartial due process hearing." *Id.* § 1415(f). Once a hearing is held and an administrative determination is made, a party may appeal the decision of the hearing officer to federal district court. *Id.* § 1415(i)(2)(A).

    **B.    Factual Background**

      The Schoenbachs' daughter, Anna, has been diagnosed with Asperger's Syndrome, a high-functioning autism spectrum disorder. In the past, Anna attended Murch Elementary School where she was in a regular education program. Murch Elementary had large classes, and Anna did not do well there. Administrative Record ("AR") at 11, Hearing Officer's Decision. On April 2,

-3-

2004, a MDT met and developed an IEP for Anna. *Id.* at 9. The IEP prescribed 8.25 hours per week of specialized instruction, 2 hours per week of psychological counseling, 4 hours per week of tutoring, 90 minutes per week of occupational therapy, 75 minutes per week of speech therapy, and 30 minutes per week of counseling. *Id.* at 9. In order to implement the IEP, Anna was placed at Kingsbury Day School for the 2004-2005 school year in a full-time special education program. *Id.* at 11. According to her father, Anna thrived in this environment. *Id.* The Schoenbachs believed that she had evolved to the point where she required a less restrictive environment for her education. Pls.' Mot. for Summ. J. at 3.

On April 29, 2005,[1] a MDT met again to develop Anna's IEP for the 2005-2006 school year. The Schoenbachs attended the meeting together with their attorney. The IEP for the 2005-2006 school year prescribed 22.75 hours per week of specialized instruction, 135 minutes per week of psychological services, 90 minutes per week of occupational therapy, and 60 minutes per week of speech and language therapy. AR at 9. Anna's parents disagreed with the IEP and noted their objection on the IEP document as follows: "Parents are not in agreement with service hours or time removed from general education setting. Parents request placement that can provide full-time specialized instruction in a mainstream setting — highly structured and small." *Id.* The Schoenbachs felt that Anna should be placed with peers of similar intellectual capabilities,[2] in a non-special education program. *Id.*

---

[1] At that time, Anna was fourteen years old.

[2] Anna's cognitive ability, as measured by IQ testing, is in the superior range. Pls.' Mot. for Summ. J. at 3.

At the April 29, 2005, IEP meeting, DCPS proposed placing Anna at McKinley Tech Senior High School ("McKinley"), a DCPS public school, in a special education program for children with Asperger's Syndrome (the "McKinley Program"). The McKinley Program would be newly implemented in the 2005-2006 school year. It would have no more than six children per class, with a special education teacher and two teacher assistants. *Id.* at 9. The Schoenbachs and the Kingsbury staff objected to this placement because the student body size at McKinley was 400 students, and they felt that Anna would be overwhelmed by this large size. *Id.* at 9-10. Anna has difficulty with social interactions. *Id.* at 10. Instead of placing Anna at McKinley, the Schoenbachs proposed to place Anna at The Nora School ("Nora"), a small private school. Nora does not offer special education services. AR at 10, Hearing Officer's Decision (citing Schoenbachs' stipulation in Parent's Memorandum of Points and Authorities at 8).

The Schoenbachs requested a due process hearing. The hearing was held on May 6, 2005, and was continued to June 14, 2005. The Hearing Officer rendered his decision on July 8, 2005. The Hearing Officer held that (1) Anna would derive educational benefit at McKinley and thus it was an appropriate placement under the IDEA, AR at 12; and (2) even if McKinley were an inappropriate placement, the Schoenbachs were not entitled to tuition reimbursement for the costs at Nora because Nora does not provide special education services or the related services designated in Anna's IEP. *Id.* at 13.

The Schoenbachs refused to send Anna to McKinley and instead enrolled her at Nora for the 2005-2006 school year. The Schoenbachs appealed the Hearing Officer's decision to this Court, claiming that Anna's placement at Nora is appropriate under the IDEA and requesting tuition reimbursement. The parties now have filed cross motions for summary judgment.

-5-

307

## II. LEGAL STANDARDS

Federal district courts have original jurisdiction over civil actions arising under federal statutes. 28 U.S.C. § 1331. Here, the Schoenbachs brought suit under the IDEA, a federal statute. As this case presents a question of federal law, this Court has original jurisdiction.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In cases under the IDEA, a district court "shall review the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Accordingly, "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which the courts generally are confined to the administrative record and are held to a highly deferential standard." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993). While the IDEA requires district courts to make their own independent determination based on a preponderance of the evidence, courts should not substitute "their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. The Act's requirement that a reviewing court "receive the records of the administrative proceeding" requires courts to give "due weight" to the hearing officer's determinations, *id.*, and to "afford some deference to the expertise of the hearing officer and school officials responsible for the child's education." *Lyons v. Smith*, 829 F. Supp. 414, 417 (D.D.C. 1993). The party challenging the administrative decision bears the burden of persuading the court that a different result should have been reached. *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988).

If neither party requests that the court hear additional evidence, then the court may determine the case based on the administrative record on summary judgment. *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). Here, neither party has requested that the Court hear additional evidence; thus, the Court bases its decision on a review of the administrative record.

-7-

### III. ANALYSIS

"[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Burlington*, 471 U.S. at 373-74. If the parents prevail on review, they are entitled to reimbursement. If the court determines that the IEP and placement proposed by school officials was appropriate, they are not entitled to reimbursement. *Id.* at 374. In this case, the Schoenbachs contend that the placement of their daughter at McKinley would have deprived her of FAPE and that her placement at Nora, a private school, was proper under the IDEA. They assert that DCPS should reimburse them for the costs of sending Anna to Nora.

When reviewing an administrative decision under the IDEA, the court must determine whether the procedural requirements were met and whether the IEP, including the student's placement, was reasonably calculated to enable the child to receive educational benefits. *Shaw v. Dist. of Columbia*, 238 F. Supp. 2d 127, 134 (D.D.C. 2002) (citing *Rowley*, 458 U.S. at 206-07).

#### A. Procedural Requirements

Without citing to any reference in the record, the Schoenbachs contend that the Hearing Officer misallocated the burden of proof. Under District of Colombia law, DCPS bears the burden of proving that the proposed placement is adequate to meet the educational needs of the student. D.C. Mun. Regs. tit. 5, § 3030.3.[3] The Schoenbachs assert that DCPS could not have met

---

[3] The Supreme Court's recent ruling in *Schaefer ex rel. Schaefer v. West*, ___ U.S. ___, 126 S. Ct. 528, 536 (2005), does not affect the D.C. rule allocating the burden of proof to DCPS at the administrative level. While the Supreme Court in *Schaefer* held that the burden of proof is on the party seeking relief, the Court declined to decide whether a state could override this rule and put the burden of proof on the school district. *See Gellert v. Dist. of Columbia Pub. Schs.*,

its burden of proof at the administrative level because the McKinley Program was new and not enough information was known about it.

Nothing in the record indicates that the Hearing Officer erroneously placed the burden of proof on the Schoenbachs instead of on DCPS. Moreover, the evidence shows that DCPS met its burden of proving that the proposed placement in the McKinley Program was adequate to meet Anna's educational needs. Despite the fact that the McKinley Program had not yet been implemented, the testimony at the due process hearing indicated that the Program would meet Anna's needs under her IEP. Anna's IEP prescribed that she receive special education 22.75 hours per week and related services, including psychological services, occupational therapy, and speech and language therapy. Victoria Williams, DCPS's coordinator of services for students with autism,[4] testified that the McKinley Program would be limited to six students with Asperger's Syndrome, Tr. 218, 249, and that it would be staffed with one certified special education teacher and two teaching assistants.[5] Tr. 218, 223-225. Further, all of the related services set forth in Anna's IEP would be made available at McKinley. Tr. 226-27. Thus, placement in the McKinley Program was reasonably calculated to provide an educational benefit to Anna.

---

No. 05-19, 2006 WL 1363851, at *10 n.3 (D.D.C. May 18, 2006) (citing *Schaffer*, 126 S.Ct. at 537). In any event, the Schoenbachs correctly point out that DCPS bore the burden of proof at the administrative level.

[4] Ms. Williams was in charge of implementing the McKinley Program.

[5] Currently, the McKinley Program only has two students. Thus, it is staffed with a single special education teacher and the teaching assistants have been reassigned. Defs.' Reply, Att. 1, Decl. of Victoria Williams.

-9-

The Schoenbachs also contend that DCPS violated the procedural requirements of the IDEA because DCPS afforded them no meaningful input. They allege that DCPS had predetermined Anna's placement at McKinley. Predetermination of school placement constitutes a procedural violation of the IDEA. *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004) (citing *Spielberg ex rel. Spielberg v. Henrico County Pub. Schs.*, 853 F.2d 256 (4th Cir. 1988)). In *Spielberg*, the school district decided to change the student's placement before drafting the IEP. The Fourth Circuit found that a procedural violation occurred because the placement had been predetermined. The court held that IEP objectives must be written before placement. *Spielberg*, 853 F.2d at 259. In *Deal*, the Sixth Circuit also found that a procedural violation had occurred. In that case, the school district determined that an autistic student should be placed in a school system program, and refused to consider the one-on-one in-home applied behavioral analysis ("ABA") program that the student's parents advocated. The evidence showed that "the School System had an unofficial policy of refusing to provide one-on-one ABA programs and that School System personnel thus did not have open minds and were not willing to consider the provision of such a program." *Deal*, 392 F.3d at 858.

The facts of this case are readily distinguishable from *Spielberg* and *Deal*. Here, unlike *Spielberg*, the MDT developed Anna's IEP and then DCPS recommended her placement. Unlike *Deal*, there is no evidence of any DCPS policy refusing placement in a particular program or at any particular school. The Schoenbachs contend that Cathy Berry, the DCPS placement specialist, started to research placement options before the April 29, 2005, IEP meeting and that this is evidence that DCPS predetermined the placement of Anna at McKinley. Ms. Berry testified that she researched DCPS placement options because she knew that the issue of Anna's placement would

Case 1:07-cv-01863-JDB    Document 8-9    Filed 01/11/2008    Page 15 of 44
19-Jan-2007 05:26 PM DCPS Office of General Counsel 2024425098          15/19

Case 1:05-cv-01591-RMC    Document 18    Filed 06/12/2006    Page 11 of 15

be raised at the IEP meeting. AR at 159, Testimony of Berry. Ms. Berry learned of the new

Asperger's Program at McKinley when she contacted Victoria Williams, the DCPS autism program

coordinator. Under the District of Columbia Municipal Regulations, DCPS is not required to pay

for a private placement if there is a public placement that would provide a FAPE. D.C. Mun. Regs.

tit. 5, § 3018. Thus, Ms. Berry was required to determine if there were an appropriate public school

placement before agreeing to a private placement. The evidence that she researched potential public

placements demonstrates that Ms. Berry did her job, not that DCPS "predetermined" Anna's

placement before the April 29, 2005, IEP meeting.

The Schoenbachs further argue that it was inappropriate to place Anna at McKinley

when the majority of the MDT agreed that Nora was a better placement for Anna. There is no basis

for this argument. In fact, the regulations do not require placement according to a majority vote of

the MDT. The regulations provide:

> The IEP team should work toward a consensus, but the public agency has ultimate
> responsibility to ensure that the IEP includes the services that the child needs in order
> to receive FAPE. It is not appropriate to make IEP decisions based upon a majority
> "vote." If the team cannot reach consensus, the public agency must provide the
> parents with prior written notice of the agency's proposals or refusals, or both,
> regarding the child's educational program, and the parents have the right to seek
> resolution of any disagreements by initiating an impartial due process hearing.

34 C.F.R. Part 300, Appendix A — Notice of Interpretations, 64 Fed. Reg. 12,473 (1999).

The Schoenbachs contend that the hearing officer erred by failing to admit the May

31, 2005, report of Dr. Gilotty, Anna's psychologist. This report recommended placing Anna at

-11-

Nora. The report was not prepared until after the first day of the two-day due process hearing.[6] The Hearing Officer excluded the report because the Schoenbachs did not list Dr. Gilotty as a witness and did not intend to call her as a witness. Thus, Dr. Gilotty was not available for cross-examination.

The IDEA provides that at least five days before a due process hearing, each party shall disclose to all other parties all evaluations and recommendations they intend to use at the hearing. 20 U.S.C. § 1415(f)(2)(A). The Hearing Officer properly excluded Dr. Gilotty's report, as it was not disclosed prior to the due process hearing and she was not available for cross-examination.[7]

### B. Placement Reasonably Calculated to Provide Educational Benefit

The Schoenbachs argue that the placement at McKinley was not the best placement for Anna and that placement at Nora was more appropriate. The IDEA establishes a "basic floor of opportunity"; it does not require that a school provide the very best educational experience. *Rowley*, 458 U.S. at 201. School districts must provide "an educational benefit" by providing an appropriate

---

[6] The due process hearing commenced on May 6, 2005, and was continued to June 14, 2005, due to lengthy witness testimony.

[7] While the Schoenbachs asked this Court to consider Dr. Gilotty's written report, they did not ask the Court to hear any additional evidence. Even if they had, the Court would have excluded such testimony because in IDEA cases, courts exclude the testimony of those witnesses who testified, or who could have testified, before the hearing officer. *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998) (following *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)); *accord Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472-73 (9th Cir. 1993). "A lenient standard for additional evidence would have the consequence of making the whole IDEA process more time consuming, as parties scrambled to use the federal court proceeding to patch up holes in their administrative case." *Springer*, 134 F.3d at 667.

-12-

education. *Id.* School officials are not required to forego an appropriate public school placement for a private school placement. D.C. Mun. Regs. tit. 5, § 3018.

Further, the IDEA does not require an education designed to satisfy a parent's wishes. *Shaw*, 238 F. Supp. 2d at 139. In *Shaw*, the plaintiff was a disabled student who was provided with an IEP and placed in a special education program. *Id.* at 131. The student and her mother sued under the IDEA, contending that the student should be placed in a school chosen by them. *Id.* at 132. Because there was no allegation that the student was not receiving services identified in her IEP and there was no allegation that she was not benefitting from her school placement, the court found that school officials had provided a FAPE and thus had met their burden under the statute. *Shaw*, 238 F. Supp. 2d at 140. Here, there is no allegation that Anna would not receive the services identified by her IEP in the McKinley Program. As explained above, DCPS met its burden under the IDEA because placement in the McKinley Program was reasonably calculated to provide an educational benefit to Anna.

The Schoenbachs also argue that the IDEA requires that disabled students be placed in the least restrictive environment. "Mainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with nonhandicapped children is not only a laudable goal but is also a requirement of the Act." *Devries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989). However, mainstreaming is not proper for every disabled child. *Id.* The key consideration is whether a proposed placement is appropriate under the IDEA. *Id.* (citing *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983)).

Parents are not "entitled to reimbursement for private school just because the private placement is less restrictive than the public school placement." *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 522 (6th Cir. 2003). The placement must provide an appropriate educational benefit. *Id.* (citing *Milford Sch. Dist. v. William F.*, No. 97-1506, 1997 WL 696108, at *6 (1st Cir. Nov. 10, 1997)). In *Berger*, the parents of a disabled child sought reimbursement of private school tuition. Despite having an IEP that indicated their son should receive certain special education services, the parents placed their son in a private school that did not provide special education services. The private school was "quieter" with "smaller classes and a better, more attentive teacher." *Id.* at 522. The court held that the parents were not entitled to reimbursement because the private school did not provide the services required under the IEP. *Id.* at 523. Without such services, the private school placement was not "consistent with the purposes of the IDEA." *Id.*

Like the parents in *Berger*, the Schoenbachs have placed their daughter in a private school that does not provide special education services because they believed that a smaller school setting was better for their child. Further, the Schoenbachs believed that, contrary to her IEP, Anna was ready to be mainstreamed full-time.[8] The Schoenbachs are not entitled to reimbursement for the cost of tuition at Nora because Nora does not provide the special education services required

---

[8] The McKinley Program does not necessarily provide a restrictive environment; the Program permits mainstreaming according to each child's ability. Ms. Williams and Lawrencia Cole-Brown, the special education coordinator at McKinley, both testified that the Program would be tailored to each child's individual needs. Tr. 218, 275 (students in McKinley's Asperger's Program could be included in the regular classrooms as they are "able and ready to go"). In the McKinley Program, students can attend class in the self-contained resource classroom full-time, or they can be fully included in regular classes, with the support of the special education resource teacher and assistants, or they can have a combination schedule. Tr. 218, 243, 274.

-14-

under Anna's IEP and without such services such private placement is not consistent with the
purposes of the IDEA. *Id.* Accordingly, the Court will deny the Schoenbachs' motion for summary
judgment and will grant DCPS's motion for summary judgment.

## IV. CONCLUSION

For the reasons explained above, the Schoenbachs' motion for summary judgment
[Dkt. #10] will be denied, and DCPS's motion for summary judgment [Dkt. #9] will be granted. A
memorializing order accompanies this Memorandum Opinion.

Date: June 12, 2006                      /s/
                               ROSEMARY M. COLLYER
                               United States District Judge

-15-

317

```
TRANSMISSION VERIFICATION REPORT
```

```
                                    TIME  : 01/22/2007 12:55
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROE6J471573
```

```
DATE,TIME            01/22  12:55
FAX NO./NAME         93016573843
DURATION             00:00:18
PAGE(S)              01
RESULT               OK
MODE                 STANDARD
                     ECM
```

# District of Columbia Public Schools
## State Enforcement & Investigation Division
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



*REVISED COPY*

### HEARING NOTICE

MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:    Parent (or Representative): _M. EIG_    Fax No.: _(301) 657-3843_

     LEA Legal Counsel: _S. GUPTA_

RE:    �ââ  O�â�- _____ and (LEA)  DOB: _____
      Student's Name

FROM:    **SHARON NEWSOME**
     Special Education Student Hearing Office Coordinator

DATE SENT: _1/16/07_

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_____. Please be advised that the hearing has been scheduled for:    _Con't F_    318

DATE: _2/12/07_                                   _1/16/07_

TIME: _9:00, 11:00, 1:00 & 3:00_

# District of Columbia Public Schools

## State Enforcement and Investigation Division
**Terry Michael Banks, Due Process Hearing Officer**
825 North Capitol Street, N.E.; Room 8076
Washington, D.C. 20002
(571) 437-7381
Facsimile: (202) 442-5556

### Confidential

| | | |
|---|---|---|
| O███ O█████, STUDENT | ) | Hearing Dates: November 16, 2006 |
| | ) | January 16, 2007 |
| Date of Birth: ████████, 1993 | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Complaint Filed: September 14, 2006 |
| THE DISTRICT OF COLUMBIA | ) | |
| PUBLIC SCHOOLS | ) | |
| | ) | |
| and | ) | |
| | ) | Held at: 825 North Capitol Street, N.E. |
| Respondent. | ) | 8th Floor |
| | ) | Washington, D.C. 20002 |
| Student Attending: | ) | |
| Kingsbury Day School | ) | Interim Orders: November 17, 2006 |

## CORRECTED SECOND INTERIM ORDER

**Parents:**          Ms. Claudia Pabo, Mother
                      3512 Rodman Street, N.W.
                      Washington, D.C. 20008

**Counsel for Petitioner:**     Michael J. Eig, Esquire
                                5454 Wisconsin Avenue; Suite 760
                                Chevy Chase, Maryland 20815-6938
                                (301) 657-1740; Fax: (301) 657-3843

**Counsel for DCPS:**     Saurabh Gupta, Esquire
                          Office of the General Counsel, DCPS
                          825 North Capitol Street, N.E.; 9th Floor
                          Washington, D.C. 20002

319

**Jurisdiction**

This proceeding was invoked in accordance with the rights established under the Individuals With Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. Sections 1400 et seq., Title 34 of the Code of Federal Regulations, Part 300; Title V of the District of Columbia ("District" or "D.C.") Municipal Regulations ("DCMR"), re-promulgated on February 19, 2003; and Title 38 of the D.C. Code, Subtitle VII, Chapter 25.

**Introduction**

Petitioner is a thirteen year-old student attending Kingsbury Day School ("Kingsbury"). On September 14, 2006, Petitioner filed a Due Process Complaint Notice ("*Complaint*") alleging that the District of Columbia Public Schools ("DCPS") had failed to provide an appropriate placement. On November 7, 2006, DCPS filed *DCPS Motion to Dismiss*, arguing that it had been unable to secure Petitioner's educational records from Kingsbury and, therefore, was unable to prepare adequately for trial. On November 8, 2006, Petitioner filed *Parent's Motion for Pre-Hearing Summary Decision and Opposition to DCPS Motion to Dismiss*. Petitioner's counsel indicated that his Five-Day Disclosure Notice mooted DCPS' concern about Petitioner's records. In his motion for summary decision, Petitioner's counsel argued that DCPS' failure to convene an appropriate team at the Resolution Session meeting entitled Petitioner to a judgment against DCPS. On November 13, 2006, DCPS filed *DCPS' Opposition to Parent's Motion for Summary Decision & DCPS Cross-Motion for Summary Decision*. DCPS argued that Petitioner had "failed to show any facts, remote or direct, which prove Prospect LC is inappropriate. Furthermore, DCPS disputes Parent's assertion the resolution meeting was invalid because the Local Education Agency (LEA) representative lacked the authority to make a decision." Later on November 13th, Petitioner filed *Parent's Opposition to DCPS Motion to Summary Decision*, in which Petitioner's counsel reiterated his position that DCPS' failure to convene an appropriate team at the Resolution Session meeting should be dispositive.

The hearing was continued from November 16, 2006 to January 16, 2007 for the reasons set forth in the Interim Order. On January 16, 2007, the hearing could not be completed due to the length of Petitioner's direct case.

320

**ORDER**

This 19th day of January 2007, it is hereby

**ORDERED,** that the proceeding is continued until February 12, 2007, 9:00 a.m. –
5:00 p.m.

_____
Terry Michael Banks
Hearing Officer

Date:   January 19, 2007

Issued:   _____

Copies to:

Michael J. Eig, Esquire
Haylie Iseman, Esquire
5454 Wisconsin Avenue; Suite 760
Chevy Chase, Maryland 20815-6938
(301) 657-1740; Fax: (301) 657-3843

Saurabh Gupta, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.
9th Floor
Washington, D.C. 20002

321

**ATTENDANCE SHEET**

STUDENT'S NAME: O███, O███

SCHOOL OF ATTENDANCE: Kingsbury Day School

D.O.B.: ███████, 1993

HEARING DATE: 1/16/07    ROOM: 8151    TIME: 9:33 (A.M.)/P.M.

| PARTICIPANT NAME: | ON BEHALF OF DCPS OR STUDENT: | TITLE: |
|---|---|---|
| Michael J. Eig | Student | Counsel for Student |
| Laura Solomon, Ed.D. | Student | special ed. consultant |
| Claudia Pabo | student | mother |
| Jermaine Perkins | DCPS | School Psychologist |
| Denise White-Jennings | DCPS | Clinical Psychologist |
| Saurabh Gupta | DCPS | Atty |
| Cindy F. Brown, LICSW | DCPS | Clinical Social Worker/Case Manager |
| Marlene Gustafson | Student | Director, KDS |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____
Impartial Hearing Officer

Revised 10/17/2006                                322

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

| | | | | |
|---|---|---|---|---|
| Michael J. Eig | MD, DC | | Paula A. Rosenstock | VA, DC |
| Haylie M. Iseman | MD, DC, NY | | Patricia Cyr | CA, DC |

January 9, 2007

Saurabh Gupta, Esq.
Attorney Advisor
District of Columbia Public Schools
Office of the General Counsel
825 North Capitol Street, NE
Washington D.C. 20002

Re: O█████ O███████
*via facsimile and first class mail*

Dear Mr. Gupta:

For the upcoming due process hearing scheduled for January 16, 2007, at 9:00 A.M., regarding the above-referenced student, we will be relying upon the previously disclosed documents and witnesses of November 7, 2006, copies of which are already in the school systems possession.

Please be advised that we may also rely on any documents and witnesses disclosed by DCPS, as well as any other documents and witnesses to which DCPS does not object. We will object to any documents or testimony from witnesses not disclosed in a timely manner in accordance to the IDEA and federal regulations.

Sincerely,

Michael J. Eig

cc:   Claudia Pabo
      Student Hearing Office

323

## MICHAEL J. EIG AND ASSOCIATES, P.C.
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig      MD, DC
Haylie M. Iseman    MD, DC, NY

Paula A. Rosenstock    VA, DC
Patricia Cyr          CA, DC

# FAX

| | |
|---|---|
| **To:** | Saurabh Gupta, Esq. <br> **DCPS Attorney Advisor** |
| **Fax Number:** | (202) 442- 5097/98 |
| **From:** | Michael J. Eig, Esq. |
| **Date:** | January 9, 2007 |
| **Time:** | 10:09 am |
| **Total Pages:** <br> (including cover) | 2 |
| **Re:** | O██ O█████ |
| **cc:** | Student Hearing Office <br> (202) 442-5556 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

324

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 12/04/2006 13:35
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROE6J471573
```

```
        DATE,TIME          12/04  13:34
        FAX NO./NAME       93016573843
        DURATION           00:00:18
        PAGE(S)            01
        RESULT             OK
        MODE               STANDARD
                           ECM
```

# District of Columbia Public Schools
## State Enforcement & Investigation Division
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



X REVISED COPY

### HEARING NOTICE

| MEMORANDUM VIA: [ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:  Parent (or Representative): _M. EIG_          Fax No.: _(301) 657 - 3843_

LEA Legal Counsel: _S. GUPTA_

RE:  _O_____, O_____  and (LEA)  DOB: _____
        Student's Name

FROM:  **SHARON NEWSOME**
        Special Education Student Hearing Office Coordinator

DATE SENT: _12/4/06_

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_____. Please be advised that the hearing has been scheduled for:

DATE: _1/16/07_                         Con't f          325

TIME: _9:00, 11:00, 1:00 & 3:00_        11/16/06

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## STUDENT HEARING OFFICE

IN THE MATTER OF

O▮▮▮ O▮▮▮▮▮

HEARING DATE:  JANUARY 16, 2007

TRANSCRIBED BY
LEGAL PERSONNEL, INC.   (301) 277-5711

<u>APPEARANCES</u>

HEARING OFFICER:  Terry Banks

ATTORNEY ADVISOR FOR D.C. PUBLIC SCHOOLS:  Serum Gupta

ATTORNEY FOR PARENT:  Michael Eig

PARENT:  Claudia Pavo

WITNESSES:       Denise White Jennings, Clinical
                 Psychologist, DCPS
                 Jermaine Perkins, School Psychologist, DCPS
                 Laura Solomon, Ph..D., Consultant to the
                 Family
                 Marlene Gustesen, Director of Kingsbury Day
                 School

327

1                          PROCEEDINGS

2        HEARING OFFICER:  Today is January 16th, 2007 this is

3    an administrative hearing for O███ O██████, who was born

4    ███████████, 1993.  This hearing is being conducted in

5    accordance with the guidelines and rights established by

6    the Individuals with Disabilities Education Improvement Act

7    of 2004, the Rules of the Board of Education for the

8    District of Columbia and D.C Code Title 38.  My name is

9    Terry Banks.  As an independent Hearing Officer, I am not

10   an employee of the D.C. Public Schools.  I'm not related

11   to, but I am acquainted with the parent in this case.  I

12   believe we worked together about twenty-five (25) years

13   ago.

14       MS. PAVO (phonetic):  Yes.  I don't remember handling

15   anything that you actually worked on, but - I'm sorry.

16       HEARING OFFICER:  That's all right.

17       MR. GUPTA:  I think Mr. Banks you brought that up a

18   few months ago, if you remember.

19       HEARING OFFICER:  Right and I believe at that time,

20   the parties had no problem.  This hearing is closed to the

21   public.  The matters discussed here today are confidential

22   and must be treated as such even after the hearing is

23   completed.  The hearing is being recorded and either party

24   may request a copy of the disk or a written transcript of

1

328

1    The proceedings by writing to the Student Hearing Office.

2    At this time, I would like everyone to identify themselves

3    for the record.

4        MR. GUPTA:  Good morning, Serum Gupta, Attorney

5    Advisor for D.C. Public Schools.

6        MS. JENNINGS:  Good morning, Denise White Jennings,

7    Clinical Psychologist for D.C. Public Schools.

8        MR. PERKINS:  Good Morning, Jermaine Perkins, School

9    Psychologist, DCPS.

10       MS. PAVO (phonetic):  Claudia Pavo, O███ mother.

11       MS.SOLOMON:  Laura Solomon, Consultant to the family,

12   good morning.

13       MR. EIG:  And I am Michael Eig, Counselor for Oleg's

14   mother.

15       MR. GUPTA:  Excuse me, counselor.  We have one other

16   witness who will be joining us a bit later, a Marlene

17   Gustesen (phonetic) (inaudible).

18       HEARING OFFICER: Okay, Mr. Eig, do you waive reading

19   of the hearing rights?

20       MR. EIG:  Yes sir, we waive the formal reading of the

21   rights we are aware of.

22       HEARING OFFICER:  Both parties have submitted five day

23   disclosure statements.  Does either party object to the

24   introduction of the other parties' statement into evidence?

1        MR. EIG:  We have no objection at this time.

2        MR. GUPTA:  I have a request for clarification on our

3   disclosures 007 and 008.  They are the same documents.  So,

4   I wanted to make sure that there was a mark - actually that

5   was just an error on their part.

6        MR. EIG:  I believe - no they're not.  They're

7   different documents. One is from August 16th and one is from

8   August 19th.

9        MR. GUPTA: No.  Both of ours are from July 11th.

10       MR. EIG:  I'm sorry.  Whose documents?  Our disclosure

11  documents?  Seven and eight?  There is a Dr. Solomon.

12  August 16th.  Eighth is an August 9th Dr. Solomon.

13       MR. GUPTA:  We have both forms -

14       MR. EIG:  Can I see - I'm sorry.

15       MR. GUPTA:  On both forms, it says, "date of

16  evaluation."

17       MR. EIG:  They are different documents as you can see.

18  They are different forms.

19       HEARING OFFICER:  Okay.  Let me see your 8, Mr. Gupta?

20  My 8 doesn't have a heading.

21       MR. EIG:  Yeah, and Dr. Solomon will explain it, but

22  there similar - there was some extra testing.  If you read

23  through it, I think you'll see.  So basically you'll be

3

330

1  seeing them sort of together.  But they are different

2  documents.

3      MR. GUPTA:  And then our second objection is to Dr.

4  Solomon and Marlene Gustafson's.  As it is, actually we

5  don't have resumes or CV for either of those witnesses.

6      MR. EIG:  That -- to begin with that has nothing to do

7  with disclosure.  It would only become an issue if they

8  were offered.  They will be offered and there is no rule in

9  this regard.  We have at Hearing Officer's suggestion begun

10  to submit resumes just as a courtesy.  This case goes back

11  so far, which is the reason why we never caught up with

12  them.  Both of these experts, special education experts are

13  well known for I'd say 25 years in the District of Columbia

14  public school system. They've accepted them as experts in

15  many matters. I'm not saying that Mr. Gupta is -- I'm not

16  saying that at all.  This is my first hearing with Mr.

17  Gupta, and we'll ask that they be qualified based upon

18  their testimony, and that's it.  That's all set.

19      HEARING OFFICER:  Well, we'll deal with them when

20  they're offered.  But that's not a disclosure, right?

21      MR. EIG:  Correct.  If it was a disclosure, I think

22  Mr. Gupta would have brought it up is the point.

1      HEARING OFFICER:  Okay.  So, what you're objecting to

2    is his proposal to call Laura Solomon and Marlene

3    Gustafson, as experts is that right?

4      MR. EIG:  Correct, sir.

5      HEARING OFFICER:  Okay.

6      MR. EIG:  They are designated on the disclosure.

7      HEARING OFFICER:  Right.  Mr. Eig, I'm not sure why

8    you didn't submit Ms. Solomon's.

9      MR. EIG:  Because we started a few months ago at –

10   well, we should have caught up.  I'm not saying that we

11   shouldn't have. All I'm saying is that as you are well

12   aware there is no rule that requires this.  And one would

13   think that experts that have been acknowledged by the

14   District of Columbia would –

15     HEARING OFFICER:  I don't know that.  That's not

16   evidence.

17     MR. EIG:  Yeah, but I know that --

18     HEARING OFFICER:  Well you know that but I don't.

19   I'm the hearing officer.  And you know what I expect.

20     MR. EIG:  Yes, sir.

21     HEARING OFFICER:  So to tell me that somebody did

22   something 10 years ago doesn't carry much weight.

23     MR. EIG:  No, but I can tell you that they did it

24   within the last year but once again, you don't know that.

5

1          HEARING OFFICER:  Independent Hearing Officer.  That's

2          what the statute says.

3          MR. EIG:  Once again, we'll deal with it when we

4     reintroduce them.

5          HEARING OFFICER:  Okay, Mr. -

6          MR. EIG:  I'm sorry.  I apologize.  Mr. Banks, if

7     indeed you are the hearing officer you may - so let's be a

8     little efficient.  If indeed you are going to have a - for

9     a rule out, rule in, rule that, if there is not a resume

10    they cannot testify as experts.  I would like to know that

11    now because I'll will make some sort of motion.  At least

12    I'll put that on the record.  I mean if it's actually like

13    that, absolutely like that.

14         HEARING OFFICER:  Is Dr. Solomon's - let me put it

15    this way.  Is Dr. Solomon - did Dr. Solomon evaluate this

16    child?

17         MR. EIG:  Yes, sir.

18         HEARING OFFICER:  Okay.  Is her evaluation in the

19    record?

20         MR. EIG:  Yes, sir.

21         HEARING OFFICER:  Okay.  In that case, I'm likely to

22    allow her to testify.  Okay?  Would you like to open?

23         MR. EIG:  Yes and before opening, I would note that in

24    this matter, Mr. Banks, if you'll recollect there was a

1   motion for summary decision and there were cross motions.

2   Three pre-hearing motions which you ruled upon. And of

3   course, we're here.

4       We brought a second motion for summary decision which

5   has been responded to, opposed, and a reply was filed, and

6   we haven't had a ruling on that. Can I first confirm that

7   you had those motions?

8       HEARING OFFICER: I did not get those.

9       MR. EIG: Worse than our screwing' up, I'm sorry,

10  worse than our screwing up, sometimes it - what we should

11  do getting these CDs in, once again, is the fact that we

12  can file this many papers and of course Mr. Gupta can be

13  filing papers, too, and the Student Hearing Office doesn't

14  think it's (inaudible), which apparently is what has

15  happened. I'm not talking abut having filed them a couple

16  days ago. You know, a couple weeks ago are the last

17  pleading. Yet, well we want them considered, because we -

18  obviously, it's dispositive and we believe we have grounds.

19  Mr. Gupta has opposed our filing it in the first place and

20  we don't have standing.

21      HEARING OFFICER: Want's the basis of the supplement?

22      MR. EIG: The basis is - it is in the nature of a

23  reconsideration of your motion but it is directing you to

24  different language. It is suggesting that the law does

7

334

1    support using the failure to hold a correct resolution

2    session.  Direct you to specific language, some of which in

3    one of your decisions by the way.  So we would like at

4    least some opportunity to say a few words about it, and I'm

5    not exactly sure - I have copies of everything.  I'm not

6    exactly sure why we are filing these things, if the Student

7    Hearing Office doesn't want to get -

8         HEARING OFFICER:  Well, I get most of them. I mean I

9    responded to the last one.  I didn't get this one.

10        MR. EIG:  What is - is my motion -

11        HEARING OFFICER:  Is this one filed November 8th or

12   subsequent to November 8th?

13        MR. EIG:  It's - No, November 8th is subsequent.  No,

14   that's the first one.  That's the first one.  It's filed

15   December 27th.  It's opposed by Mr. Gupta.  He can probably

16   give you that date faster than I'm going to get it.

17        MR. GUPTA:  I believe January 2nd.

18        MR. EIG:  Thank you very much and we responded the

19   next day.

20        MR. GUPTA:  No, I'm sorry.  That's their opposition.

21        MR. EIG:  So he responded very quickly, which I

22   appreciate.

23        MR. GUPTA:  December 29th is when I responded.

8

335

1      MR. EIG:  And the last thing was January 2nd.  And

2  this being January 16th, it was two weeks ago the last piece

3  of paper.

4      HEARING OFFICER:  I'm pleased to say that it's not

5  even in my file.

6      MR. EIG:  Yeah, I'm pleased to say on behalf of all of

7  us, would you please say it on your own behalf.

8      HEARING OFFICER:  I just did.  Well, I'm just saying

9  it's not in the file, so it confirms that I never got it.

10      MR. EIG:  My motion was a little over three pages long

11  and I have a copy right here so you can certainly look at

12  that.  Mr. Gupta responded a little more lengthy and then

13  we filed a very brief reply.  We would ask that we take a

14  minute for you to review those papers.  I think that we

15  have that right.  Even if you're then willing to say let's

16  go on, because we wanted to address it orally.

17      HEARING OFFICER:  If you've got the documents, I'll

18  look at them.

19      MR. EIG:  Do you have a copy of yours, Mr. Gupta?

20      HEARING OFFICER:  Okay.  Mr. Eig, Would you like to be

21  heard on the motion?

22      MR. EIG:  Yes.  And I will do it briefly since you've

23  had your additional motions and the subsequent motions.  I

24  want to explain why we think this is important and why

9

336

1  because it is important, it does support at least the

2  school system violations significant enough to have you

3  consider parental relief.

4      As you are well aware the resolution session set forth

5  in the IDA from 2004, 14, 15, F1B.  And the only language

6  from those paragraphs that I'll point out to is that it is,

7  of course, mandatory language.  The local education issue

8  shall be in the meeting and they shall have the relevant

9  member or members of the IEP team who have specific

10  knowledge of the facts as identified in the Complaint and

11  they shall have a representative of the agency who decision

12  making authority on behalf of such agency.

13      Now that language has been deemed in the Massey case,

14  which is the principal case in the District of Columbia we

15  certainly rely upon and that's Judge Lambert's decision

16  that we've quoted a number times.  It's from November of

17  05.  So, it's getting on to - it's over a year old now.

18  And in Massey there was more than just not holding a

19  resolution session.  There were other procedures.  There

20  was no written notice.  There was no written reply of

21  notice.  In response to the school system's argument at 400

22  Fed.Supp. 2nd 66, p.73.  That - well, I'll just read Judge

23  Lambert's language.

10

337

1    "DCPS also implied at the October 18th hearing that any

2    failure to conform to the statute was a mere technical

3    oversight.  It is technical compliance with the law,

4    however, that gives parents faith that their concerns will

5    be addressed in accordance with Congress' intent.  Many of

6    the procedural safeguards in the IDA are extremely

7    technical; spelling out particular deadlines and required

8    content.  This kind of detail embodies the purpose of a

9    statute prescribing administrative, i.e., procedural

10   remedies."  Citing Blackman and then also citing the

11   (inaudible).  "Does DCPS mean to imply that it is permitted

12   to violate the IDEA as long as the ways in which it does so

13   are minor?  This Court has not been directed to any

14   evidence that Congress intended an exemption for 'close

15   enough'."  That's the (inaudible) that the District of

16   Columbia United States District Court.  More recently and

17   this is the case I was telling you, that I'm not sure that

18   we have in there is that Western District of Michigan

19   United States District Court of Opinion which is -- should

20   be cited Mr. and Mrs. S on behalf of BS v. Rochester

21   Community Schools. Rochester, of course, is where the Mayo

22   Clinic is.

23       October 2nd, 2006.  And I can provide you with a copy

24   of that.  This goes through a history of dispute resolution

11

338

1    session and also finding for the parents.  And just quoting

2    a bit of this:  "The Committee" – I'm sorry; this is the

3    history of the Senate Committee speaking about the dispute

4    resolution session.  "The Committee believes that the

5    parties should have a forum to resolve matters in a more

6    formal way before moving to a more adversarial process.

7    The Bill adds a new provision to provide this forum."  It

8    then speaks to the purpose and says, "The Bill creates a

9    new concept and resolution session that is intended to

10   improve the communication between parents and school

11   officials and to help foster greater efforts to resolve

12   disputes in a timely manner so that the child's interest

13   are best served.  At that meeting the parents and school

14   officials should work together to determine the nature of

15   the Complaint and to work collaboratively to attempt to

16   resolve the Complaint."

17         And somewhere else it mentions that this isn't just

18   supposed to be another IEP meeting where the parent – I'm

19   sorry.  It's the next page.  The purpose of it is not to

20   make parents go to another IEP meeting to explain an issue

21   that has already reached an impasse with the District. When

22   you denied our motion that we filed the first time, Mr.

23   Banks, you correctly noted that D.C. said well we weren't

12

339

1    not going to resolve - yeah - we weren't going to agree to

2    the placement anyway.

3        In holding a dispute resolution session in which they

4    did not have any IEP members there, did not have anybody

5    that had any knowledge of the child and did not have

6    anybody with decision making authority and they

7    acknowledged that, right?  I mean, because they do that

8    with a number of dispute resolution sessions now.  They

9    have one person who is an essential place person so he's

10   not an -- doesn't have anybody else there, and they say, I

11   only have the authority I'm walking in here with which is

12   to say, then write down your complaints and that's it.

13   Well, if that's good enough, and we run into this time and

14   time again now.  If that's good enough, there's no reason

15   for a dispute resolution session.  Just do like they did in

16   Massey and don't even have to.  Because the purpose is to

17   try to resolve things that you don't know if you're going

18   to be - oh, I'm sorry, I turned it on, I forgot to turn it

19   back off.  That's all.  The purpose of the dispute

20   resolution session is to give the school system the

21   decision maker the information from the IEP team members

22   and from the parents and whomever the parents bring in, to

23   see if they can resolve it and sometimes they can resolve

24   things by what we lawyers would call a settlement.  Maybe

13

340

1    partial support.  You know, who knows?  There's nothing

2    illegal about that.  A lot of cases settle that way or a

3    placement without statehood.  You know, there are all kinds

4    of possible ways, and that's what it is supposed to be.

5    What they do in this case, and this isn't the only case

6    they've done it, is the problem, is they have one person

7    and that person doesn't have authority, that person doesn't

8    have knowledge, and all that person does is write down that

9    we can't resolve it.  That makes a mockery of this new very

10   important section and if this is okay, then I don't know

11   what's not okay.  The final point I want to make is that

12   you also noted in the mix, since first hearing, but I would

13   ask you to reconsider, that in cases subsequent – in

14   previous cases you found a failure to hold – to have a

15   properly constituted IEP team, could lead.  Did in fact

16   lead…and it was rather an absolute decision to a school

17   system, basically a default, a finding against them, when

18   they don't have a regular education teacher.  And that

19   makes sense, because most IEPs are going to have some

20   mainstreaming and if you are not the regular education

21   teacher there, how do you know that you can really

22   mainstream.  It makes sense.  Well, if the resolution

23   session now isn't more important than IEP, we would ask at

24   least that you reconsider, of equal reports.  It is their

14

341

1    last chance to get it right which is exactly what we just

2    read in the legislative history because sometimes IEP teams

3    get it wrong or sometimes there's new information that can

4    be presented which is what they say, too.  You know and

5    you're supposed to have some of those IEP team members

6    there to listen again.  So, it should be at least on equal

7    standing so such a violation, and there really isn't any

8    kind of dispute factually I would respectfully suggest,

9    that they didn't have the people they were supposed to

10   have.  They didn't have a decision maker and all that –

11   should support a finding against the school system.

12       HEARING OFFICER:  Mr. Gupta?

13       MR. GUPKA:  DCS'S response is twofold.  First as part

14   of this Motion, we take it to be as a Summary Judgment

15   which means that no dispute is in fact, or no fact is in

16   dispute.  Then they have a right to their relief.  The fact

17   of the matter is there are many facts in dispute here.  One

18   being that the resolution session actually did occur and

19   was proper.  That is what we assert.  And if in their

20   experience, that those are procedurally invalid, that's a

21   fact that is in dispute.  The second thing about the

22   meeting is that there was nothing to resolve.  As you say

23   in your prior decision, they wanted things very re-proposed

24   (phonetic) Prospect, unless they were going to acquiesce on

15

342