1   Kingsbury or we relented on Prospect, there was going to be

2   nothing resolved at this meeting.  Secondly, in terms of

3   the regulations, Section 305(10)(b) supp. 4-5 specifically

4   state that if the District refuses to participate in a

5   resolution meeting or otherwise fails to uphold a

6   resolution meeting then the relief for the parent is to

7   move on to the due process hearing timeline.  That is the

8   only relief envisioned and allowed under the law, but the

9   full judgment is nowhere envisioned in the law.

10      It specifically states, "That if the Agency fails to

11  have the resolution meeting or fails in any way during the

12  resolution portion of the 75 day time line then the remedy

13  is the parents will begin the 45 day time line.

14      HEARING OFFICER:  Well, let's look.  Say it.

15      MR. GUPTA:  34 CFR, Section 305(10)(b)(4-5).

16      HEARING OFFICER:  Is that it?

17      MR. GUPKA:  That's it, sir.

18      MR. EIG:  On the first point, there are no factual

19  disputes because we have attached to our additional motion

20  and the school system I think has disclosed probably.  The

21  school resolution meeting notes.  We'll stand on those.  Just

22  make sure that there's no factual dispute.  In that, and I'm

23  looking at it now, in that you can see that the only person

24  here in the school system is the essentially placed person

16

343

1  Kimberly Grafton (PHONETIC).  In addition, she writes down at

2  our request that the parent objects to there not being a

3  complete DRS-IEP team at today's meeting.  The parent objects

4  to the writer' lack of authority to state anything, but

5  DCPS's pre-existing position.  The parents question why they

6  were required to come to this DRS.  And then – all D.C. says

7  is when, we're, you know, we're not going accept the school

8  system's offer.  So, there's no factual dispute there.

9  Secondly – as to what happened.  Secondly, Mr. Gupta says

10  there's nothing to resolve. Well, as the Federal Court to

11  say, that's not an excuse for not holding out a legally

12  constituted bureau.  That's the third point I got to, "is

13  that legally constituted?"

14      You don't know that there's nothing to resolve until

15  you get there with the people to listen to.  That's the whole

16  purpose of the meeting the meeting and possibly a resolution

17  could be something in between those two things.  I could

18  certainly say on behalf of my client, that, you know, we

19  would have considered anything that might have been offered.

20  We never got that chance.

21      HEARING OFFICER:  Anything like what?

22 MR. GUPTA:  Fifty cents on the dollar for tuition, or here,

23  sir.  They're supposed to send us, settle cases with us.

24  They're allowed to do that and they've done it many times.  A

1 place without statehood protection, wage statehood

2 protection.  Waiving statehood just to get this year out of

3 the way.  That's another possibility that they settle with

4 all the time.  There are all kinds of possible settlements.

5 Or, here.  We've just identified all these things at that

6 Prospect - the school system's placement can do, and the

7 parent, and I have had a number of parents who do this, we

8 want - I want my kid to finish out this year, but I will, and

9 the kid eventually does, transition into the public school.

10 Anything is possible if you don't go through the required

11 mandatory session, you'll never get there.

12      The third point is that school system counsel has just

13 said there is a regulation that says that you've got to hold

14 a dispute resolution session within a certain amount of time,

15 which the school system did in this case, as you know.  We

16 certainly don't raise that as an issue.  And if you've held

17 it, then of course you're - (inaudible). Well, there is a

18 statute in the regulations that says and here who has to be

19 there. It's the same thing as an IEP.  You have got to hold

20 an IEP meeting once you've determined eligibility within 30

21 days and as you've ruled before, Mr. Banks, there is another

22 regulation that says that here's who has to be at the meeting

23 and the fact is if you don't have these required people and I

1 can imagine some people not being important enough by the

2 way.  It's not an all or nothing.  Then, that's a violation.

3 Well, in this case, they've admitted that they had a

4 resolution session.  They had one person who doesn't know the

5 kid, there were no IEP team members there, and this person

6 had no authority but the rubber stamp that the school system

7 walked in there with.  It violates everything in the

8 regulation and in the statute.  Thank you.

9       HEARING OFFICER:  No more then.  Let me see that case

10 for the record.

11      MR. GUPTA:  Yes sir.

12      HEARING OFFICER:  Okay.  I've read the – Mr. S and Ms.

13 S versus Rochester Community Schools case presented by Mr.

14 Eig.  I think the issue presented in the supplemental motion

15 for summary decision is whether or not DCPS's failure to

16 conduct a regulatorally (phonetic) appropriate resolution

17 session gives rise to a summary decision.  And in order to

18 make that finding, I would have to agree with Mr. Eig's

19 suggestion that the resolution session rises to the same

20 level as an IEP team and I just don't believe that.

21 An IEP team is the central facet of IDEA.  That's where the

22 decisions are made.  If the decisions are not made

23 appropriately, it gives rise to a right to file a complaint

24 as occurred here.  And then the law mandates a resolution

19

1  session to give the parties a chance to try to resolve the

2  dispute.  Now, D.C. did hold the meeting.  I would agree with

3  Mr. Eig that it did not meet the regulatory requirements.

4  But the purpose of that meeting is to try to resolve a

5  dispute as to whether or not the previous IEP Team meeting

6  was appropriately conducted, whether or not the placement

7  derived at that meeting was an appropriate placement.  And I

8  don't think it rises to the same level as the IEP meeting

9  itself.

10       The issue is the appropriateness of the IEP.  The

11  issue is the appropriateness of the placement.  You know, at

12  the point of the resolution session, we're 45 days away from

13  a resolution of the disputed issue, which is the

14  appropriateness of the IEP and the appropriateness of the

15  placement.  So, I think the appropriate thing to do is to

16  move forward with a hearing on the issues in dispute and that

17  is the appropriateness of the IEP and the appropriateness of

18  the placement.

19       MR. EIG:  I'd say that was - and I apologize for

20  getting up while you were doing that.

21       HEARING OFFICER:  That's all right.

22       MR. EIG:  I just ask because we have that time to get

23  Ms. Gustafson's and Dr. Solomon's CDs faxed out because we

24  have them at the office.

1        HEARING OFFICER:   Okay.

2        MR. EIG:   And it's only a page and a half, and I'm

3   going to offer this to Mr. Gupta so that he can –

4        HEARING OFFICER:   We'll take a break before she

5   testifies.

6        MR. EIG:   Okay.   And as for Ms. Gustafson's assurance,

7   I don't know why it's not here, but she's not here yet.

8        HEARING OFFICER:   Whose is that?

9        MR. EIG:   Dr. Solomon.

10       HEARING OFFICER:   Oh, okay.

11       MR. EIG:   And we'll get a copy of the (inaudible).

12( Opening statement, I can do it quite briefly.

13       HEARING OFFICER:   Okay.

14       MR. EIG:   And now, sir.   O███ is a learning disabled

15   student, who is, if you can tell me, remind me how old he is?

16       MS. PAVO:   Thirteen.

17MR. EIG:   Thirteen.   Thank you.   Currently attending the

18   King's Gray Day School.   He has significant functioning

19   problems and classic learning disabled and disabilities.   The

20   school system and the parents are certainly not in

21   disagreement about one thing.   He is a significantly –

22   although he has very good abilities.   Shall we say that for

23   the parent, because the record shows that?   He has

24   significant learning disabilities, educational disabilities,

21

348

1  such that the school system did an IEP largely advised by and

2  supplemented by Dr. Solomon here.  And you know, the first

3  witness, calling for, at least in some parts a full-time

4  special education placement with related services and then

5  with Prospect.  We believe the evidence will indicate that

6  the IEP was inappropriate, not in calling for full-time

7  services. This student definitely needs full-time services.

8  But in a number of other regards, you will see the evidence

9  that deducts Dr. Solomon's opinion that those problems with

10  the IEP, were pointed out during the IEP meeting.  The school

11  system's IEP notes were exemplary to that extent in this

12  case, and so you'll see specifically where the school system

13  got it wrong and Dr. Solomon will tell you of course why

14  educationally, that makes for an inappropriate document.

15 More importantly, the evidence will also indicate that

16  Prospect was an inappropriate placement for O███ for a number

17  of reasons.  This proposed, slightly too late, but more

18  importantly, it was proposed at a time he was at capacity, as

19  the school system acknowledges.  Acknowledged.  I'm sorry.

20  And then upon observation by the two women to my left here,

21  and they coming back and sharing what they saw, there were

22  significant problems also with curriculum and support

23  services.  They could not adequately implement an IEP that

24  would meet O████ needs.  You will hear to the contrary that

1  in the full-time placement at Kingsbury, as appropriately

2  paid for by his parents, that we're seeking recovery for,

3  that his needs are being met in a class in which the size and

4  the constituency is appropriate and the services were

5  intervened.  At conclusion of all evidence and not waiving

6  our procedural arguments about the resolution session, we

7  will ask you to find that the school system has failed to

8  provide an appropriate IEP and placement for O███ and that he

9  is benefiting from Kingsbury where he is funded for the '06-

10  '07 school year.  Thank you.

11      HEARING OFFICER:  Mr. Gupta.

12      MR. GUPTA:  The controlling regulation here is 301 for

13  age, in which it says in general, the law is –

14      HEARING OFFICER:  I'm sorry.  Three-hundred what?

15      MR. GUPTA:  1.148.  Wherein in general the LEA does

16  not have to pay for private placement if the LEA made space

17  available, and then the parents elected to place the child in

18  an appropriate school.  Under IDA 2004, the parents have the

19  right to participate in developing the student's educational

20  program.  And the school district has the exclusive right to

21  decide on the location of where the program will be

22  implemented.

23      HEARING OFFICE:  Where does that come from?

24      MR. GUPTA:  I'll have to give you a (inaudible).

23

1       HEARING OFFICER:  Please do.  I'm not familiar with

2    that language. Other than the Circuit case in light.  Go

3    ahead.

4       MR. GUPTA:  Here, we agree, sir, that, that this

5    hearing is not about the program.  Both sides agree the

6    student is MD with OHI and LD classification, that he needs

7    full-time placement.

8       HEARING OFFICER:  I thought you said LD.

9       MR. EIG:  He did. I think MD, multiplely disabled, I

10   believe, and then he specified.  I don't think we have a

11   disagreement there.

12      HEARING OFFICER:  So he is MD, LD, and OHI?

13      MR. EIG:  Correct.

14      MR. GUPTA:  Yes.  We stipulate that he certainly is –

15   would qualify as learning disabled and other (inaudible).

16      HEARING OFFICER:  Good enough.

17      MR. GUPTA:  All right.  Full-time placement requires

18   related services, some of which are but not limited to are

19   site services and OT services.  There were -- as petitioner

20   mentioned in their opening – there were disputes in the

21   involvement of the IEP program but none of those disputes

22   were major disputes.  A lot of those actually were minor

23   disputes and didn't impact the overall educational program.

24   DCPS has decided on – the parents and DCPS agree on the

24

351

1    educational program.  DCPS decided to place the student at

2    Prospect because they felt Prospect could and should

3    implement this program.  As I said before, IDA allows DCPS

4    the authority to select a location because there was an

5    additional agency and the LEA would know most about where

6    the LEA resources were located.  (inaudible) educational

7    programs.  Here, the –

8        HEARING OFFICER:  Say that sentence again.

9        MR. GUPTA:  My very last sentence?

10       HEARING OFFICER:  Uh-hum.

11       MR. GUPTA:  I said, the agency and the LEA have the

12   authority to make the location of the placement because the

13   LEA knows where their resources are located in order to

14   implement educational programs.

15       HEARING OFFICER:  Okay.  See that's where I have the

16   problem.  My understanding of the requirements of a

17   placement meeting are that the MDT makes a determination,

18   both as to setting and as to the location where the child's

19   needs can be met.  And you seem to disassociate the

20   location from the placement.  And that's where I have a

21   problem.

22       MR. GUPTA:  I can supply you with a post hearing

23   brief, sir, but in the new regulations, time and time

24   again, Congressional notes on those – on the D section

25

352

1   state they make a clear delineation between location and

2   program.   Time and time again they do that.   Location and

3   program are meant to be two distinct ideas, where the first

4   segment, redundancy, and IDA.   But there are two distinct

5   things in it and the review regulations with the

6   Congressional notes on it, they stated over and over again

7   that they, in certain sections, they're not, they

8   explicitly state that location and program are two

9   different things.

10       HEARING OFFICER:   Okay.   Today is the 16th.   I'll give

11   you to close of business on Friday to provide post hearing

12   briefs on that.

13       MR. EIG:   Since the school system is bringing up an

14   issue that wasn't in any answer or ever communicated to us,

15   could we have –

16       HEARING OFFICER:   This is very easy.   Either it's in

17   the notes or it's not.   I've got to issue a decision in a

18   timely fashion.

19       MR. EIG:   I just don't want to – I want an opportunity

20   to have a few days to at least respond to whatever he

21   points out.   The regulations as you are very well aware are

22   enormous now.   And that is that, I think I know what he's

23   referring to, and I know what is wrong about that, if I'm

24   right, but I need to have from him citations for me to

1  respond to.  I just can't go through hundreds of pages of

2  regulations to guess what he is going to rely upon.  So I

3  would ask until like Wednesday.

4      HEARING OFFICER:  Well I'll give –

5      MR. EIG:  That's all I'm saying.  I just need some

6  time to look at what he says.

7      HEARING OFFICER:  I give DCPS until close of business,

8  what's today?  Today is Tuesday the 16th.  This is a

9  reimbursement case, so it's not that critical.  So I'll

10  give you to close of business Friday, I'll give you to

11  close of business next Wednesday to respond.

12      MR. EIG:  Thank you.  And that might apply to anything

13  else that comes up that may fold into this one.

14      HEARING OFFICER:  Well, unless it gets to be too

15  burdensome in which case I'll extend the time for him.  I

16  presume what he's going give me is pretty easy to find

17  since this is – it's readily apparent in the record.  I

18  would note that no one from OGC has ever made this

19  suggestion to me before in the three years since the

20  statute's been on the books.  Okay, the record is left open

21  till the close of business, Friday, for DCPS to provide

22  points and authority on the issue of the distinction

23  between setting and location, and LEA's unilateral

24  authority as to the latter.

1        MR. EIG:  Setting?  I'm sorry.

2        HEARING OFFICER:  Setting and location.

3        MR. EIG:  I just have a - by setting do you mean what

4   the program IEP calls for.

5        HEARING OFFICER:  Right.

6        MR. EIG:  Thank you.

7        HEARING OFFICER:  D.C.'s position is that the parent

8   has the authority to participate in the determination of

9   the setting.  But the location where that setting is to

10   take place is under their unilateral authority.

11        MR. EIG:  Would that be the same - because just trying

12   to get language here - as to participate in the, and ask

13   Mr. Gupta this, the parent participates in the definition

14   of the program about the placement?

15        HEARING OFFICER: Well he says the placement is the

16   same.

17        MR. GUPTA:  Just to be clear, here.  When we say

18   program we mean the ID, whether it gets LD, MD, mentally

19   retarded or whatnot, you know.  Twenty hours a week, 10

20   hours a week.

21        MR. EIG:  That's program.

22        MR. GUPTA:  Just to be, what I'm saying, just define

23   it.  Program is the ID, the type classification.  But

24   placement is the physical location where that ID is.

28

1      HEARING OFFICER:  Well see now that undercuts your

2  argument.

3      MR. EIG:  Yeah, sure it does.

4      HEARING OFFICER:  Because the statute says the parent

5  has to participate in the placement determination.  And the

6  only way you can be - pardon?

7      MR. EIG:  Placement within -

8      HEARING OFFICER:  Either placement means location or

9  it doesn't.  And what you need to show me is that under the

10  new statute that there is a distinction between setting and

11  location.  My reading of the statute is that a parent has

12  the opportunity to prove - and my consistent holdings have

13  been - that the parent has the right under IDEA to

14  participate in the determination of placement and placement

15  includes not only the setting but where that setting will

16  be located.  So that if a child, for instance, just

17  hypothetically, has an IEP that calls for full-time

18  therapeutic placement and D.C. proposes a location where it

19  proposes to implement that IEP, and that location in the

20  parent's view, cannot implement the IEP, but the parent has

21  a right to participate in the discussion as to whether or

22  not that location is an appropriate location for the

23  implementation of the IEP.

1  I believe DCPS's position here and in other cases to be that

2  once the full-time therapeutics placement has been

3  determined, that the parent's rights expire.

4       MR. GUPTA:   That is correct.   And also, I mean, I

5  didn't get a chance to finish my opening which further of

6  what I was going to say is, that here there is no question in

7  that because the parent did participate and that's where the

8  disagreement arose.   The parent was at the August 30th

9  meeting where DCPS first thought about introducing Prospect

10 at the meeting and at that meeting stated they wanted

11 Kingsbury.

12       HEARING OFFICER: Well, the distinction is they are not

13 alleging lack of participation.   What you're saying is that

14 they don't have the right to challenge the location.   That I

15 believe is your argument.   They are not saying they didn't

16 have a right to participate.

17       MR. GUPTA:   If the location – they have the right if

18 the location can't implement that IED.   For example, if the

19 student is a full-time special ed student, we send him to a

20 general education center.   Of course they have that right.

21 But here they're attacking -- they just disagree with

22 Prospect.   Or from what we heard for the first time today in

23 the opening was that because they thought the schools lacked

24 capacity.

1        HEARING OFFICER:  Wait a minute.  If the location you

2  choose to implement the program is abundantly inappropriate,

3  you're saying the parents have a right to challenge it?

4        MR. GUPTA:  I think, once the student gets there, yes.

5  Because then the student is not receiving faith (phonetic) in

6  that sense, but here there was challenge before the student

7  even got to the place.  So the place, location was

8  appropriate, but they challenged it.

9        HEARING OFFICER:  Okay.  Well -

10        MR. GUPTA:  Before we got there.  And that's why it

11  started off at 30148, because the parents have the right to

12  take the student to private placement if they think faith is

13  not going to be delivered.  But we're saying faith would have

14  been delivered at Prospect.

15        HEARING OFFICER:  Okay.  Go ahead.

16        MR. GUPTA:  To continue then, the parents did

17  participate in the 8-30-2006 as I had just stated where

18  Prospect was proposed and the parent rejected and requested

19  that Kingsbury be provided as the placement and DCPS to fund

20  that private placement.  DCPS disagreed, and thereafter the

21  parent through their counsel wrote letters to DCPS refusing

22  to allow the MDT meeting to go forward which would have

23  issued - which eventually on 9-21 and I issued a prior notice

24  of Prospect learning center.  But prior to that meeting, that

31

358

1  meeting the parent did not attend, and prior to that meeting,

2  petitioner's counsel, or parent's counsel, wrote many letters

3  to dismiss telling us not to go forward with that meeting.

4       HEARING OFFICER:  Okay.  What meeting was on 8-30?

5       MR. GUPTA:  8:30 was the MDT meeting where an OT

6  evaluation was deemed necessary and the MD classification was

7  given, psychological services were given and full-time

8  placement was recommended.

9       HEARING OFFICER:  Okay.  And at that meeting, DCPS

10  proposed Prospect?

11       MR. GUPTA:  DCPS mentioned Prospect but at that time

12  we weren't ready to go forward with the placement portion and

13  we were willing to reschedule it immediately and immediately

14  disagreed with that placement by DCPS and thereafter counsel

15  wrote repeatedly to the Care Center requesting that a

16  placement meeting not go forward because they already

17  disagree with our meeting; additionally, that they were going

18  to file a due process complaint against our placement.  So

19  the due process complaint was actually filed before the prior

20  notice was issued.  The due process complaint was filed on 9-

21  14 and between 8-30 and 9-21, 9-21 was the date the prior

22  notice was given.  The parents refused to show up to our

23  attempted MDT placement meetings.  Eventually 9-21 we did go

24  forward and issued the prior notice.

1    So it is also DCPS's position that the parents had

2 their mind set on their own placement and weren't willing to

3 give DCPS's placement another chance; so hence why a due

4 process complaint was filed before a prior notice was ever

5 even issued.

6    HEARING OFFICER:  Okay.  You have a witness?

7    MR. EIG:  Yeah, but, can I, just so I know what to

8 present, can I ask the Hearing Officer to look at DCPS 5.

9 This is the 8-30, I just want to make sure that I cover –

10    HEARING OFFICER:  DC 5?

11    MR. EIG:  DC 5.  It's the MDT notes from the August

12 30th meeting back to back.  I don't think you want to waste

13 time on an issue that I don't think is an issue.

14    HEARING OFFICER:  I'm not sure – what's your question?

15    MR. EIG:  Yes. Page – I'm sorry.  Page 4 of 4.  It's

16 about four pages in.

17    HEARING OFFICER:  Uh-huh.

18    MR. EIG:  If you see the second line, this is the

19 August 30th meeting.

20    HEARING OFFICER:  All right.

21    MR. EIG:  DCPS proposing Prospect Learning Center.

22    HEARING OFFICER:  All right.

23    MR. EIG:  Yes.  Apparently Dr. Solomon had visited, I

24 think they visited again, but this was – you will see in our

33

360

1 disclosures a couple letters when they noted the meeting in

2 September with our letter, two letters by the way, saying

3 that we filed for due process; you proposed Prospect on 8-

4 30th.  We don't know why you'd want us to come back for a

5 meeting.  And they never responded to that.  This is what I

6 believe the evidence will show.  We're not raising as an

7 issue the fact that they didn't issue their notice until – in

8 September.  Because we understood this very clearly that

9 Solomon and Ms. Pavo can testify.  Prospect was proposed on

10 August 30th.

11      HEARING OFFICER:  That's what he said.

12      MR. EIG:  What?  No.

13      HEARING OFFICER:  He said that.

14      MR. EIG:  No.  He says they mentioned it.  He

15 specifically made sure that he said it was mentioned but we

16 weren't ready to propose it.

17      HEARING OFFICER:  I'm not understanding what you're

18 asking me to do.

19      MR. EIG:  All I'm – I just want to know if we have to

20 present any evidence about what happened at the August 30th –

21 if we're not raising the notice.

22      HEARING OFFICE:  I'm not telling you how to try your

23 case.  You filed the complaint.  My determination – let me

24 just tell you.

34

361

1       MR. EIG:  Yes, sir.

2       HEARING OFFICER:  My determination will be what I'm

3 here to find is when the complaint was filed whether or not

4 DCPS had denied a faith.

5       MR. EIG:  My first witness is Dr. Solomon.

6       HEARING OFFICER:  Okay.  Dr. Solomon, will you raise

7  your right hand.  Do you swear or affirm the testimony you

8  are about to give will be the truth, the whole truth and

9  nothing but the truth?

10      DR. SOLOMON:  I do.

11      HEARING OFFICER:  Thank you.  Go ahead, Mr. Eig.

12      MR. EIG:  Thank you very much Mr. Banks.  Please state

13  your name for the record.

14      DR. SOLOMON:  Laura Judith Solomon.

15      MR. EIG:  And Dr. Solomon, how are you employed?

16      DR. SOLOMON:  I run a full-time special education

17  consultation practice. This is my 23rd year.  I work with

18  families with children with disabilities, all disabilities

19  and all ages through age 22, beginning at birth, and I

20  represent in the neighborhood of 100 or 125 families a

21  year, all the way from a single consult to beginning a case

22  and following it through placement.

23      MR. EIG:  Let me interrupt you.

24      DR. SOLOMON:  Yes.

1      MR. EIG:  Give us your educational background – higher

2  education background.

3      DR. SOLOMON:  I have a doctorate degree in special

4  education with a focus on learning disabilities which I

5  received in 1993.  Prior to that –

6      MR. EIG:  What school?

7      DR. SOLOMON:  George Washington University.  I also

8  have an education specialist degree from George Washington

9  University and the focus on that was infant toddlers,

10  special education, and special education administration, as

11  I say from GW, also from George Washington.  I have a

12  master's degree from Howard University which I received in

13  1978 with a focus on early childhood special education.

14  And I have a bachelor's degree in early childhood education

15  from the University of Florida which I received in 1973.

16      MR. EIG:  Have you ever taught special education?

17      DR. SOLOMON:  I have.

18      HEARING OFFICER:  I'm sorry. What was the DA in?

19      DR. SOLOMON:  Early childhood.

20      MR. EIG:  And by special education, it ought to mean

21  possibly a college level so they got, but actually teaching

22  learning disabled or other education disabled students.

23      DR. SOLOMON:  I have.

24      MR. EIG:  Where?

1     DR. SOLOMON:  In several different day care centers on

2   special projects and then ultimately at what was then

3   Christ Church Child Center, now Ivy Mount School, working

4   with students with learning disabilities, autism, multiple

5   disabilities, attention disorders, medical conditions.

6     MR. EIG:  Have you ever tutored special education

7   students?

8     DR. SOLOMON:  I did.  For 10 years, between 1982 and

9   1992 I tutored students, again all the way from preschool

10  where we worked on prerequisite skills and behavior

11  management through high school.

12     MR. EIG:  Have you ever taught at the higher education

13  level?

14     DR. SOLOMON:  I have.

15     MR. EIG:  Where and in what capacity?

16     DR. SOLOMON:  George Washington University and

17  Galludet University and their Master's programs in special

18  education.  I taught assessment, diagnostics, behavior

19  management and case management for working with families.

20     MR. EIG:  Dr. Solomon, have you ever participated in

21  these due process hearings in this jurisdiction or

22  elsewhere?

23     DR. SOLOMON:  Yes.

1      MR. EIG:  Over that long period of time that you

2   talked about your practice?

3      DR. SOLOMON:  Yes.

4      MR. EIG:  Have you ever been offered as an expert in

5   special education?

6      DR. SOLOMON:  Yes.

7      MR. EIG:  And have you been accepted as such?

8      DR. SOLOMON:  Yes.

9      MR. EIG:  Can you recall any time that you weren't?

10     DR. SOLOMON:  No.

11     MR. EIG:  And finally, just as background responding

12  to also Mr. Banks' inquiry as to your connection and just

13  brief at this point with O████.  You know O███ O██████?

14     DR. SOLOMON:  I do.

15     MR. EIG:  And how do you know him?

16     DR. SOLOMON:  I had an opportunity to evaluate him on

17  two different occasions to review his records, speak with

18  his mother and observe him at the Kingsbury Day School.

19     MR. EIG:  And are there reports at Parent's Exhibit 8

20  and 9?  I'm sorry.  7 and 8?

21     DR. SOLOMON:  Yes they are.

22     MR. EIG:  7 to 9.  Thank you.  Do you also participate

23  in IEP proceedings for O████?

24     DR. SOLOMON.  Yes.

1        MR. EIG:  With DCPS?

2        DR. SOLOMON:  Yes I did.

3        MR. EIG:  And did you actively participate?

4        DR. SOLOMON:  I did.

5        MR. EIG:  And the IEP that the school system has as a

6   proposed IEP, does it have, does it incorporate any of your

7   suggestions as to goals, objectives and combinations of

8   services or anything like that?

9        DR. SOLOMON:  Yes it does.

10       MR. EIG:  We offer her as an expert in special

11  education.

12       HEARING OFFICER:  Mr. Gupta, do you need time to

13  review her vita?

14       MR. GUPTA:  No.  But I could, I'd like to ask one

15  question.

16       HEARING OFFICER:  Go right ahead.

17       MR. GUPTA:  You said you taught special education

18  children, correct?

19       DR. SOLOMON:  I did.

20       MR. GUPTA:  How long have you been a teacher for?

21       DR. SOLOMON:  Between 1978 and 1982.  I did fail to

22  say one thing, if I might.  When I left teaching I went to

23  Head Start in the District of Columbia and coordinated

24  their handicapped services, now called disability services

39

366

1    for two years.  During that time I evaluated 100 children a

2    year, drafted IEP, IEPs for them and was responsible for

3    obtaining community services.  It was then my job to follow

4    those children until they left Head Start and make

5    referrals into the appropriate jurisdiction which would

6    have been the District of Columbia Public Schools when they

7    left.

8         MR. GUPTA:  So when you taught, what age children did

9    you focus on?

10        DR. SOLOMON:  I taught children between the ages of 3

11   and 10.

12        MR. GUPTA:  And your practice primarily is what aged

13   children?

14        DR. SOLOMON:  As I already stated, I serve children

15   birth through age 22.  I can't control who comes along.

16        DR. GUPTA:  And have you, did you observe O████ at Our

17   Lady of Victory?

18        DR. SOLOMON:  I did not.

19        DR. GUPTA:  Did you observe them - you only came in

20   contact with him over the summer?

21        DR. SOLOMON:  His -

22        DR. GUPTA:  When did you come in contact with him?

23        DR. SOLOMON:  I would have to look in my notes

24   specifically.  Sometime in 2006.

1          DR. GUPTA:  So the only contact you've had, or the

2     only contact you had with O██ were the two evaluations and

3     the meetings you attended over the summer?

4          DR. SOLOMON:  And I observed him at Kingsbury Day

5     School.

6          DR. GUPTA:  I have a couple of questions in terms of

7     her qualifications.

8          HEARING OFFICER:  Do you have an objection to her

9     being admitted as an expert witness?

10         DR. GUPTA:  I still have a standing objection but

11    that's on a procedural issue for the record not being

12    submitted to me with the five day disclosures.

13         HEARING OFFICER:  Okay.  And this particular case I'm

14    going to overrule the objection, primarily because she was

15    a listed witness.  She did prepare the evaluations, so DC

16    is not prejudiced by her appearance as a witness to testify

17    particularly with respect to her evaluation and her

18    observations.  So I'm going to overrule the objection.  She

19    will be admitted as a witness, as an expert.

20         MR. EIG:  Thank you.  Could we just for the record,

21    could we mark at a break her resume that I've given and put

22    it in as supplemental.

23         MR. GUPTA:  Hearing Officers are hard.

41

368

1      MR. EIG:  Just because it has been reviewed by

2   (inaudible).  It's only a page and a half long.

3      HEARING OFFICER:  Are you offering it into --

4      MR. EIG:  Yes, I would.  I'd have to ask the five day

5   rule to be waived.  I would note, by the way, and this has

6   nothing to do with her not knowing what your practice is.

7   We know it very well, okay?  It appears that the school

8   system did not ask for the resume, in their cover letter in

9   this case.  Which is unusual for them.  I just went back.

10   They didn't ask for resumes in this case.

11      HEARING OFFICER:  Look.  As far as I know, I am the

12   only hearing officer that requires this, so.

13      MR. EIG:  Yes.  Believe it or not –

14      HEARING OFFICER:  Where is there a requirement for one

15   side to ask for particular evidence from the other?

16      MR. EIG:  There isn't.  If indeed the other side is

17   supposed to comply with something that isn't required by

18   rule, then I would think that whether the other side asks

19   for it, it should be taken into consideration.  There's no

20   rule that says we have to do it, okay?  Once again.  We're

21   doing it with all of our current cases because –

22      HEARING OFFICER:  Mr. Eig –

23      MR. EIG:  We may get you.  And so we –

42

369

1      HEARING OFFICER:  Mr. Eig, there are certain basic

2  rules of evidence.  Some of them are relaxed.  Some are

3  not.  What I'm saying is, if you're going to come in with

4  someone who you're going to offer to provide opinion

5  testimony to make your case, I'm not likely to relax the

6  rule to put the other side on notice.  Now you can batter

7  me for having that position as much as you like.  I'm not

8  going to stop you from presenting it.  If necessary, I will

9  grant a continuance.  So you can disagree with me my rule

10 as much as you like but I'm going to continue to enforce it

11 until some court above me tells me not to.  Okay?

12      MR. EIG:  Yes, sir.

13      HEARING OFFICER:  Thank you.

14      MR. EIG:  Mr. Banks, just for the record, we are

15 actually complying currently with your requirement in all

16 of our cases, not –

17      HEARING OFFICER:  This is –

18      MR. EIG:  – not just because of you, because it does

19 make sense.

20      HEARING OFFICER:  Okay.

21      MR. EIG:  We're not arguing with it.  I just want to

22 get this thing in since we've given it to them.  That's all

23 I'm saying at the present time.

1    HEARING OFFICER:  But do you object to the resume

2  coming in?

3    MR. GUPTA:  No I don't.

4    HEARING OFFICER:  Fits in.  And as petitioner's 16?

5    MR. EIG:  I guess so.  No.  Later.  19th.  Should be

6  19th.

7    HEARING OFFICER:  I'm sorry.  I was looking at the

8  wrong disclosure.  Okay.  You have 18.  You're right.  So

9  this would be Dr. Solomon's admitted as P No. 19.  Can I

10  have that Mr. Gupta?

11    MR. GUPTA:  I'm going to go make copies.

12    MR. EIG:  I also note, before I (inaudible) with Dr.

13  Solomon, here on the record, that the two disclosure

14  statements from the school system, November 8th - the second

15  page of the disclosure statement from the school system was

16  obviously picked off by standard disclosure form has

17  another student's name on it.  I mean, this happens to us

18  sometimes.  Obviously.  Their disclosure, second page.  You

19  see in that paragraph.

20    HEARING OFFICER:  Right.  Devon Ellis.

21    MR. EIG:  Yes.

22    MR. GUPTA:  We could -

44

371

1      MR. EIG:  Yes, sure.  Could we just get a clean page

2   subsequent to today so that the record doesn't (inaudible)

3   but that's okay.

4      HEARING OFFICER:  Okay.  So that is - just a second.

5   [LONG SILENCE] Okay.  Go ahead, Mr. Eig.

6      MR. EIG:  Thank you.  Do you got stuff?  Dr. Solomon,

7   you said that you - sometime in 2006 you became acquainted

8   with O████, correct?

9      DR. SOLOMON:  Yes.

10     MR. EIG:  Okay.  Do you know a little more precisely

11  the month or date when that might be?

12     DR. SOLOMON:  It was during the summer.

13     MR. EIG:  Okay.  And do you remember why Ms. Pavo came

14  to you?

15     DR. SOLOMON:  Yes.  She was concerned about his

16  performance and his skill development at Our Lady of

17  Victory.  She had had a comprehensive evaluation conducted

18  by Ronald Feterechi (phonetic), Dr. Feterechi.  He had -

19  O███ had been off of his medication at the time which is

20  Dr. Feterechi's practice which I note in my report and Ms.

21  Pavo felt that O████ performance on the evaluation was

22  significantly hampered by the fact that she was off

23  medication.  She asked essentially for a second educational

24  and cognitive, not intellectual, but cognitive opinion, and

45

372

1  she also informed me that she had applied to the District

2  of Columbia Public Schools for special education services

3  and was in that process, and would I accompany her to the

4  meetings and participate in the development of the IEP.

5      MR. EIG:  First of all, I will keep referring to

6  Parent exhibits, they're OO for O███ O█████ for the record.

7  Parent Exhibit 14, is that Dr. Feterechi's lengthy report?

8      DR. SOLOMON:  Yes it is.

9      MR. EIG:  Are you sure it was Dr. Feterechi?

10      DR. SOLOMON:  Yes I am.

11      HEARING OFFICER:  I'm sorry.  What was the question?

12      MR. EIG:  Are you familiar with Dr. Feterechi? Is this

13  Dr. Feterechi --

14      HEARING OFFICER:  You referred to a document.  I'm

15  sorry.

16      MR. EIG:  Parent 14 and Parent and said OO sounds --

17  so I'm going to say Parent.

18      HEARING OFFICER:  Uh-hum.

19      MR. EIG:  Is Dr. Feterechi a well-respected

20  neuropsychologist?

21      DR. SOLOMON:  Yes he is.

22      MR. EIG:  And does he usually do reports this long?

23      DR. SOLOMON:  Yes he does.

373

1        MR. EIG:  Okay.  Now.  By the way, on the first page

2    of the report, there is some handwriting.  This is Ms.

3    Pavo's comment about that lack of medication?

4        DR. SOLOMON:  Yes.

5        MR. EIG:  Now.  You said that Ms. Pavo asked you to

6    test O███ and also accompany her to DCPS, IEP meeting?

7        DR. SOLOMON:  Meetings.  Whatever meetings would come

8    up.

9        MR. EIG:  How about - we know there's a Kingbury, how

10   about Kingsbury?  Did that come up early on in her seeing

11   you?

12       DR. SOLOMON:  No it did not.

13       MR. EIG:  Okay.  We'll get around to that.  Parent 7

14   and Parent 8.  You've already identified Parts two

15   documents that you authored, is that correct?

16       DR. SOLOMON:  Okay.

17       MR. EIG:  Why are there two?

18       DR. SOLOMON:  Because I had conducted the initial

19   portion of my testing and then the issue of finding out

20   whether if we provided a nonverbal opportunity for Oleg to

21   show what he knows, would he, could he possibly perform

22   better, and so I saw him a second time.

23       MR. EIG:  And the second report is the non-letterhead

24   or the letterhead?

47

374

1      DR. SOLOMON:  The non-letterhead.

2      MR. EIG:  Is there a reason it is not letterheaded?

3      DR. SOLOMON:  I faxed it - or I think I sent it as an

4 attachment.

5      MR. EIG:  Okay.  And I see, I'm sorry, which is the

6 first?  Because I see August 9th is the second date, Parent

7 8 and August 16th is -

8      DR. SOLOMON:  August 16th is the second one and August

9 8th is the first one.

10      MR. EIG:  Now.  About how long over the two testing

11 opportunities did you work with O███?

12      DR. SOLOMON:  I either worked with him or played with

13 him for a total of about four hours.  He is a youngster who

14 needs a fair number of breaks during testing, and he was

15 very intrigued by the unit blocks, the small to large

16 blocks that I keep in my office waiting room.  So he played

17 and then we worked, and then he played some more and then

18 he took a break and he ran up and down the stairs at my

19 direction to sort of organize himself, so over the times it

20 was about four hours.

21      MR. EIG:  And Dr. Solomon, did you - had you before

22 testing and play with O███, did you have the opportunity to

23 review records on him?

24      DR. SOLOMON:  Yes, I did.

1      MR. EIG:  And the opportunity to talk to his mother

2  about it.

3      DR. SOLOMON:  Yes.  At great length.  We had three or

4  four conferences about O█████

5      MR. EIG:  I'll ask you about what you know about him

6  subsequently, but let's first ask you, what did you find

7  out, now, of course Mr. Banks has not had the opportunity

8  to read what he hasn't (inaudible) the value of your

9  reports and everything else, in detail, so, as why don't

10  you, as best you can to give him a preview of coming

11  attractions.  What's he going to see here.

12      DR. SOLOMON:  Sure.  What you're going to see is a

13  pattern of pretty significant discrepancy in strengths and

14  needs.  He had for example high average scores in several

15  areas that depended on auditory processing and verbal

16  responses.

17      HEARING OFFICER:  Significant discrepancy between what

18  in needs?

19      DR. SOLOMON:  Between his strengths and his needs.

20      HEARING OFFICER:  Oh, strengths and needs?

21      DR. SOLOMON:  Yes.  So he had some very significant

22  strengths when the information came into him auditorially

23  (phonetic) through his ears, and when he had to make verbal

24  responses.  And in contrast, he had, he showed some very

49

376

1   significant deficits.  When the information coming in was

2   visual and he needed to provide a motor response.  And that

3   was especially true [clears throat], excuse me, on a test

4   that was timed.

5        HEARING OFFICER:  Go back again to the first points

6   you made.

7        DR. SOLOMON:  Sure.

8        HEARING OFFICER:  When the information coming in was -

9        DR. SOLOMON:  - was auditory and a verbal response was

10   required.

11        HEARING OFFICER:  What happens?

12        DR. SOLOMON:  He did quite well.

13        HEARING OFFICER:  Okay.  Go ahead.

14        DR. SOLOMON:  And when the information coming in was

15   visual and he needed to provide a motor response - a

16   written response, he actually performed quite poorly.

17        MR. EIG:  Let me ask you about a couple of other areas

18   about his functioning.  You mentioned a few minutes ago

19   that he has attentional issues.  Is that correct?

20        DR. SOLOMON:  O███ has very severe attentional issues

21   even while medicated.

22        MR. EIG:  And how do they manifest themselves?

23        DR. SOLOMON:  He has a great deal of difficulty

24   staying focused on what's presented to him.  He is

1   extremely hyperactive and impulsive.  For example, when I

2   would ask him questions during testing, he often would

3   begin to provide the response before the question was fully

4   asked or before the information was fully presented to him;

5   which required me to intervene at that point and to say to

6   him, wait a minute, listen to the whole question before you

7   begin to answer.  Or look at the whole page before you

8   begin to write.

9        MR. EIG:  Now, Dr. Solomon, when you said that he had

10   a strength or relative strength in taking information

11   auditorally and responding verbally?

12        DR. SOLOMON:  Taking in auditorially and responding

13   verbally, yes.

14        MR. EIG:  Would his attention ever get in the way of

15   that strength?

16        DR. SOLOMON:  His attention absolutely gets in the way

17   of that because the information often needed to be repeated

18   when I was speaking to him and he was listening to it.  And

19   that is a finding that I think is consistent across

20   evaluators and across observers.  What I was after testing,

21   what I was after evaluating, was what were O███████ skills

22   and abilities in the best of all possible worlds?  So when

23   information could be repeated, did he actually have the

24   skill to perform the task, as opposed to, well I only got

51

378

1    to say it once, and he missed it.  And in that sense, I

2    wouldn't know whether he missed it because he actually

3    didn't process the whole thing, he didn't hear the whole

4    thing, he didn't attend to the whole thing, or he actually

5    couldn't do it.

6        MR. EIG:  Where did Dr. Feterechi find him to be

7    cognitively?

8        DR. SOLOMON:  In the below average range.

9        MR. EIG:  Okay.  And is that from your review of Dr.

10   Feterechi or your experience working, does he seem to be a

11   child of below average ability?

12       DR. SOLOMON:  He didn't.

13       MR. EIG:  What did he seem?

14       DR. SOLOMON:  He seemed to be a youngster with at

15   least average ability if you could, you know, sort of get

16   him when he was able to pay attention and you tested his

17   strength.  As I have already said, there are enormous

18   discrepancies in this child's functioning.

19       MR. EIG:  That's apparent to the test scores he got in

20   Parent Exhibit 7, the last page of Parent Exhibit 7, it

21   says "Test Scores for O█████ O███████" and these test scores in

22   Parent 7 on page 10 are the WJ 3 - what's the WJ 3?

23       DR. SOLOMON:  It is short for the Woodcock Johnson

24   Psychoeducational Battery Third Edition.

1     MR. EIG:  And there are some clusters and there's a

2     line, and then there are some other things.  What are the

3     things underneath the cleft bag (phonetic)?  The

4     cluster/test.  Are those individual sub tests from the

5     second half?

6     DR. SOLOMON:  What the heading indicates, because

7     cluster is written in capital letters, it indicates the, in

8     this case, five lines underneath the word cluster, which

9     are the overall scores when where it says "test" in upper

10    and lower case letters, and then below the line, which are

11    sub tests and they are joined together to make overall

12    categories.

13    MR. EIG:  Let me just ask you about the two scores

14    here that are relative to the discrepancy you're talking

15    about.  The next to last sub test is something that's

16    called auditory work memory.  Is that auditory working

17    memory?

18    DR. SOLOMON:  It is.

19    MR. EIG:  And what is tested or is described?  Because

20    I see he got a 84% 115.  His total score, right?

21    DR. SOLOMON:  Yes, it is.  What this test presents are

22    words, labels for objects and numbers in a mixed up order.

23    And they are increasing  -- the length of the presentation

24    increases over time.  And the child's requirement is to

1    save the words and numbers back in the same order they were

2    presented while first saying all the words, and then saying

3    all the numbers.  So if I present him an item that is

4    house, 3, 5, tree.  He has to say house and tree in order

5    first, and then has to say the number.  So they get

6    increasingly longer.  And, more complex.  And I was pretty

7    impressed.

8         MR. EIG:  Go up to sub test, there's something called

9    numbers reverse?

10        HEARING OFFICER:  Well, before we go ahead what are

11    the – there are some headings here.  What are those

12    headings?

13        DR. SOLOMON:  Sure.  And is what you mean by headings,

14    sir, where it says verbal ability and thinking ability?

15    Those?

16        HEARING OFFICER:  No, no.  I'm talking about raw AE –

17        DR. SOLOMON:  Oh, okay.  Sure.

18        MR. EIG:  Thank you.  Tell us about that.

19        DR. SOLOMON:  Yes.  The raw score is – represents the

20    number of correct responses in each sub test.  The AE

21    stands for age equivalent.  The easy to difficult in this

22    case, because I scored by age, represents the range that

23    most accurately we can predict.  His true score falls,

24    because we're working with human subjects, we have to build

1    in some correction for error which is also found on the

2    very last column which I'll go over.

3         So we conjecture on another day his score - let me

4    just take one at random - the auditory working memory.  On

5    the day I tested him he got a raw score of 25.  He got 25

6    correct.  And that, according to the test statisticians

7    translated into an age equivalent of 14 years, 4 months.

8    But in real life, on another day, if I had tested him the

9    following day, we need a range to suggest what his score

10   might have been because maybe he only got a 24 the next

11   day, or maybe he got a 28 the next day.  And herein lies

12   the problem as you will see with using age or grade

13   equivalence.  You can see how the numbers have jumped.  His

14   age equivalent turned out to be 14 years, 4 months, and

15   that raw score of 25 fits somewhere in the range of 11

16   years, 9 months and more than 22 years.

17        So these are unstable scores.  They're really helpful

18   for parents and sometimes for teachers to understand where

19   a child fell.  But anyway, that's what they are.  The RPI

20   stands for the relative percentage index and if the

21   assumption is that any kid on any test is going to score

22   90% correct, where did he score relative to that and again,

23   a review, he scores well below that and well above that.

24   These are not percentiles.  That's the next column.  PR

1  stands for percentile rank.  The percentile ranks are

2  derived from standard scores which is the next column over.

3  Let me mention because I think it's important that we don't

4  hand score this test anymore.  We take the raw scores, we

5  throw them into a computer program and we get this

6  printout, with some other information on it.  There's no

7  room for error except if you input the scores incorrectly,

8  you know, which I think mostly doesn't happen.  So you get

9  a standard score.  Standard scores that range from 90 to

10  109 are considered to be average.  And each standard score,

11  according to the statisticians has a percentile rank

12  attached to it.  And then the very last column, where it

13  says 68% percent band, again that is - it's referred to as

14  standard error of measurement and it is a correction

15  procedure built in because we're working with humans, that

16  on a particular day, O███ got a verbal ability score, a

17  standard score of 101 and we feel 68% confident that his

18  true score lies someplace between a standard score of 96

19  and a standard score of 106.

20      HEARING OFFICER:  Okay.  Going back to RPI.  That's

21  relative percentage index.

22      DR. SOLOMON:  Correct.

23      HEARING OFFICER:  So in auditory work memory, what is

24  the 93 mean?

1        MR. EIG: And can I, before she answers that, just to

2    correct an error.  I said 115 and I see that's for an

3    incomplete word.  It's 103 (inaudible) might be right.

4        DR. SOLOMON:  Yes.  I'm sorry.  It's hard to see on an

5    angle.  In taking the children who constituted the norming

6    population which is kids at six month intervals and

7    typically either 500 or 1000 kids in each age interval.

8    They give this test all over the country in various kinds

9    of schools and in different geographical locations and see

10   how kids in the middle of sixth grade perform, just for

11   example.  They then can get some norms against which to

12   compare other children of middle of sixth grade who took

13   the test.  So, it's a column that's printed on here.  It's

14   not really referred to.  Nobody writes up about it, or

15   whatever.  He did slightly better on this sub test than the

16   typical child, which we also know because we see his

17   standard score of 103 and his percentile of 59.

18       MR. EIG:  Thank you.

19       HEARING OFFICER:  Thank you.

20       MR. EIG:  Should I go on?  Go up a couple to –

21       DR. SOLOMON:  Let me turn this.

22       MR. EIG:  Sure.

23       DR. SOLOMON:  Okay.

1      MR. EIG:  Okay.  Numbers reversed.  Before you cover

2  the score, what does he do, or what is he supposed to do -

3      HEARING OFFICER:  I'm sorry.  What are we talking

4  about now?

5      MR. EIG:  Two sub tests up.  Numbers reversed.

6      DR. SOLOMON:  It's four from the bottom.

7      MR. EIG:  What is he supposed to do with that?

8      DR. SOLOMON:  I give him a string of, an increasingly

9  longer string of numbers and he has to say them back to me

10  in reversed order.

11      MR. EIG:  Okay, in reverse order.  And this is all

12  verbal, auditory?

13      DR. SOLOMON:  It's all auditory input and verbal

14  output.

15      MR. EIG:  Okay, and how'd he do on that?

16      DR. SOLOMON:  He got a standard score of 111, it falls

17  at the bottom of the high average range and his percentile

18  range was 76.

19      MR. EIG:  So there is, what you were talking about,

20  auditorially -

21      DR. SOLOMON:  Wait.  I'm sorry.  Yes.  That's right.

22      MR. EIG:  Okay.  And you were talking about

23  auditorially he - he comes in auditorially, and he comes

24  out verbally, that's where he's strong.

58

1      DR. SOLOMON:  Correct.

2      MR. EIG:  Why won't he go up one more to something

3  called visual matching, in your opinion does his score fall

4  to 4/10ths of the first %?

5      DR. SOLOMON:  Right.  The visual matching subtest is a

6  time test and it is visual.  He is presented with a

7  preprinted page of number sequences and he has to find the

8  two in each row that are the same and draw circles around

9  them.  And O████, as reflected in the record, he has a

10 developmental optometric evaluation by Dr. Chris Renner

11 (phonetic) has shown that O████ visual processing is very

12 impaired.  He also has some visual acuity problems.  He

13 wears glasses.  But the correction for the glasses doesn't

14 – I'm sorry – the correction with his glasses doesn't take

15 care of the correction in his brain, or how he actually

16 processes the information coming in through his eyes.  So

17 he performed very poorly on this.  And that's what accounts

18 for it.

19     MR. EIG:  Dr. Solomon, before we look at your other

20 testing, you've just described a student with average

21 intelligence (inaudible) it sounds like, low, high, in the

22 average range, who has a significant weakness you just

23 talked about in one area and significantly stronger in

24 another area.  Did you form a conclusion as to how much

1   special education he needed based upon your testing?  And

2   in your review of the records?

3       DR. SOLOMON:  Oh, okay.  Because I didn't do it solely

4   on my testing.  I looked at the whole record.

5       MR. EIG:  Okay.  Did you form some opinions?

6       DR. SOLOMON:  I did.

7       MR. EIG:  And did you form an opinion as to whether he

8   needed a full-time special education assessment?

9       DR. SOLOMON:  I did and I wrote about that in my

10  report.

11      MR. EIG:  And you thought he did need a full-time

12  special education assessment?

13      DR. SOLOMON:  I did.

14      MR. EIG:  Well if he has these significant weaknesses,

15  but also, some strengths, why would he need a full-time

16  placement.  I mean, he's got strengths.

17      DR. SOLOMON:  He does have strengths but unless they

18  are managed he can't use them.  He has such severe

19  attentional issues that if he isn't paying attention when

20  the auditory input is being presented, the verbal input is

21  being presented, then he misses what he has to do.  So we

22  agreed ultimately with the categorization, the coding of

23  multiple disabilities, because it is very difficult with

1    O███ to sort out what's attention and what's learning

2    disability.

3        MR. EIG:  Turn to 8.  I'm sorry - 7, please. Parent 7.

4    This is, you say, there was also the subsequent testing?

5        DR. SOLOMON:  Yes.  I needed to see O███ twice.  We

6    didn't' get finished.

7        HEARING OFFICER:  I thought we were just doing 7.

8    We're still on 7?

9        MR. EIG:  I'm sorry.

10       DR. SOLOMON:  This is 7.

11       MR. EIG:  I'm sorry.  I got confused.  We were on 7.

12   You're absolutely right.  The testing that you just

13   reported on.

14       DR. SOLOMON:  Was done over two sessions.

15       MR. EIG:  Explain that.  We're back.  You're right.

16   Page 10, where we were, that was done over two sessions?

17       DR. SOLOMON:  It was.

18       MR. EIG:  Okay.  What part was done the second time?

19       DR. SOLOMON:  We just didn't finish.

20       MR. EIG:  Okay.

21       DR. SOLOMON:  We just didn't finish.

22       MR. EIG:  Why did you write two reports again?

23       DR. SOLOMON: The first one wasn't cleaned up.  I mean

24   there were things that needed to be added and, you know, it

1 needed to be presented in some sort of reasonable form.    I

2 always like to give parents some information before I clean

3 it up because parents have really good input. Especially in

4 terms of the chronology, you know, if I had missed something,

5 I don't want the report to be wrong.    So even though 8 is in

6 the record which is fine, it is 7 that is the cleaned up

7 report.    It has everything in there I want it to have.

8        MR. EIG:    Thank you.    For Mr. Banks' purposes, he

9 should read 7 for your final report?

10       DR. SOLOMON:    Right.    Because page 11, for example, of

11 our 8, doesn't even have test scores in it.

12       MR. EIG:    Okay.    Now.    You said you attended IEP

13 meetings with Ms. Pavo for O██████?

14       DR. SOLOMON:    I did.

15       MR. EIG:    And are you familiar - let me back up.

16 Explain to Mr. Banks and the rest of us when you say you

17 attended and participated in IEP meetings, how does Laura

18 Solomon participate in an IEP meeting, generally and more

19 specifically.    How does she participate?    How did she

20 participate in O███████ IEP meetings?

21       DR. SOLOMON:    Well, you know, the funny answer is I

22 participated loudly.    I -

23       MR. EIG:    Being reactive?

1      DR. SOLOMON:  Yes.  I can be.  You know.  I'm Jewish,

2  I'm loud, you know.  What I try to do is to be the voice that

3  represents first an independent view.  My own view.  You buy

4  my time, you don't buy my opinion.  I had a very strong

5  opinion that O███ was - he had severe attentional issues.

6  That wasn't in dispute.  That he had some learning

7  disabilities, which for example, was ruled out initially when

8  DCPS did its first eligibility meeting.

9      HEARING OFFICER:  Say that again?

10     DR. SOLOMON:  Yes, sir.  There was agreement between

11  Ms. Pavo and myself and DCPS that O███ had severe attention

12  deficit disorder, hyperactivity disorder.  They did not agree

13  initially that he had learning disabilities.

14     HEARING OFFICER:  When was this?

15     MR. EIG:  When was this?

16     DR. SOLOMON:  I do not have these dates in my mind.

17     MR. EIG:  You have the school system documents.  Would

18  they be there?

19     DR. SOLOMON:  Oh, yes.  I've seen them this morning.

20  Okay.  Your indulgence please, Your Honor.  Okay.  There's

21  one.  I would have made a list had I known I needed to know

22  this.

23     HEARING OFFICER:  So did you attend the meeting before

24  August 30th?  Oh, I did.

63

1       MR. EIG:  I definitely did, and I can just look for

2  dates, not at my own notes, where –

3       HEARING OFFICER:  I don't see – are there any meeting

4  notes in here other than August 30th?

5       DR. SOLOMON:  There are and maybe I am –

6       HEARING OFFICER:  I was talking about in the record.

7       DR. SOLOMON:  Yes.  This is the record.  And maybe I

8  am mis-remembering.  There was a finding of eligibility for

9  the attention issues and a rule out.  DCPS concluded that he

10  did not have learning disabilities.  There was no

11  discrepancy.  Then on August 30th, he was found eligible

12  additionally for learning disabilities, and I do apologize,

13  this is not like me.  I'm sorry Michael.

14       MALE SPEAKER:  Forget it.  That's irrelevant.

15       HEARING OFFICER:  I think we can go on.

16       MR. EIG:  Yes, we can go on while you're looking.  We

17  can do that.

18       HEARING OFFICER:  The only IEP I have in the record is

19  August 30th, 06 and that one says OHILD.

20       DR. SOLOMON:  Right.  There was a subsequent finding

21  and what happened was that because my testing on just the

22  cognitive piece had taken so long, Ms. Pavo took Oleg to the

23  practice of Dietel (phonetic)& Butler for additional

24  educational testing, and that is in the record.  We then went

391

1 back to the table and presented that information along with

2 my cognitive findings, and Mr. Perkins, who is here, and I

3 had a lengthy discussion about this and the team ultimately

4 concluded that in addition to the OHI, O█████ met criteria for

5 the '09 specific learning disabilities.  And then a long

6 discussion ensued about what areas under learning

7 disabilities, and there was a difference of opinion about

8 that.

9      MR. EIG:  On August 30th, at the time DCPS also coded

10 him for learning disabled, was an IEP done, completed,

11 started?

12      DR. SOLOMON:  It was ultimately completed.

13      MR. EIG:  Okay.

14      DR. SOLOMON:  We did a lot of work at the table.

15      MR. EIG:  Was it a long meeting?

16      DR. SOLOMON:  Yes, it was.

17      MR. EIG:  Your indulgence, please.  And is that IEP

18 and the notes about it found at DCS 5?

19      DR. SOLOMON:  Yes.

20      MR. EIG:  Have you reviewed those notes?  There's a

21 lot of notes, very small.

22      DR. SOLOMON.  I read them.  I reviewed them.

23      MR. EIG:  To the best of your recollection are they

24 relatively accurate?

392

1        DR. SOLOMON:  Yes.

2        MR. EIG:  The IEP itself.  Is the IEP that you

3  received from DCPS, the IEP as you understood it, was being

4  done and completed on that day?

5        DR. SOLOMON.  Yes.

6        MR. EIG:  At the end of that IEP meeting, was there a

7  discussion about placement?

8        DR. SOLOMON:  Yes.

9        MR. EIG:  And did the school system propose a

10  placement?

11        DR. SOLOMON:  Yes.

12        MR. EIG:  And what was that placement?

13        DR. SOLOMON:  Prospect Learning Center.

14        MR. EIG:  And did you and/or Ms. Pavo respond to that?

15        DR. SOLOMON:  Yes.

16        MR. EIG:  And did you raise questions, did you accept

17  it, did you reject it, say things about it, or what?

18        DR. SOLOMON:  We did talk about it and we certainly

19  said that we were going to see it.  We did not accept it.  In

20  fact, very specifically we rejected it, and we shared our

21  observations.  I have seen Prospect Learning Center.  Many,

22  many times I have had many very good interesting

23  conversations with Dr. Eve (phonetic) Peterson who is the

24  Principal there.  She's been the Principal there a long time.

1 We've known each other about 20 years.  And I know the

2 program, each time I go back, hoping I'll find some things

3 that are different, but I do know the program.  We did

4 ultimately go visit the program.

5       MR. EIG:  Why if indeed you were rejecting it – why

6 did you go visit? At least, or don't speak for Ms. Pavo.

7       DR. SOLOMON:  No, I won't.  Because things do get to

8 be different.  So I spoke and Ms. Pavo spoke about what we

9 already knew.  So for example.  The fact that the program

10 aged out after grade 8, and O█████ will be 14 this coming

11 March, that is relevant and that isn't changing.  Ms. Pavo,

12 for example asked about secondary programs at this meeting.

13 I mean, I'm sorry, high school programs.  Well Prospect

14 doesn't have a high school and the high school that DCPS used

15 to have, Buchanan, hasn't existed for a long time.  That's

16 were Eve Peterson came from.  So there were very significant

17 concerns.  One of the things that was stated during the

18 meeting, for example, what was represented, was that the

19 class size was 7 to 10.  Well, I didn't think that was

20 accurate and indeed when we did go and speak to Dr. Peterson

21 again, it isn't accurate.  So it is important for me to do my

22 homework and for me to make sure that what I have represented

23 is in fact accurate.  The concerns that I had about prospect

24 at the time of the August 30th meeting could not have

1 changed, even with a visit.  One, he would have only a year

2 there, and he had changed, he had had four schools I think in

3 four or five years, and the reliance on a standard

4 curriculum, the DCPS academic curriculum which I view as

5 completely inappropriate for a kid like O███.    And that

6 wasn't going to be any different.

7        MR. EIG:  Let me, before we get back to Prospect about

8 more specifically why you consider it inappropriate for Oleg.

9 Let's talk about the IEP, first.  Do you consider this to be

10 an appropriate IEP for O███?

11        DR. SOLOMON:  I consider the goals and objectives to

12 be appropriate.  On August 30th I took issue with the line

13 that says "providers," and there's a note in the meeting

14 notes.

15        MR. EIG:  We'll get to that in a second --

16        DR. SOLOMON:  Okay, I'm sorry.

17        MR. EIG:  -- when we get more specific.  Let's talk

18 about what you agreed to about a goal for an objective?

19        DR. SOLOMON:  I agreed then, and I agree with the

20 objectives.  The goals are not written in any measurable way

21 and I can explain why that is if you would like me to.

22        HEARING OFFICER:  I thought you just said the goals

23 and objectives were appropriate.

24        DR. SOLOMON:  I did, sir. And what I am saying –

1        HEARING OFFICER:  But they are not written in a

2 measurable way.

3        DR. SOLOMON:  What I'm saying, I apologize, sir.  The

4 objectives are appropriate.  I contributed to them.  We

5 reached agreement.  The goals are written as follows: And

6 I'll just –

7        MR. EIG:  Oh, thank you.

8        DR. SOLOMON:  – give you one example.  I don't know

9 how to – I –

10        MR. EIG:  Okay we are at goal No. 1.

11        DR. SOLOMON:  I'm very confused.  It follows No. 8.

12        MR. EIG:  What is confusing.

13        DR. SOLOMON:  I don't care.  We can pick another page.

14        MR. EIG:  No, no.  In DCPS 5, Mr. Banks, do you have

15 fax numbers at the top right part.

16        HEARING OFFICER:  Top right corner?  No.

17        MR. EIG:  Okay.  That's not going to help then.

18        HEARING OFFICER:  Just tell me the substance.

19        MR. EIG:  The subject is – she's added academics,

20 reading, goal No. 1 in academics reading, page 3 and 4.

21        HEARING OFFICER:  Academic reading?

22        MR. EIG:  Academics colon reading.

23        HEARING OFFICER:  Okay.  I've got it.

1      MR. EIG:  Goal No. 1.  Is that a perfectly good page,

2 or not?

3      DR. SOLOMON:  As an example?

4      MR. EIG:  Yes.

5      DR. SOLOMON:  Yes, it's a perfectly good page.  So

6 here's what the goal says.  The student will demonstrate

7 growth and reading skills as evidenced by mastery of the

8 following short term objectives.  Right to that point I'm

9 fine.  By 80%.  So if you add a measurement criteria to the

10 goal, which is 80%, and then you go down to each objective

11 which also has a measurement – a numerical criterion attached

12 to each objective.  You then have, for example, 80% of 80%.

13 Not only do I think it would be incredibly hard to take data

14 on that, which is what's required, but, you then don't – you

15 really aren't measuring mastery to 80% which is a perfectly

16 reasonable standard to have.  Kids like Oleg are never going

17 to be 100% on anything.

18      MR. EIG:  That's if indeed the IEP is read to

19 understand in those goal areas, that the 80% only refers to

20 the mastery of the objectives, do you have a problem with

21 that?

22      DR. SOLOMON:  I didn't understand the question.

1      MR. EIG:  If that 80% is only to be applied to the

2  objectives, not to the annual goal, do you have a problem

3  with that?

4      DR. SOLOMON:  No.  No.  That's why I said, you put a

5  period at the end of the word "objectives" I'm fine.

6      MR. EIG:  Okay.

7      HEARING OFFICER:  I'm not sure I'm looking at the same

8  page you are.

9      DR. SOLOMON:  Okay.

10      HEARING OFFICER:  I'm looking at academics reading.

11      DR. SOLOMON:  Right.

12      MR. EIG:  What's your first objective, sir?  The

13  student will demonstrate adequate reading?

14      HEARING OFFICER:  Yes.  Adequate reading fluency.

15      DR. SOLOMON:  Right.

16      MR. EIG:  Right.  As I've noticed by his ability to

17  self correct.

18      HEARING OFFICER:  Right.

19      MR. EIG:  If you go up above that to the annual goal.

20      HEARING OFFICER:  Yes?

21      MR. EIG:  And you see where it says the student will

22  demonstrate growth in reading skills as evidenced by mastery

23  of the following short term objectives by 80%?

24      HEARING OFFICER:  I see it.

1       MR. EIG:  What she's saying is that she believe that

2  means that it's 80% of each –

3       HEARING OFFICER:  Of the 80%.

4       MR. EIG:  So if we read it, if you understand it the

5  other way, that's all it says.  Because I don't want to spend

6  any more time on that part.

7       DR. SOLOMON:  No problem.

8       MR. EIG:  So the goals and objectives are fine so what

9  if anything is wrong with the IEP?

10      DR. SOLOMON:  The implementation of this IEP at

11  Prospect Learning Center I believe is inappropriate.

12      MR. EIG:  Before we get to the implementation at

13  Prospect.  Is there anything wrong with the paper document?

14  Not wrong, I'm sorry.  Inappropriate for O██.  We'll stay on

15  that same page.

16      MR. GUPTA:  I'm going to object.  That's leading the

17  witness.

18      HEARING OFFICER:  You're going a bit far.  Now if she

19  wants to tell me what's inappropriate about the IEP, you can

20  ask that question.

21      DR. SOLOMON:  Right.

22      MR. EIG:  Okay.  So let's turn it to another page.  I

23  want to turn it.

24      DR. SOLOMON:  One second.

1          HEARING OFFICER:  You're leading the witness.  Why

2 don't you tell me what she thinks is wrong with the IEP.

3          DR. SOLOMON:  I've got it.

4          MR. EIG:  For the record.  Directing a witness to a

5 page is not leading her that's all I was going to say.  But I

6 was interrupted.

7          HEARING OFFICER:  I would think it is?

8          MR. EIG:  "Will you please look at so and so page?"

9 How else would you get her to look at the page.

10          HEARING OFFICER:  You're leading the witness if she

11 participated in the meeting.  If she wants to tell me what's

12 wrong with the IEP she's capable of doing that.

13          DR. SOLOMON:  I have it.  I have it.

14          MR. EIG:  Okay.  Where are you?

15          DR. SOLOMON:  Well, and it's hard for me to say what

16 that page is.  But at the – after the last page of the goals

17 and objectives, Mr. Banks.

18          MR. EIG:  It's about six from the back.

19          DR. SOLOMON:  There are two pages, at least in my

20 copy, there are two pages on which accommodations and reason

21 for removal from special – sorry – regular education, that's

22 the top of the page.

23          HEARING OFFICER:  Right.

400

1      DR. SOLOMON:  Okay.  And then if you look down where

2  it talks about - it is Roman Numeral 13, Placement

3  Considerations and Justification.

4      HEARING OFFICER:  Right.

5      DR. SOLOMON:  Where the out of general education is

6  accepted, I agree with that.  Okay?  Where that then leads to

7  on the front page of the IEP -

8      MR. EIG:  Which is about four pages in on the

9  document, at the other end of the document.

10     DR. SOLOMON:  For this document, percentage of time

11 not in regular education, 85%.  I do not agree with that.  I

12 didn't agree with it at the time.

13     MR. EIG:  Now, Dr. Solomon, you're on the front of the

14 IEP page one of four, right?

15     DR. SOLOMON:  Yes.

16     MR. EIG:  Where it says, percent of time not in

17 regular education setting, 85%, where would that other 15

18 percent be as far as you understand?

19     DR. SOLOMON:  Well it would have to be in general

20 education because those are the only choices.

21     MR. EIG:  Look up above to where it says special

22 education and related services summary.

23     DR. SOLOMON:  I have it.

1      MR. EIG:   What is specified there as to the amount of

2  time that O███ would have various services?

3      DR. SOLOMON:   Specialized instruction, 26 hours a

4  week.  Psychological services, 1.5 hours a week, and then the

5  consult for psychological services, a half an hour a week.

6      MR. EIG:   And that adds up to according to the IEP,

7  how many hours of instruction related services?

8      DR. SOLOMON:   28.

9      MR. EIG:   Okay.

10     DR. SOLOMON:   Did I get that right? 29.

11     MR. EIG:   At the bottom, what does it say?

12     DR. SOLOMON:   Oh, I'm sorry.  27.5.

13     MR. EIG:   Now your familiarity with District of

14  Columbia public schools, do you know how many hours in a

15  week?

16     DR. SOLOMON:   32 and a half.

17     MR. EIG:   Okay.  Does this IEP tell us where the other

18  - whether it's 2 and a half, or 5 hours, 2 and a half is to

19  30, 5 is to 32 and a half, where those other hours are going

20  to be?

21     DR. SOLOMON:   No.

22     MR. EIG:   Again, to make it clear.  Do you agree or

23  disagree that O███ would be appropriately placed in a general

24  education setting for 2 and a half or 5 hours a week?

1      DR. SOLOMON:  I do not agree that that is appropriate.

2      MR. EIG:  Did anybody at the IEP Committee of the

3 District of Columbia Public Schools suggest that?

4      DR. SOLOMON:  That it would be appropriate?

5      MR. EIG:  Yes.

6      DR. SOLOMON:  I don't recall specifically.  I actually

7 don't.  Because this was the meeting at the end of which

8 Prospect was proposed.

9      MR. EIG:  Okay.

10      DR. SOLOMON:  And it says very clearly on page 4 of

11 the notes, "DCPS Proposing Prospect Learning Center."

12      MR. EIG:  Okay.  Now turning back to the end of the

13 IEP where you were - back to the two pages of accommodations,

14 Mr. Banks was in (inaudible).  On these two pages of

15 accommodations, this page as well.  Can you please review

16 that again and tell me if there is any place there where it

17 states or it suggests that there should be what I will now

18 call mainstreaming or placement of O█████ in general education

19 settings for any part of the day, with or without

20 accommodations?

21      DR. SOLOMON:  There is a reference to it.  It is at

22 the top of the page and it says that the student requires a

23 therapeutic setting with low teacher student ratios.  Student

1  also requires accommodations, modifications that cannot be

2  implemented in the general education setting.

3          MR. EIG:  So do you understand whether this IEP in

4  view of the whole language has called for any kind of general

5  education placement?

6          DR. SOLOMON:  I do not think it is calling for any

7  kind of general education placement.

8          MR. EIG:  Is the end of the IEP that you are just

9  reading in the front of the IEP that calls for 15% in a

10  general education setting consistent?

11          DR. SOLOMON:  No.

12          MR. EIG:  Was this discussed at the meeting?

13          DR. SOLOMON:  Yes.  To the best of my recollection I

14  would actually say probably not.

15          MR. EIG:  Was Prospect discussed at the meeting?

16          DR. SOLOMON:  Yes.

17          MR. EIG:  Before we move on to Prospect, let me ask

18  you if you agree, for me, too, the goals and the objectives

19  of the IEP and I'll go back to that academic reading page

20  since that's the one we referred to.  Page 01.  Above the

21  goals and objectives, is there something that calls for

22  providers?

23          DR. SOLOMON:  Yes.

24          MR. EIG:  And what does it say there?

1          DR. SOLOMON:   General education and/or special

2  education teacher.

3          MR. EIG:   Okay.  And, from your review of the IEP, is

4  this the only page that has this?

5          DR. SOLOMON:   No.

6          MR. EIG:   Are a lot of the pages like this?

7          DR. SOLOMON:   A lot of them.  Not all of them.

8          MR. EIG:   Okay.  Now.  What do you understand it

9  means, general education and/or special education teacher as

10  providers.

11          DR. SOLOMON:   To me that means that either a general

12  education teacher or a special education teacher could

13  implement the goals and objectives or they both would.

14  Because it also says "and."

15          MR. EIG:   Did you agree with that?

16          DR. SOLOMON:   I didn't.

17          MR. EIG:   Why not?

18          DR. SOLOMON:   Because I don't think that this IEP can

19  be implemented by a general education teacher.  I did raise

20  that at the meeting.  I asked for alternative language which

21  was special education team.

22          MR. EIG:   And did the DCPS members of the IEP team

23  agree to that change?

24          DR. SOLOMON:   No they did not.

1      MR. EIG:  With Prospect, let me ask you a number of

2 specific questions.  First of all, does Prospect have non-

3 disabled students attending it?

4      DR. SOLOMON:  No.

5      MR. EIG:  Ask it the other way around.

6      DR. SOLOMON:  Too many negatives.

7      MR. EIG:  Yes, I'm sorry.  It ends up that's a

8 positive.

9      DR. SOLOMON:  Right.

10     MR. EIG:  Does Prospect have learning disabled or

11 other education disabled students there, attending their

12 school?

13     DR. SOLOMON:  Yes.

14     MR. EIG:  Is it a physically – where is Prospect?  In

15 what section of the city?

16     DR. SOLOMON:  I don't remember.

17     MR. EIG:  Okay.

18     DR. SOLOMON:  That's much too long ago.  I'm so sorry.

19 It is in the District of Columbia.  It is a separate building

20 in the District of Columbia.

21     MR. EIG:  Let's aim to the separate building part.  Is

22 it a separate building?

23     DR. SOLOMON:  Yes.

1        MR. EIG:  Okay.  How would Prospect provide O███ 15%

2 of general education?

3        DR. SOLOMON:  They couldn't.  They don't serve

4 students in that program whose IEP call for any percentage of

5 time in general education.

6        MR. EIG:  Why is that?

7        DR. SOLOMON:  Why can't they?

8        MR. EIG:  What about the program?

9        DR. SOLOMON:  They consider the program to be a full-

10 time special education program.  It's described that way.

11       MR. EIG:  Does Prospect provide general education

12 classes?

13       DR. SOLOMON:  No.

14       HEARING OFFICER:  Mr. Eig.  We've spent a whole lot

15 more time on this than it's worth.  The IEP calls for full-

16 time special ed, the front of the IEP calls for full-time

17 special ed, and you're focusing your attention on an 85%

18 figure that can't be met.  She's already testified that it's

19 an exclusively special ed school.

20       MR. EIG:  I'll move on.  I'll move on.  I understand.

21 The only thing is, never mind, I won't respond to it.  Dr.

22 Solomon, is there anything about Prospect besides the fact

23 that it can't provide an 85% placement, that's inappropriate?

24       DR. SOLOMON:  Yes.

1        MR. EIG:  Why?

2        DR. SOLOMON:  For Oleg, specifically, that he would

3   only have one year there and he's a student who has made

4   multiple transitions.  He needs a place to go to school and

5   he needs a program that can continue over more than one year.

6   That is one consideration.  A second consideration, is the

7   reliance on a curriculum that has, uses general education

8   materials, follows a general education scope and sequence.  I

9   had an opportunity to go on line and review the scope and

10  sequence for the general education, DCPS's general education

11  for sixth grade, seventh grade, eighth grade, middle school

12  age students.  And O▮▮▮▮ skill levels are not to that level.

13  So when I look at the IEP, and it says, given material, and

14  given instruction on his instructional level.  You can't have

15  an eighth grade book and instruct someone theoretically on a

16  fourth grade level.  You can't do it.  So you've got

17  vocabulary that can't be read.  I mean how many

18  accommodations truly are you going to make.  And if we want

19  Oleg to practice his reading skills, you can't give him

20  material to read that he cannot read.  So that was a second

21  consideration.  A third consideration which I have already

22  mentioned is there aren't seven to 10 students in the 13

23  year-old classes.  There were at the time which is the

24  beginning of September of 2006, 12 students in one class, 13

81

1  students in another class and between the time we were in –

2  Ms. Pavo and I – were in Dr. Peterson's office which is when

3  we got that information and we went upstairs to observe the

4  classes, Dr. Peterson corrected herself by saying, oh,  no,

5  there actually are 13 students in each class.

6       So what was represented and what was both at the IEP

7  meeting of August 30th and ultimately when we first started

8  talking to Dr. Peterson, did not in fact prove to be true.

9  And there is a teacher, a special education teacher and a

10  teacher assistant in each class and that ratio is too large

11  for O███.  He needs virtually one on one, which on page four

12  of the IEP, there is a reference to that.  He needs very

13  small group instruction and one on one instruction.  Well you

14  have to have the staff to do that.  So those were the major

15  reasons, and I think that they're huge.  I think the fact

16  that there isn't the opportunity to choose your curriculum

17  materials.  I mean you can supplement all you want.  If you

18  have a core curriculum, you have a core curriculum and they

19  do.

20       MR. EIG:  Was any representation made at the IEP

21  meeting or any communication subsequent as to whether there

22  was actually space for O███ at Prospect.

23       DR. SOLOMON:  Not at this meeting, as I recall.  Maybe

24  on that page and I'm just not remembering.  At a subsequent

                              82                              409

1 meeting I did not attend, but I did review the notes, Dr.

2 Peterson was apparently on the telephone speaking with the –

3      MR. GUPTA:  Objection to answering subsequent meeting

4 (inaudible).

5      MR. EIG:  If you review the notes, it says so in the

6 notes.

7      HEARING OFFICER:  What notes?

8      DR. SOLOMON:  That's the OT.

9      MR. GUPTA:  My objection is just to clarify this

10 ongoing feeling of the sense that she wasn't at the meeting.

11      HEARING OFFICER:  Well, well.  If it's in the record,

12 it's in the record.

13      MR. GUPTA:  But that doesn't give her – she's not the

14 appropriate person to testify to that.  If she wasn't there,

15 she doesn't have personal knowledge.

16      HEARING OFFICER:  Let me point out something in the

17 notes.  She is a consultant with a job.

18      DR. SOLOMON:  (inaudible) when I don't do my own

19 notes.

20      MR. EIG:  Maybe I'll withdraw this question and direct

21 --

22      DR. SOLOMON:  I have it.  I think I have it.  It is

23 September – I'm sorry.

24      MR. EIG:  What's the number?

1     DR. SOLOMON:  Yes.  I'm going there.  DCPS 12, page 1.

2     HEARING OFFICER:  Okay.

3     DR. SOLOMON:  September 21st, 2006, about the middle of

4 that paragraph. The first sentence tells us that Dr. Peterson

5 participated by telephone and five or six lines down, the

6 sentence that starts "are two 13 year-old classrooms."  There

7 are two 13 year-old classrooms, although they are at

8 capacity.

9     HEARING OFFICER:  Wait a minute.  DC 12?

10     MR. EIG:  Yes, sir.

11     DR. SOLOMON:  DC 12.

12     HEARING OFFICER:  Is the prior notice.

13     MR. EIG:  Yes.  If you go in to, I'm sorry, it's not

14 the first page.  That's right.

15     DR. SOLOMON:  The first page of the notes.

16     MR. EIG:  It's the fourth page of the document.

17     HEARING OFFICER:  Okay.  So there's an MDT meeting on

18 the 21st, on what page of the notes?

19     DR. SOLOMON:  The first page of the notes, the middle

20 of the first paragraph.

21     MR. EIG:  It's the fourth page of the document.

22 You're there.

1     DR. SOLOMON:  Right in the middle of the paragraph,

2 the sentence that begins with the words "are two 13 year-old

3 classrooms."

4     HEARING OFFICER:  Uh-huh.

5     DR. SOLOMON:  Although they are at capacity.

6     MR. EIG:  The next sentence there Dr. Peterson noted

7 that she has been assured by special ed that another 13 year

8 old class will be added if necessary.  Do you have any

9 information about that, Dr. Solomon?

10     DR. SOLOMON:  I don't.

11     MR. EIG:  Okay.  How easy is it to start another

12 learning disability full-time education classroom?

13     DR. SOLOMON:  Say it again?

14     MR. EIG:  How easy is it to do it?  Okay.  Do you

15 believe that Prospect would be an appropriate placement for

16 Oleg.

17     DR. SOLOMON:  I do not.

18     MR. EIG:  Do you believe he would be expected to make

19 meaningful educational progress there?

20     DR. SOLOMON:  No I do not.

21     MR. EIG:  Briefly, you said you've observed him at

22 Kingsbury?

23     DR. SOLOMON:  Yes.

412

1        MR. EIG:  Have you also reviewed documents from

2   Kingsbury in addition to work product or whatever they have

3   over at Kingsbury.  Did you have that opportunity?

4        DR. SOLOMON:  Yes.

5        MR. EIG:  Okay.  Is Kingsbury an appropriate placement

6   for Oleg?

7        DR. SOLOMON:  Yes it is.

8        MR. EIG:  Why is an appropriate place?

9        DR. SOLOMON:  Because he has the opportunity to

10  progress age wise and grade wise in the school because they

11  go through high school.  I'll try to take the points as I

12  otherwise delivered them.  They are not wed to a specific

13  curriculum.  They have the opportunity to bring in materials

14  that are on his instructional level and still cover the same

15  content.  That is typically referred to as high interest low

16  readability.  And the point is, any school can surely use

17  that.  So if we hear that Prospect is using those, I would

18  believe that.  But, not as an adjunct to the curriculum.

19  Actually as Oleg's books, as his materials.  That is a second

20  point.  The third is –

21        HEARING OFFICER:  Go over the second point again.

22        DR. SOLOMON:  Yes, sir.  The second point being that

23  the Kingsbury Day School uses curriculum materials from a

24  multitude of sources.  They do not have a specific curriculum

1  that they must use.  Therefore, if a curriculum or certain

2  materials from a curriculum are not appropriate for a

3  particular student, they use something else.  And not only is

4  that okay, that's what the administration of Kingsbury Day

5  School wants their teachers to do.  The third point is that

6  they have increased the staff ratio in their classroom to

7  accommodate Oleg's severe attentional issues.  Severe.

8       MR. EIG:  Is he benefiting from the placement, do you

9  know?

10      DR. SOLOMON:  He is benefiting from the placement.  I

11 had an opportunity to interview his teacher and the program

12 coordinator for his section for the middle school and his

13 mother.  And he is making progress.  I had an opportunity to

14 review some work samples from the beginning of the school

15 year to this point in time, and he is indeed making progress.

16      MR. EIG:  Thank you, Dr. Solomon.  I have no further

17 questions.

18      HEARING OFFICER:  Mr. Gupta?

19      MR. GUPTA:  Yes.  One second.  Dr. Solomon, we're to

20 understand you're the - both the advocate and his evaluator,

21 correct?

22      DR. SOLOMON:  I'm a consultant to the family and I did

23 evaluate him.

24      MR. GUPTA:  And you were his advocate, correct?

87

414

1      DR. SOLOMON:  As I stated earlier, you buy my time.

2  You don't buy my opinion. If I disagree with parents, which

3  actually happens all the time, then I provide that opinion.

4  If you want to say, advocated for certain things to go into

5  the IEP, I did do that.

6      MR. GUPTA:  Is that a conflict of interest to be an

7  independent evaluator and to advocate on his behalf?

8      DR. SOLOMON:  Absolutely not.

9      MR. GUPTA:  Why do you say that?

10     DR. SOLOMON:  Because I have first hand knowledge of

11 him.  I'm in a terrific position to represent his needs.

12     MR. GUPTA:  Well when you write the reports, I mean,

13 do you write those independently?

14     DR. SOLOMON:  Of course.

15     MR. GUPTA:  Don't you find a conflict there since you

16 also have to gear your reports to the type of ID you should

17 have?

18     DR. SOLOMON:  I don't gear my reports to anything

19 except to stay true to the data and provide my opinion.

20     MR. GUPTA:  You said you first came in contact with

21 him in the summer.  Can you give us a month?

22     DR. SOLOMON:  Can I look at my notes?

23     MR. GUPTA:  Of course.

1          DR. SOLOMON:  I have to look at my Palm phone.  It was

2 either June or July.  It was either June or July.

3          MR. GUPTA:  Can you be more specific?

4          DR. SOLOMON:  Yes.

5          MR. EIG:  For the record, Dr. Solomon is referring to

6 her PDA for the date. Which is fine, just a little different.

7          DR. SOLOMON:  It's had a crash since then, I hope it's

8 in here.  July 11th, 2006.

9          MR. GUPTA:  July 11th, 2006?

10          DR. SOLOMON:  Yes.

11          MR. GUPTA:  Just so you can reiterate, you said you

12 did not observe him at the prior school, correct?

13          DR. SOLOMON:  I did not.

14          MR. GUPTA:  So on 7-11-2006, what did you do? Did you

15 have him interviewed?  Did you just talk to the mother?  You

16 know, did you have interaction with all on that day, or just

17 the mother?

18          DR. SOLOMON:  May I tell you?  O███ was there, but the

19 purpose - Ms. Pavo didn't have any place to leave him.  But

20 the purpose of the meeting was to do the initial intake.  I

21 have not been familiar with O███ before that although I had

22 worked with the family many years ago.

23          MR. GUPTA:  Okay.  Isn't that also the day of 2000

24 (inaudible).

1      DR. SOLOMON:  Okay.  I could actually be wrong about

2 this.  I saw O████ on the 11th and then I saw him again on the

3 24th.  What I can't recall is exactly how much I did on each

4 of those days.

5      MR. GUPTA:  Is the 24th date annotated anywhere in your

6 notes or in your reports?

7      DR. SOLOMON:  No I don't believe it is.

8      MR. GUPTA:  So you evaluated him on the same day you

9 met him.

10      DR. SOLOMON:  I actually did, I do think I started.

11 We did very little.  Mostly what I did was admire his sky

12 scraper.

13      MR. GUPTA:  So when did you actually evaluate him?

14      DR. SOLOMON:  I think I just answered that question.

15 I guess it was on the 11th and then again on the 24th.

16      MR. GUPTA:  Okay.  I guess I was confused with your

17 answers.  You just said you mostly admired his sky scraper.

18 I don't know what means, on the 11th.

19      DR. SOLOMON:  I wrote up in my report what O████ -

20      HEARING OFFICER:  This whole reparte (phonetic) is not

21 useful to me.

22      MR. GUPTA:  So you evaluated him on the 11th and the

23 24th you say.  When did you finally get the report to DCPS?

417

1      DR. SOLOMON:  I never, I guess I don't know.  I would

2 have to look back.  I think I have a certified sheet for it.

3 I know I completed final copy dated August 16th.

4      MR. GUPTA:  Okay.  Were you aware there was an MDT

5 scheduled on 7-13?

6      DR. SOLOMON:  I don't know whether I was aware of that

7 or not.  Again, I could pull it up in my Palm.

8      MR. GUPTA:  Were you aware there was an MDT meeting

9 scheduled on 8-10?

10      DR. SOLOMON:  I can't say that I was aware, no.  I

11 don't have a chronology written.

12      MR. GUPTA:  Okay.  In your direct testimony, you

13 stated you attended the 8-30 meeting and a meeting prior to

14 that.  Can you give us the date of the meeting that you

15 actually attended?  Prior to the 8-30 meeting.

16      DR. SOLOMON:  Right.  No, I can't.  I did not.  It was

17 an error.  I should have had this open.  I attended a meeting

18 on August 30th.

19      MR. GUPTA:  Okay. So now you are saying August 30th was

20 the only meeting you attended from the time you first

21 evaluated O███ on 7-11 till he went to Kingsbury, correct?

22      DR. SOLOMON:  Please ask me again?

23      MR. GUPTA:  For the first time you came in contact

24 with O███ –

91

418

1        DR. SOLOMON:  I – yes.  I'm sorry.  I have it.

2        MR. GUPTA:  The (inaudible)meeting at Kingsbury.  The

3  8-30 meeting was the only meeting you attended.

4        DR. SOLOMON:  That is correct.  D

5        MR. GUPTA:  And you can't give us a date when you got

6  your two evaluations to DCPS?

7        DR. SOLOMON:  Well I don't think I got two

8  evaluations.  Because one was simply –

9        MR. GUPTA:  Well, the two you have in here.  No. 7 and

10  8, in parent's disclosure.

11        DR. SOLOMON:  What I'm saying to you is that I didn't

12  send two of them.  One was an email copy specifically for the

13  purpose of having the mother look over the chronological

14  information and then the final copy, I do believe I sent out,

15  and –

16        MR. GUPTA:  Would the final copy be the one with the

17  test results?

18        DR. SOLOMON:  Yes.

19        MR. GUPTA:  The actual results on No. 7?

20        DR. SOLOMON:  Yes.  I have a copy of a letter I sent

21  to Ms. Brown dated August 18th, 2006.

22        MR. GUPTA:  In order to completely develop his IEP,

23  wouldn't you agree that your evaluation and what is listed

24  here as Parent 7 was needed?

92

419

1        DR. SOLOMON:  Absolutely.

2        MR. GUPTA:  By DCPS?

3        DR. SOLOMON:  That's why my letter says in

4 preparation, you know, please let me know if you want any

5 more information, like to discuss my findings and/or the

6 recommendations prior to the IEP meeting.  Absolutely.

7        MR. GUPTA:  Isn't it true, though you intended to have

8 that IEP meeting on 7-24, that that meeting didn't go forward

9 because your evaluations weren't ready for DCPS to review?

10       DR. SOLOMON:  You know, sir, if there is evidence of

11 that, I completely accept it.  I do not have a chronology.  I

12 don't know how many more times to say that.  I don't have it.

13       MR. GUPTA:  Well, we'll move on.

14       HEARING OFFICER:  Did you hold a meeting on 7-24?

15       MR. GUPTA:  A meeting did not go forward that day.

16 The meeting was scheduled for that day.

17       HEARING OFFICER:  Did you hold a meeting on August the

18 10th?

19       MR. GUPTA:  A meeting was held on August 10th.

20       HEARING OFFICER:  Did you put it into the record?

21       MR. GUPTA:  If you look at DCPS 05 IEP, the first page

22 of the IEP?

23       HEARING OFFICER:  But that's an August 30th meeting.

93

420

1        MR. GUPTA:  But if you look below that line, date of

2   last IEP meeting, 8-10-06.

3        HEARING OFFICER:  But there's no documentation of that

4   meeting, right?

5        MR. GUPTA:  There is a documentation.  Neither meeting

6   actually I believe went forward.  That's why we didn't –

7        HEARING OFFICER:  My point is, did you disclose

8   anything about a meeting other than the 30th?

9        MR. GUPTA:  Your indulgence for one second.

10        HEARING OFFICER:  The answer is no.  I'm looking at

11   your exhibits.  The first meeting that you report on is 8-30-

12   06.

13        MR. GUPTA:  Okay.  I'll withdraw that, but –

14        HEARING OFFICER:  I'd like to know what your point is.

15   Now we've had seven or eight questions about meetings that

16   are not documented.

17        MR. GUPTA:  My point is in their opening they said

18   that DCPS delayed in holding an IEP meeting.  And I'm trying

19   to show that it wasn't DCPS's delay.

20        HEARING OFFICER:  Oh, okay.

21        MR. EIG:  I'm sorry –

22        HEARING OFFICER:  This is not your witness.

94

421

1      MR. EIG:  I'm trying to eliminate an issue.  Because I

2  didn't say that.  I said it was slightly late and it's not an

3  issue.

4      HEARING OFFICER:  I'm just – we're past that.  I'm

5  trying to find out where he's going, I'm trying to find the

6  facts.

7      MR. EIG:  Okay.

8      HEARING OFFICER:  Go ahead, Mr. Gupta.

9      MR. GUPTA:  Now the Dr. Feterechi report, you say that

10  that was done without O█████ medication, correct?

11      DR. SOLOMON:  That's correct.

12      MR. GUPTA:  And as far as you know, does O███ take his

13  medication every single day?  When he is supposed to?  How is

14  it prescribed to him?

15      DR. SOLOMON:  Yes.  He is supposed to take it every

16  day.

17      MR. GUPTA:  So wouldn't it make sense that his testing

18  should be done on his medication?

19      DR. SOLOMON:  I do not control Dr. Feterechi's

20  practice, sir.

21      MR. GUPTA:  But you do point to Dr. Feterechi's

22  testing to support some of your arguments, don't you?

23      DR. SOLOMON:  Dr. Feterechi still has important things

24  to share.

1        MR. GUPTA:  It was a yes or no question.  Do you point

2  to - do you reference Dr. Feterechi?

3        DR. SOLOMON:  Yes I do.

4        MR. GUPTA:  Okay.  I want to move on to your testing.

5  Now the - let me get to your notes.  I guess you said 7 was a

6  complete one, correct?

7        DR. SOLOMON:  That's correct.

8        MR. GUPTA:  I'm going to the very last page -

9        DR. SOLOMON:  Sure.

10        MR. GUPTA:  - Mr. Hearing Officer.  Test scores for

11  O██, O██████.  The SS band?

12        DR. SOLOMON:  Yes.

13        MR. GUPTA:  Across the top?

14        DR. SOLOMON:  Yes.

15        MR. GUPTA:  Explain to me why, how you got to the 68%.

16        DR. SOLOMON:  It's a default in the scoring program.

17        MR. GUPTA:  Isn't it true most testers use 90%?

18        DR. SOLOMON:  No, most testers use the 68% because

19  it's a default in the scoring program.  You can both have 90%

20  confidence band and a 95% confidence band.  And most

21  evaluators do not use that.

22        MR. GUPTA:  Did DCPS disagree with the opinion you

23  have in here about O██ needing a full-time placement?

1      DR. SOLOMON:  As I recall there was some discussion

2  about it, but ultimately no, because they did recommend a

3  full-time program called Prospect Learning Center, even

4  though the paperwork is discrepant from that.

5      MR. GUPTA:  I would like you to just answer the

6  question I'm asking you.  Did DCPS disagree with your

7  recommendation that he required full-time placement?

8      DR. SOLOMON:  Not ultimately.

9      MR. GUPTA:  Did DCPS accept Dr. Feterechi's testing?

10     DR. SOLOMON:  As I recall.

11     MR. GUPTA:  I'm sorry?

12     DR. SOLOMON:  As I recall.

13     MR. GUPTA:  They did accept it?

14     DR. SOLOMON:  As I recall, they did accept it.

15     HEARING OFFICER:  I'm not sure what that means.  What

16 do you mean did they accept his testimony?

17     MR. GUPTA:  It means do they accept his results to be

18 valid.

19     HEARING OFFICER:  You mean in the MDT meeting or DCPS?

20 What are you talking about?  Are you talking about --

21     MR. GUPTA:  DCPS representatives, whether it's the

22 Care Center's staff, or Dr. –

23     HEARING OFFICER:  When you say accept it, do you mean

24 accept it for filing?  See I view that MDT as a team.

97

424

1      MR. GUPTA:  I'm sorry.  I'll clear it up.

2      HEARING OFFICER:  I don't view it as DCPS.  So I don't

3 understand what you're talking about.

4      MR. GUPTA:  Okay.  Let me – oh, yes.  I understand.

5 I'll clarify.  Did representatives of the Care Center accept

6 Dr. Feterechi's testing as valid even though it wasn't – he

7 wasn't on his medication.

8      DR. SOLOMON:  I can't answer the question as phrased,

9 I'm sorry.

10      MR. GUPTA:  Did the Care Center staff have any

11 problems with the way Dr. Feterechi tested O███?

12      DR. SOLOMON:  I do not recall.

13      HEARING OFFICER:  Are you talking about at the MDT

14 meeting?

15      MR. GUPTA:  Yes.  At the 8-30 MDT meeting.

16      HEARING OFFICER:  Well that will be in the notes, if

17 they did, wouldn't it?

18      MR. GUPTA:  That's all right.  That's all right.  I'll

19 move on.  When did you first visit the program at Prospect?

20      DR. SOLOMON:  First?

21      MR. GUPTA:  I'm sorry.  In regard to O███.

22      DR. SOLOMON:  9-7-06.

23      MR. GUPTA:  How long were you there?

24      DR. SOLOMON:  A couple hours.

425

1       MR. GUPTA:  Did the students have lunch while you were

2 there?

3       DR. SOLOMON:  Not the students we saw.  So, there are

4 probably on a rotating lunch schedule.

5       MR. GUPTA:  But O████ - Prospect does have lunch hour,

6 correct?

7       DR. SOLOMON:  They have a lunch time.  I don't know if

8 it's an hour.

9       MR. GUPTA:  Do you know if Prospect also has a recess

10 time?

11       DR. SOLOMON:  I assume they do.

12       MR. GUPTA:  Does Prospect have a home room time?

13       DR. SOLOMON:  I assume they do.

14       MR. GUPTA:  Okay.  In terms of the IEP, you said

15 specifically you disagree with the 80% section, correct?

16       HEARING OFFICER:  It's 85.

17       MR. GUPTA:  Eighty percent wording.

18       MR. EIG:  Eighty five rating.

19       MR. GUPTA:  Well, it's time to (inaudible).  I'm going

20 to the same page we were on before.  Academics reading on

21 DCPS 5.

22       HEARING OFFICER:  Oh, that 80%.  I thought you were

23 talking about - I thought you were going to follow up on the

24 questions about lunch and recess.

426

1     MR. GUPTA:  No.  I'm going to get back to it.  In the

2  same section in academics reading, how many goals, the short

3  term objective goals do you have listed there?  What do we

4  have listed there?

5     DR. SOLOMON:  On this page?

6     MR. GUPTA:  I believe this is two pages long, correct?

7     DR. SOLOMON:  The reading section is in fact two pages

8  long.

9     MR. GUPTA:  Can you count up each box, where timing

10  boxes are there, they are filled out.  Starting with the –

11  correction – starting below where it says short-term

12  objectives.

13     DR. SOLOMON:  Okay.  One, two, three, four, five, six,

14  seven, eight, and nine.

15     MR. GUPTA:  And then above under the annual goals

16  section where it says 80%?

17     DR. SOLOMON:  I see it.

18     MR. GUPTA:  Isn't it true that 80% refers to

19  fulfilling 80% of those nine goals you just enumerated here?

20     DR. SOLOMON:  No.  Not at all.  By mastering the

21  following short term objectives by 80% is the goal.  That is

22  the goal.  It is written in the goal box.

23     MR. GUPTA:  And, so the way you analyze this, it

24  doesn't represent the mastering of a numerated short-term

1 goal because it's -- when it says listed, of the following

2 short-term objectives.

3     DR. SOLOMON:  That's correct.  Because each of the

4 nine objectives has a measurement criterion attached to it.

5     MR. GUPTA:  Doesn't a criterion within each goal

6 represent the criteria for that goal?

7     DR. SOLOMON:  Its their objectives.  Goals at the top,

8 and the other nine things you had me count up are objectives.

9 Each objective has a measurement criterion associated with

10 it.  It doesn't have to be 80%.  It could be 90%.  It could

11 be 65%.  It depends on what it is.

12     MR. GUPTA:  So, the way you read this is 80% of the

13 time the student must fulfill objective one, 80%, is the way

14 you read it?  Eighty percent of 80%?

15     DR. SOLOMON:  That is what I said and I'll be happy to

16 say it again.  By the time you put 80% up at the top, and

17 then you've got 80% down below, in my view, you are taking

18 80% of 80%.  You don't need it up on the top.  Because each

19 objective must have some sort of measurement criterion

20 associated with it and it is here.

21     MR. GUPTA:  So isn't it true then, the way you read

22 the goals, then, for example, the very first objective, a

23 student can only have met that goal and failed to meet the

1  rest of the goal?  The way you read it, then, is (inaudible),

2  because he met one goal.

3       DR. SOLOMON:  I don't understand what you just said.

4       MR. GUPTA:  DCPS stated they - well, actually, I'll

5  get to that.  First of all, did you express these concerns

6  about the way the 80% of 80% at the meeting, the IEP meeting

7  on 8-30?

8       DR. SOLOMON:  No.  I didn't see final copy of this IEP

9  until it came to me and I can't remember whether I got it

10 from Ms. Pavor or I got it from Mr. Eig.  So I was dealing

11 with content.

12      MR. GUPTA:  Okay.  So when did you express your 80% of

13 80% problem with the IEP?

14      DR. SOLOMON:  I didn't.  I didn't.

15      MR. GUPTA:  You never expressed that to -

16      DR. SOLOMON:  Well I didn't express it - no, I have

17 expressed it to DCPS ever but I did not in reference to O███.

18      MR. GUPTA:  Okay.  So, then how should the Care Center

19 and the rest of the IEP team have fixed this if you never

20 told them that this was a problem?

21      DR. SOLOMON:  See I just expect them to know.  I don't

22 think they should need me.  I don't think a parent should

23 have to hire a consultant so it goes down all right.

1      MR. GUPTA:  So, just to reiterate, your view is that

2 these aren't enumerated goals, correct?

3      DR. SOLOMON:  I don't understand the question.  I'm

4 sorry.

5      MR. GUPTA:  Each short term objective is not

6 enumerated, meaning –

7      DR. SOLOMON:  I have said this.

8      HEARING OFFICER: Mr. Gupta, look, you're beating a

9 dead horse.  There's a goal and objectives under the goal.

10 What is it you're trying to get at here?

11      MR. GUPTA:  I'm trying to get at her interpretation of

12 this page is –

13      DR. SOLOMON:  She says it's poorly drafted.  She says

14 that it's, you know.  She said what she said.  I don't, I

15 mean, what am I supposed to get?

16      MR. GUPTA:  All right.  Going back earlier, you said

17 Prospect does have a lunch hour or a recess hour and probably

18 a home room hour.  Is that correct?

19      DR. SOLOMON:  I do not agree with the word "hour."

20 They have a recess time for especially the younger kids.

21 They may have it for the sixth, seventh and eighth graders,

22 that would be unusual, but they may.  Every school that runs

23 all day must have a time for the students to eat.  In some

24 schools, in middle school, you do 15 minutes, it keeps you

1 out of trouble.  Then you are right back to work.  In some

2 schools, it's 30 or 40 minutes, and you're allowed off

3 campus.  So, it's not relevant to me in terms of whether a

4 particular program placement is appropriate for a student

5 because if a kid needs monitoring, a kid needs monitoring,

6 but the kid still has to eat.

7       MR. GUPTA:  Okay.  Having said that, though, every

8 school has some amount of time dedicated for lunch, correct?

9       DR. SOLOMON:  Yes.  Of course.  As long as it runs all

10 day.

11       MR. GUPTA:  Sure.

12       DR. SOLOMON:  Okay.

13       MR. GUPTA:  And Prospect has a dedicated amount of

14 time for lunch.

15       DR. SOLOMON:  I assume they do.

16       MR. GUPTA:  Prospect has a dedicated amount of time

17 for recess, correct?

18       DR. SOLOMON:  Again, I'm saying that with as much

19 certainty as I can have, there is recess for the younger

20 students.  If there is recess for the older students, that

21 may be.  It would be unusual.

22       MR. GUPTA:  So wouldn't just those time periods,

23 whether it's 15 minutes or if it's an hour for lunch,

24 wouldn't that explain the difference between the 32.5 full-

431

1 time, or you said 32.5 hours is a full week of the school at

2 DCPS.  And this IEP has 27.5.  Couldn't home room, recess and

3 lunch explain the differentiations, the 4 and a half hours

4 right there?

5          DR. SOLOMON:  I have no idea what DCPS was thinking.

6 O██ needs full-time special education which means, I mean

7 you've never seen O██.  So you just don't know what it looks

8 like out on the playground for example. Okay?

9          MR. GUPTA:  So you take lunch and recess are  outside

10 of the 32.5 hours?

11          DR. SOLOMON:  No, they are well within the 32.5 hours.

12 But I expect the front cover of –

13          MR. GUPTA:  That's all I needed you to answer.

14          DR. SOLOMON:  No problem.

15          MR. GUPTA:  So lunch and recess, or home room are

16 included in the 32.5 hours that DCPS has as a full-time week.

17          DR. SOLOMON:  I just answered the question.

18          MR. GUPTA:  I'm just asking for a reiteration.

19 Correct?

20          DR. SOLOMON:  Correct.  Anything that has to take

21 place takes place within the school week.

22          MR. GUPTA:  Did you inquire about the certification

23 status of Prospect teachers?

24          DR. SOLOMON:  Yes I did.

432

1        MR. GUPTA:  And what was - what did you find?

2        DR. SOLOMON:  I found that the teachers were

3   certified.  They did hold certification and some of the

4   assistants held certification, and some of the assistants

5   were working on higher education.  I did not take down the

6   particulars.

7        MR. GUPTA:  And how many adults per class did you find

8   at Prospect?

9        DR. SOLOMON:  Two.

10       MR. GUPTA:  How many adults per class in Kingsbury?

11       DR. SOLOMON:  It depends.

12       MR. GUPTA:  How about in O█████ class right now?

13       DR. SOLOMON:  Three.

14       MR. GUPTA:  And how many students in his classroom?

15       DR. SOLOMON:  Ten.

16       MR. GUPTA:  Okay.  And you also said Prospect Learning

17   Center is not a general education center, correct?

18       DR. SOLOMON:  It is not.

19       MR. GUPTA:  Only special education kids attend there?

20       DR. SOLOMON:  Unless something has changed since

21   September, yes.

22       MR. GUPTA:  Is that true that all teachers, whether

23   it's general ed, or special ed, are allowed to bring in

24   outside materials to their classroom for a teaching aid?

1    DR. SOLOMON:  I don't know whether they're allowed to.

2 Most teachers do.  But that's not what I was describing.

3    MR. GUPTA:  Did you inquire whether at Prospect

4 they'll modify their curriculum to meet the students' needs?

5    DR. SOLOMON:  Oh, they absolutely modify their

6 curriculum but they use the grade level textbooks.  If you're

7 working on reading, you have to work on reading.

8    MR. GUPTA:  And you were at the 8-30 meeting, correct?

9    DR. SOLOMON:  I was.

10    MR. GUPTA:  Let's go over now some of your issues I

11 guess with the IEP you expressed at that meeting.  I noticed

12 you wanted an increase in the hour of psychological services.

13 What was the result of that?

14    DR. SOLOMON:  Dr. White-Jennings agreed with me.

15    MR. GUPTA:  I noticed you didn't believe he needed a

16 behavior plan.  Correct?

17    DR. SOLOMON:  I didn't.  But DCPS disagreed with that;

18 yet there is no behavior plan.  DCPS states clearly on page

19 what's marked 2 of 3 of Exhibit 5, but really is page 2 of 4.

20 L. Solomon does not believe a behavior plan will be needed if

21 student is in a full-time placement.  D. White-Jennings

22 indicated that she believes it is more appropriate to enter a

23 program with a plan in place, and if it is not needed it does

24 not have to be used in the MDT.

107

434

1       MR. GUPTA:  And you are a part of the MDT team,

2 correct?

3       DR. SOLOMON:  I am part of the MDT, but my

4 disagreement –

5       MR. GUPTA:  I just want you to answer the question I

6 asked you.  It was a yes or no question.

7       DR. SOLOMON:  I am part of the MDT.  The MDT in this

8 sentence does not represent my view.

9       MR. GUPTA:  You also requested large print material,

10 and accommodations in terms of like magnifying equipment.

11 Was that granted?

12      DR. SOLOMON:  I believe it was.  I believe it's on the

13 accommodation page of the IEP.  It looks like there was a

14 little disagreement about a scribe, as well.  Do you think –

15      HEARING OFFICER:  I'm sorry.  What was the last one?

16      MR. GUPTA:  Magnifying equipment and large print

17 materials, they did come to an agreement, she stated.

18 Another dispute you had was you wanted a scribe, correct?

19      DR. SOLOMON:  Correct.

20      MR. GUPTA:  And DCPS in the Care Center staff offered

21 a tape recorder, correct?

22      DR. SOLOMON:  Correct.

23      MR. GUPTA:  Do you remember why they offered the tape

24 recorder instead of the scribe?

435

1       DR. SOLOMON:  Yes, they didn't think a scribe was

2  appropriate.

3       MR. GUPTA:  Why not?

4       DR. SOLOMON:  Because O███ needed to work on written

5  language skills.

6       MR. GUPTA:  And are you still in disagreement about

7  that?

8       DR. SOLOMON:  I am.

9       MR. GUPTA:  So you don't believe he needs to practice

10  writing and work on his language skills?

11      DR. SOLOMON:  I don't believe, as Mr. Banks so

12  eloquently said a few minutes ago, in beating a dead horse.

13  This is a kid with very severe visual-motor problems.  And I

14  mean very severe.  So our job at almost 14 years old is to

15  provide him with as many coping skills as he can have so he

16  can grow up to be an independent adult and not take

17  taxpayer's dollars unnecessarily.  Having him learn how to

18  dictate to a scribe, having him – I have no objection to the

19  tape recorder, it's just not the same thing.  He needs to

20  learn what he's saying.  He needs feedback.

21      MR. GUPTA:  Does he have a scribe at Kingsbury?

22      DR. SOLOMON:  He does.

1        MR. GUPTA:  Isn't it true also at the 8-30 meeting

2  when they presented Prospect that they stated they are

3  holding a spot open for him?

4        DR. SOLOMON:  Yes.

5        MR. GUPTA:  And by what time did you let Prospect know

6  that they don't need to hold that spot anymore?

7        DR. SOLOMON:  I had nothing to do with that

8  whatsoever.  We disagreed with the proposed placement at the

9  meeting.

10        MR. GUPTA:  Who at Kingsbury is the scribe, by the

11  waY?

12        DR. SOLOMON:  It's not the same person all the time.

13  It depends on which teacher is working with O███.

14        MR. GUPTA:  Can you further explain that?  What do you

15  mean, so a teacher actually sits down and acts as a scribe

16  for him?

17        DR. SOLOMAN:  Takes dictation?  Absolutely.

18  Absolutely.

19        MR. GUPTA:  So then it changes every time?

20        DR. SOLOMON:  Well it might not change –

21        MR. GUPTA:  I don't understand your answer.

22        DR. SOLOMON:  It might not change every time but there

23  might be a particular teacher working with him in social

24  studies and if a lengthy response is necessary, that teacher

1 would take the dictation.  It might be a different teacher

2 working with him either the next day in social studies or in

3 science, or in language arts.

4     MR. GUPTA:  Okay.  So just to be clear, there's no

5 dedicated scribe that sits with him all day, correct?

6     DR. SOLOMON:  Absolutely not.  He doesn't need a

7 scribe to sit with him all day.  He needs somebody to take

8 dictation when he needs to give dictation because there is

9 lengthy written response required.

10     MR. GUPTA:  So does that mean, does that mean it's on

11 an as needed basis?  Your answer?

12     DR. SOLOMON:  Yes, I suppose it is.  As per the

13 particular assignment.  If one word is required, he doesn't

14 have any trouble writing that down.  You can't read it.  But

15 he can write it down.

16     MR. GUPTA:  Why didn't you attend the 9-21 meeting?

17     DR. SOLOMON:  I probably had a conflict.  I don't

18 remember.

19     MR. GUPTA:  Did you attend any further meetings?

20     DR. SOLOMON:  No.

21     MR. GUPTA:  Are you aware that on - a later meeting in

22 November -

23     HEARING OFFICER:  Let me just caution both parties.

24 The complaint was filed on September 14th.  My interest in

1 anything after that date, since the resolution session is no

2 longer an issue, my only interest after that date is when

3 they want to talk about educational benefit at Kingsbury.  If

4 she - my fact finding is going to be with respect to the IEP

5 and placement, it's, what was the state of affairs as of

6 September 15th.  With respect to educational benefit at

7 Kingsbury, that's post September 15th.

8      MR. GUPTA:  Well, the 8-30 meeting also recommended an

9 OT evaluation which was the MDT meeting, MDT team met.  Not

10 until November.

11     HEARING OFFICER:  The complaint was already filed.  I

12 don't care about that.  The issue for me, and either party

13 can correct me if I'm wrong.  The issue for me is on

14 September 15th, had DCPS denied petitioner faith by failing

15 to provide an appropriate placement and an appropriate IEP?

16     MR. GUPTA:  Okay.  Well, then, I have no more

17 questions.

18     HEARING OFFICER:  Mr. Eig, any re-direct?

19     MR. EIG:  Yes.  A couple.  And we agree as to your

20 day, I believe that your statement with triple negatives in

21 there what might have been said wrong, but, but, as of

22 September 15th -

23     HEARING OFFICER:  It was designed to throw everybody

24 off.

1      MR. EIG:  It was very –

2      [LAUGHTER]

3      MR. EIG:  Dr. Solomon, just a couple.  On the IEP,

4  DCPS 5, back to the first page of the IEP which is I think we

5  can agree, page 5 of the doc, 6 of the document.  First page

6  of the IEP.

7      DR. SOLOMON:  Yes.

8      MR. EIG:  In that section where it said percent of

9  time not in regular education setting, 85%.  I need to ask

10  you about that.  Does whether O██ is – if you were at

11  Prospect and whether he is on the playground, or whether he's

12  having lunch in the lunchroom or in his classroom, whether he

13  has a recess at age 13 or whatever, would any of those be in

14  a regular education setting?

15      DR. SOLOMON:  No.

16      MR. EIG:  Does Prospect to the best of your knowledge

17  and your observation talking to its director, have regular

18  education settings?

19      DR. SOLOMON:  No.

20      MR. EIG:  Is it set up to have a regular education

21  setting?

22      DR. SOLOMON:  No.

23      MR. EIG:  Now.  You said something about – you said it

24  directly in view of the fact that you've haven't seen him and

440

1  I'm a lawyer and the lawyers don't see the kid, but you

2  started talking about O██ - out on a playground.

3         DR. SOLOMON:  Yes.

4         DR. EIG:  What significant - does O██ need

5  specialized instruction and a combination of modifications on

6  the playground?

7         DR. SOLOMON:  Yes he does.

8         DR. EIG:  Why?

9         DR. SOLOMON:  For two reasons.  One, there is already

10  a documented history of numerous injuries and if I use the

11  small letters for assault, assault on him, physical assault

12  out on playgrounds and in unsupervised settings in the

13  schools.  DCPS schools as well as Our Lady of Victory.  So

14  that's one reason.  So there needs to be some proactive

15  prevention for that.  He's very small and he's extremely

16  impulsive.  So moving to the impulsivity and his difficulty

17  with peer relationships, he actually, the playground, if he's

18  out there, just in physical education, is a terrific time to

19  begin to work on forming peer relationships that will

20  actually be successful.

21         MR. EIG:  What about at lunch time?

22         DR. SOLOMON:  At lunch time we also would very much

23  like to see kids interact with each other socially.  That's

24  the time they make plans for how they are going to use their

1  free time.  It's the time when they begin to talk about, you

2  know, maybe we'll go see this new movie.  Well O███ doesn't

3  do that.  He doesn't know how to do that.  And he needs

4  instruction in order to do that.

5          MR. EIG:  Just one other question?  Thank you.  Same

6  document, DCPS 5, let's turn to the first page, and let me

7  ask you something that I noticed and Mr. Gupta was asking

8  about this.  You were at this meeting, this is the 8-30

9  meeting.

10         DR. SOLOMON:  Yes.

11         MR. EIG:  This is the one you  know you were at,

12  right?

13         DR. SOLOMON:  Yes.

14         MR. EIG:  Okay.  Is that your signature?

15         DR. SOLOMON:  Yes.

16         MR. EIG:  And is Ms. Pavo's signature there?

17         DR. SOLOMON:  Yes.

18         MR. EIG:  And is Ms. Rosenstock's, from my office, her

19  signature there as well?

20         DR. SOLOMON:  Yes.

21         MR. EIG:  Okay.  Now, are the rest of the people DCPS

22  employees?  To the best of your knowledge?

23         DR. SOLOMON:  Yes.

1       MR. EIG:  Okay.  Who is the general educator in that

2 group?

3       DR. SOLOMON:  There is no general educator.

4       MR. EIG:  Is this the IEP team that determined whether

5 or not O███ was going to receive a hundred percent special

6 education, 85 percent special education, you know, whatever?

7       DR. SOLOMON:  Yes.

8       MR. EIG:  I have no further questions.

9       HEARING OFFICER:  With respect to curriculum.

10       DR. SOLOMON:  Yes.

11       HEARING OFFICER:  Would you go over that point again

12 as to why you think the curriculum at PLC is not appropriate?

13       DR. SOLOMON:  Yes, I will.  Each year in public

14 schools, teachers are given what's referred to as a scope and

15 sequence.  What will we cover and in what order.  And most

16 school systems have that information available to parents.

17 The teachers, of course have it, and DCPS does in fact have

18 their curriculum standards on their web sites.  Along with

19 the scope and sequence, it is determined by whomever makes

20 these decisions, which books are going to be used, which

21 science kit is going to be used.  And public school teachers

22 all over the country are expected to use those materials as

23 the core of their instruction.  Of course other materials can

24 be brought in.  Of course the materials can be modified.  For

443

1  example, a teacher might read a certain section to a class or

2  to a small group of students.  But by and large the materials

3  are the materials.  So if you have a reading series, a text

4  book, a literature book, almost certainly attached to that

5  curriculum book will be a student workbook.  It's true in

6  math, it's true in language arts, it's almost always true in

7  science and social studies by the middle school grades.  And

8  those text books are not special education text books.  Those

9  are general education textbooks, so, you know, at Deale or

10  Hardy Middle School, Junior High, they use exactly the same

11  textbooks that are used at Prospect.

12        Well O████ is not on that level.  There is an

13  assumption in special education by and large that if kids are

14  functioning on grade level they probably don't qualify.  And

15  that is my objection.

16        HEARING OFFICER:  So just so that I understand –

17        DR. SOLOMON:  Sure.

18        HEARING OFFICER:  He's currently in the 8th grade?

19        DR. SOLOMON:  Yes.

20        HEARING OFFICER:  And what specifically are you saying

21  about the materials at PLC.  There are eighth grade

22  materials.

23        DR. SOLOMON:  They are.

24        HEARING OFFICER:  And you're saying he can't read?

444

1    DR. SOLOMON:  He can't read them.  He can't master the

2 concepts.  He's not at that level.  And inside DCPS 5, in the

3 objectives, you will notice language which I am completely

4 wed to, which is, given material on his instructional level,

5 well, if your instructional level is fourth grade and you're

6 given eighth grade material, how are you supposed to do that?

7 I mean just how fast can we take you?

8    HEARING OFFICER:  Where in the record, do I get that

9 he reads at a fourth grade level.

10    DR. SOLOMON:  That was a generic example.  But I will

11 be happy to answer your question more specifically.

12    HEARING OFFICER:  If her testimony is correct then I

13 shouldn't put more weight on age equivalency.

14    DR. SOLOMON:  No that's right.

15    HEARING OFFICER:  That's all that I have.  And I don't

16 have grade equivalency.

17    DR. SOLOMON:  Sure.

18    HEARING OFFICER:  But verbal ability, well verbal

19 ability I've got 13-6.  Verbal comprehension I've got 13- -

20 no I can't give you that.  Spatial relationships, no.

21    DR. SOLOMON:  Okay.

22    HEARING OFFICER:  Just lead with psycho-ed, I guess.

23 Reading comp –

118

445

1       DR. SOLOMON:  Sure.  And Dr. Federici's report

2 contains that information.

3       HEARING OFFICER:  Where's that?  Federici, the

4 neuropsych, so that's 14.

5       MR. EIG:  14.

6       DR. SOLOMON:  Okay.  Good.  I think we probably

7 disclosed this as well, but it was easy to find here.   DCPS

8 07.

9       HEARING OFFICER:  DC 07?  All right.

10      DR. SOLOMON:  Yes.  And this is the supplemental

11 educational evaluation – oh, I'm sorry, it's 8.  It's 8.  I

12 apologize.  And the practice group of Dietzel & Butler did

13 some additional information so they have included, I'm

14 looking at the second page of the report, information on

15 reading and written language.  And when if percentile ranks

16 are used, percentile ranks that range between 25 and 75 are

17 considered to be average scores.  So scores that are below

18 that are below average scores.  So we already then know that

19 the kid is not functioning and some of his were.  I'm not

20 saying absolutely in no area.  For example, when they gave

21 him – excuse me – a measure of decoding nonsense words, they

22 got a 44th percentile.  An average score.  On my testing

23 phonemic awareness was I believe, and I can look again, a

24 high average score.  He has some skills.  But when he then

119

446

1  was asked to - just one second - to use those skills to do

2  something else, and now I'm looking at the first page of

3  their appendix, several pages beyond that.  Okay.  So he's

4  got great single word decoding skills.  They then give him

5  the gray silent reading test.  He gets a standard score of

6  55, below the first percentile.  He can't use them.

7          HEARING OFFICER:  Okay.

8          MR. EIG:  Can I ask for one clarification, if you

9  don't have a question?  Okay.  Just to make it clear.  Loyd

10  Deitzel's educational results here are what you refer to, I'm

11  looking at the appendix.  Are these current educational

12  levels for O████ based on standardized testing?

13          DR. SOLOMON:  Yes.  And it measures - they measured

14  basic skills on the WJ 3 and some more integrated and higher

15  level skills.

16          MR. EIG:  Will you indulge me please for one moment.

17  And just to further answer the question.  Turn to the IEP

18  itself.  How close was his IEP, 5?  The present levels of -

19  are there also levels there, and you don't have to go through

20  them, just so we can direct Mr. Banks -

21          DR. SOLOMON:  Sure.

22          MR. EIG:  - as to where he's functioning?

23          DR. SOLOMON:  Yes.

1        MR. EIG:  And then let's say it ranges from a mid

2   third grade level to a sixth grade level.

3        DR. SOLOMON:  Yes.

4        MR. EIG:  For an eighth grader.

5        DR. SOLOMON:  Yes.

6        MR. EIG:  Thank you.

7        DR. SOLOMON:  An eighth grader should be a tenth

8   grader.  He's been retained twice.

9        HEARING OFFICER:  Mr. Gupta, do you have any questions

10   based upon those questions?

11        MR. GUPTA:  No I don't, sir.

12        HEARING OFFICER:  Okay.  Thank you very much, Dr.

13   Solomon.

14        DR. SOLOMON:  You're very welcome.

15        MR. EIG:  Mr. Banks, may I - we have two other

16   witnesses, it's 12:20, and I also have a motion.

17        HEARING OFFICER:  Uh-huh.  And that motion would be?

18        MR. EIG:  Would be that the school system should be

19   found in violation of the IDEA for failure to institute a

20   regular education teacher on its IEP team.

21        HEARING OFFICER:  When exactly did it occur to you

22   that there was no such teacher on the IEP team?

23        MR. EIG:  Last night.  You want the truth?  Mr. Banks,

24   that's true.  But a slightly more explicit answer?  From

121

1  talking to witnesses it also occurred to me last night that

2  they had an 85% special education and for a full-time

3  placement last night because I had not seen the 85% which is

4  when the general education failure became significant to me.

5  It was not – it was two pieces coming together, but, yes,

6  sir.

7        MR. GUPTA:  My response to that is I'm going to get

8  you the statute in a second, but the law requires when a

9  student is going to be in general education, that general

10  education has to be there and the student clearly was not

11  going to be general education.  There was no need to have a

12  general education teacher.

13        DR. SOLOMON:  Can he do that?

14        MR. EIG:  The law does not say that.  From what

15  reading –

16        HEARING OFFICER:  Oh, wait a minute.  What was his

17  previous IEP?

18        MR. GUPTA:  He didn't have one.

19        HEARING OFFICER:  So this was his initial IEP?

20        MR. GUPTA:  Well, he was coming from private school.

21        HEARING OFFICER:  This was his initial IEP.

22        DR. SOLOMON:  No.

449

1        MR. GUPTA:  The initial IEP was done on 8-10-2006

2 which has not been disclosed. If you look at the front page

3 of the IEP, it says, prior meeting 8 -

4        HEARING OFFICER:  Right.  This is the IEP that deals -

5 this is the IEP we're dealing with.

6        MR. EIG:  Yes, sir.  But it's not the initial IEP.

7        HEARING OFFICER:  I don't care.  Is there, is there a

8 teacher at the meeting?  Of any kind?

9        MR. EIG: A special education teacher.  A school system

10 certified special education teacher.

11        HEARING OFFICER:  Is there?

12        MR. EIG:  Yes, there is.

13        HEARING OFFICER:  Where?

14        MR. EIG:  My understanding from previous meetings, and

15 that's the only reason I'm saying that, is that where it says

16 Special Ed, IEP denoted Special Ed, that Ms. Bannar is a

17 certified special education teacher.  We just know that. And

18 if it says special ed we can believe that's short for special

19 ed certified.  Yes.  We accept that, sir.

20        HEARING OFFICER:  You accept that?

21        MR. EIG:  That there's a special ed teacher there,

22 yes.

23        HEARING OFFICER:  Right.


123

450

1      MR. EIG:  But the law doesn't say that they can't have

2  a general ed teacher.  What the law very specifically says at

3  300.321 of the new regs, says, the public agency (and it's

4  right at A) must ensure that the IEP team for each child of

5  disability includes 1) the parent of the child; 2) not less

6  than one regular education teacher of the child (if the child

7  is or may be participating in the regular education

8  environment).  The next subparagraph there speaks to the

9  special ed teacher that has to be there, too.

10      HEARING OFFICER:  Correct.

11      MR. EIG:  There is no way that DCPS is going to come

12  before you and say that, we knew before the August 30th IEP

13  meeting that we were going to propose a full-time special

14  education placement, because that would be a violation of the

15  IEP regulations.  The Spielberg case.  You can't know that.

16  That's the purpose of the IEP meeting.  And, the IEP calls

17  for him to be in 15% of the general education setting.  In

18  any event, that's the reason we asked those questions.  So

19  they had to have, he certainly may be, and we think the IEP

20  may even call for it, we can't tell.  But they certainly

21  needed the general education teacher there.  He was coming

22  from a regular education placement.  An unsuccessful one, but

23  a regular educational placement, and they needed it. I can't

24  imagine in what situation an IEP team could before it met

124

1  know that a child wasn't going to be in general ed, unless

2  it's a situation in which the child is very disabled and his

3  parents and the school system have had discussions and the

4  school system says, look, we don't need a general ed teacher

5  there, do we?  Obviously he's going to continue on – and the

6  parent says, yes.  I mean that would make sense.  And I think

7  that's what that addresses.  Not this situation.

8        MR. GUPTA:  And the fact is you don't have – in the

9  record before you – you don't have the initial IEP.  The

10 initial IEP –

11       HEARING OFFICER:  I'm not dealing with the initial

12 IEP.  I'm dealing with the IEP to be implemented.  This is

13 the IEP to be implemented.

14       MR. GUPTA:  Let me finish, sir.

15       HEARING OFFICER:  No you can't.  I don't want to hear

16 about the initial IEP.  You didn't disclose it.  So it

17 doesn't exist.

18       MR. GUPTA:  Well because –

19       HEARING OFFICER:  It doesn't exist.

20       MR. GUPTA:  Sir.

21       HEARING OFFICER:  It doesn't exist.  If you didn't

22 disclose it, it doesn't exist.

23       MR. GUPTA:  At 8-30 it was being updated.

1          HEARING OFFICER:  Well, fine.  This is what exists.

2 This is what was disclosed.  This is the evidence you want me

3 to consider.

4          MR. GUPTA:  Yes.

5          HEARING OFFICER:  That's the disclosed evidence.  So I

6 don't need to worry about the initial IEP.  You didn't think

7 it was evidence that I needed to see.  It's not in the

8 record.  I don't want to hear about it.

9          MR. GUPTA:  The only reason I bring it up is to

10 respond to Mr. Eig's claim that no general education teacher

11 was at the 8-30 meeting.

12          HEARING OFFICER:  But we're not talking - well -

13          MR. GUPTA:  Because a general education at 8-30

14 meeting was not needed.

15          HEARING OFFICER:  And that's because you weren't going

16 to do placement at 8-30?  That's because you weren't going to

17 draft an IEP?  This is an IEP.

18          MR. GUPTA:  This IEP added these OHI -

19          HEARING OFFICER: Okay. So you did an IEP.  So IEP

20 rules apply.  I don't care what you did in some other meeting

21 that you didn't disclose here.  This is the IEP in the

22 record.  This is the one I have to base my decision on.  If

23 you have an IEP meeting it's got to meet regulatory

24 requirements.  Then you proposed a placement here.  So the

126

1  IEP team that proposes a placement has to meet regulatory

2  requirements.

3      MR. GUPTA:  And our argument is we did meet regulatory

4  requirements because of the 100% IEP and the placement

5  proposed was a special ed only school.

6      HEARING OFFICER:  The regulations require you to have

7  the student's – one of the student's general education

8  teachers at the meeting.

9      MR. GUPTA:  Unless they will not be participating in

10  the regulation hearing.

11     HEARING OFFICER:  Is that what he said?  Is that what

12  it says?

13     MR. GUPTA:  That's what the statute says.  300-321 sub

14  2.

15     HEARING OFFICER:  So did she previously have a 100%

16  full-time special ed placement?

17     MR. GUPTA:  Previously there was a general education

18  teacher there where they gave 100% LD.  This is why I was

19  trying to bring up the other IEP.  At the 8-30 meeting, they

20  added 085 for the ABD (phonetic).

21     DR. SOLOMON:  [whisper] That is not right.  That is

22  not right.

23     MR. GUPTA:  I'm sorry.  That is the LD.  I had it

24  reversed.  It was clear at the 8-30 meeting the student

127

454

1 wasn't going to special ed because he wasn't going to be in a

2 regular education environment at all.

3    MR. EIG:  I think the (inaudible) regular environment

4 15% of his time.

5    HEARING OFFICER:  Mr. Eig, it does not.

6    MR. EIG:  Eighty - what's the 85% mean?

7    HEARING OFFICER:  It means what you think it means.  I

8 think it means other than lunch and recess she's on a full-

9 time special ed program.  That's what I think it means.

10    MR. EIG:  All right.

11    HEARING OFFICER:  So that's what you think it means,

12 too.

13    MR. EIG:  No, no.  No, no.  I've had too many DCPS

14 IEPs, sir, to know that they know that much of a recess is

15 part of that (inaudible), but -

16    HEARING OFFICER:  Mr. Eig, it doesn't say combo in

17 paragraph 13, it says out of general education.

18    MR. EIG:  Yes.

19    HEARING OFFICER:  Out of.  That means no combo. And

20 it's got 26 hours of special education.  If they had 22,

21 you'd have an argument.  It's got 26.  It's got 27 and a

22 half.  So other than lunch and recess, the child will be

23 getting full time special education coverage.

1      MR. EIG:  That-that's - and I apologize for bringing

2 it up - because that's not part of my motion right now.  I

3 truly believe that.  (inaudible)  All I'm saying is that my

4 motion - and that's not what - twice now.  He's mis-stated

5 the law.  I've read the law.  The law says on re-direct, the

6 law says, not less than one regular education teacher -

7      HEARING OFFICER:  Let me see the reg.  My point on the

8 85% is the only reference in this entire document to general

9 education is the 85% on that one line on the front page.

10      MR. EIG:  I think you're wrong, is my point.

11      HEARING OFFICER:  I read IEPs in total context.  If

12 the context of this IEP is full-time, with 26 hours of

13 specialized instruction, another two hours of related

14 service, that leaves 28 hours.  I think the math is wrong.

15 It's 28 hours of a 32 and a half hour week.

16      MR. EIG:  Well it's important to have consultation

17 that's the reason that the math is wrong.  It doesn't count

18 towards drifters.  I think they're writing their IEPs wrong.

19 That's my whole point.  Like, you know what?  I'm not asking

20 you to base any relief on that because you're not

21 (inaudible).

22      HEARING OFFICER:  Okay. Let me see here.  Okay.  This

23 is not less than one regular education teacher of the child

129

456

1 if the child is or may be participating in the regular

2 education environment.

3      MR. EIG:  The only situation, Mr. Banks, in which you

4 don't need a general education teacher at an IEP meeting

5 under the current regulations, is when it is clear that the

6 child is not going to be in any level of special ed, and

7 regular education, and, the school system gets in touch with

8 the parents and say, look, we don't need a general ed teacher

9 here, do we?  In this situation, this is the time they

10 determine how many hours of special education he's going to

11 have.  At this meeting.  How do they know it was going to be

12 100%?

13      HEARING OFFICER:  Well, the argument is that they had

14 determined that at the meeting earlier on.

15      MR. EIG:  There are two problems with that.  One, of

16 course, is the fact that there's nothing in his record, as he

17 pointed out.  And the second is, every IEP meeting is

18 supposed to look at goals and objectives.  Are they going to

19 do testing?  From Dr. Solomon?  With all new information, you

20 can't be wedded to what you said at a previous IEP meeting,

21 at least not if you don't talk to the parent, and say, you

22 know, you're not looking for any possibility of any

23 generalized setting, which once again I may, now that's how

24 we got into it before.  They have to have a general education

130

457

1 teacher there.  This kid certainly, before his IEP is done on

2 August 30th may be in general education.

3      HEARING OFFICER:  Well, Mr. Eig, I'm going to overrule

4 the objection.  In this case they've got a special ed teacher

5 there.  Under no circumstances if you're looking for full-

6 time placement –

7      MR. EIG:  We aren't.

8      HEARING OFFICER:  – as I understand it, you expected a

9 full-time placement. Now I understand that the intitial –

10      MR. EIG:  No, sir, we did not.  That's an absolute

11 wrong. That's absolutely not true.

12      HEARING OFFICER:  So was there a meeting earlier in

13 October?  Earlier in August?

14      MR. EIG:  Not that I'm aware of.

15      MR. GUPTA:  Sir, can I point you to Parent's

16 Disclosure 5?

17      HEARING OFFICER:  Please don't get me all upset.  I

18 think the motion you're making as to what you have no

19 awareness as of two days ago.

20      MR. EIG:  Because I didn't see the IEP.

21      HEARING OFFICER:  Fine.  Well this case has been

22 around since September.

23      MR. EIG:  Sir –

1        HEARING OFFICER:  So stop yelling at me over a

2  technical motion you're trying to make.

3        MR. EIG:  If I'm yelling, I apologize.  It's really

4  that, all I'm saying is that –

5        HEARING OFFICER:  Now just calm down.

6        MR. EIG:  Can I –

7        HEARING OFFICER:  Calm down.

8        MR. EIG:  Can I say something for the record?

9        MR. GUPTA:  Yes, sir.

10       HEARING OFFICER:  What exhibit?

11       MR. GUPTA:  Parent 5, sir.

12       HEARING OFFICER:  Go ahead.

13       MR. GUPTA:  In the first paragraph, about one, two,

14  three, four, five lines up from the bottom, stated, first of

15  all, the first paragraph you stated that they cancelled it

16  out at IEP meeting for August 10th.  Then you state that he

17  understands that the recommended setting is out of general

18  education, but did not propose a placement.  So that he

19  knows, he knew that the next IEP meeting which was 8-30 was

20  for exclusively for placement and to update the IEP as

21  appropriate which they updated since Dr. Solomon's concerns

22  with some of the things that we already talked about.

132

459

1      MR. EIG:  That's not what we understood nor is that

2  what this letter says.  That is not what - and you were

3  complaining that -

4      HEARING OFFICER:  Just a minute.  Let me say what I

5  think this letter says.  My understanding is this letter says

6  that number 1, you held a meeting that you shouldn't have.

7      MR. EIG:  That's correct.  That's the reason -

8      HEARING OFFICER:  And at that meeting you found the

9  child needed a full-time private placement -

10     MR. EIG:  Where does it say that?

11     HEARING OFFICE:  - Or full-time.

12     MR. EIG:  That's not without a general education

13  setting means to me.  It never has been.  Our general

14  education setting means that your based in special education

15  such as a self contained classroom and you can certainly be

16  mainstreamed out of that.  Because there was no proposed

17  placement, it's - keep reading the letter.

18     HEARING OFFICER: Now what is that - what does out of

19  general education mean?

20     MR. EIG:  A learning center in the state of Maryland

21  is also a - a learning center is a self contained special

22  education program.  In the paper you see they're proposing to

23  do away with them now.  That you're there, you can be there

24  100%, you can be there 90%, you can be there 80%, you can be

133

460

1 there 85%, sir.  You can get mainstream.  That's what out of

2 general education means.  You're based in a special education

3 (inaudible).  And that's what it means almost everywhere in

4 the world.

5      HEARING OFFICER:  It doesn't mean that in Washington.

6      DR. SOLOMON:  Yes it does.

7      MR. EIG:  Sir, it means six - please, would you look

8 at the IEP?

9      HEARING OFFICER:  Mr. Eig.

10      MR. EIG:  Please look at the IEP.

11      HEARING OFFICER:  Mr. Eig.  Your letter of August 15th

12 says that DCPS proposed an out of general education center on

13 August the 10th.  And then you said that you wanted a full-

14 time private placement.  So neither party came to the 30th

15 with the expectation that this child would be an anything

16 other than out of general education.

17      MR. EIG:  Out of general education does not mean a

18 full-time placement.

19      HEARING OFFICER:  I hear what you're saying.

20      MR. EIG:  And there's nowhere -

21      HEARING OFFICER:  I hear what you're saying.  The

22 motion's overruled.

23      MR. EIG:  Sir, can I just direct you to the IEP that

24 says the same thing I'm saying?

1      HEARING OFFICER:  Did you have another point that you

2 wanted to make?

3      MR. EIG:  May I direct you for the –

4      HEARING OFFICER:  Mr. Eig, overruled.

5      MR. EIG:  Okay, I'm sorry.  I would state for the

6 record that an IEP speaks to a 61 to 100% special education

7 services in and out of education, and if you look at the page

8 of the IEP, it says exactly what I'm saying.

9      HEARING OFFICER:  Let me just say this once again.

10      MR. EIG:  Yes, sir.

11      HEARING OFFICER:  The only thing in this entire record

12 that apparently suggests that this child will not be a full-

13 time special ed program is the number 85% on the first page

14 of the IEP.  Which taken in the context of the entire IEP,

15 does not mean that this child is going to be in anything

16 other than out of general education, except for lunch and

17 recess.

18      MR. EIG:  But out of general education doesn't mean

19 full-time, even on their own form is what I'm telling you.

20      HEARING OFFICER:  I hear what you're saying.  I didn't

21 say I doubt the legitimacy of their forms.  I'm just telling

22 you my reading of what this child is going to get based upon

23 this IEP is a full-time special education.

1      MR. EIG:  Well I'm judging from my motion which I've

2 said and you overruled, because you said that we know it's

3 going to be out of general education.  And I'm saying, yes we

4 do, and on their own form out of general education can be in

5 the 61% to 100%.  If you're aware of that, then you clearly

6 need a regular education teacher here.

7      HEARING OFFICER:  Look, he's got 28 and a half hours

8 of special education.

9      MR. EIG:  Then you had that before me, that's the

10 point.  That's why you need the general education teacher

11 there.  Because you can't predetermine what he's going to

12 have before the IEP meeting.  That would be a violation of

13 Spielberg.  You go to the IEP meeting, to see how much

14 regular education and how much general education you need,

15 and if you understand that out of general education doesn't

16 mean full-time special education, then you know you need a

17 general educator there.  That's the point, and it's based on

18 their own IEP.

19      HEARING OFFICER:  Okay.  You've made your record.

20      MR. EIG:  Okay. I had, I like Bregg (phonetic).

21      MR. GUPTA:  Before I put on Ms. Gusteson, 3, 4 or not,

22 it depends on what time is lunch.

23      HEARING OFFICER:  Okay.  I don't even know what my

24 schedule is.

1        MR. EIG:  I did the IEP -

2        HEARING OFFICER:  Are we going to be all day here?

3        MR. EIG:  I'm going to ask that we - that actually we

4  break if we're going to go at night and apparently we could

5  be.

6        HEARING OFFICER:  Okay.

7        MR. EIG:  If not, I'd like to know that I can't do

8  that.  Besides that, it's -

9        HEARING OFFICER:  Why don't we convene at 1 o'clock.

10       MR. EIG:  Very well.  And can we, either on the record

11 or off the record, agree to end at 4 as opposed to 5?

12       MR. GUPTA:  I don't think that will be possible if he

13 has two more witnesses and I have -

14       MR. EIG:  I don't think we're going to finish today.

15       HEARING OFFICER:  Pardon?

16       MR. EIG:  I'm afraid we're not going to finish today

17 if we need -

18       HEARING OFFICER:  I think we're going to go at least

19 till 5.

20       MR. EIG:  Okay, then I can't.

21       MR. GUPTA:  It's just that my (inaudible) a set time.

22       MR. EIG:  That's fine.  Okay.

23       HEARING OFFICER:  That's fine.

24       MR. GUPTA:  All right.

1          HEARING OFFICER:  Okay.  We'll reconvene at 1:15.

2                          [OFF THE RECORD]

3          HEARING OFFICER:  Let me just explain my ruling on the

4     timing.  I've got to prepare the DCPS.  If we can possibly

5     complete and not bring these witnesses back here again

6     another day, you asked for an all day hearing, I'll stay here

7     and it's 5 o'clock.  Now if it's clear we can't even finish,

8     then that's a different story.

9          MR. EIG:  Can I make that (inaudible)

10         MR. GUPTA:  I would like to have the opportunity –

11         MR. EIG:  We'll make that decision by 3 o'clock if

12    that's reasonable.

13         HEARING OFFICER:  Sure.

14         MR. EIG:  Because then I could probably make

15    arrangements or if we do it now, it's –

16         HEARING OFFICER:  Sure.

17         MR. EIG:  Okay.  That's fine.  Thank you.

18         HEARING OFFICER:  Uh-hum.

19                          [ON THE RECORD]

20         HEARING OFFICER:  Ms. Gusteson, would you raise your

21    right hand?  Do you swear or affirm the testimony you are

22    about to give will be the truth, the whole truth and nothing

23    but the truth?

24         MS. GUSTESON:  Yes we do.

1          HEARING OFFICER:  Thank you.  Go to Mr. Eig.

2          MR. EIG:  Thank you very much.  Please state your name

3 for the record.

4          MS. GUSTESON:  I'm Marlene Gusteson.

5          MR. EIG:  Ms. Gusteson, how are you employed?

6          MS. GUSTESON:  I am the director at Kingsbury Day

7 School.

8          MR. EIG:  All right.  And before I ask you anything

9 more about your background, Ms. Gusteson, do you have a

10 current CV?

11         MS. GUSTESON:  I do have a current CV.

12         MR. EIG:  Okay.  Where is it?

13         MS. GUSTESON:  It is in my files on my home computer.

14         MR. EIG:  Okay.  Has it been printed out at any point?

15         MS. GUSTESON:  Not to my knowledge.  I checked this

16 morning and our personnel as well as my administrative

17 assistant, and neither have copies of it.

18         MR. EIG:  And, this is much more for me and the

19 hearing officer than for your purposes, Ms. Gusteson, but has

20 my office asked you for a number of weeks to try to get that

21 updated and get it out to us?

22         MS. GUSTESEN:  Yes.

23         MR. EIG:  Now, could you give us your educational

24 background?

139

466

1      MS. GUSTESEN:  I have a master's degree in special

2  education from the George Washington University.  I have

3  completed doctoral course work also in special education from

4  the George Washington University, and I have an undergraduate

5  degree in an unrelated education field from the University of

6  Illinois.

7      MR. EIG:  What experience – do you (inaudible) certain

8  (inaudible) in an education?

9      MS. GUSTESON:  I hold an advance – I just lost the

10 word.  Advanced professional certificate in special

11 education.

12     MR. EIG:  And have you ever taught special education?

13     MS. GUSTESEN:  Yes.  I have taught special education

14 in public school system for eight years and in private school

15 for seven years.

16     MR. EIG:  And have you ever administered special

17 education?

18     MS. GUSTESEN:  Yes.  For the past 12 and a half years

19 at Kingsbury and prior to that I was the director of a

20 therapeutic nursery in private school in the Rockville area

21 for seven years.

22     MR. EIG:  And just for the record, what is Kingsbury?

1      MS. GUSTESEN:  Kingsbury is a nonpublic independent

2  school for kids between the ages of 5 through 18 who have

3  learning disabilities and attentional problems.

4      MR. EIG:  And does Kingsbury have – about how many

5  students are in Kingsbury?

6      MS. GUSTESEN:  We currently have about 230 students.

7      MR. EIG:  And are any of them funded by IDA or by the

8  District of Columbia.

9      MS. GUSTESEN:  Yes.  Some of them are.

10      MR. EIG:  About how many?

11      MS. GUSTESEN:  About 150.

12      MR. EIG:  And those 150 students that are funded by

13  DCPS, did they monitor those placements and their IEPs?

14      MS. GUSTESEN:  Yes. This year they are.

15      MR. EIG:  Okay.  And do you communicate – does your

16  staff communicate with DCPS about those students' needs?

17      MS. GUSTESEN:  Yes, on a regular basis this year.

18      MR. EIG:  We'd offer her as an expert in special

19  education.

20      HEARING OFFICER:  Mr. Gupta.

21      MR. GUPTA:  Nothing other than the fact that no resume

22  has been produced and there's no way for us to go by her

23  credentials that we're going to testify to right now.

141

468

1          HEARING OFFICER:  This is nothing personal, Ms.

2  Gustesen.  But she doesn't meet the qualifications of an

3  expert in special ed in my view.  She can certainly testify.

4  I've got her background.  She has considerable experience in

5  special ed.  She is certainly qualified to talk about her

6  role as Director at Kingsbury and the standards by which she

7  accepts students and under what circumstances.  But I don't,

8  in terms of opinion testimony –

9          MR. EIG:  Yes.

10         HEARING OFFICER:  - Other than in the normal course of

11  what she does in running Kingsbury, I don't feel she's an

12  expert.

13         MR. EIG:  She's special ed, is there some, I can't

14  imagine what else one could show.

15         HEARING OFFICER:  Like a professional degree, like an

16  independent role as a –

17         MR. EIG:  She has a Ph.D.

18         HEARING OFFICER:  No, she doesn't have a Ph.D, she

19  doesn't have any writings.  She doesn't have any

20  publications.

21         MR. EIG:  All right.  Can I ask –

22         HEARING OFFICER:  She works independently as a

23  professional in special education.

142

1      MR. EIG:  I would suggest that 90% of the experts in

2   education are Ph.Ds.  That's the only point I want to make

3   there.  That she does have a professional degree in special

4   education to testify to it and she also has –

5      HEARING OFFICER:  You mean a Master's.

6      MR. EIG:  Yes, sir.

7      HEARING OFFICER:  Okay.

8      MR. EIG:  But the great majority of special education

9   experts are the teachers.  Some of them have Bachelor's.

10      HEARING OFFICER:  I don't propose to accept opinion

11   testimony from everybody who's got a Master's in special ed.

12      MR. EIG:  And who has taught special education –

13      HEARING OFFICER:  And her experience I am aware of

14   capability and experience and are capable.  But that doesn't

15   you an expert.

16      MR. EIG:  What does?

17      HEARING OFFICER:  From a legal standpoint.  I don't

18   want to tell you again.

19      MR. EIG:  May I just state for the record that the

20   standard for experts is recognized by courts up to the

21   Supreme Court as relatively low and it is to provide a lay

22   person such as yourself and myself with opinions that we

23   wouldn't normally have.  And how someone who is a special

24   education teacher, administrator, just the experience.

1  Forget this.  Forget any degrees.  Couldn't meet that

2  standard, I don't understand.  That's just for the record.

3       HEARING OFFICER:  I can't imagine that you can't get

4  everything you want without asking her opinion testimony.

5       MR. EIG:  I'll show you how.  Okay.  Ms. Gustesen, are

6  you familiar with O███ O███████?

7       MS. GUSTESEN:  Yes I am.

8       MR. EIG:  How are you familiar with O███ O██████.

9       MS. GUSTESEN:  He is a student currently attending

10 Kingsbury and I know him through the admissions process, the

11 record reviews.  I've observed him in class.  I've seen him

12 in the hallways and I've conferred with the team of educators

13 who work with him.

14       MR. EIG:  Do you believe that he's appropriately

15 placed in Kingsbury?

16       MS. GUSTESEN:  Yes, I do.

17       MR. EIG:  Why?

18       MS. GUSTESEN:  He is a child who, well, for several

19 reasons.  He is a child who has very significant attentional

20 issues and social and emotional problems that impact his

21 availability for instruction.  He is a student who is not,

22 although he has a wide range of abilities as demonstrated

23 earlier in the testimony.  He is a child who would benefit

24 from a modified curriculum which is what we have to offer and

1  our program is structured in a way to provide supports, both

2  in terms of accommodations as well as other means to access

3  the curriculum.

4          MR. EIG:  Do you believe he needs a full-time program.

5          MS. GUSTESEN:  Yes, I do.

6          MR. GUPTA:  Objection.  You're asking for opinions.

7          MR. EIG:  We already opened the door in terms of --

8          MR. GUPTA:  The door was open.

9          HEARING OFFICER:  No, what I said was she can –

10         MR. EIG:  I already asked the opinion, do you think

11 he's appropriately placed at Kingsbury.  He did not object.

12 I then asked why and he didn't object either.

13         HEARING OFFICER:  Let me explain –

14         MR. EIG:  I'm sorry.

15         HEARING OFFICER:  - the basis for my ruling.  What I

16 said was she runs the school.  She's perfectly – I'm going to

17 allow her to testify as the director of Kingsbury on the

18 basis for her decisions to accept him and why she thinks

19 Kingsbury, based upon its program, is an appropriate placeent

20 for the child.  Now, that is a limited ability to give

21 opinion testimony.  It's not general testimony about special

22 education and so forth, but it's - that she can talk about

23 with respect to her school, why she believes her school is an

24 appropriate placement for this child.

145

472

1      MR. EIG:  It's Kingsbury.  I'm not sure how about that

2  ruling, if that's a sustaining of the objection or not.

3      HEARING OFFICER:  That's an overruling of the

4  objection.

5      MR. EIG:  Okay.  So you can answer the question.  Do

6  you believe – in the context of Kingsbury, obviously – to add

7  Mr. Banks' that O███ would require a full-time placement

8  there?

9      MS. GUSTESEN:  Yes, we do.

10     MR. EIG:  Why, why full-time?

11     MS. GUSTESEN:  Well, O███ is a child who would benefit

12  from, who does benefit form continuous support and continuous

13  supervision.  The nature of some of the learning difficulties

14  are ones that impact not only the opportunities that he has

15  for direct instruction be it reading, writing, math.  But

16  they're also in the realm of ensuring that he is emotionally

17  available for instructions, that he is physically safe, both

18  because of his own impulsivity but because of the nature and

19  the quality of some of his peer relationships, and because of

20  the language difficulties that he presents with – the fact

21  that he is a very social pro-social child, but has great

22  difficulty initiating and sustaining friendships.  And so

23  therefore, in the last structured non-directly academic

146

473

1   times, he benefits from the kind of structure and the kind of

2   support to address the broad range of his weaknesses.

3        MR. EIG:  You referred a couple of times just to

4   either social or emotional issues.  Is that a concern - was

5   it a concern during the admissions process and/or at

6   Kingsbury?

7        MS. GUSTESEN:  Yes, there was a concern during the

8   admissions process.  It is decreasingly a concern at

9   Kingsbury because he is benefiting from the kind of structure

10  that we have to offer, but initially, when he was applied

11  over the course of the summer, there were some concerns over

12  some behavioral incidences that had occurred in his prior

13  school setting.

14       MR. EIG:  Is O███ in - is he considered a middle

15  schooler at Kingsbury?

16       MS. GUSTESEN: Yes.  We consider him a middle schooler.

17       MR. EIG:  And is there a grade level that you would

18  have him at?  I mean, is he in a grade?  How does that work?

19       MS. GUSTESEN:  Well, Kingsbury at the middle school

20  level is an ungraded program.  So we can have children in

21  that program from the ages of 11 through the age of 13, 14

22  years of age, and it's unstructured because we are, or, I'm

23  sorry, it's ungraded, rather, because we are looking for the

24  kind of fit within the class for learning styles for

147

474

1 functioning levels, for social - meaningful social

2 interactions, and so when we use an ungraded model we're able

3 to achieve the right mix in terms of a learning environment

4 as well as to benefit the kid.

5     MR. EIG:  You were here for I think all or the greater

6 part of Dr. Solomon's testimony, right?

7     MS. GUSTESEN:  Yes, I was here for part.

8     MR. EIG:  And she, towards the end of her testimony

9 referred to O██ as chronologically an eighth grader, and

10 actually an eighth grader should be -

11     MR. GUTPA:  What's the relevance in comparing Dr.

12 Solomon's testimony?

13     MR. EIG:  I asked her if she heard the statement.

14     HEARING OFFICER:  She heard the statement.  We haven't

15 heard the question yet?

16     MR. EIG:  Okay.  I'll try again.  At his age would

17 Kingsbury look at him the same way as an eighth grader should

18 be a tenth grader, or do you know?

19     MS. GUSTESEN:  Well, what we do look at is the

20 learning profile, the rate at which kids make progress within

21 the program, and also, if you match him age wise, he is going

22 to be 14 in March, which means that in a kind of a lock step

23 graded system, he would be eligible for 9th grade.

148

475

1       MR. EIG:  Okay.  What grade would - can you give us a

2   grade where Kingsbury is sort of instructing him at?  Has

3   that happened?

4       MS. GUSTESEN:  He's not being instructed at a grade in

5   the public school notion of grades.  He is being instructed

6   at his functional levels and he is accessing the curriculum

7   in a way that is appropriate to support his learning.

8       MR. EIG:  And you said that was a modified curriculum

9   he was following, what does that mean?

10      MS. GUSTESEN:  Well, it's not really a modified

11  curriculum.  It is a curriculum that we certainly have the

12  curriculum correlated to standards, and to ways of being able

13  to ensure that curricular themes that are appropriate to

14  grade levels are covered.  But what we do do is we look at

15  the kinds of approaches and the kinds of materials that kids

16  can get information from.  So for example, if he is reading

17  somewhere overall at a 4th grade level, we will take materals

18  that are appropriate to the theme that he can read.  Or if we

19  have materials that are above his grade level, and he spends

20  so much time decoding that he can't comprehend, because

21  there's too much work effort going into that decoding, we

22  will use technology to help him access higher level

23  materials.

1      MR. EIG:  MS. GUSTESEN: Kingsbury goes through what

2  grade?

3      MS. GUSTESEN:  We go through 12th grade.

4      MR. EIG:  Okay.  Could O███ continue on at Kingsbury,

5  privately or publicly, I mean, would it be appropriate to

6  continue on?

7      MS. GUSTESEN:  Yes.

8      MR. EIG:  Okay.  You said that he's benefiting form

9  the curriculum.  Can you describe that a little more?

10     MS. GUSTESEN:  Which, his benefiting or the

11  curriculum?

12     MR. EIG:  Benefiting.  O███.

13     MS. GUSTESEN:  Yes.  Primarily with a child like O███,

14  what we really look for first of all before we even think

15  about academic achievement is his ability to conform to the

16  expectations of the setting, to be able to regulate his

17  attention to control his impulses to use his language to

18  express frustration and for social problem solving.  And in

19  all of those realms he is making progress within the school.

20     MR. EIG:  How large are his classes?

21     MS. GUSTESEN:  There are 10 kids in his class.

22     MR. EIG:  And what's the staffing for the class?

23     MS. GUSTESEN:  The staffing for the classes – it

24  sometimes varies.  But there is a lead teacher.  There is an

150

477

1 assistant teacher.  And then this past year, we have had

2 tutors, or this past semester we have had tutors and a

3 reading specialist come in and work with the kids or pull the

4 kids out into the smaller groups.  But we are designed not to

5 directly instruct a group of 10 kids; but to have the

6 flexibility to break off into smaller groups for instruction.

7 We can target the instruction, the skills better that way.

8      MR. EIG:  How does O███ respond to the smaller

9 settings?  Does he need those smaller settings?

10      MS. GUSTESEN:  He does absolutely need the smaller

11 settings particularly in terms of maintaining engagement,

12 maintaining focus and being able to figure out what the

13 really salient features of instruction.  And it differs from

14 class to class would be.  He needs a great deal of external

15 support in that area.

16      MR. EIG:  Can Kingsbury provide, or in fact are they

17 providing related services to O███, specifically psych,

18 speech language, and those things.

19      MS. GUSTESEN:  He is receiving individual - both

20 individual and group counseling.  We also have some classroom

21 based programs, a social motor group that is run by an

22 occupational therapist and a special educator with speech and

23 language consultation.  He is receiving some speech.  Off the

151

478

1  top of my head I cannot tell you exactly what the

2  configuration is.

3       MR. EIG:  I still have a couple more questions.  Let

4  me show you DCPS 5.  It's – I'm turning to the IEP, the

5  school system's IEP.  I don't know, except from possibly

6  seeing this during disclosure, have you seen this document

7  before?

8       MS. GUSTESEN:  Actually I have seen portions of this.

9  I have not seen the cover page.

10      MR. EIG:  Okay.

11      MS. GUSTESEN:  I just have a question.  You said the

12  you have 100 and some students, 180?

13      MR. EIG:  About 150 who are D.C. funded.

14      HEARING OFFICER:  150 D.C. funded.

15      MS. GUSTESEN:  230.

16      MR. EIG:  And that's what I meant, the D.C. funded

17  ones.  Thank you.  Excuse me.  She answered it without me

18  asking. And do you use the same DCPS forms IUP form for

19  those 150 students?

20      MS. GUSTESEN:  Yes we do.

21      MR. EIG:  And do you – you said those IUPs are

22  monitored?

23      MS. GUSTESEN:  They are monitored, yes.

479

1        MR. EIG:  Okay.  Turning to this first page of the IEP

2    where it says percent of time not in regular education

3    setting, okay?  What is noted for all 150 of those

4    students?

5        MS. GUSTESEN:  We fill in 100%.

6        MR. EIG:  And DCPS ever kick those IEPs back for being

7    wrong?

8        MS. GUSTESEN:  They've never kicked them back for

9    being wrong.

10       MR. EIG:  No further questions.

11       HEARING OFFICER:  Mr. Gupta.

12       MR. GUPTA:  When did you first come in contact with

13   ██████, O███████.

14       MS. GUSTESEN:  Probably around the end of June,

15   beginning of July.

16       MR. GUPTA:  And what materials did the file contain at

17   that time?

18       MS. GUSTESEN:  At that time, the file contained the

19   application from his family.  It contained a

20   neuropsychological by Federici and I don't remember the

21   others, if there were others.

22       MR. GUPTA:  Why don't you describe to me that – the

23   process that you go through as an administrator, so you

153

480

1    give him the application, and the Federici report.  What

2    happens next?

3        MS. GUSTESEN:  Well, we generally request, well, we

4    always request the evaluations and then we bring the

5    student in for a one or two day visit.  And we make

6    observations, we review the evaluations, we might have a

7    psychologist, a speech and language clinician, an

8    occupational therapist, make observations during the

9    classroom visit.  And then we have an admissions chain of

10   which I am part.  And we make a determination as to whether

11   or not we think that we can meet the needs and strengths of

12   this child or not.  Because sometimes we wait list.

13       MR. GUPTA:  Okay.  And before I get into the

14   application process let me just understand.  Are you a full

15   year program or do you just have summer school?  How is he

16   able to have a classroom visit in July.

17       MS. GUSTESEN:  We have an extended school year program

18   and it is a six week program.  So if we receive, because we

19   having rolling admissions with our applications, we can

20   have kids come in during that period of time.

21       MR. GUPTA:  So that the DVS (phonetic) program end at

22   the end of July?

23       MS. GUSTESEN:  It actually ends the first week in

24   August.

1     MR. GUPTA:  So, do you remember when, you said you

2  received the application package with the eval in June or

3  July, late June or early July.  About how long after that

4  did O███ come in for the 1 to 2 day visit?

5     MS. GUSTESEN:  I know that he came in some time in the

6  middle of July. I could not give you the exact dates.

7     MR. GUPTA:  Then are observations done concurrently

8  with the ones that you did for the two day visit, or is

9  that a separate.

10    MS. GUSTESEN:  It depends -

11    MR. GUPTA:  In O█████ case, let me simplify it.

12    MS. GUSTESEN:  In O█████ case, we did have a number of

13  people come in and observe him.  One in particular, a

14  psychologist on our team did do some observations in the

15  class.

16    MR. GUPTA:  And this is around the same time in that

17  middle of July period?

18    MS. GUSTESEN:  Yes, this was during that July period.

19    MR. GUPTA:  When did you sit down to make a decision

20  on it?

21    MS. GUSTESEN:  I can't answer that.  I don't recall.

22    MR. GUPTA:  Can you give me a month?

23    MS. GUSTESEN:  I'm sure it was the end of July,

24  beginning of August.

155

482

1      MR. GUPTA:  So between the end of June, early July, to

2    the end of July, early August.  Outside of any observations

3    you may have done, or any notes you might personally take,

4    were you given any more information in terms of the way of

5    evaluations, or anything of that nature by O████ family or

6    his counselor.  By counselor I mean his lawyer or his

7    educational advocate, Dr. Solomon.  Were you getting any

8    other information?

9      MS. GUSTESEN:  We did receive some information after

10   those dates.  And I believe - well, I am not very sure -

11   about exactly what information we have from Dr. Solomon.  I

12   was aware that she was evaluating him.  I was aware that

13   the evaluation was going to be quite time consuming.  But I

14   don't recall if we had her evaluation in our file at that

15   time, during that July period.

16     MR. GUPTA:  When you say "at that time" I guess you

17   can clarify.  Are you talking about that time meaning when

18   you sat down to decide on his admission?

19     MS. GUSTESEN:  Yes.

20     MR. GUPTA:  Okay.  So at the time you sat down to make

21   an admission decision on O████, you did not or did have Dr.

22   Solomon's evaluation.

23     MS. GUSTESEN:  I don't believe we had Dr. Solomon's

24   evaluation.

156

483

1    MR. GUPTA:  You did not have it.  Okay.  So in that

2  early August period when you sat down to decide on his

3  admission, did you admit him at that time?

4    MS. GUSTESEN:  Yes, we did.

5    MR. GUPTA:  Okay.  So now he's been admitted.  When do

6  you think you got Dr. Solomon's report.

7    MS. GUSTESEN:  I don't recall.

8    MR. GUPTA:  Do you ever recall getting an evaluation

9  from a Diezel?

10    MS. GUSTESEN:  Yes.  Laurie Diezel?

11    MR. GUPTA:  Here, I'll give you -- Yes.  You did.  Do

12  you remember if that was before or after the admission?

13    MS. GUSTESEN:  I don't remember the exact date.

14    MR. GUPTA:  But can you tell me if this was before or

15  after the admission?

16    MS. GUSTESEN:  Oh, it was after the admission.

17    MR. GUPTA:  After the admission.  When did you get his

18  IEP?

19    MS. GUSTESEN:  From DCPS?

20    MR. GUPTA:  Or the parents or the advocate or the

21  lawyers.

22    MS. GUSTESEN:  I think I we received the IEP sometime

23  in September.

24    MR. GUPTA:  When does school start for you?

157

484

1    MS. GUSTESEN:  It started the 6th of September.

2    MR. GUPTA:  So did you receive the IEP before school

3    started or after school started.

4    MS. GUSTESEN:  No.  We expected to develop our own

5    IEP.

6    MR. GUPTA:  Has that been done yet?

7    MS. GUSTESEN:  Yes.

8    MR. GUPTA:  When did you develop your own?

9    MS. GUSTESEN:  In mid-November.

10   MR. GUPTA:  Why did it take two months for you to

11   develop your own IEP?

12   MS. GUSTESEN:  Well, wanted to make sure that he had –

13   we wanted to make sure that he had appropriate levels of

14   related services on his IEP.  We wanted to get past the

15   transition period so that we could get some good

16   information on his classroom functioning.  And probably

17   more importantly, because we are a private provider and

18   O██ is not funded, or was not funded through any

19   jurisdiction at the time, we're not required to develop an

20   IEP for him.

21   MR. GUPTA:  Did you – at the start of the school year,

22   then, you really didn't know what his level of special

23   education was going to be because you didn't have the IEP,

24   correct?

1      MS. GUSTESEN:  What do you mean, level of special

2  education?

3      MR. GUPTA:  I mean whether he was going to be a full-

4  time placement, a part-time, maybe a combination placement.

5  You didn't' know that because you hadn't seen an IEP,

6  right?  Before he started?

7      MS. GUSTESEN:  Well we – our goal as a private school

8  is to determine whether or not we think a child can benefit

9  from the kind of program that we offer.  We don't second

10  guess or we don't make assumptions about what a public

11  jurisdiction is going to do, especially if the public

12  jurisdiction does not refer to the child to our program.

13  So as a representative from Kingsbury, what I'm looking

14  for, is the goodness of fit between the program and the

15  child.

16      MR. GUPTA:  Sir, that's what I'm asking.  How could

17  she have known that.  That actually leads to go back a

18  month, back to the early August time period when you first

19  admitted him.  You admitted him based on Dr. Federici's

20  report, and your own staff's, maybe your's personally as

21  well, observation.  Correct?  So, I mean, at that point,

22  was that enough, is that normally enough information for

23  you to admit a student to your school regardless of who's

24  paying for the student?  In many instances, when we don't

1   have a complete file as we did not have in the case of

2   O███ we make recommendations for evaluations.  And we did

3   ask one of our speech and language pathologists to review

4   the testing, because some of the testing does, depending on

5   your profession, does overlap.  And we did make those

6   recommendations.  We also made –

7        HEARING OFFICER:  You made those recommendations.

8        MS. GUSTESEN:  Oh, recommendations for speech and

9   language –

10       HEARING OFFICER:  For initial testing.

11       MS. GUSTESEN:  And for an occupational therapy

12  evaluation, particularly when you see, when you observe in

13  the classroom the kinds of regulatory issues that O███

14  presents with, you certainly want to see an OT evaluation

15  as well as for the visual motor concerns that he presents

16  with.

17       HEARING OFFICER:  So OT.  What else?

18       MS. GUSTESEN:  And speech and language.

19       HEARING OFFICER:  And this was before or after he was

20  accepted?

21       MS. GUSTESEN:  This was – it was in the process of

22  acceptance and it was reiterated after he was accepted into

23  the program.

24       HEARING OFFICER:  Who conducted the evaluation?

160

1    MS. GUSTESEN:  Well, the evaluation has not occurred.

2    We've made the request.  Or to my knowledge, the evaluation

3    has not occurred.

4    HEARING OFFICER:  Who did you make your request to?

5    MS. GUSTESEN:  To the parent.

6    HEARING OFFICER:  Oh, okay.

7    MR. GUPTA:  I'm sorry.  You made the request to who?

8    MS. GUSTESEN:  To the parent.

9    MR. GUPTA:  To the parent.

10    HEARING OFFICER:  So you don't do your own

11    evaluations?

12    MS. GUSTESEN:  Well, Kingsbury does do evaluations.

13    But a speech and language therapist –

14    HEARING OFFICER:  All the schools in the area, I'm

15    just asking.  It's not an accusation.  There are some

16    schools who take it upon themselves when they decide a kid

17    needs x evaluation, they have the staff to do it.  So

18    that's what I'm inquiring here. You decided he needs OT and

19    speech and language.  You just don't get a consent and do

20    it yourself?

21    MS. GUSTESEN:  Right.

22    HEARING OFFICER:  You do not.

161

1          MS. GUSTESEN:  For occupational therapy, and for

2     speech and language therapy, we make recommendations to the

3     parent.

4          HEARING OFFICER:  Go ahead.

5          MS. GUSTESEN:  We don't do it ourselves.

6          HEARING OFFICER:  Go ahead, Mr. Gupta.

7          MR. GUPTA:  Were you not invited to a November

8     occupational therapy MDT meeting?  Were you aware, or I

9     should back up.  Were you aware that a MDT meeting did

10    occur?

11         MS. GUSTESEN:  I was unaware that there was a November

12    MDT meeting for OT services.

13         MR. GUPTA:  So then, I guess, you were also unaware

14    that they added OC services or they recommended it.

15         MS. GUSTESEN:  On the IEP that was generated by DCPS?

16    I was unaware of that.

17         MR. GUPTA:  Just for the record.

18         HEARING OFFICER:  Yes?

19         MR. GUPTA:  DCPS 06 is an October 19th OT eval done by

20    DCPS.  Conducted by DCPS I should say, by a Denise Solomon,

21    and DCPS 02 is prior notice with MDT notes adding OT

22    (inaudible).

23         HEARING OFFICER:  Now who's the special ed teacher?

162

1      MR. GUPTA:  This was all done by the Care Center. It's

2  getting very – do you want those MDT meeting notes?  The

3  special ed teacher was Angel Hunter.  Their notes state

4  Kingsbury staff invited but not present.  Parent and

5  counsel agrees to proceed with meeting without (inaudible).

6      HEARING OFFICER:  Parent and counsel did?

7      MR. GUPTA:  Yes.

8      HEARING OFFICER:  Okay.

9      MR. GUPTA:  So then I guess it's also safe to assume

10  that in the IEP that you developed later in November you

11  spoke of would not have this OT, obviously since you didn't

12  know an evaluation existed?

13      MS. GUSTESEN:  We received an evaluation, an OT eval

14  that roughly corresponded to the date of the Kingsbury IEP.

15  I believe the Kingsbury IEP was November 14th.

16      MR. GUPTA:  Are you changing your testimony on that?

17  Earlier you said that you never received an OT eval.  I'm

18  just asking if the new ID you developed, obviously it

19  wouldn't include an OT because you didn't know an OT eval

20  existed.

21      MS. GUSTESEN:  Let me clarify because I'm not changing

22  my testimony.  What I'm saying to you is that during the

23  application process, we had no knowledge that there was an

24  OT evaluation during that time frame of last summer, from

163

490

1    the time of application which I believe is somewhere around

2    the 19th of June through our acceptance.  We were unaware

3    and had no knowledge of an OT evaluation, and so we made

4    the recommendation for speech and OT.  Now, I was not aware

5    that Kingsbury had been invited to an MDT meeting to place

6    occupational therapy services onto the IEP in November.

7    But independent of that meeting, of whenever that meeting

8    occurred, we did receive an OT evaluation, and I believe

9    that that evaluation came from one of Mr. Eig's associates.

10        MR. GUPTA:  And again that time frame when you did

11   receive the OT?

12        MS. GUSTESEN:  I don't, off the top of my head, recall

13   the specific date.  But it corresponded roughly to the time

14   - very close, rather, to the time that Kingsbury conducted

15   it's own IEP meeting.

16        MR. GUPTA:  Okay.  I understand that now.  So at that

17   time, is there a time that closely corresponds to it you

18   said it's later in November, around the 14th or 13th.

19   Correct?

20        MS. GUSTESEN:  Yes.  Yes.

21        MR. GUPTA:  Okay.  But you were never invited to the

22   DCPS MDT meeting, that you incorporated the OT, let me give

23   you the date, that meeting occurred on November 8th which

24   would be before you when you (inaudible).

164

491

1    MS. GUSTESEN:  Yes, to my knowledge, we were not

2    invited to the meeting.

3    MR. GUPTA:  Okay.  I just want to point the hearing

4    officer's attention to DCPS 14, page 14 is a letter

5    inviting Ms. Pavo from Cindy (inaudible) and it is

6    proposing different dates for November 8th, 2006, and three

7    different times for November 8th, 2006.  It was sent out on

8    October 25th.  It is inviting Mr. Eig, Patricia Young, Gail

9    Hall, and (inaudible) Tazwell (phonetic), assistant

10   director of Kingsbury Day School.  Those are all the ccs.

11   HEARING OFFICER:  Who signed the letter?

12   MR. GUPTA:  Cindy Brown, the case manager for O███

13   O█████.

14   HEARING OFFICER:  Okay.  She's going to be testifying.

15   MR. GUPTA:  She's going to be testifying, sir.  And

16   under that same number, a second page is a letter from

17   Paula, Ms. Paula Rosenstock, who is a –

18   MR. EIG:  I object at this point.  This is our case he

19   is testifying in.  And this isn't an issue when Baker, you

20   know, wanted to say is that this isn't an issue anyway –

21   and –

22   HEARING OFFICER:  Well, still, I think he's, I mean,

23   it's an issue if he's contesting the appropriateness of the

24   placement at Kingsbury.

165

492

1      MR. EIG:  Kingsbury is providing a – we have to –

2  (inaudible)

3      HEARING OFFICER:  You don't have to say it.

4      MR. EIG:   I'll have to testify myself.

5      HEARING OFFICER:  I mean it's relevant to the issue, I

6  mean if he's confessed –

7      MR. EIG:  What does it have to do their IEP meeting?

8  We're not contesting that he needs those tests.  We said

9  that we agreed.  Both sides agree that he needs an OT.

10     HEARING OFFICER:  Okay.  I don't know what his program

11 is at Kingsbury with respect to OT.

12     MR. EIG:  I understand that part.

13     HEARING OFFICER:  And I presumed he was making the

14 case that whatever they're doing at Kingsbury is

15 inappropriate if they're not aware of the OT evaluation.

16     MR. EIG:  But she said that she got it.  The only

17 thing that I was objecting to with these letters of the

18 meeting, where it says, and it says we agree to go ahead,

19 get an OT program.

20     HEARING OFFICER:  Okay.

21     MR. EIG:  That's absolutely correct.  That's the only

22 thing I would question.

23     HEARING OFFICER:  Again, I don't know if he's

24 testifying, he's just identifying documents.

166

493

1      MR. EIG:  During cross examination of another witness

2  not in his case.  I think that's inappropriate.  It's not

3  his case.

4      MR. GUPTA:  The witness testified that –

5      HEARING OFFICER:  He's asking her –

6      MR. EIG:  He's putting it into evidence.

7      HEARING OFFICER:  What evidence?

8      MR. EIG:  I'm sorry.  He's directing you to evidence

9  in his case during cross examination of a witness and

10 that's beyond the scope to say the least.

11     MR. GUPTA:  The witness testified that they were

12 (inaudible) in September –

13     MR. EIG:  I withdraw the objection.  This is taking

14 much more time.  I just think that it's inappropriate

15 during cross examination of an opposing witness, could be

16 directing the hearing officer without a question, without a

17 question to the witness.  That's the only thing I was

18 objecting to.  But I withdraw the objection.

19     HEARING OFFICER:  Go ahead, Mr. Gupta.

20     MR. GUPTA:  I'd like to move on to your school

21 specifically.  You stated that the middle school is

22 ungraded.  Isn't it true that high school is ungraded, too?

167

494

1    MS. GUSTESEN:  No. Our upper school is not ungraded.

2    We go from grades 9 through 12.  But our lower school and

3    our middle school are ungraded.

4    MR. GUPTA:  How do you determine when a student is

5    ready for the next level, from middle school to high

6    school?

7    MS. GUSTESEN:  We look at a number of factors.  One is

8    the ability to navigate an independent social scene, to be

9    able to make transitions because the upper school program

10    is departmentalized at Kingsbury.  Meaning that Oleg would

11    have six or seven teachers depending upon on how many

12    academic subjects he would take.  We look at social

13    maturity and we look at the ability, the prerequisite

14    academic skills needed to move into 9th grade program.

15    MR. GUPTA:  What is the academic ability that he would

16    need to get into the 9th grade level?

17    MS. GUSTESEN:  Well, he would certainly need to be

18    able to achieve more independence in terms of his reading

19    and his written expression, for one.  To be able to

20    generate information and to work more independently.

21    MR. GUPTA:  And you said he's made progress so do you

22    envision him getting there next year or the year after?

23    Being able to do that?

24    MS. GUSTESEN:  Yes.  Next year or the year after, yes.

168

495

1  MR. GUPTA:  So when he gets to high school, he will

2 rotate classes, you say.  He'll have up to 6 to 7 teachers.

3  MS. GUSTESEN:  That's correct.

4  MR. GUPTA:  Does the class ratio go up?

5  MS. GUSTESEN:  No.  It goes down actually.

6  MR. GUPTA:  What's the class ratio in high school?

7  MS. GUSTESEN:  Eight.  Well, 4 to 2.  We have

8 assistant teachers and lead teachers but we generally go –

9 we have fewer kids.  And the range could be anywhere from

10 four kids actually up to eight kids, if it would be

11 freshman English, 9th grade English, 9th grade math.

12  MR. GUPTA:  Do the high school kids receive Carnegie

13 units?

14  HEARING OFFICER:  Mr. Eig, you're punishing me.  What

15 are we talking about, high school kids?

16  MR. GUPTA:  Because that's one of their –

17  MR. EIG:  You meant Mr. Gupta you're punishing me.

18  HEARING OFFICER:  No, you are, by not objecting.  Why

19 are we talking about high school –

20  MR. GUPTA:  -- complaints in their, about Prospect

21 because he'd only be there a year and then he'd have to

22 transition again.

23  HEARING OFFICER:  Oh, you're right.  Go ahead.

24  MR. GUPTA:  Again –

496

1      MR. EIG:  That's why I didn't object.

2      MR. GUPTA:  I didn't hear your answer.  In high school

3 would he receive Carnegie units?

4      MS. GUSTESEN: Yes he does.  He would.

5      MR. GUPTA:  How does that correlate to being ungraded?

6      MS. GUSTESEN:  The upper school is not ungraded.

7      MR. GUPTA:  Are you familiar with what the last grade

8 it was before you came to (inaudible)

9      MS. GUSTESEN:  No.  Off the top of my head, no. I

10 understand KDS.

11      MR. GUPTA:  I'm sorry.  Now your staff.  Do you have

12 psychologists on your staff?

13      MS. GUSTESEN:  Yes, we do.

14      MR. GUPTA:  How many?

15      MS. GUSTESEN:  There are 11 that provide services

16 within the school.  And then there are additional

17 psychologists who provide testing to the community at

18 large.

19      HEARING OFFICER:  I'm sorry.  Run through that again.

20      MS. GUSTESEN:  We have –

21      MR. GUPTA:  I have to limit it to middle school

22 issues.

23      MS. GUSTESEN:  Oh, to the middle school?  We probably

24 have four or five psychologists who provide services.

170

1    Those providers if a kid is in our program year after year,

2    it generally is not wise to change psychologists because of

3    the kind of work that they do together.  So of the 11, I

4    think we have four or five who provide services to our

5    middle schoolers.

6        MR. GUPTA:  How about social workers?

7        MS. GUSTESEN:  We have a social worker who is

8    programmatically based and we have one for the middle

9    school.

10        MR. GUPTA:  Is she licensed?

11        MS. GUSTESEN:  She is.

12        MR. GUPTA:  And in the middle school, are all your

13    teachers certified in special education?

14        MS. GUSTESEN:  Yes they are.

15        MR. GUPTA:  In special education?

16        MS. GUSTESEN:  In special education.

17        MR. GUPTA:  Are they certified in their general

18    education for the subject they're in?

19        MS. GUSTESEN:  No, not as yet.

20        MR. GUPTA:  Do you have an OT service provider at your

21    school?

22        MS. GUSTESEN:  Yes, we do.

23        HEARING OFFICER:  What?

171

1    MS. GUSTESEN:  Oh, we contract her services with Lynn

2    Israel & Associates and we have 10 occupational therapists

3    providing services to the entire school.  Occupational

4    therapists are assigned by classroom and so the

5    occupational therapist assigned to O███████ classroom would

6    see all of those children within that classroom.

7    MR. GUPTA:  And in your high school, are all your

8    teachers certified in special education?

9    MS. GUSTESEN:  Yes.  We have teachers who have

10    provisional certification through their college and

11    university.  Or college.

12    MR. GUPTA:  It's not really relevant if they're

13    (inaudible)

14    MS. GUSTESEN: Well if they're taking course work it is

15    the university who does the approval for that.  With the

16    SEA.

17    MR. GUPTA:  Okay.  So in high school, do the teachers

18    have each of four subject areas, or are certified in

19    general education for those courses, subject areas?

20    MS. GUSTESEN:  Some of our teachers are certified in

21    their content area.

22    MR. GUPTA:  What do you mean?

23    MS. GUSTESEN:  So they would hold dual certifications.

499

1    MR. GUPTA:  But not all the content area teachers are

2    certified in their content area, is that what you're

3    saying?  Because you said some of them are.

4        MS. GUSTESEN:  Yes.  Some of them are seeking

5    certification.  For example, we have a collaborative

6    training program with the George Washington University.

7    And we have lead teachers who are in their second year of

8    training who are eligble for certification both in special

9    education and in their content area.  But they meet the

10   requirements.

11       MR. GUPTA:  How many teachers you think fall into that

12   category?

13       MS. GUSTESEN:  You'll have to give me a minute to

14   think.  I wasn't anticipating those questions.  Let's see,

15   we have - okay.  We have 13, we have 15 upper school

16   teachers.

17       MR. GUPTA:  Okay.  How many of those are dually

18   certified in the four subject area along with special

19   education?

20       MS. GUSTESEN:  I would say either 11 or 12 of them,

21   the others being in our collaborative training program with

22   GW.

23       MR. GUPTA:  And then I wanted clarification on the

24   middle school certification.  You said some of them are

1    certified through their university.  Does the university

2    then give that to the SEA or the Department of Education to

3    obtain that certification?  I don't understand the

4    significance.

5        MS. GUSTESEN:  Well, the individual cannot apply

6    directly to the SEA for certification as I understand it.

7    They need to have the university send them their paper

8    work.  Send the paper work to the SEA for that, and then we

9    get a copy of their provisional certificate.

10        MR. GUPTA:  Okay.  Thank you.  I have no further

11    questions.

12        HEARING OFFICER:  Any re-direct?

13        MR. EIG:  Just on the Kingsbury program.  I just want

14    to make sure they were clear on the related services

15    (inaudible).  She said Kingsbury completed this IEP and it

16    calls for special education instruction?

17        MS. GUSTESEN:  Yes.

18        MR. EIG:  It's all very general, that instruction?

19        MS. GUSTESEN:  No.

20        MR. EIG:  Okay.  Does the OT report, you said, that

21    was forwarded to you, maybe through my office?  Let me show

22    you DCPS 6, and ask you if that's it.

23        MS. GUSTESEN:  That is the report by Denise Hallman

24    (phonetic).

174

501

1        MR. EIG:  And this is a school system occupational

2    therapy report, 10-19-06, that's the date?

3        MS. GUSTESEN:  Yes.

4        MR. EIG:  Does Kingsbury's pro-IEP that they've

5    developed, does it call for speech and language services?

6        MS. GUSTESEN:  Yes it does.

7        MR. EIG:  Does it call for psychological services?

8        MS. GUSTESEN:  Yes it does.

9        MR. EIG:  Does it call for occupational therapy

10   services?

11       MS. GUSTESEN:  Yes, it does.

12       MR. EIG:  Can Kingsbury provide all these things?

13       MS. GUSTESEN:  Yes we can.

14       MR. EIG:  Does O███ need all those things?

15       MS. GUSTESEN:  Yes, he does.

16       MR. EIG:  I have no further questions.

17       HEARING OFFICER:  Thank you.

18       MR. EIG:  Thank you, Ms. Gustesen.

19       MS. GUSTESEN:  Yes, thanks.

20       HEARING OFFICER:  We need to take a break.  My pad is

21   full.

22                          [OFF THE RECORD]

23                          [ON THE RECORD]

175

502

1          HEARING OFFICER:  Okay.  Ms. Pavo, would you raise

2    your right hand?  Do you swear or affirm the testimony you

3    are about to give will be the truth, the whole truth and

4    nothing but the truth?

5          MS. PAVO:  I do.

6          HEARING OFFICER:  Thank you.  Go ahead.

7          MR. EIG:  Thank you.  Would you please state your full

8    name for the record?

9          MS. PAVO:  Claudia Ruth Pavo.

10         MR. EIG:  And Ms. Pavo, how do you know O█████ O███████?

11         MS. PAVO:  I'm his mother.

12         MR. EIG:  Okay.  Do you have other children?

13         MS. PAVO:  We have two other children.

14         MR. EIG:  Okay.  So, and, where does O████ fit into the

15    -

16         MS. PAVO:  O████ is the youngest.  He has an older

17    brother and an older sister.

18         MR. EIG:  Ms. Pavo, where was O████ in school last

19    year?  Just go through his school history quickly.

20         MS. PAVO:  We adopted O████ when he was five years old.

21    He had spent from birth to when we adopted him in an

22    orphanage in Reckta (phonetic).  We adopted him I think in

23    April when he had just turned five.  He started school at

24    Hearst (phonetic) Elementary after that.  The following

176

503

1  fall, he was not remotely ready for Kindergarten, so he did

2  pre-K.  He went to Hearst through 3rd grade which is where

3  Hearst ends.  Then he moved to John Eaton (phonetic) where

4  he was in John Eaton in 4th grade, and in 5th grade at John

5  Eaton, and then I moved him to Our Lady of Victory where he

6  repeated 5th grade.  And then it became apparent that OLV

7  was not an appropriate placement for him and he had very

8  severe problems at OLV.

9        MR. EIG:  Okay.  I'm going to interrupt you.  I do

10  have some questions about OLV.  How long was he at OLV?

11        MS. PAVO:  One year.

12        MR. EIG:  Okay.  You said he repeated 5th grade and

13  that was the year at OLV.

14        MS. PAVO:  Yes.  He had done 5th grade in DCPS and

15  OLV's 5th grade language arts program was at least a year

16  more advanced than the DCPS program.  So that even having

17  completed 5th grade at Eaton, he was not equipped to do 6th

18  grade at OLV.

19        MR. EIG:  Oh, I'm sorry.  I wasn't clear.  Had he

20  repeated a previous grade?

21        MS. PAVO: Instead at 5, he did pre-K at Hearst instead

22  of Kindergarten, which would be the normal grade at 5.

23        MR. EIG:  And then after a year at OLV, this year at

24  Kingsbury, right?

1      MS. PAVO:  Yeah.  And he would – his first grade

2  teacher would have retained him in first grade if she could

3  have but she said he couldn't because he was ESL.

4      MR. EIG:  Now, therefore, age-wise, what do you

5  understand his grade level should be or would normally be?

6      MS. PAVO:  I believe it would normally be 8th grade.

7      MR. EIG:  And has Kingsbury, you said he completed 5th

8  grade at OLV.  Has Kingsbury – we heard Ms. Gustesen, and I

9  guess the record can reflect you've been here for the

10  testimony of both Dr. Solomon and Ms. Gustesen?

11      MS. PAVO:  Yes.

12      MR. EIG:  Okay.  Has anybody else at Kingsbury

13  suggested a grade level to you.  I believe we heard Ms.

14  Gustesen say they are ungraded, but has anyone talked about

15  grade levels to you from Kingsbury as to where he's at in

16  middle school?

17      MS. PAVO:  Not really.  Because the program's

18  ungraded, but –

19      MR. EIG:  Now, let me – when he was at Hearst and

20  Eaton, and I guess the record, to be absolutely clear,

21  should reflect that Hearst and Eaton are both D.C. public

22  schools, correct?

23      MS. PAVO:  Yes.

178

505

1     MR. EIG:  Okay.  Was he receiving any special ed

2  services at that time?

3     MS. PAVO:  No.

4     MR. EIG:  Did you want special education services for

5  O▓▓ at that time?

6     MR. GUPTA:  Objection.  The objection is based on

7  relevance.  Because even if she did, we'd be SOL.

8     MR. EIG:  I'm not raising a claim.  This is background

9  contextual information.

10     MR. GUPTA:  This has nothing to do with this claim.

11  It's not relevant.

12     MR. EIG:  How does she know?

13     HEARING OFFICER:  What would be the relevance of what

14  she wanted if you didn't allege it in the complaint?

15     MR. EIG:  We did say, actually that they were late in

16  providing services. But we're not basing – it's not worth

17  it.  I do believe there's such context is often helpful to

18  a hearing officer when taken together, but can I say

19  specifically how in first grade whether she had trouble

20  getting special ed or what I care about, it's relevant to

21  your decision now?  No, I can't – so I just think it's

22  helpful.  When did he start receiving special ed?

1      MS. PAVO:  I don't believe he did receive special ed

2   services.  He received English as a second language

3   services.

4      MR. EIG:  Okay.  So he never had an IEP.

5      MS. PAVO:  No.

6      MR. EIG:  Okay.  So his first IEP was this year?

7      MS. PAVO:  Yes, yes.

8      MR. EIG:  When you moved him to Our Lady of Victory,

9   why did you do that?

10     MS. PAVO:  Because the – Basically, I felt that at

11  Hearst basically the school was somewhat wild and somewhat

12  sort of out of control in a sense that by the time O██

13  finished 5th grade, he was getting hurt at school.  O██

14  went to Hearst and then to John Eaton.  And when I moved

15  him to OLV, it was from John Eaton.

16     HEARING OFFICER:  You said Hearst was wild.

17     MS. PAVO:  Excuse me, I apologize.  I meant John

18  Eaton.

19     HEARING OFFICER:  Okay.

20     MR. EIG:  Tell us about him getting hurt.

21     MS. PAVO:  Okay.  Well, O██ was constantly at John

22  Eaton getting hurt.  Basically in situations where there

23  were – O██ is very, very small.  There were lots, older

24  boys, particularly older boys, who were basically kind of

180

507

1    wild and not very well supervised and just one example,

2    there was one occasion when O███ was trying to go up or

3    down a stair well, and there was a group of sixth grade

4    boys rough housing in the stair well.  And when O███ went

5    past them, one of the larger shoved another.  That boy fell

6    into O███ and O███ was knocked down the stairs.

7         But there were lots and lots of incidences that

8    occurred like that at John Eaton.  I mean –

9         MR. EIG:  How did he respond to this?

10        MS. PAVO:  It upset him a lot.  You know, I mean, it

11   upset him a lot.

12        MR. EIG:  Does O███ like school?

13        MS. PAVO:  He loves Kingsbury.

14        MR. EIG:  Before that.  Counting OLV, too, not just –

15        MS. PAVO:  By the end of OLV, he felt extremely

16   overwhelmed and very unhappy.

17        MR. EIG:  Does he have friends?

18        MS. PAVO:  No.  No.  He had one friend who was a

19   couple years younger.  He was not really able to make

20   friends.

21        MR. EIG:  And how is he doing academically, say for

22   the last two years, the last year at Eaton and a year at

23   OLV.


                              181

                                                     508

1    MS. PAVO:  He didn't do horribly badly in fifth grade

2    at John Eaton, and his grades at OLV were reasonable.  I'm

3    not sure he flunked anything at OLV.  But the reason he

4    never in his whole public school and at OLV, he never

5    seemed capable of learning anything in class.  Basically,

6    he would come home with homework that mystified him, that

7    he was clueless about how to do.  And then I would re-teach

8    the lesson for the day.  And then when I had re-taught the

9    subject matter, we'd do the homework together.  And I mean

10   basically, probably fourth and fifth grades at John Eaton

11   and then fifth grade again at OLV – as a practical matter,

12   I home schooled him.  Particularly so at OLV which was

13   quite, which was fairly demanding.  I was spending three to

14   five hours every single night with him.  I was leaving work

15   early so that we'd have time to do extra work, and I was

16   spending often as much as 16 hours on the weekends with

17   him, on the weekends he was with me as opposed to his dad.

18        MR. EIG:  Ms. Pavo, I'm sorry to interrupt.  You're

19   divorced, right?

20        MS. PAVO:  Separated.

21        MR. EIG:  Separated.  And does O███ spend time with

22   his dad?

23        MS. PAVO:  Yes.  He spends every other weekend with

24   his dad and every Friday night.

182

509

1      MR. EIG:  Now.  Ms. Pavo, when did it become apparent

2  to you or to OLV, or how'd that work, that he wasn't going

3  to return the next year?

4      MS. PAVO:  After Dr. Federici's evaluation, the

5  principal told me that she didn't feel that O▬ should

6  return to OLV.  And I think she was right on that.  It

7  wasn't the right setting for her.

8      MR. EIG:  And this is Parent 14.  This is with your

9  note about the medication, on Dr. Federici's report.

10     MS. PAVO:  Yes.

11     MR. EIG:  It was done within May?

12     MS. PAVO:  Yes.

13     MR. EIG:  I'm sorry.  Except for the size of the

14  report which might be a little surprising, were you

15  surprised by the results of Dr. Federici's report or not?

16     MS. PAVO:  By that point, it had become very clear to

17  me that O▬ had significant learning disabilities and it

18  had been apparent to me for quite some time before that

19  that O▬ had massive attentional difficulties that we were

20  not able to get a handle on with medication.  I as many

21  other people were somewhat surprised by the finding that

22  O▬ IQ was in the sort of borderline or very low average

23  range surprised me.  The principal at OLV took one look at

24  that and scoffed, also.  She felt that at least in certain

510

1    respects he was brighter than that report indicated.  The

2    extend of the emotional difficulties that showed up on Dr.

3    Federici's report also surprised me somewhat.  It's very

4    clear to me as it was at that time that O███ had

5    significant emotional difficulties, problems, for example,

6    inability to relate in a normal way, or form friendships

7    with children of his own age.  But when we were in the

8    process of trying to find a special ed, you know, trying to

9    see if we could find a special ed school for O███, a number

10   of schools, and initially Kingsbury, declined to consider

11   or admit him on the grounds that he was emotionally

12   disturbed and had emotional problems that were beyond what

13   they could handle.

14        Now Kingsbury subsequently, based on further

15   information, reconsidered that, but their initial reaction

16   was that his problems were so severe that it was even

17   beyond what they could do.

18        MR. EIG:  And let me follow up with that.  Page 18 of

19   the Parent 14 is the page where Dr. Federici has his

20   diagnostic impressions.  And I want to ask you a question

21   or two about those diagnoses.  The first one on axis one is

22   cognitive disorder, not otherwise specified (alcohol

23   related with neurodevelopmental disorder and static

184

1  encephalopathy, minimal brain dysfunction).  Did Dr.

2  Federici discuss this with you?  This diagnosis?

3      MS. PAVO:  Yes.  And I would agree with it.  The fact

4  is I knew O███ had some degree of fetal alcohol exposure

5  when we adopted him.  I could tell from the dysmorphic

6  (phonetic) ear placement.

7      MR. EIG:  Did Dr. Federici, just so the record is

8  absolutely clear here, tell you that this first diagnosis

9  is what is otherwise referred to as fetal alcohol syndrome.

10     MS. PAVO:  Yes.  Yes.  And I –

11     MR. EIG:  That doesn't – it's an adjective, okay?  And

12 then moving down, there are a number of learning disorders,

13 here.  I'm going to move way down to and direct your

14 attention now to the last two, 8 and 9.

15     Adjustment disorder of a child with mixed emotional

16 features, anxiety, depression, period disturbance of

17 conduct.  I'm not going to ask you to diagnose that.  By

18 the way, are you a psychologist?  What do you for a living.

19     MS. PAVO:  No.  I'm a lawyer.

20     MR. EIG:  Okay.  So I'm certainly not going to ask a

21 lawyer about diagnostics.  There are too many in this room

22 to begin with.  But anxiety, depression, conduct

23 disturbance.  Those are more words than I think we could

24 all say at night.  Does your son –  Okay.  Before

185

512

1    Kingsbury, then I'll ask you about Kingsbury.  Does your

2    son, did he exhibit anxiety, depression, what you would

3    call depression.  Did he seem depressed?  Or have some

4    conduct problems.

5         MS. PAVO:  Yes. Yes.

6         MR. EIG:  Has that gotten any better at Kingsbury?

7         MS. PAVO:  Yes.  And I think –

8         MR. EIG:  We'll get to – we'll get to that.  I just

9    want to get that in there now.  Post traumatic stress

10   disorder, early childhood institutionalization.  You said

11   you adopted him at five?

12        MS. PAVO:  Yes.

13        MR. EIG:  Okay.  How much do you know about what those

14   first five years of his life were like?

15        MS. PAVO:  I don't know anything about the orphanage

16   that he was in from birth to age three.  Although at age

17   three, and O▆▆ now talks non-stop.  At age three, he did

18   not speak.  To me, that indicates that those first three

19   years were incredibly traumatic for him.

20        MR. EIG:  And how about four and five?

21        MS. PAVO:  As Russian orphanages go, it was a fairly

22   good one.  But that's not saying too much.

23        MR. EIG:  Now.  Dr. Federici's report.  Did he

24   recommend schools to you?

186

513

1      MS. PAVO:  He felt that Kingsbury would be an

2  excellent placement for O█████ and yes.  He specifically

3  mentioned Kingsbury as a place where he had, where other

4  prior clients with similar types of diagnoses and reports

5  and some of them had been very successful there.  And he

6  was very specific about, you know, about Kingsbury as a

7  great place for kids like O███.

8      MR. EIG:  Ms. Pavo, did you at some point go back to

9  the District of Columbia Public Schools to get him

10  registered again or whatever or to seek services from them?

11      MS. PAVO:  I met with the folks at the Care Center.

12      MR. EIG:  Do you remember when that was?

13      MS. PAVO:  I believe it was April 26th of 2006 was the

14  first meeting.  That's to the best my recollection.  I

15  could be mistaken but I believe that that was the day.

16      MR. EIG:  That being my birthday, we'll go with it

17  because then I can remember it.  April 26th, thereabout, you

18  went back to D.C.  Now at that point, had you applied to

19  Kingsbury?

20      MS. PAVO:  No.

21      MR. EIG:  Dr. Federici's report hadn't even been done,

22  right?

23      MS. PAVO:  No, we had Dr. Federici's report at that

24  point.  He put the report together very, very quickly.

187

514

1      MR. EIG:  Well let me ask you, the date on the

2  examination is May 3rd.  That's the reason –

3      MS. PAVO:  All right.  Well maybe I'm mistaken.

4      MR. EIG:  It might have been May 26th you went? Or it

5  might have been later.

6      MR. GUPTA:  Objection.  You might as well testify for

7  her.

8      MS. PAVO:  I'm not sure.

9      MR. EIG:  Well, the answer for me would be "I don't

10  know."

11      MS. PAVO:  I had thought it was April 26th, I must be

12  mistaken.

13      MR. EIG:  When you went to D.C. did you have Dr.

14  Federici's report?

15      MS. PAVO:  I thought that I did but at this point, I

16  don't know.  I'm not certain.

17      MR. EIG:  Whenever you went to D.C., was it in the

18  spring of 2006?

19      MS. PAVO:  Yes.

20      MR. EIG:  Did you give D.C. Schools Dr. Federici's

21  report once you had it?

22      MS. PAVO:  As soon as I had it, yes.

23      MR. EIG:  Did you have any outside reports?  Did you

24  give him any records from OLV, did you have anything?

1      MS. PAVO:  The, the - I think we gave them report

2   cards from OLV and then OLV has a special services

3   coordinator that the Care Center worked with and met with.

4   I think they got some disciplinary reports on conduct

5   problems O███ had had at OLV.  And then later, I had

6   additional testing done by Dietzel Butler.  And when that

7   was available I gave that to D.C.

8      MR. EIG:  Can you think of any circumstance in the IEP

9   process in which you did not cooperate with DCPS?

10      MS. PAVO:  No.  There was one process where we

11   accidentally and unintentionally crossed wires with Cindy

12   Brown where Laura Solomon called and said we're not meeting

13   with you and I talked with Cindy and I said we are, and I

14   thought that Laura's call to Cindy was after mine, but

15   apparently mine was after Laura's or something like that.

16   But we got, there was one incident of crossed wires which

17   was totally unintentional and I apologized for it profusely

18   the next time we saw them.  It was completely accidental.

19      MR. EIG:  Let me show you DCPS 7, which is the social

20   work evaluation, by it's title, of D.C. and ask you

21   specifically to review documents reviewed by the social

22   worker.  Just look at those.  Okay?

23      MS. PAVO:  Uh-hum.

189

1       MR. EIG:  Now the first document reviewed there by  -

2    did Ms. Brown do it?  Yes.  Ms. Brown's report.  First a

3    multidisciplinary team meeting on April 26, 2006.  Does

4    that reflect your recollection as to when that first

5    meeting was?

6       MS. PAVO:  Then it was April 26 as I thought it was.

7       MR. EIG:  Okay.  If Dr. Federici's report wasn't

8    finished until about a week later, would you have had it on

9    that date?

10       MS. PAVO:  No I wouldn't have.

11       MR. EIG:  Now.

12       MS. PAVO:  Unless possibly he gave me some kind of

13    preliminary draft or something, but that's not what I

14    recall.

15       MR. EIG:  Okay.  Now.  DCPS - there's a social worker

16    report here.  Did they do other evaluations?

17       MS. PAVO:  Yes.  They did some classroom observations

18    and some testing of O███. is my recollection.

19       MR. EIG:  Okay.  As of - this is right up to the end

20    of the school year - end of June '06, did you know where

21    O███. was going to school the next year?

22       MS. PAVO:  No, I did not.  Again, the principal at OLV

23    had told me that OLV was not an appropriate placement for

24    him, but she had held open the door sort of a little tiny

                            190

1   bit that, you know, if I couldn't find an appropriate

2   placement for him, you know, to come back and talk to us.

3   But it was very clear to me that OLV was not an appropriate

4   placement for him.  They didn't think it was and neither

5   did I.  But I did not know where he was going to be going.

6        MR. EIG:  When did you apply to Kingsbury.  About?

7        MS. PAVO:  I believe it was in July of 2006.  I'm not

8   absolutely certain but I think it was July.

9        MR. EIG:  Did you bring him Ms. Gustersen's testimony?

10        MS. PAVO:  They've got a copy of that.  I'm sorry.

11        MR. EIG:  No, that's their job.  That's okay.  Ms.

12   Gustesen testified as you just heard about a visit.  Did

13   you ever visit Kingsbury over the summer?

14        MS. PAVO:  Yes.  He visited for two days.

15        MR. EIG:  Okay.  Now, did you want him to go to

16   Kingsbury – by the time of the August 30th – I'm sorry.

17   Let's turn to August 10th.  Was there an MDT meeting, or any

18   kind of meeting before those August meetings we've talked

19   about?

20        MS. PAVO:  Yes.  We've had several, several meetings.

21        MR. EIG:  What were the purposes of the meetings with

22   DCPS?

23        MS. PAVO:  To come up with an IEP and then after the

24   IEP to discuss placement issues.

1          MR. EIG:  Now.  Do you remember the discussion this

2    morning about an August 10th IEP meeting and an August 30th

3    IEP meeting?

4          MS. PAVO:  Uh-hum.

5          MR. EIG:  Okay.  Do you recollect attending an August

6    10th IEP meeting?

7          MS. PAVO:  I believe so.

8          MR. EIG:  Okay.  Whatever meeting you were

9    recollecting, was it to come up with an IEP?

10         MS. PAVO:  Yes.  We had more than one meeting related

11   to IEPs.

12         MR. EIG:  And by the August 30th meeting, and I'll turn

13   you to DCPS 5, you were at this meeting?  Oops.  August

14   30th, I turned it to the first page of the DCPS.  You can

15   just sign and say a word.

16         MS. PAVO:  Yes.  I was there.

17         MR. EIG:  Who was there with you?

18         MS. PAVO:  Dr. Solomon and Paula Rosenstock.

19         MR. EIG:  The attorney from our office?

20         MS. PAVO:  Yes.

21         MR. EIG:  Okay.  And there's an IEP that comes after

22   this meeting, there are notes.  Did you go with an IEP as

23   of that date?

24         MS. PAVO:  Yes.

1      MR. EIG:  Okay.  And the IEP calls for - how much

2   service do you understand that it called for?  I don't want

3   to make it necessary for you to look.  Did it call for a

4   part-time or a full-time placement, as far as your

5   understanding.

6      MS. PAVO:  We ended - DCPS started out proposing a

7   part-time placement for O█████ and then we discussed the

8   fact that O█████ attentional issues and emotional problems

9   carried over into nonacademic settings, such as lunch,

10  P.E., things like that, and I pointed out that some of

11  O█████ greatest behavior difficulties had actually occurred

12  at lunch time, in a relatively poorly supervised lunch

13  setting.  And D.C. at that point agreed that a full-time

14  special, you know, that full-time special ed setting was

15  what made sense.

16     MR. EIG:  Okay.  And looking at DCPS 5, the second

17  page of the August 30th notes.  Can you just review the

18  first, up to where the horizontal line is on the notes, or

19  just the first comments?  My question here is - is that the

20  discussion that you're referring to about?  DCPS thinking

21  he might be able to do an (inaudible).

22     [LONG SILENCE]

23     MS. PAVO:  Yes.

520

1       MR. EIG:  Was that the discussion?  And what school

2   were they at the beginning of the meeting were they

3   suggesting you possibly try?

4       MS. PAVO:  No.

5       MR. GUPTA:  Objection.  How many times is he going to

6   insert the answer for her.

7       MR. EIG:  Actually the answer is Deale, so that wasn't

8   the answer.

9       HEARING OFFICER:  Mr. Eig, for God's sakes!  Sir, he

10  had a perfectly legitimate objection.  You were leading the

11  witness.

12      MR. EIG:  I-I –

13      HEARING OFFICE:  You were leading the witness.  And

14  stop doing it.

15      MR. EIG:  I wasn't leading the witness.

16      HEARING OFFICER:  You were leading the witness.

17      MR. EIG:  Was that her answer?

18      HEARING OFFICER:  I don't care about what the answer

19  is.  I don't care what the answer is.  I just want you to

20  follow procedures that you know are appropriate.

21      MR. EIG:  Yes, sir.  For the record I will state that

22  you do not lead a witness by suggesting a long answer.

1    HEARING OFFICER:  Well, you can lead, no, yes you can.

2    That's still leading the witness.  It may not be doing it

3    properly but it's still leading the witness.

4    MR. EIG:  I apologize.  It would be very incompetent.

5    I agree.  I'll back off.

6    HEARING OFFICER:  Please do.

7    MR. EIG:  Did they discuss a placement in a possible

8    school at all?  As to where they were considering placing

9    this student.

10    MS. PAVO:  They wanted to place him in 7th grade with a

11    mix of special ed and mainstreaming and I assumed that that

12    would have been Deale.

13    HEARING OFFICER:  Did they say -

14    MS. PAVO:  I don't, I'm not certain.

15    HEARING OFFICER:  Okay.

16    MR. EIG:  Okay.  If indeed they were suggesting

17    general education classes, what's your neighborhood middle

18    school, or junior high school?

19    MS. PAVO:  Deale.

20    HEARING OFFICER:  Okay.  Let me go back.

21    MR. EIG:  Yes, sir.

22    HEARING OFFICER:  The question was did they suggest -

23    let me just change the question.  They suggested a setting

24    of something other than full-time.

195

522

1      MS. PAVO:  DCPS's original position was that he did

2  not need a full-time special ed setting.  That was

3  discussed fairly extensively.  And after we discussed that

4  and I pointed out that, you know, the attentional problems

5  –

6      HEARING OFFICER:  I got that much.

7      MS. PAVO:  – They agreed that a full-time special ed

8  setting was what was appropriate.

9      HEARING OFFICER:  And Deale – that's your neighborhood

10  school for middle school?

11      MS. PAVO:  Yes.  Yes.  Someone who finished 6th grade

12  at Eaton would move on to Deale.

13      HEARING OFFICER:  Go ahead, Mr. Eig.

14      MR. EIG:  Thank you.  In, on this page, it says page 2

15  of 3 on DCPS 5 where it says, DCPS indicated that on last

16  report card shows student received excellent or

17  satisfactory grades and should be able to go to these

18  classes in combinations and modifications; moreover, these

19  classes are not as demanding as the correct (inaudible)

20  classes.  What kind of classes were they talking about?

21      MS. PAVO:  Music, art and P.E. is my understanding as

22  well as lunch.

23      MR. EIG:  Was there any input – did anybody pick up

24  the phone and call a general education teacher to talk

196

523

1    about mainstreaming the student at that point in the

2    meeting?

3        MS. PAVO:  Not to my recollection.  My recollection

4    was just a group of us there in the room.

5        MR. EIG:  Who convinced DCPS – who was doing the

6    talking on your behalf to advocate for full-time as opposed

7    to some mainstreaming.

8        MS. PAVO:  It was –

9        MR. EIG:  (inaudible)

10       MS. PAVO:  Me.  It was points that I raised about O███

11   at OLV, both disciplinary problems that occurred during a

12   poorly – what I perceived as a poorly supervised lunch

13   period at OLV, and the difficulties that O███ – O███ had

14   been skipping music classes.  Everytime music class came

15   up, O███ suddenly became "ill" and went to the school

16   secretary and chatted with her until music was over.  And

17   insofar as he did well in art, it had to do with the fact

18   that, again, I was effectively home schooling him in art.

19       MR. EIG:  Now, Ms. Pavo.  Once you convinced, or once

20   you said what you said and did the team agree on full-time?

21       MS. PAVO:  Particularly with regards to the

22   disciplinary problems that had occurred at lunch which is

23   the least academic of all activities at school, yes.  They

24   felt that a full-time placement as appropriate after that.

197

524

1       MR. EIG:  And toward the end of the meeting, did they

2   present Prospect?  At some point in the meeting, did they

3   present Prospect?

4       MS. PAVO:  I am not absolutely certain which meeting –

5   Prospect –

6       MR. EIG:  Then stop. If you're not sure.  Let me show

7   you something that should refresh your recollection.  I'm

8   showing her again DCPS 5 to page 4 of 4 of the notes, just

9   to yourself, review the method.

10      MS. PAVO:  It says –

11      MR. EIG:  There's no question here.  You're supposed

12  to read.

13      [LONG SILENCE]

14      MR. EIG:  Okay, have you read it?

15      MS. PAVO:  I've read down to here.

16      MR. EIG:  That's enough.  She read down to the part

17  that says Parent wants funding of placement at Kingsbury.

18  Does that reflect your recollection as to whether DCPS

19  proposed Prospect?

20      MS. PAVO:  It was at that meeting.

21      MR. EIG:  Had you been to prospect before August 30th,

22  2006?

23      MS. PAVO:  No.

24      MR. EIG:  Did you know about Prospect?

198

1      MS. PAVO:  Yes.  I had discussed, I discussed Prospect

2    and I can't give you the exact date, but discussed, in

3    fact, I believe it was before this meeting.  I had

4    discussed with Dr. Solomon what DCPS had available in the

5    way of full-time special ed placements and whether she felt

6    that those programs could adequately meet O███████ needs.

7      MR. EIG:  Okay.  Now.

8      MS. PAVO:  And she felt that – and she was very clear

9    that she didn't feel that they could. I believe that

10   Prospect is the only full-time special ed setting that DCPS

11   has for kids O██████ age although I could be mistaken.

12     MR. EIG:  Okay, now, Ms. Pavo, did you go and observe

13   and visit Prospect.

14     MS. PAVO:  I visited Prospect on two separate

15   occasions.

16     MR. EIG:  Okay and the first occasion, this is August

17   30th, how long did it take you to get there?

18     MS. PAVO:  I went with Dr. Solomon on September 7th and

19   that was the first, the earliest that we could arrange to

20   visit.

21     MR. EIG:  And you said two separate – have you been

22   back to Prospect to visit?

199

526

1          MS. PAVO:  I went back to Prospect and visited again

2     for approximately a half day.  I believe it was in early

3     December.

4          MR. EIG:  Why did you go back the second time?

5          MS. PAVO:  I wanted to learn more about their program

6     and - having O██ at Kingsbury is extraordinarily expensive

7     and I wanted to be certain that I had made the right

8     choice.  And because, you know, I mean, he's not going to

9     end school after this year.

10         MR. EIG:  Ms. Pavo, based upon what you saw at

11    Prospect, do you believe that your son would be well-

12    placed?

13         MS. PAVO:  No.  It, it - and I don't mean to in any

14    way denigrate what DCPS is doing at Prospect.  There are

15    many good parts of that program and I think that there are

16    many students that it serves very well.  It's totally clear

17    to me that I would be back to home schooling O██ again.

18         MR. EIG:  Why do you say that?

19         MS. PAVO:  The classes are too large and too noisy.

20         MR. EIG:  Let me stop you right away on large and ask

21    you, when you went there on September 7th, I know Dr.

22    Solomon has talked about this a bit.  Did Dr. Peterson tell

23    you anything about the number of kids in the classroom, if

200

1   there's more than one class, so that I know O██ might be

2   in?

3      MS. PAVO:  When we went there on September 7th, Dr.

4   Peterson, I believe based on having looked at O████

5   records, had chosen, they have two classrooms for the

6   oldest kids.  And she felt that one of those classrooms was

7   the proper classroom for O██ and the other was not the

8   proper classroom for O██   And when we were in her office,

9   my recollection is that she said that there were 11 kids in

10   that class, possibly 12, but that there were 11 kids in

11   that class.  When we actually went up and observed the

12   class, there were 13 students physically present in the

13   classroom.  And she conceded that her records had been –

14   that there had been some difficulty with her records or

15   something.  And that there were 13 kids, you know, that

16   there were 13 kids assigned to that classroom on that day.

17      MR. EIG:  Did she say yes or no, whether there was

18   space for O██ as of September 7th.

19      MS. PAVO:  She conceded that they did not have an

20   opening within their guidelines for how many students there

21   should be in a class that they did not at that time have an

22   opening for him.

23      MR. EIG:  As of December when you went back, had

24   anything changed?

1    MS. PAVO:  No.  They did not have an opening for him.

2    MR. EIG:  There is - and I won't - but we asked them

3    this morning a place where it was suggested by Dr. Peterson

4    that they needed another class and would start another

5    another class.  Has another class been started?

6    MS. PAVO:  No.  Not as of the time that I was there in

7    December.

8    MR. EIG:  In December.  Now, Ms. Pavo, do you see

9    anything besides just the numbers?  What else if anything

10   did you see that concerned you about O█████ going to

11   Prospect?

12   MS. PAVO:  The curriculum was not - basically it's

13   kind of a replay of the curriculum that they have in the

14   public schools as opposed to in a special ed school and I'm

15   familiar with this at some extent because O█████ older

16   sister attended the Lab school for many years.  They change

17   the way they teach so that kids who have learning

18   disabilities and are not going to pick up information in a

19   traditional classroom setting, they tailor their teaching

20   techniques, so that they're basically trying to get across

21   information in different ways that will get through to kids

22   with learning disabilities.  I didn't observe - I did not

23   observe that.  In fact, on the second visit, the math

24   teacher, repeatedly when kids did not understand the

1    material, the math teacher, it was very clear that he was

2    pacing himself and had to get through a certain amount of

3    material within a certain amount of time.  And when kids

4    didn't get stuff in the math class, he repeatedly, and

5    again, it was like about half a dozen times or more, said,

6    "I'm sorry.  We need to move on. You can come and see me at

7    lunch, at recess, whatever, after school.  But we have to

8    move on now in class.  I can't take time and explain the

9    thing that you don't understand."  The math class that I

10   sat in on in December also had only one teacher.  There was

11   not an aid present.  And there were at least 12 kids in the

12   class and there was just one teacher, not an aid.  I asked

13   Dr. Peterson about that and she said that they were trying

14   to hire an aid for that class, but hadn't been able to do

15   so.  I got the impression that there had been an aid, and

16   she had left, and they were trying to replace her, but it

17   hadn't happened.  The class was also – it was also very

18   clear that none of the other students had the kind of

19   attentional issues that O███ has and it was also very clear

20   to me that they weren't dealing with any students who had

21   the type of attentional issues that O███ had.  And it was

22   very clear to me that he would not have been able to

23   benefit significantly from the class because of his

24   attentional problems.

1      MR. EIG:  Now.  Was there any discussion at the IEP

2   meeting on August the 30th?

3      HEARING OFFICER:  Let me just stop you now.

4      MR. EIG:  Yes, sir.

5      HEARING OFFICER:  I guess intuitively I don't

6   understand that.  If there's 12 to 13 kids but his problem

7   it seems to me, they have even less than a chance of

8   benefiting.  If he's the only one with an attentional then

9   perhaps he could get more attention.

10     MS. PAVO:  I should clarify that.  They were not - I

11  did not observe any significant interventions such as the

12  ones O███ would have required in order to attend to pay

13  attention in class.  I didn't see that.

14     HEARING OFFICER:  So you're addressing the response to

15  - oh, wait a minute.  But you're saying you didn't see

16  attentional problems.

17     MS. PAVO:  No.  What I'm saying is I didn't see them.

18  There were definitely kids who had attentional problems.

19  But I did not see any interventions or you know, I didn't

20  see anyone doing the kinds of things that would have

21  permitted O███ to benefit from that hour of classroom

22  instruction.  It's very clear to me that O███, you know,

23  given that classroom instruction, he would have come home

24  not understanding anything and would have readily

204

531

1    understood the material if I had taught it to him one on

2    one.

3        HEARING OFFICER:  Okay.  Let me just make sure because

4    I don't want to put words in your mouth.  I am only trying

5    to understand what you're saying.  The first time around, I

6    thought what I heard you were saying was kids didn't have

7    O███ attentional issues.  And then the next thing you

8    said was he wouldn't benefit from that class.  I took that

9    to mean that he would have been out of place because of his

10   attentional issues and therefore wouldn't, and I didn't see

11   how that followed.  But now what you're saying is – that's

12   not what you were saying?

13       MS. PAVO:  I think I'm saying two things.  And I

14   didn't see anyone doing the kinds of things that you have

15   to do to get a child like O███ to be able to benefit from

16   classroom instruction in the sense of, you know, it was 13

17   kids and it was one teacher, and the teacher was up at the

18   blackboard.  And he did move through the class occasionally

19   but it certainly wouldn't have been enough to keep O███ on

20   task.

21       HEARING OFFICER:  Okay.  Let me just ask this.  Are

22   you saying that you saw some behaviors that you would have

23   expected some interventions for.

205

532

1     MS. PAVO:  Saw.  Sort of an omission against – none of

2   the kids in the class appeared to have the same level of

3   needs as O███.

4     HEARING OFFICER:  Okay.

5     MS. PAVO:  But insofar as kids in the class did

6   display attentional needs, and there were a couple, the

7   kinds of interventions that would have been required, you

8   know, for O███.  I mean it was a constantly – I'm sorry we

9   need to move on.  I'm sorry we need to move on when the

10   kids didn't get stuff.  And some of them weren't getting it

11   because they weren't paying attention.

12     HEARING OFFICER:  Okay.  Go ahead, Mr. Eig.

13     MR. EIG:  Thank you.  Was there any discussion at the

14   August 30th IEP meeting about where O███ wouldn't move on

15   after the – was it discussed during the IEP meeting?

16     MS. PAVO:  I don't recall.  That was one of the things

17   that if we had the dispute resolution.

18     MR. EIG: No, no, no, no, no.  You're making my

19   argument.

20     MS. PAVO:  Sorry.

21     MR. EIG:  It's all right.  No, it's fine.  Just answer

22   the questions.  If you don't recall, it's fine.

23     MS. PAVO:  I'm not really sure.

206

533

1      MR. EIG:   What's different at Kingsbury?   In O▆▆▆
2  response to school.

3      MS. PAVO:  Kingsbury is very experienced in dealing
4  with children who have learning disabilities that are as
5  severe as O▆▆▆ and they are very experienced in dealing
6  with kids who have attentional problems that are as severe
7  as O▆▆▆.

8      MR. EIG:  So what are you saying in your son?  What's
9  different about how your son's behaving at Kingsbury.

10     MS. PAVO:  He really likes school.  He is slowly and
11  gradually trying to take more responsibility for keeping
12  track of his own homework, for paying attention and knowing
13  what his homework is, bringing home the right materials.
14  He is, again, it's not happening super fast, but he is
15  focusing better.  One of the things that they do at
16  Kingsbury that's really fabulous for O▆▆, and O▆▆▆ a
17  very kinesthetic, or hands on learner, and he loves that
18  kind of learning and gets incredibly excited by it.  And
19  Kingsbury has a fabulous science program.  And they do a
20  lot of actual science experiments in class where the kids
21  do science experiments.  And O▆▆ just raves about that.
22  He gets so excited about it and then comes home and tries
23  to replicate the experiments at home.  And if he's seen
24  something demonstrated through a science experiment, he can

207

534

1    remember it and remember related facts and principals in a

2    way that he could never do if it was up on the blackboard

3    kind of thing.

4         MR. EIG:  Are you free from having to home school him

5    these days?  Do you supervise?

6         MS. PAVO:  Yes, I supervise his homework.  But it's

7    not the kind of thing of you know, basically re-teaching

8    the class every day which is what I was doing before.

9         MR. EIG:  I'll just ask you one or two other things

10   about Kingsbury and I'll be finished.  First of all, did

11   Kingsbury condition O██████ acceptance on a receipt of

12   psychological services?

13        MS. PAVO:  I'm not sure exactly how formal the

14   condition was, but basically they wanted us to commit to

15   his having psychological services and I agreed with them on

16   that.  I felt that that was you know, O█████ dad and I are

17   incredibly strapped financially, but if you were going to

18   pick the one thing that I thought was most critical I

19   thought it was the psych services and they thought that,

20   too.

21        MR. EIG:  And besides any group or classroom work that

22   the OT and the speech language pathologist might be

23   providing the classroom with something, is he receiving

208

535

1    currently at Kingsbury any individual OT or any individual

2    speech?

3         MS. PAVO:  Not that I'm aware of.  Because we can't

4    afford that.

5         MR. EIG:  Has it been recommended by Kingsbury?

6         MS. PAVO:  Yes.  And DCPS.

7         MR. EIG:  Is he benefiting even without those two

8    individualized services, do you believe that your son is

9    benefiting from Kingsbury?

10        MS. PAVO:  Very significantly.  Number 1, he likes

11   school now.  He recently left out of the car in car pool

12   line screaming, I love school, as he charges up the back

13   steps at Kingsbury and then lets out a war hoop and charges

14   through the door into the school.  He's enthusiastic about

15   school and he is learning to take more responsibility for

16   his own school work and his own performance.  Again, that's

17   changing slowly and gradually.  His social skills are also

18   improving.

19        MR. EIG:  Ms. Pavo, thank you.  I have no further

20   questions.

21        HEARING OFFICER:  That's fine.  Mr. Gupta.

22        MR. GUPTA:  Yes.  Ms. Pavo, good afternoon.  Sorry

23   it's been such a long day.  This is his first year as a

24   special education student, correct?

536

1    MS. PAVO:  It's his first year in a special ed

2    setting.  He was an ESL student before and in 5th grade at

3    Eaton, they packed an awful lot of stuff under the rubric

4    of ESL.  And most of that, the meaningful part, most of

5    that occurred in 5th grade at Eaton.

6    MR. GUPTA:  At Eaton?  That was his first time

7    through, is that correct?

8    MS. PAVO:  Yes.

9    MR. GUPTA:  Okay. So what did he put in and what did

10   he get out of ESL.

11   MS. PAVO:  Pardon?

12   MR. GUPTA:  What did he get, what kind of support did

13   he get? You said they packed a lot under the rubric of -

14   MS. PAVO:  In 4th grade he was at Eaton.  He was, they

15   had a special math class that was for kids who were

16   achieving very poorly in math.  And he was in that in 4th

17   grade, and, although, frankly, he didn't benefit from that

18   a lot.  He basically drove the teacher nuts.  And then we

19   did tutoring - we spent a lot of money and a lot of time

20   with math tutoring at Sylvan Learning Center where

21   basically they teach one on two, one on three, and he

22   benefited enormously from that because he was able to

23   attend.  You know when it's one adult and two or three kids

24   he can really pay attention and focus and learn.

210

537

1    MR. GUPTA:  Let me rephrase my question.  I guess you

2    didn't understand.  As a special education student, a

3    student with disability, for example, in one of his classes

4    is for learning disabled, this is the first year he's

5    attended school as that type of student.

6    MS. PAVO: Yes.

7    MR. GUPTA:  He's never had to have an IEP before, is

8    that correct?

9    MS. PAVO:  That's correct.  That is correct.

10    MR. GUPTA:  And when you did approach the Care Center

11    I guess we finally mailed that down somewhere in April, and

12    you got the - did they recommend that you go and get Dr.

13    Federici's evaluation?  Get an evaluation with Dr.

14    Federici?

15    MS. PAVO:  No.  O████ had, O████ had disciplinary

16    incidence at OLV tied to his attention deficit disorder,

17    his impulsivity, and a very bad - what they call a rebound

18    effect when his ADD meds were off, and the ADD meds were

19    wearing off way earlier than anyone thought they were.  And

20    he was having horrible rebound effects by lunch time.  And

21    there were some disciplinary incidents.  And the school -

22    he was suspended from school and we were told that he would

23    be readmitted only after a full psycho-ed evaluation.  And

24    we had that done very - actually, we had that scheduled

211

538

1    before the suspension.  We had that scheduled before the

2    suspension.  But it was due to problems stemming from his

3    disabilities.

4        MR. GUPTA:  So that's your understanding of why Dr.

5    Federici just handled that with medication.  Is that

6    something he told you ahead of time?  Make sure he doesn't

7    take  -

8        MS. PAVO:  Yes, yes.  Dr. Federici's position is that

9    he will not evaluate any child if the child is taking

10   medication for attention or psychological problems.  He

11   insists that the child be not be under the influence of any

12   psychotropic or attentional medication when evaluated.  And

13   his reason for that is that he feels that those medications

14   can also mask conditions so that if you test a child, and

15   again, this is his theory.  If you test a child on

16   medication, you can often in his opinion get misleading

17   results because the medication distorts the performance.

18   So he wants to see the child unmedicated and he will not

19   evaluate a child unless they are entirely unmedicated.  The

20   flip side of that is that you know, the test results done

21   on an unmedicated child don't really reflect what the child

22   could do medicated.

23       MR. GUPTA:  Is that why you went ahead with the second

24   evaluation with Dr. -

1       MS. PAVO:  Dietzel.  Dietzel Butler.  Basically, what

2    had happened was that Dr. Federici's report combined with

3    O█████ behavioral and disciplinary problems at OLV, when I

4    started looking at, you know, investigating what was out

5    there in the way of private schools, and seeing if there

6    was a private school that would accept him, you know,

7    because basically I wanted to have options.  A number of

8    schools looked at Federici's report, and this is what

9    happened with Kingsbury initially.  Kingsbury initially

10   looked at O████ based on Federici's report and declined his

11   application on the grounds that he was emotionally

12   disturbed and needed to go to a school that treated

13   children who were emotionally disturbed as well as learning

14   disabled.  They for example recommended that I investigate

15   the Phillips School out in Virginia or other schools that

16   treated children; again, who had a combination of learning

17   disabilities.  They were basically recommending, they were

18   saying, this child needs a more restrictive environment

19   than Kingsbury.  We can't handle him.  His emotional

20   problems are too severe.  They also felt that his learning

21   disabilities were more severe.  They also felt that the

22   learning disabilities were at the very border of what they

23   could handle if not beyond, based on Federici's report.

24   And I - so I started shopping around to see if I could find

                                213

                                                              540

1  someone who would reevaluate O██ on meds, because I felt

2  that that would produce a somewhat better, a somewhat - you

3  know, he would behave better, during testing and that the

4  test scores would be somewhat higher.  I mean I wasn't

5  expecting a difference between night and day but I was

6  hoping that maybe it would be enough to sort of squeak him

7  over the - to get some of the private schools that weren't

8  for emotionally disturbed children to be willing to

9  consider him.

10    MR. GUPTA:  And so with that second round of testing

11  with Dietzel and Butler (inaudible), did you get that

12  result that you wanted?

13    MS. PAVO:  They - well, first of all, O██ behaved

14  much better when he was with them.  He behaved well and if

15  you read the reports it's very clear that he behaved well

16  during the testing, and the test scores were, you know they

17  weren't a lot higher, but they were somewhat higher.  Which

18  was basically what I was expecting.  Again, I wasn't

19  expecting the difference between learning disabled and not,

20  but you know, I was expecting that medicated he'd do maybe

21  10 percent better.  And that's about - I mean in ballpark,

22  that's kind of about what happened, was what I sort of

23  expected.

541

1    MR. GUPTA:  Okay.  And then, going back to Dr.

2    Federici's report, is he the only one, or are there other

3    medical examiners that have stated maybe there was the

4    fetal alcohol syndrome or a brain dysfunction, things of

5    that nature.

6    MR. EIG:  May I just note that Federici is not a

7    medical person.

8    MR. GUPTA:  Okay, well, I need to have evaluators.

9    MS. FAVO:  I can answer the question.  We took O███ to

10   and I can't remember the doctor's name.  But Dr. Federici

11   recommended an endocrinologist I think at ANOVA Fairfax and

12   we took O███ to that endocrinologist and Federici was

13   recommending the endocrinologist see O███ because of O██████

14   very small size which is a marker for fetal alcohol,

15   Aphaxer (phonetic) syndrome, and I mentioned in talking

16   with that guy, O██████, you know, Federici's reaction and

17   the doctor that we saw again, now I can't remember his

18   name.  It may have been Dr. Mason.  He's kind of, he didn't

19   want to talk about it in front of O███ but he sort of

20   nodded in a way that indicated to me that he agreed with

21   Federici's diagnosis.  I also raised Dr. Federici's –

22   MR. GUPTA:  (inaudible) I don't mean to interrupt you.

23   MS. PAVO:  Well there's a second doctor who also felt

24   that O███ – Dr. Wenner (phonetic) who did the eye exam on

215

542

1    O███, he also indicated to me that he felt that based on –

2    in fact he may have even mentioned that – I don't know if

3    he mentioned it in his report, but it was clear that Dr.

4    Wenner felt that O███ had fetal alcohol effects or fetal

5    alcohol syndrome.

6        MR. GUPTA:  Well in his report, in Dr. Federici's

7    report, or in his conversations to you, how did he come up

8    with the determination of minimal brain dysfunction or

9    fetal alcohol.  Did he ever relate that to you?

10       MS. PAVO:  Yes.

11       MR. GUPTA:  This is supporting evidence.

12       MS. PAVO:  He sort of, you know, he met with me and

13   O███ dad, and he explained sort of how you come to a

14   diagnosis of fetal alcohol syndrome or effects.  Number 1,

15   and this is just the simplest thing.  There are a number of

16   facial markers for fetal alcohol syndrome.  Widely spaced

17   eyes.  Sometimes a deformation in the area at the top of

18   the nose – it's kind of scooped out.  Deformation in the

19   upper lip, the two lines from the nose to the lip are very,

20   very faint.  They are not as strong, these lines, as in

21   normal people, and a dysmorphic (phonetic) ear placement.

22   Those are physical.  And also small head circumference and

23   small physical stature.  They are all markers for fetal

1    alcohol effects or syndrome and Dr. Federici felt that O█ █

2    had quite a few of those markers.

3        HEARING OFFICER:  Dysmorphic what?

4        MS. PAVO:  Dysmorphic ear placement.  The ears are

5    lower.  The ear canal is located radically lower on the

6    skull than in a person who does not have fetal alcohol

7    effects, or fetal alcohol syndrome.

8        HEARING OFFICER:  And then you said small head

9    circumference.

10        MS. PAVO:  Small head circumference and small stature.

11   Just generally being under-sized.  And O███ is extremely,

12   O███ is quite small.  I mean when we adopted him at 5 he

13   weighed 29 pounds.

14        MR. GUPTA: Did he ever provide the medical –

15        MS. PAVO:  Let me just note there's more.

16        MR. EIG:  He's allowed the attention.

17        HEARING OFFICER:  Oh.

18        MR. GUPTA:  I want to know in terms of that – when he

19   made that diagnosis and impression, did he ever provide you

20   with the medical diagnosis?

21        MR. EIG:  Objection.  He's not a doctor.  I'm sorry.

22   He's a doctor, he's not a medical doctor.  He's a

23   neuropsychologist.

24        MR. GUPTA:  That's my point.  Dr. Federici –

1      MR. EIG:  Excuse me.  We'll stipulate this.  Ron

2   Federici is a neuropsychologist.  He cannot make a medical

3   diagnosis.  He can certainly diagnose on DSM 3, if you want

4   to know where all those diagnoses are.

5      MR. GUPTA:  And as far as you know, and you may not be

6   able to answer.  But isn't a minimal brain dysfunction a

7   medical opinion?

8      MR. EIG:  Objection.  She cannot –

9      MS. PAVO:  I believe –

10      MR. EIG:  Objection.

11      MR. GUPTA: Can you answer that question?

12      MR. EIG:  No.  She's not competent to answer a

13   question.  If you want me to brief this, I'd be very happy.

14   I don't know why.  It's in the DS – Diagnostic – it's a

15   statistical manual, 3rd or 4th edition.  Okay?

16      HEARING OFFICER:  It sounds to me like this is an

17   occasion for closing arguments for the mother, who didn't

18   conduct the evaluation.

19      MR. GUPTA:  All right.  Well, let's move on to the MDT

20   meeting from August 30th.

21      MS. PAVO:  I get a little confused between what

22   happened at which meetings and what exact dates.

1        MR. GUPTA:  Will you turn to DCPS 05 please.  Who is

2    going to testify that the conversation started off with

3    presenting information for accommodation setting?  Correct?

4        MS. PAVO:  D.C.'s original position, their original

5    position on the IEP.  Again, the first position as I recall

6    it was that was a combination setting.

7        MR. GUPTA:  That's fine. But was this before or after

8    they started discussing the new evaluations which they had

9    just received from Dr. Solomon?

10        MS. PAVO:  That was way before Dr. Solomon's stuff.

11        MR. GUPTA:  Okay.  So Dr. Solomon presented - after

12    that, Dr. Solomon presented DCPS with the new evaluations.

13        MS. PAVO:  Well, new evaluation doesn't - because we

14    have three different evaluations.  We have Federici, we

15    have Dietzel Butler, and then we have Dr. Solomon.  And

16    they occurred in that order.

17        MR. GUPTA:  And so then where did the setting

18    discussion occur?  That's what I'm asking you to lay out.

19    You just said that there are all those evaluations.  And

20    are you saying all those evaluations were discussed at this

21    meeting?

22        MS. PAVO:  I'm not sure.

23        MR. GUPTA:  Can you testify to any of those

24    evaluations being discussed at this meeting?

1      MS. PAVO:  Dr. Federici's report was available at that

2  time.  And I'm not sure about whether DCPS had Dietzel

3  Butler by then or not.  Wait, this is August –

4      MR. GUPTA:  August 30th.

5      MS. PAVO:  I'm pretty sure that DC had Dietzel Butler

6  by then.

7      MR. GUPTA:  No.  What I'm asking is, were those

8  evaluations discussed at this meeting?

9      MS. PAVO:  I'm not sure whether they were discussed at

10  this meeting or at the prior meeting.  There was an earlier

11  meeting.

12      MR. GUPTA:  Okay.

13      MS. PAVO:  And I don't know that we, you know, were,

14  well, I believe that there – my recollection is that at the

15  August 30th meeting that the evaluations, certainly

16  Federici's report was discussed to some extent and I think

17  Dietzel Butler, my recollection is people noting the

18  discrepancy or differences in the evaluations, Dietzel

19  Butler's being somewhat more favorable and Dr. Federici's

20  being you know, sort of painting a grimmer picture,

21  perhaps.

22      MR. GUPTA:  What about Dr. Solomon's –

1        MS. PAVO:  I cannot remember exactly when her - you'd

2   have to focus on the date of her report, not - I can't

3   remember exactly when.

4        MR. GUPTA:  I'll refresh your memory on the date of

5   her report.  And you can look at Mr. Eig's copy, too, it's

6   number 7.  It's dated August 16th, 2006.

7        MR. EIG:  Yes.  Could I inquire while I am looking for

8   this I just realized I made a slight mistake.  About how

9   much longer?  Do you have any idea?

10       MR. GUPTA:  I don't know.  Maybe 10 or 15 minutes, but

11  I'm not sure.

12       MR. EIG:  Could I ask for about 10 minutes to move my

13  car.  I just realized that I left it.  But I made

14  arrangements to stay.

15       HEARING OFFICER:  You don't schedule an all day

16  hearing and just park on the street.

17       MR. EIG: Well, I was going to move it, then I new we

18  were leaving at 3:30, and so then I forgot.

19       MR. GUPTA: I really don't want to stop.

20       MR. EIG:  Oh, thanks a lot.  I'll remember - I don't'

21  think that that's the most - you're right.  You're right.

22       HEARING OFFICER:  We'll pause.

23                          [OFF THE RECORD]

24                          [ON THE RECORD]

1      HEARING OFFICER:  Okay.  We're back on the record.

2   Mr. Gupta.

3      MR. GUPTA:  All right.  We'll start again.  Let me

4   think where we left off.  The subject of meetings.  How

5   many meetings did you attend since contacting the Care

6   Center in April when you started the special education

7   process for your son.

8      MS. PAVO:  I'm not entirely certain.  I think that I

9   met with some folks on the 26th.  I believe that I came back

10  and was -

11     MR. GUPTA:  Well, can you be - 26th of what month?

12     MS. PAVO:  I'm sorry.  April 26th was my recollection

13  of the initial meeting which was confirmed by some of the

14  paper work.  I came back another time and met with Cindy

15  Brown for sort of a social history of the child.

16     MR. GUPTA:  Do you have the date on that?

17     MS. PAVO:  No, I don't remember that.

18     MR. GUPTA:  Can you give us a month?

19     MS. PAVO:  I'm not sure whether it was July or August.

20  Or it could even have been June.

21     MR. GUPTA: The social history that you're talking

22  about, is that just between you and Ms. Brown?

23     MS. PAVO:  Yes.  She basically interviewed me about

24  O██████ background and everything.

222                                                    549

1     MR. GUPTA: Is that part of her business of her other

2  social history report, though, right?

3     MS. PAVO:  Yes.  And then my recollection is that

4  there were two IEP meetings and then the dispute resolution

5  meeting.  And it, you know, it's possible that there was

6  something else in there, but that's my recollection and I –

7  you know if the records show that there was something else,

8  you know that I'm mistaken, then I would just have to stand

9  corrected.

10     MR. GUPTA:  Do you recall canceling an IEP meeting for

11  July 13th the night before?

12     MS. PAVO:  I don't believe it was cancelled the night

13  before.

14     MR. GUPTA:  Or the day before, canceling it on 7-12?

15     MS. PAVO:  To the best of my recollection, the

16  question about whether we were going to go forward on that

17  – that was addressed on the day of the meeting.  No, wait.

18  I'm not sure.  There was a meeting that was scheduled and

19  we got, Dr. Solomon and I and Cindy Brown got wires crossed

20  about whether we were going to go forward with that.  And I

21  cannot – I can't say for certain exactly how the confusion,

22  you know, how that occurred, but to the best of my surmise

23  and recollection, what happened was that that Dr. Solomon

24  told Cindy Brown that the meeting was cancelled.  That's

1   what she had told me.  That she had cancelled the meeting.

2   And then I told Cindy Brown that the meeting was going

3   forward and that I had thought that Dr. Solomon's call with

4   Cindy Brown occurred later.  But that, what I'm

5   constructing here is based on the best of my recollection

6   and surmise.

7       MR. GUPTA:  That's fine.

8       MS. PAVO:  We-we-we, you know, I felt bad about the

9   confusion that occurred and I apologized for our

10  contribution to the confusion that occurred.

11      MR. GUPTA:  That's fine.  Ms. Pavo, let's move on to

12  our next meeting.

13      MS. PAVO:  Okay.

14      MR. GUPTA:  Do you recall canceling a meeting because

15  now you had new testing available with medication.  I'm

16  assuming that's –

17      MS. PAVO:  I don't recall that.

18      MR. GUPTA: So you don't recall ever speaking to

19  somebody in the Care Center saying that you had new testing

20  with your child on medication?

21      MS. PAVO:  I may have rescheduled something.  I just

22  don't remember.

23      MR. GUPTA:  Okay.

224

551

1       MS. PAVO:  We had – it's possible that occurred.  I'm

2    not certain.

3       MR. GUPTA:  Now I want you to return to DC 05.  I

4    think that's where we originally left off when we took a

5    little break there.  Isn't it true, well, let me just

6    remind you this is in reference to when you were answering

7    questions for Mr. Eig.  In your direct testimony, you

8    stated that the meeting started off with them suggesting a

9    combination setting.  Do you recall saying that?

10      MS. PAVO:  D.C.'s initial position at the initial

11   meeting was a combined setting.

12      MR. GUPTA:  In the initial meeting, are you speaking

13   of the initial meeting in April or this particular meeting

14   on August 30th?

15      MS. PAVO:  I'm not talking about the meeting in April

16   because they did not have a position at that time.

17      MR. GUPTA:  Or are you speaking of the 8-10 meeting?

18      MS. PAVO:  Certainly there – just a second.  The notes

19   for the August 30th meeting reflect a discussion about full-

20   time versus not full time placement.

21      MR. GUPTA:  Okay.  Well let's stick with that.  Isn't

22   it true that this discussion was failed because it wasn't

23   full-time versus, what did you say –

225

552

1    MS. PAVO:  Full time special ed versus some

2    mainstreaming.  And the discussion here talks about the

3    proposal from D.C. that's reflected in the notes here.

4    First, I had a discussion with DCPS about a full-time

5    special ed setting for O███ versus a part-time special ed

6    setting.  And I, without refreshing my recollection, I

7    can't tell you which meeting that occurred at.  But the

8    notes for the 30th track my recollection of that discussion.

9    It talks about his doing well in some of the special

10   classes, like art, music, P.E., the idea that he could be

11   mainstreamed for them, etc.  That that's in the notes, but

12   I am relying on the notes as opposed to, I cannot say.  I

13   mean my recollection of what happened at the August 30th

14   meeting is I know there was this discussion about full-time

15   versus part-time special ed placement.  I'm unequivocally

16   clear on that.

17       MR. GUPTA:  Ms. Pavo, Ms. Pavo, I understand your

18   confusion about when things happened.  I'm going to hold

19   them in here that these notes correlate to the memory that

20   you're having.

21       MS. PAVO:  Yes.

22       MR. GUPTA:  But isn't it true at this meeting they

23   were asking you to explain why he had the grades in some of

24   these classes, some of these non core classes, because

1  apparently he did have good grades in music and some of the

2  other non academic classes, and they were seeking

3  clarification for that?

4      MS. PAVO:  No. No.  The relevance of the grades in his

5  specials was raised to the best of my recollection only as

6  it related to whether he could get by or be appropriately

7  be placed in a part-time special ed study.  Again, the

8  proposal was that academic subjects would be special ed,

9  non academic subjects would be - like music, art, P.E.,

10  lunch, recess would be mainstream.  That's why his grades

11  in what I call specials was raised.  And it didn't have

12  relevance to anything else that I can recall.

13      MR. GUPTA:They didn't ask you about his grades in

14  those classes.  In what you're calling the specials.

15      MS. PAVO:  We discussed the grades in those classes

16  but the reason they were discussed was because of the

17  concept, that DCPS's initial concept that O███ could be

18  mainstreamed for those classes.

19      MR. GUPTA:  Okay.  At any time was it reported to you

20  that DCPS's I guess classroom observations didn't correlate

21  to his grades, and that's why DCPS was confused as regards

22  to the status.

23      MS. PAVO:  Several different times over the course of

24  the meetings, and I can't say you know at which particular

227

554

1    meeting or whatever, but more than once the question of why

2    O███ grades at OLV appeared to be relatively okay and

3    certainly were disparate, you know, were somewhat different

4    than what you'd expect based on his testing.  That question

5    came up and I explained extensively, multiple times, the

6    fact that while O███ was at OLV, I was essentially home

7    schooling him spending three to five hours every evening

8    and as much as 10, 16 hours each weekend that he was with

9    me, basically re-teaching what was being taught in class.

10   I read all of O███ text books to him, many of them, 5, 6,

11   7, 8 times.  The school gave out study guides.  I wrote

12   answers to the questions.  I drilled O███ on those answers

13   until he essentially had memorized them.  If they were

14   going to have essay questions, sometimes they tell you what

15   the essay questions would be, if not, I would speculate as

16   to what the essay questions would be and we would write out

17   answers to likely essay questions.  O███ would memorize –

18        MR. GUPTA:  Ms. Pavo, I would ask that you continue to

19   answer –

20        MS. PAVO:  I'm sorry.  I apologize.

21        MR. GUPTA:  That's fine.  That's okay.  Well, okay.

22   So the grade discussion did come up and you explained that

23   very thoroughly.  Thank you.  What I want to know then is,

24   after that, then did they start discussing evaluations?

1       MS. PAVO:  The evaluations were definitely discussed

2    certainly at the August 30th meeting.

3       MR. GUPTA:  And then after that is when the

4    determination was made of full-time placement, correct?

5       MS. PAVO:  My recollection, again, based on the notes

6    that I'm looking at concerning the August 30th meeting

7    address issues related to part-time placement verus full-

8    time placement.  And that makes me think that the

9    discussion of full versus part-time placement occurred at

10   that meeting.  That's what the notes reflect.

11      MR. GUPTA:  Ms. Pavo, I hate to keep asking you again.

12   I guess I'm either satisfied with your answer or I don't'

13   feel like you've answered my question.  My question was,

14   after you already set up the evaluations we discussed, and

15   my question was, after the evaluations were discussed, the

16   team discussed and determined full-time placement was

17   appropriate, correct?

18      MS. PAVO:  D.C., after discussing the question of

19   full-time versus part-time special ed placement, at the end

20   of that discussion, the IEP team agreed that a full-time

21   placement was necessary.

22      HEARING OFFICER:  That's not answering the question.

23      MS. PAVO:  I may not be - I apologize.  I'm trying.

229                                                      556

1       HEARING OFFICER:  The question was, did the decision

2   by the MDT on a full-time placement occur after Dr.

3   Federici's evaluation was discussed.

4       MS. PAVO:  Dr. Federici's report along with Diezel

5   Butler were discussed before that decision was made.

6       MR. GUPTA: Thank you.  I have no further questions for

7   you.

8       HEARING OFFICER:  Just a second.  Okay.  Any re-

9   direct, Mr. Eig?

10      MR. EIG:  Your indulgence for a minute while I review

11  the notes of the meeting?  No.  No, thank you.

12      HEARING OFFICER: Okay.  Here's what I want to know.

13  Did you – you mentioned there were two IEP meetings.

14      MS. PAVO:  That's my recollection.

15      HEARING OFFICER:  Okay.  When was the first one?

16      MS. PAVO:  I think that there was one earlier in

17  August.

18      MR. EIG:  May I just show her something that might

19  refresh her recollection?

20      HEARING OFFICER:  Well I've already seen something

21  that might.

22      MR. EIG:  Yes, and –

23      HEARING OFFICER:  No.  I don't want you to show it to

24  her.  According to a document that I used earlier to make a

230

557

1    ruling on, there was an IEP meeting on August 10th.  Do you

2    recall a meeting on August the 10th?

3         MS. PAVO:  I don't recall a meeting and say yes, I

4    know that meeting was August 10th.  I know I recall there

5    being two IEP meetings.

6         HEARING OFFICER:  And you want to the first one.

7         MS. PAVO:  I went to both of them.

8         HEARING OFFICER:  Okay.

9         MS. PAVO:  Can I independently verify that the first

10   one was on August 10th?

11        HEARING OFFICER:  What happened at the first one?  You

12   don't recall?

13        MS. PAVO:  There was a lot of discussion about what

14   O_____ needs were and the testing that was done.  D.C. had

15   Federici and I believe they had Dietzel Butler's report by

16   then.

17        HEARING OFFICER:  Were any decisions made?

18        MS. PAVO:  At the first meeting?

19        HEARING OFFICER:  Uh-hum.

20        MS. PAVO:  I don't think so, but I'm not absolutely

21   certain.  I am confusing - frankly, the two August meetings

22   kind of blend in together and also, the same things were

23   discussed at both meetings.  At lot of the material

558

1   discussed at the first meeting was also discussed at the

2   second meeting.

3       HEARING OFFICER:  Well that's all right.  I only have

4   records as to one, if you had some clear recollection about

5   the first one, I would take it, but you don't so I'll move

6   on. Now in your direct testimony, you use the proverbial

7   "they" on a number of occasions talking about your

8   experience when you were trying to identify a school that

9   might take O███.  And you said that you went through these

10  examinations and Dr. Federici's was not terribly positive

11  and the schools took a look at that as well as his

12  experience and they declined to take him because of his

13  behaviors and they said he might be ED and they weren't

14  equipped to do that.  Now, you said they recommended

15  Phillips.  Who is the "they" that recommended Phillips.

16      MS. PAVO: The admissions director at Kingsbury

17  specifically mentioned Phillips as a possible placement for

18  O███ on the assumption that he was emotionally disturbed.

19  And Lab School and the Chelsey School also after discussing

20  O███ with me basically said they thought that he was

21  emotionally disturbed and beyond their capabilities, and

22  that he needed to go to a school – that he needed a more

23  restrictive setting, i.e., a school for children who are

24  emotionally disturbed.  Not just children who were learning

232                                                        559

1    disabled.  And that came from the admissions director at

2    Lab as well as from the admissions director at the Chelsey

3    School.  And that was Kingsbury's initial reaction to him.

4         HEARING OFFICER:  On the follow up statement you said

5    that his disabilities were at the outer edge of where they

6    could help him.  Who said that?

7         MS. PAVO:  To the best of my recollection, that was

8    part of the - Lab School said that his test scores, you

9    know, achievement and IQ and all that, was below what they

10   could take and initially, Kingsbury felt that he was

11   borderline or beyond what they could handle in terms of his

12   learning disabilities were too severe or his IQ was too

13   low, based on Federici's report when you know he was tested

14   unmedicated.  And then they took a more positive view of

15   him after the Dietzel Butler report and I also persuaded

16   Kingsbury to have one of their staff psychologists review

17   both Federici's report and the Dietzel Butler material so

18   that you know, that someone other than the admissions

19   director, so that they would have one of their

20   psychologists on staff look at his materials and that

21   person felt that O███ was not emotionally disturbed, and

22   that he had the potential to you know fit in at Kingsbury.

23        HEARING OFFICER:  Okay.  That's all I have.  Thank you

24   very much.

560

1                          [OFF THE RECORD]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# District of Columbia Public Schools
## State Enforcement and Investigation Division
**Terry Michael Banks, Due Process Hearing Officer**
**825 North Capitol Street, N.E.; Room 8076**
**Washington, D.C. 20002**
**(571) 437-7381**
**Facsimile: (202) 442-5556**

### Confidential

|  |  |  |
|---|---|---|
| O▓▓ O▓▓▓▓, STUDENT | ) | |
| | ) | |
| Date of Birth: ▓▓▓▓▓, 1993 | ) | |
| | ) | |
| Petitioner, | ) | Hearing Date: November 16, 2006 |
| | ) | |
| v. | ) | |
| | ) | Complaint Filed: September 14, 2006 |
| THE DISTRICT OF COLUMBIA | ) | |
| PUBLIC SCHOOLS | ) | |
| | ) | |
| and | ) | |
| | ) | Held at: 825 North Capitol Street, N.E. |
| Respondent. | ) | 8th Floor |
| | ) | Washington, D.C. 20002 |
| Student Attending: | ) | |
| Kingsbury Day School | ) | |

### INTERIM ORDER

| | |
|---|---|
| **Parents:** | Ms. Claudia Pabo, Mother |
| | 3512 Rodman Street, N.W. |
| | Washington, D.C. 20008 |
| | |
| **Counsel for Petitioner:** | Michael J. Eig, Esquire |
| | 5454 Wisconsin Avenue; Suite 760 |
| | Chevy Chase, Maryland 20815-6938 |
| | (301) 657-1740; Fax: (301) 657-3843 |
| | |
| **Counsel for DCPS:** | Saurabh Gupta, Esquire |
| | Office of the General Counsel, DCPS |
| | 825 North Capitol Street, N.E.; 9th Floor |
| | Washington, D.C. 20002 |

562

**Jurisdiction**

This proceeding was invoked in accordance with the rights established under the Individuals With Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. Sections 1400 et seq., Title 34 of the Code of Federal Regulations, Part 300; Title V of the District of Columbia ("District" or "D.C.") Municipal Regulations ("DCMR"), re-promulgated on February 19, 2003; and Title 38 of the D.C. Code, Subtitle VII, Chapter 25.

**Introduction**

Petitioner is a thirteen year-old student attending Kingsbury Day School ("Kingsbury"). On September 14, 2006, Petitioner filed a Due Process Complaint Notice ("*Complaint*") alleging that the District of Columbia Public Schools ("DCPS") had failed to provide an appropriate placement. On November 7, 2006, DCPS filed *DCPS Motion to Dismiss*, arguing that it had been unable to secure Petitioner's educational records from Kingsbury and, therefore, was unable to prepare adequately for trial. On November 8, 2006, Petitioner filed *Parent's Motion for Pre-Hearing Summary Decision and Opposition to DCPS Motion to Dismiss*. Petitioner's counsel indicated that his Five-Day Disclosure Notice mooted DCPS' concern about Petitioner's records. In his motion for summary decision, Petitioner's counsel argued that DCPS' failure to convene an appropriate team at the Resolution Session meeting entitled Petitioner to a judgment against DCPS. On November 13, 2006, DCPS filed *DCPS' Opposition to Parent's Motion for Summary Decision & DCPS Cross-Motion for Summary Decision*. DCPS argued that Petitioner had "failed to show any facts, remote or direct, which prove Prospect LC is inappropriate. Furthermore, DCPS disputes Parent's assertion the resolution meeting was invalid because the Local Education Agency (LEA) representative lacked the authority to make a decision." Later on November 13th, Petitioner filed *Parent's Opposition to DCPS Motion to Summary Decision*, in which Petitioner's counsel reiterated his position that DCPS' failure to convene an appropriate team at the Resolution Session meeting should be dispositive.

On December 15, 2006, the day before the scheduled hearing date, the hearing officer initiated a conference call with the parties' counsel. The hearing officer indicated that he would deny DCPS' Motion to Dismiss, because DCPS had received the records it needed in Petitioner's Five-Day Disclosure. The hearing officer also indicated that he would not grant Petitioner's *Motion for Summary Decision*. While this hearing officer has held that the failure to convene an appropriate IEP team is a substantive violation of IDEIA, there is no caselaw raising the Resolution Session meeting to the same level of importance. Petitioner argued that DCPS did not provide an individual who had appropriate decision-making authority. IDEIA compels the parties to attend the Resolution Session meeting to attempt to resolve the issues in the *Complaint* informally. However, DCPS had already decided that it was unwilling to settle on the terms insisted upon by Petitioner, a placement at Kingsbury. Thus, the issue is not that DCPS failed to produce a team member with adequate authority, but whether they were obligated to

563

come to the table willing to concede on the only issue in dispute. The hearing officer does not believe that IDEIA compels this. Finally, the hearing officer stated that he would deny DCPS' motion for summary decision, because issues of fact remain concerning the appropriateness of DCPS proposed placement for Petitioner.

During the conference call, Mr. Eig indicated that his expert witness could not testify until late in the day on November 16th. Thus, her testimony could be accommodated only if DCPS agreed to allow the testimony to be taken out of order. DCPS declined, because this would force DCPS to give up the strategic advantage of knowing the expert's position before putting on its case. The hearing officer also indicated that he would need to recess the hearing to take his mother to a doctor's appointment at 11:00 a.m., but that he would be available to start the hearing at 9:00 a.m. and after returning from the appointment. In light of DCPS' reluctance to present testimony out of turn, the hearing officer concluded that the best solution would be to continue the proceeding. He promised to consult with the Student Hearing Office ("SHO") to obtain a new hearing date.

On September 16th, Mr. Gupta filed a letter advising the hearing officer of dates that would be inconvenient for his witnesses. The SHO then suggested hearing dates of December 5th, 12th, and 13th. The hearing officer contacted Mr. Eig and offered these dates. Mr. Eig advised the hearing officer that he already had conflicting assignments on December 12th and 13th, but that he would try to clear December 5th. He also stated that his expert witness, Dr. Laura Solomon, would be unavailable throughout December. On November 17th, Mr. Eig faxed a letter to the SHO agreeing to the December 5th date, but reiterating that Dr. Solomon would not be available until January.

In light of the unavailability of Dr. Solomon until January, setting the hearing date for December 5th would return the parties to nearly the same position as that on the original hearing date. Petitioner could complete all of his direct case except the testimony of Dr. Solomon. DCPS is reluctant to put on its case until Petitioner completes his direct case, particularly the testimony of Dr. Solomon. While the hearing officer has the authority to direct DCPS to proceed out of turn, Dr. Solomon's unavailability in December would necessitate reconvening the hearing on a second date in January. Therefore, the hearing officer concludes that the solution that would accommodate both parties would be to continue the case to one mutually convenient date in January.

## ORDER

Upon consideration of Petitioner's request for a due process hearing, the parties' cross motions, and the parties' letters of November 16th and 17th regarding rescheduling the hearing date, this 16th day of November 2006, it is hereby

**ORDERED,** that *DCPS Motion to Dismiss, Parent's Motion for Pre-Hearing Summary Decision,* and *DCPS' Cross-Motion for Summary Decision* are **DENIED.**

564

**IT IS FURTHER ORDERED,** that on or before November 22, 2006, Petitioner's counsel shall provide counsel for DCPS three dates in January that are convenient for his witnesses. On or before November 29, 2006, counsel for DCPS shall notify the SHO if one or more of those dates are convenient for his witnesses. If so, the SHO will set a hearing date. If none of Mr. Eig's proposed dates is convenient for DCPS' witnesses, Mr. Gupta should notify Mr. Eig, and the parties should submit lists of convenient dates in January to the hearing officer by facsimile transmission.

_____
Terry Michael Banks
Hearing Officer

Date:   November 17, 2006

Issued:   _____

Copies to:

Michael J. Eig, Esquire
Haylie Iseman, Esquire
5454 Wisconsin Avenue; Suite 760
Chevy Chase, Maryland 20815-6938
(301) 657-1740; Fax: (301) 657-3843

Saurabh Gupta, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.
9th Floor
Washington, D.C. 20002

565

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig      MD, DC
Haylie M. Iseman    MD, DC, NY

Paula A. Rosenstock   VA, DC
Patricia Cyr          CA, DC

# FAX

**To:**              Sharon Newsome
                     **Student Hearing Coordinator**
**Fax Number:**      (202) 442-5556
**From:**            Michael J. Eig, Esq.
**Date:**            November 17, 2006
**Time:**            8:55 am

**Total Pages:**     2
(including cover)

**Re:**              O▮▮O▮▮▮

**cc:**              Terry Michael Banks, Esq.
                     (202) 442-5556

                     Saurabh Gupta, Esq.
                     (202) 442-5077

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

566

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740
FACSIMILE (301) 657-3843

November 17, 2006

Sharon Newsome
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, N.E., 8th Floor
Washington, D.C. 20002

Re: O███ O████/DCPS
*via facsimile and first-class mail*

Dear Ms. Newsome:

I was advised by Mr. Banks yesterday afternoon that the first date being suggested for hearing in the above-referenced matter is December 5, 2006. I have cleared my calendar and that of my witnesses for that date, with one exception. Dr. Laura Solomon, our special education expert, is out of the country for the entire month of December and therefore cannot attend the hearing on any of the dates offered. I would therefore request that we be allowed to present her testimony as early in January as schedules permit if we proceed on December 5th. If that is not acceptable, then I would ask that we explore early January hearing dates.

By copy of this letter, I am also correcting the record as reflected in Mr. Gupta's letter of November 16th. In that letter, he stated that, "Parent's counsel requested a continuance due to unavailability of a witness." That is plainly false. I sought no continuance of this matter, but did voice my concern that we could not complete the case in an afternoon or that I could ensure Dr. Solomon's availability late in the afternoon of the 16th. The hearing was actually continued when Mr. Gupta refused to proceed first with his case and the Hearing Officer responded that we would just set in a new date. I had no problem with the continuance, but I have a big problem with Mr. Gupta getting the facts wrong.

Sincerely,

Michael J. Eig

cc: Terry Michael Banks, Esq.
    Saurabh Gupta, Esq.
    Ms. Claudia Pabo

567

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740
FACSIMILE (301) 657-3843

November 10, 2006

Sharon Newsome
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, N.E., 8th Floor
Washington, D.C. 20002

Re: O█  O█████/DCPS
*via facsimile and first-class mail*

Dear Ms. Newsome:

As you know, a hearing has been set in the above-named case for November 16, 2006. Accordingly, the parties' five-day disclosure was due by 5:00 PM on November 8, 2006. We received a large "additional disclosure" from DCPS after business hours on November 8, 2006. We therefore reserve the right to object to all documents disclosed after business hours by DCPS.

Sincerely,

Michael J. Eig

cc:    Ms. Claudia Pabo
       Saurabh Gupta, Esq.



RECEIVED
NOV 1 3 2006
STUDENT HEARING OFFICE

568

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig        MD, DC
Haylie M. Iseman    MD, DC, NY

Paula A. Rosenstock    VA, DC
Patricia Cyr              CA, DC

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome |
| | Student Hearing Coordinator |
| | DCPS-Student Hearing Office |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael J. Eig |
| **Date:** | November 13, 2006 |
| **Time:** | 2:06 pm |
| **Total Pages:**<br>(including cover) | **2** |
| **Re:** | O█ O████ |
| cc: | Saurabh Gupta, Esq.<br>(202) 442-5097/5098 |

RECEIVED
NOV 1 3 2006
STUDENT HEARING OFFICE

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

569



**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815

(301) 657-1740
FACSIMILE (301) 657-3843

November 10, 2006

Sharon Newsome
Student Hearing Coordinator
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

                                        Re: O███ O██████
                                        *by facsimile & first-class mail*

Dear Ms. Newsome:

    Enclosed please find a copy of the Parent's Opposition to DCPS Motion for Summary
Decision in the above-named student's case. Please forward this to the assigned Hearing Officer
for consideration. Thank you.

                            Sincerely,

                            Michael J. Eig

*Enclosure*
cc:    Saurabh Gupta, Esq. *(with enclosure)*
       Claudia Pabo *(with enclosure)*



IN THE MATTER OF 2006 NOV 16 AM 9: 47 BEFORE AN IMPARTIAL HEARING
                                   *   OFFICER OF THE DISTRICT OF
                                       COLUMBIA OFFICE OF
O▩▩ O▩▩▩          DC PUBLIC         *   STUDENT HEARINGS
                  SCHOOL SYSTEM
                                   *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PARENT'S OPPOSITION TO DCPS MOTION FOR SUMMARY DECISION

Yesterday afternoon, DCPS filed its opposition to our motion for summary decision as

well as its own motion for summary decision.  Based upon what we set forth below, we

respectfully request that the pending motions -- our motion for summary decision and the school

system's motions to dismiss and for summary decision -- be argued on November 16, 2006, the

date currently set for hearing on the merits.  Since the resolution of the motions is likely to be

dispositive of the appeal, it would serve the mutual interests of both parties and the Student

Hearing Office to first resolve the pre-hearing pleadings without bringing in all of the witnesses

that have been disclosed.[1]

Whether or not the Hearing Officer decides to restrict the hearing on the 16th to the

pending motions, summary decision should be awarded to O▩▩ and his family.  This is more

evident today than before the school system filed its pleading yesterday.  Based upon the

authorities previously cited (in our memorandum in support of the motion for summary

decision), there was every reason to grant that motion.  Now, based upon an unresponsive,

---

[1]     Since O▩▩ is currently in a private special education placement selected by his parent,
and doing well, no possible prejudice will accrue to the student by proceeding in this manner
even if the appeal is not resolved by the rulings on the pre-hearing motions.

571

garbled and barely-literate opposition, an opposition that "responds" to arguments that we never made and ignores those that were made, there is only more reason to rule in favor of the student.[2]

DCPS devotes a half of its opposition, and all of its support for its own motion for summary decision, to the argument that Prospect Learning Center ("Prospect") is an appropriate placement. Although we certainly do not agree with the DCPS position, it is literally impossible to understand why the argument is being made since we have not raised the substantive inappropriateness of Prospect in our motion, either for good or ill, but have argued that the Hearing Officer need never reach that point in view of the overt violations of Due Process in the Resolution Session proceedings. DCPS simply does not understand that, if there is a fatal flaw in the Resolution Session, then the school system will have denied O███ the critical Due Process half of his FAPE entitlement, and that we do not need to consider Prospect. As we pointed out in our previous filing, this is the clear import of the IDEA and case law interpreting it.

We cannot say it any better than Congress did in explaining the critical importance of the Resolution Session additions to the law. "the goal of these new provisions is fairness: to be sure that a district is aware of a problem and has a chance to resolve it in a less formal manner before having to spend the time and resources for a due process hearing. The purpose is not to make parents go to another IEP meeting to explain an issue that has already reached an impasse with the district." S.Rep. No. 108-185, at 39 (2003).

---

[2] Two points should be underscored at the outset. First, we intend no attack on counsel or any DCPS employee, but we must note that the school system's opposition is hard to understand, peppered with non-sequiturs and sentence fragments, and personal observations passing as legal argument. Second, we do not return to our opposition to the school system's motion to dismiss, based upon its argument that it was unfairly disadvantaged when a third party, the Kingsbury Day School, refused to violate FERPA when it was asked to divulge records about O███ Enough has already been said in response to that incredible position.

2

Nor can we think of more overt and open violations of the Resolution Session process than to have nobody from the previous IEP teams, nobody with decision-making authority, nobody with any attachment to O▉ as the sole DCPS representative at the Session. It would amount to an open invitation to chaos and/or negligence to allow this school system to so flaunt federal law. Interestingly, the school system admits in their motion that the purpose of the resolution session was to discuss why the parent believes Prospect is inappropriate. However, as we explained in our motion for summary decision, DCPS failed to have any representatives from Propsect at the meeting to address the parent's concerns. DCPS also suggests that the LEA representative was bound by federal law to reject the parent's request for placement at Kingsbury because placement decisions *must* be made by a group of persons knowledgeable about the student, and not one person on behalf of the LEA.[3] However, had DCPS followed the IDEA's clear guidelines on the Resolution Session and had the "relevant member or members of the IEP team who have specific knowledge of the facts identified in the complaint" present at the meeting, such a decision could have been considered.[4] 20 U.S.C. § 1415(f)(1)(B).

Finally, the school system argues that because no substantive educational harm was suffered as a direct result of the school system's failure to hold a proper Resolution Session, no

---

[3]    The school system states that the LEA representative fulfilled her obligations at the meeting by offering to convene a placement meeting. The LEA representative **did not** offer to convene another meeting. In fact, she did precisely the opposite. She stated in the notes that because it was the school system's position that an appropriate placement was already identified, "another meeting would not be productive." *See* Resolution Meeting notes (attached as "Exhibit 2" to parents' motion for summary decision, and disclosed as OO-17).

[4]    It must be noted that counsel for DCPS argues against the very essence of the resolution session. The IDEA instructs school systems to have a representative with decision-making authority present at the meeting to make these very decisions.

3

relief is warranted. This issue was addressed at length in our previous motion. Historically, federal courts have held that "failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that a school board has failed to provide [the student] with a FAPE." *Board of Educ. of Cabell County v. Dienelt*, 843 F.2d 813, 815 (4th Cir. 1988) (quoting *Hall v. Vance*, 774 F.2d 629, 635 (4th Cir. 1985); *see also, Hudson*, 828 F.2d at 1063 (holding that "procedural noncompliance can itself support a finding that a child has not been provided with a FAPE"); *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361, 364-5 (D. Md. 1994); *Reusch v. Fountain*, 872 F. Supp. 1421 (D. Md. 1994). More to the point here, as the Court in *Massey* explained, "Does DCPS mean to imply that it is permitted to violate the IDEA as long as the ways in which it does so are minor? This Court has not been directed to any evidence that Congress inteded an exemption for 'close enough'." *Massey v. District of Columbia*, 400 F. Supp.2d 66, 73 (D.D.C. 2005).

Clearly, by denying this student and his family the opportunity to participate in the Resolution Session, DCPS denied the family their due process rights, and denied O█ a FAPE. We therefore request that summary decision be granted to O█ and his family. In the alternative, we ask that the pending motions – our motion for summary decision and the school system's motions to dismiss and for summary decision – be argued on November 16, 2006, the date currently set for hearing on the merits.

Respectfully Submitted,

Michael J. Eig
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue

4

574

Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for O██ O████ and his parent

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage prepaid, to the Saurabh Gupta, on November 10, 2006.

Michael J. Eig

5

575



**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

*Office of the Superintendent*
**Office of the General Counsel**
*825 North Capitol Street, N.E., 9th Floor*
Washington, DC 20001
202-442-5000   Fax # 202-442-5098
*www.k12.dc.us*

November 9, 2006

Impartial Hearing Officer
Student Hearing Office
DCPS Office of Compliance
825 North Capitol, N.E.
Washington, D.C. 20002

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS

### SPECIAL EDUCATION

### ADMINISTRATIVE DUE PROCESS HEARING OFFICE

In the Matter of                                    *
O▊ O�135                                            *
                                                   *
                                                   *
*************************************************************************

## <u>DCPS' Opposition to Parent's Motion for Summary Decision & DCPS Cross-Motion for Summary Decision</u>

DCPS, through, Saurabh Gupta, Esq, Attorney Advisor, responding to Parent's Motion for Summary Decision filed on November 8, 2006.  DCPS accepts Parent's motion for summary decision as a functional equivalent to a motion for summary judgment.  DCPS further presents that motions for summary judgment are proper where there are no factual issues in dispute.  In the case at hand, there are factual issues in dispute, and DCPS is requesting that the Parent's Motion for Summary Decision be denied.

The Parent argues DCPS' proposed placement at Prospect Learning Center (LC) for the 2006-2007 school was an inappropriate placement and the resolution meeting was procedurally invalid.  Parents requested their pled relief of funding and placement at Kingsbury Day School (KDS) should be granted.  Parents have the burden of proof in this matter to prove Prospect LC is

576

inappropriate. DCMR §3030.3. DCPS asserts Parents have failed to show any facts, remote or direct, which prove Prospect LC is inappropriate. Furthermore, DCPS disputes Parent's assertion the resolution meeting was invalid because the Local Education Agency (LEA) representative lacked authority to make a decision. The LEA had authority to make decisions, however, educational placement is a group decision pursuant to IDEIA. 20 U.S.C. 1412(a)(5); *see also* 34 C.F.R. §300.115. Had the LEA at the meeting abided by Parent's desires to place the student at KDS, she would have violated federal law. Finally, Parents failed to show any perceived or actual education harm for DCPS' alleged procedurally invalid resolution meeting. DCPS asserts without some evidence of educational harm, Parents can not be granted substantive relief for an alleged procedural harm. *See DCPS-01* - Kingsmore v District of Columbia, No. 05-7156, 2006 U.S. App. Lexis 24588, at *4 (D.C. Cir. September 29, 2006).

DCPS asserts a cross motion for a summary decision for failure to present facts which proves Prospect LC is inappropriate. Parents have only presented opinion(s) through their declarations in their motion for summary decisions. Further, Parents disclosures do not present any facts or witnesses which are reasonably calculated to lead to the conclusion that Prospect LC is inappropriate.

DCPS moves the impartial hearing officer to deny Parents motion for summary decision and to grant DCPS' cross motion for summary decision.

## I. Factual Summary.

1.  DCPS received the due process complaint on September 15, 2006 from the attorney for O▮▮O▮▮▮

2.  The complaint alleged inappropriate placement at Prospect LC for the 2006/07 school year. The relief sought funding and placement at KDS for the 2006/07 school year.

3.  Student's November 8, 2006 IEP requires the following:
    i.   25.0 hours/week of specialized instruction delivered by a General Education or Special Education teacher.
    ii.  1.5 hours/week psychological services delivered by a social worker or psychologists.
    iii. 0.5 hours/week of psychological services consultation delivered by a social worker or psychologists.
    iv.  1.0 hours/week of occupational therapy delivered by occupational therapists.

4.  The only difference between the November 8, 2006 IEP and the August 30, 2006 is the occupational therapy services were added.

O█ O███ *[DOB: ███/93]*
*DCPS Opposition to Summary Decision & Cross Motion for Summary Decision*

5. The August 30, 2006 and September 21, 2006 MDT/placement meetings presented Parents with the necessary information regarding Prospect LC.  DCPS stated at the meeting Prospect was proper and can deliver the student's IEP and other related services.  *Eve Byford-Peterson Declaration.*

## II.  Prospect LC is Not Inappropriate Educational Setting.

Facts in DCPS' Declaration of Eve Byford-Peterson and the Declarations of Claudia Pabo and Laura Solomon are in direct conflict with regards to the appropriateness of Prospect LC. Ms. Pabo asserts in paragraph five (5) of her statement that she "visited and observed the Prospect LC and found that it is not an appropriate placement for O█████  Ms. Pabo's statement about Prospect is an opinion and not fact.  The purpose of this motion is to show no facts are in controversy, not that no opinion is in controversy.  Secondly, Ms. Pabo's statement is the only evidence presented (although remote) in Parent's motion that shows *why* Prospect LC is inappropriate.  Parents present many assertions and opinions as to the appropriateness of KDS in Laura Solomon's declaration.  Presumably, Parents feel they have overcome their burden of proof which requires them to prove the inappropriateness of Prospect by presenting an opinion declaration of Ms. Solomon that states KDS is appropriate and provides an educational benefit.

Conversely, DCPS has attached the declaration of Eve Byford-Peterson which explicitly states Prospects ability to deliver hour for hour the services required in the student's IEP. *Declaration of Eve Byford-Peterson.*  Furthermore, Eve Byford-Peterson has presented facts which show class size, student teacher ratios, total number of students in O████ age group, technological services available, technical service providers at the school, behavior intervention mechanisms, and teacher certification information.  Parents have yet to present any evidence as to why they disagree with both the resources and educational benefit available at Prospect LC.

Due to a lack facts presented by Parents and an overwhelming amount of affirmative facts presented by DCPS the hearing officer should deny Parent's motion for summary decision.

////

////

////

578

### III.   Resolution Meeting was Not Procedurally Invalid because the LEA Representative Followed Federal Law.

The resolution meeting was not invalid because the LEA representative followed federal law thus this issue is in controversy. In the alternate, even if the resolution meeting was procedurally invalid, Parents have failed to show any educational harm suffered by the "invalid" meeting.

Parents' contend the resolution meeting was invalid and their rights were violated because DCPS did not have an authorized representative at the resolution meeting. They attempt to substantiate this claim because they asked the LEA representative to place and fund the student at KDS. The LEA representative informed Parents she was both unwilling and unable to authorize such a placement. It is important to note that the MDT team on August 30, 2006 issued a prior notice to Prospect LC. Thus the purpose of the meeting was to discuss why parents believed Prospects LC was inappropriate. Parents failed to make case against Prospect LC outside of a statement of their opinion that they felt it was inappropriate. Due to Parents unwillingness or inability to present any facts as to why Prospect LC was inappropriate, DCPS concluded the meeting. The LEA representative is bound to federal law and not to the desires and wishes of the Parent. IDEIA is quite clear on its face stating, a placement discussion is to be made by "*. . . a group of persons . . .*" [emphasis added]. One person can not make such a decision on behalf of the LEA. 20 U.S.C. 1412(a)(5); *see also* 34 C.F.R. §300.115. Thus the LEA representative at the resolution meeting fulfilled her duties obligated to her under IDEIA by offering to convene a placement meeting.

Parents further assert due to the alleged procedural harm caused by the resolution meeting they should be afforded the relief they pled in their due process complaint. This is assertion is inaccurate because the law is quite clear in such situations. Parents must a show a substantive educational harm suffered as a direct result of the procedural violations. *Kingsmore v DCPS* states, "A court may only provide substantive relief for a procedural violation of IDEA if that violation causes substantive harm to a child's right to a FAPE." No. 05-7156, 2006 U.S. App. Lexis 24588, at *4 (D.C. Cir. September 29, 2006). Here the Parent failed to present any facts which show a substantive harm due to the dispute not being settled at the resolution meeting. Furthermore, the only consequence that one can envision as a result of an ineffective or allegedly invalid resolution is a ripe claim. However, a claim which is ripe is not a substantive harm since the due process hearing has been scheduled and thus Parents still have an opportunity to present a case.

579

*O█ O█████ [DOB: ████93]*
*DCPS Opposition to Summary Decision & Cross Motion for Summary Decision*

DCPS asserts Parent's rights have not been violated because of an alleged procedurally invalid resolution meeting. DCPS requests the hearing officer to dismiss the motion for summary decision for both that the LEA Representative followed federal law and because parents failed to present facts regarding an educational harm suffered.

## IV.   DCPS Cross-Motion for Summary Decision.

DCPS moves for a cross-motion for summary decision against the Parents for failure to present any evidence which is reasonably calculated to meet their burden of proof – Inappropriateness of Prospect LC. Parent's alleged Prospect LC is an inappropriate placement because presumably O█████ IEP can not be implemented there and thus will suffer an educational harm. However, Parents have presented little to no fact based evidence to support their claim.

Parent's 5-day disclosures contain 18 documents and four (4) listed witnesses. Only the September 21, 2006 DCPS Prior Notice (OO-18) presents any evidence regarding Prospect LC. This document reveals essentially similar information listed in the Declaration of Eve Byford-Peterson. The documentary record is silent as to any notion or theory why Prospect LC is inappropriate. Additionally, only Ms. Pabo and/or Ms. Solomon have standing as witnesses to present evidence in regards to Prospects LC. However, their testimony would be limited to their thoughts and impressions of their visit to Prospect LC and thus are not proper evidentiary facts.

DCPS asserts Parents can not or do not have the fact based evidence to prove Prospect LC is inappropriate. Parents could have presented some evidence through their excessive use of pre-hearing motions, but only managed to further show appropriateness of KDS, which is not at issue in this complaint. The fact is Parents have not even attempted to prove the inappropriateness of Prospect LC. Due to a lack of facts and for judicial economy the impartial hearing officer should make a summary decision against Parents.

For the reasons stated above, DCPS moves the impartial hearing officer to dismiss Parents due process complaint and make a finding of no denial of FAPE and Prospect LC is appropriate.

*////*

*////*

*////*

580

O█ █G█████ [DOB:█████/93]
*DCPS Opposition to Summary Decision & Cross Motion for Summary Decision*

## V.  Conclusions.

DCPS asserts Prospect LC is not inappropriate and the resolution meeting was not procedurally invalid.  In the alternative, even if the resolution meeting was procedurally invalid, Parent's failed to present facts which show a substantive educational harm.  DCPS requests the hearing officer should deny the motion for summary decisions.

DCPS also asserts a cross-motion for summary decision because the parents through their motions and submitted disclosures failed to present any fact which could reasonably calculated to prove Prospect LC is inappropriate.

Respectfully Submitted,

11/9/06
Dated

Saurabh Gupta
Attorney Advisor, DCPS

581

NT BY: PROSPECT LEARNING CENTER;        2026983815;        NOV-9-06  5:38PM;      PAGE 1/1

| | |
|---|---|
| **IN THE MATTER OF** | **★ DC PUBLIC SCHOOLS** |
| **O▮▮▮: O▮▮▮▮** | **★ STUDENT HEARING OFFICE** |
| | ★ |
| | ★ |
| | ★ |

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

## DECLARATION OF DR. EVE BYFORD- PETERSON

1. My name is Eve Byford-Peterson. I am the principal at Prospect Learning Center (LC).

2. I am familiar with the student O▮▮ O▮▮▮ because I received his referral packet when a Prior Notice was issued on his behalf in August 2006. I have reviewed his file some of which included the IEP, evaluations, and MDT meeting notes.

3. I have reviewed O▮▮▮ IEP and I am confident Prospect LC can implement his IEP. Prospect LC has the services and services providers to deliver the following per O▮▮▮ IEP:

   a) Prospect LC can implement 25.0 hours/week of specialized instruction to be delivered by the Special Education teacher.

   b) Prospect LC can implement 1.5 hours/week psychological services to be delivered by a social worker or psychologist.

   c) Prospect LC can implement 0.5 hours/week of psychological services consultation to be delivered by a social worker or psychologist.

   d) Prospect LC can implement 1.0 hours/week of occupational therapy to be delivered by an occupational therapists.

4. Prospect LC has a total of 23 students in O▮▮▮ age group (13 year olds).

5. Prospect LC has a 12 students to 2 adults ratio. Each class has a certified special education teacher and 1 teacher's aide.

   a) Additional classes can be organized and programmed to support additional students.

*Eve Byford-Peterson*

*Page 1 of 2*

582

6.    There are 18 teachers at Prospect LC.  All teachers at Prospect LC are certified and the majority are certified in special education and have a Masters' degree.

7.    Prospect LC has a licensed social worker, three (3) schools psychologists (one is a licensed clinical psychologist), two (2) speech and language pathologists, an occupational therapist, and an adaptive physical education teacher on staff. All of these personnel are dedicated to the Prospect LC program.

8.    Prospect LC has a behavior intervention plan called - PBIS – Positive Behavior Intervention Support.  Plan is implemented school wide. The plan supports the individual behavior management plans already in place in each classroom.

9.    Prospect LC can provide the required supplementary aides such as books on tape, tape recorder, and large print materials.

10.    Prospect LC has advanced technological support which assists in the education and support of the students.

11.    Prospect LC is an appropriate setting for O█ O████

12.    O█ O████ will receive an educational benefit from Prospect LC.

Respectfully submitted,

*Eve Byford-Peterson*

Eve Byford-Peterson, Ed. D.
Prospect Learning Center
Principal

DATED  *November 9, 2006*

*Eve Byford-Peterson*

*Page 2 of 2*

583

NT BY: PROSPECT LEARNING CENTER;          2026983815;          NOV-9-06  5:35PM;          PAGE 1



**District of Columbia**
**Public Schools**

**PROSPECT LEARNING CENTER**
*At Goding Building*
*920 F Street, NE.*
*Washington, D.C. 20007*
*(202) 698-3800 Fax: (202) 698-5073*
*Eve M. Byford-Peterson, Ed. D*
*Principal*

DATE: 11/9/06

NO. OF PAGES (INCLUDING COVER SHEET) 3

TO: Saurabh Gupta, Esquire
    OGC                    FAX NO 2 5097

FROM: Eve Byford-Peterson
      PROSPECT LEARNING CENTER

COMMENTS: Re: O███ O███

2.   I am familiar with the student Oleg Oliver because I received his ____
     when a Prior Notice was issued on his behalf in August 2006.  I have reviewed his
     ____ of which included the IEP, evaluations, and MDT meeting notes.

584

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 14, 2006     Decided September 29, 2006

No. 05-7156

LAUREN KINGSMORE, PARENT AND NEXT FRIEND OF HANNAH
LUTZ, A MINOR,
APPELLEE

v.

DISTRICT OF COLUMBIA,
A MUNICIPAL CORPORATION AND
PAUL VANCE, OFFICIAL AS SUPERINTENDENT,
APPELLANTS

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01130)

---

Before: RANDOLPH and BROWN, *Circuit Judges*, and
EDWARDS, *Senior Circuit Judge*.

### JUDGMENT

This cause was considered on the record from the United
States District Court for the District of Columbia, and was
briefed and argued by counsel.  It is

ORDERED AND ADJUDGED that the judgment of the District
Court be vacated and the case remanded.

585

2

Under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, the District of Columbia must ensure that a "free appropriate public education" ("FAPE") is available to learning disabled children, *id.* at § 1412(a). In 2002, Lauren Kingsmore moved with her mildly disabled minor daughter, Hannah Lutz, to the District of Columbia. The District of Columbia Public Schools ("DCPS") prepared an individual education plan ("IEP") for Hannah. Dissatisfied with the plan, Ms. Kingsmore requested and received an administrative hearing to challenge the adequacy of the IEP. The hearing officer determined the IEP was appropriate and met the requirements of IDEA.

Ms. Kingsmore appealed and discovered the transcript of the due process hearing was incomplete. Specifically, the transcript was missing all of the cross examination of DCPS's expert, contained over 100 instances where the hearing officer's comments were "inaudible," and contained an "audio break" of unknown duration. *Kingsmore v. District of Columbia*, 393 F. Supp. 2d 30, 32 (D.D.C. 2005). Under IDEA, DCPS is obligated to provide a "verbatim" transcript. 20 U.S.C. § 1415(h)(3). Arguing that the record was so deficient as to prevent the court from providing any meaningful review, appellee moved for summary judgment, or, in the alternative, a new hearing. Appellants insisted the transcript was sufficient and cross-moved for summary judgment in their favor.

The District Court granted appellee's motion and ordered DCPS to provide reimbursement for Hannah Lutz's placement in a private school for the 2002-03 and 2003-04 academic years. *Kingsmore*, 393 F. Supp. 2d at 34. The District Court held that:

> By failing to provide the complete transcript or verbatim recording of the due process hearing to which plaintiffs were entitled under 20 U.S.C. § 1415(h), defendants denied plaintiffs their right to contest adequately an adverse [hearing officer decision], and so denied Hannah Lutz the

3

free appropriate public education she is guaranteed by the IDEA.

*Id.*

Thereafter, this Court joined the majority of other circuits in ruling that a claim based on a violation of IDEA's procedural requirements "is viable only if those procedural violations affected the student's *substantive* rights." *Lesesne v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006). This Court denied relief to the plaintiff in *Lesesne* because she failed to demonstrate "that [the student's] education was affected by any procedural violations DCPS might have committed." *Id.*

The District Court's decision fails to consider whether the transcript violation did *substantive* harm to Hannah Lutz. Instead, the decision contains only repeated *ipse dixits* equating failure to provide a verbatim transcript with a substantive denial of FAPE. We fail to see how the transcript violation in this case could have caused a substantive denial of FAPE. The District Court has multiple means by which to remedy such a procedural defect. It could itself hear additional evidence to supplement the missing parts of the record. *See* 20 U.S.C. § 1415(i)(2)(C)(ii) (providing that the reviewing court "shall hear additional evidence at the request of a party"); *Branham v. District of Columbia*, 427 F.3d 7, 13 (D.C. Cir. 2005) (encouraging the district court in that case to "undertake the evidentiary hearing itself in order to minimize the potential for delay"). The District Court could also remand the case to the hearing officer to either supplement the record or even hold a de novo hearing. *See Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 526 (D.C. Cir. 2005); *Branham*, 427 F.3d at 13. The District Court therefore erred in concluding "DCPS's failure to provide a full transcript or recording of the April 23, 2003 due process hearing constituted a denial of FAPE." *Kingsmore*, 393 F. Supp. 2d at 33. The judgment of the District Court is accordingly vacated and the case is remanded.

587

4

Pursuant to D.C. Circuit Rule 36(a)(2)(F), this disposition will be published. The clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41.

<u>Per Curiam</u>

**FOR THE COURT:**
Mark J. Langer, Clerk



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| **To:** | Michael J. Eig | **From:** | Saurabh Gupta, Esq. |
|---|---|---|---|
| **Fax:** | 301/ 657-3843 | **Date:** | November 9, 2006 |
| **Phone:** | | **Pages:** | ___ (Including cover page) |
| **Re:** | O█O████ | **CC:** | |

☐ Urgent  ☐ For Review ☐ Please Comment  ☐ Please Reply ☐ Please Recycle

•**Comments:**

DCPS   Opposition to Summary Decision & DCPS Cross-Motion for Summary Decision.

589

```
*************** -COMM. JOURNAL- ******************* DATE NOV-09-2006 ***** TIME 16:47 ********

    MODE = MEMORY TRANSMISSION              START=NOV-09 16:45     END=NOV-09 16:47

       FILE NO.=980

 STN    COMM.       STATION NAME/EMAIL ADDRESS/TELEPHONE NO.    PAGES     DURATION
 NO.

 001    OK         ☎93016573843                                014/014   00:01:39


                                                   -DCPS GENERAL COUNSEL    -

 ***** UF-8000 ******************** -DCPS GEN COUNSEL- ***** -      2024425097- *********
```



Saurabh Gupta, Esq.
Attorney Advisor
Office of the General Counsel
825 North Capitol Street, NE
Room 9095
Washington, DC 20002
(202) 442-5000 main
(202) 442-5178 direct
(202) 442-5097/8 fax

# Fax

| | | | |
|---|---|---|---|
| **To:** | Michael J. Eig | **From:** | Saurabh Gupta, Esq. |
| **Fax:** | 301/ 657-3843 | **Date:** | November 9, 2006 |
| **Phone:** | | **Pages:** | ___ (Including cover page) |
| **Re:** | O█ Ol███ | **CC:** | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

•**Comments:**

DCPS   Opposition to Summary Decision & DCPS Cross-
Motion for Summary Decision.

590

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815

(301) 657-1740
FACSIMILE (301) 657-3843

November 8, 2006

Sharon Newsome
Student Hearing Coordinator
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: O███ O██████
*by facsimile & first-class mail*

Dear Ms. Newsome:

Enclosed please find a copy of the Parent's Motion for Pre-Hearing Summary Decision and Opposition to DCPS Motion to Dismiss in the above-named student's case. Please forward this to the assigned Hearing Officer for consideration. Thank you.

Sincerely,

Michael J. Eig

*Enclosure*
cc:    Saurabh Gupta, Esq. *(with enclosure)*
       Claudia Pabo *(with enclosure)*

591

IN THE MATTER OF

O█ O█

\* BEFORE AN IMPARTIAL HEARING
\* OFFICER OF THE DISTRICT OF
\* COLUMBIA OFFICE OF
\* STUDENT HEARINGS
\*
\*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PARENT'S MOTION FOR PRE-HEARING SUMMARY DECISION AND OPPOSITION TO DCPS MOTION TO DISMISS

O█ O█, by and through his parent, Claudia Pabo, respectfully moves this administrative body for summary decision. More specifically, O█ and his mother request an order under the Individuals With Disabilities Education Improvement Act, 20 U.S.C. §§ 1400, *et seq.* ("IDEA"), requiring the District of Columbia Public Schools ("DCPS" or "the school system"), to provide a free appropriate public education ("FAPE") to O█ by placing and funding him at the Kingsbury Day School ("Kingsbury") for the 2006-07 school year. On November 7, 2006, DCPS filed a motion to dismiss seeking dismissal of the parent's hearing complaint based on "unfair access to records." The motion to dismiss is frivolous and baseless and therefore should be denied. Further, because DCPS has violated the statutory requirements by holding an improperly-constituted resolution session, it is respectfully submitted that summary decision should be granted to O█ and his mother.

## I.    FACTUAL SUMMARY.

1.    O█ is a student with significant educational disabilities that affect his ability to succeed academically, and require that he receive intensive educational support to access his education. *See* Declaration of Claudia Pabo (attached).

592

2.    During the 2005-06 school year, O███attended Our Lady of Victory School ("OLV"). Prior to attending OLV, O███attended John Eaton and Hearst Elementary Schools within DCPS. *See* <u>Declaration of Claudia Pabo</u>.

3.    O███experienced great difficulty during the 2005-06 school year. Ms. Pabo spent an average of three to five hours a night with him trying to complete his school assignments, as well as many hours on the weekends. Out of concern for her son, and at the recommendation of OLV, in the Spring of 2006, Ms. Pabo, contacted DCPS and requested that the school system determine O███ special education eligibility. *See* <u>Declaration of Claudia Pabo</u>.

4.    A multi-disciplinary team ("MDT") met in April of 2006 and determined that evaluations and observation were necessary. The team reconvened prior to the start of the 2006-07 school year to review all evaluations and observations and to determine O███eligibility. The DCPS MDT found O███eligible for special education services and proposed Individualized Education Program ("IEP") goals and objectives. *See* <u>Declaration of Claudia Pabo</u>.

5.    The team recommended that O███receive full-time special education at the Prospect Learning Center ("Prospect") for the 2006-07 school year. After reviewing the proposed IEP, O███ educational consultant shared many concerns about the goals and objectives with the DCPS IEP team. The team refused to modify any of the goals and/or objectives. *See* <u>Declaration of Claudia Pabo</u>.

6.    Ms. Pabo, along with her educational consultant Dr. Laura Solomon, observed Prospect and found it inappropriate for O███ *See* <u>Declaration of Claudia Pabo</u>.

DC PUBLIC SCHOOL SYSTEM
2007 JUN -5 PM 3:10

2

7.     Ms. Pabo filed a due process hearing request on September 14, 2006, appealing the DCPS procedural and substantive failures. *See* Due Process Hearing Request (attached as "Exhibit 1").

8.     In response to the hearing request, the IDEA required DCPS to convene a timely resolution session that included (1) knowledgeable MDT/IEP team members, and (2) at least one DCPS representative with decision-making authority. 20 U.S.C. § 1415(f)(1)(B).

9.     On September, 26, 2006, DCPS convened a resolution session. This meeting was run by Kymberly Grafton, a DCPS representative with no decision-making authority, and who had no knowledge of O█. At the meeting, Ms. Grafton informed Ms. Pabo that she had no authority to state anything except the DCPS pre-existing position -- that Prospect is an appropriate placement for O█.

10.     DCPS failed to have a representative from Prospect present at the meeting or anyone with decision-making authority. The parties were unable to resolve the issues in the complaint. *See* Declaration of Claudia Pabo and Resolution Meeting Notes (attached as "Exhibit 2").

11.     On November 7, 2006, DCPS filed a Motion to Dismiss based on unfair access to records which terminally affects DCPS ability to defend itself in the pending action.

**II.     THE DCPS MOTION TO DISMISS IS FRIVOLOUS, BASELESS, AND SHOULD BE DENIED.**

DCPS fails to cite any law to support its baseless motion and claim that it has a right to O█ private student records from Kingsbury. DCPS argues that it is entitled to such information from Kingsbury, and because it was denied access to that information by Kingsbury,

3

594

the hearing cannot go forward.  This claim is frivolous and we request that the Hearing Officer deny it out of hand.

The school system states that Dr. Tiece Ruffin, Placement Specialist Monitor for DCPS, attempted to gain access to O███ personal information at Kingsbury, but that staff at Kingsbury refused to release the information.  This action by Kingsbury is not surprising.  O██ is currently a privately-placed, non-funded student at Kingsbury.  It would be illegal under the Family Educational Rights and Privacy Act ("FERPA") for Kingsbury to release O███ information to DCPS without express permission from O███ parent.[1]  34 C.F.R. § 99.  Nowhere in the motion does DCPS claim that it attempted to gain permission to inspect these records from O███ parent or attorney.

Furthermore, the law anticipates that parties may possess information and evidence which the opposing party has not seen.  Therefore, the law specifies that at least five business days prior to a hearing, each party must disclose evaluations and evidence on which they plan to rely at the hearing.  34 C.F.R. § 300.512.  On November 7, 2006, six business days prior to the hearing date, counsel for the parent mailed, via overnight mail, disclosure documents to counsel for DCPS.  Included in the disclosure are all documents in counsel's possession on which they plan to rely at

---

[1]     FERPA states that a school must have specific written permission from a parent in order to release school records to an unauthorized party.  34 C.F.R. § 99.30

4

the hearing. Accordingly, as of November 8, 2006, counsel for DCPS had in its possession all

relevant documents related to O█.[2]

The school system's motion to dismiss is without merit and completely uniformed. We

therefore ask that the motion be dismissed and summary decision be granted in favor of the

parent.

**III.    DCPS DENIED O█ A FAPE BY FAILING TO CONVENE A PROPER RESOLUTION SESSION.**

The IDEA sets forth the following specific requirements that bind the school system

when a parent files a due process complaint notice:

> Prior to the opportunity for an impartial due process hearing under
> subparagraph (A), the local educational agency *shall* convene a
> meeting with the parents **and the relevant member or members
> of the IEP team who have specific knowledge of the facts
> identified in the complaint** –
>
> . . .
> (II)    which shall include a representative of the agency **who has
> decisionmaking authority** on behalf of such agency;
>
> . . .
> (IV)    where the parents of the child discuss their complaint, and
> the facts that form the basis of the complaint, and the local
> educational agency is provided the opportunity to resolve
> the complaint, unless the parents and the local educational

---

[2]       Incredibly, in its motion, the only authority DCPS cites is *Schaffer v. Weast*, 546 U.S. 49
(2005). The school system relies on *Schaffer* for the notion that the IDEA envisions a
collaborative process between the parties in which neither party has an unfair tactical advantage.
DCPS implies that counsel for the parent has not worked in a collaborative manner. However,
their claim is that Kingsbury, the child's current educational placement, has "blocked" or
otherwise interfered with the DCPS right to student records – a right which does not even exist.
DCPS does not claim that O█ or his attorney have interfered with this process. In fact, DCPS
never contacted O█ parent or attorney for this information and on November 7, 2006, counsel
for O█ disclosed all relevant documents in preparation for the hearing. Therefore, this
argument must fail.

5

596

agency agree in writing to waive such meeting, or agree to
use the mediation process described in subsection (c).

20 U.S.C. § 1415(f)(1)(B) (emphasis added). A resolution session that meets these criteria is

**mandatory** under the Act, unless waived by both parties. It is critical in the instant case to

recognize that the IDEA specifies exactly who is to attend this meeting, on behalf of the school

system, and what authority is required of that person (or people).

On September 14, 2006, Ms. Pabo filed her due process appeal, and DCPS timely

convened the resolution session on September 26, 2006. However, the only DCPS representative

in attendance was Kymberly Grafton, who identified herself as the "LEA/CRS," or "Local

Educational Agency/Complaint Resolution Specialist." No member of the August, 2006

MDT/IEP team attended the session, much less did any DCPS representative with "specific

knowledge of the facts identified in the complaint."[3] At the meeting, Ms. Grafton reiterated the

school system's initial position taken at the previous IEP meetings – that Prospect is an

appropriate placement for O███.[4] Ms. Pabo again requested that DCPS place and fund O██ at

---

[3]     DCPS failed to have a representative from the proposed placement present at the meeting.
This was particularly disappointing because Ms. Pabo observed the program at Prospect and had
a number of concerns about the program which she was unable to discuss at the resolution
session.

[4]     Congress added the mandatory resolution session to the IDEA in order to increase
fairness and minimize litigation. The Senate Committee report indicates that: "the goal of these
new provisions is fairness: to be sure that a district is aware of a problem and has a chance to
resolve it in a less formal manner before having to spend the time and resources for a due process
hearing. *The purpose is not to make parents go to another IEP meeting to explain an issue that
has already reached an impasse with the district.*" S.Rep. No. 108-185, at 39 (2003) (emphasis
added). The situation identified in the Senate report is exactly what occurred in O███ case –
Ms. Pabo arrived at the resolution session only to learn that DCPS was committed to its initial
position and would not discuss any alternative solutions. This outcome was clearly not what
Congress intended when adding the resolution session to the IDEA.

6

597

Kingsbury. Ms. Grafton unequivocally stated that she lacked the authority to consider such a request, and further, that she lacked the authority to state anything other than the DCPS preexisting position. *See* Exhibit 2. By failing to convene a resolution session with the proper and requisite DCPS personnel, the school system denied this family due process of the law, and thereby denied O███ a FAPE.[5]

Hearing Officers in the District of Columbia have held that the failure to convene a properly-constituted educational team – that includes all members required by law – is, in and of itself, a violation upon which to award parents their requested relief. *See, e.g., D.J. v. DCPS*, Hearing Officer's Determination (October 4, 2006, Hearing Officer Terry Michael Banks) (attached) (determining that, "A local education agency ("LEA") should not take lightly its obligation to ensure the availability of the required team members[]", and holding that, "the failure to convene an appropriate team constitutes a substantive violation of IDEA, and is a denial of FAPE.")

In *Massey v. District of Columbia*, 400 F. Supp.2d 66 (D.D.C. 2005), the Court refused to excuse DCPS from holding a resolution session, despite the school system's claim that it was unable to get in touch with the parents in order to schedule the meeting. The *Massey* Court found that the school system's failure to comply with the strict procedural requirements of the law is a violation of the IDEA. The Court was emphatically instructive: "[M]any of the

---

[5]    Historically, federal courts have held that "failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that a school board has failed to provide [the student] with a FAPE." *Board of Educ. of Cabell County v. Dienelt*, 843 F.2d 813, 815 (4th Cir. 1988) (quoting *Hall v. Vance*, 774 F.2d 629, 635 (4th Cir. 1985); *see also, Hudson*, 828 F.2d at 1063 (holding that "procedural noncompliance can itself support a finding that a child has not been provided with a FAPE"); *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361, 364-5 (D. Md. 1994); *Reusch v. Fountain*, 872 F. Supp. 1421 (D. Md. 1994).

7

procedural safeguards in the IDEA are extremely technical, spelling out particular deadlines and required content. This kind of detail embodies the purpose of a statute prescribing administrative – *i.e.*, procedural–remedies." *Id.* at 66. *See also, Spencer v. District of Columbia*, 416 F. Supp.2d 5 (D.D.C. 2006), (confirming the importance of the legally-mandated resolution session).[6]

Given the unambiguous and detailed requirements set forth in the statute, and the Court's binding precedents of *Massey* and *Spencer*, it is clear that DCPS has violated the IDEA by failing to properly convene a resolution session with a team comprised of knowledgeable DCPS personnel with decision-making authority. By failing to hold a proper resolution session, DCPS denied this family the opportunity to resolve its complaint. This fact, by itself, is a clear and direct violation of the IDEA and a denial of FAPE. It is difficult to imagine how DCPS could have more brazenly flouted federal law and its own rules.

---

[6]    Hearing Officers for the District of Columbia have held that "a hearing officer has the inherent authority to issue a default judgment for the petitioner where an LEA offers no explanation for failing to file a timely response under 20 U.S.C. § 1415(c)(2)(B)(i)(I) and fails to convene a Resolution Meeting under 20 U.S.C. § 1415(f)(1)(B)." *T.M. v. DCPS*, Hearing Officer's Determination (Oct. 17, 2005, Hearing Officer Terry Michael Banks) (attached). In *T.M.*, the Hearing Officer issued a default judgment after DCPS cancelled a resolution session because it believed that the petitioner was not a resident or ward of the District. The Hearing Officer confirmed the importance of the resolution session, noting that it would be preferable for parties to resolve these types of "ministerial issues" at resolution meetings rather than hearings; he therefore issued a default judgment for the parents. *Id. See also, Z.S. v. DCPS*, Hearing Officer's Determination (Oct. 12, 2006, Hearing Officer Terry Michael Banks) (attached) (holding that, "where DCPS blatantly refuses to comply with the prehearing requirements of IDEIA, a hearing officer has the inherent authority to issue a default judgment for the petitioner.")

IV.    WHEN A STUDENT HAS BEEN DENIED A FAPE, THE FUNDING OF A "PROPER"
         PARENTAL PLACEMENT IS THE APPROPRIATE RELIEF.

Under established law, the school system's failure to provide O___ a FAPE leads directly

to the determination of whether his parent has identified a placement that is providing him with

educational benefit.  The proper analysis in such an inquiry is found in *Burlington Sch. Comm. v.*

*Dep't of Educ.*, 471 U.S. 359, 368 (1985) and *Florence County Sch. Dist. Four v. Carter*, 510

U.S. 7, 13 (1993).

In *Burlington*, the Supreme Court explained that "parents who disagree with the proposed

[educational program] are faced with a choice: go along with the [proposed program] to the

detriment of their child if it turns out to be inappropriate or pay for what they consider to be the

appropriate placement." 471 U.S. at 370.  To avoid compromising a child's right to a FAPE, the

Court concluded that if "a court determined that a private placement desired by the parents was

*proper* under the Act and that [a proposed] placement in a public school was inappropriate," the

IDEA authorizes "retroactive reimbursement to parents." *Id.* (emphasis added).  This result is

necessary because "[t]he Act was intended to give handicapped children both an appropriate

education and a free one; it should not be interpreted to defeat one or the other of those

objectives." *Id.*

In *Carter*, the Supreme Court reaffirmed its ruling in *Burlington* and explained that

"public educational authorities who want to avoid reimbursing parents for the private education

of a disabled child can do one of two things: give the child a free appropriate public education in

a public setting, or place the child in an appropriate private setting of the State's choice." *Carter*,

510 U.S. at 13 (1993).

9

The test of whether a parental placement is "proper under the Act" is whether "the education provided by the private school is '*reasonably calculated to enable the child to receive educational benefits.*'" *Carter v. Florence County Sch. Dist. Four*, 950 F.2d 156, 163 (4th Cir. 1984) (emphasis added) (quoting *Rowley*, 458 U.S. at 207)). It is worthwhile, particularly in the instant case, to distinguish the standard of "properness" required of parental placements from that of "appropriateness" required of school system placements. Parental placements are held to a less strict standard, because "it hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place." *Carter*, 950 F.2d at 164.

The Supreme Court in *Carter* specifically considered whether "parents are barred from reimbursement because the private school in which [their child is] enrolled did not meet the [IDEA] definition of a 'free appropriate public education.'" 510 U.S. at 13. The Court held "that they are not, because [the IDEA's] requirements cannot be read as applying to parental placements." Thus, any determination of O█████ placement must apply this more lenient standard of "properness."

10

## V.     KINGSBURY IS A "PROPER" PLACEMENT FOR O████

Knowing that O██ would continue to suffer educational and emotional detriment if not placed appropriately and immediately, his mother unilaterally enrolled him in Kingsbury for the 2006-07 school year.  As the court stated in *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361, 365 (D. Md. 1994), by securing an appropriate placement for her son, O████ parent merely acted as would "any reasonably prudent family who could afford to do so..."  850 F. Supp. at 365.  She stepped in for the school system, when it failed to offer a appropriate placement as required under 34 C.F.R. §§ 300.1 and 300.116.

The undisputed and unrebutted evidence demonstrates that O████ placement at Kingsbury meets the standard of "properness."  Kingsbury provides O███with intensive academic benefit through intensive and individualized instruction.  The staff at Kingsbury is developing an IEP with goals and objectives to meet his needs.  *See* Declaration of Marlene Gustafson (attached) and Declaration of Laura Solomon (attached).  O███has made significant educational progress at Kingsbury since the start of the 2006-07 school year.  *See* Declaration of Marlene Gustafson, Declaration of Laura Solomon, Declaration of Claudia Pabo.  The staff at Kingsbury therefore anticipate that O██will continue to make academic progress in all goal areas throughout the 2006-07 school year.  *Id.*

## VI.     CONCLUSION.

We hereby seek an administrative order placing O██ O███ at Kingsbury Day School for the 2006-07 school year.  Summary decision is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  It is doubly appropriate where, as here, DCPS has failed to hold the properly-constituted resolution session

11

602

required by law.  Accordingly, the school system's baseless motion to dismiss should be denied, and the parent's pre-hearing motion for summary decision should be granted.

Respectfully Submitted,

Michael J. Eig
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for O███, O█████ and his parent

*********************************************************************************

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage prepaid, to the DCPS Office of the General Counsel, on November 8, 2006.

Michael J. Eig

12

603

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

__ PUBLIC        ___DCPS CHARTER        __ LEA CHARTER        __ NONPUBLIC        _X__ PRIVATE/RELIGIOUS

## RESOLUTION MEETING NOTES

Meeting Confirmation Date: [        ]          Meeting Held: 9-26-06

Student: O███    O███                          DOB: ███-93                  Kingsbury Day

| PARTICIPANTS: (Print Name) | PARTICIPANTS (Sign Name) | POSITION |
|---|---|---|
| Kymberly Grafton | *Kymberly Grafton* | LEA/CRS |
| Claudia Pabo | *Claudia Pabo* | Mother |
| Michael Eig | *Eig* | Attorney |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

[   ] Resolved          [ X ] Unresolved

The meeting began with introductions. The parent's complaint is that DCPS failed to propose an ~~appropriate program and placement for the student. The parent is requesting DCPS place and~~ fund the student at Kingsbury Day School for the 2006-2007 school year.

The parent registered and proved residency at the CARE Center. It is DCPS position that an appropriate placement has been identified. Another meeting would not be productive. DCPS is rejecting funding and placement at Kingsbury.

The parent objects to their not being a complete DRS/IEP team for today's meeting. The parent objects to this writer's lack of authority to state anything but, DCPS' preexisting position. The parent questions why they were required to come to this DRS. The parent has observed at Prospect and has a number of concerns with what she saw, but there is no one to present those issues to. Based on the parent's observation at Prospect, she feels this placement is not appropriate for her son. The parent continues to request placement at Kingsbury.

The parent is unwilling to accept DCPS offer and will proceed to due process. This case is unresolved.

IN THE MATTER OF

O███ O████

\*
\*
\*
\*
\*
\*
\*

BEFORE AN IMPARTIAL HEARING
OFFICER OF THE
DISTRICT OF COLUMBIA OFFICE OF
STUDENT HEARINGS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF CLAUDIA PABO

Claudia Pabo declares and says as follows:

1.     I am the mother of O███ O████. I make this declaration at the request of and for use by the attorneys representing my family in special education matters. The matters discussed herein are from my personal knowledge.

2.     O███ has a specific learning disability, severe problems with his visual processing, language disorder, significant problems with reading social cues and great difficulty with peer relationships, severe Attention Deficit Hyperactivity Disorder ("ADHD") including some oppositionality, impulsivity, variable attention, hyperactivity, and very poor executive functioning. O███ is also identified as having Fetal Alcohol Syndrome. He has significant special education needs which require that he receives full-time special education in a program such as Kingsbury Day School, where he is currently enrolled.

3.     During the 2005-06 school year, O███ attended Our Lady of Victory School ("OLV"). Prior to attending OLV, O███ attended John Eaton and Hearst Elementary Schools within the District of Columbia Public Schools ("DCPS"). He experienced great difficulty during the 2005-06 school year. I spent an average of three to five hours a night with him trying to complete his school assignments, as well as many hours on the weekends.

Page 1 of 3

605

4.    In the Spring of 2006, I contacted DCPS and requested that the school system determine O███ special education eligibility. A multi-disciplinary team ("MDT") met in April of 2006 and determined that evaluations and observation were necessary. The team reconvened prior to the start of the 2006-07 school year to review all evaluations and observations and to determine O██ eligibility. The DCPS MDT found O██ eligible for special education services and proposed IEP goals and objectives. The team recommended that he receive full-time special education at the Prospect Learning Center for the 2006-07 school year. My attorney and my educational consultant shared many concerns on my behalf about the goals and objectives with the DCPS IEP team; however, the team refused to modify any of the goals and/or objectives.

5.    I visited and observed the Prospect Learning Center and found that it is not an appropriate placement for O██. As a result, on September 14, 2006, my attorney filed a due process hearing complaint on my son's and my behalf, appealing the decision of the IEP team.

6.    On September 29, 2006, I attended a Dispute Resolution Session with my attorney which was run by Ms. Kymberly Grafton of DCPS. Ms. Grafton was the only DCPS representative present at the meeting. She informed us that she lacked the authority to state anything but the DCPS pre-existing position – that Prospect Learning Center was appropriate. DCPS failed to have a representative from Prospect Learning Center present at the meeting or anyone with decision-making authority. I was precluded from discussing the resolution of my claims at this meeting.

7.    O██ currently attends Kingsbury Day School. Since the start of the 2006-07 school year, he has made significant educational progress at Kingsbury, in a setting where his

Page 2 of 3

606

strengths and weaknesses are being addressed.  O███ is receiving educational benefit from his

placement at Kingsbury.

8.     I believe that Kingsbury is a proper placement for O███.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT.

Executed on _Nov. 7, 2006_          Claudia Pabo
                                                      Claudia Pabo

Page 3 of 3

607



**State Educ 'on Agency for the District of Cc mbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**





EXHIBIT

**FAXED**

SEP 1 4 2006

# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the District of Columbia Public Schools, District of Columbia Public Charter School (DCPS or LEA) and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. <u>A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).</u>

- The due process complaint must describe an alleged violation that occurred not more that two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- <u>Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice.</u> Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. <u>The Student Hearing Office does NOT schedule resolution meetings.</u>

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A. INFORMATION ABOUT THE STUDENT:

Student Name: O█ O█████ Birth Date: ████████, 1993

Address: 3512 Rodman Street, NW, Washington, D.C. 20008

Home School: John Eaton Elementary School

Present School of Attendance: Kingsbury Day School

Is this a charter school? No (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: Claudia Pabo

Address (if different from the student's above): same as above

Phone/Contact Number: see below Fax Number (if applicable): see below

608

**B.** **Individual Making the Complaint/Request for Due Process Hearing:**

Name: Michael J. Eig, Esq.

Complete Address: _____ same as above _____

_____

Phone: (h) __see below__ (w) __see below__ (Fax) __see below__ (e-mail) _____

Relationship to the Student:

☒ Parent          ☐ Legal Guardian          ☐ Parent Surrogate

☐ Self/Student    ☐ Local Education Agency (LEA)    ☐ Parent Advocate

**C.** **Legal Representative/Attorney (if applicable):**

Name: Michael J. Eig, Esq.

Address: _____ Michael J. Eig and Associates, P.C. _____

_____ 5454 Wisconsin Avenue, Suite 760, Chevy Chase, Maryland 20815 _____

Phone: (w) 301-657-1740 (Fax) 301-657-3843 (e-mail) _____

Will attorney / legal representative attend the resolution session? ☒ Yes    ☐ No

**D.** **Complaint Made Against (check all that apply):**

☒ DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.** **Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution session to avoid having this meeting.)

☐ I wish to waive the Resolution Session.

**E.** **Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session. Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint. Please check all that apply:

☐ I am requesting mediation as an alternative to the resolution session meeting.
☐ I am requesting mediation services **only**.
☐ I do not wish to use a mediator at this time.

609

## G.   Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions.  Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.        What is the nature of the problem, including the facts related to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

O▆ O▆ is a thirteen-year-old student who is eligible to receive special education services under the IDEA as a student with Multiple Disabilities. O▆ has a specific learning disability, language disorder, problems with reading social cues and peer relationships, behaviors associated with Attention Deficit Hyperactivity Disorder ("ADHD") including some oppositionality, impulsivity, variable attention, hyperactivity, and poor executive functioning. O▆ is also identified as having Fetal Alcohol Syndrome. The District of Columbia Public Schools ("DCPS") has identified him as a student with an educational disability eligible to receive special education and related services under the IDEA.

During the 2005-06 school year O▆ attended Our Lady of Victory School ("OLV").  Prior to attending OLV, O▆ attended John Eaton and Hearst Elementary School.  O▆ experienced great difficulty during the 2005-06 school year.  Ms. Pabo spent several hours a night with Oleg trying to complete his school assignments.  As a result, out of concern for her son, and at the recommendation of OLV, in the Spring of 2006, Ms. Pabo, contacted DCPS and requested that the school system determine O▆ special education eligibility.  A multi-disciplinary team ("MDT") met in April of 2006 and determined that evaluations and observation were necessary.  The team reconvened prior to the start of the 2006-07 school year to review all evaluations and observations and to determine O▆ eligibility.  The DCPS MDT found O▆ eligible for special education services and proposed IEP goals and objectives.  The team recommended that O▆ receive full-time special education at the Prospect Learning Center for the 2006-07 school year.  After reviewing the proposed IEP, Ms. Pabo shared many concerns about the goals and objectives with the DCPS IEP team.  The team refused to modify any of the goals and/or objectives.

Ms. Pabo, along with her educational consultant, Dr. Laura Solomon, observed the Prospect Learning Center and found that it is not appropriate for O▆ needs. Ms. Pabo has many concerns about Prospect. For example, Prospect does not offer a flexible curriculum which is essential for O▆ to succeed. In addition, O▆ would be at Prospect for only one year, before having to change schools due to his age.

In sum, the school system's failure to propose an appropriate program and placement for O▆ is a denial of the free appropriate public education to which he is entitled under IDEA.  Ms. Pabo has located an appropriate placement for O▆ at the Kingsbury Day School.  As a remedy for the school system's failure she requests that O▆ be placed and funded at Kingsbury for the 2006-07 school year.

2.        To the extent known to you at this time, how can this problem be resolved?

As a remedy for the school system's failure she requests that O▆ be placed and funded at Kingsbury for the 2006-07 school year.

610

3.    Issues presented:

**H.**    **Estimated amount of time needed for the hearing:**    **1 Day**

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing.  Please indicate if you believe more that two hours will be needed.

**I.**    **Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- •   Interpreter (please specify the type) N/A _____

- •   Special Communication (please describe the type) N/A _____

- •   Special Accommodations for Disability (please be specific) N/A _____

- •   Other N/A _____

**J.**    **Waiver of Procedural Safeguards:**

☐    I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.**    **Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____                    _____
Signature of Parent or Guardian                                    Date

**L.**    **Signature of Attorney/Legal Representative:**

_____                    9·14·06
Legal Representative / Advocate                                    Date

**M.**    **Signature of LEA Representative (if hearing requested by LEA):**

_____                    _____
Representative of LEA                                                Date

611

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002
Fax number: 202/442-5556

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID) Special Education*
*Programs*



EXHIBIT

2

# *Due Process Complaint Disposition*

- This form should be used by the parties to notify the Student Hearing Office about important information concerning the outcome of the resolution meeting.
- Please return to the Student Hearing Office of the District of Columbia Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002, Fax number 202/442-5556.

## A. STUDENT AND CASE INFORMATION:

Student Name: [redacted] [redacted]        Birth Date: [redacted]-93

        First    MI    Last

SHO Case Number: [blank]        (if applicable)

## B. PARENT / GUARDIAN:

Name: Claudia                    Pabo

    First                            Last

Complete Address: 3512 Rodman Street, NW
Washington, DC 20008

Phone: [blank]        [blank]        [blank]

    Home         Work or alternative phone no.    Fax No. if applicable

## C. LOCAL EDUCATION AGENCY REPRESENTATIVE:

Full Name: Kymberly    Grafton        Title: LEA, CRS

Address:

925 Rhode Island Avenue, NW
Washington, DC 20001

Phone: (202) 671-0882        (202) 673-6557

    Office                Fax

1

SEID DRN Rev'd. 6/14/05

_____ The complaint has been resolved and the parties have reached agreement to the satisfaction of the parent / guardian. The due process complaint notice and the request for a due process hearing should be dismissed and withdrawn. The parties are aware that the agreement may be voided by any party within 3 business days of the date the agreement is signed. The parties have agreed to wait at least 3 business days before filing this form with the Student Hearing Office.

_X____ The resolution session was unsuccessful. The case should proceed to a due process hearing.

_____ The resolution session was unsuccessful. The parties have agreed to try mediation.

_____ The parties mutually agree to waive the resolution session and request mediation and the assignment of a mediator to this case.

_____ The parties mutually agree to waive the resolution session and request that this case proceed to a due process hearing on the merits.

_____ The parent has failed to participate in a resolution meeting as required under the law. A due process hearing should not be scheduled until further notice

**J.    Signature and Affirmation:**

I affirm that the information provided on this form is true and correct. I also affirm my receipt of the Procedural Safeguards Manual or I have waived my right to receive the Procedural Safeguards Manual.

Claudia Pabo                    9/26/06
Signature of Parent/Guardian              | Date

Kymberly Drafton                9-26-06
Local Educational Agency Representative         Date

Mail, fax or deliver this form to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC  20002
Fax number: 202/442-5556

2

614

IN THE MATTER OF

O██ O████

*
*
*
*
*
*

BEFORE AN IMPARTIAL HEARING
OFFICER OF THE
DISTRICT OF COLUMBIA OFFICE OF
STUDENT HEARINGS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF MARLENE GUSTAFSON

Marlene Gustafson declares and says as follows:

1.    I am the Director of the Kingsbury Day School. I make this declaration at the request of and for use by the attorneys representing O██ O████ and his parent in special education matters. The matters discussed herein are from my personal knowledge.

2.    I am a certified special educator in the State of Maryland. I have worked as a special education school teacher and an administrator in both the public school system and at private schools, for more than twenty-three years. I have served as administrator at Kingsbury Day School for approximately twelve years.

3.    Kingsbury Day School is a nonpublic day school that specializes in educating students with disabilities.

4.    I first became familiar with O██O████ when the admissions team considered his application to Kingsbury for the 2006-07 school year. I am familiar with O████ current educational file, including his evaluations and progress reports.

5.    From my knowledge of O██, I recognize that he has significant disabilities, and the findings detailed in the written reports that are in my possession are consistent with my opinions of his needs.

Page 1 of 2

615

6.    I believe that O███ disabilities require that he receive a specialized, structured and individualized program in order for him to receive benefit from his education, in a full-time special education placement.

7.    At Kingsbury, we are in the process of developing an IEP for O███ for the 2006-07 school years. This IEP will establishes goals and objectives for O███, taking into account his various areas of strength and disability. All of these goal areas will be imperative to O███ educational success.

8.    The Admissions Committee at the school accepted O███ because the team believed that Kingsbury would be able to provide him with the special education and related services he requires in a placement appropriate to meet his needs. I concurred with the decision of the Admissions Committee, that O███ requires a full-time special education placement to succeed.

9.    I do not believe that a less intensive program would appropriately address O███ needs.

10.    I believe that O███ has been able to receive significant educational benefit at Kingsbury, in this setting where both his strengths and his disabilities are being addressed. I believe that O███ will continue to receive significant educational benefit throughout the 2006-07 school year.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on _November 2, 2006_                _Marlene Gustafson_
                                               Marlene Gustafson

616

IN THE MATTER OF

O███ O████

BEFORE IMPARTIAL HEARING
OFFICER DAVID SMITH OF THE
DISTRICT OF COLUMBIA OFFICE OF
STUDENT HEARINGS

\* \* \* \* \* \* \* \* \* \* \* \*        \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF LAURA SOLOMON

Laura Solomon declares and says as follows:

1.      I am an Educational Advocate and Consultant in private practice. I make this declaration at the request of and for use by the attorneys representing O██ O███ and his parent in special education matters. The matters discussed herein are from my personal knowledge.

2.      I have worked in the field of special education for over thirty years, first as a teacher and, for the past twenty-four years, as an Educational Advocate and Consultant. I received a B.A. with honors in Early Childhood Education, an M.Ed. with high honors in Early Childhood/Special Education, an Ed.S. with high honors in Special Education, and an Ed.D. in special education.

3.      As a part of my job, I meet with students and their families, review their educational files, observe them in their educational placements, and meet with their educators and service providers in order to form an opinion on appropriate and beneficial educational programming and placement for the students.

4.      I have met with O███ and his mother, reviewed his educational file, and conducted testing on O██.

5.      My experiences with O███ as well as my review of his educational file, my assessments, and my conversations with his mother have allowed me to assess his educational

617

strengths and weaknesses, and enable me to make a recommendation about the type of

educational program and placement he requires.

6.    O▇ requires a specialized, structured and individualized program in order for him

to receive benefit from his educational program.  He needs to be placed in a school in which the

staff are knowledgeable, experienced and equipped to educate students with his types of

disabilities.  It is important that O▇ placement have built-in, consistent academic and

behavioral structure and supports, as well as a non-traditional, creative curriculum with strategies,

techniques, and programming designed to further his academic and cognitive growth.

7.    Oleg currently attends Kingsbury Day School.  From my review of O▇

educational file and testing, and my long-standing knowledge of the program at Kingsbury, I

believe that he is receiving significant educational benefit from Kingsbury.  That setting is one

in which his strengths and disabilities are being addressed, he is receiving benefit from consistent

behavioral and emotional supports, and his interest in, and availability for, instruction in content

knowledge is a major component of his educational program.

8.    I do not believe that a less intensive program would fully address O▇ needs.  I

also do not believe that he would be appropriately placed in any school in which the staff are not

knowledgeable, experienced and equipped to educate students with his specific types of needs.

9.    The District of Columbia Public Schools has not proposed an appropriate program

or placement for O▇ for the 2006-07 school year.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT.

Executed on __11/6/06_____                    _Laura Solomon_
                                                               Laura Solomon

618

**LAURA JUDITH SOLOMON, ED.D.**
5512  30th Street, NW
Washington, DC  20015
202-244-6616

*Highlights of Professional Practice*:  Twenty years of comprehensive experience in the fields of special education and early childhood education including: teaching; diagnostic evaluation; early identification of disabilities; IEP design, development, and implementation; school placement; program administration; teacher and parent education; multi-disciplinary team participation.

*Philosophy of Professional Practice:*  Dedicated to the prevention and treatment of disabilities through early identification and intervention, parent and teacher education, placement of children in appropriate educational settings, and provision of appropriate therapeutic services.

*Special Skills and Areas of Interest*:

> School Placement: working with parents to obtain special education and community services for their children.

> Training: for parents in the areas of accessing the special education system on behalf of their children, due process rights, advocating for their children in the schools; for teachers in the areas of assessment, IEP development and implementation, working with parents, instructional strategies, and behavior management.

> Consultation: to public and private schools in the areas of designing and implementing appropriate special education and related service programs and evaluation of children with special needs.

*Graduate Teaching*:  Former adjunct faculty at George Washington and Gallaudet Universities. Courses have included assessment, behavior management, and family dynamics and assessment. Supervision of student teachers at George Washington University and American University.

*Education*:

> Ed.D. in Special Education, 1993, George Washington University.

> Ed.S. with high honors in Special Education, 1988, George Washington University.

> M.Ed. with high honors in Early Childhood/Special Education, 1978, Howard University.

> B.A. with honors in Early Childhood Education, 1973, University of Florida.

Laura Solomon

*Professional Experience*:

1984-present: private special education practice providing diagnostic evaluation, school placement, and community referral services.

1984-1989: individualized tutoring with preschool and elementary-age children with learning disabilities, autism, and developmental delays.  Therapeutic model included weekly communication with parents, teachers, other school staff, and community-based professionals involved with the child and coordination of tutoring program with the IEP and curriculum.

1982-1984: Coordinator of Handicap Services for National Child Day Care Association, Washington, D.C.  Responsible for coordination of special education and related services, assessment, and IEP development for up to 100 preschool children per year, for meeting federal and local guidelines related to serving children with disabilities, and for staff training in working with preschoolers with disabilities in regular education classrooms.

1980-1982: Master teacher at Ivymount School (formerly Christ Church Child Center), Rockville, MD.  Full-time special education teacher for primary-age children with learning disabilities, emotional disabilities, autism, and multiple disabilities.

1973-1979: Regular and special education teacher in a variety of settings including public school, nursery schools, and day care centers.

REFERENCES:  Available on request.

620

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

Michael J. Eig       MD, DC
Haylie M. Iseman     MD, DC, NY

Paula A. Rosenstock   VA, DC
Patricia Cyr          CA, DC

# FAX

**Part One**

| | |
|---|---|
| **To:** | Sharon Newsome |
| | Student Hearing Coordinator |
| | **DCPS-Student Hearing Office** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael J. Eig, Esq. |
| **Date:** | November 8, 2006 |
| **Time:** | 2:26 pm |
| **Total Pages:** (including cover) | 27 |
| **Re:** | O⬛ O⬛ |
| cc: | Saurabh Gupta, Esq. |
| | (202) 442-5097/5098 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

621



**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

**Office of the Superintendent**
Office of the General Counsel
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000      Fax: 202-442-5098
www.k12.dc.us

November 8, 2006

Michael J. Eig, Esquire
5454 Wisconsin Avenue
Suite 760
Chevy Chase, MD 20815

<u>**DISCLOSURE STATEMENT**</u>

<u>**VIA FACSIMILE 301-657-3843**</u>

**Subject: Due Process Hearing for O▮▮, O▮▮▮▮**
**DOB:**     ▮▮▮▮/93

Dear Mr. Eig:

  At the upcoming due process hearing in the above-referenced matter, scheduled for Thursday, November 16, 2006, at 9:00 a.m., and pursuant to 34 C.F.R. 300.509(a)(3), in addition to any documents and witnesses disclosed by the parent, DCPS may rely upon any of the following witnesses/documents[1]:

**Witnesses:**

1. Marla Oakes, Executive Director, Office of Special Education, DCPS and/or designee(s) –
2. 825 North Capitol Street, N.E., Washington, D.C. 20002; (202) 442-4800 – same for all Central Office staff;
3. Carol Helton, Assistant Director, Technical Support, School Support, DCPS, and/or her designee(s);
4. Erika Grey, DCPS Non-Public Placement Specialist, and/or designee;
5. Dr. Tiece Ruffin, DCPS Non-Public Placement Specialist, and/or designee;
6. Dr. Eve Peterson, Principal, Prospect LC, and/or designee(s) – 920 F Street, NE, Washington D.C. 20002; (202) 698-3800;
7. Cindy F. Brown L.I.C.S.W., Case Manager, C.A.R.E Center at Shaw Junior High, and/or designee – 925 Rhode Island Ave, NW, Washington D.C. 20001, (202) 671-0882 – Same for all CARE Center Staff;
8. Leslie Charles, Speech & Language Therapists, CARE Center, and/or designee;
9. Dr. Denise White-Jennings, Clinical Psychologist, CARE Center, and/or designee;
10. Jermaine Perkins, Psychologist, CARE Center, and/or designee;

  Pursuant to 34 C.F.R. 300.509(a)(2) and 5DCMR 3031.1(b), DCPS hereby compels the attendance of the below named individual as a necessary and material witness(es):

  1. **Claudia Pabo, mother**

---

[1] Witnesses may testify by telephone.



**Documents:**

| | |
|---|---|
| DCPS-01 | Notarized Statement of Dr. Tiece Ruffin |
| DCPS-02 | Prior Notice & MDT Notes (11/8/06) |
| DCPS-03 | IEP and MDT Notes (11/8/06) |
| DCPS-04 | Prior Notice & MDT Notes (8/30/06) |
| DCPS-05 | IEP and MDT Notes (8/30/06) |
| DCPS-06 | Occupational Therapy Evaluation (10/19/2006) |
| DCPS-07 | Social Work Evaluation Report (6/28/06) |
| DCPS-08 | Educational Evaluation (5/30/2006) |
| DCPS-09 | Classroom Observations (7/10/20060 |
| DCPS-10 | Speech & Language Evaluation (5/18/2006) |
| DCPS-11 | Neuropsychological Evaluation (5/3/2006) |
| DCPS-12 | Prior Notice & MDT Notes (9/21/2006) |
| DCPS-13 | Contact Log |
| DCPS-14 | November 2006 Meeting Confirmation correspondences |
| DCPS-15 | MDT Meeting invitation (9/8/2006) |

DCPS reserves the right to examine any witness called or identified as a potential witness by the representative of Dayvonne Elvis, as if such witness was called by DCPS. Also, DCPS reserves the right to rely upon and/or use any documents/witnesses presented and/or disclosed by the parent that DCPS deems relevant in this case. Lastly, DCPS reserves the right to call rebuttal witnesses in this matter.

If you wish to discuss any aspect of this case further, or have questions, please contact me at (202) 442-5178.

Sincerely,

Saurabh Gupta
Attorney Advisor

cc:     Student Hearing Office

```
MESSAGE  CONFIRMATION
❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖

                                    11/08/2006  17:52
                                    ID=OFFICE OF THE GENERAL COUNSEL


DATE        S.R-TIME   DISTANT STATION ID      MODE      PAGES   RESULT           S.C.
11/08       00'21"     301 657 3843            TX        002     OK               0000


❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖

11/08/2006   17:47    OFFICE OF THE GENERAL COUNSEL → 93016573843           NO.455   P001
```



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

**Office of the Superintendent**
Office of the General Counsel
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000        Fax: 202-442-5098
www.k12.dc.us

November 8, 2006

Michael J. Eig, Esquire
5454 Wisconsin Avenue
Suite 760
Chevy Chase, MD 20815

**DISCLOSURE STATEMENT**

**VIA FACSIMILE 301-657-3843**

**Subject: Due Process Hearing for O█ O████**
**DOB:** ████/93

Dear Mr. Eig:

    At the upcoming due process hearing in the above-referenced matter, scheduled for Thursday, November 16, 2006, at 9:00 a.m., and pursuant to 34 C.F.R. 300.509(a)(3), in addition to any documents and witnesses disclosed by the parent, DCPS may rely upon any of the following witnesses/documents[1]:

**Witnesses:**

1. Marla Oakes, Executive Director, Office of Special Education, DCPS and/or designee(s) –
2. 825 North Capitol Street, N.E., Washington, D.C. 20002; (202) 442-4800 – same for all Central Office staff;
3. Carol Helton, Assistant Director, Technical Support, School Support, DCPS, and/or her designee(s);
4. Erika Grey, DCPS Non-Public Placement Specialist, and/or designee;
5. Dr. Tiece Ruffin, DCPS Non-Public Placement Specialist, and/or designee;
6. Dr. Eve Peterson, Principal, Prospect LC, and/or designee(s) – 920 F Street, NE, Washington D.C. 20002; (202) 698-3800;
7. Cindy F. Brown, C.A.R.E Center at Shaw Junior High, and/or designee – 925 Rhode Island Ave, NW, Washington D.C. 20001, (202) 671-0882 – Same for all CARE Center Staff;
8. Leslie Charles, Speech & Language Therapists, CARE Center, and/or designee;
9. Dr. Denise White-Jennings, Clinical Psychologist, CARE Center, and/or designee;
10. Jermaine Perkins, Psychologist, CARE Center, and/or designee;

    Pursuant to 34 C.F.R. 300.509(a)(2) and 5DCMR 3031.1(b), DCPS hereby compels the attendance of the below named individual as a necessary and material witness(es):

**Claudia Pabo, mother**

---

[1] Witnesses may testify by telephone.

624

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

### Dr. Tiece Ruffin's Attestation and Statement

I, Dr. Tiece Ruffin, affirm my statements below are true:

1. I am writing this statement based on Mr. Saurabh Gupta's, Attorney-Advisor DCPS, request to retrieve records for the following students all of whom are attending Kingsbury Day School:

   a. 

2. I am a DCPS employee in the Office of Special Education.

3. I am a placement specialist and monitor for Non-Public Day Schools for DCPS.

4. On November 1, 2006 I attempted to gain access to and obtain copies of the students' (listed above) educational records from Kingsbury Day School.

5. Mr. Robert Brooks, Assistant to the Director, Kingsbury Day School, informed me the above listed students are current attendees at Kingsbury.

6. Mr. Brooks further informed me that I could not have access to those records.

7. Mr. Brooks explained that these students were private pay. Additionally, DCPS did not place or fund these students. Therefore, I did not have privileges to access, view, or copy Kingsbury's records.

8. Kingsbury Day School's policy only allows parent or the party responsible for the placement of the student access to the records.

9. I left Kingsbury Day School with out any information or records on the students listed above because these students are not DCPS students.

Respectfully Submitted,

_11/07/06_
**Date**

**Dr. Tiece Ruffin**
**DCPS Placement Specialist**

n to and subscribed before me
_7th_ day of _November, 2006_
Ann J. Fenwick
ary Public - Washington, D.C.

**ANN J. FENWICK**
District of Columbia
My Commission Expires
April 14, 2011

625

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM (MDT)

PRIOR NOTICE

Check Purpose:
- [X] Initial Evaluation
- [ ] Initial Placement
- [ ] Reevaluation
  - [ ] Change in Category Exit
  - [ ] Related Service Add
  - [ ] Related Service
  - [ ] Change in Placement
  - [ ] Other

Date  *November 8, 2006*

Student  O___ O_____    DOB ___/93

School  Kingsbury/C.A.R.E. Center

Current Disability Category  Multiple Disability (OHI/LD)

Setting  Out of General Education

Dear  Ms. Claudia Pabo

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
- [X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Other _____

**A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)**

- [ ] Your child is not eligible for special education service(s).
- [X] Your child is eligible or continues to be eligible to receive special education services as a student with  MD - OHI/LD
- [X] Your child will begin receiving  Psychological services, Occupational Therapy  as a related service(s).
- [ ] Your child will no longer receive _____ as a related service(s).
- [ ] Your child's category of disability is being changed from _____ to _____
- [ ] Your child's alternative placement on continuum (next setting) is being changed,
  from _____ to _____
- [ ] Your child is no longer eligible and will be exited from the special education program.
- [X] Other:  Placement at: Prospect LC (as discussed at last IEP meeting)

**Description and Explanation of agency action proposed or refused.**

The MDT has reviewed evaluations/reports and determined that the student is eligible for special education services as a student with a disability classification of MD. Out of General Education is an appropriate setting and Prospect LC can address the student's needs as identified on the IEP and discussed at last IEP meeting.

**Description of Other Options Considered and reasons for rejection of each option**

The MDT has reviewed evaluations/reports and determined that Combination General Education/Resource Setting and General Education Setting are not appropriate, as these settings do not provide the level of services needed to address the student's special education needs.

Other relevant factors to the decision- _____

MDT Members:
- [X] Principal or Designee
- [X] Parent
- [ ] Student
- [X] Social Worker
- [ ] General Education Teacher
- [X] Special Education Teacher
- [ ] Speech and Language
- [X] *LEA & Interpreter  (*may be one)
- [X] Psychologist
- [X] Other:  OT
  *Kingsbury Staff (not present)*

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the **Procedural Safeguards** for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact  Cindy F. Brown, LICSW - Case Manager  at  202/671-0882  (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior Written Notice to the Parent
07-02-2001                                                                                          1

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION
MULTIDISCIPLINARY TEAM
(MDT)

Student O O_____    _____  DOB ___/93 Age 13  Grade 7  ID 9051483_____

You have the right to challenge the recommendations by requesting Mediation or a Due Process Hearing before an impartial hearing officer. To initiate a mediation or hearing, you will need to complete a REQUEST FOR MEDIATION or DUE PROCESS HEARING form and mail it to the address listed below:

Student Hearing Office
D.C. Public Schools 825 North
Capitol Street, N.E. 8ᵗʰ floor
202-442-5432

You have the right to be represented at the hearing by legal counsel.
A copy of Parents Procedural Safeguards handbook is provided.
A list of free or low cost legal service, for which you may qualify depending on your income, is included.
If you would like an additional copy, please contact the principal.

EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

☒ Wechsler Intelligence Scale for Children-III (WISC III) - commonly employed individually administered test designed to measure the intelligence of individuals aged 6 to 16 years. Date of Report  5/3/06 (Indep Eval)

☐ Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R) - measures specific mental abilities and processes in ages 4 to 6 ½ years. Date of Report _____

☐ Wechsler Adult Intelligence Scale-III (WJAS 111) an individually administered test designed to measure the intelligence of individuals ages 16 and over. Date of Report _____

☐ Bayley Scales of Infant Development-11 - an individually administered instrument that measures motor, mental and social development in infants and children from 1 month to 42 months of age. Date of Report _____

☒ Wechsler Individual Achievement Test (WIAT)- a commonly used individually administered instrument designed to assess the educational achievement of children and adolescents in areas of basic reading, mathematics reasoning, spelling, reading comprehension, numerical operations, listening comprehension, oral expression, and written expression. Date of Report  5/3/06 (Indep Eval)

☐ Peabody Individual Achievement Test-Revised (PIAT-R) - an individually administered test measuring achievement in areas of general information, reading recognition, reading comprehension, spelling, written expression, and mathematics. Date of Report _____

☐ Kaufman Test of Educational Achievement (KTEA) -an individually administered instrument measuring achievement skills in reading decoding, mathematics applications, spelling, reading comprehension, and mathematics computation. Date of Report _____

☒ Woodcock-Johnson Psycho-Educational Battery - a diagnostic and evaluation instrument composed of twenty-seven tests divided into three major parts: tests of cognitive ability, tests of achievement, and tests of interests. Date of Report  5/3/06 (Indep Eval)
Cognitive  7/11/06 (Indep Eval)

☐ Bender Visual Motor Gestalt Test - measures perceptual motor skills to determine visual-motor gestalt functioning and neurological soft-signs in ages 4 to 12 years using the Koppitz Scoring System. Date of Report _____

☒ Developmental Test of Visual Motor Integration (VMI) -assesses visual perception and motor coordination in ages 3 years and up using a more structured booklet format. Date of Report  5/3/06 (Indep Eval)

☐ Children's Apperception Test - a projective story-telling technique for personality evaluation in ages 5 to 10 years. Date of Report _____

☐ Thematic Apperception Test - a projective story-telling technique for personality evaluation in older children and adolescents.
Date of Report _____

☐ House-Tree-Person - a projective drawing technique providing insight into personality structure, physical concerns, and social-emotional adjustment in children and adolescents. Date of Report _____

Neuropsychological Evaluation (Federici, 5/3/06)
Comprehensive Receptive and Expressive Vocabulary Test-CREVT-2 (5/15/05)
Social Work Evaluation Report (7/5/06), Revised Report (8/31/06)
Review of Independent Evaluation (8/21/06)
Occupational Therapy Evaluation (10/9/06)

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**
**MULTIDISCIPLINARY TEAM**
**(MDT)**

Student O�â–ˆO�â–ˆ_____    _____    DOB �â–ˆâ–ˆ/93 Age 13  Grade 7  ID 9051483_____

☒ **Kinetic Family Drawing** - a projective drawing technique measuring one's perception of her family and her role within the family.
   Date of Report    5/3/06 (Indep Eval)

☒ **Rorschach Psychodiagnostic Test** - a projective measure y which one's responses to inkblots reveal personality structure, ego strengths and reality
   testing in ages 3 and older. Date of Report    5/3/06 (Indep Eval)

☐ **Goodenough-Harris Drawing Test** -a projective drawing procedure measuring intellectual perceptual-motor maturity and personality through the
   use of drawings of self and a member of the opposite sex in ages 3 to 15.11 years. Date of Report _____

☒ **Conner's Parent and Teacher Rating Scales -** a paper-and-pencil instrument measuring problem behaviors of children and adolescents as reported
   by the child's teacher, parents, or alternate care-giver. Date of Report   5/3/06 (Indep Eval)

☐ **The Vineland Adaptive Behavior** Scales - assesses adaptive and social competency skills. Date of Report _____

☐ **Test of Language Development Primary - Revised (TOLD-P)** - measures primary language proficiency and specific strengths and weaknesses in
   language skills. Date of Report _____

☐ **Kaufman Assessment Battery for Children** - assesses the ability to solve problems using simultaneous and sequential metal processes in four global
   areas: Sequential Processing, Simultaneous Processing, Mental Processing, and Achievement. Date of Report _____

☐ **Preschool Language Scale -** measures auditory comprehension and verbal ability skills. Date of Report _____

☐ **Oral Peripheral Speech Examination -** a procedure to determine whether the examinee can appropriately use the lips, tongue, mouth, etc.
   Date of Report _____

☒ **Clinical Evaluation of Language Fundamentals -IV-** assesses the child's language functioning including processing and production.
   Date of Report    5/19/06

☐ **Expressive One Word Picture Vocabulary Test** - assesses the child's single word expressive vocabulary. Date of Report _____

☐ **Receptive One Word Picture Vocabulary Test** assesses the child's single word receptive vocabulary. Date of Report _____

☐ **Goldman-Fristoe Test of Articulation -** assesses the production of consonants in simple and complex contexts. Date of Report _____

☐ **Peabody Picture Vocabulary Test-Revised -** individually administered, multiple choice test measuring nonverbal, receptive vocabulary.
   Date of Report _____

☐ **Fisher-Logemann Test of Articulation Competence -** assesses articulation proficiency with single sounds, consonant blends, and vowel production.
   Date of Report _____

☒ **Classroom Observation -** assesses present functioning of the student within the classroom environment.

**Free or Low Cost Legal Services**

Neighborhood Legal Services
701 4' Street, N.E.
Washington, D.C. 20001
202-682-2700 (NW)
202-682-2732 (NE)
Fax 202-682-0588

The Children's Law Center Inc. 1050
Connecticut Avenue, N.W. Suite 1200
Washington Square
Washington, D.C. 20036-5317
202-467-4900
Fax 202-467-4949

Neighborhood Legal
Services 1213 Good Hope
Road, S.E. Washington, D.C.
20020 202-678-2000
Fax 202-889-3374

University Legal Services
300 1 Street, N.E.
Washington, D.C. 20002
202-547-0198
Fax 202-547-2662

National Coalition for Students
with Disabilities
10560 Main Street, Suite 417
Fairfax, VA 22030
703-267-6588    (fax) 703-267-6992

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: 8/30/06

STUDENT: O█ O█ (DOB:█93)    SCHOOL: Kingsbury/C.A.R.E. Center    DATE: 11/8/06

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Claudia Pabo | Claudia Pabo | Mother |
| Cindy F. Brown, LICSW | Cindy F. Brown LICSW | Case Manager/Social Worker |
| Jermaine Perkins | Jermaine Perkins | School Psychologist |
| Delise Holloman, OTR/L | Delise Holloman OTR/L | Occupational Therapist |
| ~~Vesia Bango~~ Angel Hunter | Angel D. Hunter | Special Ed Tchr/IEP Developer |
| Paula Rosenstock | Paula Rosenstock | counsel for Oleg + Ms. Pabo |

*  Kingsbury staff invited by not present. Parent & counsel agreed to proceed w/
   meeting w/o Kingsbury staff.

---

The purpose of this meeting is to review the occupational therapy evaluation and determine whether the student is eligible for occupational therapy services.

Review of Occupational Therapy Evaluation

Student observed in classroom setting. Noted that student was inattentive at times but responded appropriately to questions from teacher. There were minimal distractions, but he responded appropriately to verbal cues.

Testing - TVMS-R - Raw score 130 (12 yrs, 6 mos), ss -103 - Student demonstrated 1 yr, 1 mo delay in the area of visual motor. He also displayed some deficits in the areas of closure, modification of design's, angles, and over/underpenetration of angles.

MVPT-III - Raw score 52, ss - 99 (13 yrs). Student displays 7 mo. delay in area of visual memory and figure ground.

Noted that student given a ball to sit on during activities of evaluation. He was able to complete puzzles w/ no assistance. He was also able to maintain fair posture while sitting on the ball. Student also able to throw a tennis ball, bounce and pass a basketball, and dribbling alternating hands as well as independently. His upper extremity functions are appropriate for his age. Eye movements were smooth and he was able to track objects. No problems w/ convergence noted.

Handwriting was also assessed. Noted problems w/ spacing, directionality and letter formation when writing letters. No problems w/ spacing and alignment when writing numbers. Scissor skills were average, but noted to be slow, meticulous and very smooth.

Self-care skills are appropriate (self-report). Parent agrees that he is able to complete these tasks, although his organization is poor.

Based on the results of this evaluation, occupational therapy services are

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES**

MDT REFERRAL DATE: 8/30/06

MDT

STUDENT: O___ O___ (DOB: ___93)      SCHOOL: Kingsbury/C.A.R.E. Center      DATE: 11/8/06

PARTICIPANTS: (Print Name)      PARTICIPANTS: (Sign Name)      POSITION

Page 2

recommended for 30 minutes per week to address fine motor, visual motor and visual perception deficits. Additional recommendation for classroom also provided.

Parent inquired about student's scanning abilities, as he has difficulties reaching. OT did not note problems w/ scanning visual information during testing. Parent asked if there is any specific test for this concern. School psychologist noted that student was given testing during psycho-educational evaluation that addressed this issues. There were deficits in this area. OT concurs that scanning is an issue and will be addressed. Change in the amount of services increased to 1 hr/wk (suggested two 30 minute sessions) to address areas of deficit.

Parent will request Kingsbury and possibly a consultant to review OT report and goals/objectives, as she wants input from them re: appropriateness of goals/objectives.

## SUPPLEMENTAL AIDES, SERVICES, ACCOMODATIONS, AND MODIFICATIONS CHECKLIST

Use for explanation as to removal of student from general education setting.

| STUDENT: C___ O___ (DOB:___/93) | | SCHOOL: OUR LADY OF VICTORY CB KINGSBURY | |
|---|---|---|---|
| III.     Check each accommodation applied | | III. Student needed accommodations in these classes: (check) | |
| II.       Indicate Setting | | ☑ Language Arts (reading, writing, spelling) | |
|  ☐ General Education Classroom | | ☑ Social Studies | |
|  ☐ Combination General Education and Resource Classroom | | ☑ Science | |
|  ☑ Out of General Education Classroom | | ☑ Health | |
|  | | ☑ Math | |
|  | | ☑ Physical Education | |
|  | | ☑ Music | |
|  | | ☑ Art | |
|  | | ☑ Other | |
| 1. | Directions read aloud | 19. | Carrels |
| 2. | Questions read aloud | 20. | Special seating/proximity to monitor |
| 3. | Simplified directions, as needed | 21. | Adaptive furniture |
| 4. | Signed | 22. | Noise buffers |
| 5. | Taped | 23. | Special lighting/acoustics |
| 6. | Assistance with interpretations of directions (written directions), as needed | 24. | Extended time |
| 7. | Braille | 25. | Breaks, as needed |
| 8. | Large print  materials, test booklets, etc... | 26. | Multiple test sessions or test sessions spread over several days |
| 9. | Fewer lines/items per page | 27. | Student specific schedule |
| 10. | Extra spacing between lines | 28. | Behavioral support |
| 11. | Important words highlighted | 29. | Word lists/dictionaries |
| 12. | Magnifying equipment | 30. | Number table or math fact sheets |
| 13. | Amplification equipment | 31. | Spell checker |
| 14. | Templates to reduce visual print field | 32. | Specific contracts |
| 15. | Tape recorder | 33. | Behavior modification reinforcement charts |
| 16. | Computer/word processor | 34. | Allowance of cooling off period, time out area in class |
| 17. | Large pen or specifically designed writing tool | 35. | Specific limits, clear consequences defined in advanced – consequences in effect immediately and consistently |
| 18. | Altered worksheets/materials and/or reduced workload | 36. | Redirection, cueing, and/or prompting to remain on task |
|  | | 37. | Small group or one-to-one, as needed |
|  | | 38. | Flexible scheduling |
| Comments | | | |
|  | | | |
|  | | | |
|  | | | |

631

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
**(IEP)**
MEETING NOTES

STUDENT  O██ O████ (DOB: ███/93)                    SCHOOL Kingsbury/C.A.R.E. Center   DATE: 11/8/06

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Claudia Pabo | Claudeä Pabo | Mother |
| Cindy F. Brown, LICSW | Cindy F. Brown, LICSW | Case Manager/Social Worker |
| Jermaine Perkins | ~Jermaine Perkins~ | School Psychologist |
| Delise Holloman, OTR/L | Delise J Holloman OTR/L | Occupational Therapist |
| ~Vecia Banfield~ Angel Hunter | Angel D Hunter | ~Special Ed. Tchr~/IEP Developer |
| Paula Rosenstock | Paula Rosenstock | Counsel for Parent |

\* ~Kingsbury staff invited but not present.~ Parent & counsel agreed to proceed w/
mtg w/o Kingsbury staff.

---

The purpose of this meeting is to develop an appropriate Individual Education Program (IEP) for the student.

The MDT has determined that:

- the student is eligible for special education services a s a student with a disability classification of
   *continues to be*
**Multiple Disability (OHI/LD)**

- the student requires the following services:         OT goals/objectives developed and agreed upon

| | | |
|---|---|---|
| X  specialized instruction | - _____ hours/week | |
| ___ speech therapy | - _____ hours/week | |
| X  psychological services | - 1.5 hours/week | w/ .5 hr/wk of psychological consultation |
| X  occupational therapy | - 1.0 hours/week | (2-30 min. sessions  recommended) |
| ___ physical therapy | - _____ hours/week | |
| ___ other - _____ | - _____ hours/week | |
| ___ other - _____ | - _____ hours/week | |

- a behavior plan is **still needed (no change)**

- the student requires level **IV** testing with accommodations/modifications as indicated on page 4 of 4 on the IEP

- the student requires supplementary aides/services as indicated on page 4 of 4 on the IEP

DISTRICT OF COLUMBIA PUBLIC SCHOOLS      07-02-2001      DIVISION OF SPECIAL EDUCATION      IEP MEETING NOTES

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)

STUDENT ___ O█ O█████ (DOB:████/93) SCHOOL _Kingsbury/C.A.R.E. Center_ PAGE _2_ OF _3_

Discussion of Setting and Placement:

General Education Setting – reason for acceptance or rejection:

*Discussed @ previous meeting*

Combination General Education/Resource Setting – reason for acceptance or rejection:

*Discussed at previous meeting*

Out of General Education Setting – reason for acceptance or rejection:

*Discussed at previous meeting – no change in setting*

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

**INDIVIDUALIZED EDUCATION PROGRAM**
**(IEP)**

STUDENT ___O__ O___ (DOB: __/93) SCHOOL _Kingsbury/C.A.R.E. Center_ PAGE _3_ OF _3_

---

Discussion of Setting/Placement (continued):

Proposed placement is: ___not discussed at this meeting.___
Reason for proposed placement:

No change in proposed placement as discussed at previous meeting.
Purpose of meeting was to revise IEP to address OT.

Parent still in disagreement w/ IEP as noted in meeting notes
8/30/06.

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**
**INDIVIDUALIZED EDUCATIONAL PROGRAM**

DCPS - IEP  Page 1 of 4

Additional Comments: ☐

## I. IDENTIFICATION INFORMATION

## II. CURRENT INFORMATION

Date of IEP Meeting: 11|8|06

Date of Last
IEP Meeting: 8/30/06

Date of Most Recent
Eligibility Decision: 11|8|06

Student Name: Last O████    First O███    MI

Student ID 9051483    Soc. Sec. No. ████████    Age: 13    Grade 7

Gender ☒ M ☐ F    Date of Birth ███93    Ethnic Group Caucasian

Address    ** 3512 Rodman Street, N.W.
House No.    Street Name    Quadrant    Apartment #
Washington, D.C. 20008
City    State    Zip Code

☐ Non-attending

Attending School Kingsbury    Home School Eaton ES

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Parent    **Claudia Pabo/Charles Oliver

Address (if different from student):    ☐ Parent ☐ Guardian ☐ Surrogate

House No.  Street Name    Quad  Apt. No.  City    State    Zip Code
Telephone: Home **202/966-4368    Work **202/418-1595

Purpose of IEP Conference:
☐ Initial IEP    ☒ Review of IEP
☒ Requested Eval. ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:
IV

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | ☒ | TRANSPORTATION |
| ESY | | TRANSITION |

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | N/A | English | Oral |
| Parent | English | English | English | Native Lang | Rdg./ Written |
| Home | English | N/A | N/A | English | Instrument: |
| | | | | | Date: |

## IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks./mos |
|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | 0.0 | 25.0 | 25.0 | Hour | Week | Gen Ed and/or Spec Ed Tchr | 11/9/06 | 10 mos |
| Psychological Services | 0.0 | 1.5 | 1.5 | Hour | Week | Social Worker/Psychologist | 11/9/06 | 10 mos |
| Psych. Services Consultation | 0.0 | 0.5 | 0.5 | Hour | Week | Social Worker/Psychologist | 11/9/06 | 10 mos |
| Occupational Therapy | 0.0 | 1.0 | 1.0 | Hour | Week | Occupational Therapist | 11/9/06 | 10 mos |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| TOTAL | 0.0 | 27.5 | 27.5 | Hours Per Week | | | | |

## V. Disability(ies)

Multiple Disability    (OHI/LD)

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☐ 0-20%  ☐ 21-60%  ☒ 61-100%

Percent of time NOT in a Regular Education Setting 100%

## VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Claudia Pabo - Mother    *Claudia Pabo*    Paula Rosenstock - Counsel for Parent    ███████

Cindy F. Brown, LICSW - Case Manager/SW    *Cindy F. Brown, LICSW*

Jermaine Perkins - School Psychologist    *Jermaine Perkins*

Delise Holloman, OTR/L    *Delise Ballomia OTR/L*

Venia ████ - Spec Ed Tchr/IEP Developer
*Angel Hunter*    *Angel D. Hunter*

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature    Date

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 1 of 4

635

| Student Name | O████ | Managing School | C.A.R.E. Center | DCPS - IEP |
| Student ID Number | 9051483 | DOB ███/93 Attending School | Kingsbury | Page 2 of 4 |

**VII. Present Educational Performance Levels in Areas Affected by the Disability**     Additional Comments: ☐

**Academic Areas: (Evaluator)** J. Butler (Indep Eval); J. Perkins (Reviewer)

Score(s) When Available

Math Strengths:

Low average math calculation and problem-solving skills

| Math Cal. | 96 | 6.7 |
| Math Rea. | 87 | 4.9 |

Impact of disability on educational performance in general education curriculum:

Weaknesses in reading comprehension, as well as deficits in attention, organization, and impulse control negatively impact academic performance.

See goal page:

Date: 5/30/06 (Indep Eva

Reading Strengths:

Overall low average to average word reading and writing skills

| Rdg. Com | 84 | 3.6 |
| Rdg. Basic | 99 | 6.3 |
| Written Ex. | 85 | 4.8 |

Impact of disability on educational performance in general education curriculum:

Weaknesses in reading comprehension, as well as deficits in attention, organization, and impulse control negatively impact academic performance.

See goal page:

Date: 5/30/06 (Indep Eval)

**Communication (Speech & Language) (Evaluator)**

Score(s) When Available

Strengths:

| Exp.Lang. | | |
| Rec- Lang. | | |
| Artic | | |
| Voice | | |
| Fluency | | |
| Exp. Voc. | | |
| Rec. Voc. | | |

Impact of disability on educational performance in general education curriculum:

See goal page:

Date:

**Motor/Health (Evaluator)** Delise Holloman, OTR/L

Score(s) /Results When Available

Strengths:

Adequate self-care skills, scissor skills, muscle strength, posture, and adaptive responses

| TVMS-R - 103 | |
| MVPT - 99 | |
| Handwriting - | below average |

Impact of disability on educational performance in general education curriculum:

Minor deficits in visual perception (7 month delay) and visual motor skills (1 year, 1 month delay), as well as handwriting difficulties negatively impact academic performance.

See goal page:

Date: 10/19/06

**Social Emotional Behavioral Areas: (Evaluator)** D. White-Jennings, Ph.D.

Score(s) When Available

Strengths:

Able to express needs, receptive to positive reinforcement, wants to acheive

N/A

Impact of disability on educational performance in general education curriculum:

Difficulties in social-emotional functioning, as well as deficits in attention, organization, and impulse control negatively impact academic performance.

See goal page:

Date: 7/10/06

**Cognitive/Adaptive Behavior: (Evaluator)** L. Solomon (Indep Eval); J. Perkins (Reviewer)

Score(s) When Available

Strengths:

Verbal, auditory processing, and auditory working memory abilities

| Verbal Ability - | 101 |
| Thinking Ability - | 91 |
| Cog Efficiency - | 85 |

Impact of disability on educational performance in general education curriculum:

Weaknesses in processing skills, organization, and attention negatively impact academic

See goal page:

Date: 8/16/06; 8/21/06

**Prevocational Skills: (Evaluator)**

Score(s) When Available

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:

Date:

636

| Student Name ___ C___ C_____ | Managing School ___ C.A.R.E. Center ___ | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483_ DOB __/93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ☐ |
|---|---|---|
| | Area addressed by goal: _____ Academics: Written Expression _____ | |

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in written expression skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** _____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will write letters, words, and numbers with correct formation, sizing, and spacing, 8 out of 10 attempts over a consistent period of time. | | Weekly |
| Given various word lists, including sight word lists, at his instructional level, the student will utilize strategies to correctly spell familiar one- and multi-syllable words from dictation with 80% mastery over a consistent period of time. | | Weekly |
| Given spelling words mastered in isolation, the student will correctly use these words in writing sentences of increasing length and complexity with 80% mastery over a consistent period of time. | | Weekly |
| Given at least five sentences, the student will correctly sequence sentences for writing, 8 out of 10 attempts over a consistent period of time. | | Weekly |
| Given a teacher- or student-identified writing prompt, the student will write sentences of increasing length and complexity using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given sets of simple sentences, the student will combine simple sentences to make compound sentences, 8 out of 10 attempts over a consistent period of time. | | Weekly |

| **EVALUATION PROCEDURE(S)** |
|---|
| X Portfolio ☐ Log ☐ Chart X Test X Documented Observation ☐ Report ☐ Other _____ |

| Student Name _____O___O_____ | Managing School ____C.A.R.E. Center____ | DCPS – IEP |
| Student ID Number __9051483___ DOB ___93__ | Attending School _Our Lady of Victory_ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**   Additional Comments:                     Goal Number: ☐

Area addressed by goal: _____Academics: Written Expression_____

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in written expression skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** _____General Education and/or Special Education Teacher_____

**Consider audience, behavior, condition, degree and evaluation.**

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a teacher- or student-identified writing prompt, the student will elaborate on sentences by adding adverbs, adjectives, and phrases, as well as using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given various types of sentences, the student will distinguish between and write sentences (i.e., declarative, interrogative, etc...) using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given a teacher- or student-identified writing prompt, the student will use various strategies (i.e., mapping, webbing, outlining, etc...) to organize information and ideas before writing – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| After identifying a topic, the student will write a simple paragraph using correct format, sequencing, as well as capitalization, punctuation, spelling, grammar, and syntax and grammar 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given a teacher- or student-identified writing prompt, the student use organizational strategies and write a paragraph using the correct format (i.e., topic sentence, supporting details, and concluding sentence), as well as correct capitalization, punctuation, spelling, syntax, and grammar, 80% mastery over a consistent period of time. | | Monthly |
| Using a list of writing goals/guidelines, the student will proofread written drafts to correct for punctuation, capitalization, spelling, syntax, and grammar – 8 out of 10 opportunities over a consistent period of time. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
| X Portfolio ☐ Log ☐ Chart X Test X Documented Observation ☐ Report ☐ Other _____ |

District of Columbia Public Schools    07-02-2001    Division of Special Education  Appendix – A    IEP Page 3 of 4

638

| Student Name ___O__ O___ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
| Student ID Number ___9051483___  DOB ___93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: [    ]

Area addressed by goal: ____Academics: Written Expression____

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in writing skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): ____General Education and/or Special Education Teacher____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Using a list of writing goals/guidelines, the student will edit written assignments to improve the quality of drafts by identifying needed changes in word choices, sentence structures, as well as identifying errors in punctuation, capitalization, spelling, syntax, and grammar errors – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| Using a list of writing goals/guidelines, the student will revise written assignments to improve the quality of drafts by changing and/or word choices, modifying/correcting sentence structures, as well as correcting for punctuation, capitalization, spelling, syntax, and grammar errors – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| | | |
| | | |
| | | |
| | | |

| **EVALUATION PROCEDURE(S)** |
| X Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____ |

District of Columbia Public Schools      07-02-2001      Division of Special Education  Appendix – A      IEP Page 3 of 4

639

| Student Name __O___ O_____ | Managing School __C.A.R.E. Center__ | DCPS – IEP |
|---|---|---|
| Student ID Number __9051483__ DOB __93__ | Attending School __Our Lady of Victory__ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**     Additional Comments:                                          Goal Number: [ ]

Area addressed by goal: _____Academics: Reading_____

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate growth in reading skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** ____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate adequate reading fluency, as evidenced by his ability to self-correct errors while reading passage material, respond appropriately to punctuation marks, and determining familiar/unfamiliar words w/speed, 80% of the time over a consistent period of time. | | Weekly |
| The student will use various strategies (i.e., sound segmentation, phonics skills, linguistic patterns, structural analysis, context clues) to correctly determine the pronunciation and meaning of familiar and unfamiliar words in isolation and in text, 80% of the time over a consistent period of time. | | Monthly |
| The student will use various strategies (i.e., rereading, paraphrasing, self-questioning, highlighting, outlining, mapping, illustrating) without teacher prompting to enhance comprehension of material 80% of the time over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will orally and in writing answer who, what, when, where, and why questions with 80% mastery over a consistent period of time. | | Weekly |
| After reading passage material at the instructional level, the student will answer questions (orally and in writing) regarding the sequence of events and specific details/facts with 80% mastery over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will identify, give the meaning, and discuss literary devices/forms (i.e., metaphors, analogy, exaggeration, personification, etc...) that are used in text in order to enhance comprehension, 80% mastery over a consistent period of time. | | Weekly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools      07-02-2001      Division of Special Education  Appendix – A      IEP Page 3 of 4

640

| Student Name ___O__ O___ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483_ DOB ___93_ | Attending School Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: [   ]

Area addressed by goal: ____Academics: Reading_____

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate growth in reading skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):**____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| After reading passage material at the instructional level, the student will accurately summarize (orally and in writing) events from the passage material 80% of the time over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will, orally and in writing, accurately answer questions in a complete sentence that require him to identify the main idea, compare characters, predict events, and draw conclusions with 80% mastery over a consistent period of time. | | Weekly |
| After reading passage material at the instructional level, the student will, orally and in writing, accurately answer questions in a complete sentence that require him to infer information based on information referenced in the text with 80% mastery over a consistent period of time. | | Weekly |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio ☐ Log ☐ Chart X Test X Documented Observation ☐ Report ☐ Other _____

| Student Name ___ O__ O___ | Managing School ___ C.A.R.E. Center ___ | DCPS – IEP |
|---|---|---|
| Student ID Number __9051483___ DOB ___93__ | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ☐ |
|---|---|---|
| | Area addressed by goal: ____ Academics: Mathematics _____ | |

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in mathematical skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** _____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| At his instructional level, the student will compare and order very large numbers in standard, expanded, and exponential forms with 80% mastery over a consistent period of time. | | Monthly |
| Using manipulative materials and/or symbols, the student will demonstrate understanding of place value up to hundred thousandths by interpreting the model of a number, modeling a number, matching the model of a number with the written symbol, and illustrating a number with the model – all with 80% mastery over a consistent period of time. | | Monthly |
| The student will recall and math facts (i.e., addition, multiplication, etc...), as well as effective strategies for determining these math facts with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will correctly complete computation problems involving multi-digit calculations (i.e., additional, subtraction, multiplication and division) with 80% mastery over a consistent period of time. | | Monthly |
| Given at least ten real world math problems involving multiple steps at his instructional level, the student will demonstrate understanding of comparative and quantitative terms, by identifying number relations and then, identifying the correct sequence of operations to correctly solve these problems - 80% mastery over a consistent period of time. | | Monthly |
| Given math calculation and word problems involving multiple steps at his instructional level, the student will identify the correct sequence of operations and then apply appropriate strategies to correctly solve these problems - 80% mastery over a consistent period of time. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
|---|
| X Portfolio ☐ Log ☐ Chart  X Test  X Documented Observation ☐ Report ☐ Other _____ |

| Student Name ___O__ O____ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
| Student ID Number __9051483_____ DOB ____93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: [    ] |

Area addressed by goal: _____Academics: Mathematics_____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in mathematical skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| At his instructional level and using manipulative materials and/or symbols, the student will demonstrate understanding of the following fraction concepts: name fractional parts, sequencing fractions, finding equivalent fractions, renaming improper fractions and mixed numbers, reducing fractions – all with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will complete computation problems involving addition and subtraction of mixed numbers with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will complete computation problems involving multiplication and division of mixed numbers with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will apply appropriate strategies to correctly solve problems involving time with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will apply appropriate strategies to correctly solve problems involving the conversion, addition, and subtraction of units of measurement (within the same measurement system) for length, volume, capacity, and weight with 80% mastery over a consistent period of time. | | Monthly |
| Using manipulative materials and/or symbols, the student will count dollar/coin combination amounts and correctly make change for any dollar/coin combination amount with 80% mastery over a consistent period of time. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
| X Portfolio ☐ Log ☐ Chart  X Test  X Documented Observation ☐ Report ☐ Other _____ |

District of Columbia Public Schools    07-02-2001    Division of Special Education  Appendix – A    IEP Page 3 of 4

643

| Student Name ___O__O___ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
|---|---|---|
| Student ID Number __9051483_____ DOB ____93__ | Attending School _Our Lady of Victory_ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**

Additional Comments:

Goal Number: [  ]

Area addressed by goal: _____Cognitive_____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in the area of cognition, especially as it relates to attention and organization, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s):_____General  Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given previously presented strategies for improving attentional skills, the student will use these strategies for improving attention skills with minimal prompting or cueing 80% of the time. | | Weekly |
| Given previously presented strategies for improving organizational skills (i.e., checklists, planner, outlines, etc...), the student will use these strategies for improving organization skills needed to successfully complete academic activities with minimal prompting or cueing 80% of the time. | | Weekly |
| The student will start and complete tasks as assigned by teacher/adult with minimal redirection and/or prompting from teacher/adult, 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will sustain attention during a variety of activities (i.e., presentation, lesson, discussion, classwork, group activity, etc...) with minimal redirection and/or prompting from teacher/adult, 8 out of 10 situations over a consistent period of time. | | Weekly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

[ ] Portfolio   X Log   [ ] Chart   [ ] Test   X Documented Observation   [ ] Report   [ ] Other _____

| Student Name  O___O___ | Managing School  C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number  9051483    DOB ___93 | Attending School  Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**     Additional Comments:     Goal Number: ☐

Area addressed by goal: _____ Social - Emotional _____

ANNUAL GOAL: (including mastery criteria.)

> The student will demonstrate growth in social-emotional functioning in the area of coping skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ Social Worker/Psychologist/Therapist and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will appropriately verbalize and discuss his emotions, both positive and negative, with minimal prompting from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will **identify** various adaptive coping strategies (i.e., self time-out, counting, participating in calming activity, deep breathing, etc...) to effectively manage negative emotions (i.e., anger, frustration, anxiety, etc...) with minimal assistance from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will **identify and utilize** various adaptive coping strategies (i.e., self time-out, counting, participating in calming activity, deep breathing, etc...) to effectively manage negative emotions (i.e., anger, frustration, anxiety, etc...) with minimal assistance from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will identify and demonstrate appropriate behavioral responses to a variety of situations, both positive and negative, with minimal assistance or prompting from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| Given a variety of problem situations, the student will identify the problems, select adaptive coping strategies by which to solve it, and implement the appropriate strategy for resolution with minimal assistance from adult/therapist/teacher, 8 out of 10 situations over a consistent period of time. | | Monthly |
| The student will accept redirection and/or consequences for inappropriate behavior with decreasing need for emotional and/or behavioral support therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  X Log  X Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name _____ O___ O___ | Managing School ___ C.A.R.E. Center ___ | DCPS – IEP |
| Student ID Number _9051483_    DOB ___93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| VII. SPECIALIZED SERVICES | Additional Comments: | Goal Number: [ ] |

Area addressed by goal: _____ Social - Emotional _____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in social-emotional functioning, especially as it relates to interpersonal skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ Social Worker/Psychologist/Therapist and/or Special Education Teacher _____
Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
| --- | --- | --- |
| The student will develop a therapeutic relationship with his therapist, as evidenced by his willingness to disclose personal thoughts to therapist with minimal prompting and/or emotional support in 8 out of 10 sessions over a consistent period of time. | | Weekly |
| The student will appropriately verbalize thoughts, emotions, and/or needs to peers and adults (i.e., /teachers, school staff, therapist) with minimal behavior and/or emotional support from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| Given a variety of structured and unstructured social situations, the student will engage in positive, non-provocative, and non-aggressive interactions with peers and adults with minimal prompting and/or redirection from teachers/adults – 8 out of 10 opportunities over a consistent period of time. | | Weekly |
| Given a variety of social situations, the student will demonstrate the ability to take another's perspectives by identifying/stating the other's perspective in such situations - 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will comply with requests or directives from adults/teachers/therapist with minimal prompting, cueing and/or redirection from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will appropriately ask for assistance, when necessary or as appropriate, with regard to academic activities or social situations with minimal need for intervention from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |

| **EVALUATION PROCEDURE(S)** |
| [ ] Portfolio  X Log  X Chart  [ ] Test  X Documented Observation  [ ] Report  [ ] Other _____ |

| Student Name          O___ O_____ | Managing School    C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number  9051483        DOB   ___93 | Attending School  Our Lady of Victory | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: [  ] |
|---|---|---|

Area addressed by goal: _____ Social-Emotional _____

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate growth in social-emotional functioning, especially as it relates to interpersonal skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ Social Worker/Psychologist/ Therapist and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate improved self-advocacy skills, as evidenced by his ability to act in a manner that allows him to seek assistance or solve problems on his own during interactions with peers and adults - 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will demonstrate socially appropriate conversational skills, including appropriate responses to nonverbal cues, with minimal prompting and/or redirection from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will accept redirection from teacher/adult/therapist with minimal need for behavioral support from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will accept consequences for negative or inappropriate behavior with minimal need for emotional and/or behavioral support or intervention from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

[ ] Portfolio   X Log   [ ] Chart   [ ] Test   X Documented Observation   [ ] Report   [ ] Other _____

| District of Columbia Public Schools | 07-02-2001 | Division of Special Education  Appendix – A | IEP Page 3 of 4 |
|---|---|---|---|

647

| Student Name ___ O█████O█████ | Managing School ___ C.A.R.E. Center | DCPS – IEP |
| Student ID Number _9051483___ DOB __██93__ | Attending School _Our Lady of Victory__ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: [  ] |

Area addressed by goal: _____ Social-Emotional _____

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate increased self-regulation, impulse-control, and frustration tolerance, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** _____ Social Worker/Psychologist/ Therapist and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
| --- | --- | --- |
| The student will complete classroom activities/assignments with no more than two prompts from therapist/teacher/adult during the activity/assignment in 8 out of 10 events. | | Weekly |
| The student will utilize organizational skills necessary for successfully completing work assignments within specified period of time with minimal reminders and/or prompting from therapist/teacher/adult during the activity/assignment in 8 out of 10 events. | | Weekly |
| Given a novel or challenging task that the student perceives as challenging, the student will approach the task with a positive attitude and persist through the task with minimal behavioral support (i.e., redirection, cueing, prompting) from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will self-initiate the completion of assignments with no more than two prompts by therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will demonstrate improved self-regulation of behavior and emotional responses, as evidenced by his ability to use adaptive strategies to remain on task, remain calm or calm herself, demonstrate appropriate boundaries, and make appropriate comments to others with minimal need for emotional and/or behavior support from therapist/teacher/adult, 80% of the time over a consistent period of time. | | Weekly |
| | | |

| **EVALUATION PROCEDURE(S)** |
| [ ] Portfolio  X Log  [ ] Chart  [ ] Test  X Documented Observation  [ ] Report  [ ] Other _____ |

| | | | | |
|---|---|---|---|---|
| Student Name ___O___O___ | | | Managing School ___C.A.R.E. Center___ | **DCPS – IEP** |
| Student ID Number _9051483_ | DOB ___93_ | | Attending School _Our Lady of Victory_ | Page 3 of 4 |

---

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ☐ |
|---|---|---|
| | Area addressed by goal: ___Social-Emotional___ | |

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in area of self-concept, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** ___Social Worker/Psychologist/ Therapist and/or Special Education Teacher___

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate improved self-concept, as evidenced by his ability to appropriately verbalize personal and academic strengths in discussions with peers and adults, 8 out of 10 situations over a consistent period of time. | | Monthly |
| The student will demonstrate increase self-confidence, as evidenced by his ability to take risks in academic and social situations with a decreasing need for behavioral and/or emotional support from therapist/teacher/adult, 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| With the assistance from therapist/teacher/adult, the student will identify negative/problematic behavior and with assistance, develop a plan for changing behavior with rewards, consequences, and monitoring. | | Weekly |
| With the assistance from therapist/teacher/adult, the student will monitor his progress toward identified goal(s) for academic and/or personal achievement. | | Monthly |
| | | |
| | | |

---

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio  X Log  ☐ Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____ |

| Student Name ____ O__ O____ | Managing School ___ C.A.R.E. Center ____ | DCPS – IEP |
| Student ID Number _9051483_____ DOB ____93____ | Attending School Our Lady of Victory ____ | Page 3 of 4 |

| VII. SPECIALIZED SERVICES | Additional Comments: | Goal Number: [ ] |

Area addressed by goal: _____ Motor/Health _____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in the area of motor skills, especially as it relates to visual perception, visual motor skills, and scanning, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): ____ Occupational Therapist _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| O__ will complete a 100 piece puzzle with picture within 2 sessions while seated on a therapy ball.  Criteria: 80% accuracy | | Weekly |
| O__ will complete a maze, word search, and connect the dot puzzle while seated on a therapy ball.  Criteria: 95% accuracy | | Weekly |
| Given instruction in correct directionality, alignment, and spacing of letters O__ will write uppercase and lower case letters with correct directionality, alignment, and good spacing while seated on a therapy ball  Criteria: 95% accuracy | | Weekly |
| O__ will attend to a table top activity for 20 minutes while sitting on a therapy ball.  Criteria:  3 out of 4 sessions | | Weekly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

[ ] Portfolio  X Log  [ ] Chart  [ ] Test  X Documented Observation  [ ] Report  [ ] Other _____

| Student Name O▊ O▊ | | Managing School C.A.R.E. Center | DCPS - IEP |
|---|---|---|---|
| Student ID Number 9051483 | DOB ▊▊/93 | Attending School Kingsbury | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education? ☐ Yes ☑ No

Explanation for removal out of regular education classroom.

The student requires a therapeutic setting with low student-teacher ratio. Student also requires accommodations/modifications that cannot be implemented in general education.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SETTING SpEd | Total | FREQUENCY Hr./ Min | FREQUENCY D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| Large print materials, test booklets | 0.0 | 27.5 | 27.5 | Hour | Week | General Ed and/or Special Ed Tecahers | 11|9|06 |
| Books on tape | 0.0 | 10.0 | 10.0 | Hour | Week | General Ed and/or Special Ed Tecahers | 11|9|06 |
| Tape recorder | 0.0 | 27.5 | 27.5 | Hour | Week | General Ed and/or Special Ed Tecahers | 11|9|06 |
| OT-Therapy ball for attending/activity | 0.0 | 27.5 | 27.5 | Hour | Week | General Ed and/or Special Ed Teachers | 11|9|06 |
| OT-Inflated bumpy seat cushion | 0.0 | 27.5 | 27.5 | Hour | Week | General Ed and/or Special Ed Teachers | 11|9|06 |

Check and list modifications or accommodations for **testing**: ☐ None needed

Timing/Scheduling: extra response time; breaks; flexible scheduling; tests sessions over several days

Setting: small group or 1-to-1, as needed; behavioral support

Presentation: repeated, simplified directions; checks for understanding; test read to student; large print test

Response: written responses transcribed verbatim by administrator; student marks answers in test booklet

Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I    Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III    (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V    Portfolio

☐ Level II    (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☑ Level IV    (Describe the alternative assessment)
test read to student

## XII. Areas Requiring Specialized Instruction and Related Services:

☑ Reading
☑ Mathematics
☑ Written Expression
☑ Other: Cognitive, OT
☐ None

☐ Physical/Sensory
☑ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☐ Speech/Language

**Modifications:**
☐ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| General Education Setting | Reject | |
| Combination General Education/Resource Setting | Reject | |
| Out of General Education Setting | Accept | Negative impact on self-esteem |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

psychological services; small group or 1-to-1 as needed; behavioral support; extra response time; breaks; flexible scheduling; test sessions over several days; repeated, simplified directions; checks for understanding; calculator; templates to reduce visual field; highlighters; word processor; test read to student; large print materials; modified assignments/reduced workload;

| Location for Services | Prospect LC | Tape recorder, magnifying equipment |
|---|---|---|

| Student Name | O███ O███ | Managing School | C.A.R.E. Center | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number 9051483 | | DOB ██/93 | Attending School Kingsbury | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in <u>regular education</u>? ☐ Yes ☑ No

Explanation for removal out of regular education classroom.

The student requires a therapeutic setting with low student-teacher ratio. Student also requires accommodations/modifications that cannot be implemented in general education.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SpEd | Total | FREQUENCY Hr./Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| Word processor | 0.0 | 10.0 | 10.0 | Hour | Week | General Ed and/or Special Ed Teachers | |
| Highlighters | 0.0 | 27.5 | 27.5 | Hour | Week | General Ed and/or Special Ed Teachers | |
| Templates to reduce visual field | 0.0 | 27.5 | 27.5 | Hour | Week | General Ed and/or Special Ed Teachers | |
| Calculator | 0.0 | 10.0 | 10.0 | Hour | Week | General Ed and/or Special Ed Teachers | |
| Magnifying equipment | 0.0 | 27.5 | 27.5 | Hour | Week | General Ed and/or Special Ed Teachers | |

Check and list modifications and/or accommodations for <u>testing</u>:   ☐ None needed

Timing/Scheduling: extra response time; breaks; flexible scheduling; tests sessions over several days

Setting: small group or 1-to-1, as needed; behavioral support

Presentation: repeated, simplified directions; checks for understanding; test read to student; large print test

Response: written responses transcribed verbatim by administrator; student marks answers in test booklet

Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I   Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III (Describe non-uniform conditions for level III)
Tested under non-standard conditions with permissible accommodations

☐ Level V  Portfolio:

☐ Level II   (Describe accommodations for level II)
Tested under standard conditions with special accommodations.

☑ Level IV  (Describe the alternative assessment)

test read to student

## XII. Areas Requiring Specialized Instruction and Related Services:

☑ Reading
☑ Mathematics
☑ Written Expression
☑ Other:  Cognitive, OT
☐ None

☐ Physical/Sensory
☑ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☐ Speech/Language

**Modifications:**
☐ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| General Education Setting | Reject | |
| Combination General Education/Resource Setting | Reject | |
| Out of General Education Setting | Accept | Negative impact on self-esteem |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

psychological services; small group or 1-to-1 as needed; behavioral support; extra response time; breaks; flexible scheduling; test sessions over several days; repeated, simplified directions; calculator; templates to reduce visual field; highlighters; word processor; test read to student; large print materials; modified assignments/reduced workload; *Tape recorder, magnifying equipment*

| Location for Services | Prospect LC |
|---|---|

District of Columbia Public Schools       07-02-2001       Division of Special Education       Appendix - A       IEP Page 4 of 4

## District of Columbia Public Schools
### Washington, D.C.

I.E.P. Attachment A
Intervention Behavior Plan

### INTERVENTION BEHAVIOR PLAN    Date Developed: __8/30/06__

Student Name __O___ __O___    ID# __9051483__    DOB: __93    Grade 7th

Address __3512__    __Rodman Street__    __N.W.__ ____    __Washington__    __D.C.__    __20007__
        Street #        Street Name        Quadrant  Apartment #        City        State    Zip Code

Telephone (H) __202/966-4368__    (W) __202/418-1595__    Counselor _____

Attending School __Our Lady of Victory__    Teacher _____    Room _____    Section _____

TARGETED BEHAVIOR(S):    Additional Comments: ☐

Refusal to complete schoolwork; Non-compliance with rules/routines or adult requests; withdrawal from situations when challenged; verbal aggression or inappropriate commenting toward peers and/or adults

POSITITVE INTERVENTION STRATEGIES: Student Objective –

Student will (1) appropriately verbalize needs, feelings, thoughts; (2) follow class rules/routine with minimal prompting; (3) appropriately ask for assistance from teacher when needed; (4) complete schoolwork with minimal prompting; (5) appropriately participate in class activities; and (6) interact with peers and adults in a friendly, non-provocative, non-aggressive manner.

Implementation description –

Participation in behavior modification plan targeting specific behaviors and specified goals, rewards, and/or consequences. Development of behavioral contract with student identifying rewards for expected behavior

POSITIVE INTERVENTION STRATEGIES: Teacher Strategies

Proximity; verbal prompting/cueing; redirection; immediate recognition when desired behavior is demonstrated; immediate redirection for inappropriate behavior; praise, rewards, and incentives; modeling; special privileges, responsibilities

MONITORING SYSTEM: Responsible Teacher - __General and/or Special Education Teacher__

Describe System –

Charting of behavior, observation, treatment notes, anecdotal notes; Daily and/or weekly communication with parent regarding student's behavior and progress

Data Collection timeline –

Daily

FOLLOW-UP MEETING: Date - _____

DISTRICT OF COLUMBIA PUBLIC SCHOOLS   07-02-2001  DIVISION OF SPECIAL EDUCATION    IEP ATTACHMENT A    INTERVENTION BEHAVIOR PLAN

653

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

TRANSPORTATION DIVISION

**STUDENT TRANSPORTATION
DATA FORM**

2006-2007
School Year

9051483
STUDENT IDENTIFICATION NUMBER

(MDT must first determine if student meets the requirements for transportation services and has it included in the IEP.)

Person Making Request: Cindy F. Brown, LICSW

Date of Request: 11/8/06

Status of Request:

Date Request Received:

Person Receiving Request:

---

Claudia Pabo

Parent / Guardian (Print legibly or type)

202/966-4368

Telephone (H)

202/418-1595

Telephone (W)

Emergency Contact

Relationship

Telephone No.

Pager / Cell No.

Students will be taken to a central location until 6:00 p.m. if the bus attendants are unable to deliver them to the designated location. After 6:00 p.m. the police will be contacted. This year's central location is _____

---

Student:    Last Name          First Name          MI

3512    Rodman Street

House No.    Street Name          Quad.    Apt.

Washington, D.C. 20008

City          State    Zip Code

93    M    English    C.A.R.E. Center - 202/671-882

DOB    Gender    Primary Language    Submitting School and Telephone Number

MD - (OHI/LD)          None

Disability Classification          Medical Issues

**MODE OF TRANSPORTATION** [X] *Bus [ ] Tokens [ ] Farecards

* SPECIAL ACCOMMODATIONS FOR BUS

Height _____    Weight _____

Oxygen    Tracheotomy tube    Seizures    Helmet

Harness    1:1 Aide    Behavioral issues _____

Medication    Specific allergies Latex

Dosage required during transportation :

[ ] Yes [ ] No    Dosage _____    [ ] PM [ ] AM

[ ] Mobility    [ ] Ambulatory ( [ ] Cane, [ ] Crutch, [ ] Walker)

[ ] Ambulatory w/ assistance ( [ ] Cane, [ ] Crutch, [ ] Walker)

[ ] Non Ambulatory ( [ ] Standard, [ ] Motorized, [ ] Oversized

w/ lap tray    [ ] Yes [ ] No)

[ ] Car Seat          [ ] Positioning Device _____

[ ] Special Restraint          [ ] Other, Describe: _____

---

Click one of the following:

[✓]  AM Pick-up & PM Drop-off is the same as the student address.

[ ]  _____

AM Pick-up Address          Telephone No.

[ ]  _____

PM Drop-off Address          Telephone No.

---

**Transportation will NOT be provided without confirmed placement through the proper procedures. Justification for other than neighborhood settings must be explained on the back by the school official requesting the transportation services.**

Cindy F. Brown, LICSW          202/671-0882          11/8/06

School Official requesting transportation service:    Telephone No.          Date

School to Attend:          Address of School          Telephone No.

**Questions may be directed to the Special Education Transportation Liaison.**

District of Columbia Public Schools    07-02-2001    Division of Special Education    IEP Attachment B    Transportation

**EVALUATION TO JUSTIFY TRANSPORTATION**

Student  O___ O_____     ID# 9051483 _____     DOB ____/93 _____

Attending School  Kingsbury _____     Neighborhood School  Eaton ES _____

Attach a copy to the Transportation Data Form and maintain as a part of the IEP

Justification for Transportation as a related service as stipulated in 300.24 (15). (Check all that apply):

1. ☐ Medical reports document a severe health condition that prevents the student from walking to school. Specify _____

2. ☐ Medical reports document a physical disability that prevents the students from walking to or getting to school independently. Specify _____

3. ☐ A documented severe cognitive disability prevents the students from walking or getting to school independently. Specify _____

4. ☐ A visual and/or hearing disability interferes with the student's ability to arrive at school independently. Documentation source _____

5. ☐ A severe communication disability prevents the student from communicating for his/her own safety Documentation source _____

6. ☐ A behavior /emotional disability is so severe or erratic that there is concern for the safety of the student and/or others. Documentation source _____

7. ☐ The student is eligible for the preschool special education program and could not participate without special transportation.

8. ☒ The student is/will attend a distant school because the IEP cannot be implemented at the zoned school.

9. ☐ The student is medically fragile. Documentation source _____

10. ☐ The student requires assistance to get on and off the bus. Documentation source _____

11. ☐ The student is unable to function independently due to the severity of the disability. Documentation source _____

12. ☐ The student requires a non-routine transportation schedule (i.e. contract services, abbreviated school day). Explain _____

13. ☐ Medical reports document that the student has a physical disability and/or severe health condition that prevents him or her from walking to school. Documentation source_____

14. ☐ A documented severe cognitive disability prevents the student from walking to school. Documentation source _____

15. ☐ Other (Specify)

_____

## DOCUMENTED LEVEL OF SERVICE (PERM)
Complete and attach to MDT/IEP meeting notes

| School | Kingsbury/C.A.R.E. Center | Principal | | Special Education Coordinator | |
|---|---|---|---|---|---|
| Date | 11/8/06   Case Manager   Cindy F. Brown, LICSW | | Technical Support Supervisor | | |
| Student | Q█ O█ | DOB █93 | Age 13 | Grade 7   ID# 9051483 | SSN# ███ |
| Parent | Claudia Pabo | Telephone (H) 202/966-4368 | | (W) 2-2/418-1595 | |

Address:  3512 Rodman Street, N.W., Washington, D.C. 20008
Street #   Street                                             Quad   Apt. No.   City                          State   Zip Code

REFERRAL SOURCE: (Check)   ☐ 120 Day   ☐ Reeval.   ☐ HOD   ☐ SA   ☐ MA

☐ Nonpublic   ☐ Residential   ☐ Citywide   ☐ Courts   ☐ Local School   ☒ Other: C.A.R.E. Center

Previous least restrictive environment (LRE Setting):   Out of General Education

---

## JUSTIFICATION FOR SETTING CONSIDERATION
(Submit TAT/MDT Documentation)
SUPPORTIVE DATA/DOCUMENTATION

| 2. ACCOMMODATIONS/ MODIFICATIONS | 3. DATA REQUIREMENTS | | |
|---|---|---|---|
| Homework tracking system | Current IEP | Yes ☒ | No ☐ |
| Modifying methods, materials, presentations | Signatures of required participants (MDT notes) | Yes ☒ | |
| Change in grouping | Intervention Behavior Plan | Yes ☒ | |
| Change in text, materials | Copies of current class work and homework assignments: | Yes ☐ | |
| Positive reinforcement | Medical Reports: | Yes ☐ | No ☐ |
| 1-to-1 assistance and small group | Clinical Reports: | Yes ☒ | No ☐ |
| Individual time to complete assignments | Psychiatric Reports: | Yes ☐ | No ☐ |
| | Medications: | Yes ☐ | No ☐ |
| | Attendance Record | Yes ☐ | |
| | Copies of most recent evaluation(s) | Yes ☒ | |

| 4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.) | 5. Resources needed for program implementation |
|---|---|
| SEP/Referral Meeting - 4/26/06<br>MDT/IEP Meeitng - 8/10/06<br>MDT/IEP Meeting - 8/30/06<br>MDT/IEP Meeitng - 11/8/06 | Highlighters<br>Calculator<br>Large print materials, test booklets<br>Templates to reduce visual field<br>Magnifying equipment<br>Tape recorder<br>OT - therapy ball for attention/activity<br>OT - Inflated bumpy seat cushion |

---

## 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | ☐ in general education classroom setting | ☐ general educators with consultation from special education staff | ☐ between 0% and 20% of service time |
| 2 | ☐ combination general education and resource classroom | ☐ combination of general educators, special educators and related service providers | ☐ between 21 % and 60% of service time |
| 3 | ☒ *out of general education classroom | ☒ special educators and related service providers | ☒ between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children m those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings)

Check the level of need as indicated:
DIRECTIONS:

| If two or three boxes are checked in the Row l, check LOW.<br>If two or three boxes are checked in the Row 2, check MODERATE.<br>If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row,<br>check either MODERATE or HIGH,<br>depending on the need of the student. |
|---|---|

| 7. LEVEL OF NEED | | |
|---|---|---|
| ☐ LOW | ☐ MODERATE | ☒ HIGH |

07-02-2001                                   Attention: Technical Support Supervisor / PERM Compliance Team

656

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED SERVICE PLAN
(ISP)

STUDENT ~~O~~ O~~ ~~           SCHOOL  Kingsbury           DATE 11/8/06

| NAME (PRINT) | SIGNATURE | TITLE/DISCIPLINE |
|---|---|---|
| Cindy F. Brown, LICSW | Cindy F. Brown, LICSW | Case Manager/Social Worker |
| Paula Rosenstock | Paula Ross | counsel for Oleg |
| Claudia Pabo → | Claudia Pabo | Oleg's mother |
| Angel DeHunter | Angel DeHunter | SpEd/IEP Develop |
| Jermaine Perkins | Jermaine Perkins | school Psychologist |
| DENISE E. HOLLOMAN | Denise Holloman OTR/L | Occupational Therapist |

The purpose of this meeting is to develop an Individual Service Plan (ISP) for the student. Per the Services Agreement for Private-Religious Schools, the student is entitled to twice yearly occupational therapy consultation. See attached plan. Services will likely be provided at the nearest DCPS school to the student's attending school. Other service location options will be determined between the parent and OT Department -- DCPS.

Parent is not accepting or rejecting ISP plan. Parent will review and make a decision later. DCPS is requesting a written response re: ISP services.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    09-22-04    OFFICE OF SPECIAL EDUCATION    ISP MEETING NOTES

*Offered to parent 11/8/06 - Response from parent pending*



District of Columbia Public Schools
Office of Special Education

## INDIVIDUALIZED SERVICE(S) PLAN FOR
## PARENTALLY PLACED PRIVATE/RELIGIOUS SCHOOL STUDENTS

Student Name: ___O___O___    DOB: ___/93    School: __Kingsbury__

The district and the parent/guardian of the student agree that the district has offered the student a Free Appropriate Public Education (F.A.P.E.) pursuant to the IEP date __11/7/06__ (see attached). Parents have declined this IEP and instead have placed the student in the __Kingsbury__ private/religious school at their own expense. The parents agree that the district has no responsibility for the costs of the private/religious school placement.

Pursuant to 20 USC 1412(a)(10) (IDEA 98), the Local Education Agency (LEA) will provide special education service(s) per the agreement as outlined below for the student while enrolled in private-religious school.

| Special Education Service | Frequency of Service | Duration | Location | Start Date | End Date |
|---|---|---|---|---|---|
| Occupational Therapy Consultation | 2X | Yearly | TBD | | |
| | | | | | |
| | | | | | |

Area of need: ____Motor (Occupational Therapy)____

Present Level: __TVMS-R – 103; MVPT – 99; Handwriting – below average__

Annual Goal: ____see goal page____

Benchmarks: ____see goal page____

Personnel Responsible: ____Occupational Therapist____

*The parent(s) understand in accordance with IDEA 97, their rights to due process do not apply in the Private-Religious Setting*

Parent Signature: _____    Date: _____

IEP Chair Signature: _____    Date: _____

Student's Case Manager: _____    Date: _____

Other: _____    Date: _____

Next Annual Review Date: _____    Next Triennial Review Date: _____

Please check one Service Delivery Plan:

- o    Two School based consultations per year
- o    Services provided at the Private-Religious School
- o    Services provided at the neighborhood school
- o    Services provided at the nearest school to the private-religious school

District of Columbia Public Schools        09-22-04        Office of Special Education

658

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM (MDT)

PRIOR NOTICE

Check Purpose:
[X] Initial Evaluation
[X] Initial Placement
[ ] Reevaluation
    [ ] Change in Category Exit
    [ ] Related Service Add
    [ ] Related Service
    [ ] Change in Placement
    [ ] Other _____

Date _August 30, 2006_

Student O_____ DOB ___93

School  Our Lady of Victory/C.A.R.E. Center

Current Disability Category  Multiple Disability (OHI/LD)

Setting  Out of General Education Setting

Dear  Ms. Pabo

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
[X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
[ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
[ ] Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)
[ ] Your child is not eligible for special education service(s).
[X] Your child is eligible or continues to be eligible to receive special education services as a student with  MD (OHI/LD)
[X] Your child will begin receiving  Psychological services  as a related service(s).
[ ] Your child will no longer receive _____ as a related service(s).
[ ] Your child's category of disability is being changed from _____ to _____
[X] Your child's alternative placement on continuum (next setting) is being changed,
    from  Not in special education  to  Out of General Education Setting
[ ] Your child is no longer eligible and will be exited from the special education program.
[ ] Other: _____

**Description and Explanation of agency action proposed or refused.**

The MDT has reviewed evaluations/reports and determined that the student is eligible fo rspecial education services as a student w/ a disability classification of _MD_ . He requires Out of General Education Setting, as accomodations/modifications cannot be implemented in the general education setting.

**Description of Other Options Considered and reasons for rejection of each option**

The MDT has reviewed evaluations/reports and determined that General Education Setting and Combination General Education/Resource Setting will not provide the appropriate level of services to address the student's special education needs. Accomodations/modifications cannot be implemented in the general education setting.

Other relevant factors to the decision- _____

MDT Members: [X] Principal or Designee   [X] General Education Teacher   [X] Psychologist
    [X] Parent   [X] Special Education Teacher   [X] Other: Ed. Consultant
    [ ] Student   [X] Speech and Language   _____
    [X] Social Worker   [X] *LEA & Interpreter (*may be one)   _____
Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the **Procedural Safeguards** for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact  Cindy F. brown, LICSW - Case Manager  at  202/671-0882  (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior Written Notice to the Parent
07-02-2001

**DCPS - 04**

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**
**MULTIDISCIPLINARY TEAM**
**(MDT)**

Student O██O██_____   DOB ████/93  Age 13  Grade 7  ID 9051483

You have the right to challenge the recommendations by requesting Mediation or a Due Process Hearing before an impartial hearing officer. To initiate a mediation or hearing, you will need to complete a REQUEST FOR MEDIATION or DUE PROCESS HEARING form and mail it to the address listed below:

> **Student Hearing Office**
> D.C. Public Schools 825 North
> Capitol Street, N.E. 8ᵗʰ floor
> 202-442-5432

You have the right to be represented at the hearing by legal counsel.
A copy of Parents Procedural Safeguards handbook is provided.
A list of free or low cost legal service, for which you may qualify depending on your income, is included.
If you would like an additional copy, please contact the principal.

**EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

[X] **Wechsler Intelligence Scale for Children-III (WISC TII)** - commonly employed individually administered test designed to measure the intelligence of individuals aged 6 to 16 years. Date of Report  5/3/06

[ ] **Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R)** - measures specific mental abilities and processes in ages 4 ½ to 6 ½ years. Date of Report _____

[ ] **Wechsler Adult Intelligence Scale-III (WIAS 111)** an individually administered test designed to measure the intelligence of individuals ages 16 and over. Date of Report _____

[ ] **Bayley Scales of Infant Development-11** - an individually administered instrument that measures motor, mental and social development in infants and children from 1 month to 42 months of age. Date of Report _____

[X] **Wechsler Individual Achievement Test (WIAT)**- a commonly used individually administered instrument designed to assess the educational achievement of children and adolescents in areas of basic reading, mathematics reasoning, spelling, reading comprehension, numerical operations, listening comprehension, oral expression, and written expression. Date of Report  5/3/06

[ ] **Peabody Individual Achievement Test-Revised (PIAT-R)** - an individually administered test measuring achievement in areas of general information, reading recognition, reading comprehension, spelling, written expression, and mathematics. Date of Report _____

[ ] **Kaufman Test of Educational Achievement (KTEA)** -an individually administered instrument measuring achievement skills in reading decoding, mathematics applications, spelling, reading comprehension, and mathematics computation. Date of Report _____

[X] **Woodcock-Johnson Psycho-Educational Battery** - a diagnostic and evaluation instrument composed of twenty-seven tests divided into three major parts: tests of cognitive ability, tests of achievement, and tests of interests. Date of Report  5/30/06 (Indep Eval)
Cognitive  7/11/06 (Indep Eval)

[ ] **Bender Visual Motor Gestalt Test** - measures perceptual motor skills to determine visual-motor gestalt functioning and neurological soft-signs in ages 4 to 12 years using the Koppitz Scoring System. Date of Report _____

[X] **Developmental Test of Visual Motor Integration (VMI)** -assesses visual perception and motor coordination in ages 3 years and up using a more structured booklet format. Date of Report  5/3/06

[ ] **Children's Apperception Test** - a projective story-telling technique for personality evaluation in ages 5 to 10 years. Date of Report _____

[ ] **Thematic Apperception Test** - a projective story-telling technique for personality evaluation in older children and adolescents. Date of Report _____

[ ] **House-Tree-Person** - a projective drawing technique providing insight into personality structure, physical concerns, and social-emotional adjustment in children and adolescents. Date of Report _____
Neuropsychological Evaluation (Federici, 5/3/06)
Comprehensive Receptive and Expressive Vocabulary Test (CREVT-2) - 5/15/06
Social Work Evaluation Report (7/5/06)
Review of Independent Evaluation (8/21/06)

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**
**MULTIDISCIPLINARY TEAM**
**(MDT)**

Student O████O█████ _____ DOB ███/93 Age 13 Grade 7 ID 9051483

[X] **Kinetic Family Drawing** - a projective drawing technique measuring one's perception of her family and her role within the family.
   Date of Report  5/3/06

[X] **Rorschach Psychodiagnostic Test** - a projective measure y which one's responses to inkblots reveal personality structure, ego strengths and reality testing in ages 3 and older. Date of Report  5/3/06

[ ] **Goodenough-Harris Drawing Test** - a projective drawing procedure measuring intellectual perceptual-motor maturity and personality through the use of drawings of self and a member of the opposite sex in ages 3 to 15.11 years. Date of Report _____

[X] **Conner's Parent and Teacher Rating Scales** - a paper-and-pencil instrument measuring problem behaviors of children and adolescents as reported by the child's teacher, parents, or alternate care-giver. Date of Report  5/3/06

[ ] **The Vineland Adaptive Behavior Scales** - assesses adaptive and social competency skills. Date of Report _____

[ ] **Test of Language Development Primary - Revised (TOLD-P)** - measures primary language proficiency and specific strengths and weaknesses in language skills. Date of Report _____

[ ] **Kaufman Assessment Battery for Children** - assesses the ability to solve problems using simultaneous and sequential metal processes in four global areas: Sequential Processing, Simultaneous Processing, Mental Processing, and Achievement. Date of Report _____

[ ] **Preschool Language Scale** - measures auditory comprehension and verbal ability skills. Date of Report _____

[ ] **Oral Peripheral Speech Examination** - a procedure to determine whether the examinee can appropriately use the lips, tongue, mouth, etc.
   Date of Report _____

[X] **Clinical Evaluation of Language Fundamentals - III** - assesses the child's language functioning including processing and production.
   Date of Report  5/15/06

[ ] **Expressive One Word Picture Vocabulary Test** - assesses the child's single word expressive vocabulary. Date of Report _____

[ ] **Receptive One Word Picture Vocabulary Test** assesses the child's single word receptive vocabulary. Date of Report _____

[ ] **Goldman-Fristoe Test of Articulation** - assesses the production of consonants in simple and complex contexts. Date of Report _____

[ ] **Peabody Picture Vocabulary Test-Revised** - individually administered, multiple choice test measuring nonverbal, receptive vocabulary.
   Date of Report _____

[ ] **Fisher-Logemann Test of Articulation Competence** - assesses articulation proficiency with single sounds, consonant blends, and vowel production.
   Date of Report _____

[X] **Classroom Observation** - assesses present functioning of the student within the classroom environment.

Free or Low Cost Legal Services

Neighborhood Legal Services
701 4' Street, N.E.
Washington, D.C. 20001
202-682-2700 (NW)
202-682-2732 (NE)
Fax 202-682-0588

Neighborhood Legal
Services 1213 Good Hope
Road, S.E. Washington, D.C.
20020 202-678-2000
Fax 202-889-3374

University Legal Services
300 1 Street, N.E.
Washington, D.C. 20002
202-547-0198
Fax 202-547-2662

The Children's Law Center Inc. 1050
Connecticut Avenue, N.W. Suite 1200
Washington Square
Washington, D.C. 20036-5317
202-467-4900
Fax 202-467-4949

National Coalition for Students
with Disabilities
10560 Main Street, Suite 417
Fairfax, VA 22030
703-267-6588        (fax) 703-267-6992

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT | 

MDT REFERRAL DATE: 4/26/06

STUDENT: O▓ O▓▓▓▓    SCHOOL: Our Lady of Victory    DATE: 8/30/06

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Claudia Pabo | Claudia Pabo | Mother |
| Cindy F. Brown, LICSW | Cindy F. Brown, LICSW | Case Manager/Social Worker |
| Jermaine Perkins | Jermaine Perkins | School Psychologist |
| Leslie Charles | Leslie Charles | Speech Therapist |
| Laura Solomon, Ed.D. | Laura Solomon, Ph.D. | Educational Consultant |
| Vecia Banner | Vecia Q. Banner | IEP Developer/Spec. Ed. |
| Paula Rosenstock | Paula Rosenstock | Counsel for Oleg |
| Denise White-Jennings, Ph.D. | Denise White-Jennings Ph.D. | Clinical Psychologist |

The purpose of this meeting is to review any additional evaluations/reports and determine if there is any change in the students' disability classification or special education services.

MDT agreed to brief review of Dr. Solomon's report, as all participants had an opportunity to review the information.

Review of Independent Evaluation

Noted that student performed much better on this evaluation than previous cognitive evaluation.

Woodcock-Johnson III - Verbal Ability -101; Thinking Ability -91; Cognitive Efficiency -85

Weaknesses noted in area of visual processing and inability to identify relations and underlying concepts.

Based on review of evaluation, along w/ previously reviewed evaluation information it appears that student is eligible for special education services as a student w/ a learning disability.

Review of Eligibility Criteria

School Psychologist reviewed verbatim the eligibility criteria for LD. L. Solomon asked that academic scores from Federici's report be considered. DCPS noted that Federici's testing was w/o medication and most recent testing is w/ medication. DCPS maintains that most current evaluations are more accurate reflection of his abilities. School Psychologist noted that identified disability (OHI) has impact on student's performance and therefore supports IEP. Solomon believes LD identified only in reading comprehension does not support IEP.

Criteria reviewed and based on review, the student is eligible for special education services as LD. MDT notes change in disability classification to Multiple Disability to include OHI and LD. Educational Consultant and parent disagree w/ identification of areas under LD and believe math reasoning and writing should be included.

# Specific Learning Disability
## Eligibility Determination Form
### (Attach MDT Meeting Notes)

| | | |
|---|---|---|
| Student's Full Name: O███ O██████ | Student ID: | 9051483 |
| Date of Birth: ████93 | Date of MDT: | 8/30/06 |
| Attending School: **OUR LADY OF VICTORY** | Neighborhood School: | **EATON ES** |

In order to determine if a student to have a disability of Specific Learning Disability and is eligible for specialized instruction and/or related services, the MDT must compare evaluation data and document that:

| | | |
|---|---|---|
| ●Y ○N<br>○Insufficient<br>(There is NOT enough documentation available to make a determination) | 1a. | The student has a severe aptitude/achievement discrepancy as identified by a validated regression method and does not achieve commensurate with his or her age and ability levels in one or more of the following areas:<br>○ Oral Expression<br>○ Listening Comprehension<br>○ Written Expression<br>○ Basic Reading Skills<br>● Reading Comprehension<br>○ Mathematics Calculation<br>○ Mathematics Reasoning<br>○ Developmental Skills (e.g., motor skills, language development, memory skills), and |
| ●Y ○N<br>○Insufficient | 1b. | The severe discrepancy between ability and achievement is not primarily the result of a visual, hearing, or motor impairment; mental retardation; emotional disturbance; or environmental, cultural, or economic disadvantage. |
| ●Y ○N<br>○Insufficient | 2. | Evaluation information confirms there is an adverse effect on educational performance. |
| ●Y ○N<br>○Insufficient | 3a. | The following relevant behavior was noted during the observation of the child:<br>**Inattentiveness, difficulty following directions, difficulty understanding information** |
| ●Y ○N<br>○Insufficient | 3b. | Relationship between the observed behavior in 3a. to the child's academic functioning is:<br>**Behaviors negatively impact his academic performance** |
| Supporting evidence [Type(s) of documentation used to make the determination, i.e., psycho-educational evaluation, speech language evaluation, classroom work, teacher observation, etc.]:<br>**Neuropsychological Evaluation; Speech-Language Evaluation; Observations; Social Work Evaluation** | | |
| ●Y ○N | | Evaluation information confirms that lack of instruction in reading and/or math was not a determinant factor in the eligibility decision. |
| ●Y ○N | | Evaluation information confirms that limited English proficiency was not a determinant factor in the eligibility decision. |

The MDT used the above interpretation o d the evaluation data to determine:

☒ The student has Specific Learning Disability and is eligible for specially designed instruction and/or related services (Criteria 1, 2, and 3 must be checked to be eligible), **or**

☐ The student does not have Specific Learning Disability, **or**

☐ Evaluation data is insufficient to determine eligibility. Additional assessments and/or data will be obtained in the area(s) as indicated on the **STUDENT EVALUATION PLAN (SEP)**. The MDT will reconvene by _____ _____ to review and determine eligibility.

All medical documentation must be reviewed by a DCPS medical doctor.

September 20, 2002

Specific Learning Disabilities Written Report – Continued

Student's Full Name: O~~___ O~~~~___          Student ID:          9051483
Date of Birth: ~~___~~/93                      Date of MDT:         8/30/06
Attending School:  **OUR LADY OF VICTORY**     Neighborhood School:  EATON ES

Multidisciplinary Team Members: The MDT has reviewed evaluations/reports and determined that the student
(is) is not   eligible for services as a student with a disability classification of Learning Disability (LD)

| Titles | Signatures | Agree | Disagree |
|---|---|---|---|
| LEA Representative | _Caulip Le Breeny LLSw_ | ✓ | |
| Parent/Guardian | | | |
| Regular Education Teacher | | | |
| Special Education Teacher | _Veca O. Banner_ | ✓ | |
| Psychologist/Evaluator | _Yumm  Punk ms_ | ✓ | |
| Speech/Language Therapist | _Lucie J. Charles_ | ✓ | |
| Social Worker or Counselor | _Crily Le Breeny LLSw_ | ✓ | |
| ~~Student~~ Clinical Psychologist | _Laura L. Solomon PhD_ | ✓ | |
| ~~Other~~ Special ed consultant | _Laura Solomon Ed.D._ | ✓ | |
| ~~Other~~ Counsel for Student | _Robin Vergh_ | ✓ | |
| Other  Claudia Pabo | _Claudia Pabo_ | ✓ | |

Each MDT member shall certify in writing whether the report reflects his/her conclusion. If it does not reflect
his/her conclusion, the team member must submit a separate statement presenting his or her conclusion. By
completing the appropriate boxes the MDT will document decisions.

✱ Dr. Laura Solomon, along with parent and counsel, believe
that there is sufficient documentation to identify math
calculations & reasoning & written language as areas of
learning disability. Our signatures reflect agreement
that O~~__~~ meets criteria for specific learning disabilities
under the IDEA but not that reading comprehension
is the only area of need. This was expressed at
the meeting.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

**MDT**

### CONSENT FOR EVALUATION - INITIAL OR REEVALUATION
**(*CHECK ONE ONLY - INITIAL OR REEVALUATION)**

**I.     INITIAL EVALUATION CONSENT** ☒

As a result of the review of the screening information at the MDT meeting on ___8/30/06___

it was determined in a MDT meeting that your child, O█ O█████_____

is in need of a full and individual evaluation to assist us in developing the most appropriate educational program. You have been provided a copy of the "Procedural Safeguards - Parental Rights" booklet. We would like to remind you at this time that:

- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all necessary action to provide an appropriate program and may be required to initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) in Section III.

**II.     REEVALUATION** ☐

The MDT received the following request for a reevaluation for_____

by /for a:     ☐ **parent request**     ☐ **teacher request**     ☐ **3 year reevaluation**

The MDT will collect supportive documentation in the area of the disability to determine the need for continued special education and related services. The school is required to only evaluate in those areas of documented need or consensus of the MDT (parent is a member of team). Parents have the right to request assessments to determine if the child continues to be a child with a disability. DCPS may reevaluate your child, without your consent, if the school district can demonstrate that it has taken reasonable steps to get parental consent and the parent has not responded.

- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all necessary action to provide a Free Appropriate Public Education program and may be required to initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) on the student evaluation plan (SEP).

**III.     I give permission for District of Columbia Public Schools to proceed with the evaluation(s) based on the Student Evaluation Plan (attached ) for my child, O█ O█████_____**

Within a reasonable period of time days after completion of the evaluation, we will hold another MDT meeting (to which you will be invited) to determine if your child is eligible for special education and related services. The written reports of all procedures administered will be provided to you at that meeting, along with explanations and interpretations. We will use this information to determine an appropriate program for your child. If records are to be obtained/released as part of this evaluation, the "Consent for Release of Records" form is completed and attached.

If you have questions or concerns at any time during the evaluation process, feel free to contact me at ___202/671-0882_____(telephone number).

*☒ INITIAL EVALUATION          *☐ REEVALUATION

Parent Response Section:

☒ I agree to the proposed evaluation(s)          ☐ I do NOT agree to the proposed evaluation(s)

_Claudia Pabo_____          ___8/30/06___
Parent/Guardian Signature          Date

DCPS     DIVISION OF SPECIAL EDUCATION     07-02-2001     MDT - CONSENT FOR EVALUATION     APPENDIX - A

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**STUDENT EVALUATION PLAN**
**(SEP)**

MDT
SEP

MDT REFERRAL DATE: 8/30/06                    MEETING DATE: 8/30/06

STUDENT: O___ O___     DOB: ___/93   AGE: 13  GRADE: ___  SCHOOL: Our Lady of Victory

STUDENT IDENTIFICATION NUMBER: 9051483     TEACHER / HOMEROOM: _____

ADDRESS: 3512 Rodman Street, N.W., Washington, D.C. 20007

Street #      Street Name,         Quadrant     Apartment #      City,          State,      Zip Code

PARENT(S)/GUARDIAN: Claudia Pabo     TELEPHONE (H): 202/966-4368    (W): 202/418-1595

**Summarize Area(s) of Concern:**

Student presents with deficits in fine motor skills and visual perceptual skills. Also noted are problems in sensory integration and self-regulation.

**Team Recommendations:**

MDT recommends an Occupational Therapy Evaluation

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☐ Psychological | | | | |
| ☐ Speech/Language | | | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☐ Educational | | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other  Other: TBD | | Other: TBD | 7/14/06 | |
| Occupational Therapy | | | | |

| TEAM MEMBERS: | NAME | POSITION | TEAM MEMBERS: | NAME | POSITION |
|---|---|---|---|---|---|
| Claudia Pabo | i C P | Mother | Kathie Thompson  Leslie Charles | | Speech Therapist |
| Cindy F. Brown, LICSW | | Case Manager/SW | Vecia Banner  OB | | IEP Developer/Spec Ed |
| Jermaine Perkins | J P | School Psychologist | Paula Rosenstock PR | | Attorney for Student |
| Denise White-Jennings, Ph.D. | | Clinical Psychologist | | | |

The MDT meeting __ __ __ evaluation results is scheduled on _____ at _____ in room _____

**Place completed form in MDT folder.**

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

INTENT Page 1

## NOTICE TO PARENT OF INTENT TO EVALUATE/REEVALUATE

Date: _8|30|06_

To  Ms. Claudia Pabo

3512 Rodman Street, N.W.

Washington, D.C. 20007

Telephone: (H) 202/966-4368

Dear  Ms. Claudia Pabo

Ref  O█ O█

DOB ██/93

ID # 9051483

(W)  202/418-1595

The District of Columbia Public Schools is requesting that _____ O█ O█ _____ be available for testing for the following tests, on the indicated date, at the school.

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TEST DATE ASSIGNED | ADMINISTERED |
|---|---|---|---|---|
| ☐ Psychological | | | | |
| ☐ Speech/Language | | | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☐ Educational | | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other  OT | Other:  TBD | Other:  TBD | Other:  7/14/06 | |

### LIST OF TESTS WITH DESCRIPTIONS

☐ **Bayley Scales of Infant Development-II** - an individually administered instrument that measures motor, mental and social development in infants and children from 1 month to 42 months of age.

☐ **Bender Visual Motor Gestalt Test** - measures perceptual motor skills to determine visual-motor gestalt functioning and neurological soft-signs in ages 4 to 12 years using the Koppitz Scoring System.

☐ **Children's Apperception Test** - a projective story-telling technique for personality evaluation in ages 5 to 10 years.

☐ **Clinical Evaluation of Language Functions - III** - assesses the child's language functioning including processing and production.

☐ **Conner's Parent and Teacher Rating Scales** - a paper-and-pencil instrument measuring problem behaviors of children and adolescents as reported by the child's teacher, parents, or alternate caregiver.

☐ **Developmental Test of Visual Motor Integration (VMI)** - assesses visual perception and motor coordination in ages 3 years and up using a more structured booklet format.

☐ **Expressive One Word Picture Vocabulary Test** - assesses the child's single word expressive vocabulary.

☐ **Fisher-Logemann Test of Articulation Competence** - assesses articulation proficiency with single sounds, consonant blends, and vowel production.

☐ **Goldman-Fristoe Test of Articulation** - assesses the production of consonants in simple and complex contexts.

## NOTICE TO PARENT OF INTENT TO EVALUATE/REEVALUATE

| INTENT Page 2 |
|---|

Student O__O_____    DOB ___93    Age 13    Grade ____    ID 9051483

- [ ] **Goodenough-Harris Drawing Test** - a projective drawing procedure measuring intellectual perceptual-motor maturity and personality through the use of drawings of self and a member of the opposite sex in ages 3 to 15. 11 years.
- [ ] **House-Tree-Person** - a projective drawing technique providing insight into personality structure, physical concerns, and social-emotional adjustment in children and adolescents.
- [ ] **Kaufman Assessment Battery for Children** - assesses the ability to solve problems using simultaneous and sequential metal processes in four global areas: Sequential Processing, Simultaneous Processing, Mental Processing, and Achievement.
- [ ] **Kaufman Test of Educational Achievement (KTEA)** - an individually administered instrument measuring achievement skills in reading decoding, mathematics applications, spelling, reading comprehension, and mathematics computation.
- [ ] **Kinetic Family Drawing** - a projective drawing technique measuring one's perception of her family and her role within the family.
- [ ] **Oral Peripheral Speech Examination** - a procedure to determine whether the examinee can appropriately use the lips, tongue, mouth, etc.
- [ ] **Peabody Individual Achievement Test-Revised (PIAT-R)** - an individually administered test measuring achievement in areas of general information, reading recognition, reading comprehension, spelling, written expression, and mathematics.
- [ ] **Peabody Picture Vocabulary Test-Revised** - individually administered, multiple choice test measuring nonverbal, receptive vocabulary.
- [ ] **Preschool Language Scale** - measures auditory comprehension and verbal ability skills.
- [ ] **Receptive One Word Picture Vocabulary Test** - assesses the child's single word receptive vocabulary.
- [ ] **Rorschach Psychodiagnostic Test** - a projective measure y which one's responses to inkblots reveal personality structure, ego strengths and reality testing in ages 3 and older.
- [ ] **Test of Language Development Primary - Revised (TOLD-P)** - measures primary language proficiency and specific strengths and weaknesses in language skills.
- [ ] **The Vineland Adaptive Behavior Scales** - assesses adaptive and social competency skills.
- [ ] **Thematic Apperception Test** - a projective story-telling technique for personality evaluation in older children and adolescents.
- [ ] **Wechsler Adult Intelligence Scale-III (WIAS III)** - an individually administered test designed to measure the intelligence of individuals ages 16 and over.
- [ ] **Wechsler Individual Achievement Test (WIAT)** - a commonly used individually administered instrument designed to assess the educational achievement of children and adolescents in areas of basic reading, mathematics reasoning, spelling, reading comprehension, numerical operations, listening comprehension, oral expression, and written expression.
- [ ] **Wechsler Intelligence Scale for Children-III (WISC III)** - commonly employed individually administered test designed to measure the intelligence of individuals ages 6 1/2 to 16 1/2 years.
- [ ] **Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R)** - measures specific mental abilities and processes in ages 4 1/2 to 6 1/2 years.
- [ ] **Woodcock-Johnson Psycho-Educational Battery** - a diagnostic and evaluation instrument composed of twenty-seven tests divided into three major parts: tests of cognitive ability, tests of achievement, and tests of interests.
- [ ] **Classroom Observation** - assesses present functioning of the student within the classroom environment.
- [ ] **List other tests with descriptions:**

**Other factors that are relevant to be included:**

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT OF ~~█████~~                    SCHOOL Our Lady of Victory        DATE: 8/30/06

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Claudia Pabo | Claudia Pabo | Mother |
| Cindy F. Brown, LICSW | Cindy F. Brown LICSW | Social Worker/Case Manager |
| Jermaine Perkins | Jermaine Perkins | School Psychologist |
| Leslie Charles | Leslie Charles | Speech Therapist |
| Vecia Banner | Vecia O'Banner | IEP Developer/Special Ed. |
| Laura Solomon, Ed. D. | Laura Solomon, Ed. D. | Educational Consultant |
| Denise White-Jennings, Ph. D. | Denise White-Jennings Ph D | Clinical Psychologist |
| Paula Rosenstock | Paula Rosenstock | Counsel for Student |

The purpose of this meeting is to review the drafted Individual Education Program (IEP) developed for the student on 8/10/06 and make revisions, if necessary.

The MDT has determined that:

- the student is eligible for special education services a s a student with a disability classification of
  _Multiple Disability (MD → OHI/LD)_

- the student requires the following services:

| | | |
|---|---|---|
| X specialized instruction | - 26.0 hours/week | |
| speech therapy | - ___ hours/week | |
| X psychological services | - 1.5 hours/week | (direct services) & .5 hr/wk consultation |
| occupational therapy | - ___ hours/week | |
| physical therapy | - ___ hours/week | |
| other - ___ | - ___ hours/week | |
| X other - psychological services consultation | - .5 hours/week | |

- a behavior plan is was reviewed. It is appropriate.

- the student requires level _IV_ testing with accommodations/modifications as indicated on   page 4 of 4 on the IEP
  * changes made from 8/10/06 IEP.
- the student requires supplementary aides/services as indicated on page 4 of 4 on the IEP
  * changes made from 8/10/06 IEP.

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
WASHINGTON, D.C.

**INDIVIDUALIZED EDUCATION PROGRAM**
(IEP)

STUDENT ~~O. O.~~             SCHOOL  Our Lady of Victory         PAGE 2 OF 3

Discussion of Setting and Placement: ~~US~~

- MDT had discussion re: whether student could functioning adequately in non-academic classes. DCPS indicated that on last report card student received excellent or satisfactory grades and should be able to go to these classes w/ accommodations/modifications. Moreover, these classes are not as demanding as the core academic classes. Parent reports that she spends many hours helping student complete assignments in special subject (non-academic classes). Parent also notes that student was often absent from music classes, as he would have somatic complaints and not be in class. ~~Solomon also stated that student would still be required to complete assignments on grade level and would not be successful.~~ Parent also expressed concern of student being in large phys. ed. class w/ peers, as he is very small for his age and has a history of being injured by peers. He also has visual perceptual issues and is extremely impulsive. Dr. White-Jennings confirmed parents report that student would go to the school nurse to avoid music and science class. L. Solomon and parent do not believe that student can function well in a large group especially during lunch/recess when he is expected to function independently. Parent also notes that student experienced a lot of problems during lunch/recess at OLV and has responded to ~~taunting~~ by threatening ~~the student.~~ Clinical Psychologist also indicated that she believes that student requires a great deal of structure across all school settings, including lunch/recess. MDT agrees, after much discussion, that student requires full-time program, including non-academic classes in small group, low teacher: student ratio w/ high level of structure.

- MDT discussed amount of psychological services. L. Solomon does not believe that 1 hr/week is ~~not~~ enough, as student would need indiv. and ~~small~~ group therapy. Dr. White-Jennings indicated that same goals would be addressed in class setting. MDT considered increasing the amount of time and determined that 1.5 hrs/week of psychological services (to accommodate indiv. and group) as well as .5 hr/wk of psychological consultation.

- MDT discussed behavior plan. L. Solomon does not believe a behavior plan will be needed if student is in a full-time placement. D. White-Jennings indicated that she believes it is more appropriate to enter a program w/ a plan in place and if it is not needed then it does not have to be used.

- MDT agreed. L. Solomon wants language of DCPS re: service provider as "special ed and/or general ed tchr" change to "special ed. team." DCPS disagrees w/ change and believes language is inclusive.

- MDT discussed testing level and accommodations/modifications. L. Solomon asking for large print worksheets and test materials to be include, as well as magnifying equipment. Also requested is to answers marked in test booklet

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)

STUDENT ___O___O_____    SCHOOL __Our Lady of Victory__    PAGE **3** OF 4

Discussion of Setting and Placement:

under testing accommodations. MDT agrees to changes to accommodations/
modifications for testing and classroom. Also change to supplementary
aides - to include magnifying equipment & large print materials, test
books, books on tape.
- MDT revisited recommendation for OT Evaluation
- Parent and attorney requested that a scribe be used for student's written
responses. DCPS does not believe this is appropriate, as he will not be
given adequate opportunity to develop his writing skills. DCPS suggested
use of a tape recorder - so that student could replay his ideas/response
for writing tasks and to record info he needs.
- Attorney asked about communication section on page 2. DCPS informed
attorney that this area is only completed if there are goals/objectives in
this area.
- MDT reviewed goals/objective. Attorney asked for mastery criteria to be
delete. DCPS objected and explained that goals has mastery criteria that
refers to 80% mastery of the objectives, whereas the objectives (short-
term) refer to mastery of that goals and demonstrated over a short period
of time.
  Attorney asked specifically about math concepts and DCPS noted that there
are specific objectives that address this area.
  Attorney asked about social-emotional goals as she objective to amount of
goals. DCPS indicated that goals where written in steps and are appropriate,
as student's processing issues w/ impact his ability to mastery objectives
that group multiple skills. Also attorney believed that objective
referring to therapeutic relationship is inappropriate and should be
deleted. DCPS objected and believes objective is appropriate, as the
student should develop a therapeutic relationship w/ therapist in order
to be able to disclose and discuss personal feelings.
  Attorney also asked that wording his setting be included in the objectives,
DCPS indicated that the setting does not need to be included in goals/
objectives as the MDT has already discussed and noted the setting
the student requires.
  Attorney objected to writing goals and stated they are too difficult. DCPS
maintained that writing samples were reviewed, as well as test scores.
Based on this info, student should be able to mastery writing objectives
w/ specialized instruction support. DCPS does not agree to change
goals for writing.
  Parent raised issue re: revisions/corrections she wants to social work
evaluation. Evaluation will consider corrections once copy from parent
is obtained.

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

**INDIVIDUALIZED EDUCATION PROGRAM**
**(IEP)**

STUDENT  O___ O_____          SCHOOL  Our Lady of Victory          PAGE **4** OF **4**

---

**Discussion of Setting and Placement:**

MDT is in agreement w/ Out of General Education Setting.

DCPS proposing Prospect LC. This program is a full-time special education program w/ low student-teacher ratio. Teachers are certified special ed w/ exception of humanities, librarian. Physical ed teacher is also adaptive physical education. Program also provides all related services — speech therapy, OT, psychological & social work services, PT. School also has full-time nurse to address medical needs of student. Teachers utilize various approaches to instruction and having a reading writing program new to school. Aides are in each room and are either completing requirements or have completed requirements. Most of population of student is male and there are approximately 7-10 children per class. Attorney queried about age/grade of student. Program is ungraded and services students through middle school. Parent also inquired as to whether that DCPS has full-time special ed high school program. DCPS does not have separate school, but programs in school. Prospect transitions students into HS programs as appropriate.

Parent wants to visit program and has not made a decision. Student has a slot being held. Slot will only be held for a couple of days.

Parent wants funding and placement at Kingsbury. Parent has visited Kingsbury. School services children w/ similar needs of student. Classes sizes are max 12 student w/ teacher and 2 aides. Teachers also have master's degree and are certified special ed? Many aides are working on Master's degree or in area of special ed. School provides related services and specialized reading program. Also provides therapeutic support. School also addresses students w/ FAS, ADHD and other emotional/social/behavioral concerns. Related services (i.e., speech, OT, psychological services are on-site. School also is equipped to address needs of children through High school. Parent does not want student to change school a great deal — wants to minimize transitions.

**SUPPLEMENTAL AIDES, SERVICES, ACCOMODATIONS, AND MODIFICATIONS CHECKLIST**

Use for explanation as to removal of student from general education setting.

| STUDENT:    O█████ O█████ (DOB:███93) | | SCHOOL:  OUR LADY OF VICTORY | |
|---|---|---|---|
| III.      Check each accommodation applied | | III. Student needed accommodations in these classes: (check) | |
| II.       Indicate Setting | | ☑ Language Arts (reading, writing, spelling) | |
| ☐  General Education Classroom | | ☑ Social Studies | |
| ☐  Combination General Education and Resource Classroom | | ☑ Science | |
| ☑ Out of General Education Classroom | | ☑ Health | |
| | | ☑ Math | |
| | | ☑ Physical Education | |
| | | ☑ Music | |
| | | ☑ Art | |
| | | ☑ Other | |
| 1. | Directions read aloud | 19. | Carrels |
| 2. | Questions read aloud | 20. | Special seating/proximity to monitor |
| 3. | Simplified directions, as needed | 21. | Adaptive furniture |
| 4. | Signed _____ | 22. | Noise buffers |
| 5. | Taped _____ | 23. | Special lighting/acoustics |
| 6. | Assistance with interpretations of directions (written directions), as needed | 24. | Extended time |
| 7. | Braille _____ | 25. | Breaks, as needed |
| 8. | Large print  materials, test booklets, etc... | 26. | Multiple test sessions or test sessions spread over several days |
| 9. | Fewer lines/items per page | 27. | Student specific schedule |
| 10. | Extra spacing between lines | 28. | Behavioral support |
| 11. | Important words highlighted | 29. | Word lists/dictionaries |
| 12. | Magnifying equipment | 30. | Number table or math fact sheets |
| 13. | Amplification equipment | 31. | Spell checker |
| 14. | Templates to reduce visual print field | 32. | Specific contracts |
| 15. | Tape recorder | 33. | Behavior modification reinforcement charts |
| 16. | Computer/word processor | 34. | Allowance of cooling off period, time out area in class |
| 17. | Large pen or specifically designed writing tool | 35. | Specific limits, clear consequences defined in advanced – consequences in effect immediately and consistently |
| 18. | Altered worksheets/materials and/or reduced workload | 36. | Redirection, cueing, and/or prompting to remain on task |
| | | 37. | Small group or one-to-one, as needed |
| | | 38. | Flexible scheduling |
| | | 39. | Books on tape |
| Comments | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**
**INDIVIDUALIZED EDUCATIONAL PROGRAM**

DCPS - IEP  Page 1 of 4
Additional Comments: ☐

## I. IDENTIFICATION INFORMATION

Student Name: Last ████     First ████     MI

Student ID 9051483     Soc. Sec. No.     Age: 13     Grade 7

Gender ☒ M ☐ F     Date of Birth ██93     Ethnic Group  Asian American

Address  * 3512 Rodman Street, N.W.
House No.     Street Name     Quadrant     Apartment #
Washington, D.C. 20008
City     State     Zip Code

☐ Non-attending

Attending School  Our Lady 'of Victory     Home School  Deal JHS

☐ Elem. ☒ Mid/JHS ☐ SHS ☐ CWS /

Parent  *Claudia Pabo/Charles Oliver

Address of (if different from student):   ☐ Parent ☐ Guardian ☐ Surrogate

House No.   Street Name     Quad.   Apt. No.   City     State   Zip Code
Telephone: Home *202/966-4368     Work *202/418-1595

### II. CURRENT INFORMATION

Date of IEP Meeting:  8/30/06
Date of Last IEP Meeting:  8/10/06
Date of Most Recent Eligibility Decision:  8/30/06

Purpose of IEP Conference:
☒ Initial IEP     ☒ Review of IEP
☐ Requested Eval.   ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:
IV

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | | ☒ | TRANSPORTATION |
| ESY | | | TRANSITION |

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | N/A | English | Oral _____ |
| Parent | English | English | | Native Lang | Rdg./ Written _____ |
| Home | English | N/A | N/A | English | Instrument: _____ Date: _____ |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks./mos |
|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | .0 | 26.0 | 26.0 | Hour | Week | Gen Ed and/or Spec Ed Tchr | 8/31/06 | 10 mos |
| Psychological Services | .0 | 1.5 | 1.5 | Hour | Week | Social Worker/Psychologist | 8/31/06 | 10 mos |
| Psychological Services Consult | .0 | .5 | .5 | Hour | Week | Social Worker/Psychologist | 8/31/06 | 10 mos |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| TOTAL | | 27.5 | 27.5 | Hours Per Week | | | | |

### V. Disability(ies)    Multiple Disability (MD-OHI/LD)

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☐ 0-20%   ☐ 21-60%   ☒ 61-100%
Percent of time NOT in a Regular Education Setting  85%

### VI. IEP TEAM (Participants in the development of the IEP)     Print and sign your name below.

Claudia Pabo - Mother     _Claudia Pabo_     Vicia Banner- IEP Developer-  _Vicia Banner_

Cindy F. Brown, LICSW - Case Manager/SW     _Cindy F. Brown, LICSW_     Paula Rosenstock -Attorney  _Paula Rosenstock_
for Parent

Jermaine Perkins - School Psychologist     _Jermaine Perkins_

Leslie Charles - Speech Therapist     _Leslie Charles_

D. White-Jennings, Ph.D     _D. White-Jennings_
Clinical Psychologist

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.
Parent/Guardian Signature     Date

| Student Name | O�as▇▇O▇▇▇ | Managing School | C.A.R.E. Center | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number 9051483 | DOB ▇▇/93 | Attending School | Our Lady of Victory | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)** J. Butler (Indep Eval); J. Perkins (Reviewer)

Math Strengths:

| Low average math calculation and problem-solving skills |
|---|

Impact of disability on educational performance in general education curriculum:

| Weaknesses in reading comprehension, as well as deficits in attention, organization, and impulse control negatively impact academic performance. |
|---|

Reading Strengths:

| Overall low average to average word reading and writing skills |
|---|

Impact of disability on educational performance in general education curriculum:

| Weaknesses in reading comprehension, as well as deficits in attention, organization, and impulse control negatively impact academic performance. |
|---|

**Score(s) When Available**

| | | |
|---|---|---|
| Math Cal. | 96 | 6.7 |
| Math Rea. | 87 | 4.9 |
| See goal page: | | |
| Date: | 5/30/06 (indep Eva | |
| Rdg. Com | 84 | 3.6 |
| Rdg. Basic | 97 | 6.3 |
| Written Ex. | 85 | 4.8 |
| See goal page: | | |
| Date: | 5/30/06 (indep Eval) | |

**Communication (Speech & Language) (Evaluator)**

Strengths:

| |
|---|

Impact of disability on educational performance in general education curriculum:

| |
|---|

**Score(s) When Available**

| | | |
|---|---|---|
| Exp.Lang. | | |
| Rec- Lang. | | |
| Artic | | |
| Voice | | |
| Fluency | | |
| Exp. Voc. | | |
| Rec. Voc. | | |
| See goal page: | | |
| Date: | | |

**Motor/Health (Evaluator)**

Strengths:

| |
|---|

Impact of disability on educational performance in general education curriculum:

| |
|---|

**Score(s) /Results When Available**

| | | |
|---|---|---|
| | | |
| | | |
| See goal page: | | |
| Date: | | |

**Social Emotional Behavioral Areas: (Evaluator)** D. White-Jennings, Ph.D.

Strengths:

| Able to express needs; receptive to positive reinforcement; wants to acheive |
|---|

Impact of disability on educational performance in general education curriculum:

| Difficulties in social-emotioal functioning, as well as deficits in attention, organization, and impulse control negatively impact academic performance. |
|---|

**Score(s) When Available**

| | |
|---|---|
| | |
| | |
| | |
| See goal page: | |
| Date: | 7/10/06 |

**Cognitive/Adaptive Behavior: (Evaluator)** L. Solmon (Indep Eval); J. Perkins (Reviewer)

Strengths:

| Verbal, auditory processing and auditory working memory abilities |
|---|

Impact of disability on educational performance in general education curriculum:

| Weaknesses in processing skills, organization, and attention negatively impact academic performance. Also weaknesses in visual processing with speed. |
|---|

**Score(s) When Available**

| | |
|---|---|
| Verbal Ability – | 101 |
| Thinking Ability | - 91 |
| Cog Efficiency | 85 |
| See goal page: | |
| Date: | 8/16/06; 8/21/06 |

**Prevocational Skills: (Evaluator)**

Strengths:

| |
|---|

Impact of disability on educational performance in general education curriculum:

| |
|---|

**Score(s) When Available**

| | |
|---|---|
| | |
| | |
| See goal page: | |
| Date: | |

675

| Student Name ____ O__ O____ | Managing School ___ C.A.R.E. Center ___ | DCPS – IEP |
| Student ID Number __9051483__ DOB __/__/93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**     Additional Comments:     Goal Number: [  ]

Area addressed by goal: _____ Academics: Mathematics _____

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in mathematical skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| At his instructional level, the student will compare and order very large numbers in standard, expanded, and exponential forms with 80% mastery over a consistent period of time. | | Monthly |
| Using manipulative materials and/or symbols, the student will demonstrate understanding of place value up to hundred thousandths by interpreting the model of a number, modeling a number, matching the model of a number with the written symbol, and illustrating a number with the model -- all with 80% mastery over a consistent period of time. | | Monthly |
| The student will recall and math facts (i.e., addition, multiplication, etc...), as well as effective strategies for determining these math facts with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will correctly complete computation problems involving multi-digit calculations (i.e., additional, subtraction, multiplication and division) with 80% mastery over a consistent period of time. | | Monthly |
| Given at least ten real world math problems involving multiple steps at his instructional level, the student will demonstrate understanding of comparative and quantitative terms, by identifying number relations and then, identifying the correct sequence of operations to correctly solve these problems - 80% mastery over a consistent period of time. | | Monthly |
| Given math calculation and word problems involving multiple steps at his instructional level, the student will identify the correct sequence of operations and then apply appropriate strategies to correctly solve these problems - 80% mastery over a consistent period of time. | | Monthly |

**EVALUATION PROCEDURE(S)**

X Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name   Olu... ... | Managing School   C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number  9051483        DOB   .../93 | Attending School  Our Lady of Victory | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | | Goal Number: ☐ |
|---|---|---|---|

Area addressed by goal: _____ Academics: Mathematics _____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in mathematical skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** _____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| **SHORT-TERM OBJECTIVES** (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| At his instructional level and using manipulative materials and/or symbols, the student will demonstrate understanding of the following fraction concepts: name fractional parts, sequencing fractions, finding equivalent fractions, renaming improper fractions and mixed numbers, reducing fractions – all with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will complete computation problems involving addition and subtraction of mixed numbers with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will complete computation problems involving multiplication and division of mixed numbers with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will apply appropriate strategies to correctly solve problems involving time with 80% mastery over a consistent period of time. | | Monthly |
| At his instructional level and using manipulative materials and/or symbols, the student will apply appropriate strategies to correctly solve problems involving the conversion, addition, and subtraction of units of measurement (within the same measurement system) for length, volume, capacity, and weight with 80% mastery over a consistent period of time. | | Monthly |
| Using manipulative materials and/or symbols, the student will count dollar/coin combination amounts and correctly make change for any dollar/coin combination amount with 80% mastery over a consistent period of time. | | Monthly |

---

**EVALUATION PROCEDURE(S)**

X Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools        07-02-2001        Division of Special Education  Appendix – A        IEP Page 3 of 4

677

| Student Name    O__ O___ | Managing School:    C.A.R.E. Center | DCPS – IEP |
|---|---|---|
| Student ID Number   9051483        DOB ___93 | Attending School   Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**        Additional Comments:        Goal Number: ☑

Area addressed by goal: _____Cognitive_____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in the area of cognition, especially as it relates to attention and organization, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____General Education and/or Special Education Teacher_____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given previously presented strategies for improving attentional skills, the student will use these strategies for improving attention skills with minimal prompting or cueing 80% of the time. | | Weekly |
| Given previously presented strategies for improving organizational skills (i.e., checklists, planner, outlines, etc...), the student will use these strategies for improving organization skills needed to successfully complete academic activities with minimal prompting or cueing 80% of the time. | | Weekly |
| The student will start and complete tasks as assigned by teacher/adult with minimal redirection and/or prompting from teacher/adult, 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will sustain attention during a variety of activities (i.e., presentation, lesson, discussion, classwork, group activity, etc...) with minimal redirection and/or prompting from teacher/adult, 8 out of 10 situations over a consistent period of time. | | Weekly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  X Log  ☐ Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools      07-02-2001      Division of Special Education  Appendix – A      IEP Page 3 of 4

678

| Student Name ___O___O___ | Managing School ___C.A.R.E. Center___ | |
| Student ID Number _9051483_____ DOB ___/93_ | Attending School _Our Lady of Victory_ | DCPS – IEP Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: _1_ |

Area addressed by goal: _____ Academics: Reading _____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in reading skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate adequate reading fluency, as evidenced by his ability to self-correct errors while reading passage material, respond appropriately to punctuation marks, and determining familiar/unfamiliar words w/speed, 80% of the time over a consistent period of time. | | Weekly |
| The student will use various strategies (i.e., sound segmentation, phonics skills, linguistic patterns, structural analysis, context clues) to correctly determine the pronunciation and meaning of familiar and unfamiliar words in isolation and in text, 80% of the time over a consistent period of time. | | Monthly |
| The student will use various strategies (i.e., rereading, paraphrasing, self-questioning, highlighting, outlining, mapping, illustrating) without teacher prompting to enhance comprehension of material 80% of the time. over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will orally and in writing answer who, what, when, where, and why questions with 80% mastery over a consistent period of time. | | Weekly |
| After reading passage material at the instructional level, the student will answer questions (orally and in writing) regarding the sequence of events and specific details/facts with 80% mastery over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will identify, give the meaning, and discuss literary devices/forms (i.e., metaphors, analogy, exaggeration, personification, etc…) that are used in text in order to enhance comprehension, 80% mastery over a consistent period of time. | . | Weekly |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other _____ |

District of Columbia Public Schools     07-02-2001     Division of Special Education  Appendix – A     IEP Page 3 of 4

| Student Name ___ O█ O█ | Managing School ___ C.A.R.E. Center | DCPS – IEP |
| Student ID Number 9051483 ___ DOB ___ █93 | Attending School Our Lady of Victory | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: 2 |

Area addressed by goal: ___ Academics; Reading

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate growth in reading skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): ___ General Education and/or Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| After reading passage material at the instructional level, the student will accurately summarize (orally and in writing) events from the passage material 80% of the time over a consistent period of time. | | Monthly |
| After reading passage material at the instructional level, the student will, orally and in writing, accurately answer questions in a complete sentence that require him to identify the main idea, compare characters, predict events, and draw conclusions with 80% mastery over a consistent period of time. | | Weekly |
| After reading passage material at the instructional level, the student will, orally and in writing, accurately answer questions in a complete sentence that require him to infer information based on information referenced in the text with 80% mastery over a consistent period of time. | | Weekly |
| | | |
| | | |
| | | |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio  ☐ Log  ☐ Chart  X Test  X Documented Observation  ☐ Report  ☐ Other ___ |

District of Columbia Public Schools       07-02-2001       Division of Special Education  Appendix – A       IEP Page 3 of 4

680

| Student Name _____ O____O_____ | Managing School _____C.A.R.E. Center_____ | DCPS – IEP |
|---|---|---|
| Student ID Number __9051483_____ DOB ____93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: [  ] |
|---|---|---|

Area addressed by goal: _____ Academics: Written Expression _____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in written expression skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s):_____ General Education and/or Special Education Teacher _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will write letters, words, and numbers with correct formation, sizing, and spacing, 8 out of 10 attempts over a consistent period of time. | | Weekly |
| Given various word lists, including sight word lists, at his instructional level, the student will utilize strategies to correctly spell familiar one- and multi-syllable words from dictation with 80% mastery over a consistent period of time. | | Weekly |
| Given spelling words mastered in isolation, the student will correctly use these words in writing sentences of increasing length and complexity with 80% mastery over a consistent period of time. | | Weekly |
| Given at least five sentences, the student will correctly sequence sentences for writing, 8 out of 10 attempts over a consistent period of time. | | Weekly |
| Given a teacher- or student-identified writing prompt, the student will write sentences of increasing length and complexity using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given sets of simple sentences, the student will combine simple sentences to make compound sentences, 8 out of 10 attempts over a consistent period of time. | | Weekly |

| **EVALUATION PROCEDURE(S)** |
|---|
| X Portfolio ☐ Log ☐ Chart  X Test  X Documented Observation ☐ Report ☐ Other _____ |

| Student Name ___O___ O___ | | | Managing School ___C.A.R.E. Center___ | |
|---|---|---|---|---|
| Student ID Number ___9051483___ | | DOB ___93___ | Attending School ___Our Lady of Victory___ | DCPS – IEP Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ☐ |
|---|---|---|
| | Area addressed by goal: ___Academics: Written Expression___ | |

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in written expression skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** ___General Education and/or Special Education Teacher___

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a teacher- or student-identified writing prompt, the student will elaborate on sentences by adding adverbs, adjectives, and phrases, as well as using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given various types of sentences, the student will distinguish between and write sentences (i.e., declarative, interrogative, etc...) using correct capitalization, punctuation, spelling, grammar, and syntax - 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given a teacher- or student-identified writing prompt, the student will use various strategies (i.e., mapping, webbing, outlining, etc...) to organize information and ideas before writing – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| After identifying a topic, the student will write a simple paragraph using correct format, sequencing, as well as capitalization, punctuation, spelling, grammar, and syntax and grammar 8 out of 10 attempts over a consistent period of time. | | Monthly |
| Given a teacher- or student-identified writing prompt, the student use organizational strategies and write a paragraph using the correct format (i.e., topic sentence, supporting details, and concluding sentence), as well as correct capitalization, punctuation, spelling, syntax, and grammar, 80% mastery over a consistent period of time. | | Monthly |
| Using a list of writing goals/guidelines, the student will proofread written drafts to correct for punctuation, capitalization, spelling, syntax, and grammar – 8 out of 10 opportunities over a consistent period of time. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
|---|
| X Portfolio ☐ Log ☐ Chart X Test X Documented Observation ☐ Report ☐ Other _____ |

District of Columbia Public Schools     07-02-2001     Division of Special Education  Appendix – A     IEP Page 3 of 4

| Student Name ___O___o___ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
| Student ID Number  9051483  DOB ___/93 | Attending School  Our Lady of Victory | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:                    Goal Number: [ ]

Area addressed by goal: ___Academics: Written Expression___

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in writing skills, as evidenced by mastery of the following short-term objectives by 80%.

**Provider(s):** ___General Education and/or Special Education Teacher___

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Using a list of writing goals/guidelines, the student will edit written assignments to improve the quality of drafts by identifying needed changes in word choices, sentence structures, as well as identifying errors in punctuation, capitalization, spelling, syntax, and grammar errors – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| Using a list of writing goals/guidelines, the student will revise written assignments to improve the quality of drafts by changing and/or word choices, modifying/correcting sentence structures, as well as correcting for punctuation, capitalization, spelling, syntax, and grammar errors – 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| | | |
| | | |
| | | |
| | | |

| **EVALUATION PROCEDURE(S)** | | | | | | |
|---|---|---|---|---|---|---|
| X Portfolio | ☐ Log | ☐ Chart | X Test | X Documented Observation | ☐ Report | ☐ Other _____ |

District of Columbia Public Schools    07-02-2001    Division of Special Education  Appendix – A    IEP Page 3 of 4

| Student Name    O▇▇ O▇▇ | | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
|---|---|---|---|
| Student ID Number  9051483 | DOB ▇▇93 | Attending School  Our Lady of Victory | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: [ 9 ] |
|---|---|---|
| | Area addressed by goal: ___Social - Emotional___ | |

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in social-emotional functioning in the area of coping skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s):    Social Worker/Psychologist/Therapist and/or Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will appropriately verbalize and discuss his emotions, both positive and negative, with minimal prompting from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will **identify** various adaptive coping strategies (i.e., self time-out, counting, participating in calming activity, deep breathing, etc…) to effectively manage negative emotions (i.e., anger, frustration, anxiety, etc…) with minimal assistance from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will **identify and utilize** various adaptive coping strategies (i.e., self time-out, counting, participating in calming activity, deep breathing, etc…) to effectively manage negative emotions (i.e., anger, frustration, anxiety, etc…) with minimal assistance from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will identify and demonstrate appropriate behavioral responses to a variety of situations, both positive and negative, with minimal assistance or prompting from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| Given a variety of problem situations, the student will identify the problems, select adaptive coping strategies by which to solve it, and implement the appropriate strategy for resolution with minimal assistance from adult/therapist/teacher, 8 out of 10 situations over a consistent period of time. | | Monthly |
| The student will accept redirection and/or consequences for inappropriate behavior with decreasing need for emotional and/or behavioral support therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio  X Log  X Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____ |

| Student Name ▊▊ O▊▊ | Managing School ___C.A.R.E. Center___ | DCPS – IEP |
| Student ID Number __9051483__ DOB __▊▊93__ | Attending School __Our Lady of Victory__ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: ⎡*10*⎤

Area addressed by goal: _____Social - Emotional_____

**ANNUAL GOAL:** (including mastery criteria.)

The student will demonstrate growth in social-emotional functioning, especially as it relates to interpersonal skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____Social Worker/Psychologist/Therapist and/or Special Education Teacher_____
Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will develop a therapeutic relationship with his therapist, as evidenced by his willingness to disclose personal thoughts to therapist with minimal prompting and/or emotional support in 8 out of 10 sessions over a consistent period of time. | | Weekly |
| The student will appropriately verbalize thoughts, emotions, and/or needs to peers and adults (i.e., /teachers, school staff, therapist) with minimal behavior and/or emotional support from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| Given a variety of structured and unstructured social situations, the student will engage in positive, non-provocative, and non-aggressive interactions with peers and adults with minimal prompting and/or redirection from teachers/adults – 8 out of 10 opportunities over a consistent period of time. | | Weekly |
| Given a variety of social situations, the student will demonstrate the ability to take another's perspectives by identifying/stating the other's perspective in such situations - 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will comply with requests or directives from adults/teachers/therapist with minimal prompting, cueing and/or redirection from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will appropriately ask for assistance, when necessary or as appropriate, with regard to academic activities or social situations with minimal need for intervention from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  X Log  X Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name | O▮▮ O▮▮ | | Managing School | C.A.R.E. Center | | DCPS – IEP |
|---|---|---|---|---|---|---|
| Student ID Number | 9051483 | DOB ▮▮/93 | Attending School | Our Lady of Victory | | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: ▢/1/ |
|---|---|---|

Area addressed by goal: _____ Social-Emotional

**ANNUAL GOAL:** (including mastery criteria.)

> The student will demonstrate growth in social-emotional functioning, especially as it relates to interpersonal skills, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): _____ Social Worker/Psychologist/ Therapist and/or Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate improved self-advocacy skills, as evidenced by his ability to act in a manner that allows him to seek assistance or solve problems on his own during interactions with peers and adults - 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will demonstrate socially appropriate conversational skills, including appropriate responses to nonverbal cues, with minimal prompting and/or redirection from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will accept redirection from teacher/adult/therapist with minimal need for behavioral support from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will accept consequences for negative or inappropriate behavior with minimal need for emotional and/or behavioral support or intervention from therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| | | |
| | | |

| **EVALUATION PROCEDURE(S)** |
|---|
| ▢ Portfolio  X Log  ▢ Chart  ▢ Test  X Documented Observation  ▢ Report  ▢ Other _____ |

| Student Name ___O___ O___ | Managing School ___C.A.R.E. Center___ | DCPS -- IEP |
|---|---|---|
| Student ID Number _9051483_ DOB ___/93 | Attending School _Our Lady of Victory_ | Page 3 of 4 |

| **VII. SPECIALIZED SERVICES** | Additional Comments: | Goal Number: 12 |
|---|---|---|

Area addressed by goal: ____Social-Emotional____

**ANNUAL GOAL: (including mastery criteria.)**

The student will demonstrate increased self-regulation, impulse-control, and frustration tolerance, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): ____Social Worker/Psychologist/ Therapist and/or Special Education Teacher____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will complete classroom activities/assignments with no more than two prompts from therapist/teacher/adult during the activity/assignment in 8 out of 10 events. | | Weekly |
| The student will utilize organizational skills necessary for successfully completing work assignments within specified period of time with minimal reminders and/or prompting from therapist/teacher/adult during the activity/assignment in 8 out of 10 events. | | Weekly |
| Given a novel or challenging task that the student perceives as challenging, the student will approach the task with a positive attitude and persist through the task with minimal behavioral support (i.e., redirection, cueing, prompting) from therapist/teacher/adult in 8 out of 10 events over a consistent period of time. | | Weekly |
| The student will self-initiate the completion of assignments with no more than two prompts by therapist/teacher/adult in 8 out of 10 situations over a consistent period of time. | | Weekly |
| The student will demonstrate improved self-regulation of behavior and emotional responses, as evidenced by his ability to use adaptive strategies to remain on task, remain calm or calm herself, demonstrate appropriate boundaries, and make appropriate comments to others with minimal need for emotional and/or behavior support from therapist/teacher/adult, 80% of the time over a consistent period of time. | | Weekly |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☐ Portfolio   X Log   ☐ Chart   ☐ Test   X Documented Observation   ☐ Report   ☐ Other _____ |

| Student Name _____ C___ O_____ | Managing School ___ C.A.R.E. Center ___ | DCPS – IEP |
|---|---|---|
| Student ID Number _9051483_____ DOB ____/93 | Attending School _Our Lady of Victory___ | Page 3 of 4 |

**VII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: ☐3

Area addressed by goal: ____ Social-Emotional _____

ANNUAL GOAL: (including mastery criteria.)

The student will demonstrate growth in area of self-concept, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s): ___ Social Worker/Psychologist/ Therapist and/or Special Education Teacher ___

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria and benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will demonstrate improved self-concept, as evidenced by his ability to appropriately verbalize personal and academic strengths in discussions with peers and adults, 8 out of 10 situations over a consistent period of time. | | Monthly |
| The student will demonstrate increase self-confidence, as evidenced by his ability to take risks in academic and social situations with a decreasing need for behavioral and/or emotional support from therapist/teacher/adult, 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| With the assistance from therapist/teacher/adult, the student will identify negative/problematic behavior and with assistance, develop a plan for changing behavior with rewards, consequences, and monitoring. | | Weekly |
| With the assistance from therapist/teacher/adult, the student will monitor his progress toward identified goal(s) for academic and/or personal achievement. | | Monthly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  X Log  ☐ Chart  ☐ Test  X Documented Observation  ☐ Report  ☐ Other _____

| Student Name | C___ O_____ | | Managing School | C.A.R.E. Center | DCPS - IEP |
| Student ID Number | 9051483 | DOB ___/93 | Attending School | Our Lady of Victory | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in <u>regular education</u>? ☐ Yes ☑ No

Explanation for removal out of regular education classroom.

The student requires a therapeutic setting with low teacher-student ratio. Student also requires accommodations/modifications that can not be implemented in the general education setting.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| Large print materials, test booklets | | 27.5 | 27.5 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |
| Books on tape | | 10.0 | 10.0 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |
| Tape recorder | | 27.5 | 27.5 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for <u>testing</u>:  ☐ None needed

Timing/Scheduling: extra response time; breaks, flexible scheduling; test sessions over several days
Setting: small group or 1-to-1, as needed; behavioral support
Presentation: repeated, simplified directions; checks for understanding; test read to student; large print test
Response: written responses transcribed verbatim by test administrator; student mark answers in test book
Equipment: calculator

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V Portfolio:

☐ Level II (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☑ Level IV (Describe the alternative assessment)

test read to student

## XII. Areas Requiring Specialized Instruction and Related Services:

☑ Reading   ☐ Physical/Sensory   ☐ Transition
☑ Mathematics   ☑ Social Emotional   ☐ Vocational
☑ Written Expression   ☐ Physical Development   ☐ Independent Living
☑ Other: Cognitive   ☐ Speech/Language
☐ None   Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

**Modifications:**
☐ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| General Education Setting | Reject | |
| Combination General Education/Resource | Reject | |
| Out of General Education Setting | Accept | Negative impact on self-esteem |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

psychological services; small group or 1-to-1 instruction; behavioral support; extra response time; breaks, flexible scheduling; test sessions over several days; repeated, simplified directions; checks for understanding; calculator; templates to reduce visual field; highlighters; word processor; test read to student; large print materials; modified assignments/reduced workload; Tape recorder, magnifying equipment

Location for Services

| Student Name | O██ O██ | Managing School | C.A.R.E. Center | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number 9051483 | DOB ██/93 | Attending School | Our Lady of Victory | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education? ☐ Yes ☑ No

Explanation for removal out of regular education classroom.

The student requires a therapeutic setting with low teacher-student ratio. Student also requires accommodations/modifications that can not be implemented in the general education setting.

## X. Supplementary Aids and Services
**Classroom Needs**
(Do not name products or companies.)

| | GenEd | SETTING SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| Word processor | | 10.0 | 10.0 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |
| Highlighters | | 27.5 | 27.5 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |
| Templates to reduce visual field | | 27.5 | 27.5 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |
| Calculator | | 10.0 | 10.0 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |
| Magnifying equipment | | 27.5 | 27.5 | Hour | Week | Gen Ed and/or Spec Ed Teachers | 8/31/06 |

Check and list modifications and/or accommodations for **testing**: ☐ None needed

Timing/Scheduling: extra response time; breaks, flexible scheduling; test sessions over several days
Setting: small group or 1-to-1, as needed; behavioral support
Presentation: repeated, simplified directions; checks for understanding; test read to student; large print test
Response: written responses transcribed verbatim by test administrator; student mark answers in test book
Equipment: calculator

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III  (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V  Portfolio:

☐ Level II  (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☑ Level IV  (Describe the alternative assessment)

test read to student

## XII. Areas Requiring Specialized Instruction and Related Services:

☑ Reading
☑ Mathematics
☑ Written Expression
☑ Other: Cognitive
☐ None

☐ Physical/Sensory
☑ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☐ Speech/Language

**Modifications:**
☐ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| General Education Setting | Reject | |
| Combination General Education/Resource | Reject | |
| Out of General Education Setting | Accept | Negative impact on self-esteem |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

psychological services; small group or 1-to-1 instruction; behavioral support; extra response time; breaks, flexible scheduling; test sessions over several days; repeated, simplified directions; checks for understanding; calculator; templates to reduce visual field; highlighters; word processor; test read to student; large print materials; modified assignments/reduced workload; Taperecorder, Magnifying equipment

Location for Services

## District of Columbia Public Schools
### Washington, D.C.

| I.E.P. Attachment A |
| Intervention Behavior Plan |

### INTERVENTION BEHAVIOR PLAN     Date Developed: ___8/30/06___

Student Name ___O___ ___O___     ID# ___9051483___     DOB: ___/93   Grade 7th

Address __3512__   __Rodman Street_____   __N.W.__   ____   __Washington_____   __D.C.__   __20007__
          Street #      Street Name              Quadrant   Apartment #   City                State   Zip Code

Telephone (H) ___202/966-4368___ (W) ___202/418-1595___   Counselor _____

Attending School __Our Lady of Victory_____   Teacher _____   Room _____   Section _____

TARGETED BEHAVIOR(S):                                    Additional Comments: ☐

Refusal to complete schoolwork; Non-compliance with rules/routines or adult requests; withdrawal from situations when challenged; verbal aggression or inappropriate commenting toward peers and/or adults

POSITITVE INTERVENTION STRATEGIES: Student Objective –

Student will (1) appropriately verbalize needs, feelings, thoughts; (2) follow class rules/routine with minimal prompting; (3) appropriately ask for assistance from teacher when needed; (4) complete schoolwork with minimal prompting; (5) appropriately participate in class activities; and (6) interact with peers and adults in a friendly, non-provocative, non-aggressive manner.

Implementation description –

Participation in behavior modification plan targeting specific behaviors and specified goals, rewards, and/or consequences. Development of behavioral contract with student identifying rewards for expected behavior

POSITIVE INTERVENTION STRATEGIES: Teacher Strategies

Proximity; verbal prompting/cueing; redirection; immediate recognition when desired behavior is demonstrated; immediate redirection for inappropriate behavior; praise, rewards, and incentives; modeling; special privileges, responsibilities

MONITORING SYSTEM: Responsible Teacher - __General and/or Special Education Teacher_____

Describe System –

Charting of behavior, observation, treatment notes, anecdotal notes; Daily and/or weekly communication with parent regarding student's behavior and progress

Data Collection timeline –

Daily

FOLLOW-UP MEETING: Date - _____

DISTRICT OF COLUMBIA PUBLIC SCHOOLS  07-02-2001  DIVISION OF SPECIAL EDUCATION   IEP ATTACHMENT A   INTERVENTION BEHAVIOR PLAN

691

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

| | IEP Attachment B |
| --- | --- |
| | Transportation |

**TRANSPORTATION DIVISION**

**STUDENT TRANSPORTATION DATA FORM**

**2006-07**
School Year

9051483
STUDENT IDENTIFICATION NUMBER

(MDT must first determine if student meets the requirements for transportation services and has it included in the IEP.)

Person Making Request: Cindy F. Brown, LICSW

Date of Request: 8/30/06

Status of Request: _____

Date Request Received: _____

Person Receiving Request: _____

---

Ms. Claudia Pabo

Parent / Guardian (Print legibly or type)

202/966-4368

Telephone (H)

~~202/418-1595~~

Telephone (W)

Emergency Contact

Relationship

Telephone No.

Pager / Cell No.

Students will be taken to a central location until 6:00 p.m. if the bus attendants are unable to deliver them to the designated location. After 6:00 p.m. the police will be contacted. This year's central location is _____

---

Student:    Last Name                           First Name          MI

3512    Rodman Street, N.W.

House No.    Street Name                    Quad.    Apt.

Washington, D.C. 20007

City                         State      Zip Code

█93    M    English              C.A.R.E. Center - 202/671-0882

~~DOB    Gender    Primary Language    Submitting School and Telephone Number~~

DHI                                            None

Disability Classification                Medical Issues

**MODE OF TRANSPORTATION**    [X] *Bus    [ ] Tokens    [ ] Farecards

* SPECIAL ACCOMMODATIONS FOR BUS

Height _____    Weight _____

Oxygen      Tracheotomy tube      Seizures      Helmet

Harness      1:1 Aide      Behavioral issues _____

Medication _____            Specific allergies Latex

Dosage required during transportation :

[ ] Yes  [ ] No    Dosage _____                    [ ] PM [ ] AM

[ ] Mobility    [ ] Ambulatory ( [ ] Cane, [ ] Crutch, [ ] Walker)

[ ] Ambulatory w/ assistance ( [ ] Cane, [ ] Crutch, [ ] Walker)

[ ] Non Ambulatory ( [ ] Standard, [ ] Motorized, [ ] Oversized

w/ lap tray  [ ] Yes  [ ] No)

[ ] Car Seat            [ ] Positioning Device _____

[ ] Special Restraint    [ ] Other, Describe: _____

---

Click one of the following:

[X] **AM Pick-up & PM Drop-off** is the same as the student address.

[ ] _____

[ ] **AM Pick-up Address** _____    Telephone No.

[ ] **PM Drop-off Address** _____    Telephone No.

**Transportation will NOT be provided without confirmed placement through the proper procedures. Justification for other than neighborhood settings must be explained on the back by the school official requesting the transportation services.**

Cindy F. Brown, LICSW                202/671-0882                    8/30/06

School Official requesting transportation service:    Telephone No.        Date

School to Attend: _____    Address of School _____    Telephone No.

**Questions may be directed to the Special Education Transportation Liaison.**

District of Columbia Public Schools    07-02-2001    Division of Special Education    IEP Attachment B    Transportation

692

## EVALUATION TO JUSTIFY TRANSPORTATION

Student  O___ O_____     ID# 9051483     DOB ___/93

Attending School  Our Lady of Victory     Neighborhood School  Baton PS Deal JHS

Attach a copy to the Transportation Data Form and maintain as a part of the IEP

Justification for Transportation as a  related service as stipulated in 300.24 (15). (Check all that apply):

1. ☐   Medical reports document a severe health condition that prevents the student from walking to school. Specify _____

2. ☐   Medical reports document a physical disability that prevents the students from walking to or getting to school independently. Specify _____

3. ☐   A documented severe cognitive disability prevents the students from walking or getting to school independently. Specify _____

4. ☐   A visual and/or hearing disability interferes with the student's ability to arrive at school independently. Documentation source _____

5. ☐   A severe communication disability prevents the student from communicating for his/her own safety Documentation source _____

6. ☐   A behavior /emotional disability is so severe or erratic that there is concern for the safety of the student and/or others. Documentation source _____

7. ☐   The student is eligible for the preschool special education program and could not participate without special transportation.

8. ☒   The student is/will attend a distant school because the IEP cannot be implemented at the zoned school.

9. ☐   The student is medically fragile. Documentation source _____

10. ☐   The student requires assistance to get on and off the bus. Documentation source _____

11. ☐   The student is unable to function independently due to the severity of the disability. Documentation source _____

12. ☐   The student requires a non-routine transportation schedule (i.e. contract services, abbreviated school day). Explain _____

13. ☐   Medical reports document that the student has a physical disability and/or severe health condition that prevents him or her from walking to school. Documentation source _____

14. ☐   A documented severe cognitive disability prevents the student from walking to school. Documentation source _____

15. ☐   Other (Specify)

> |  |
> | --- |
> |  |

DISTRICT OF COLUMBIA PUBLIC SCHOOLS     07-02-2001     DIVISION OF SPECIAL EDUCATION     APPENDIX-A

## DOCUMENTED LEVEL OF SERVICE (PERM)
### Complete and attach to MDT/IEP meeting notes

| | | |
|---|---|---|
| School · Our Lady of Victory/C.A.R.E. | Principal S. Martinez (OLV) | Special Education Coordinator |
| Date 8/30/06  Case Manager Cindy F. Brown, LICSW | | Technical Support Supervisor |
| Student O___ O___ | DOB: ___93  Age 13  Grade 7  ID# 9051483 | SSN# |
| Parent  Claudia Pabo/Charles Oliver | Telephone (H) 202/966-4368 - Mom | (W) 202/418-1595 - Mom |

Address: 3512 Rodman Street, N.W.                Washington, D.C. 20007
　　　　Street #　Street　　　　　　　　　　　　　　City　　　　　　　　　　State　Zip Code

REFERRAL SOURCE: (Check)  [X] 120 Day  [ ] Reeval.  Quad  Apt. No.  [ ] HOD  [ ] SA  [ ] MA

[ ] Nonpublic  [ ] Residential  [ ] Citywide  [ ] Courts  [ ] Local School  [X] Other: C.A.R.E. Center

Previous least restrictive environment (LRE Setting):  not previously in special education

---

## JUSTIFICATION FOR SETTING CONSIDERATION
### (Submit TAT/MDT Documentation)
#### SUPPORTIVE DATA/DOCUMENTATION

**2. ACCOMMODATIONS/ MODIFICATIONS**

Homework tracking system
~~odifyingm ethods, amterials, presentations~~
change in grouping
~~change n texts/materials~~
positive reinforcement
one-to-one assistance
indivdual time to work on assisgnments

**3. DATA REQUIREMENTS**

| | | | | |
|---|---|---|---|---|
| Current IEP | Yes | [X] | No | [ ] |
| Signatures of required participants (MDT notes) | Yes | [X] | | |
| Intervention Behavior Plan | Yes | [ ] | | |
| ~~Copies of current class work and homework assignments~~ | Yes | [X] | | |
| Medical Reports: | Yes | [ ] | No | [ ] |
| Clinical Reports: | Yes | [X] | No | [ ] |
| Psychiatric Reports | Yes | [ ] | No | [ ] |
| Medications: | Yes | [ ] | No | [ ] |
| Attendance Record | Yes | [ ] | | |
| Copies of most recent evaluation(s) | Yes | [X] | | |

**4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.)**

SEP/Referral meeting - 4/26/06
MDT/IEP Meeting - 8/10/06
MDT/IEP/SEP Meeting - 8/30/06

**5. Resources needed for program implementation**

Highlighters
Calculator
Work Processor
Templates to reduce visual field
Magnifying Equipment
Large Print materials, test books

---

### 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | [ ] in general education classroom setting | [ ] general educators with consultation from special education staff | [ ] between 0% and 20% of service time |
| 2 | [ ] combination general education and resource classroom | [ ] combination of general educators, special educators and related service providers | [ ] between 21 % and 60% of service time |
| 3 | [X] *out of general education classroom | [X] special educators and related service providers | [X] between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings).

Check the level of need as indicated:
~~DIRECTIONS:~~

| | |
|---|---|
| If two or three boxes are checked in the Row 1, check LOW. If two or three boxes are checked in the Row 2, check MODERATE. If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student. |

### 7. LEVEL OF NEED

| [ ] LOW | [ ] MODERATE | [X] HIGH |
|---|---|---|

07-02-2001                                Attention: Technical Support Supervisor / PERM Compliance Team

District of Columbia Public Schools
Local Education Agency
Special Education Branch
Occupational/Physical Therapy Unit
(202) 576-5422

## OCCUPATIONAL THERAPY EVALUATION REPORT

### STUDENT IDENTIFYING INFORMATION:

**Student Name:** O█████, O███
**D.O.B.:** █████/93
**Parent(s):** Claudia Pabo and Charles Oliver
**Address:** 3512 Rodman St NW Washington DC 20015
**C.A.:** 13 years 7 months
**School:** Kingsbury
**Phone:** 202-966-4368
**Therapist:** Delise Holloman, OTR/L
**Date of Evaluation:** 10/19/06

### REASON FOR REFERRAL:

O████ is a 13-year, 7-month-old Caucasian male student referred for an occupational therapy evaluation to assess his need for school-based services. O███ was referred for an evaluation for special education services by his school special education teacher due to concerns regarding his academic and social/emotional functioning as per social history report.

### HISTORY/BACKGROUND INFORMATION:

As per social report as well as psychoeducational report, special education evaluation, it is reported that O███ is two years older than his grade mates who will enter the sixth grade in the fall of 2006. Ms. Pabo, the student's mother, reported that she essentially home-schooled O███ during the elementary years as he was not learning during school hours and her concerns were about the number of injuries that O███ sustained at the hands of older children at a previous school, at Eaton, he was attending. He is adopted. He was adopted when he was 5 years old and, at the time, both parents, a sister and an older brother live together. However, since that time, the parents have separated. As per report, current issues include specific learning disabilities, language disorder, problems with reading social cues, peer relationships and behaviors associated with attention deficit hyperactivity disorder. O███ was also identified as having fetal alcohol syndrome. O███ has had two incidents of testing, one when he was on medication due to his severe ADH and the other when he was off of his medication. They had recommended a minimum of two to three hours a week of speech and language therapy, occupational therapy for at least two hours a week and a minimum of five hours a week of special education support. Currently, he is attending Kingsbury school and does not receive any occupational therapy at this time; thus, the purpose of the occupational evaluation. It was reported, as well, that other

**Occupational Therapy Evaluation Report**

**Student Name:** O▮▮▮▮, O▮▮
**D.O.B.:** ▮▮▮▮/93
**Therapist:** Delise Holloman, OTR/L
**Page 2**

concerns are significant difficulties with attention and organization, his lack of focus as well as problems with transition. O▮▮ lives with his mother a brother and a sister in a home and the children split weekends with their parents.

**BEHAVIORAL OBSERVATIONS:**
O▮▮ was observed in his classroom as well as the testing area. In the testing area, he was able to follow various directions, ask appropriate questions. It was noted that there were minimal distractions but he was easily verbally cued back on task. It is felt that this is an accurate assessment of O▮▮▮ current skill level in the areas tested.

**ASSESSMENTS ADMINISTERED:**
 MVPT-III revised (Motor-Free Visual Perception Test-Revised)
 TVMS (Test of Visual Motor Skills-Revised)
 Classroom Observation
 Teacher Interview
 Clinical Observation
 Record Review
**ASSESSMENT RESULTS:**

**CLASSROOM OBSERVATION/Teacher Interview:**
O▮▮ was observed in his science class for approximately 45 minutes. He was very distracted and fidgety at his desk. He used a paper clip and was playing with a paper clip during class session. He was also asked to participate in the classroom sessions by the teacher and he asked the teacher at one point, " Well, where are we on our paper?" He was able to answer a couple of questions that the teacher asked even though he was distracted and not focused on the activity. He continually played with the paper clip, doodled and just played with other items on his desk while in the classroom. Mr. Eldridge, the science teacher, reported that this was one of O▮▮▮ better days. He appeared to be more focused than usual. However, when he initially started the class, he was very disorganized, he needed verbal cues to focus on task and, at one point in the session, the substitute teacher also had to stand by O▮▮ at the desk and continually cue him on where the class was in reference to the activity that was being done in the classroom and what he had to write on his paper. O▮▮▮ teacher Sara Hutchkins reported that he has difficulty organizing his thoughts into writing and struggling to make transitions from one class to the next. His posture, as Ms. Hutchkins noted, was stiff when sitting

**Occupational Therapy Evaluation Report**

**Student Name:** O██████, O███
**D.O.B.:** ████/93
**Therapist:** Delise Holloman, OTR/L
**Page 3**

in a regualar chair. His pencil grip was hard and that he wrote hard. reports that he has difficulty maintaining focus during the whole class and in small groups and doing individual work. He is easily distracted. He has a hard time copying notes from the board onto the paper or an Alphasmart. He also has difficulty with executive functioning. However, when asked to read aloud, he read independently in the class and he did raise his hand to ask the teacher where he was on the work sheet. Eventually, he placed his head on the desk and, when called to respond to some questions, he was unable to respond with the answer.

**TEST OF VISUAL MOTOR SKILLS-REVISED:**
This test is designed to assess a child's ability to translate motorically with his or her hand what they perceive visually. It consists of 23 forms/designs that the student is asked to copy. The eight classifications in scoring are closure, angles, intersecting/overlapping individual lines, size of design, rotational reversals, ling lengths, over/underpenetration and modification of designs.
O██████ raw score was 130, his motor age is 12 years, 6 months. His standard score was 103, his scaled score was 11 and percentile rank was 58. O███ demonstrated a 1-year, 1-month delay in the areas of visual-motor. Although he had a pretty high score, he did display some deficits in the areas of closure, modification of designs, angles and over/underpenetration of angles, particularly in that area. He was able to duplicate what he saw in the test booklet; however, he needed verbal cues to take his time, to slow down. Overall, he did very well with copying the objects.

**MOTOR-FREE VISUAL PERCEPTION TEST-III:**
This is a 65-item multiple choice test administered to assess a child's visual (their ability to see) and perceptual (their interpretation of the material presented) skills without the motor component. For students ages 4 through 10, only items 1 through 40 are administered. For students ages 11 years and older, administration begins with number 14 and continues thought number 65. The student is required to either point or verbally indicate the letter of the four alternatives that he or she feels is the correct response. The five areas identified and assessed with the MVPT-III are the following:
1.    Spacial Relationships: The ability to orient ones body in space and to perceive the positions of objects in relation to oneself and other objects; for example, figure reversals and

**Occupational Therapy Evaluation Report**

**Student Name:** O████, O████
**D.O.B.:** ████/93
**Therapist:** Delise Holloman, OTR/L
**Page 4**

figural rotations.

2.  Visual Discrimination: The ability to discriminate dominant features of different objects; for example, the ability to discriminate position, shapes, forms, colors and letter-like forms.

3.  Figure Ground: A form of visual discrimination that involves the ability to distinguish an object from the background (or surrounding objects).

4.  Visual Closure: A form of visual discrimination that involves the ability to perceive a whole figure when only fragments are presented.

5.  Visual Memory: The ability to recognize one stimulus item after a very brief interval.

Scoring for the MVPT is based on the number of correct responses (raw score). O████ raw score was 52, his standard score was 99, his age-equivalent is 13 years. Overall, O████ displays a 7-month delay in this area, particularly in the areas of visual memory and figure ground. He required minimal to moderate verbal cues to take his time and to really look at the items and to focus on what was being done.

**CLINICAL OBSERVATION:**
During testing, O████ was seated on a ball to increase his inability to attend and to focus on task and to work on his posture. He was able to sit with his feet on the ground, in an upright posture close to the desk while performing all the activities that require writing or eye-hand coordination tasks. First he was given a 24-piece puzzle in which he was able to put together independently upside down and then he turned it around. He did not need any visual cues. He was also given a Lego puzzle with visual numerical instructions and he was able to read and follow the instructions to complete this puzzle with no assistance from the therapist, no cues. It appeared when performing activities that required him to put together things such as the 24-piece puzzle as well as the Lego puzzle, he was very focused and determined and was able to complete the task in a timely fashion. He was very talkative through the whole process while he was performing this task and, for the most part, his comment was, "I like building things," and he said, "I am so disorganized." He was able to maintain fair posture while sitting on the ball. He used his elbow occasionally to support himself. O████ was able to catch and throw a tennis ball 6/6 trails, bounce and pass a basketball and dribble alternating hands and with

**Occupational Therapy Evaluation Report**

**Student Name:** O████, O████
**D.O.B.:** ████/93
**Therapist:** Delise Holloman, OTR/L
**Page 5**

both hands independently. He was able to use a scooter board using just his upper extremity to propel himself.When asked why he did not use his legs student replied" I like ussing my arms". It also appeared that O███ sitting on the ball encouraged him to be less distracted and mor focused on table top activities.

**UPPER EXTREMITY FUNCTION:**
O███ demonstrated appropriate muscle strength in his arms and his legs for his age. His range of motion, which is the (degree of movement in his joints), was within normal limits. The tone, which is the (degree of muscle tension), was also within normal limits.

**VISUAL SKILLS/SENSORY PROCESSING SKILLS:**
This skill area focuses on the student's ability to organize and interpret sensory input needed for an appropriate adaptive response and interaction with the environment. O███ was noted to have smooth eye movements to locate objects either stationary or moving (tracking). His eyes came together appropriately (convergence) as needed for near and far point copying, up close and board work tasks. O███ wears glasses and he performed all these activities with his glasses.

**HANDWRITING SKILLS:**
Clinical observations were made of O████ hand dominance, grasp pattern writing pressure, alphabet and number reproduction, spacing/alignment, directionality/reversals and stabilization of written work. O███ was asked to write his name at the top of the paper, as well as date. He was able to write his name; however, spacing was a problem. He was able to write a sentence with poor spacing and with poor directionality and letter formation. However, he did demonstrate good punctuation and capitalization of the sentences. He was asked to also writer upper and lower case letters of the alphabet which he completed in a timely fashion. However, some of the letters were written in the wrong direction; for example the letter P and J, starting from bottom to top. He did display adequate spacing when writing these letters as well as legibility. Also, when writing his numbers, he wrote 1 through 20 and was able to write those numbers correctly and in a timely fashion, with fairly good spacing and alignment. He was asked to come up with a sentence on his own, which he did, and displayed minimal directionality problems; however, spacing appears to be a problem, but the sentence was legible. He used his right hand to stabilize the paper while writing and he used adequate, good

**Occupational Therapy Evaluation Report**

**Student Name:**    O██████, O████
**D.O.B.:**        ██████/93
**Therapist:**      Delise Holloman, OTR/L
**Page 6**

pressure and had formed a good tripod grasp when writing.

**SCISSOR SKILLS:**
Clinical observation of O████ scissor skills was made. He was noted to orient himself to the scissors and paper effectively. He used the table and his left hand occasionally to stabilize the paper and to move it appropriately. When he was having difficulties cutting more complex designs, he was able to raise the paper up and use his hand to manipulate the paper to cut it effectively. He demonstrated average ability to open and close the scissors. He was able to cut out the shapes on a bold-face line. The movements were noted to be slow and meticulous and very smooth. He had no difficulty cutting out the shapes.

**SELF-CARE SKILLS:**
O████ reports that he is able to bathe himself and dress himself independently. He demonstrated the ability to tie his shoes independently. He also reports that he is able to open various containers in the cafeteria and has no difficulty with eating. He also reports that for his chores he helps his mom occasionally with sweeping off the front porch and the front walk but he needs major help with his room, his room is so disorganized. He reports that he does not, as far as his hobbies are concerned, prefer to play any team games. He does like to shoot basketball and toss a football. He enjoys swimming, ice skating and rollerskating and running.

**SUMMARY:**
O████ is a 13-year, 7-month-old Caucasian student who is currently in the 6th grade at Kingsbury school. As a result of classroom observation and formal assessments, O████ demonstrates minor deficits in the areas of visual perception, with a 7 month delay and, in the area of visual motor skills, with also a deficit of 1-year, 1-month delay. It is recommended that O████ receive school-based occupational therapy one time a week for 30 minutes to address fine motor, visual motor and visual perception deficits. It is also recommended that occupational therapy engage the student in various therapeutic tasks and exercises to achieve the objectives outlined in his current IEP. The teachers and family working with O████ are more than welcome to contact the therapy department for further information as needed. The number for the therapy department is 202-576-5422.

**RECOMMENDATIONS:**

**Occupational Therapy Evaluation Report**

Student Name:  O███████, ███████
D.O.B.:         ████████/93
Therapist:     Delise Holloman, OTR/L
Page 7

1.    O███ sit in the front of the class and that instructions are presented in simple form as well as written form.
2.    O███ should be given ample time to perform written activities such as tests and assignments and to encourage him to ask for help if needed.
3.    It is also recommended that a behavioral program be set in place to provide rewards when O███ has completed an assignment or has focused on an activity within a certain amount of time.
4.    O███ be given an organized list of things that need to be done for that day; however, not overwhelming - maybe three items - that can be placed on the list so that he knows what he has to do that day, and then a list when he gets home of what he needs to do.

*Delise Holloman OTR/L*           10/23/06
Delise Holloman, OTR/L            DATE

304/OTI:HSC/422/768331
D:  10/20/2006 1109
T:  10/23/2006 0945

701



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

Central Assessment Referral and Evaluations
(C.A.R.E.) CENTER @ Shaw JHS
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001
202-671-0882, fax: 202-673-6557

# facsimile transmittal

| | | | | |
|---|---|---|---|---|
| To: | M. Eig, Esquire | Fax: | 301/657-3843 | |
| From: | Emily F. Brown, LICSW – Date: Case Manager | | 10|25|06 | |
| Re: | | Pages: | 6 | |
| CC: | | | | |

☐ Urgent    ☐ For Review    ☐ Please comment    ☐ Please Reply    ☐ **Please Recycle**

Occupational Therapy Evaluation Report

Please forward a copy of the report to Ms. Pabo.

Thank you

702

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | M. Eig, Esquire | Fax: | 301/657-3843 |
| From: | Gingy F. Brown, LICSW – Case Manager | Date: | 10|25|06 |
| Re: | O [ ] | Pages: | 8 |
| CC: | | | |

☐ Urgent   ☐ For Review   ☐ Please comment   ☐ Please Reply   ☐ **Please Recycle**

Occupational Therapy Evaluation Report

Please forward a copy of the report to Ms. Pabo.

Thank you

. . . . . . . . . . . . . . . . . . . . . .

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO                    1016
RECIPIENT ADDRESS      93016573843
DESTINATION ID
ST. TIME            10/25 15:12
TIME USE                   01'08
PAGES SENT                     8
RESULT                        OK
```

703



**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
Central Assessment Referral and Evaluations
(C.A.R.E.) CENTER @ Shaw JHS
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001
202-671-0882, fax: 202-673-6557

<u>**This report is confidential and should be secured at all times. Use and disclosure of this information should be done within the guidelines of The Health Insurance Portability and Accountability Act (HIPAA) of 1996.**</u>

| REVISED COPY |
| --- |

**Social Work Evaluation Report**

**Demographic Information**

| | | | |
| --- | --- | --- | --- |
| Name of Student: | O█ O█████ | Gender: | Male |
| DOB: | ████/93 | Ethnicity: | Asian American |
| Primary Language: | English | Religion: | |
| School/Grade: | Our Lady of Victory/5th | Student ID#: | 9051483 |
| Neighborhood School: | Eaton ES | | |
| Parent/Guardian: | Claudia Pabo/Charles Oliver | Telephone#: | 202/966-4368 (Home) |
| Address: | 3512 Rodman Street, N.W. | Telephone #: | 202/418-1595 (M - Work) |
| | Washington, D.C. 20007 | | |

Person(s) Interviewed: Claudia Pabo (Mother)
Date of Interview:     6/28/06
Interviewer:           Cindy F. Brown, LICSW
Document(s) Reviewed: Multi-disciplinary Team Meeting - MDT Notes (4/26/06); Student Evaluation Plan –
                       SEP (4/26/06); Neuropsychological Evaluation (Educational Assessment (R. Federici,
                       5/3/06); Our Lady of Victory Report Card (2005-06); Eaton ES Report Card (6/4/04);
                       Stanford Nine Test of Achievement (4/2004); Stanford Nine Test of Achievement
                       (4/2003); Copies of classwork (undated)

**Social History Interview**

**Reason for Referral**

O█ was referred for evaluation for special education services by his school's special education teacher (Mary Ann Ewers) and mother (Claudia Pabo), due to concerns regarding his academic and social-emotional functioning. Per the C.A.R.E. Center Referral (2006), he is reported to have difficulty completing schoolwork; difficulty competing written assignments; organization, participating in instruction; maintaining attention and concentration; retaining visual information, following school rules, and interacting appropriately with peers and adults. O█ also lacks motivation and attempts to avoid schoolwork. He is rated as average in all academic areas, expect written language and science. His mother, Ms. Pabo, also reports similar concerns regarding O█ academic functioning and indicates that he is diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

**Involvement with School and/or Community Agencies**
**(include information regarding social, medical, legal, psychological, psychiatric, school –based, academic, educational advocate/attorney services, as well as any evaluations – educational, psychological, psychiatric, medical – that may have been completed)**

According to Ms. Pabo, O█ has received school-based services at various times throughout his schooling. He received English as a Second Language (ESL) services from first through fifth grades, as well as

, O.
Page 2

minimal accommodations (i.e., daily homework checklists from his math teacher) during fifth grade at Eaton ES. Ms. Pabo also obtained private tutoring two to three times per week through Sylvan Learning Center in order to provide O███ with additional academic support. He also underwent neuropsychological evaluation (Federici, 2006) after an incident in which he verbally threatened to harm another student. Ms. Pabo reports that evaluation was a condition of his return from suspension, as the school administrator was concerned as to whether O███ posed any serious threat to students.

The results of O███ psychological evaluation (2006) revealed cognitive functioning in the low average to borderline range. Achievement testing revealed low average oral language skills and below average reading, math, and written language skills. Assessment of his language skills indicated below average functioning. Additional testing to assess his ADHD symptoms and emotional functioning revealed significant problems in these areas.

O███ does not receive any community-based services nor is he or any immediate family members presently involved in the legal system. There is a past history of legal involvement as it relates to domestic violence and mediation regarding child custody issues.

Ms. Pabo has retained the services of educational consultants, Dr. Laura Solomon and Peter Sturtevent, in order to identify a placement she deems appropriate. Ms. Pabo indicates that her experiences with DCPS in identifying an appropriate placement for her daughter cause her to question whether DCPS can offer a placement that meets O███ needs.


<u>School History</u>
(include information regarding school placements, progress, retentions, general education or special
education services, behavioral concerns, peer relations, etc... )

O███ began his schooling (pre-kindergarten) at Hearst ES. Ms. Pabo indicates that he began pre-kindergarten instead of kindergarten, his appropriate grade. She believed that he did not have the foundation to be successful in school since he had just been adopted from a Russian orphanage. He continued at Hearst ES until third grade and then, enrolled at Eaton ES for fourth and fifth grades. Due to concerns regarding O███ ability to adequately function in a larger school, he was enrolled at Our Lady of Victory. He repeated fifth grade upon the recommendation of school staff.

According to Ms. Pabo, O███ did not experience any significant adjustment difficulties in pre-kindergarten. He learned English very quickly and did not preset with any behavioral concerns. Learning issues became evident in kindergarten, as he had difficulties associating sounds with their respective letters. Ms. Pabo indicates that she obtained private speech therapy services (one to two times per week) to address O███ weaknesses in phonetic skills, but notes that he continues to have difficulty in this area. His decoding and reading fluency skills improved, but he still had difficulty comprehending written information. These learning issues persisted in first grade, but they were compounded by the onset of behavioral issues. O███ was consistently disruptive in class (i.e., out of seat behaviors, singing, talking during instruction) and was asked to leave the classroom. Ms. Pabo indicates that O███ spent a significant amount of time in the hallways pretending to be a truck or a train and that the school did not provide adequate academic or behavioral support. She believes he was only promoted because he was an ESL student.

O███ school functioning improved in second grade, as his teacher was much more supportive. Although his behavior improved significantly, he still was not completing his schoolwork even with assistance from an aide. Ms. Pabo reports that she took leave from work approximately five hours per week to observe and assist O███ in class. Through her observation, it was apparent that he did not understand written or oral directions and needed much more individualized assistance. With her help, he began completing his classwork and making progress. Although O███ made significant progress in second grade, Ms. Pabo indicates that he was still functioning below his expected age- and grade-level. O███ demonstrated improved academic and social-emotional functioning in third grade, but he continued to lag behind his peers. Ms. Pabo notes that she was unable to devote as much attention to O███ during third grade, as her older son was experiencing academic concerns requiring her time and attention. His results from the Stanford Nine Test of Achievement (April, 2003) indicated that he performed at the "Proficient" level in Vocabulary; "Basic" in Total Reading, Reading Comprehension, Procedures, and Science; and "Below Basic" in Total Math, Problem Solving.

According to Ms. Pabo, she transferred O███ to Eaton ES in fourth grade. Adjustment difficulties were immediately evident, as he would leave his class during transitions to specials and hide in the lavatory or

705

O█████, O.
Page 3

custodian's closet. O█ would also wander the hallways and/or remain on the playground with other classes (during other recess periods). Ms. Pabo believes he was attempting to avoid instruction. Although he had been diagnosed with ADHD that summer, he had not undergone pharmacological treatment. Once medication (i.e., Concerta and Ritalin) was prescribed, his behavior improved. Ms. Pabo notes that she provided a great deal of home instruction to O█ as well as private tutoring two to three days per week in an effort to improve his academic performance. Tutoring was particularly beneficial in improving his math, although he demonstrated overall academic progress. Per results from the Stanford Nine Test of Achievement (April, 2004), O█ scored "Proficient" in Vocabulary; "Basic" in Total Math, Problem Solving, and Procedures; and "Below Basic" in Total Reading and reading Comprehension. His fourth grade report card (June, 2004) indicates that he has satisfactory performance in all areas except reading. Reading was not graded, as it was taught through ESL.

In fifth grade, Ms. Pabo reports that O█ received more academic and behavioral support under ESL. He was provided resource instruction (i.e., small class instruction) in language arts and this allowed him to receive more individualized assistance. Ms. Pabo indicates, however, that additional help for O█ was provided as a means of amelioration after the school failed to ensure that he was receiving math instruction during the first five to six weeks of school. She reports that she discovered O█ evaded math class by telling each of the math teachers that he was assigned to the others' class. This issue was resolved and his math teacher implemented a plan to track his class and home assignments. His other teachers did not implement such a plan, as Ms. Pabo believes that they expected him to be responsible for tracking, completing, and turning in his assignments. Consequently, Ms. Pabo continued private tutoring so that O█ would receive the additional support he needed. At the end of fifth grade, he was reportedly exited from ESL services and reportedly scored "Basic" (in Language Arts and Math) and "Proficient" (in Vocabulary) on the Stanford Nine Test of Achievement.

Due to concerns regarding O█ functioning in a large school setting, O█ was enrolled at Our Lady of Victory (OLV). Ms Pabo reports that she chose this program due to its strong academic component, especially in language arts. OLV recommended that O█ repeat fifth grade in order to have more opportunity to improve his overall academic skills and Ms. Pabo agreed. Initially, O█ attempted to avoid homework, but this was addressed through the implementation of a homework tracking system. Academic difficulties, however, persisted as a result of his deficits in reading comprehension and poor motivation. Math, which had been his strength, had also become more difficult, but Ms. Pabo believes this was due to his teacher's delivery of instruction. Ms. Pabo reports that she spent an extraordinary amount of time (i.e., 3 to 5 hours nightly) on home instruction and eventually resorted to reading material to him since his oral comprehension skills are much better developed. His reading skills stagnated as a consequence. Moreover, his performance continued to be inconsistent due to his failure to review his work and correct for errors. O█ third quarter report card from OLV indicates that he received an A in religion; B's in language arts and math; a C in social studies; and a D in science. It is noted that he is two grades below his same-age peers.

Socially, O█ is described as having ongoing difficulties throughout his schooling with regarding to social interactions. He is noted to be small for his age and height and has a history of minor and serious injures at school resulting for rough play with same-age or older male students. Ms. Pabo reports that he often plays alone and occasionally plays with female peers of the same-age. O█ has not developed any close friendships with peers at school, although he has had a few play dates with one particular boy. Ms. Pabo believes that the student have not been very accepting of O█ as they have been already developed close social groups.

Per parent report, O█ also has a history of behavioral and emotional issues resulting from his impulsivity; difficulty managing frustration and anger; and inability to accurately interpret social situations. Since first grade, he has consistently presented with disruptiveness and/or noncompliant behavior (i.e., talking during instruction, failure to go to class, refusal to complete homework). Aggressive behavior only became evident this past school year and Ms Pabo contributes these incidents to O█ misunderstanding of or over-reaction to social situations. He is reported to have overreacted to students' comments/questions about a leg injury at the beginning of the school year when he thought students were insinuating that he was faking the injury. He also made a derogatory comment to another student in response to similar comments made to him by this student. The most serious incident, however, was when O█ wrote a letter to a friend who was recently diagnosed with cancer. The letter contained aggressive themes of revenge (aimed at the doctor who made the diagnosis), as well as anger (centered on his personal feelings of loss). Ms. Pabo believes that this incident triggered emotions related to her previous diagnosis of cancer and surgery two years prior, as he had significant difficulty coping with this event. Ms. Pabo notes that subsequent testing revealed that the diagnosis was incorrect.

O█, O.
Page 4

O█ has also experienced suspensions this past school as a result of verbally aggressive behavior. Ms. Pabo believes that O█ behavior was not reflective of intent to harm others, but a manifestation of his difficulties in accurately interpreting social situations and responding appropriately to stressful situations. He was suspended for a half-day for a perceived threat toward a teacher and again, in November for unknowingly making an obscene gesture. O█ was last suspended in April for threatening physical harm against another student. Ms. Pabo reports that O█ had been taunted by another student and told this student that he had guns at home and would defend himself if that student came to his home. OLV took this incident very seriously and required that O█ undergo psychiatric/psychological evaluation as a condition of his return to school. A psychological evaluation was immediately obtained, however, the results of the evaluation did not reveal that he was a danger to others. Ms. Pabo believes that O█ medication regimen likely contributed to his behavioral difficulties, as he was very irritable while he was on such a high dose of ADHD medication. Another factor may also have been provocation from peers who were aware of his difficulties coping with negative situations. She also notes that O█ is very empathetic toward others and when he behaves or reacts inappropriately in situations, he is remorseful.

Family History
(include information regarding household composition, significant persons not in household, family relationships, occupation and level of education – as relevant, separations, history of moves, losses, etc... )

O█ is a thirteen-year-old male of Russian descent who was adopted by Claudia Pabo and Charles Oliver when he was five years. Prior to his adoption, he lived an orphanage in Russia from infancy to three years and then, another orphanage from three to five years. Ms Pabo notes that the second orphanage was specifically for children with disabilities. She reports that documents she reviewed indicated that he has an older biological sister. Ms. Pabo reports that her father who speaks Russian stayed with the family for the first few weeks to assist O█ in his adjustment. He experienced some adjustment difficulties, but such concerns appear to have been manageable.

O█ presently resides in N.W. Washington, D.C. with his adoptive parents and two adoptive siblings (15-year-old brother and sister). His brother and sister were both adopted from a Russian orphanage at 2 ½ and 3 ½ years of age, respectively. None of the children are biologically related. Ms. Pabo and Mr. Oliver are recently separated and have been for approximately nine months. The children spit residences between parents.

Ms. Pabo alleges that she and her husband separated as a result of domestic violence. She cites many incidents of aggressive behavior (verbally and physically) on the part of her husband and indicates that two of the most incidents required police intervention. None of the incidents involved violence against the children. She does note that O█ verbally expressed a desire to protect her, although he did not physically intervene. Ms. Pabo acknowledges that she was arrested once for striking her husband after feeling threatening. She notes, however, that the police did not arrest her husband after the last incident, although there were obvious signs that he assaulted her. The police did suspect child endangerment since the children witnessed the domestic violence. Ms. Pabo reports that as a consequence, social services became involved and investigated the family with regard to the allegations of child endangerment. She indicates that she was advised to obtain a protective order and soon after she began the process of obtaining such an order (in June 2005), she and her husband negotiated a custody agreement in which they share joint custody of the children. O█ in particular, resides with his mother on days with school nights, his father on the remaining days, and alternate weekends and holidays between both parents.

According to Ms. Pabo, she and O█ share a mostly positive relationship. He is, however, noted to have difficulty responding to request/directives and sometimes becomes oppositional and irritable around schoolwork. O█, at times, verbally challenges adult authority and needs prompting to comply with requests/directives. Ms. Pabo indicates that he does not fully trust adults to make appropriate decisions regarding his well being and therefore, attempts to negotiate his compliance. She also acknowledges that she may be reinforcing this behavior, since she does not consistently expect immediate compliance with her request/directives. Discipline usually ranges from discussions (about expected/appropriate behavior) to physical discipline (i.e., spanking) being the last resort. Ms. Pabo reports that she no longer uses physical discipline, due to her concerns regarding whether physical discipline or threats of physical discipline was contributing to negative behavior. Overall, O█ is described as a funny, affectionate, helpful, relatable, and empathetic child who has various challenges that impact his overall functioning.

With regard to the father-son relationship, O█ shares a somewhat conflictual relationship with his father, Mr. Oliver. Ms. Pabo reports that O█ loves his father, but is very angry about how his father treated her. He was,

O█████, O.
Page 5

initially, very ambivalent about visitation with his father, but this has improved. Ms. Pabo notes that she would not force O██ to visit with his father and initially, this was issue of contention between her and his father. O██ now visits regularly with his father, but expresses his anger through rudeness, snide comments, and inconsiderate behavior. Ms. Pabo has addressed this behavior with O██, but it has not ceased. She also reports that Mr. Oliver is somewhat permissive and his failure to consistently redirect inappropriate behavior often leads to him becoming very angry and having outbursts. He then expects immediate compliance. Ms. Pabo reports that Mr. Oliver is improving with regard to discipline, but consistency remains a concern.

O██ reportedly shares somewhat positive relationships with his siblings. He does not interact much with his sister, but their relationship is considered very typical. With regard to O██ relationship with his brother, Ms. Pabo notes that there is a history of previous conflicts resulting from his brother's teasing. She and Mr. Oliver have since addressed this issue after it became evident that the teasing was impacting O██ functioning at school. Ms. Pabo also indicates that sibling conflicts also arise as a result of O██ failure to acknowledge personal boundaries and space. This, however, has significantly improved, since Ms. Pabo gave them separate rooms. They still share a room at their father's home.

With regard to O██ functioning in the community, he has difficulty interacting with same-age peers, although he interacts well with younger children and adults. He often plays alone and has not developed close friendships. Ms. Pabo also indicates that he has a history of being somewhat indiscriminate in his interactions with adults (i.e., affectionate towards or initiating interactions with unfamiliar adults) and consequently, she has implemented very strict guidelines regarding personal safety, especially in public places. She relates this behavior to attachment issues identified by his psychologist O██ is also very impulsive and during summer camp was reported to have damaged a restroom door by repeatedly striking the door with a rock. Ms. Pabo notes that the last incident occurred shortly after she and her husband separated.

Trauma History

According to Ms. Pabo, O██ experienced significant trauma as a result of his early history in the orphanages in Russia. Specific information is not available, but it appears he has developed significant issues related to attachment. Ms Pabo also reports that she experienced a health crisis two years ago, which was extremely upsetting to O██, especially. He visited her in the hospital at every opportunity, became very clingy, and began reporting somatic complaints (i.e., pain in his testicles). He was evaluated on several occasions, but no medical issues were revealed. Ms. Pabo believes that this was his way of testing her ability to care for him. O██ has not resolved issues regarding safety and stability and such issues, again, resurfaced after he found out that his friend had cancer. O██ reacted with significant emotionality and wrote a letter to his friend expressing anger and aggression toward the doctor who gave the diagnosis, as well as significant self-centeredness regarding his own feelings of personal loss.

Birth/Developmental/Medical History

(include information regarding pregnancy, birth, in utero exposure to substances/alcohol, infant health, medical concerns – physical defects scars, physical disability, frequent colds, special dietary needs, allergies/hay fever, speech problems, ear infections, asthma, frequent sore throats, lead poisoning, diabetes, headaches/migraines, epilepsy/seizures, surgeries, serious accidents/injuries, heart conditions/disease, sickle cell anemia, cancer, enuresis/encopresis, head injuries, fever above 104 F, vision problems special equipment for school, sleeping problems/disorders, eating problems/disorders, etc...)

Ms. Pabo has limited information regarding O██ birth and early developmental history. She reports that his biological mother was single and had an older daughter. His Apgar scores at birth were reportedly normal and his weight was somewhat low, but still in the normal range. Ms. Pabo is unaware of any medical concerns following his birth and indicates that he had a physical examination prior to leaving Russia.
O██ early developmental history is reportedly remarkable for speech delays, but Ms. Pabo believes this was due to a lack of stimulation while he was residing in the orphanages. He began speaking at three years and his first language is Russian. Beginning at age six, O██ received speech therapy once to twice per week for several years to

O███, O.
Page 6

address fluency and phonetic skills. Ms. Pabo notes that his oral fluency is now a strength and he enjoys talking to others. He was evaluated soon after he arrived in the United States and developmental delays in multiple areas were confirmed. Ms. Pabo notes that he does not present with any gross motor issues, but appears to have fine motor, visual perceptual, sensory integration, and language concerns. O███ is also crossed-eyed and she believes this contributes to his reading difficulties. He received vision therapy in the past. O███ is reported to fatigue easily during writing activities and has demonstrated left-hand preference. He also is sensitive to noises and touch. O███ learning issues are confirmed through neuropsychological evaluation (2006) and he has been provided diagnoses of Cognitive Disorder, NOS (Not Otherwise Specified); Mixed Receptive-Expressive Language Disorder; Learning Disorder, NOS; Mathematics Disorder; Disorder of Written Language; Developmental reading Disorder; ADHD, NOS (Secondary to Multi-Sensory Neurological Deficits); Adjustment Disorder of Childhood with Mixed Emotional features (Anxiety, Depression, and Periodic Disturbance of Conduct); Post-Traumatic Stress Disorder – PTSD (Early Childhood Institutionalization); Low Average – Borderline Intellectual Functioning; and Psychosocial Growth Failure Secondary to Fetal Alcohol Spectrum Disorder.

Per parent report, O███ medical history is remarkable for growth delays, likely fetal alcohol exposure, ADHD, and latex allergies. Ms. Pabo notes that his height and weight is below the 1st percentile for his age. He has dysmorphic ear placement, which is associated with fetal alcohol syndrome, and wears corrective eyeglasses for strabismus (cross-eyes). Ms. Pabo reports that at the time of the adoption she was aware of the implications of his facial dysmorphia, but did not reveal this information with her husband. O███ is currently prescribed Concerta (36 mg, qam) and Ritalin (5 mg, tib - morning, afternoon, and evening) to manage ADHD symptomology. His medication was recently adjusted and he is benefiting from pharmacological treatment. O███ reportedly had been evaluated by an endocrinologist to assess his growth delays. Ms. Pabo indicates that the evaluation revealed delayed bone age, but it is suspected that he will eventually reach a normal height and weight. He underwent a physical examination in August 2005 and no medical concerns are identified. O███ immunizations are up to date and there are no concerns regarding his hearing. O███ has orthodontic issues and wears braces. Presently, he appears to be in good physical health.

Ms. Pabo notes that O███ has sustained minor, as well as serious injuries (i.e., leg fracture), resulting from being accidentally knocked down steps or knocked over due to his small size and weight. He sustained a heel fracture jumping fro play equipment at Eaton ES and sustained an ankle injury at OLV. Ms. Pabo reports that O███ was in a wheelchair and during his process of recovery, re-injured his leg during an outing with his father, brother, and sister. It is reported that his brother was pushing him very fast in the wheelchair, lost control, and caused him to fall out of the wheelchair. O███ was evaluated at the hospital and the results of a MRI later suggested a "bone bruise." Ms. Pabo notes that the injury healed on its own, but he was n crutches for the beginning of this past school year.


## Independent Living Skills
(include information regarding the child's level of personal functioning, interests, career/vocational goals, as appropriate)

According to Ms. Pabo, O███ demonstrates mostly age-appropriate hygiene/grooming and self-help skills. He dislikes bathing/showering and needs prompting. O███ is also able to prepare cold snacks and use the microwave to heat up prepared food items. He enjoys assisting with age-appropriate household chores, but requires a lot of prompting to put away his belongings. Ms. Pabo notes that O███ is very disorganized and needs direction with chores. O███ is required to complete two hours of homework and chores before he can earn his allowance. His allowance is for movie rentals, fast food, snacks, etc...).

With regard to recreation, he enjoys swimming, biking, roller-blading, shooting baskets, and building things. He also enjoys being read to. Ms. Pabo notes that O███ demonstrates particular skill in building things and wants to be an architect.


## Social and Behavioral Characteristics

| Behaviors – Strengths | Home | Community | School |
|---|---|---|---|
| Accepts teachers' authority | N/A | N/A | X |
| Accepts parents' authority | inconsistent | N/A | N/A |

709

O., O.
Page 7

| | | | |
|---|---|---|---|
| Completes assignments | | | |
| Self-confident | | | |
| Takes responsibility for behavior/problems | X | X | X |
| Follows teachers' cues (indirect/direct) to change behavior | sometimes | sometimes | sometimes |
| Follows directions | sometimes | sometimes | sometimes |
| Self-motivated | | | |
| Accepts constructive criticism | X | inconsistent | unsure |
| Attends school regularly | N/A | N/A | X |
| Talks about/expresses future goals | X | N/A | X |
| Compromises/flexible when appropriate | X | inconsistent | unsure |
| Completes household tasks | X | N/A | N/A |
| Independent (not a follower) | X | X | X |
| Understands impact of his/her behavior on others | X | X | X |
| Demonstrates adaptive coping strategies | inconsistent | inconsistent | inconsistent |
| Able to cope/mange transitions/changes | | | |
| Has a group of friends | | | |
| Takes initiative | | | |
| Has hobbies | X | X | X |
| Behaves respectfully and courteously toward others | inconsistent | inconsistent | inconsistent |
| Can win/lose without loss of control of emotions/behavior | X | X | X |
| Compliant with routines and limits | inconsistent | inconsistent | inconsistent |
| Demonstrates understanding of appropriate roles | | | |

| Behaviors – Weaknesses/Challenges | Home | Community | School |
|---|---|---|---|
| Use and/or interest in substance and/or alcohol use | | | |
| Seeks attention inappropriately | inconsistent | inconsistent | inconsistent |
| Demonstrates inappropriate sexual behaviors | | | |
| Unable to control emotions (outburst, tantrums) | | | occasional |
| Makes negative comments about self and/or others | | | |
| Controlling (sometimes) | | | |
| Oppositional, stubborn and/or defiant | occasional | | sometimes |
| Difficulty with organization | X | X | X |
| Short attention | X | X | X |
| Overactive | X | X | X |
| Difficulty with time management/often tardy | X | X | X |
| Excessive talking | X | X | X |
| Impulsive | X | X | X |
| Avoids homework | X | N/A | X |
| Tells lies/often deceitful | | | |
| Overly shy and/or withdrawn | | | |
| Has unrealistic fantasies | X | X | X |
| Verbally and/or physically aggressive | | | occasional |
| Lacks motivation | | | X |
| Hallucinates (talks to self, hears voices, etc…) | | | |
| Liable mood and/or inconsistent pattern of behaviors | | | |
| Needs constant reassurance | | | |
| Difficulty making friends and/or keeping friends | X | X | X |
| Exhibits self-injurious behaviors (i.e. head banging, etc…) | | | |
| Bites nails | X | X | X |
| Suicidal and/or homicidal ideation | | | |
| Rocking | | | |
| Thumb/finger sucking | | | |
| Hand flapping/fluttering | | | |
| Perseverative or obsessive behaviors | | | |

710



Describe any behaviors that are checked above:

Ms. Pabo is most concerned about O⬛ poor motivation for school, lack of organizational skills, impulsivity, difficulty interpreting social cues, and difficulty interacting with peers. He is struggling academically and therefore, requires significant academic and behavioral supports in the school setting to address inattentiveness, lack of organization, poor time management, and avoidance of schoolwork. O⬛ is noted to interact well with adults and younger children, but has obvious difficulty interacting with same-age peers. Ms. Pabo believes that O⬛ is very mistrustful of adults and often questions their ability to make appropriate decisions, especially in regard to his well being. Despite these difficulties, he demonstrates strengths in that he takes responsibility for his behavior, is able to accept constructive criticism from familiar adults, is able to manage transitions at home, and is usually respectful toward adults.

## Psychosocial Analysis and Implications

O⬛ is a thirteen-year-old male of Russian decent who was referred for evaluation for special education services by his school and parent, due to concerns regarding his poor academic performance and social-emotional functioning. He has difficulty completing schoolwork; participating in instruction; maintaining attention and concentration; and interacting appropriately with peers and adults. O⬛ also lacks motivation, attempts to avoid schoolwork, and has difficulty managing anger and frustration. He is currently diagnosed with ADHD, NOS (Secondary to Multi-Sensory Neurological Deficits), as well as Cognitive Disorder, NOS; Mixed Receptive-Expressive Language Disorder; Learning Disorder, NOS; Mathematics Disorder; Disorder of Written Language; Developmental reading Disorder; Adjustment Disorder of Childhood with Mixed Emotional features (Anxiety, Depression, and Periodic Disturbance of Conduct; Post-Traumatic Stress Disorder -- PTSD (Early Childhood Institutionalization); Low Average –Borderline Intellectual Functioning; and Psychosocial Growth Failure Secondary to Fetal Alcohol Spectrum Disorder.

O⬛ early history is significant for institutionalization, global developmental delays, ADHD, learning concerns, ad social-emotional concerns. These concerns have translated to difficulties at home, school, and the community with regard to his ability to control impulses; regulate his emotionality, especially anger and frustration; understand social cues; and respond appropriately to various social situations. O⬛ copes with negative emotions and situations through avoidance, withdrawal, isolation, aggression, manipulation, and somatization in order to protect himself from perceived threats. His maladaptive ways of coping with stressors, however, only further compound existing difficulties with regard to his academic performance and social interactions. Although O⬛ has the support of his family, he requires additional supports in the school setting to address concerns regarding his overall functioning.

Based on the parent's report, C.A.R.E. Center Referral, and review of the neuropsychological evaluation (Federici, 2006), therapeutic services in the form of counseling or therapy appear warranted. If such services are recommended, they should focus on developing adaptive coping skills, self-regulation, social skills, and self-concept. It is also recommended that a behavior modification plan be implemented in the classroom, along with accommodations/modifications to address his academic needs. The MDT will make a final determination regarding the need for therapeutic interventions once all pertinent information is considered.

Submitted by:

*Cindy F. Brown LICSW*    August 31, 2006
Cindy F. Brown, LICSW            Date
Clinical Social Worker

This information will only be used by District of Columbia Public Schools (DCPS) professionals to determine whether the student is or continues to be eligible for special education services. If eligible, this information, along with other evaluations, will be used to develop and Individualized Educational Program (IEP), as well as determine the appropriate educational setting and placement for the student. The material will be kept in a confidential folder and will only be made available for review by appropriate personnel.

**This form is to be completed by DCPS Licensed Social Workers ONLY!**

873? Colesville Road Suite U.104
Silver Spring, Maryland 20910
Phone: 301-588-1400
Fax: 301-588-9411
info@dietzelbutler.com
www.dietzelbutler.com

Dietzel Butler & Associates, LLC

## EDUCATIONAL EVALUATION

### Confidential

| | | | |
|---|---|---|---|
| **Name:** | O███ O████ | **School:** | Our Lady of Victory |
| **Date of Birth:** | █████████, 1993 | **Grade:** | 5 |
| **Age:** | 13 years, 3 months | **Dates of Testing:** | May 30, 2006 |

### REASON FOR REFERRAL

Ms. Claudia Pabo, O████ mother, requested updated academic testing in order to reassess his skills. O███ has been previously diagnosed with an attention deficit disorder for which he takes stimulant medication. O███ most recent assessment was conducted without stimulant medication. For today's session, O███ had taken his medication prior to testing.

### SOURCES OF DATA / TESTS ADMINISTERED

Gray Silent Reading Tests (GSRT), Form B
Test of Written Language-Third Edition (TOWL-3), Spontaneous Writing Test, Form B
Woodcock-Johnson III (WJ-III) Tests of Achievement, Form B

### BEHAVIORAL OBSERVATIONS

O███ was a very cooperative, engaging, and personable participant throughout testing. He initiated conversation and offered us a glimpse of his good sense of humor. O███ was hardworking and eager to do well. He demonstrated good attention and impulse control, persisting even when tasks appeared difficult. O███ appeared to process directions without difficulty and did not ask for them to be repeated. He used a left-handed appropriate pencil grip and his handwriting was legible. Given his strong effort and cooperation, evaluation results are viewed as providing an accurate description of his current functioning. It should be noted, however, that testing was conducted in an optimal, one-to-one setting.

### EVALUATION RESULTS (See Appendix for standard scores and percentiles)

### Academic Achievement

Since O███ is an older fifth grade student, his academic performance is discussed by comparing him to his grade peers (i.e., 5th grade norms) as well as to his age peers (i.e.,



13 year, 3 month old student norms).  The Appendix includes standard scores and percentile ranks by both grade and age.

**Reading:** O▇▇ reading skills ranged from well below average to higher in the average range when he is compared to other 5th grade students and to other 13 year olds.  O▇▇ did best, performing toward the upper end of average (71st percentile using grade norms) on a word recognition test where he read a list of individual words (WJ-III Letter-Word Identification). O▇▇ incorrect responses were close phonetic approximations. When he is compared to other students his age, his word recognition skills placed at the 47th percentile.  When asked to decode nonsense words, O▇▇ scored in the average range, at the 44th percentile (WJ-III Word Attack), using grade norms and at the 36th percentile, using age norms.  As a measure of reading fluency, O▇▇ read simple sentences and indicated if they were true or false. His performance placed in the low average range, at the 20th percentile using grade norms and at the bottom of the low average range and at the 10th percentile using age norms (WJ-III Reading Fluency).  Of the 38 items he completed within the 3-minute time frame, he made only one error, indicating that he sacrificed speed for accuracy.

O▇▇ had more difficulty on measures of comprehension, when using both grade and age norms. On the WJ-III Passage Comprehension test, O▇▇ was required to provide a missing word in a one or two sentence passage.  He performed at the low end of the average range (26th percentile) using grade norms. When compared to his age peers, his score fell to the low average range (15th percentile).  O▇▇ worked persistently on this task, attempting an answer even when unsure. He demonstrated some variability, as he incorrectly answered earlier and easier items while correctly responding to later and more difficult ones. He worked slowly on this untimed test, using some subvocalizing (read softly to himself). To gain additional information about his comprehension for lengthier material, O▇▇ was asked to read stories silently and answer multiple choice questions (GSRT).  He scored in the very poor range and below the first percentile when compared to his age peers (The GSRT uses age norms only). It is useful to note that O▇▇ correctly answered 4 out of 5 questions on the first 3 stories; however, standardized test procedures required 100% accuracy on the first paragraph in order to include subsequent correct responses in his score.

**Written Language:** O▇▇ written language scores placed from the low to average range when comparing him to his grade and age peers. He used an appropriate left handed pencil grip and his writing was legible for brief and lengthy tasks. O▇▇ strongest performance (solidly average, 49th percentile using grade norms) was on a traditional dictation-format spelling test (WJ-III Spelling).  His performance was similar using age norms (average range, 36th percentile). O▇▇ worked with good speed on this measure.  He obtained average proficiency (39th percentile using grade norms) when asked to write single sentences according to specific directions (WJ-III Writing Samples).  He was not generally penalized for mechanical errors (spelling, punctuation, and capitalization) on this measure of written expression.  His spelling was excellent on this task and his sentences were simple constructions, with limited detail; his performance on the WJ-III Writing Samples test was weaker, placing in the low average

O█ O█

range and at the 24th percentile using age norms. O█ had more difficulty when asked to write brief sentences quickly using three target words as a measure of his writing fluency (WJ-III Writing Fluency). He scored in the low average range and at the 18th percentile, when using grade based norms and in the low range (5th percentile) using age based norms. Of the 14 sentences he completed, he made one error due to incorrect spelling of the target word. Again, O█ worked slowly and accurately.

To gain more information about O█ skill at organizing and composing lengthy material when under time constraints, he was asked to plan and write a story about a picture in 15 minutes (TOWL-3). O█ finished his story in the allotted time. His performance placed, overall, in the below average range and at the 16th percentile. He scored at the low end of the average range (25th percentile) for his use of punctuation/capitalization, spelling, and general use of writing mechanics as well as for his story construction, which included character development, organization, theme/plot. O█ obtained below average proficiency (16th percentile) for the quality of his sentences and vocabulary. O█ story was very concrete and his prose was quite simple. He consistently used capital letters at the beginning of his sentences and periods at the end of them. These scores compare O█ to other 13-year olds; grade based norms are not available.

**Mathematics:** All of O█ math scores fell in the average range when he is compared to his 5th grade peers; his performance ranged from low average to average using age based norms. When asked to complete progressively more difficult math computations, O█ scored at the 65th percentile (grade norms) and at the 39th percentile when compared to his age peers (WJ-III Calculation). He correctly completed all basic and most advanced addition, subtraction, multiplication and division items. O█ was also successful with problems requiring him to add and subtract fractions with like denominators. He used his fingers to help him solve some of the problems.

O█ applied math skills were assessed by asking him to solve word problems that were read to him and were usually accompanied by pictures or text (WJ-III Applied Problems). He scored at the 36th percentile for his grade. His performance fell to the low average range and at the 20th percentile for his age. O█ used paper and pencil as well as mental calculation to solve these problems. O█ demonstrated inconsistency on this task as he made errors on earlier and easier problems yet correctly answered some of the later and more difficult ones. O█ demonstrated proficiency at the 46th percentile (grade based norms) when asked to rapidly complete simple addition, subtraction, and multiplication problems, thus measuring his automaticity with basic math facts (WJ-III Math Fluency). When he is compared to other 13-year olds, his math fluency score fell to the low average range, at the 17th percentile. O█ made only one error on the 72 items completed, which was due to performing the wrong operation.



## SUMMARY

O███ is a friendly, cooperative 13 year, 3-month old 5th grader who was very hard-working and motivated during testing. O███ enjoyed making conversation during the assessment and did not become frustrated when presented with difficult tasks. O███ academic skills – reading and spelling words in isolation and solving paper-pencil math computations – were in the average range, both when comparing him to his grade and age peers. By comparison, his fluency (accuracy and speed) on simple reading and writing tasks was significantly weaker, placing in the low average range for reading and math fluency and in the low range for math fluency, using age and grade based norms. While O███ basic skills were adequate, he had more difficulty applying them to reading comprehension, math problem solving, and written expression at both the single sentence and paragraph level; his scores fell in the low average range when compared to age peers on the WJ-III tests. His reading comprehension on an untimed paragraph test was in the very poor range while his paragraph writing performance was below average. O███ and his parents should be commended for their persistent effort to improve his academic performance.

## RECOMMENDATIONS

1. As O███ demonstrates a slow work pace on timed reading and writing tasks, he should be permitted extended time for tests and in class assignments as appropriate.

2. O███ should continue to read for pleasure. Using books on tape and reading along as he listens to the recording is recommended. This will help not only with reading fluency but also with word recognition.

3. He should continue to expand his written and oral vocabulary. O███ would benefit from being explicitly taught reading comprehension techniques such as previewing material, highlighting and writing in the margins, as well as formulating questions to be answered from his reading.

4. Please refer to his most recent neuropsychological evaluation for more detailed recommendations.

Laurie C. Dietzel, Ph.D.                    Jamie G. Butler, M.A., M.S.T.
Licensed Psychologist                       Educational Diagnostician
Maryland License #3344

4 715



# APPENDIX

Key:
SS = Standard Score; P/A = Percentile by Age, P/G = Percentile by Grade;
GE = Grade Equivalent

**Unless otherwise noted, the average range for standard scores (SS) is 90-109/110, with a mean of 100 and a standard deviation of 15; *scaled scores* (S/S) have a mean of 10 and a standard deviation of 3; the average range is 8-12.**

**Gray Silent Reading Tests (GSRT) – Form B**

|  | SS | P/A |
|---|---|---|
| Silent Reading Comprehension | 55 | <1 |

**Test of Written Language - Third Edition (TOWL-3) – Form B**

|  | SS | S/S | P/A |
|---|---|---|---|
| Spontaneous Writing Composite | 85 |  | 16 |
| Contextual Conventions |  | 8 | 25 |
| Contextual Language |  | 7 | 16 |
| Story Construction |  | 8 | 25 |

**Woodcock-Johnson III (WJ-III) Tests of Achievement (Form A)**
Scores are presented by age and grade, as O█ is an older fifth grader

|  | SS (Grade) | P/G (Grade) | SS (Age) | P/A (Age) | GE* (Grade) |
|---|---|---|---|---|---|
| Broad Reading | 94 | 34 | 87 | 19 | 4.8 |
| Letter-Word ID | 108 | 71 | 99 | 46 | 7.2 |
| Passage Comprehension | 90 | 28 | 84 | 15 | 3.6 |
| Reading Fluency | 87 | 20 | 81 | 10 | 3.9 |
| Basic Reading Skills | 103 | 57 | 97 | 41 | 6.3 |
| Word Attack | 98 | 44 | 95 | 36 | 5.1 |
| Letter-Word ID | 108 | 71 | 99 | 46 | 7.2 |
| Broad Mathematics | 98 | 45 | 89 | 23 | 5.6 |
| Calculation | 106 | 65 | 96 | 39 | 6.7 |
| Applied Problems | 94 | 36 | 87 | 20 | 4.9 |
| Math Fluency | 98 | 46 | 86 | 17 | 5.7 |

| | | | | | |
|---|---|---|---|---|---|
| **Broad Written** | | | | | |
| **Language** | 93 | 32 | 85 | 16 | 4.8 |
| Spelling | 100 | 49 | 95 | 36 | 5.8 |
| Writing Samples | 96 | 39 | 89 | 24 | 5.0 |
| Writing Fluency | 86 | 18 | 75 | 5 | 3.9 |
| | | | | | |
| Academic Skills | 106 | 65 | 96 | 40 | 6.6 |
| Academic Applications | 93 | 32 | 84 | 15 | 4.5 |
| Academic Fluency | 87 | 20 | 78 | 7 | 4.2 |

\* Test grade equivalents should be interpreted with caution; they are less reliable than standard scores and do not indicate the grade at which the student is functioning.